# United States Court of Appeals

*for the*

# First Circuit

---

Case No. 24-1443

DRAFTKINGS INC.,

*Plaintiff-Appellee,*

v.

MICHAEL HERMALYN,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON, IN CASE NO. 1:24-CV-10299-JEK,
HONORABLE JULIA ELEANOR KOBICK, JUDGE

---

## JOINT APPENDIX
## VOLUME I OF III, PAGES A1 - A417

ANDREW S. DULBERG
MARK C. FLEMING
WILLIAM F. LEE
WILMER CUTLER PICKERING HALE
   AND DORR LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-5000

-and-

JUSTINE GOEKE
HARRIS MUFSON
ORIN S. SNYDER
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

-and-

JACOB T. SPENCER
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

*Attorneys for Plaintiff-Appellee*

CHRISTOPHER G. MICHEL
GREGG M. BADICHEK
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000

-and-

ALIKI SOFIS
ALEXANDER S. DEL NIDO
ISAAC SAIDEL-GOLEY
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
(617) 712-7100

-and-

RUSSELL BECK
STEPHEN D. RIDEN
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, Massachusetts 02110
(617) 500-8660

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

Docket Entries ..................................................................................  A1

Verified Complaint, filed February 5, 2024 .....................................  A22

    Exhibit A: Nondisclosure & Assignment of Inventions Agreement
    dated August 31, 2020 ................................................................  A71

    Exhibit B: Noncompetition Covenant dated August 16, 2023 ..............  A85

Motion for a Temporary Restraining Order, filed February 5, 2024 ...............  A103

[Proposed] Temporary Restraining Order, filed February 5, 2024 .................  A108

Affidavit of Gregory Karamitis in Support of Plaintiff's Motion for
    Temporary Restraining Order, filed February 5, 2024 ..........................  A111

Defendant's Emergency Motion to Stay Pursuant to the First Filed Rule,
    filed February 6, 2024 ..............................................................  A121

Declaration of Defendant Michael Z. Hermalyn in Support of Defendant's
    Motion to Stay, filed February 6, 2024 ...........................................  A125

Order Denying Motion to Stay, filed February 6, 2024 ..................................  A128

Declaration of Russell Beck in Support of Defendant's Opposition to
    Plaintiff's Motion for Temporary Restraining Order,
    filed February 7, 2024 ..............................................................  A131

    Exhibit A: Assembly Committee on Labor and Employment ...............  A134

    Exhibit B: Senate Judiciary Committee ................................................  A138

    Exhibit C: Senate Bill No. 699 ............................................................  A143

Declaration of Defendant Michael Z. Hermalyn in Support of Defendant's
    Opposition to Plaintiff's Motion for Temporary Restraining Order,
    filed February 7, 2024 ..............................................................  A147

    Exhibit A: E-Ticket ............................................................................  A163

    Exhibit B: Printout of Communications ................................................  A168

Temporary Restraining Order, filed February 8, 2024 ....................................  A171

Excerpts of Transcript of Motion Hearing Held on February 8, 2024 .............  A174

Defendant's Motion to Dismiss or, in the Alternative, to Stay,
March 14, 2024 ........................................................................... A185

Declaration of Stephen D. Riden in Support of Defendants Motion to
Dismiss or, in the Alternative, to Stay, filed March 14, 2024 ............... A187

Exhibit B: Complaint for Declaratory Relief, Injunctive Relief , and
Violations of Cal. Bus. & Prof. Code Sections 16600, 16600.1,
16600.5, and 17200 .................................................................... A190

Exhibit C: Remand Order, February 5, 2024 .......................... A217

Exhibit D: Remand Order, February 8, 2024 .......................... A221

Exhibit E: Transcript of Proceedings, February 22, 2024 ...................... A226

Declaration of Defendant Michael Z. Hermalyn in Support of His Motion to
Dismiss or, in the Alternative, to Stay, filed March 14, 2024 ............... A266

Motion for Preliminary Injunction, filed March 14, 2024 ............................... A269

[Proposed] Preliminary Injunction, filed March 14, 2024 ............................... A275

Affidavit of Mitchell Green in Support of Plaintiff's Motion for Preliminary
Injunction, filed March 14, 2024 ........................................................... A281

Affidavit of Andrew Larracey in Support of Plaintiff's Motion for
Preliminary Injunction, filed March 14, 2024 ....................................... A301

Exhibit B: Screenshot of Text Message Exchange with Mr. Metz on
February 1, 2024 ....................................................................... A309

Exhibit C: Screenshot of Phone Call ..................................... A311

Exhibit D: Screenshot of the Call History ............................ A313

Exhibit K: Screenshot of Call from Mr. Kain dated February 20, 2024  A316

Exhibit L: Job Posting for the "Director, VIP Customer Development.  A318

Affidavit of Hayden Metz in Support of Plaintiff's Motion for Preliminary
Injunction, filed March 14, 2024 ........................................................... A323

Exhibit A: Text Message Exchange ....................................... A329

Exhibit B: Screenshot of Call History ................................... A331

Exhibit C: Screenshot of Notes of Conversations ................................. A334

Declaration of Jacob T. Spencer in Opposition to Defendant's Motion to Dismiss or, in the Alternative, to Stay, filed March 21, 2024 ............... A336

Exhibit A: Plaintiff Draftkings Inc.'s Third Amended Responses and Objections to Defendant Michael Z. Hermalyn's Interrogatory No. 9, filed March 21, 2024 .................... A340

Affidavit of Brian Harris in Opposition to Defendant's Motion to Dismiss or, in the Alternative, to Stay, filed March 21, 2024 ............................ A354

Exhibit A: Copy of Email Draft ............................ A358

Appendix C: Hermalyn's Requested Revisions to DK's Proposed PI in Event Court Enters Injunctive Relief ...................... A360

Declaration of Russell Beck in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction, filed March 21, 2024 .... A368

Exhibit G: Senate Bill No. 699 ................................ A372

Exhibit H: Specially Appearing Defendant Draftkings Inc.'s Notice of Motion and Motion to Quash Service of Summons for Lack of Personal Jurisdiction; Memorandum in Support .................... A376

Exhibit I: Webpage Legal Online Gambling in the United States ......... A400

Exhibit J: 2023 Form 10-K ...................................... A418

Declaration of Defendant Michael Z. Hermalyn in Support of His Opposition to Plaintiff's Motion for Preliminary Injunction, filed March 21, 2024 .................... A562

Transcript of Evidentiary Hearing Held on April 16, 2024 ............................ A568

Memorandum and Order on Plaintiff's Motion for Preliminary Injunction and Defendant's Motion to Dismiss or Alternatively to Stay this Action, filed April 30, 2024 ..................... A845

Order on Preliminary Injunction, filed April 30, 2024 .................................. A905

Notice of Appeal, filed May 2, 2024 ............................... A907

**Sealed Volume:**

Affidavit of Mitchell Green in Support of Plaintiff's Motion for Preliminary Injunction, filed March 15, 2024 ........................... A910

Appendix A: Slack Documents Activity Across Sources ...................... A930

Appendix B: Stroz Friedbert Digital Forensics and Incident Response. A932

Appendix C: Identified References to File Names Consistent with
Mac OS Screenshots .................................................................. A937

Affidavit of Andrew Larracey in Support of Plaintiff's Motion for
Preliminary Injunction, filed March 15, 2024 ........................................ A940

Exhibit A: Screenshot of Call .................................................. A948

Exhibit E: Screenshot of Calls ................................................ A951

Exhibit F: Screenshot of Notes ............................................... A956

Exhibit G: Email Correspondence ........................................... A961

Exhibit H: Email Correspondence ........................................... A963

Exhibit I: Screenshot of Call ................................................. A972

Exhibit J: Text Messages ....................................................... A974

Affidavit of Shawn Henley in Support of Plaintiff's Motion for Preliminary
Injunction, filed March 15, 2024 ............................................ A977

Exhibit A: Text Messages .................................................... A995

Affidavit of Brian Harris in Support of Plaintiff's Motion for Preliminary
Injunction, filed March 15, 2024 ............................................ A997

Appendix A: Google Workspace Report .............................. A1015

Exhibit A: Email Correspondence ....................................... A1021

Exhibit B: Computer Asset Return & Tracking ..................... A1023

Exhibit C: Direct Messages Between Michael Hermalyn and George
Hernandez .................................................................. A1030

Affidavit of Samuel Russell in Support of Plaintiff's Motion for Preliminary
Injunction, filed March 15, 2024 ........................................ A1032

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:24-cv-10299-JEK

DraftKings Inc. v. Hermalyn
Assigned to: District Judge Julia E. Kobick
Case in other court: USCA - First Circuit, 24-01443
Cause: 18:1836(a) Injunction against Misappropriation of Trade Secrets

Date Filed: 02/05/2024
Jury Demand: Plaintiff
Nature of Suit: 880 Defend Trade Secrets Act (of 2016)
Jurisdiction: Federal Question

**Plaintiff**

**DraftKings Inc.**                    represented by **Jason C. Schwartz**
Gibson Dunn & Crutcher LLP
1050 Connecticut Avenue N.W.
Suite 300
Washington, DC 20036
202-955-8500
Fax: 202-530-9522
Email: jschwartz@gibsondunn.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Orin Snyder**
Gibson Dunn & Crutcher
200 Park Avenue
New York, NY 10166
212-351-4000
Email: osnyder@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew S. Dulberg**
Wilmer Cutler Pickering Hale and Dorr
LLP (Bos)
60 State Street
Boston, MA 02109
617-526-6352
Fax: 617-526-5000
Email: andrew.dulberg@wilmerhale.com
*ATTORNEY TO BE NOTICED*

**Christine Demana**
Gibson Dunn & Crutcher LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 76201

214-698-3100
Email: cdemana@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Harris Mufson**
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
212-351-4000
Fax: 212-351-4035
Email: hmufson@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Jacob T. Spencer**
Gibson, Dunn & Crutcher LLP
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. NW
Washington
Washington, DC 20036
617-921-2105
Email: jspencer@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Justin DiGennaro**
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
212-351-3977
Email: jdigennaro@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Justine Goeke**
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
212-351-5372
Email: jgoeke@gibsondunn.com
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Michael Hermalyn**                     represented by   **Russell Beck**
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Boston, MA 02110
617-500-8670
Fax: 617-500-8665
Email: rbeck@beckreed.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Stephen D. Riden**
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Suite 1302
Boston, MA 02110
617-500-8672
Email: sriden@beckreed.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander S. Del Nido**
Quinn Emanuel Urquhart & Sullivan LLP
111 Huntington Ave
Suite 520
Boston, MA 02118
617-712-7100
Email: alexdelnido@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Aliki Sofis**
Quinn Emanuel Trial Lawyers
111 Huntington Avenue, Suite 520
Boston, MA 02199
617-951-7000
Email: alikisofis@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Christopher Michel**
Quinn Emanuel Urquhart Sullivan
1300 I St NW, Suite 900
Washington, DC 20005
202-538-8308
Email:
christophermichel@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Kimberly Carson**
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
New York, NY 10010
212-849-7000
Fax: 212-849-7100
Email:
kimberlycarson@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

Email All Attorneys

Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 02/05/2024 | 1 | COMPLAINT against Michael Hermalyn Filing fee: $ 405, receipt number AMADC-10255503 (Fee Status: Filing Fee paid), filed by DraftKings Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Civil Cover Sheet, # 4 Category Form, # 5 Summons)(Dulberg, Andrew) (Entered: 02/05/2024) |
| 02/05/2024 | 2 | CORPORATE DISCLOSURE STATEMENT by DraftKings Inc. identifying Corporate Parent No Corporate Parent for DraftKings Inc... (Dulberg, Andrew) (Entered: 02/05/2024) |
| 02/05/2024 | 3 | MOTION for Temporary Restraining Order by DraftKings Inc.. (Attachments: # 1 Text of Proposed Order)(Dulberg, Andrew) (Entered: 02/05/2024) |
| 02/05/2024 | 4 | MEMORANDUM in Support re 3 MOTION for Temporary Restraining Order filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 02/05/2024) |
| 02/05/2024 | 5 | AFFIDAVIT of Gregory Karamitis in Support re 3 MOTION for Temporary Restraining Order filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 02/05/2024) |
| 02/05/2024 | 6 | AFFIDAVIT of Brian Harris in Support re 3 MOTION for Temporary Restraining Order filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 02/05/2024) |
| 02/06/2024 | 7 | MOTION for Expedited Discovery by DraftKings Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Dulberg, Andrew) (Entered: 02/06/2024) |
| 02/06/2024 | 8 | MEMORANDUM in Support re 7 MOTION for Expedited Discovery filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 02/06/2024) |
| 02/06/2024 | 9 | MOTION for Short Order of Notice re 7 MOTION for Expedited Discovery , 3 MOTION for Temporary Restraining Order by DraftKings Inc..(Dulberg, Andrew) (Entered: 02/06/2024) |
| 02/06/2024 | 10 | MOTION for Leave to Appear Pro Hac Vice for admission of Orin Snyder Filing fee: $ 125, receipt number AMADC-10255522 by DraftKings Inc.. (Attachments: # 1 Certification of Orin Snyder)(Dulberg, Andrew) Modified on 2/6/2024 to add receipt number (Cook, Savannah). (Entered: 02/06/2024) |
| 02/06/2024 | 11 | MOTION for Leave to Appear Pro Hac Vice for admission of Jason C. Schwartz Filing fee: $ 125, receipt number AMADC-10255520 by DraftKings Inc.. (Attachments: # 1 Certification of Jason C. Schwartz)(Dulberg, Andrew) (Entered: 02/06/2024) |
| 02/06/2024 | 12 | MOTION for Leave to Appear Pro Hac Vice for admission of Harris M. Mufson Filing fee: $ 125, receipt number AMADC-10255521 by DraftKings Inc.. (Attachments: # 1 Certification of Harris M. Mufson)(Dulberg, Andrew) (Entered: 02/06/2024) |
| 02/06/2024 | 13 | MOTION for Leave to Appear Pro Hac Vice for admission of Justin M. DiGennaro Filing fee: $ 125, receipt number AMADC-10255523 by DraftKings Inc.. (Attachments: # 1 Certification of Justin M. DiGennaro)(Dulberg, Andrew) (Entered: 02/06/2024) |
| 02/06/2024 | 14 | ELECTRONIC NOTICE of Case Assignment. District Judge Julia E. Kobick assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Jennifer C. Boal. (Cowan, Nicole) (Entered: 02/06/2024) |

| | | |
|---|---|---|
| 02/06/2024 | 15 | NOTICE of Appearance by Russell Beck on behalf of Michael Hermalyn (Beck, Russell) (Entered: 02/06/2024) |
| 02/06/2024 | 16 | NOTICE of Appearance by Stephen D. Riden on behalf of Michael Hermalyn (Riden, Stephen) (Entered: 02/06/2024) |
| 02/06/2024 | 17 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Barbosa, Nilsa) (Entered: 02/06/2024) |
| 02/06/2024 | 18 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered granting 11 Motion for Leave to Appear Pro Hac Vice Added Jason C. Schwartz.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(Cook, Savannah) (Entered: 02/06/2024) |
| 02/06/2024 | 19 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered granting 12 Motion for Leave to Appear Pro Hac Vice Added Harris M. Mufson.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Cook, Savannah) (Entered: 02/06/2024) |
| 02/06/2024 | 20 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered granting 13 Motion for Leave to Appear Pro Hac Vice Added Justin M. DiGennaro.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney. |

| | | (Cook, Savannah) (Entered: 02/06/2024) |
|---|---|---|
| 02/06/2024 | 21 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered granting 10 Motion for Leave to Appear Pro Hac Vice Added Orin Snyder.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Cook, Savannah) (Entered: 02/06/2024) |
| 02/06/2024 | 22 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered denying 9 MOTION for Short Order of Notice re 7 MOTION for Expedited Discovery, 3 MOTION for Temporary Restraining Order. (Currie, Haley) (Entered: 02/06/2024) |
| 02/06/2024 | 23 | ELECTRONIC NOTICE Setting Hearing on Motion 7 MOTION for Expedited Discovery , 3 MOTION for Temporary Restraining Order - Motion Hearing set for 2/8/2024 01:00 PM in Courtroom 3 (In person only) before District Judge Julia E. Kobick. (Currie, Haley) (Entered: 02/06/2024) |
| 02/06/2024 | 24 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered - The defendant is ORDERED to file a response, if any, to the plaintiff's motion for a temporary restraining order 3 and motion for expedited discovery 7 by **4pm on Wednesday, February 7.** (Currie, Haley) (Entered: 02/06/2024) |
| 02/06/2024 | 25 | Emergency MOTION to Stay *Pursuant to the First-Filed Rule* by Michael Hermalyn. (Beck, Russell) (Entered: 02/06/2024) |
| 02/06/2024 | 26 | MEMORANDUM in Support re 25 Emergency MOTION to Stay *Pursuant to the First-Filed Rule* filed by Michael Hermalyn. (Beck, Russell) (Entered: 02/06/2024) |
| 02/06/2024 | 27 | DECLARATION re 25 Emergency MOTION to Stay *Pursuant to the First-Filed Rule of Russell Beck* by Michael Hermalyn. (Attachments: # 1 Exhibit A - California Complaint, # 2 Exhibit B - California TRO / PI Application, # 3 Exhibit C - California Remand Order, # 4 Exhibit D - California TRO / PI Application)(Beck, Russell) (Entered: 02/06/2024) |
| 02/06/2024 | 28 | DECLARATION re 25 Emergency MOTION to Stay *Pursuant to the First-Filed Rule of Michael Hermalyn* by Michael Hermalyn. (Beck, Russell) (Entered: 02/06/2024) |
| 02/06/2024 | 29 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered.<br><br>Defendant Michael Hermalyn's Emergency Motion to Stay 25 is **DENIED.** Invoking the first-to-file rule, also known as the prior pending action doctrine, Hermalyn asks this Court to stay this matter, because he filed two similar, but not entirely overlapping, lawsuits against DraftKings Inc. in California state court. Both California lawsuits were removed by DraftKings to federal court; one has since been remanded for lack of jurisdiction, *see* ECF 27-3 (Beck Decl., Ex. C), (In Chambers) Remand Order, *Hermalyn v. DraftKings, Inc.*, No. 2:24-cv-00918 (C.D. Cal. Feb. 5, 2024), and |

Hermalyn has argued that the other should likewise be immediately remanded for lack of jurisdiction, *see* ECF 6, Plaintiff's Notice of Related Case, *Hermalyn and FVP, LLC v. DraftKings, Inc.*, No. 2:24-cv-00997 (C.D. Cal. Feb. 6, 2024).

The prior pending action doctrine "covers scenarios in which 'actions involving the same parties and similar subject matter are pending in different federal district courts" and "the overlap between the two suits is nearly complete.'" *Maldonado-Cabrera v. Anglero-Alfaro*, 26 F.4th 523, 526 (1st Cir. 2022) (quoting *TPM Holdings, Inc. v. Intra-Gold Indus., Inc.*, 91 F.3d 1, 4 (1st Cir. 1996)). But that "general principle... to avoid duplicative litigation holds water only within the federal system." *Id.* at 527 (internal quotation marks omitted). Where there exists substantial overlap between parties and issues in federal and state court actions, "'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'" *Id.* "Except when warranted by a doctrine of abstention or comity recognized by the Supreme Court,... a federal court is not free to surrender jurisdiction-whether by outright dismissal or by a stay-to a parallel state-court action without a sufficient showing of the required exceptional circumstances." *Id.* (citations omitted).

Hermalyn makes no argument that any abstention doctrine warrants a stay of this litigation in light of the pending California cases. And Hermalyn has taken the position that the federal court lacks subject matter jurisdiction in the case pending in the U.S. District Court for the Central District of California, because, he says, it is "exactly the same case" as the case already remanded to state court. ECF 6, at 2, Plaintiff's Notice of Related Case, *Hermalyn and FVP, LLC v. DraftKings, Inc.*, No. 2:24-cv-00997 (C.D. Cal. Feb. 6, 2024). Under the circumstances, the first-to-file rule does not apply. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, at a minimum, and it has a "virtually unflagging obligation" to exercise its jurisdiction in this case. *Maldonado-Cabrera*, 26 F.4th at 527 (internal quotation marks omitted).

But even if the first-to-file rule were to apply, the Court would decline to exercise its discretion to stay this case. "When deciding whether to apply the rule, courts must consider: (1) which action was filed first; (2) the similarity of the parties; and (3) the similarity of the issues." *Waithaka v. Amazon.com, Inc.*, 404 F. Supp. 3d 335, 350 (D. Mass. 2019), aff'd, 966 F.3d 10 (1st Cir. 2020). However, "the first-to-file rule is not to be applied in a mechanical way," and "[e]xceptions to the rule are not rare." *EMC Corp. v. Parallel Iron, LLC*, 914 F. Supp. 2d 125, 127 (D. Mass. 2012). While the California case was filed before this action and includes both Hermalyn and DraftKings as parties, the Courts exercise of jurisdiction here would "better serve the interests involved." *Id.*

Hermalyn signed a confidentiality agreement and a noncompetition covenant with DraftKings expressly stating that he "submit[s] to the personal jurisdiction of" "the United States District Court for the District of Massachusetts for any dispute arising hereunder" and "waive[s] any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process." ECF 1-1, at 6 (§ 9); ECF 1-2, at 15 (§ f). Hermalyn has thus "submit[ted]" to the Court's exercise of personal jurisdiction in this case. *See Inso Corp. v. Dekotec Handelsges, mbH*, 999 F. Supp. 165, 166 (D. Mass. 1998) ("A party to a contract may waive its right to challenge personal jurisdiction by consenting to personal jurisdiction in a forum selection clause.'" (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 11 (1972), and *Jacobson v. Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 575 (1995)). The parties also agreed, in those same contractual provisions, that their agreements "shall

| | | |
|---|---|---|
| | | be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law." ECF 1-1, at 6 (§ 9); ECF 1-2, at 15 (§ f). Moreover, this case, unlike the California cases, involves a claim for misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836. *See* ECF 1, ¶¶ 130-143. The Court thus declines to exercise its discretion to stay this matter. (Currie, Haley) Modified on 2/6/2024 (Kelly, Danielle). (Entered: 02/06/2024) |
| 02/07/2024 | 30 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Justine Goeke Filing fee: $ 125, receipt number AMADC-10258376 by DraftKings Inc.. (Attachments: # 1 Certification of Justine Goeke)(Dulberg, Andrew) (Entered: 02/07/2024) |
| 02/07/2024 | 31 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered granting 30 Motion for Leave to Appear Pro Hac Vice Added Justine Goeke. <br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** <br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. <br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney. <br><br>(Cook, Savannah) (Entered: 02/07/2024) |
| 02/07/2024 | 32 | AFFIDAVIT OF SERVICE Executed by DraftKings Inc.. Michael Hermalyn served on 2/6/2024, answer due 2/27/2024. Acknowledgement filed by DraftKings Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Dulberg, Andrew) (Entered: 02/07/2024) |
| 02/07/2024 | 33 | Opposition re 3 MOTION for Temporary Restraining Order filed by Michael Hermalyn. (Beck, Russell) (Entered: 02/07/2024) |
| 02/07/2024 | 34 | DECLARATION re 33 Opposition to Motion *of Russell Beck* by Michael Hermalyn. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Beck, Russell) (Entered: 02/07/2024) |
| 02/07/2024 | 35 | Opposition re 7 MOTION for Expedited Discovery filed by Michael Hermalyn. (Beck, Russell) (Entered: 02/07/2024) |
| 02/07/2024 | 36 | DECLARATION re 33 Opposition to Motion *of Michael Hermalyn* by Michael Hermalyn. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Beck, Russell) (Entered: 02/07/2024) |
| 02/07/2024 | 37 | DECLARATION re 33 Opposition to Motion *of Robert Ferrara* by Michael Hermalyn. (Beck, Russell) (Entered: 02/07/2024) |
| 02/07/2024 | 38 | Emergency MOTION to Continue hearing on Plaintiff DraftKings' Motion for a Temporary Restraining Order to February 9, 2024 by Michael Hermalyn.(Riden, Stephen) (Entered: 02/07/2024) |
| 02/07/2024 | 39 | Opposition re 38 Emergency MOTION to Continue hearing on Plaintiff DraftKings' Motion for a Temporary Restraining Order to February 9, 2024 filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 02/07/2024) |

| 02/08/2024 | 40 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered re 38 Emergency MOTION to Continue hearing on Plaintiff DraftKings' Motion for a Temporary Restraining Order - The motion to continue is denied as moot. (Currie, Haley) (Entered: 02/08/2024) |
|---|---|---|
| 02/08/2024 | 41 | Electronic Clerk's Notes for proceedings held before District Judge Julia E. Kobick: Motion Hearing held on 2/8/2024 re 3 MOTION for Temporary Restraining Order filed by DraftKings Inc., 7 MOTION for Expedited Discovery filed by DraftKings Inc. Case called. The Court hears arguments regarding the MOTION for Temporary Restraining Order 3 . The Court hears arguments reading the MOTION for Expedited Discovery 7 . The Court takes a brief recess and session resumes with a ruling. The Court grants in part the MOTION for Temporary Restraining Order 3 for the reasons stated on the record and will issue a temporary restraining order without the third clause. The Court grants in part the MOTION for Expedited Discovery 7 for the reasons stated on the record. The Court sets a briefing schedule for Motion for PI and Motion to Dismiss. Motions to be filed by 3/14/2024; Oppositions to be filed by 3/21/24; and Replies to be filed by 3/28/24 no more than 8 pages. The Court sets a Motion Hearing for 4/2/24 at 10 AM. The Court holds it's decision on the bond requirement. Order to follow. (Court Reporter: Rachel Lopez at raeufp@gmail.com.) (Attorneys present: Jason C. Schwartz and Andrew S. Dulberg for the Plaintiff. Russell Beck and Stephen D. Riden for the Defendant.) (Currie, Haley) Modified on 2/8/2024 (Currie, Haley). (Entered: 02/08/2024) |
| 02/08/2024 | 42 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered. DraftKings Inc.'s motion for expedited discovery [ECF 7 ] is **GRANTED in part and DENIED in part.** "To obtain expedited discovery, a party must show good cause," which "exists if the request for expedited discovery is reasonabl[e]... in light of all of the surrounding circumstances, including the purpose for the discovery, the ability of the discovery to preclude demonstrated irreparable harm, the plaintiff's likelihood of success on the merits, the burden of discovery on the defendant, and the degree of prematurity." *Roe v. Mayorkas*, No. 22-cv-10808-ADB, 2023 WL 3466327, at \*18 (D. Mass. May 12, 2023) (quotation marks omitted). For the reasons stated on the record at the hearing, DraftKings has established, at this early stage in the proceedings, a likelihood of success on the merits on some of its claims and has shown that it would suffer irreparable harm in the absence of a temporary restraining order. Based on the current record, there is good cause for DraftKings' ten requested interrogatories, which are relevant and narrowly tailored to its claims in this action. Good cause also exists to permit DraftKings to depose Michael Hermalyn, but that deposition will be limited to four hours and to the topics raised in those interrogatories, and Mr. Hermalyn may choose to sit for the deposition in person or remotely. There is not good cause, however, for DraftKings' ten requests for production of documents because they are overbroad and unduly burdensome at this stage of the litigation. Mr. Hermalyn is also granted leave to depose Brian Harris, DraftKings' Director of IT, for up to four hours, on the topics covered in Mr. Harris's affidavit. DraftKings may choose to hold the deposition of Mr. Harris remotely or in person. Mr. Hermalyn is further granted leave to propound on DraftKings up to ten interrogatories that are narrowly tailored to the claims asserted by DraftKings. Mr. Hermalyn is ORDERED to submit to the Court his proposed interrogatories by February 15, 2024, and the Court |

| | | |
|---|---|---|
| | | will review that proposal and enter an appropriate order. |
| | | The parties are ORDERED to respond to the interrogatories eight days after service. All discovery authorized by this order must be complete by March 7, 2024. (Currie, Haley) (Entered: 02/08/2024) |
| 02/08/2024 | 43 | ELECTRONIC NOTICE Setting Hearing on Motion re 68 MOTION to Dismiss or in the Alternative, to Stay and 72 MOTION for Preliminary Injunction - Hearing set for 4/2/2024 10:00 AM in Courtroom 3 (In person only) before District Judge Julia E. Kobick. (Currie, Haley) Modified on 3/28/2024 to link filed motions (Currie, Haley). (Entered: 02/08/2024) |
| 02/08/2024 | 44 | District Judge Julia E. Kobick: ORDER entered. TEMPORARY RESTRAINING ORDER (Currie, Haley) (Entered: 02/08/2024) |
| 02/09/2024 | 45 | NOTICE by DraftKings Inc. re 44 Temporary Restraining Order - *Notice of $20,000 Bond* (Dulberg, Andrew) (Entered: 02/09/2024) |
| 02/09/2024 | 46 | Transcript of Motion Hearing held on February 8, 2024, before Judge Julia E. Kobick. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com. Redaction Request due 3/1/2024. Redacted Transcript Deadline set for 3/11/2024. Release of Transcript Restriction set for 5/9/2024. (McDonagh, Christina) (Entered: 02/13/2024) |
| 02/09/2024 | 47 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 02/13/2024) |
| 02/14/2024 | 48 | Emergency MOTION for Clarification re 44 Temporary Restraining Order by Michael Hermalyn.(Beck, Russell) (Entered: 02/14/2024) |
| 02/14/2024 | 49 | MEMORANDUM in Support re 48 Emergency MOTION for Clarification re 44 Temporary Restraining Order filed by Michael Hermalyn. (Attachments: # 1 Text of Proposed Order Exhibit A, # 2 Exhibit B)(Beck, Russell) (Entered: 02/14/2024) |
| 02/15/2024 | 50 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered re 48 Emergency MOTION for Clarification re 44 Temporary Restraining Order filed by Michael Hermalyn |
| | | Any response to the motion from DraftKings must be filed by Tuesday, February 20, 2024.(Currie, Haley) (Entered: 02/15/2024) |
| 02/15/2024 | 51 | MOTION for Discovery *Defendant's Request for Approval of Proposed Interrogatories to Plaintiff per 2/8/24 Order (Dkt. 42)* by Michael Hermalyn. (Attachments: # 1 Exhibit A - Proposed Interrogatories)(Beck, Russell) (Entered: 02/15/2024) |
| 02/16/2024 | 52 | Opposition re 51 MOTION for Discovery *Defendant's Request for Approval of Proposed Interrogatories to Plaintiff per 2/8/24 Order (Dkt. 42)* filed by DraftKings Inc.. (Attachments: # 1 Exhibit A)(Dulberg, Andrew) (Entered: 02/16/2024) |

| 02/16/2024 | 53 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered - Mr. Hermalyn's motion 51 is **granted in part and denied in part.** Mr. Hermalyn may propound on DraftKings each of his proposed interrogatories except interrogatory 4. No further interrogatories will be permitted. (Currie, Haley) (Entered: 02/16/2024) |
|---|---|---|
| 02/20/2024 | 54 | Emergency MOTION to Modify Order regarding expedited discovery *in connection with the deposition of DraftKings Brian Harris* by Michael Hermalyn. (Attachments: # 1 Exhibit A)(Beck, Russell) (Entered: 02/20/2024) |
| 02/20/2024 | 55 | MEMORANDUM in Opposition re 48 Emergency MOTION for Clarification re 44 Temporary Restraining Order filed by DraftKings Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Dulberg, Andrew) (Entered: 02/20/2024) |
| 02/21/2024 | 56 | NOTICE of Appearance by Justine Goeke on behalf of DraftKings Inc. (Goeke, Justine) (Entered: 02/21/2024) |
| 02/21/2024 | 57 | NOTICE of Appearance by Harris Mufson on behalf of DraftKings Inc. (Mufson, Harris) (Entered: 02/21/2024) |
| 02/21/2024 | 58 | NOTICE of Appearance by Justin DiGennaro on behalf of DraftKings Inc. (DiGennaro, Justin) (Entered: 02/21/2024) |

| | | |
|---|---|---|
| 02/21/2024 | 59 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered.

Michael Hermalyn's Emergency Motion for Clarification [ECF 48 ] is **DENIED.** As the Court explained in granting in part and denying in part DraftKings' motion for a temporary restraining order, the temporary relief preserves the status quo pending consideration of DraftKings' forthcoming motion for a preliminary injunction. The limitations imposed in subsection (d) of the temporary restraining order are targeted to prevent Mr. Hermalyn from disclosing any of DraftKings' confidential information and trade secrets in connection with his new role at Fanatics. Those limitations are qualified, such that they apply only to DraftKings' customers, clients, vendors, or partners, or prospective customers, clients, vendors, or partners, "about which Mr. Hermalyn learned confidential information or which Mr. Hermalyn had some involvement or knowledge relating to: (i) the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, offtrack betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing; or (ii) any aspect of the Business of the Company (as defined in the Noncompetition Covenant)."

Mr. Hermalyn will have the opportunity to address DraftKings' likelihood of success on the merits in briefing the forthcoming motion for a preliminary injunction. A motion for clarification is not, however, an appropriate mechanism for seeking reconsideration of the temporary relief entered to preserve the status quo in advance of the Court's consideration of the preliminary injunction motion. At Mr. Hermalyn's request, the Court extended the schedule for expedited discovery and briefing on the preliminary injunction motion. That schedule, and the temporary restraining order entered on February 8, 2024, remain in place pending resolution of DraftKings' forthcoming preliminary injunction motion. (Currie, Haley) (Entered: 02/21/2024) |
| 02/21/2024 | 60 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered.

Michael Hermalyn's Emergency Motion to Modify the Discovery Order [ECF 54 ] is **DENIED.** As the Court stated on the record at the hearing on February 8, 2024, and ordered that same day, *see* ECF 41-42, there is not good cause for expedited document discovery at this point in the litigation, as the parties proceed expeditiously to the preliminary injunction stage. (Currie, Haley) (Entered: 02/21/2024) |
| 03/08/2024 | 61 | Joint MOTION for Leave to File Excess Pages *for Briefing Related to Plaintiff's Motion for Preliminary Injunction* by DraftKings Inc..(Dulberg, Andrew) (Entered: 03/08/2024) |
| 03/08/2024 | 62 | District Judge Julia E. Kobick: ELECTRONIC ORDER granting 61 Joint MOTION for Leave to File Excess Pages for Briefing Related to Plaintiff's Motion for Preliminary Injunction (Currie, Haley) (Entered: 03/08/2024) |
| 03/08/2024 | 63 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Christine Demana Filing fee: $ 125, receipt number AMADC-10309678 by DraftKings Inc.. (Attachments: # 1 Certification of Christine Demana)(Dulberg, Andrew) (Entered: 03/08/2024) |

| Date | # | Description |
|---|---|---|
| 03/11/2024 | 64 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered granting 63 Motion for Leave to Appear Pro Hac Vice Added Christine Demana.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Cook, Savannah) (Entered: 03/11/2024) |
| 03/14/2024 | 65 | MOTION to Seal *Certain Information Filed in Connection with Plaintiff's Motion for Preliminary Injunction* by DraftKings Inc..(Dulberg, Andrew) (Entered: 03/14/2024) |
| 03/14/2024 | 66 | DECLARATION re 65 MOTION to Seal *Certain Information Filed in Connection with Plaintiff's Motion for Preliminary Injunction of Christine Demana in Support* by DraftKings Inc.. (Dulberg, Andrew) (Entered: 03/14/2024) |
| 03/14/2024 | 67 | MOTION to Seal *unredacted memorandum of law and one exhibit* by Michael Hermalyn.(Beck, Russell) (Entered: 03/14/2024) |
| 03/14/2024 | 68 | MOTION to Dismiss *or in the Alternative, to Stay* by Michael Hermalyn.(Beck, Russell) (Entered: 03/14/2024) |
| 03/14/2024 | 69 | MEMORANDUM in Support re 68 MOTION to Dismiss *or in the Alternative, to Stay* filed by Michael Hermalyn. (Beck, Russell) (Attachment(s): # 1 SEALED Memorandum in Support) Modified on 3/15/2024: Sealed Memorandum in Support added to entry - leave to file granted 3/15/24, D. 84 (Currie, Haley) (Entered: 03/14/2024) |
| 03/14/2024 | 70 | DECLARATION re 68 MOTION to Dismiss *or in the Alternative, to Stay of Stephen D. Riden* by Michael Hermalyn. (Attachments: # 1 SEALED Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Beck, Russell) (Currie, Haley). Modified on 3/15/2024: Sealed Exhibit A added in replacement of place holder - leave to file granted 3/15/24, D. 84 (Currie, Haley). (Entered: 03/14/2024) |
| 03/14/2024 | 71 | DECLARATION re 68 MOTION to Dismiss *or in the Alternative, to Stay of Michael Hermalyn* by Michael Hermalyn. (Beck, Russell) (Entered: 03/14/2024) |
| 03/14/2024 | 72 | MOTION for Preliminary Injunction by DraftKings Inc.. (Attachments: # 1 Text of Proposed Order)(Dulberg, Andrew) (Entered: 03/14/2024) |
| 03/14/2024 | 73 | MEMORANDUM in Support re 72 MOTION for Preliminary Injunction filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 03/14/2024) |
| 03/14/2024 | 74 | DECLARATION re 72 MOTION for Preliminary Injunction *of Justine Goeke in Support* by DraftKings Inc.. (Attachments: # 1 Exhibit A, # 2 SEALED Exhibit B, # 3 SEALED Exhibit B-1, # 4 SEALED Exhibit B-2, # 5 SEALED Exhibit B-3, # 6 SEALED Exhibit B-4, # 7 SEALED Exhibit B-5, # 8 SEALED Exhibit B-6, # 9 SEALED Exhibit B-7, # 10 SEALED Exhibit B-8, # 11 Exhibit B-9, # 12 Exhibit B-10, # 13 Exhibit C, # 14 Exhibit D, # 15 Exhibit E, # 16 Exhibit F)(Dulberg, |

| | | |
|---|---|---|
| | | Andrew) <u>Modified on 3/15/2024:</u> Exhibits B through B-8 and C added in replacement of place holders - leave to file granted 3/15/24, D. 84 (Currie, Haley). (Entered: 03/14/2024) |
| 03/14/2024 | <u>75</u> | AFFIDAVIT in Support re <u>72</u> MOTION for Preliminary Injunction *of Mitchell Green* filed by DraftKings Inc.. (Attachments: # <u>1</u> SEALED Appendix A, # <u>2</u> SEALED Appendix B, # <u>3</u> SEALED Appendix C)(Dulberg, Andrew) <u>Modified on 3/15/2024:</u> Sealed Appendix A-C added in replacement of place holders - leave to file granted 3/15/24, D. 84 (Currie, Haley) (Entered: 03/14/2024) |
| 03/14/2024 | <u>76</u> | AFFIDAVIT in Support re <u>72</u> MOTION for Preliminary Injunction *of Andrew Larracey* filed by DraftKings Inc.. (Attachments: # <u>1</u> SEALED Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Exhibit D, # <u>5</u> SEALED Exhibit E, # <u>6</u> SEALED Exhibit F, # <u>7</u> SEALED Exhibit G, # <u>8</u> SEALED Exhibit H, # <u>9</u> SEALED Exhibit I, # <u>10</u> SEALED Exhibit J, # <u>11</u> Exhibit K, # <u>12</u> Exhibit L)(Dulberg, Andrew) <u>Modified on 3/15/2024:</u> Sealed Exhibits A, E-J added in replacement of place holders - leave to file granted 3/15/24, D. 84 (Currie, Haley) (Entered: 03/14/2024) |
| 03/14/2024 | <u>77</u> | AFFIDAVIT in Support re <u>72</u> MOTION for Preliminary Injunction *of Hayden Metz (Redacted)* filed by DraftKings Inc.. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C)(Dulberg, Andrew) (Entered: 03/14/2024) |
| 03/14/2024 | <u>78</u> | SEALED AFFIDAVIT of Shawn Henley in Support re <u>72</u> MOTION for Preliminary Injunction filed by DraftKings Inc.. (Attachments: # <u>1</u> Exhibit A (Filed Under Seal)) (Dulberg, Andrew) <u>Modified on 3/15/2024:</u> Sealed Affidavit and Exhibit A added in replacement of place holders - leave to file granted 3/15/24, D. 84 (Currie, Haley) (Entered: 03/14/2024) |
| 03/14/2024 | <u>79</u> | SEALED AFFIDAVIT of Brian Harris in Support re <u>72</u> MOTION for Preliminary Injunction filed by DraftKings Inc.. (Attachments: # <u>1</u> SEALED Appendix A, # <u>2</u> SEALED Exhibit A, # <u>3</u> SEALED Exhibit B, # <u>4</u> SEALED Exhibit C)(Dulberg, Andrew) <u>Modified on 3/15/2024:</u> Sealed Affidavit, Appendix A, and Exhibits A-C added in replacement of place holders - leave to file granted 3/15/24, D. 84 (Currie, Haley) (Attachment 4 replaced with corrected exhibit provided by counsel on 3/28/2024) (Cook, Savannah). (Entered: 03/14/2024) |
| 03/14/2024 | <u>80</u> | SEALED AFFIDAVIT of Samuel Russell in Support re <u>72</u> MOTION for Preliminary Injunction filed by DraftKings Inc.. (Dulberg, Andrew) <u>Modified on 3/15/2024:</u> Sealed Affidavit added in replacement of place holder - leave to file granted 3/15/24, D. 84 (Currie, Haley) (Entered: 03/14/2024) |
| 03/14/2024 | <u>81</u> | SEALED AFFIDAVIT of Brittney Goodman in Support re <u>72</u> MOTION for Preliminary Injunction filed by DraftKings Inc.. (Attachments: # <u>1</u> Exhibit A) (Dulberg, Andrew) <u>Modified on 3/15/2024:</u> Sealed Affidavit added in replacement of place holder - leave to file granted 3/15/24, D. 84 (Currie, Haley) (Entered: 03/14/2024) |
| 03/14/2024 | <u>82</u> | SEALED AFFIDAVIT of George Hernandez in Support re <u>72</u> MOTION for Preliminary Injunction filed by DraftKings Inc.. (Dulberg, Andrew) <u>Modified on 3/15/2024:</u> Sealed Affidavit added in replacement of place holder - leave to file granted 3/15/24, D. 84 (Currie, Haley) (Entered: 03/14/2024) |
| 03/14/2024 | <u>83</u> | SEALED AFFIDAVIT of Jordan Whallin Support re <u>72</u> MOTION for Preliminary Injunction filed by DraftKings Inc.. (Dulberg, Andrew) <u>Modified on 3/15/2024:</u> Sealed Affidavit added in replacement of place holder - leave to file granted 3/15/24, D. 84 |

| | | |
|---|---|---|
| | | (Currie, Haley) (Entered: 03/14/2024) |
| 03/15/2024 | 84 | District Judge Julia E. Kobick: ELECTRONIC ORDER granting 65 MOTION to Seal *Certain Information Filed in Connection with Plaintiff's Motion for Preliminary Injunction*; granting 67 MOTION to Seal *unredacted memorandum of law and one exhibit*. Counsel will receive an email within twenty-four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Cook, Savannah) (Entered: 03/15/2024) |
| 03/15/2024 | 85 | NOTICE of Appearance by Christine Demana on behalf of DraftKings Inc. (Demana, Christine) (Entered: 03/15/2024) |
| 03/15/2024 | 86 | DECLARATION re 72 MOTION for Preliminary Injunction *of Justine Goeke in Support* by DraftKings Inc.. (Attachments: # 1 Exhibit B (Redacted), # 2 Exhibit B-1 (Redacted), # 3 Exhibit B-2 (Redacted), # 4 Exhibit B-3 (Redacted), # 5 Exhibit B-4 (Redacted), # 6 Exhibit B-5 (Redacted), # 7 Exhibit B-6 (Redacted), # 8 Exhibit B-7, # 9 Exhibit B-8, # 10 Exhibit C (Redacted))(Dulberg, Andrew) (Entered: 03/15/2024) |
| 03/15/2024 | 87 | AFFIDAVIT in Support re 72 MOTION for Preliminary Injunction *of Mitchell Green* filed by DraftKings Inc.. (Attachments: # 1 Appendix A, # 2 Appendix B (Redacted), # 3 Appendix C)(Dulberg, Andrew) (Entered: 03/15/2024) |
| 03/15/2024 | 88 | AFFIDAVIT in Support re 72 MOTION for Preliminary Injunction *of Andrew Larracey* filed by DraftKings Inc.. (Attachments: # 1 Exhibit A (Redacted), # 2 Exhibit E (Redacted), # 3 Exhibit F (Redacted), # 4 Exhibit G (Redacted), # 5 Exhibit H (Redacted), # 6 Exhibit I (Redacted), # 7 Exhibit J)(Dulberg, Andrew) (Entered: 03/15/2024) |
| 03/15/2024 | 89 | AFFIDAVIT of Shawn Henley in Support re 72 MOTION for Preliminary Injunction *(Redacted)* filed by DraftKings Inc.. (Attachments: # 1 Exhibit A (Redacted)) (Dulberg, Andrew) (Entered: 03/15/2024) |
| 03/15/2024 | 90 | AFFIDAVIT of Brian Harris in Support re 72 MOTION for Preliminary Injunction *(Redacted)* filed by DraftKings Inc.. (Attachments: # 1 Appendix A, # 2 Exhibit A (Redacted), # 3 Exhibit B (Redacted), # 4 Exhibit C)(Dulberg, Andrew) (Attachment 4 replaced with corrected exhibit provided by counsel on 3/28/2024) (Cook, Savannah). (Entered: 03/15/2024) |
| 03/15/2024 | 91 | AFFIDAVIT of Samuel Russell in Support re 72 MOTION for Preliminary Injunction *(Redacted)* filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 03/15/2024) |
| 03/15/2024 | 92 | AFFIDAVIT of Brittney Goodman in Support re 72 MOTION for Preliminary Injunction *(Redacted)* filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 03/15/2024) |
| 03/15/2024 | 93 | AFFIDAVIT of George Hernandez in Support re 72 MOTION for Preliminary Injunction *(Redacted)* filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 03/15/2024) |
| 03/15/2024 | 94 | AFFIDAVIT of Jordan Whall in Support re 72 MOTION for Preliminary Injunction *(Redacted)* filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 03/15/2024) |
| 03/18/2024 | 95 | MOTION for Leave to Appear Pro Hac Vice for admission of Jacob T. Spencer Filing fee: $ 125, receipt number AMADC-10321568 by DraftKings Inc.. (Attachments: # 1 |

| | | Certification of Jacob T. Spencer)(Dulberg, Andrew) (Entered: 03/18/2024) |
|---|---|---|
| 03/18/2024 | 96 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered granting 95 Motion for Leave to Appear Pro Hac Vice Added Jacob T. Spencer.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Cook, Savannah) (Entered: 03/18/2024) |
| 03/21/2024 | 97 | MEMORANDUM in Opposition re 68 MOTION to Dismiss *or in the Alternative, to Stay* filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 03/21/2024) |
| 03/21/2024 | 98 | DECLARATION re 68 MOTION to Dismiss *or in the Alternative, to Stay of Jacob T. Spencer in Opposition* by DraftKings Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Dulberg, Andrew) (Entered: 03/21/2024) |
| 03/21/2024 | 99 | AFFIDAVIT of Brian Harris in Opposition re 68 MOTION to Dismiss *or in the Alternative, to Stay* filed by DraftKings Inc.. (Attachments: # 1 Exhibit A)(Dulberg, Andrew) (Entered: 03/21/2024) |
| 03/21/2024 | 100 | MOTION to Seal , *Unopposed* by Michael Hermalyn.(Beck, Russell) (Entered: 03/21/2024) |
| 03/21/2024 | 101 | MEMORANDUM in Opposition re 72 MOTION for Preliminary Injunction filed by Michael Hermalyn. (Attachments: # 1 Appendix A, # 2 Appendix B)(Beck, Russell) (Entered: 03/21/2024) |
| 03/21/2024 | 102 | APPENDIX/EXHIBIT re 101 Memorandum in Opposition to Motion *Appendix C* by Michael Hermalyn. (Beck, Russell) (Entered: 03/21/2024) |
| 03/21/2024 | 103 | DECLARATION re 101 Memorandum in Opposition to Motion *of Russell Beck* by Michael Hermalyn. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J)(Beck, Russell) (Additional attachment(s) added on 4/1/2024: # 11 SEALED Exhibit A, # 12 SEALED Exhibit B, # 13 SEALED Exhibit F) (Currie, Haley). Modified on 4/1/2024: sealed exhibits A, B and F added to the entry - sealed submission granted 3/25/24 at D. 108 (Currie, Haley). (Entered: 03/21/2024) |
| 03/21/2024 | 104 | DECLARATION re 101 Memorandum in Opposition to Motion *of Michael Hermalyn* by Michael Hermalyn. (Beck, Russell) (Entered: 03/21/2024) |
| 03/21/2024 | 105 | DECLARATION re 101 Memorandum in Opposition to Motion *of Niles Brandon* by Michael Hermalyn. (Beck, Russell) (Entered: 03/21/2024) |
| 03/21/2024 | 106 | SEALED DECLARATION re 101 Memorandum in Opposition to Motion *of Taylor Gwiazdon* by Michael Hermalyn. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Beck, |

| | | Russell) <u>Modified on 4/1/2024:</u> declaration place holder replaced with sealed document - sealed submission granted 3/25/2024 at D. 108 (Currie, Haley). (Entered: 03/21/2024) |
|---|---|---|
| 03/22/2024 | <u>107</u> | NOTICE of Appearance by Jacob T. Spencer on behalf of DraftKings Inc. (Spencer, Jacob) (Entered: 03/22/2024) |
| 03/25/2024 | 108 | District Judge Julia E. Kobick: ELECTRONIC ORDER granting <u>100</u> MOTION to Seal, *Unopposed.* Counsel will receive an email within twenty-four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Cook, Savannah) (Entered: 03/25/2024) |
| 03/25/2024 | <u>109</u> | MOTION to Strike <u>102</u> Appendix/Exhibit, <u>101</u> Memorandum in Opposition to Motion by DraftKings Inc..(Dulberg, Andrew) (Entered: 03/25/2024) |
| 03/25/2024 | <u>110</u> | DECLARATION re <u>109</u> MOTION to Strike <u>102</u> Appendix/Exhibit, <u>101</u> Memorandum in Opposition to Motion by DraftKings Inc.. (Attachments: # <u>1</u> Exhibit A)(Dulberg, Andrew) (Entered: 03/25/2024) |
| 03/25/2024 | <u>111</u> | Opposition re <u>109</u> MOTION to Strike <u>102</u> Appendix/Exhibit, <u>101</u> Memorandum in Opposition to Motion filed by Michael Hermalyn. (Beck, Russell) (Entered: 03/25/2024) |
| 03/26/2024 | 112 | District Judge Julia E. Kobick: ELECTRONIC ORDER.

DraftKings' motion to strike <u>109</u> is **DENIED.** This Court's Local Rules provide that "[m]emoranda supporting or opposing allowance of motions shall not, without leave of court, exceed 20 pages, *double-spaced.*" Local Rule 7.1(b)(4) (emphasis added). On March 8, 2024, the Court permitted the parties to file 30-page briefs in support of, and in opposition to, DraftKings' motion for a preliminary injunction. ECF 62. In relying on excessive single-spaced bullet points, Hermalyn's opposition to DraftKings' motion for a preliminary injunction failed to comply with Local Rule 7.1(b)(4), as modified by this Court's order. Nevertheless, in view of the volume of evidentiary material submitted by DraftKings in support of its motion for a preliminary injunction, the Court declines to strike Hermalyn's filings. DraftKings is given leave to file a 15-page reply brief. In future filings, the parties shall adhere to the rules of this Court. (Currie, Haley) (Entered: 03/26/2024) |
| 03/28/2024 | <u>113</u> | REPLY to Response to <u>68</u> MOTION to Dismiss *or in the Alternative, to Stay* filed by Michael Hermalyn. (Beck, Russell) (Entered: 03/28/2024) |
| 03/28/2024 | <u>114</u> | REPLY to Response to <u>72</u> MOTION for Preliminary Injunction *in Support* filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 03/28/2024) |
| 04/02/2024 | 115 | Electronic Clerk's Notes for proceedings held before District Judge Julia E. Kobick: Motion Hearing held on 4/2/2024 re <u>68</u> MOTION to Dismiss *or in the Alternative, to Stay* filed by Michael Hermalyn, <u>72</u> MOTION for Preliminary Injunction filed by DraftKings Inc.

Case Called. The Court reminds the parties of the Local Rules of this court regarding page limits and if an extension of page limits is necessary, a motion can be filed by the parties. The Court also reminds the parties of Local Rule 7.1. The Court hears arguments regarding the plaintiff's Motion for Preliminary Injunction <u>72</u> . The Court |

| | | |
|---|---|---|
| | | hears arguments regarding the defendant's Motion to Dismiss or in the Alternative, Stay 68 . Because of strong case law from the First Circuit suggesting an evidentiary hearing should be held when there is a dispute of the facts, the Court informs the parties she wants to hold a hearing, no more than 1 day. The Court takes a brief break for parties to confer regarding availability for an evidentiary hearing. Court resumes and the Court sets an evidentiary hearing for 4/16/24 at 9AM. The Court confirms parties allocation of time will be equal between 9AM-4PM, as needed, with a mid-morning break and a lunch break for 1PM. The Court alerts the parties that there will be no new witnesses and no additional evidence beyond what is in the declarations that are part of the record. The parties are ordered to submit, by Tuesday, 4/9/2024, their positions on what an appropriate bond would be, up to 5 pages. The Court takes the Motion to Dismiss or in the Alternative, Stay 68 under advisement and will continue the Motion for Preliminary Injunction 72 to the evidentiary hearing on that will be held 4/16/2024.<br><br>(Court Reporter: Jessica Leonard at jessica.bewsee@gmail.com.) (Attorneys present: Orin Snyder, Christine Demana, Andrew S. Dulberg, Justine Goeke for the Plaintiff. Russell Beck and Stephen D. Riden for the Defendant.) (Currie, Haley) (Entered: 04/02/2024) |
| 04/02/2024 | 116 | ELECTRONIC NOTICE of Hearing - Evidentiary Hearing re 72 Motion for Preliminary Injunction set for 4/16/2024 09:00 AM in Courtroom 3 (In person only) before District Judge Julia E. Kobick. (Currie, Haley) (Entered: 04/02/2024) |
| 04/09/2024 | 117 | STIPULATION *Regarding Security Bond (Joint)* by DraftKings Inc.. (Dulberg, Andrew) (Entered: 04/09/2024) |
| 04/11/2024 | 118 | Transcript of Motion Hearing held on April 2, 2024, before Judge Julia E. Kobick. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Jessica Leonard at jessicamichaelleonard@gmail.com. Redaction Request due 5/2/2024. Redacted Transcript Deadline set for 5/13/2024. Release of Transcript Restriction set for 7/10/2024. (McDonagh, Christina) (Entered: 04/11/2024) |
| 04/11/2024 | 119 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 04/11/2024) |
| 04/11/2024 | 120 | NOTICE of Appearance by Aliki Sofis on behalf of Michael Hermalyn (Sofis, Aliki) (Entered: 04/11/2024) |
| 04/11/2024 | 121 | NOTICE of Appearance by Alexander S. Del Nido on behalf of Michael Hermalyn (Del Nido, Alexander) (Entered: 04/11/2024) |
| 04/15/2024 | 122 | MOTION to Seal by Michael Hermalyn.(Beck, Russell) (Entered: 04/15/2024) |
| 04/15/2024 | 123 | District Judge Julia E. Kobick: ELECTRONIC ORDER.<br><br>The motion to seal 122 is conditionally granted pending the Court's review of the forthcoming motion. (Currie, Haley) (Entered: 04/15/2024) |
| 04/15/2024 | 124 | Emergency MOTION to Compel *George Hernandezs Testimony or, in the Alternative, to Strike* by Michael Hermalyn. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 |

| | | |
|---|---|---|
| | | Exhibit C, # 4 Exhibit D)(Beck, Russell) (Additional attachment(s) added on 4/15/2024: # 5 SEALED Emergency Motion, # 6 SEALED Exhibit C) (Sealed documents added to entry pending review from the Court and pending ruling on Motion to Seal - see 123 (Currie, Haley). (Entered: 04/15/2024) |
| 04/16/2024 | 125 | MOTION to Seal Document by DraftKings Inc.. (Attachments: # 1 Affidavit / DECLARATION OF CHRISTINE DEMANA IN SUPPORT OF PLAINTIFFS MOTION TO SEAL)(Dulberg, Andrew) (Entered: 04/16/2024) |
| 04/16/2024 | 126 | MOTION for Leave to Appear Pro Hac Vice for admission of Kimberly E. Carson Filing fee: $ 125, receipt number BMADC-10368709 by Michael Hermalyn. (Attachments: # 1 Exhibit 1 [Declaration])(Del Nido, Alexander) (Entered: 04/16/2024) |
| 04/16/2024 | 127 | Electronic Clerk's Notes for proceedings held before District Judge Julia E. Kobick: Evidentiary Hearing re Motion for Preliminary Injunction 72 held on 4/16/2024.

Case Called. The Court reviews the information provided at the previous motion hearing held on 4/2/2024 and outlines the schedule for the hearing. The Court allows the Motion to Seal 122 after reviewing materials. The Court also denies the Emergency MOTION to Compel George Hernandez's Testimony or, in the Alternative, to Strike 124 for the reasons stated on the record. Defendant moves to sequester witnesses and the request was allowed by the Court. Plaintiffs evidence begins with the examination of Mr. Michael Hermalyn (sworn); cross, re-direct, re-cross. The Court takes a brief break and returns with plaintiff's examination of Mr. Andrew Larracey (sworn); cross, defense moves to admit exhibit 1, plaintiff objects and motion denied, re-direct. Plaintiff examines Mr. Hayden Metz (sworn); cross, re-direct. The Court takes an hour recess. Court resumes with plaintiff's examination of Mr. Brian Harris (sworn); cross, re-direct. Plaintiff examines Ms. Brittney Goodman (sworn); cross. Plaintiff examines Mr. Mitchel Green (sworn); cross. The Court takes a brief recess and resumes with post testimony arguments from the parties. The Court takes the Motion for Preliminary Injunction 72 matter under advisement. The Court reminds the parties that the Temporary Restraining Order remains in place pending the ruling on the motion.

(Court Reporter: Catherine Zelinski at CAL.Zelinski.Steno@gmail.com.)(Attorneys present: Orin Snyder, Jacob T. Spencer, Harris Mufson, Justine Goeke, Christine Demana and Andrew White (tech) for the Plaintiff. Russell Beck, Alexander S. Del Nido, Aliki Sofis, Stephen D. Riden, and Kelsey Sullivan (tech) for the Defendant.) (Currie, Haley) (Entered: 04/16/2024) |
| 04/17/2024 | 128 | District Judge Julia E. Kobick: ELECTRONIC ORDER granting 126 Motion for Leave to Appear Pro Hac Vice Added Kimberly E. Carson.

**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**

Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. |

| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney. |
|---|---|---|
| | | (Kelly, Danielle) (Entered: 04/17/2024) |
| 04/17/2024 | 129 | District Judge Julia E. Kobick: ELECTRONIC ORDER. |
| | | DraftKings' motion to seal [ECF 125 ] is DENIED as moot in light of the Court's denial of Hermalyn's motion to compel [ECF 124 ] at the April 16, 2024 evidentiary hearing. *See* ECF 127. (Currie, Haley) (Entered: 04/17/2024) |
| 04/25/2024 | 130 | Transcript of Evidentiary Hearing held on April 16, 2024, before Judge Julia E. Kobick. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Catherine Zelinski at CAL.Zelinski.Steno@gmail.com. Redaction Request due 5/16/2024. Redacted Transcript Deadline set for 5/28/2024. Release of Transcript Restriction set for 7/24/2024. (Cook, Savannah) (Entered: 04/25/2024) |
| 04/25/2024 | 131 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (Cook, Savannah) (Entered: 04/25/2024) |
| 04/30/2024 | 132 | District Judge Julia E. Kobick: MEMORANDUM AND ORDER entered. |
| | | For the foregoing reasons, DraftKings's motion for a preliminary injunction, ECF 72 , is **GRANTED.** The Court will issue a separate Order of Preliminary Injunction consistent with this opinion. The temporary restraining order previously entered, ECF 44 , is hereby **DISSOLVED.** Hermalyn's motion to dismiss or alternatively to stay, ECF 68 , is **DENIED.** |
| | | **SO ORDERED.** (Kelly, Danielle) (Entered: 04/30/2024) |
| 04/30/2024 | 133 | District Judge Julia E. Kobick: ORDER OF PRELIMINARY INJUNCTION entered. (Kelly, Danielle) (Entered: 04/30/2024) |
| 05/02/2024 | 134 | NOTICE OF APPEAL as to 132 Memorandum & ORDER, 133 Preliminary Injunction by Michael Hermalyn Filing fee: $ 605, receipt number AMADC-10398365 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf US District Court Clerk to deliver official record to Court of Appeals by 5/22/2024. (Sofis, Aliki) (Entered: 05/02/2024)** |
| 05/02/2024 | 135 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 134 Notice of Appeal,,, (Paine, Matthew) (Entered: 05/02/2024) |
| 05/03/2024 | 136 | USCA Case Number 24-1443 for 134 Notice of Appeal, filed by Michael Hermalyn. (Paine, Matthew) (Entered: 05/03/2024) |

| 05/03/2024 | 137 | MOTION for Leave to Appear Pro Hac Vice for admission of Christopher G. Michel Filing fee: $ 125, receipt number AMADC-10399313 by Michael Hermalyn. (Attachments: # 1 Exhibit 1)(Del Nido, Alexander) (Entered: 05/03/2024) |
|---|---|---|
| 05/03/2024 | 138 | District Judge Julia E. Kobick: ELECTRONIC ORDER granting 137 Motion for Leave to Appear Pro Hac Vice Added Christopher G. Michel. |
| | | **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. |
| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney. |
| | | (Kelly, Danielle) (Entered: 05/03/2024) |
| 05/03/2024 | 139 | STIPULATION and [Proposed] Order re Defendant's Deadline to Respond to 1 Complaint (Filed Jointly) by Michael Hermalyn. (Sofis, Aliki) (Entered: 05/03/2024) |
| 05/06/2024 | 140 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered. |
| | | The Court notes the parties' stipulation, ECF 139, and construes it as a motion to enlarge the deadline for the defendant to file a responsive pleading. That motion is granted. (Currie, Haley) (Entered: 05/06/2024) |
| 05/06/2024 | 141 | NOTICE by DraftKings Inc. re 133 Preliminary Injunction - *Notice of $150,000 Additional Security Bond* (Dulberg, Andrew) (Entered: 05/06/2024) |
| 05/06/2024 | 142 | NOTICE of Appearance by Christopher Michel on behalf of Michael Hermalyn (Michel, Christopher) (Entered: 05/06/2024) |
| 05/10/2024 | 143 | MOTION for Extension of Time to Move for Attorneys' Fees *(Unopposed)* by DraftKings Inc..(Dulberg, Andrew) (Entered: 05/10/2024) |
| 05/13/2024 | 144 | District Judge Julia E. Kobick: ELECTRONIC ORDER granting 143 MOTION for Extension of Time to Move for Attorneys' Fees (Unopposed) (Currie, Haley) (Entered: 05/13/2024) |
| 05/15/2024 | 145 | NOTICE of Appearance by Kimberly Carson on behalf of Michael Hermalyn (Carson, Kimberly) (Entered: 05/15/2024) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/16/2024 13:59:10 | | |
| **PACER Login:** | saliki4754 | **Client Code:** | 07590-00010 |
| **Description:** | Docket Report | **Search Criteria:** | 1:24-cv-10299-JEK |
| **Billable Pages:** | 17 | **Cost:** | 1.70 |

A21

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| DRAFTKINGS INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:24-cv-10299 |
| MICHAEL HERMALYN, | |
| Defendant. | |

## VERIFIED COMPLAINT

Plaintiff DraftKings Inc. ("DraftKings" or the "Company"), by its undersigned attorneys, hereby files this Verified Complaint against Defendant Michael Hermalyn ("Hermalyn"), and in support thereof, alleges as follows:

## INTRODUCTION

1.     Hermalyn, a senior executive compensated millions of dollars by DraftKings to oversee VIP customer acquisition and retention, hatched a secret plan over the past year to steal and use confidential information, solicit customers and employees and join a key competitor, Fanatics, Inc. ("Fanatics"), in brazen violation of his agreements with and duties to DraftKings.  Hermalyn's scheme appears to have started as early as the February 2023 Super Bowl, when Hermalyn clandestinely met with Fanatics' CEO and leadership team to discuss employment.  He took further disloyal steps over the summer, pretending he was "getting out of the industry" and improperly encouraging his subordinates to meet with Fanatics' CEO about employment there, while at the same time urging DraftKings to pay himself and his subordinates large retention payments, valued in the millions of dollars.  Hermalyn's disloyal scheme

1

culminated late last week on the eve of this year's Super Bowl.  While he falsely claimed to be mourning the loss of a friend from Pennsylvania, Hermalyn instead secretly traveled to Fanatics offices in Los Angeles, negotiated an employment agreement with Fanatics, downloaded DraftKings' confidential business plans for the Super Bowl while sitting in Fanatics' offices, and fraudulently attempted to establish California residency during his 48-hour visit so he could resign from DraftKings and try to invalidate his non-compete agreements in California state court only a few days later.

2.      DraftKings is a leader in the fiercely competitive digital sports entertainment and gaming industry, best known for fantasy sports, mobile sports betting, and iGaming products. Before his sudden resignation late last week, Hermalyn was a senior DraftKings executive holding a position of trust and with access to some of the company's most valuable and sensitive trade secrets and other highly confidential information and business strategies.

3.      Hermalyn led DraftKings' VIP team, responsible for acquiring and retaining DraftKings' most loyal and high value potential players.  In the fantasy sports, mobile sports betting, and iGaming industry, businesses can sink or swim on the strength of their customer relationships.  DraftKings is one of only a few prominent companies competing for extremely scarce resources, especially the patronage of the relatively small number of high-net worth customers who wager significant sums on sporting events.  During his employment, Hermalyn was entrusted with knowing the identities and betting preferences of DraftKings' most loyal and significant customers and DraftKings' strategies to attract and retain those customers.

4.      Hermalyn repeatedly executed contractual agreements with DraftKings—in exchange for millions of dollars of compensation—in which he agreed not to use or disclose confidential DraftKings information, not to compete with DraftKings, and not to solicit

2

DraftKings' employees or customers.  Hermalyn's contractual agreements also state that any disputes with DraftKings about his obligations would be resolved in Massachusetts and pursuant to Massachusetts law.

5.      On Thursday, February 1, 2024—only ten days before Super Bowl LVIII, scheduled for February 11—Hermalyn abruptly resigned from his position at DraftKings to take a nearly identical role with Fanatics.  The Super Bowl is the most significant day in the gaming calendar and the most important event of the year for DraftKings and its business, not just because of the billions of dollars wagered, but also for the vital opportunities to strengthen relationships with VIP customers and business partners at events surrounding the game.  Without prompt injunctive relief barring Hermalyn from violating his agreements with DraftKings, Hermalyn will be free to launch an unlawful and targeted attack against DraftKings' business and divert its most valuable customers immediately prior to one of the most business critical weekends for DraftKings.  Customer loyalty is one of the most important competitive edges in the gaming industry.  Hermalyn knows DraftKings' playbook on how to engage and retain VIP clients.  On information and belief, Hermalyn, acting in concert with Fanatics, timed his departure and theft of confidential information to coincide with the critical days leading up to the Super Bowl to further a scheme to irreparably interfere with DraftKings' customer and business relationships by pursuing those relationships at Fanatics using the confidential information and goodwill that he obtained at DraftKings.  In his agreements, Hermalyn expressly agreed that DraftKings would suffer irreparable harm in the event of a breach or threatened breach of his obligations to the company.  Hermalyn is now in active breach of his agreements, and DraftKings is being irreparably harmed as a result.  DraftKings paid Hermalyn millions of dollars in compensation pursuant to his written agreements, and is entitled to the benefit of its bargain.  Immediate judicial intervention is required.

3

A24

6.      Hermalyn's brazen disregard of his contractual obligations to DraftKings is just the tip of the iceberg.  DraftKings has discovered that on his way out the door, and from a non-DraftKings device, Hermalyn viewed and downloaded trade secrets and other highly sensitive confidential information of DraftKings.  On January 29, Hermalyn emailed DraftKings employees and external potential partners that "a friend passed, dealing with that today / tomorrow."  He further proposed "[t]wo options for Wednesday, keep as is and my team can tackle . . . or push to next week?"  He closed by thanking everyone "so much for understanding."  During the next several days, Hermalyn was essentially AWOL: ignoring communications from his DraftKings colleagues, rescheduling meetings, and failing to conduct business as usual.  DraftKings has since learned, through geolocation data and access account records, Hermalyn had in fact traveled to California and visited Fanatics offices in Los Angeles on January 29 and 30.

7.      While there, and while still employed by DraftKings, Hermalyn accessed and downloaded confidential and important DraftKings information—some of which only a handful of other DraftKings employees could access.  This information includes, among other things, a detailed list of business partners, such as representatives of teams and leagues, as well as athletes, celebrities, influencers, vendors, and corporate officers and directors who are attending the 2024 Super Bowl, as well as a presentation reflecting DraftKings' marketing strategy and value proposition for prospective business partners to enter into commercial engagements with DraftKings.  Given his impending resignation, there was no legitimate business reason for Hermalyn to download these highly confidential documents to a non-DraftKings device. On information and belief, Hermalyn has misappropriated DraftKings' confidential information to further the business interests of Fanatics, even before he was on the payroll of his new employer.

8.      In the hands of a competitor like Fanatics, the information Hermalyn accessed and

4

A25

downloaded represents a significant threat to DraftKings' business—especially during the crucial days leading up to and during the Super Bowl.  Injunctive relief is urgently necessary to prevent Hermalyn from using and disclosing the extraordinarily sensitive information he downloaded and, on information and belief, stole, to harm DraftKings any more than he already has.

9.       Hermalyn and Fanatics took additional fraudulent steps to further their scheme.  On the same day that Hermalyn resigned from DraftKings, he filed a 26-page lawsuit—obviously prepared well in advance by two sophisticated large law firms—in California Superior Court in Los Angeles seeking to void his non-competition covenants on the grounds that he is a California resident.  In that lawsuit, Hermalyn claims that he supposedly became a California resident during the few days he was covertly visiting Fanatics in Los Angeles.  But Hermalyn maintains a multi-million dollar residence in New Jersey, where his wife still works and his kids go to school.  He is no more a Californian than Governor Murphy.  And in an effort to prevent his sham California lawsuit from being removed to federal court, Hermalyn and Fanatics acted in concert to cause Fanatics to form a sham corporation in the State of Nevada the day before they filed that lawsuit.

10.      DraftKings has conducted a limited investigation in the days since Hermalyn's sudden resignation.  But even that initial investigation has revealed that during his employment with DraftKings Hermalyn engaged in numerous other acts of deception, lies, and other misconduct.  DraftKings has already uncovered evidence showing that Hermalyn actively solicited DraftKings employees to join Fanatics this past year, and spent thousands of dollars of DraftKings' money to enter into an agreement with a restaurant group with which Hermalyn had, on information and belief, an undisclosed personal affiliation.

11.      Discovery in this litigation will establish the full extent of Hermalyn's misconduct. On this record, Hermalyn's misdeeds urgently warrant injunctive relief to protect DraftKings from

5

suffering further irreparable harm to its valuable customer and business relationships.  Immediate injunctive relief is necessary because Hermalyn is acting in concert with DraftKings' direct competitor and is engaging in a pattern of deceit and dishonesty, including, but not limited to, illicitly downloading, retaining, and using DraftKings' valuable confidential information concerning DraftKings' Super Bowl and other sensitive business strategies.

## PARTIES

12.     DraftKings is a Nevada corporation with a principal place of business in Boston, Massachusetts.

13.     Hermalyn is a natural person who, on information and belief, is domiciled and resides in New Jersey.  From approximately September 14, 2020 until February 1, 2024, Hermalyn was an employee of DraftKings, living first in New York and then in New Jersey.  During his employment with DraftKings, Hermalyn held the titles of Senior Vice President of Business Development and Vice President of VIP Management.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331, 1332(a)(2), 1367.

15.     This Court has personal jurisdiction over Hermalyn pursuant to the forum-selection clauses in the Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement dated August 31, 2020 (Ex. A) (the "Confidentiality Agreement") and the Noncompetition Covenant dated August 16, 2023 (Ex. B) (the "Noncompetition Covenant"), through which Hermalyn has irrevocably submitted to the exclusive jurisdiction of the United States District Court for the District of Massachusetts and the laws of the Commonwealth of Massachusetts for purposes of this dispute.  *See* Confidentiality Agreement § 9; Noncompetition Covenant § (f).  These forum-

selection provisions expressly provide that Hermalyn "submit[s] to the personal jurisdiction of such court[]" and "waive[s] any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction" for "any dispute arising" under the Confidentiality Agreement or the Noncompetition Covenant. *See* Confidentiality Agreement § 9; Noncompetition Covenant § (f).

16.     This Court also has personal jurisdiction over Hermalyn because his tortious acts caused harm to DraftKings in Massachusetts, where it has its principal place of business.

17.     Venue in this Court is proper because the parties contractually agreed that this Court would serve as the exclusive venue for this dispute. *See* Confidentiality Agreement § 9; Noncompetition Covenant § (f). Venue is also proper because DraftKings has its principal place of business in Suffolk County, Massachusetts.

## STATEMENT OF FACTS

**I.     DraftKings and Fanatics Are Fierce Competitors in the Digital Sports Betting and iGaming Industry**

18.     Online sports betting and iGaming is a fiercely competitive industry. There are a handful of online gaming businesses that compete for the small number of high-net worth players who drive substantial revenue for these businesses. These competitors jealously guard the customer relationships that they establish, the technology that they create, and the marketing strategies that they develop to pursue their own respective share of the market.

19.     DraftKings is a digital sports entertainment and gaming company known for its industry-leading fantasy sports, mobile sports betting, and iGaming products. Headquartered in Boston, DraftKings is a multi-channel provider of sports betting and gaming technologies, powering sports and gaming entertainment across U.S. and global markets.

A28

20.     DraftKings has three core business-to-consumer vertical business lines: Fantasy Sports; DraftKings Sportsbook; and DraftKings Casino, commonly referred to as its iGaming business.  Fantasy Sports is available for free in every state.  DraftKings' Sportsbook offers online and retail betting for major U.S. and international sports and, along with paid Fantasy Sports, operates in legalized markets across the United States.  DraftKings Casino (*i.e.*, its iGaming business) brings consumers casino games online, and is available in Connecticut, New Jersey, Michigan, Pennsylvania, and West Virginia.  The business of DraftKings is global in its scope, especially with respect to high net-worth VIP players who frequently have residences in multiple jurisdictions throughout the world.

21.     Fanatics is a digital sports platform operating businesses throughout the United States.  According to its website, one such business is Fanatics Betting & Gaming, an online and retail sports betting and online casino real-money wagering platform.  The Fanatics Sportsbook app allows customers to place bets on a substantially similar range of sporting events as DraftKings' Sportsbook and is similarly available in certain jurisdictions where sports betting is legal.  Fanatics iGaming, like DraftKings' Casino, provides customers with the opportunity to play casino games including slots, table games, and live-action dealers, and is currently available in Pennsylvania and West Virginia.

22.     Fanatics' businesses compete directly throughout the United States with DraftKings.

## II.     Hermalyn Received and Accessed DraftKings' Trade Secrets and Other Highly Confidential Information

23.     The trade secrets and confidential information that Hermalyn learned and accessed in his role leading DraftKings' VIP team are among the most valuable owned by DraftKings, and correspondingly, the most attractive that any competitor—like Fanatics—could hope to steal.

24.     In his role leading this critical team, Hermalyn was responsible for developing and managing two distinct segments of the VIP business.

25.     Hermalyn supervised and oversaw DraftKings' VIP hosts, the network of DraftKings employees working one-on-one with VIP players as the "human face" of DraftKings. Once a VIP becomes a hosted player, they have access to additional benefits and perks (*e.g.* tickets to sporting events and dinners). These types of personal, one-on-one relationships are important to develop brand loyalty and encourage VIP players to stay with DraftKings rather than leave for a competitor.

26.     Hermalyn was responsible for DraftKings' events and experiences business. During marquee sporting events throughout the year (*e.g.*, Super Bowl, Formula One races, Kentucky Derby, etc.), DraftKings arranges to host VIP players at events to build brand loyalty and further encourage and incentivize a long term relationship. These events frequently include VIP players and business partners, such as teams, leagues, casinos, athletes, celebrities, influencers, vendors, and corporate officers and directors.

27.     In overseeing these business segments, Hermalyn accessed and received some of DraftKings' most valuable trade secrets and other confidential information, including:

- **VIP Player Lists** – Hermalyn received comprehensive VIP player lists containing a wide range of information critical to forging personal connections with VIP players. Such information would be incredibly valuable to a competitor—like Fanatics—in trying to recruit these VIP players away from DraftKings by establishing their own personal relationships through the use of DraftKings' intelligence.

- **Research and Development** – Hermalyn managed and developed player promotions and incentives. Most notably, Hermalyn managed the VIP Hosts who used

9

A30

DraftKings' Dynasty Program to identify and reward customers based on their loyalty and repeat business.  Hermalyn had intimate knowledge of DraftKings' strategies for identifying loyal customers, providing tailored incentives and rewards, building relationships with them, managing their questions and interests, and ensuring ongoing loyalty.  In the hands of Fanatics, this information would provide a roadmap for how to mimic DraftKings' analysis of the sports betting and iGaming customer base, as well as how to develop programs, promotions, and incentives specifically geared towards luring that customer base away from DraftKings to Fanatics.

- **Partnership Relationships** – Hermalyn was intimately familiar with the fundamental relationships and points of contact with DraftKings' critical business partners, such as teams, leagues, casinos, athletes, celebrities, influencers, vendors, and corporate officers and directors, as well as a host of other organizations and individuals that are essential to the advancement of DraftKings' marketing strategy.  In other cases, these relationships form a core component of DraftKings' marketing strategy, advancing DraftKings' reputation as a well-established and reliable brand in the online sports betting and gaming space that can be trusted for both casual and VIP players alike.  If Fanatics were to access this information, it could accelerate its business in the sports betting and iGaming space by capitalizing on DraftKings' significant investment of time and money in identifying valuable partnerships and securing those connections. Hermalyn also knew the terms of DraftKings' engagements with its partners.  Fanatics could use that confidential information to undercut DraftKings in contract negotiations with these partners.

A31

- **Employee Information** – As a supervisor, Hermalyn had access to employee lists, compensation information, and performance reviews and metrics for a wide range of DraftKings' employees.  Hermalyn could use that information to help Fanatics refine its own employee retention and recruitment procedures.  Hermalyn could also use that information improperly to solicit DraftKings employees based on his knowledge of their confidential employment terms and compensation, performance, customer relationships and knowledge of trade secrets and confidential business plans.

28.     Finally, as a senior leader with DraftKings, Hermalyn regularly participated in executive meetings where he was privy to confidential financial information, performance information, as well as business plans and prospects that transcend the VIP team and extend to DraftKings' broader strategic approach to the market.

### III.     DraftKings Takes Reasonable Precautions to Protect Its Trade Secrets and Other Highly Confidential Information

29.     DraftKings places a high value on its trade secrets and other confidential information, and as a result, has implemented a robust infrastructure of agreements, policies, and technological safeguards to maintain the secrecy of such information.

30.     For instance, DraftKings requires all employees upon commencing employment to execute their own confidentiality agreement, mandating that they not use or disclose any confidential or proprietary information except on behalf of DraftKings.

31.     DraftKings also promulgates a document containing all of its "Information Security Policies," which govern the manner in which DraftKings' employees are expected to safeguard DraftKings' information assets.  Such policies include the:

- Acceptable Use Policy

- Database Credentials Policy

11

A32

- Email & Electronic Messaging System Use Policy

- Employee Termination Policy

- Information Sensitivity Policy

- Password Policy

- Removable Media Policy

- Risk Assessment Policy

- Training Policy

32.     In addition, all DraftKings' employees are trained and re-trained on an annual basis with respect to DraftKings' information security policies and must acknowledge that they have received such training and that they agree to abide by such policies.

33.     As for technological safeguards, all DraftKings' devices are encrypted so that in the event that they are lost or stolen, an unauthorized user would not be able to access any DraftKings' information that is stored or normally accessible from the device.

34.     In addition, in order to access DraftKings' Google workspace—that houses DraftKings' trade secrets and other highly sensitive confidential information—DraftKings employees must enter a password that they need to update every 90 days, as well as engage in a two-step authentication process.

35.     Once in DraftKings' Google workspace, access rights to particular folders and files is strictly limited to those employees who would have a legitimate business reason for consulting such materials.

36.     DraftKings has also implemented a host of data loss prevention systems that actively monitor the sharing and transfer of any DraftKings' files or folders outside of the DraftKings' IT infrastructure, either through the use of USB devices, external cloud platforms, or

through email.  In the event that any of these systems identify suspicious activity, DraftKings' IT team immediately launches a thorough investigation to determine whether a DraftKings' employee has engage in conduct that violates the law or DraftKings' policies.

**IV.**   **Hermalyn Agrees to the Confidentiality Agreement and the Noncompetition Covenant in Exchange for His Employment and Valuable Equity in DraftKings**

37.      Hermalyn signed a number of agreements with DraftKings throughout his employment committing to certain post-termination obligations.

### A. *The Confidentiality Agreement*

38.      As a condition of his employment, Hermalyn entered into the Confidentiality Agreement, which is governed by Massachusetts law.  *Id*. § 9.

39.      Through that agreement, Hermalyn affirmed his duty of loyalty to DraftKings, committing that during his employment he "will devote [his] best efforts on behalf of the Company," and further agreeing "not to provide any services to any Competing Business or engage in any conduct which may create an actual or appear to create a conflict of interest."  *Id*. § 1.

40.      A "Competing Business" is defined as "any person, firm, association, corporation or any other legal entity that is engaged in a business that is competitive with any aspect of the Business of the Company," which includes "the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for . . . Regulated Gaming."  *Id*. Definitions (i)-(ii).

41.      "Regulated Gaming" is defined as "the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing."  *Id*. Definitions (ii).

42.     Hermalyn further agreed to safeguard DraftKings "Confidential Information," promising that he will "not, during or after [his] employment: (i) use any Confidential Information for any purpose that is not authorized by the Company; (ii) disclose any Confidential Information to any person or entity, except as authorized by the Company in connection with Employee's job duties; or (iii) remove or transfer Confidential Information from the Company's premises or systems except as authorized by the Company." *Id*. § 5.

43.     "Confidential Information" is defined as "all information or a compilation of information, in any form (tangible or intangible or otherwise), that is not generally known to competitors or the public, which Company considers to be confidential and/or proprietary, including but not limited to: research and development; techniques; methodologies; strategies; product information, designs, prototypes and technical specifications; algorithms, source codes, object codes, trade secrets or technical data; training materials methods; internal policies and procedures; marketing plans and strategies; pricing and cost policies; customer, supplier, vendor and partner lists and accounts; customer and supplier preferences; contract terms and rates; financial data, information, reports, and forecasts; inventions, improvements and other intellectual property; product plans or proposed product plans; know-how; designs, processes or formulas; software and website applications; computer passwords; market or sales information, plans or strategies; business plans, prospects and opportunities (including, but not limited to, possible acquisitions or dispositions of businesses or facilities); information concerning existing or potential customers, partners or vendors.  Confidential Information shall also mean of or related to Company's current or potential customers, vendors or partners that is considered to be confidential or proprietary to the applicable customer, vendor or partner." *Id*. Definitions (iii).

44.     Relatedly, Hermalyn promised that upon termination of his employment for any reason, he "will immediately surrender to the Company all Company property in [his] possession, custody, or control, including any and all documents, electronic information, and materials of any nature containing any Confidential Information, without retaining any copies." *Id.* § 5.

45.     DraftKings made clear, however, that "[p]ursuant to 18 U.S.C. Section 1833(b), [Hermalyn] shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (1) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to any attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." *Id.*

46.     In addition to his confidentiality and return of property obligations, Hermalyn also agreed to certain narrowly tailored non-solicitation obligations.  For instance, he agreed that during his employment and for twelve (12) months after the termination of his employment, he would "not directly or indirectly either for [himself] or for any other person, partnership, legal entity, or enterprise, solicit or transact business, or attempt to solicit or transact business with, any of the Company's customers, clients, vendors or partners, or with any of the Company's prospective customers, clients, vendors or partners about which [Hermalyn] learned Confidential Information . . . or which [Hermalyn] had some involvement or knowledge related to the Business of the Company." *Id.* § 2.

47.     He similarly committed that during his employment and the same twelve (12)-month post-termination period, he would not "directly or indirectly either for [himself] or for any other person, partnership, legal entity, or enterprise: (i) solicit, in person or through supervision or control of others, an employee, advisor, consultant or contractor of the Company for the purpose

15

A36

of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with the Company or to change an existing business relationship to the detriment of the Company; (ii) hire away an employee, advisor, consultant or contractor of the Company; or (iii) help another person or entity hire away a Company employee, advisor, consultant or contractor." *Id.* § 3.

48.     Hermalyn also acknowledged and agreed that any breach or threatened breach of the Confidentiality Agreement "would cause the Company irreparable harm for which monetary damages are inadequate" and that as a result, if he breaches or threatens to breach the agreement, "the Company shall be entitled to an injunction restraining such breach or threatened breach, or requiring specific performance, in addition to any and all rights and remedies at law and equity." *Id*. § 8.  Hermalyn further agreed that "[t]he Company shall not be obligated to present additional evidence of irreparable harm or the insufficiency of monetary damages and, to the extent permitted by law or under applicable court rule, does not need to post a bond or other surety."  *Id.*

49.     Finally, Hermalyn assented that "[i]f the Company prevails in any request to have [him] specifically perform [his] obligations under this Agreement (including pursuant to a temporary restraining order or preliminary injunction), the Company shall be entitled to receive from [him] the Company's costs of suit, including reasonable attorney's fees, costs and expenses (in addition to any other relief sought, available or awarded under this Agreement)."  *Id.*

## B. *Noncompetition Covenants*

50.     Throughout his employment with DraftKings, Hermalyn was offered the opportunity to receive valuable equity in the company in exchange for his agreement to abide by certain non-competition restrictions all governed by Massachusetts law.  *See, e.g.*, Noncompetition Covenant § (f).

51.     ***Hermalyn agreed to these restrictions no less than 12 times in exchange for his receipt of millions of dollars in DraftKings equity.***

52.     In the Noncompetition Covenant, Hermalyn professed his loyalty to DraftKings, promising that during his employment, he would "not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of the Company), provide services to a Competing Business." *Id*. § (a).

53.     He also agreed that for a period of twelve (12) months following the end of his employment, he would "not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company): (1) provide services to a Competing Business that relate to any aspect of the Business of the Company . . . for which [he] performed services or received Confidential Information . . . at any time during the six (6) month period prior to such termination; or (2) commit a Threatened Breach of the obligation set forth in the immediately preceding clause." *Id*.

54.     The Noncompetition Covenant contains substantially similar definitions of "Competing Business," "Business of the Company," (which includes "Gaming") and "Confidential Information" as are included in the Confidentiality Agreement. *Compare* Noncompetition Covenant §§ (a)(i), (iv), (v), and (viii) *with* Confidentiality Agreement, Definitions (i)-(iii).

55.     The "Restricted Area" is defined as "any place within the United States or anywhere else in the world, since Competing Businesses operate globally and without meaningful limitation to compete caused by geographic locations, and because the Business of the Company is global in nature due to the specialized industries in which the Company and Competing Businesses operate, which Employee acknowledges and agrees is reasonable." *Id*. § (a)(vii).

A38

56.     Hermalyn further agreed that in the event that he breaches or threatens to breach the Noncompetition Covenant, the duration shall be extended "for an additional period of time equal to the time that elapses from the commencement of such breach [or] Threatened Breach . . . to the later of: (i) the termination of such breach [or] Threatened Breach . . . or (ii) the final non-appealable resolution of any litigation or other legal proceeding stemming from such breach [or] Threatened Breach." *Id*. § (g).

57.     Hermalyn also acknowledged that "the enforcement of the Noncompetition Covenant is necessary, among other things, to ensure the preservation, protection and continuity of the Company's Confidential Information, trade secrets and goodwill" and that "due to the proprietary nature of the Business of the Company and relationships with others, the restrictions . . . set forth herein are reasonable as to duration and scope." *Id*. § (d).

58.     Finally, as with the Confidentiality Agreement, Hermalyn acknowledged and agreed that his breach or threatened breach of the Noncompetition Covenant would cause DraftKings irreparable harm, entitling it to provisional injunctive relief without a need to submit additional evidence of irreparable harm or the insufficiency of monetary damages, as well as entitle DraftKings to its attorneys' fees and costs should it prevail in an enforcement action. *Id*. § (e).

**V.     Hermalyn Executes His Plan to Steal Trade Secrets And Confidential Information To Use At Fanatics**

59.     In the week leading up to his DraftKings departure and the 2024 Super Bowl – the most critical time for any sports betting business and thus when Hermalyn's defection to Fanatics could give it the maximum unfair advantage and cause DraftKings maximum injury – Hermalyn viewed and downloaded and, on information and belief, stole many of DraftKings' most commercially sensitive documents. Hermalyn had no legitimate business reason to be accessing,

A39

let alone downloading, these documents from DraftKings' systems at a time when he clearly has already planned to defect to Fanatics.

60.     On January 23, 2024, Hermalyn accessed a "VIP Founders Club" PowerPoint presentation. Out of DraftKings' thousands of employees, only 23 have access rights to this document.  This presentation was created in 2021 and describes a proposed loyalty program for recruiting top-tier VIP players.  In essence, it provides a roadmap for designing and executing a gaming-industry VIP rewards program.  This presentation identifies benefits to be provided to VIP customers and explains the metrics and analyses conducted to determine what customers should be accorded VIP status.  In other words, the information in this document is exactly the information a competitor would need to create its own VIP rewards program.

61.     It is unclear how Hermalyn could contend to have a legitimate business purpose for accessing this document at this time.  It reflects the blueprint for creating a new VIP rewards program that DraftKings never ultimately implemented.  Although this particular program was not implemented, the presentation contains valuable information concerning how DraftKings' scales and values customers, as well as how to successfully structure VIP rewards to incentivize and recruit customers.  Hermalyn's role at DraftKings involved managing its existing, successful VIP program; his ordinary business responsibilities did not create any reason for him to review a years-old roadmap document created to guide the development of a different program from its origin.  Rather, the only plausible reason why Hermalyn would have accessed this April 2021 document in January 2024 was to misappropriate its extremely valuable and confidential contents to use and disclose for Fanatics' benefit in competing unfairly with DraftKings.

62.     Then, on January 24, Hermalyn downloaded a document entitled "BD [Business Development] Team Tracker – Weekly Report."  Again, only 23 DraftKings employees have

A40

access rights to this document.  This report is a 181-page chart containing, among other things:  (i) lists of short-term and long-term priority deals and projects; (ii) lists of then-ongoing contracts and their current status (*i.e.*, executed, in the process of being executed, or being negotiated through redline exchanges); (iii) identification of target markets, media, and platforms; and (iv) internal questions and comments from DraftKings employees and department representatives reflecting DraftKings' confidential business strategies.  This document would allow Fanatics to evaluate the entire landscape of DraftKings business contracts, prospects, and active contract negotiations, and provide a window into how Fanatics can undercut and outbid DraftKings for those very same deals.

63.     On information and belief, Hermalyn also had no legitimate business reason to access this document, especially nearly one week prior to his departure.  The "BD [Business Development] Team Tracker – Weekly Report" was last updated in late November 2023, and existed to allow teams involved in active negotiations with partners to centralize updates to their negotiations and compare their negotiations to past agreements.  There was also no legitimate business reason for Hermalyn to review this document since he would be resigning from DraftKings only a week later.  The only plausible reason for Hermalyn to access this document was for him to misappropriate the information about DraftKings' existing and potential contractual agreements, its planned and priority partnerships, and other business development opportunities, and to use and disclose that information for Fanatics' benefit in competing unfairly with DraftKings.

64.     Armed with core DraftKings information—information that would be of great value in operating a competitor like Fanatics—on information and belief, Hermalyn put into action a calculated plan to exit DraftKings at the most damaging possible time.

65.     On January 29, Hermalyn informed two DraftKings employees and external potential partners that a "close friend" had died.  He told DraftKings he would be taking a leave on January 29 and January 30.  Hermalyn canceled meetings scheduled for January 29, moving some to February 1.



> **From:** Michael Hermalyn on behalf of Michael Hermalyn <m.hermalyn@draftkings.com>
> **Sent:** Monday, January 29, 2024 1:01 PM EST
> **To:** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
> **Subject:** DK // Project ON+
> ▇▇▇, a friend passed, dealing with that today / tomorrow. Two options for Wednesday, keep as is and my team can tackle… or push to next week? Thanks so much for understanding.

66.     On January 30, Hermalyn informed another DraftKings employee that in light of his leave, he would need to cancel a planned VIP onsite in Boston for the core VIP team to prepare for the Super Bowl.  This onsite was scheduled to run from January 29 through February 2.  Hermalyn did not respond to most, if not all, emails from his DraftKings colleagues during his time off—purportedly because he was mourning the loss of a friend from Pennsylvania.

67.     Geolocation data, call logs, and other activity on Hermalyn's  DraftKings' account have revealed that, under cover of his purported "leave," Hermalyn traveled to California on January 29 and went to Fanatics' offices in Los Angeles.  On January 30, while physically present in Fanatics' offices, Hermalyn accessed DraftKings' Google workspace from a non-DraftKings device and downloaded a commercially sensitive document—the "(Master) SB 2024" spreadsheet, a document to which only 21 DraftKings employees, out of thousands, have access rights.

68.     This spreadsheet contains a compilation of all of DraftKings' plans for entertaining its key partners at the 2024 Super Bowl.  These business partners include representatives of teams and leagues, as well as athletes, celebrities, influencers, vendors, and corporate officers and directors who are invited to special events (like the Super Bowl) and are critical to DraftKings'

business development efforts to recruit and retain VIP customers.  In addition to identifying these business partners, the spreadsheet lists the corresponding DraftKings employees who maintain relationships with each business partner and would serve as their point of contact at the Super Bowl—information that would be extremely valuable to a competitor seeking to enter into a similar business relationship with them.  The spreadsheet also includes information reflecting the number of VIP customers who will also be attending those events, which, if in the hands of a competitor, would allow them to attend the same events as DraftKings VIPs and potentially solicit them.

69.     Hermalyn had no legitimate business reason to download the "(Master) SB 2024" spreadsheet to a non-DraftKings device, especially because he knew that he would no longer be employed by DraftKings by the Super Bowl.  On information and belief, Hermalyn downloaded DraftKings' sensitive Super Bowl strategies in order to share the information with Fanatics, with which he was actively negotiating the terms of his future employment.

70.     On the same trip to California, Hermalyn also repeatedly accessed and downloaded a presentation entitled "BD_Gaming101."  DraftKings' business development team uses this document to pitch potential business partners on the value proposition of partnering with DraftKings, including confidential information about the profile of DraftKings' customers and its other business partnerships.  DraftKings requires potential partners to execute a non-disclosure agreement before viewing the presentation.

71.     Once again, Hermalyn had no legitimate business reason to review this document while he was in California, as he was not participating in any partnership pitches and was not scheduled to participate in any partnership pitches in the near future.  On information and belief, Hermalyn downloaded this presentation as well in order to share it with Fanatics.

72.     Hermalyn abruptly informed DraftKings on February 1 that he was resigning from DraftKings to join Fanatics as the President of its VIP Team, precisely the same position that he held on behalf of DraftKings.  He also claimed that he would be heading up its Los Angeles office.

73.     And yet, despite his resignation, that same day, Hermalyn again downloaded the "BD-Gaming 101" presentation, again without any legitimate business reason for doing so.

74.     The upcoming Super Bowl will occur on February 11—one week after Hermalyn's resignation, but with enough time for Hermalyn to download and use DraftKings' confidential and proprietary Super Bowl information and strategies to compete unfairly against DraftKings in the most important days in the sports gaming calendar.

**VI.     After Hermalyn's Theft and Resignation, He Sues in California To Invalidate His Enforceable Restrictive Covenants**

75.     On February 1, 2024—the day of his resignation, Hermalyn filed a 26-page complaint in California Superior Court for the County of Los Angeles seeking declaratory and injunctive relief alleging violations of California Business & Professions Code Sections 16600, 16600.1, 16600.5, and 17200.  Hermalyn simultaneously filed an *Ex Parte* Application for a Temporary Restraining Order and an Order to Show Cause Regarding Preliminary Injunction seeking to invalidate his non-compete agreement as a "resident" of California.

76.     These extensive legal papers demonstrate that Hermalyn had been coordinating with Fanatics and its lawyers for weeks—possibly months—to evade his non-competition obligations to DraftKings.

77.     On information and belief, Hermalyn manufactured his purported "residency" in California solely to evade the obligations of his contractual agreements with DraftKings—despite having resided in New Jersey with his family for years.

23

A44

78.     During his DraftKings employment from September 2020 through February 1, 2024, Hermalyn resided in Bay Head, New Jersey.   Hermalyn also routinely traveled to Massachusetts for DraftKings business.

79.     Hermalyn owns a home in Bay Head, New Jersey which he purchased in December 2021 for $4,100,000.  Hermalyn pays property and income tax in the state of New Jersey.

80.     Hermalyn previously lived in New York and is registered to vote in New York. Approximately three weeks prior to his resignation from DraftKings, he told a colleague that he intended to move back to New York City and send his children to a public school located on the Upper West Side of Manhattan.

81.     Hermalyn's children attend schools in New Jersey and his wife is currently employed as a Director of Sales for Tory Burch in New York City, her employer for over seven years.

82.     On information and belief, Hermalyn's new-found "residence" in California is a hastily manufactured litigation gambit.  It is a transparent effort to flee a jurisdiction that enforces non-competition agreements to one that does not.  Hermalyn's desire to avoid his bargained-for obligations simply by devising a plan to "move" to California irreparably harms DraftKings.

83.     Hermalyn claims that during his visit to California which spanned January 29 to January 31, he: (1) signed a lease for an apartment in Los Angeles (location, size, cost, and duration of lease unknown); (2) obtained a California driver's license; (3) purchased a car registered in California; (4) registered to vote in California; (5) obtained an appointment with a physician in California; and (6) contacted summer camps and "joined waitlists."  Then, on February 1, 2024, he filed suit in California state court claiming to be a California resident who could not be held to his contractual non-competition obligations and Massachusetts forum-selection clauses.  In short,

what Hermalyn would have this Court believe is that anyone with some spare cash and a phone can become a California resident in less time than the average trip to Disneyland.

**VII.  If Hermalyn Is Permitted to Use DraftKings' Trade Secrets and Confidential Information, and Continue His Employment with Fanatics, DraftKings Will Continue To Suffer Irreparable Harm**

84.  The irreparable competitive injury that DraftKings will suffer in the absence of emergency relief is all the more pronounced given the various aggravating factors evidenced by Hermalyn's conduct.

85.  During the final weeks of his employment with DraftKings, Hermalyn, on information and belief, in concert with and at the direction of Fanatics, engaged in a pattern of stealth, deception, and outright lies on the eve of the Super Bowl, the most important gaming event of the year.  On information and belief, the reason behind the timing is readily apparent: to cause the maximum harm to DraftKings, and its customer relationships, and to provide the maximum competitive benefit to Fanatics.

86.  On information and belief, through misappropriation and exploitation of DraftKings' trade secrets and confidential information, including information relating specifically to DraftKings' strategies, events, and activities during the Super Bowl, Hermalyn and Fanatics hope to interfere with and commandeer DraftKings' most important long-term customer and partner relationships *this weekend*.

87.  Hermalyn, formerly the head of DraftKings' VIP team, is assuming the role of President of Fanatics VIP.  He will be competing directly *against* DraftKings for the very same VIP players he was working to solicit just weeks prior on DraftKings' behalf—players that drive a significant percentage of overall revenue in the sports betting and iGaming industry.  DraftKings welcomes fair competition.  But this is a paradigm record of unfair competition.  On information and belief,  Hermalyn and Fanatics are using, and without injunctive relief, will continue to use

25

A46

DraftKings' trade secrets and confidential information to recruit VIP players to Fanatics.

**VIII.    DraftKings' Post-Resignation Investigation Uncovers Additional Wrongdoing**

88.    Once it became clear that Hermalyn had been lying to DraftKings for at least several weeks leading up to his resignation, DraftKings immediately launched a preliminary investigation of Hermalyn's activities at DraftKings.  The preliminary investigation revealed that Hermalyn engaged in widespread misconduct, including, on information and belief, unlawfully soliciting DraftKings employees on behalf of Fanatics in 2023, inducing DraftKings to award him a multi-million dollar retention grant under false pretenses, and entering into a self-dealing transaction.

89.    In February 2023, Hermalyn attended a Super Bowl party with Fanatics executives. After that party, by email dated February 17, Matt King, Fanatics Betting and Gaming's Chief Executive Officer, requested a meeting with Hermalyn ostensibly to discuss an employment position for Hermalyn with Fanatics.

90.    After meeting with Hermalyn, Fanatics targeted and attempted to poach other employees in DraftKings' VIP organization, all of whom, like Hermalyn, are bound by post-termination non-competes.

91.    For example, Fanatics offered Robert Ferrara ("Ferrara"), a VIP representative who reported to Hermalyn, a senior level "strategy" role reporting to Alex Lee, Senior Vice President & General Manager of Fanatics Loyalty.  Fanatics also attempted to hire at least two other DraftKings VIP representatives—both of whom also reported to Hermalyn.

92.    On July 20, 2023, Ferrara notified DraftKings that he was resigning to assume a role with Fanatics that Ferrara claimed was in a non-competitive part of Fanatics' business. Specifically, Ferrara claimed that he was going to work in Fanatics' collectibles business, as opposed to its gaming business.

93.    Later that day, disregarding his contractual commitments not to solicit DraftKings

A47

employees, Hermalyn emailed members of his VIP team multiple times encouraging them to meet with "Mike," presumably Michael Rubin, Fanatics' Chief Executive Officer, describing him as "one of us."



94.     Hermalyn's email encouraging members of his team to explore employment opportunities with a direct competitor constitutes a breach of his duty of loyalty and contractual non-solicitation obligations to DraftKings.

95.     Hermalyn's email also states that he was "getting out of the industry" at the time— on information and belief, a thinly veiled reference to his plan to avoid his noncompete obligations by claiming to work in a non-competitive capacity with Fanatics—like Ferrara.

96.     This is only the beginning of Hermalyn's deception and disloyalty.  In July 2023, Hermalyn affirmed his loyalty and devotion to DraftKings, falsely portraying himself to DraftKings' management as a white knight against Fanatics' recruitment campaign.  Hermalyn informed DraftKings' management about Fanatics' efforts to recruit him and the VIP team and falsely stated that he was trying to persuade his team to remain with DraftKings.  On information and belief, Hermalyn leveraged his lies and self-dealing to trick DraftKings into awarding him a lucrative retention compensation package.

97.     Unaware that Hermalyn was a double agent encouraging his subordinates to meet with Fanatics' CEO, on July 31, 2023, DraftKings awarded Hermalyn a multi-million dollar equity

grant under false pretenses through another equity agreement. That agreement, as the ones before it, prohibited Hermalyn from competing with DraftKings for 12 months following the end of his employment.

98.   On information and belief, after Hermalyn unlawfully and surreptitiously solicited his own DraftKings subordinates to consider joining Fanatics, he informed DraftKings management that in order to retain his subordinates, DraftKings would need to pay them generous retention packages.

99.   At all relevant times, Hermalyn was aware that DraftKings fiercely protects its confidential and proprietary information concerning its VIP customers and customer strategies, both in connection with the Super Bowl and more broadly. As a result of Fanatics' recruitment of Ferrara, described above, Hermalyn knew that DraftKings enforces the restrictive covenants it obtains from its employees, including but not limited to, the non-competition covenants, to protect against employees unfairly competing, particularly as it relates to Fanatics and other major competitors. On this record, Hermalyn's breach of his contractual obligations and fiduciary duties is knowing and willful.

100.   Hermalyn's deceptive conduct was not limited to assisting Fanatics' efforts to raid DraftKings' workforce or poach Hermalyn and his subordinates.

101.   He also arranged for DraftKings to purchase thousands of dollars worth of dinners at three New York City restaurants owned by an entity with which, on information and belief, he is affiliated, ostensibly for the purpose of entertaining VIP clients. Hermalyn signed the contract on behalf of DraftKings with those very restaurants. On information and belief, Hermalyn never disclosed his affiliation to anyone at DraftKings when he made this arrangement. Furthermore, to date, DraftKings has not uncovered evidence that Hermalyn entertained any VIP clients at these

restaurants.

**IX.    Hermalyn Exacts Revenge on DraftKings After He Is Held Accountable For Workplace Misconduct.**

102.    In the weeks leading up to Hermalyn's departure, Hermalyn became aware that he was under investigation for workplace misconduct.  On January 26, 2024, Hermalyn was informed that DraftKings was taking immediate disciplinary action towards him, including by reducing his compensation and title, while DraftKings continued to evaluate his conduct.  After this meeting, Hermalyn expressed that his desire was to move forward with DraftKings and remain employed.  However, DraftKings' disciplinary action and ongoing observation of his conduct, on information and belief, motivated Hermalyn to finally carry out his scheme, that appears to have been hatched as early as February 2023, to leave DraftKings for Fanatics and inflict maximum harm upon DraftKings on his way out.  So, he decided to travel to Los Angeles to Fanatics' offices, download DraftKings' confidential information while there and then resign the week before the Super Bowl  – with no warning or notice.

103.    The investigation was prompted by a female employee's allegations about inappropriate workplace treatment, and thereafter numerous additional employees raised allegations of improper conduct including theft of company funds, inappropriate behavior towards women and bullying.  In part, DraftKings learned the following:

- Hermalyn used a corporate credit card to purchase thousands of dollars of wine intended for personal use with his friends, while describing in DraftKings' expense records that the purchase was for VIP entertainment and gifts.  He also used his corporate credit card to book first-class plane tickets in violation of company policy;

- Hermalyn further directed DraftKings funds to his close friends' business, without

29

A50

disclosing his relationship, by ensuring that the company's 2023 holiday gifting initiative was run through a high-end boutique owned by that friend;

- Hermalyn violated DraftKings' policies with respect to expense reimbursement, on information and belief, using company funds for his own personal benefit. He spent thousands of dollars in company funds on merchandise featuring the company's logo and intellectual property that he did not obtain approval to use. He miscoded the invoices as "holiday giving"; and

- Numerous female DraftKings employees made allegations that Hermalyn made them feel uncomfortable in the workplace. For example, these allegations include that he: (i) inappropriately berated a female employee during a meeting with co-workers; (ii) engaged in unwelcome physical contact with a female employee without her consent; (iii) made inappropriate comments regarding his female colleague's physical appearance; and (iv) numerous other allegations that are still outstanding.

104.     DraftKings' investigation is ongoing, and DraftKings reserves the right to add additional claims against Hermalyn in the future as the evidence warrants.

## COUNT I – Breach of Contract by Misappropriation (Confidentiality Agreement)

105.     DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

106.     The Confidentiality Agreement is a valid and binding contractual agreement, as described above.

107.     DraftKings fully performed its obligations under the Confidentiality Agreement.

108.     The Confidentiality Agreement was made for valid consideration, including the

compensation Hermalyn received in the course of his employment.

109.   In the Confidentiality Agreement, Hermalyn agreed to safeguard DraftKings "Confidential Information," promising that he will "not, during or after [his] employment: (i) use any Confidential Information for any purpose that is not authorized by the Company; (ii) disclose any Confidential Information to any person or entity, except as authorized by the Company in connection with Employee's job duties; or (iii) remove or transfer Confidential Information from the Company's premises or systems except as authorized by the Company." *Id*. § 5.

110.   Hermalyn further agreed that upon termination of his employment for any reason, he "will immediately surrender to the Company all Company property in [his] possession, custody, or control, including any and all documents, electronic information, and materials of any nature containing any Confidential Information, without retaining any copies." *Id.* § 5.

111.   Hermalyn also affirmed his duty of loyalty to DraftKings, committing that during his employment he "will devote [his] best efforts on behalf of the Company," and further agreeing "not to provide any services to any Competing Business or engage in any conduct which may create an actual or appear to create a conflict of interest." *Id*. § 1.

112.    As described in detail above, Hermalyn breached these provisions of the Confidentiality Agreement, including by stealing DraftKings' trade secrets and other confidential information to use for Fanatics' benefit.

113.   DraftKings has suffered and will suffer damages and irreparable harm as a direct and proximate result of Hermalyn's breach of the Confidentiality Agreement, including the loss of its trade secrets and other confidential information, and will continue to suffer irreparable harm as a result of that breach for which there is no adequate remedy at law.

**COUNT II – Breach of Contract by Employee Solicitation (Confidentiality Agreement)**

114.    DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

115.    The Confidentiality Agreement is a valid and binding contractual agreement, as described above.

116.     DraftKings fully performed its obligations under the Confidentiality Agreement.

117.    The Confidentiality Agreement was made for valid consideration, including the compensation Hermalyn received in the course of his employment.

118.    In the Confidentiality Agreement, Hermalyn agreed that during his employment and for the twelve (12) months following the termination of his employment, he would not "directly or indirectly either for [himself] or for any other person, partnership, legal entity, or enterprise: (i) solicit, in person or through supervision or control of others, an employee, advisor, consultant or contractor of the Company for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with the Company or to change an existing business relationship to the detriment of the Company; (ii) hire away an employee, advisor, consultant or contractor of the Company; or (iii) help another person or entity hire away a Company employee, advisor, consultant or contractor. *Id.* § 3.

119.    Hermalyn affirmed his duty of loyalty to DraftKings, committing that during his employment he "will devote [his] best efforts on behalf of the Company," and further agreeing "not to provide any services to any Competing Business or engage in any conduct which may create an actual or appear to create a conflict of interest." *Id*. § 1.

120.    As described in detail above, Hermalyn breached these provisions of the Confidentiality Agreement, including by encouraging subordinate members of his VIP team to

meet with, on information and belief, Fanatics' CEO Michael Rubin and explore employment opportunities with Fanatics.

121.    DraftKings has suffered damages as a direct and proximate result of Hermalyn's breach of the Confidentiality Agreement, including being forced to replace at least one member of the VIP team who resigned to commence employment with Fanatics, and forced to pay additional retention packages to other employees.

122.    By virtue of his lawsuit in California seeking to invalidate his employee non-solicitation restrictions, Hermalyn has threatened to breach such restrictions, in which case DraftKings would suffer irreparable harm as the result of Hermalyn's breach of the Confidentiality Agreement, including the loss of valuable members of the VIP team, and will continue to suffer irreparable harm as a result of that breach for which there is no adequate remedy at law.

**COUNT III – Breach of Contract by Competition (Noncompetition Covenant)**

123.    DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

124.    Throughout his employment with DraftKings, Hermalyn was offered the opportunity on multiple occasions to receive valuable equity in DraftKings in exchange for his agreement to abide by certain non-competition restrictions that are substantially similar to those found in the Noncompetition Covenant.  The Noncompetition Covenant is a valid and binding contractual agreement that Hermalyn affirmed 12 times during his DraftKings employment.

125.     DraftKings fully performed its obligations under the Noncompetition Covenant.

126.    Under the Noncompetition Covenant, Hermalyn agreed that for a period of twelve (12) months following the end of his employment, he would "not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or

33

A54

otherwise (other than on behalf of Company): (1) provide services to a Competing Business that relate to any aspect of the Business of the Company . . . for which [he] performed services or received Confidential Information . . . at any time during the six (6) month period prior to such termination; or (2) commit a Threatened Breach of the obligation set forth in the immediately preceding clause." *Id.* (a)

127.    The Noncompetition Covenant contains substantially similar definitions of "Competing Business," "Business of the Company," (which includes "Gaming") and "Confidential Information" as appears in the Confidentiality Agreement.    *Compare* Noncompetition Covenant §§ (a)(i), (iv), (v), and (viii) *with* Confidentiality Agreement, Definitions (i)-(iii).  The "Restricted Area" is defined as "any place within the United States or anywhere else in the world, since Competing Businesses operate globally and without meaningful limitation to compete caused by geographic locations, and because the Business of the Company is global in nature due to the specialized industries in which the Company and Competing Businesses operate, which Employee acknowledges and agrees is reasonable." *Id.* § (vii).

128.    Hermalyn breached the Noncompetition Covenant by accepting employment with Fanatics, a direct competitor of DraftKings, in substantially the same position he held at DraftKings within the Restricted Area during the 12-month period following the termination of his employment.  Furthermore, Hermalyn has not established his status as a California resident.

129.    DraftKings has suffered and will suffer damages and irreparable harm as a direct and proximate result of Hermalyn's breach of the Noncompetition Covenant, including the loss of its client relationships, good will, significant business opportunities, reputational status, as well as its trade secrets and other confidential information, and will continue to suffer irreparable harm as a result of that breach for which there is no adequate remedy at law

**COUNT IV – Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act (DTSA) (18 U.S.C. § 1836)**

130.   DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

131.   Hermalyn misappropriated DraftKings' trade secrets including but not limited to: (i) the "(Master) SB 2024" spreadsheet containing all of DraftKings' plans for entertaining its key partners, including representatives of teams and leagues, as well as athletes, celebrities, influencers, vendors, and corporate officers and directors, at the 2024 Super Bowl, the corresponding DraftKings employees who maintain relationships with each business partner and would serve as their point of contact at the Super Bowl, what events the key partners would be attending, as well as the number of VIP customers who will also be attending those same events; (ii) the presentation entitled "BD_Gaming101" reflecting DraftKings' pitch to potential business partners on the value proposition of partnering with DraftKings, including the profile of DraftKings' customers and its other business partnerships; (iii) the "VIP Founders Club" PowerPoint presentation describing a proposed loyalty program for recruiting top-tier VIP players, identifying benefits to be provided to VIP customers, explaining the metrics and analyses conducted to determine what customers should be accorded VIP status, and providing a roadmap for designing and executing a gaming-industry VIP rewards program; and (iv) the "BD [Business Development] Team Tracker – Weekly Report," containing, among other things:  (a) lists of short-term and long-term priority deals and projects; (b) lists of then-ongoing contracts and their current status (*i.e.*, executed, in the process of being executed, or being negotiated through redline exchanges); (c) identification of target markets, media, and platforms; and (d) internal questions and comments from DraftKings employees and department representatives reflecting DraftKings' confidential business strategies. This information constitutes protectable trade secrets owned by DraftKings, pursuant to 18 U.S.C.

§ 1839(3).

132.    DraftKings relies on the above trade secrets in providing its gaming services in interstate commerce—including in Arizona, Colorado, Connecticut, Illinois, Indiana, Iowa, Louisiana, Maine, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, Tennessee, Virginia, Vermont, West Virginia, and Wyoming, as well as internationally.

133.    DraftKings' trade secrets, including but not limited to lists of important business partners including teams, leagues, casinos, athletes, celebrities, influencers, vendors, and corporate officers and directors, and detailed information concerning strategies for pitching to prospective partners, framework for developing promotional programs, deals and projects, contract terms, as well as target markets, medias, and platforms—which are generated by a substantial investment by DraftKings of money, time, and energy—derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person or business who can obtain economic value from the disclosure or use of that information.

134.    DraftKings has taken reasonable measures to protect the confidentiality of its trade secrets.  As described above, DraftKings requires employees to enter into confidentiality agreements prohibiting the use or disclosure of DraftKings' trade secrets.  Additionally, DraftKings has robust policies in place that are also designed to protect DraftKings' trade secrets. Finally, DraftKings uses a host of technological safeguards to ensure that its trade secrets do not fall into the hands of competitors.

135.    DraftKings does not consent to the acquisition, disclosure or use of its trade secrets by anyone other than authorized personnel using them within the scope of the contractual

obligations of their employment with DraftKings. DraftKings did not consent to Hermalyn acquiring, disclosing or using DraftKings trade secrets for any purpose whatsoever following his termination of employment.

136.   DraftKings disclosed and provided its trade secrets to Hermalyn in confidence, while he was an employee of the company, pursuant to a duty to maintain the confidentiality and secrecy of that information.

137.   Hermalyn breached that confidence by improperly acquiring, disclosing and/or using DraftKings trade secrets, including by accessing and downloading them from a non-DraftKings device while inside the offices of Fanatics, and with the intent to benefit Fanatics.

138.   Before resigning from DraftKings, Hermalyn knew that the documents he accessed and downloaded contained highly valuable trade secrets based on his years of executive experience working for DraftKings.

139.   DraftKings disclosed to Hermalyn in the Confidentiality Agreement that "[p]ursuant to 18 U.S.C. Section 1833(b), [Hermalyn] shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (1) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to any attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." *Id*. § 5.

140.   Hermalyn knew and was aware of his duties to refrain from disclosing or using DraftKings' trade secrets.

141.   DraftKings has suffered irreparable harm as a direct and proximate result of Hermalyn's misappropriation, and will continue to suffer irreparable harm if Hermalyn is not

permanently enjoined from retaining, using, or disclosing DraftKings' trade secrets.

142.     DraftKings also seeks an award of actual damages in an amount to be proven at trial under 18 U.S.C. § 1836(b)(3)(B).

143.     Hermalyn's misappropriation of DraftKings' trade secrets was conducted through improper means, willful, malicious, bad faith conduct, and theft, as demonstrated by his deception regarding his involvement with Fanatics, entitling DraftKings to attorneys' fees and exemplary damages. 18 U.S.C. § 1836(3)(C)-(D).

**<u>COUNT V – Misappropriation of Trade Secrets in Violation of the Massachusetts Uniform Trade Secrets Act (MUTSA) (M.G.L. c. 93, §§ 42 to 42G)</u>**

144.     DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

145.     Hermalyn misappropriated DraftKings' trade secrets including but not limited to: (i) the "(Master) SB 2024" spreadsheet containing all of DraftKings' plans for entertaining its key partners, including representatives of teams and leagues, as well as athletes, celebrities, influencers, vendors, and corporate officers and directors, at the 2024 Super Bowl, the corresponding DraftKings employees who maintain relationships with each business partner and would serve as their point of contact at the Super Bowl, what events the key partners would be attending, as well as the number of VIP customers who will also be attending those same events; (ii) the presentation entitled "BD_Gaming101" reflecting DraftKings' pitch to potential business partners on the value proposition of partnering with DraftKings, including the profile of DraftKings' customers and its other business partnerships; (iii) the "VIP Founders Club" PowerPoint presentation describing a proposed loyalty program for recruiting top-tier VIP players, identifying benefits to be provided to VIP customers, explaining the metrics and analyses conducted to determine what customers should be accorded VIP status, and providing a roadmap for designing and executing a gaming-

industry VIP rewards program; and (iv) the "BD [Business Development] Team Tracker – Weekly Report," containing, among other things:  (a) lists of short-term and long-term priority deals and projects; (b) lists of then-ongoing contracts and their current status (*i.e.*, executed, in the process of being executed, or being negotiated through redline exchanges); (c) identification of target markets, media, and platforms; and (d) internal questions and comments from DraftKings employees and department representatives reflecting DraftKings' confidential business strategies. This information constitutes protectable trade secrets owned by DraftKings, pursuant to M.G.L. c. 93, §§ 42 to 42G.

146.    DraftKings' trade secrets, including but not limited to lists of important business partners including teams, leagues, casinos, athletes, celebrities, influencers, vendors, and corporate officers and directors, and detailed information concerning strategies for pitching to prospective partners, framework for developing promotional programs, deals and projects, contract terms, as well as target markets, medias, and platforms—which are generated by a substantial investment by DraftKings of money, time, and energy—derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person or business who can obtain economic value from the disclosure or use of that information.

147.    DraftKings has taken reasonable measures to protect the confidentiality of its trade secrets.  As described above, DraftKings requires employees to enter into confidentiality agreements prohibiting the use or disclosure of DraftKings' trade secrets.  Additionally, DraftKings has robust policies in place that are also designed to protect DraftKings' trade secrets.  Finally, DraftKings uses a host of technological safeguards to ensure that its trade secrets do not fall into the hands of competitors.

A60

148. DraftKings does not consent to the acquisition, disclosure or use of its trade secrets by anyone other than authorized personnel using them within the scope of the contractual obligations of their employment with DraftKings. DraftKings did not consent to Hermalyn acquiring, disclosing or using DraftKings trade secrets for any purpose whatsoever following his termination of employment.

149. DraftKings disclosed and provided its trade secrets to Hermalyn in confidence, while he was an employee of the company, pursuant to a duty to maintain the confidentiality and secrecy of that information.

150. Hermalyn breached that confidence by improperly acquiring, disclosing and/or using DraftKings trade secrets, including by accessing and downloading them from a non-DraftKings device while inside the offices of Fanatics, and with the intent to benefit Fanatics.

151. Before resigning from DraftKings, Hermalyn knew that the documents he accessed and downloaded contained highly valuable trade secrets based on his years of executive experience working for DraftKings.

152. Hermalyn knew and was aware of his duties to refrain from disclosing or using DraftKings' trade secrets.

153. DraftKings has suffered irreparable harm as a direct and proximate result of Hermalyn's misappropriation, and will continue to suffer irreparable harm if Hermalyn is not permanently enjoined from retaining, using, or disclosing DraftKings' trade secrets.

154. DraftKings also seeks an award of actual damages in an amount to be proven at trial under M.G.L. c. 93, § 42B(a).

155. Hermalyn's misappropriation of DraftKings' trade secrets was conducted through willful and malicious conduct, as demonstrated by his deception regarding his involvement with

Fanatics, entitling DraftKings to attorneys' fees and exemplary damages. M.G.L. c. 93, § 42B(b).

### **COUNT VI – Misappropriation of Confidential Business Information**

156.    DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

157.    Hermalyn misappropriated DraftKings' confidential business information by accessing and downloading the documents described above for no legitimate purpose as he prepared to depart DraftKings. These documents included confidential information.

158.    DraftKings has taken reasonable measures to protect the confidentiality of its confidential information. As described above, DraftKings requires employees to enter into confidentiality agreements prohibiting the use or disclosure of DraftKings' confidential information. Additionally, DraftKings has robust policies in place that are also designed to protect DraftKings' confidential information. Finally, DraftKings uses a host of technological safeguards to ensure that its confidential information does not fall into the hands of competitors.

159.    DraftKings does not consent to the acquisition or use of its confidential information by anyone other than authorized personnel using them within the scope of the contractual obligations of their employment with DraftKings. DraftKings did not consent to Hermalyn acquiring or using DraftKings confidential information for any purpose whatsoever following his termination of employment.

160.    DraftKings disclosed and provided its confidential information to Hermalyn in confidence, while he was an employee of the company, pursuant to a duty to maintain the confidentiality and secrecy of that information.

161.    Hermalyn breached that confidence by accessing and downloading DraftKings confidential information, including from a non-DraftKings device while inside the offices of Fanatics, and with the intent to benefit Fanatics.

162.    DraftKings has suffered irreparable harm as the direct and proximate result of Hermalyn's misconduct, and will continue to suffer irreparable harm if Hermalyn is not permanently enjoined from retaining, using, or disclosing DraftKings' confidential information.

<u>**COUNT VII – Breach of Duty of Loyalty**</u>

163.    DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

164.    Hermalyn was a key executive of DraftKings, occupying the position of Senior Vice President of Business Development and Vice President of VIP Management.

165.    In these roles, Hermalyn occupied positions of trust and confidence, and had access to DraftKings' valuable trade secrets and other confidential information.

166.    Hermalyn owed DraftKings a duty of loyalty as its key employee and a senior executive on the VIP team.

167.    As described above, Hermalyn violated his duty of loyalty during his employment with DraftKings by soliciting VIP team members on behalf of Fanatics, lying to DraftKings about his intentions to remain employed with DraftKings, engaging in self-dealing by funneling a DraftKings' contract to restaurants owned by an entity with which, on information and belief, he was affiliated without disclosing such affiliation,  misusing corporate funds for his own personal gain, and ultimately stealing DraftKings' trade secrets and other confidential information to benefit Fanatics.

168.    Upon information and belief, DraftKings has suffered damages as a result of Hermalyn's breach of loyalty, including the competitive harm resulting from Fanatics' exploitation of its trade secrets and confidential information, the loss of a valuable member of the VIP team, the enhanced retention packages paid to other members of the VIP team, and Hermalyn's own enhanced retention package worth millions of dollars, and thousands of dollars of DraftKings'

funds directed by Hermalyn in a self-dealing transaction.

## COUNT VIII – Conversion

169.    DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

170.    As described above, Hermalyn has no right of possession in DraftKings trade secrets and confidential information at the time he downloaded materials at the offices of Fanatics, and since his resignation as an employee of DraftKings.  Hermalyn similarly has no right of possession of some or all of the thousands of dollars of DraftKings' funds directed by Hermalyn, upon information and belief, in a self-dealing transaction.

171.    Hermalyn intentionally and wrongfully exercised control or dominion over DraftKings' property, and conducted a scheme of wrongful acts with the intention to appropriate the property and deprive DraftKings' of its property.

172.    DraftKings' retained at the time of the conversion, and still retains, ownership in the property.

173.    As a direct and proximate result of Hermalyn's conversion of DraftKings' property, DraftKings is entitled to compensatory and punitive damages, as Hermalyn's acts were maliciously taken in willful disregard of DraftKings' rights.

## PRAYER FOR RELIEF

WHEREFORE, DraftKings respectfully requests that the Court enter an order and judgment against Hermalyn as follows:

A)    For a temporary restraining order against Hermlayn, including but not limited to:

- restraining and enjoining him from directly or indirectly providing any services to Fanatics or its subsidiaries, affiliates, and joint ventures relating to: (i) the research, design, development, marketing, sales, operations, maintenance and commercial

A64

exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing; or (ii) any other aspect of the Business of the Company for which he performed services or received Confidential Information (each as defined in the Noncompetition Covenant) at any time during the six (6) month period prior to February 1, 2024;

- restraining and enjoining him from directly or indirectly soliciting or transacting business, or attempting to solicit or transact business with, any of DraftKings' customers, clients, vendors or partners, or with any of DraftKings' prospective customers, clients, vendors or partners about which Hermalyn learned Confidential Information (as defined in the Noncompetition Covenant) or which Hermalyn had some involvement or knowledge relating to: (i) the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing; or (ii) any aspect of the Business

44

A65

of the Company (as defined in the Noncompetition Covenant);

- restraining and enjoining Hermalyn from directly or indirectly: (a) soliciting, in person or through supervision or control of others, an employee, advisor, consultant or contractor of DraftKings for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with DraftKings or to change an existing business relationship to the detriment DraftKings; (b) hiring away an employee, advisor, consultant or contractor of DraftKings; or (c) helping another person or entity hire away a DraftKings employee, advisor, consultant or contractor;

- restraining and enjoining Hermalyn from using or disclosing any of DraftKings' Confidential Information (as defined in the Confidentiality Agreement);

- directing Hermalyn, within three (3) days of the entry of such order, to: (a) return to DraftKings all DraftKings' Confidential Information such that no Confidential Information remains in his possession, custody, or control; (b) identify to DraftKings in writing any disclosure of DraftKings' Confidential Information (as defined in the Confidentiality Agreement) he made to any third party apart from any such disclosures he made in his ordinary course of business as an employee of DraftKings; and (c) certify to DraftKings his compliance with (a) and (b) above under the pains and penalties of perjury.

B)    Awarding DraftKings preliminary and permanent injunctive relief, including but not limited to:

- restraining and enjoining him from directly or indirectly providing any services to Fanatics or its subsidiaries, affiliates, and joint ventures relating to: (i) the research,

A66

design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing; or (ii) any other aspect of the Business of the Company for which he performed services or received Confidential Information (each as defined in the Noncompetition Covenant) at any time during the six (6) month period prior to February 1, 2024;

- restraining and enjoining him from directly or indirectly soliciting or transacting business, or attempting to solicit or transact business with, any of DraftKings' customers, clients, vendors or partners, or with any of DraftKings' prospective customers, clients, vendors or partners about which Hermalyn learned Confidential Information (as defined in the Noncompetition Covenant) or which Hermalyn had some involvement or knowledge relating to: (i) the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or

46

A67

product related to or connected with the foregoing; or (ii) any aspect of the Business of the Company (as defined in the Noncompetition Covenant);

- restraining and enjoining Hermalyn from directly or indirectly: (a) soliciting, in person or through supervision or control of others, an employee, advisor, consultant or contractor of DraftKings for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with DraftKings or to change an existing business relationship to the detriment DraftKings; (b) hiring away an employee, advisor, consultant or contractor of DraftKings; or (c) helping another person or entity hire away a DraftKings employee, advisor, consultant or contractor;

- restraining and enjoining Hermalyn from using or disclosing any of DraftKings' Confidential Information (as defined in the Confidentiality Agreement);

C)      Restitution of any vested equity that Hermalyn received in exchange for any noncompetition covenants contained in his equity agreements;

D)      Awarding DraftKings actual and compensatory damages in an amount to be determined at trial, including costs, fees, and pre- and post-judgment interest;

E)      Awarding DraftKings its costs, expenses, and reasonable attorneys' fees;

F)      Awarding DraftKings exemplary, treble, and/or punitive damages;

G)      Awarding DraftKings recoupment and/or disgorgement of any equity grants and other compensation paid to Hermalyn during his period of disloyalty; and

H)      Awarding DraftKings such further and other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

174.    DraftKings hereby demands a jury trial.

Dated: February 5, 2024                     Respectfully submitted,

                                            */s/ Andrew S. Dulberg*
                                            William F. Lee (BBO #291960)
                                            Andrew S. Dulberg (BBO #675405)
                                            WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                            60 State Street
                                            Boston, MA 02109
                                            Telephone: (617) 526-6000
                                            william.lee@wilmerhale.com
                                            andrew.dulberg@wilmerhale.com

                                            **GIBSON, DUNN & CRUTCHER LLP**
                                            Orin Snyder (*pro hac vice pending*)
                                            Harris M. Mufson (*pro hac vice pending*)
                                            Justin M. DiGennaro (*pro hac vice pending*)
                                            200 Park Avenue
                                            New York, NY  10166-0193
                                            Tel:  212.351.4000
                                            Fax:  212.351.4035
                                            OSnyder@gibsondunn.com
                                            HMufson@gibsondunn.com
                                            JDiGennaro@gibsondunn.com

                                            Jason C. Schwartz (*pro hac vice pending*)
                                            1050 Connecticut Avenue, N.W.
                                            Washington, D.C. 20036
                                            Tel:  202.955.8500
                                            JSchwartz@gibsondunn.com

                                            *Attorneys for Plaintiff DraftKings Inc.*

A69

## **VERIFICATION**

I, Gregory Karamitis, Chief Revenue Officer, verify that I have read the allegations contained in this Verified Complaint; that, other than allegations made upon information and belief, those allegations are true and correct based on my knowledge and belief which, in some instances, is based on information that was provided to me from DraftKings' personnel and from DraftKings records.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 5th DAY OF FEBRUARY 2024

_____
Gregory Karamitis

49

A70

# EXHIBIT A

## Addendum A

## NONSOLICITATION, NONDISCLOSURE & ASSIGNMENT OF INVENTIONS AGREEMENT

The undersigned Employee (the "Employee"), executes this Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement (the "Agreement") in consideration of, and a material inducement for, the Company's (as defined below) relationship with Employee, whether by employment, contractor, or in advisory or consulting capacities, or otherwise, and in consideration of receiving any form of compensation or benefit from or in the Company. Employee understands and agrees that this Agreement shall remain in effect and survive any and all changes in Employee's job duties, titles and compensation during Employee's relationship with Company.

## Definitions

    i.   "Company" shall mean any entity controlled by, controlling, or under common control with DraftKings Inc., including affiliates and subsidiaries. Control means the direct or indirect possession of the power to direct or cause the direction of the management and policies of an entity, whether through ownership, by contract or otherwise.

    i.   "Competing Business" shall mean any person, firm, association, corporation or any other legal entity that is engaged in a business that is competitive with any aspect of the Business of the Company, including but not limited to: FanDuel, Paddy Power Betfair, William Hill and bet365.

    ii.   "Business of the Company" shall mean the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for: (1) fantasy sports contests ("FSC"); (2) Regulated Gaming (defined below); (3) all other products and services that exist, are in development, or are under consideration by the Company during your relationship with the Company ("Other Products and Services"); and (4) all products and services incidentally related to, or which are an extension, development or expansion of, FSC, Regulated Gaming and/or Other Products and Services ("Incidental Products and Services").

    ii.   "Regulated Gaming" shall mean the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing.

    iii.   "Confidential Information" shall mean all information or a compilation of information, in any form (tangible or intangible or otherwise), that is not generally known to competitors or the public, which Company considers to be confidential

A72

and/or proprietary, including but not limited to: research and development; techniques; methodologies; strategies; product information, designs, prototypes and technical specifications; algorithms, source codes, object codes, trade secrets or technical data; training materials methods; internal policies and procedures; marketing plans and strategies; pricing and cost policies; customer, supplier, vendor and partner lists and accounts; customer and supplier preferences; contract terms and rates; financial data, information, reports, and forecasts; inventions, improvements and other intellectual property; product plans or proposed product plans; know-how; designs, processes or formulas; software and website applications; computer passwords; market or sales information, plans or strategies; business plans, prospects and opportunities (including, but not limited to, possible acquisitions or dispositions of businesses or facilities); information concerning existing or potential customers, partners or vendors. Confidential Information shall also mean of or related to Company's current or potential customers, vendors or partners that is considered to be confidential or proprietary to the applicable customer, vendor or partner.

Confidential Information does <u>not</u> include: information in the public domain (other than as a result of disclosure by you); approved in writing for unrestricted release by Company; or produced or disclosed pursuant to a valid court order, provided you have given Company written notice of such request such that Company has an actual, reasonable opportunity to defend, limit or protect such production or disclosure.

1. **Duty of Loyalty**. During the period of Employee's relationship with the Company, Employee will devote Employee's best efforts on behalf of the Company. Employee agrees not to provide any services to any Competing Business or engage in any conduct which may create an actual or appear to create a conflict of interest, without the expressed, written permission of the Company.

2. **Nonsolicitation of Customers, Clients or Vendors.** During the period of Employee's relationship with the Company and for a period of twelve (12) months after termination of such relationship (for any reason), Employee shall not directly or indirectly either for him/herself or for any other person, partnership, legal entity, or enterprise, solicit or transact business, or attempt to solicit or transact business with, any of the Company's customers, clients, vendors or partners, or with any of the Company's prospective customers, clients, vendors or partners about which Employee learned Confidential Information (as defined below) or which Employee had some involvement or knowledge related to the Business of the Company.

3. **Nonsolicitation of Employees and Contractors.** During the period of Employee's relationship with the Company and for a period of twelve (12) months after termination of such relationship (for any reason), Employee will not directly or indirectly either for him/herself or for any other person, partnership, legal entity, or enterprise: (i) solicit, in person or through supervision or control of others, an employee, advisor, consultant or contractor of the Company for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with the Company or to change an existing business relationship

A73

to the detriment of the Company, (ii) hire away an employee, advisor, consultant or contractor of the Company; or (iii) help another person or entity hire away a Company employee, advisor, consultant or contractor.

4. **Nondisclosure of Customer, Partner and Vendor Information**. Employee understands and agrees that it is essential to the Company's success that all nonpublic customer, partner, and vendor information is deemed and treated as Confidential Information and a confidential trade secret. Employee will not directly or indirectly either for him/herself or for any other person, partnership, legal entity, or enterprise use or disclose any such customer, partner, or vendor information except as may be necessary in the normal conduct of the Company's business for the specific customer, partner, or vendor. Employee agrees that at the end of Employee's relationship with the Company, or upon request by the Company, Employee will return to the Company any materials containing such information.

5. **Nondisclosure of Confidential Information**. All such Confidential Information is (and will be) the exclusive property of the Company, and Employee shall not, during or after Employee's employment: (i) use any Confidential Information for any purpose that is not authorized by the Company; (ii) disclose any Confidential Information to any person or entity, except as authorized by the Company in connection with Employee's job duties; or (iii) remove or transfer Confidential Information from the Company's premises or systems except as authorized by the Company.

Upon termination of Employee's relationship (for any reason), or upon the request of the Company, Employee will immediately surrender to the Company all Company property in Employee's possession, custody, or control, including any and all documents, electronic information, and materials of any nature containing any Confidential Information, without retaining any copies.

Employee understands that the Company is now and may hereafter be subject to non-disclosure or confidentiality agreements with third persons that require the Company to protect or refrain from use of Confidential Information. Employee agrees to respect and be bound by the terms of such agreements in the event Employee has access to such Confidential Information.

Notwithstanding the foregoing or anything to the contrary in this Agreement or any other agreement between the Company and the Employee, nothing in this Agreement shall limit the Employee's right to discuss Employee's employment or report possible violations of law or regulation with the Equal Employment Opportunity Commission, United States Department of Labor, the National Labor Relations Board, the Securities and Exchange Commission, or other federal government agency or similar state or local agency or to discuss the terms and conditions of his employment with others to the extent expressly permitted by Section 7 of the National Labor Relations Act or to the extent that such disclosure is protected under the applicable provisions of law or regulation, including but not limited to "whistleblower" statutes or other similar provisions that protect such disclosure. Employee agrees to take all reasonable steps to ensure that the Company's Confidential Information is not made public during any such disclosure. Pursuant to 18 U.S.C. Section 1833(b), the Employee shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a

trade secret that: (1) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

6. **Assignment of Inventions**.  Employee expressly understands and agrees that any and all right or interest Employee obtains in any designs, trade secrets, technical specifications and technical data, know-how and show-how, customer and vendor lists, marketing plans, pricing policies, inventions, concepts, ideas, expressions, discoveries, improvements and patent or patent rights which are authored, conceived, devised, developed, reduced to practice, or otherwise obtained by him during the term of this Agreement which relate to or arise out of his relationship with the Company and which relate to the business of the Company are expressly regarded as "*works for hire*" or works invented or authored within the scope of employment or engagement, whether as an adviser, consultant, officer, executive, director or other capacity (the "Inventions").  Employee hereby assigns to the Company the sole and exclusive right to such Inventions.  Employee agrees to disclose all Inventions fully and in writing to the Company promptly after development, conception, invention, creation or discovery of the same, and at any time upon request.  Employee will provide all assistance that the Company reasonably requests to secure or enforce its rights throughout the world with respect to Inventions, including signing all necessary documents to memorialize those rights and take any other action which the Company shall deem necessary to assign to and vest completely in the Company, to perfect trademark, copyright and patent protection with respect to, or to otherwise protect the Company's trade secrets and proprietary interest in such Inventions.  The obligations of this Section shall continue beyond the termination of Employee's relationship with respect to such Inventions conceived of, reduced to practice, or developed by the Employee during the term of this Agreement.  The Company agrees to pay any and all copyright, trademark and patent fees and expenses or other costs incurred by Employee for any assistance rendered to the Company pursuant to this Section.

In the event the Company is unable, after reasonable effort, to secure Employee's signature on any patent application, copyright or trademark registration or other analogous protection relating to an Invention, the Employee hereby irrevocably designates and appoints the Company and its duly authorized officer and agent and his agent and attorney-in-fact, to act for and on his behalf and stead to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright or other analogous protection thereon with the same legal force and effect as if executed by the Employee.

In Attachment A to this Agreement, Employee has listed all Inventions that relate to the Business of the Company's that Employee (alone or jointly with others) made, conceived, or first reduced to practice by Employee prior to Employee's execution of this Agreement, and in which Employee has any property interest or claim of ownership.  If no such Inventions are listed in said Attachment, Employee represents that Employee has no such Inventions.

To the extent Employee is a citizen of and subject to law of a state which provides a limitation on invention assignments, then this Agreement's assignment shall not include inventions excluded under such law.

7. **<u>Absence of Conflicting Agreements</u>**.  Employee understands that the Company does not desire to acquire from Employee any trade secrets, know-how or confidential business information that Employee may have acquired from others, and Employee agrees not to disclose any such information to the Company or otherwise utilize any such information in connection with Employee's performance of duties with the Company.  Employee represents that Employee is not bound by any agreement or any other existing or previous business relationship which purports to conflict or impact the full performance of Employee's duties and obligations to the Company.

8. **<u>Remedies Upon Breach</u>**.  Employee agrees that any action that violates this Agreement would cause the Company irreparable harm for which monetary damages are inadequate.  Accordingly, in the event of a breach, or threatened breach, the Company shall be entitled to an injunction restraining such breach or threatened breach, or requiring specific performance, in addition to any and all rights and remedies at law and equity.  The Company shall not be obligated to present additional evidence of irreparable harm or the insufficiency of monetary damages and, to the extent permitted by law or under applicable court rule, does not need to post a bond or other surety.  Nothing herein shall be construed as prohibiting the Company from pursuing any other remedy available to the Company for such breach or threatened breach.  If the Company prevails in any request to have Employee specifically perform his/her obligations under this Agreement (including pursuant to a temporary restraining order or preliminary injunction), the Company shall be entitled to receive from Employee the Company's costs of suit, including reasonable attorney's fees, costs and expenses (in addition to any other relief sought, available or awarded under this Agreement).

9. **<u>Jurisdiction, Venue and Choice of Law</u>** The parties hereby mutually agree to the exclusive jurisdiction of the Superior Court (inclusive of the Business Litigation Session) of the Commonwealth of Massachusetts or the United States District Court for the District of Massachusetts for any dispute arising hereunder.  Accordingly, with respect to any such court action, Employee (a) submits to the personal jurisdiction of such courts; (b) consents to service of process by regular mail to your last known address; and (c) waives any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process.  If Employee commences a legal action or other proceeding against the Company concerning a dispute arising from or relating to this Agreement outside of Massachusetts, Employee shall reimburse the Company for its reasonable attorneys' fees, costs and expenses if Company prevails in staying, transferring, dismissing or otherwise defending such action or proceeding based on the location of the action or proceeding, regardless of whether such fees, costs and expenses are incurred in the forum where you commenced the action or in a Massachusetts forum.  This Agreement shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law.

DocuSign Envelope ID: E9295787-3E2F-4E29-93FA-1B5E78E547E0

10. **At-Will Employment.**  Employee agrees and acknowledges that Employee is an employee "at will" and nothing in this Agreement is intended to guarantee employment for any period of time.  Even though the nature of Employee's relationship with the Company is as an "at will" employee, the parties enter this Agreement with the understanding that Employee's position, title, duties and responsibilities could change in a material way in the future and, in light of that understanding, the parties intend that this Agreement shall follow Employee throughout the entire course of Employee's employment with the Company, and such subsequent material change shall not affect the enforceability or validity of this Agreement.

11. **Return of Property**.  Employee agrees that, at the time of termination of Employee's employment (for any reason), Employee will return immediately to the Company, in good condition, all property of the Company.  This return of property includes, without limitation, a return of physical property (such as computer, phone or other mobile devices, credit card, promotional materials, etc.) and intangible property (such as computer passwords).

12. **Litigation and Regulatory Cooperation**.  During and after the Employee's relationship with the Company, Employee shall cooperate fully with the Company in the defense or prosecution of any claims or actions now in existence or that may be brought in the future against or on behalf of the Company by/against third parties that relate to events or occurrences that transpired while the Employee was employed by the Company.  Employee's full cooperation in connection with such claims or actions shall include, but not be limited to, being available to meet with counsel to prepare for discovery or trial and to act as a witness at mutually convenient times.  During and after the Employee's employment, Employee also shall cooperate fully with the Company in connection with any investigation or review of any federal, state, or local regulatory authority as any such investigation or review relates to events or occurrences that transpired while the Employee was employed by the Company, unless such claim is brought by Employee.

13. **Communication to Future Employers**.  Employee agrees to communicate the contents of all post-relationship obligations in this Agreement to any Competing Business that you intend to be employed by, associated with, or represent.  Employee understands and agrees that the Company may, in its discretion, also share any post-employment obligation set out in this Agreement with any future employer or potential employer of Employee, or any entity which seeks to be associated with Employee for Employee's services.

14. **Miscellaneous**.  Any waiver by the Company of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach hereof.  If a court determines that one or more of the provisions contained in this Agreement shall be invalid or unenforceable, such court shall construe, reform or otherwise revise such provision(s) and/or sever such provisions from this Agreement so as to render it enforceable to the maximum extent allowed by law.  Any part of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions of this Agreement.  The obligations of Employee under this Agreement shall survive the termination of the Employee's relationship with the Company regardless of the manner of such termination.  All covenants and agreements hereunder shall inure to the benefit of and be enforceable by the successors of the Company.  This Agreement

A77

amends, supplants and supersedes any agreement previously executed between the parties regarding the subject matter of this Agreement.

Employee recognizes and agrees that the enforcement of this Agreement is necessary, among other things, to ensure the preservation, protection and continuity of Confidential Information, trade secrets and goodwill of the Company.  Employee agrees that, due to the proprietary nature of the Business of the Company and relationships with others, the post-employment restrictions set forth above are reasonable as to duration and scope.

Employee is advised to consult with an attorney before entering into this Agreement.

PLEASE DO NOT SIGN THIS AGREEMENT IF YOU HAVE INVENTIONS TO DISCLOSE. PLEASE REACH OUT TO YOUR RECRUITER TO COMPLETE A SEPARATE INVENTIONS DOCUMENT (ATTACHMENT A – ON NEXT PAGE FOR REFERENCE) IN THE EVENT THAT YOU HAVE INVENTIONS TO DECLARE.

**IN WITNESS WHEREOF,** the undersigned Employee and the Company have executed this Nonsolicitation, Nondisclosure and Assignment of Inventions Agreement as an instrument under seal as of  8/31/2020                        .

**DraftKings Inc.**                                         **Employee**

**By: Jason Robins**

**Title:**  Chief Executive Officer

**Signature**

Michael Z. Hermalyn

**Print Name**

A78

# NONSOLICITATION, NONDISCLOSURE & ASSIGNMENT OF INVENTIONS AGREEMENT

### ATTACHMENT A

List of all inventions or improvements (referred to in Section 6 of the Agreement) made by you, alone or jointly with others, prior to joining the Company.

| Right, Title or Interest (If none, please write "NONE".) | Date Acquired | Identifying Number or Brief Description of Inventions or Improvements |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Name of Employee:

_____
Print

_____
Sign

_____
DATE

A79

**Addendum B**
**Noncompetition Covenant**

(a) During the period of your relationship with Company, you agree to not, anywhere within the Restricted Area (defined below), acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company): provide services to a Competing Business (defined below). For a period of six (6) months following termination of your relationship with Company (for any reason other than referenced below in section (b)), you agree to not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company): provide services to a Competing Business that relate to any aspect of the Business of the Company (i.e., FSC, Regulated Gaming, Other Products and Services, and/or Incidental Products and Services) for which you performed services or received confidential information at any time during the six (6) month period prior to such termination. For example, if you performed services for the FSC aspect of the Business of the Company and received confidential information about the Regulated Gaming aspect of the Business of the Company during the six (6) month period prior to the termination of your relationship with the Company (for any reason other than referenced below in section (b)), then for six (6) months after such termination, you shall not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company), provide services to a Competing Business that relate to FSC or Regulated Gaming. The foregoing shall not be construed to preclude you from owning up to one percent (1%) of the outstanding stock of a publicly held corporation that constitutes or is affiliated with a Competing Business.

As set out in the Massachusetts Noncompetition Act, you and the Company agree that the option constitutes mutually-agreed upon consideration for this Noncompetition Covenant. Such consideration is specifically designated and you acknowledge the receipt and sufficiency of the consideration.

   i.   "Company" shall mean any entity controlled by, controlling, or under common control with DraftKings Inc., including affiliates and subsidiaries. Control means the direct or indirect possession of the power to direct or cause the direction of the management and policies of an entity, whether through ownership, by contract or otherwise.

   ii.  "Restricted Area" shall mean the entire United States since the Business of the Company encompasses the entire United States, of which you acknowledge and agree.

   iii. "Competing Business" shall mean any person, firm, association, corporation or any other legal entity that is engaged in a business that is competitive with any aspect of the Business of the Company, including but not limited to: FanDuel, Paddy Power Betfair, William Hill and bet365.

iv. <u>"Business of the Company"</u> shall mean the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for: (1) fantasy sports contests ("FSC"); (2) Regulated Gaming (defined below); (3) all other products and services that exist, are in development, or are under consideration by the Company during your relationship with the Company ("Other Products and Services"); and (4) all products and services incidentally related to, or which are an extension, development or expansion of, FSC, Regulated Gaming and/or Other Products and Services ("Incidental Products and Services").

v. <u>"Regulated Gaming"</u> shall mean the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing.

vi. "Confidential Information" shall mean all information or a compilation of information, in any form (tangible or intangible or otherwise), that is not generally known to competitors or the public, which Company considers to be confidential and/or proprietary, including but not limited to: research and development; techniques; methodologies; strategies; product information, designs, prototypes and technical specifications; algorithms, source codes, object codes, trade secrets or technical data; training materials methods; internal policies and procedures; marketing plans and strategies; pricing and cost policies; customer, supplier, vendor and partner lists and accounts; customer and supplier preferences; contract terms and rates; financial data, information, reports, and forecasts; inventions, improvements and other intellectual property; product plans or proposed product plans; know-how; designs, processes or formulas; software and website applications; computer passwords; market or sales information, plans or strategies; business plans, prospects and opportunities (including, but not limited to, possible acquisitions or dispositions of businesses or facilities); information concerning existing or potential customers, partners or vendors. Confidential Information shall also mean of or related to Company's current or potential customers, vendors or partners that is considered to be confidential or proprietary to the applicable customer, vendor or partner.

Confidential Information does not include: information in the public domain (other than as a result of disclosure by you); approved in writing for unrestricted release by Company; or produced or disclosed pursuant to a valid court order, provided you have given Company written notice of such request such that Company has an actual, reasonable opportunity to defend, limit or protect such production or disclosure.

A81

(b) You and the Company agree that the Noncompetition Covenant shall not be enforceable against you if the Company terminates your employment without Cause or if you are laid off. In the event of a termination without Cause or layoff, all other agreements with the Company (including without limitation the Award Agreement (as defined in the Stock Option Grant Notice)), shall remain in full force and effect. You and the Company acknowledge and agree that "Cause" shall mean, for the purposes of this Noncompetition Covenant, that there exists either (1) a reasonable basis for the Company's dissatisfaction with you, entertained in good faith, for reasons, including but not limited to, lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior, or (2) grounds for discharge reasonably related, in the Company's honest judgment, to the needs of the Business of the Company.

(c) You agree to communicate the contents of all post-relationship obligations in this Noncompetition Covenant to any Competing Business that you intend to be employed by, associated with, or represent. You understand and agree that the Company may, in its discretion, also share any post-relationship obligation in this Noncompetition Covenant with any future (or potential) employer or association that is a Competing Business that seeks to be associated with you or employ you for your services.

(d) You agree that the enforcement of the Noncompetition Covenant is necessary, among other things, to ensure the preservation, protection and continuity of the Company's Confidential Information, trade secrets and goodwill of the Company. You agree that, due to the proprietary nature of the Business of the Company and relationships with others, the post-employment restrictions set forth above are reasonable as to duration and scope.

(e) You agree that any action that violates this Noncompetition Covenant would cause the Company irreparable harm for which monetary damages are inadequate. Accordingly, in the event of a breach, or threatened breach, of this Noncompetition Covenant, the Company shall be entitled to an injunction restraining such breach or threatened breach, or requiring specific performance, in addition to any and all rights and remedies at law and equity. The Company shall not be obligated to present additional evidence of irreparable harm or the insufficiency of monetary damages and, to the extent permitted by law or under applicable court rule, does not need to post a bond or other surety. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedy available to the Company for such breach or threatened breach. If the Company prevails in any request to have you specifically perform your obligations under this Noncompetition Covenant (including pursuant to a temporary restraining order or preliminary injunction), the Company shall be entitled to receive from you the Company's costs of suit, including reasonable attorney's fees (in addition to any other relief sought, available or awarded under this Noncompetition Agreement).

(f) You and the Company hereby mutually agree to the exclusive jurisdiction of the Superior Court (inclusive of the Business Litigation Session) of the Commonwealth of Massachusetts or the United States District Court for the District of Massachusetts for any dispute arising hereunder. Accordingly, with respect to any such court action, you (a)

A82

submit to the personal jurisdiction of such courts; (b) consent to service of process by regular mail to your last known address; and (c) waive any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process.  If you commence a legal action or other proceeding against the Company concerning a dispute arising from or relating to this Noncompetition Covenant outside of Massachusetts you shall reimburse the Company for its reasonable attorneys' fees, costs and expenses if Company prevails in staying, transferring, dismissing or otherwise defending such action or proceeding based on the location of the action or proceeding, regardless of whether such fees, costs and expenses are incurred in the forum where you commenced the action or in a Massachusetts forum. This Noncompetition Covenant shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law.

(g) The failure of you or Company to insist upon strict performance of this Noncompetition Covenant irrespective of the length of time for which such failure continues, shall not be a waiver of such party's rights herein.  No term or provision of this Noncompetition Covenant may be waived unless such waiver is in writing.

(h) If a court determines that one or more of the provisions contained in this Noncompetition Covenant shall be invalid or unenforceable, such court shall construe, reform or otherwise revise such provision(s) and/or sever such provisions from this Noncompetition Covenant so as to render it enforceable to the maximum extent allowed by law.  Any part of this Noncompetition Covenant which is prohibited or which is held to be void or unenforceable shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions of this Noncompetition Covenant.

(i) Except as described in Section (b) of this Noncompetition Covenant, your obligations under this Noncompetition Covenant shall survive the termination of your relationship with the Company regardless of the manner of such termination.

(j) The rights granted to the Company under the Noncompetition Covenant shall inure to the benefit of, and be enforceable by, the successors or assigns of Company.

(k) You agree that you received this Noncompetition Covenant by the earlier of the formal offer of employment that you received from the Company or 10 business days before commencement of your employment with the Company.

(l) Before agreeing to this Noncompetition Covenant, you have the right to consult with counsel. The terms and conditions of this Noncompetition Covenant shall supersede all prior noncompetition covenants between you and Company.

(m)In the event that you breach this Noncompetition Covenant, in addition to any other rights and remedies available to the Company, you agree that the Company shall have the right to deem that any and all vested and unvested shares subject to this stock option grant have been forfeited.

A83

(n) The parties agree that you are employed "at will" and nothing in this Noncompetition Covenant is intended to guarantee employment for any period of time.  Even though the nature of your relationship with the Company is as an "at will" employee, the parties enter this Noncompetition Covenant with the understanding that your position, title, duties and responsibilities could change in a material way in the future and, in light of that understanding, the parties intend that this Noncompetition Covenant shall follow you throughout the entire course of your employment with the Company, and such subsequent material change shall not affect the enforceability or validity of this Noncompetition Covenant.

**Acknowledged and Agreed:**

_____
**Signature**

Michael Z. Hermalyn
_____
**Name**

8/31/2020
_____
**Date**

**DRAFTKINGS INC.:**

Jason Robins
CEO

A84

# EXHIBIT B

*(2022 Time-Based Vesting – 4 Years Quarterly)*

**DRAFTKINGS INC.**

**RESTRICTED STOCK UNIT GRANT NOTICE
AND NON-COMPETITION COVENANT
(2020 INCENTIVE AWARD PLAN)**

**DRAFTKINGS INC.**, a Nevada corporation (the "***Company***"), pursuant to its 2020 Incentive Award Plan, as may be amended from time to time (the "***Plan***"), hereby grants to Participant the number of restricted stock units ("***RSUs***") set forth below, each of which represents the right to receive one Common Share without any payment for such shares.  This award is subject to all of the terms and conditions as set forth in this notice, in the corresponding Restricted Stock Unit Agreement and the Plan, which are attached hereto and incorporated herein in their entirety.  Capitalized terms not explicitly defined herein but defined in the Plan or the Restricted Stock Unit Agreement will have the same definitions as in the Plan or the Restricted Stock Unit Agreement.  If there is any conflict between the terms in this notice, Exhibit A to this notice, the corresponding Restricted Stock Unit Agreement and the Plan, then such conflict or inconsistency shall be resolved by giving such documents precedence in the following order: Exhibit A, this notice, the corresponding Restricted Stock Unit Agreement then the Plan.

As required by the Massachusetts Noncompetition Agreement Act, you and the Company acknowledge and agree that the RSUs constitute fair and reasonable consideration and mutually-agreed upon consideration for the Noncompetition Covenant set out in Attachment III hereto (the "***Noncompetition Covenant***").  Such consideration is specifically designated and you acknowledge the receipt and sufficiency of the consideration.  You must review and execute the Noncompetition Covenant as this grant of RSUs is conditioned upon (i) the Noncompetition Covenant becoming effective pursuant to paragraph (l) in Attachment III, and (ii) your Relationship (as defined below in Section (a)(xv) of the Noncompetition Covenant) with the Company being active, in good standing, and not having been terminated on the date such Noncompetition Covenant becomes effective.

| | |
|---|---|
| Participant | Michael Hermalyn |
| Date of Grant: | 31-Jul-2023 |
| Vesting Commencement Date: | 01-Sep-2023 |
| Number of RSUs: | 104,870 |

**Type of Grant:**   Restricted Stock Units

**Vesting Schedule:**  This award shall vest pursuant to the schedule set forth in Exhibit A, which is attached hereto and incorporated herein in its entirety.

**Additional Terms/Acknowledgements:**  Participant acknowledges receipt of, and understands and agrees to, this Restricted Stock Unit Grant Notice, the corresponding Restricted Stock Unit Agreement and the Plan.  Participant acknowledges and agrees that this Restricted Stock Unit Grant Notice and the corresponding Restricted Stock Unit Agreement may not be modified, amended or revised except as provided in the Plan.  Participant further acknowledges that as of the Date of Grant, this Restricted Stock Unit Grant Notice, the corresponding Restricted Stock Unit Agreement, and the Plan set forth the entire understanding between Participant and the Company regarding this RSU award and supersede all prior oral and written agreements, promises and/or representations on that subject with the exception of the following agreements only.

A86

**OTHER AGREEMENTS:** _____

_____

_____

By accepting these RSUs, you consent to receive such documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

**DRAFTKINGS INC.**                                          **PARTICIPANT**

By: _____                     By: _*Michael Hermalyn*_

Jason Robins

Title: Chief Executive Officer                              Name: _Michael Hermalyn_

Date of Acceptance: 16-Aug-2023 06:59 MDT

**ATTACHMENTS**:  Restricted Stock Unit Agreement, 2020 Incentive Award Plan, Noncompetition Covenant

A87

**EXHIBIT A**

**VESTING SCHEDULE**

RSUs shall vest in equal installments every three months following the Vesting Commencement Date set forth in the Restricted Stock Unit Grant Notice so that the RSUs are fully vested on the fourth anniversary of the Vesting Commencement Date.  Each installment that vests on each three-month vesting date will be rounded down to the nearest full number of RSUs, with the remaining number of RSUs vesting on the last vesting date.

**ATTACHMENT I**

**RESTRICTED STOCK UNIT AGREEMENT**

**DRAFTKINGS INC.**

**2020 INCENTIVE AWARD PLAN**

**RESTRICTED STOCK UNIT AGREEMENT**

Pursuant to your Restricted Stock Unit Grant Notice ("***Grant Notice***") and this Restricted Stock Unit Agreement (this "***Agreement***" or this "***Restricted Stock Unit Agreement***"), DraftKings Inc., a Nevada corporation (the "***Company***"), has granted you the number of RSUs under its 2020 Incentive Award Plan (the "***Plan***") indicated in your Grant Notice, each of which represents the right to receive one Common Share.  The RSUs are granted to you effective as of the date of grant set forth in the Grant Notice (the "***Date of Grant***").  If there is any conflict between the terms in the Grant Notice, Exhibit A to the Grant Notice, this Restricted Stock Unit Agreement and the Plan, then such conflict shall be resolved by giving such documents precedence in the following order: Exhibit A, the Grant Notice, this Restricted Stock Unit Agreement then the Plan.  Capitalized terms not explicitly defined in this Restricted Stock Unit Agreement or in the Grant Notice but defined in the Plan will have the same definitions as in the Plan.

The details of the RSUs, in addition to those set forth in the Grant Notice and the Plan, are as follows:

**1.**     **VESTING; NO SHAREHOLDER RIGHTS**.  The RSUs will vest as provided in your Grant Notice.  Vesting will cease upon the termination of your service with the Company and its Subsidiaries except as may be provided otherwise in the Vesting Schedule in Exhibit A to your Grant Notice or in an employment or other agreement between you and the Company.  You will not be deemed to be the holder of, or have any of the rights of a stockholder with respect to any RSUs unless and until they have vested and the Company has issued and delivered Common Shares to you and your name shall have been entered as a stockholder of record on the books of the Company.

**2.**     **NUMBER OF RSUS**.  The number of RSUs are set forth in your Grant Notice and will be adjusted in the event of changes in capital structure and similar events as provided in Section 12 of the Plan.

**3.**     **SETTLEMENT**.  Subject to Section 8, each RSU will be settled by delivery to you of one Common Share as promptly as practicable, and in any event within 60 days, following the date on which the RSU vests and no later than March 15 of the year following the year in which the vesting date occurs.  The Company may, in its sole discretion, deliver cash in lieu of all or any portion of the Common Shares otherwise deliverable in respect of the RSUs in an amount equal to such number of Common Shares multiplied by the Fair Market Value of a Common Share on the date when such shares would otherwise have been issued, as determined by the Board.

**4.**     **SECURITIES LAW COMPLIANCE**.  In no event shall the Company deliver Common Shares upon vesting of the RSUs unless such shares are then registered under the Securities Act or, if not registered, the Company has determined that the issuance of the shares would be exempt from the registration requirements of the Securities Act.  The issuance of Common Shares is also subject to compliance with all other applicable laws and regulations.

**5.**     **OTHER TERMS**.

**(a)**     In considering the acceptance of this award of RSUs, you understand, acknowledge, agree and hereby stipulate that you should use the same independent investment judgment

that you would use in making other investments in corporate securities.  Among other things, stock prices will fluctuate over any reasonable period of time and the price of Common Shares may go down as well as up.  No guarantees are made as to the future prospects of the Company or the Common Shares.  No representations are made by the Company.

        **(b)**       Notwithstanding anything to the contrary in this Restricted Stock Unit Agreement, the Common Shares issued under this Restricted Stock Unit Agreement, any other restricted stock unit agreement or any stock option agreement, and all amounts that may be received by you in connection with any disposition of any such Common Shares shall be subject to applicable recoupment, "clawback" and similar provisions under law, as well as any recoupment, "clawback" and similar policies of the Company that may be adopted at any time and from time to time in order to comply with the Dodd-Frank Wall Street Reform and Consumer Protection Act or other applicable law.

        **6.**       **TRANSFERABILITY**.  Except as otherwise provided in this Section 6 or in the Plan, the RSUs are not assignable or transferable, except by will or by the laws of descent and distribution.  Without limiting the generality of the foregoing, the RSUs may not be sold, assigned, transferred or otherwise disposed of, or pledged or hypothecated in any manner (whether by operation of law or otherwise), and shall not be subject to execution, attachment or other process. Any assignment, transfer, sale, pledge, hypothecation or other disposition of the RSUs or any attempt to make any such levy of execution, attachment or other process will cause the RSUs to terminate immediately, unless the Chief Legal Officer of the Company, in his sole discretion, specifically waives applicability of this provision.

        **(a)**       **Certain Trusts**.  Upon receiving written permission from the Chief Legal Officer of the Company, you may transfer the RSUs to a trust if you are considered to be the sole beneficial owner (determined under Section 671 of the Code and applicable state law) while the RSUs are held in the trust.  You and the trustee hereby agree to enter into transfer and other agreements required by the Company.

        **(b)**       **Domestic Relations Orders**.  Upon receiving written permission from the Chief Legal Officer of the Company, and provided that you and the designated transferee enter into transfer and other agreements required by the Company, you may transfer the RSUs pursuant to the terms of a domestic relations order, official marital settlement agreement or other divorce or separation instrument that contains the information required by the Company to effectuate the transfer.  You are encouraged to discuss the proposed terms of any division of these RSUs with the Company prior to finalizing the domestic relations order or marital settlement agreement to help ensure the required information is contained within the domestic relations order or marital settlement agreement.

        **(c)**       **Beneficiary Designation**.  Upon receiving written permission from the Chief Legal Officer of the Company, you may, by delivering written notice to the Company, in a form approved by the Company and any broker designated by the Company to administer its equity program, designate a third party who, on your death, will thereafter be entitled to receive the Common Shares or other consideration in settlement of the vested RSUs.  In the absence of such a designation, your executor or administrator of your estate will be entitled to receive, on behalf of your estate, the Common Shares or other consideration in settlement of the vested RSUs.

        **7.**       **RSUS NOT A SERVICE CONTRACT**.  The RSUs are not an employment or service contract, and nothing in the RSUs will be deemed to create in any way whatsoever any obligation on your part to continue in the employ or service of the Company or an Affiliate, or of the Company or an Affiliate to continue your employment or service.  In addition, nothing in the RSUs will obligate the Company or an Affiliate, their respective stockholders, boards of directors, officers or employees to

continue any relationship that you might have as a member of the Company's Board or a consultant for the Company or an Affiliate.

      **8.**      **WITHHOLDING OBLIGATIONS**.

      **(a)**      At the time the RSUs vest, in whole or in part, and at any time thereafter as requested by the Company, you hereby agree to make adequate provision for (including by means of a "same day sale" pursuant to a program developed under Regulation T as promulgated by the Federal Reserve Board to the extent permitted by the Company), any sums required to satisfy the federal, state, local and foreign tax withholding obligations of the Company or an Affiliate, if any, which arise in connection with the vesting and settlement of the RSUs.

      **(b)**      In the event that you fail to make the adequate provisions contemplated by Section 8(a) above, then, subject to compliance with any applicable legal conditions or restrictions, the Company shall have the option in its sole discretion (but not the obligation) to withhold from fully vested Common Shares otherwise issuable to you upon the settlement of the RSUs a number of whole Common Shares having a Fair Market Value, determined by the Company as of the date of vesting or settlement as applicable, not in excess of the amount of tax required to be withheld by law (or such lower amount as may be necessary to avoid classification of the RSUs as a liability for financial accounting purposes).

      **(c)**      The Company assumes no responsibility for individual income taxes, penalties or interest related to grant, vesting or settlement of any RSU.  Neither the Company nor any affiliate makes any representation or undertaking regarding the treatment of any tax withholding in connection with the grant, vesting or settlement of the RSUs. **You should consult with your personal tax advisor regarding the tax ramifications, if any, which result from receipt of the RSUs, the subsequent issuance, if any, of Common Shares on settlement of the RSUs, and subsequent disposition of any such Common Shares.** You acknowledge that the Company may be required to withhold federal, state and/or local taxes in connection with the vesting and/or settlement of the RSUs. **No RSUs will vest or be settled unless and until you have made the adequate provisions contemplated by Section 8(a) or the Company has exercised its option to withhold the necessary amount of Common Shares pursuant to Section 8(b) above.** The Company will have no obligation to issue a certificate for Common Shares in respect of the RSUs unless the obligations set forth in this Section 8 are satisfied.

      **9.**      **SECTION 409A; TAX CONSEQUENCES**.  It is the Company's intent that all benefits under this Restricted Stock Unit Agreement and Grant Notice shall be exempt from Section 409A of the Internal Revenue Code ("Section 409A") to the extent applicable, and that this Restricted Stock Unit Agreement shall be administered accordingly. Notwithstanding anything to the contrary contained in this Restricted Stock Unit Agreement, Grant Notice or any employment agreement you have entered into with the Company, to the extent that any benefit under this Restricted Stock Unit Agreement is determined by the Company to constitute "non-qualified deferred compensation" subject to Section 409A and is payable to you by reason of termination of your employment, then (a) such benefit shall be made or provided to you only upon a "separation from service" as defined for purposes of Section 409A under applicable regulations and (b) if you are a "specified employee" (within the meaning of Section 409A and as determined by the Company), such benefit shall not be made or provided before the date that is six months after the date of your separation from service (or your earlier death). Each benefit under this Restricted Stock Unit Agreement shall be treated as a "separate payment" under Section 409A. You hereby agree that the Company does not have a duty to design or administer the Plan or its other compensation programs in a manner that minimizes your tax liabilities.  You will not make any claim against the Company, or any of its officers, directors, employees or Affiliates related to tax liabilities arising from the RSUs or your other compensation.

10.     NOTICES.  Any notices provided for in the Restricted Stock Unit Agreement or the Plan will be given in writing and will be deemed effectively given upon receipt.  The Company may, in its sole discretion, decide to deliver any documents related to participation in the Plan and these RSUs by electronic means or to request your consent to participate in the Plan by electronic means.  By accepting these RSUs, you consent to receive such documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

11.     AGREEMENT SUMMARIES.  In the event that the Company provides you (or anyone acting on your behalf) with summary or other information concerning, including or otherwise relating to your rights or benefits under this Restricted Stock Unit Agreement (including, without limitation, the RSUs and any vesting thereof), such summary or other information shall in all cases be qualified in its entirety by Exhibit A, the Grant Notice, this Restricted Stock Unit Agreement and the Plan and, unless it explicitly states otherwise and is signed by an officer of the Company, shall not constitute an amendment or other modification hereto.

12.     ACKNOWLEDGEMENTS.  You understand, acknowledge, agree and hereby stipulate that: (1) you are executing this Restricted Stock Unit Agreement voluntarily and without any duress or undue influence by the Company or anyone else; (2) the RSUs are intended to be consideration in exchange for the promises and covenants set forth in this Restricted Stock Unit Agreement; (3) you have carefully read, considered and understand all of the provisions of this Restricted Stock Unit Agreement and the Company's policies reflected in this Restricted Stock Unit Agreement; (4) you have asked any questions needed for you to understand the terms, consequences and binding effect of this Restricted Stock Unit Agreement and you fully understand them; (5) you were provided an opportunity to seek the advice of an attorney and/or a tax professional of your choice before accepting this award of RSUs; and (6) the obligations and restrictions set forth in this Restricted Stock Unit Agreement are fair and reasonable.

**ATTACHMENT II**

**2020 INCENTIVE AWARD PLAN**

**ATTACHMENT III**

**NONCOMPETITION COVENANT**

(a)  During the period of your Relationship (defined below) with the Company (defined below), you ("you" or "your") agree to not, anywhere within the Restricted Area (defined below), acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of the Company), provide services to a Competing Business (defined below) or commit a Threatened Breach (defined below) of such obligation.  For a period of twelve (12) months following termination of your Relationship with the Company you agree to not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company): (1) provide services to a Competing Business that relate to any aspect of the Business of the Company (defined below) (i.e., FSC (defined below), Gaming (defined below), Marketplace (defined below), Media (defined below), Other Products and Services (defined below), and/or Incidental Products and Services (defined below)) for which you performed services or received Confidential Information (defined below) at any time during the six (6) month period prior to such termination; or (2) commit a Threatened Breach of the obligation set forth in the immediately preceding clause. For example, in the event that you performed services for the FSC aspect of the Business of the Company and received Confidential Information about the Gaming aspect of the Business of the Company during the six (6) month period prior to the termination of your Relationship with the Company, then for twelve (12) months after such termination, you shall not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of the Company), provide services to a Competing Business that relates to FSC or Gaming, or commit a Threatened Breach of that obligation.  The foregoing shall not be construed to preclude you from owning up to one percent (1%) of the outstanding stock of a publicly held corporation that constitutes or is affiliated with a Competing Business.

As set out in the Massachusetts Noncompetition Act, Mass. General Laws c. 149, s. 24L, you specifically agree that the opportunity for, or the receipt of, the RSUs (as defined in the first paragraph of this Restricted Stock Unit Grant Notice and Non-Competition Covenant (2020 Incentive Award Plan) (the "Restricted Stock Unit Grant Notice")) granted to you as set forth in this Restricted Stock Unit Grant Notice are fair and reasonable consideration for this Noncompetition Covenant. You and the Company further agree that the opportunity for, or the receipt of, the RSUs is mutually agreed upon consideration for this Noncompetition Covenant. Such consideration is specifically designated and you acknowledge the receipt and sufficiency of the consideration.

For purposes of this Attachment III:

i.     "Business of the Company" shall mean the research, design, development, marketing, broadcasting, streaming, promotion, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for: (1) fantasy sports contests ("FSC"); (2) Gaming; (3) Marketplace; (4) Media; (5) all other products and services that exist, are in development, or are under consideration by the Company during your Relationship with the Company ("Other Products and Services"); and (6) all products and services incidentally related to, or which are an extension, development or expansion of, FSC, Gaming, Marketplace, Media or Other Products and Services ("Incidental Products and Services").

ii.       "<u>Cause</u>" has the meaning ascribed to it in Section (b).

iii.     "<u>Company</u>" shall mean DraftKings Inc., a Nevada corporation, and any person or entity controlled by, controlling, or under common control with DraftKings Inc., a Nevada corporation, including affiliates and subsidiaries. "Control" (and its derivatives) means the direct or indirect possession of the power to direct or cause the direction of the management and policies of an entity, whether through ownership, by contract or otherwise.

iv.     "<u>Competing Business</u>" shall mean any person, firm, association, corporation or any other entity that is engaged in a business or activity (whether online, at a physical location or otherwise) that is competitive with any aspect of the Business of the Company, including, but not limited to: Action Network, Barstool Sports, BetAmerica, BetEasy, Betfair, Betgenius, BetStars, BetQL, Bet365, Bleacher Report, Borgata, Caesars, Candy Digital, Dapper Labs, Entain, ESPN, FanDuel, Flutter Entertainment PLC, FoxBet, FoxSports, GAN, Golden Nugget, Harrah's, Holdings PLC, International Game Technology, Kambi, Light & Wonder, LooksRare, MGM, NiftyGateway, Ocean Casino Resort, Oddschecker, OpenSea, Paddy Power, Pala, Penn National Gaming, Playtech, PointsBet, Pokerstars, Rarible, Resorts, Rivers Casino, Rush Street Interactive, Scientific Games, Sky Betting & Gaming, Sorare, Sportradar, Sportsbet, SugarHouse, theScore, Tropicana, TVG, Unibet, Virgin, Wynn, William Hill, 888, and any of the foregoing persons or entities later known by a different name, any person or entity that acquires, is acquired by, merges with, is spun off by, or otherwise combines with or separates from any of the foregoing persons or entities or enters into an agreement to do so, any person or entity directly or indirectly controlling, controlled by, or under common control with any of the foregoing persons or entities, including, but not limited to, any direct and indirect subsidiaries, affiliates, and ventures of any of the foregoing persons or entities, and any successor or assign of any of the foregoing persons or entities.

v.      "<u>Confidential Information</u>" shall have the same meaning as set forth in any and all Nonsolicitation, Nondisclosure & Assignment of Invention Agreements, or agreements with respect to substantially similar subject matter, (collectively, the "NDA") that you entered into with the Company. Confidential Information shall also mean all information or a compilation of information, in any form (tangible or intangible or otherwise), that is not generally known to competitors of the Company or the public, which Company considers to be confidential and/or proprietary, including, but not limited to: research and development; techniques; methodologies; strategies; product information, designs, prototypes and technical specifications; algorithms, source codes, object codes, trade secrets and technical data; training materials and methods; internal policies and procedures; marketing plans and strategies; pricing and cost policies; customer, supplier, vendor and partner lists and accounts; customer and supplier preferences; contract terms and rates; financial data, information, reports, and forecasts; inventions, improvements and other intellectual property; product plans and proposed product plans; know-how; designs, processes and formulas; software and website applications; computer passwords; market and sales information, plans and strategies; business plans, prospects and opportunities (including, but not limited to, possible acquisitions or dispositions of businesses or facilities); information concerning existing or potential customers, partners or vendors. Confidential Information shall also mean information related to Company's current or potential customers, vendors or partners that is considered to be confidential or proprietary to the applicable customer, vendor or partner.

Confidential Information does not include information that is: in the public domain (other than as a result of disclosure by you); approved in writing for unrestricted release by Company; or produced or disclosed pursuant to a valid subpoena or court order, provided you have given Company written notice of such anticipated production or disclosure (to the extent not prohibited by such subpoena or court order) such that Company has an actual, reasonable opportunity to defend, limit or protect such production or disclosure.

vi.    "Control" has the meaning ascribed to it in the definition of Company.

vii.   "FSC" shall mean any fantasy or simulated activity or contest where winning outcomes are determined predominantly by accumulated statistical results of the performance of individuals in athletic or other events; the wining outcome reflects the knowledge and skill of the participant; and a winning outcome is not based solely on the performance of a single team or individual.

viii.  "Gaming" shall mean games of chance or skill, pari-mutuel, fixed odds, pools or otherwise (including, but not limited to, lottery, pari-mutuel betting, bingo, horse and dog racing, simulated racing and sporting events, jai alai, sports betting, online casino games/iGaming, social casino, poker and keno) whether played for real money or cash equivalent, virtual currency, free, or otherwise and any type of ancillary service or product related to the foregoing.

ix.    "Incidental Products and Services" has the meaning ascribed to it in the definition of Business of the Company.

x.     "Marketplace" shall mean a digital platform facilitating the purchase and sale of non-fungible tokens and other collectibles.

xi.    "Media" shall mean the development, distribution, procurement and programming of content offerings in audio and video focused media related to sports, Gaming, FSC, Marketplace or Other Products and Services.

xii.   "Noncompetition Covenant" shall mean this noncompetition covenant, Attachment III, as also set forth in the second paragraph of the Restricted Stock Unit Grant Notice.

xiii.  "NDA" has the meaning ascribed to it in the definition of Confidential Information.

xiv.   "Other Products and Services" has the meaning ascribed to it in the definition of Business of the Company.

xv.    "Relationship" shall mean your relationship with the Company, whether as an owner, shareholder, partner, employee, contractor, agent, advisor or consultant.

vii.   "Restricted Area" shall mean any place within the United States or anywhere else in the world, since Competing Businesses operate globally and without meaningful limitation to compete caused by geographic locations, and because the Business of the Company is global in nature due to the specialized industries in which the Company and Competing Businesses operate, which Employee acknowledges and agrees is reasonable.

xvi.   "RSUs" has the meaning ascribed to it in Section (a), second paragraph.

A97

xvii.   "<u>Terms and Conditions</u>" shall mean any of terms, conditions, covenants, representations, warranties, duties or obligations set forth in this Noncompetition Covenant.

xviii.  "<u>Threatened Breach</u>" shall mean any attempt by you to engage in conduct that would breach these Terms and Conditions.

(b)  You and the Company agree that this Noncompetition Covenant may not be enforceable against you in the event the Company terminates your Relationship without Cause. In the event of a termination without Cause, all other agreements between you and the Company shall remain in full force and effect. You and the Company acknowledge and agree that "Cause" shall mean, for the purposes of this Noncompetition Covenant: (i) gross misconduct by you, which results in loss, damage or injury to the Company, its goodwill, business or reputation; (ii) your commission or attempted commission of an act of embezzlement, fraud or breach of fiduciary duty, which results or could result in loss, damage or injury to the Company, its goodwill, business or reputation; (iii) your unauthorized or attempted unauthorized disclosure or misappropriation of any trade secret or Confidential Information of the Company or any third party that has a business relationship with the Company; (iv) your conviction of or plea of nolo contendere to, a felony under any state or federal law, which materially interferes or could interfere with your ability to perform your services for the Company or which results or could result in loss, damage or injury to the Company, its goodwill, business or reputation; (v) a breach or Threatened Breach by you, in any material respect, of these Terms and Conditions, the NDA or any other material agreement between you and the Company; (vi) your failure to perform your assigned duties and responsibilities to the reasonable satisfaction of the Company, which failure continues, in the reasonable judgment of the Company, after written notice given to you by the Company; (vii) your use of controlled substances, illicit drugs, alcohol or other substances or behavior by you, in each case, that interferes with your ability to perform your services for the Company or that otherwise results or could result in loss, damage or injury to the Company, its goodwill, business or reputation; (viii) the existence or prior existence of a reasonable basis for the Company's dissatisfaction with you, entertained in good faith, for reasons, including, but not limited to, lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior; or (ix) there exists or existed grounds for discharge reasonably related, in the Company's good faith judgment, to the needs of the Business of the Company.  Any determination of whether Cause exists shall be made by the Company in its sole and absolute discretion.  Any failure, delay or omission by the Company to make a determination of whether Cause exists will in no way be construed as a waiver of such right to do so at a later time.

(c)  You agree to communicate the contents of all post-Relationship obligations in this Noncompetition Covenant to any Competing Business that you intend to be employed by, associated with, or represent.  You understand and agree that the Company may, in its sole and absolute discretion, also share any post-Relationship obligation in this Noncompetition Covenant with any future (or potential) employer, association, contractor, owner or partner that is a Competing Business that seeks to associate, contract, partner or employ you for your services.

(d)  You agree that the enforcement of this Noncompetition Covenant is necessary, among other things, to ensure the preservation, protection and continuity of the Company's Confidential Information, trade secrets and goodwill.  You agree that, due to the proprietary nature of the Business of the Company and relationships with others, the restrictions during your Relationship with the Company and post-Relationship restrictions set forth herein are

reasonable as to duration and scope.  You acknowledge that this Noncompetition Covenant is necessary because, among other things, the Company's interests cannot be adequately protected through an alternative restrictive covenant, including, but not limited to, the NDA.

(e)  You agree that any breach, Threatened Breach or challenge to the enforceability of this Noncompetition Covenant would cause the Company to suffer immediate and irreparable harm for which monetary damages are inadequate.  Accordingly, in the event of a breach, Threatened Breach or challenge to the enforceability of this Noncompetition Covenant, the Company shall be automatically entitled to a temporary, preliminary and permanent injunction restraining such breach, Threatened Breach or challenge requiring specific performance, in addition to any and all rights and remedies at law and equity. The Company shall not be obligated to present additional evidence of irreparable harm or the insufficiency of monetary damages and, to the extent permitted by law or under applicable court rule, does not need to post a bond or other surety.  Nothing herein shall be construed as prohibiting the Company from pursuing any other remedy available to the Company for such breach, Threatened Breach or challenge.  In the event the Company prevails in any request to enforce your obligations under this Noncompetition Covenant (including pursuant to a temporary restraining order or preliminary or permanent injunction), the Company shall be entitled to receive from you the Company's reasonable attorney's fees, costs and expenses incurred (in addition to any other relief sought, available or awarded under this Noncompetition Covenant).  In the event that you commit a breach, Threatened Breach or challenge of your obligations under this Noncompetition Covenant that causes the Company to incur attorneys' fees, costs or expenses before you relent such breach, threats or challenge, the Company shall be entitled to its reasonable attorney's fees, costs and expenses incurred prior to you relenting (in addition to any other relief sought, available or awarded under this Noncompetition Covenant).

(f)  You and the Company hereby mutually agree to the exclusive jurisdiction of the Business Litigation Session ("BLS") of the Suffolk Superior Court of the Commonwealth of Massachusetts (and, in the event that the BLS declines to accept jurisdiction, to the exclusive jurisdiction of the Suffolk Superior Court of the Commonwealth of Massachusetts) or the United States District Court for the District of Massachusetts for any dispute arising hereunder. Accordingly, with respect to any such court action, you (a) submit to the personal jurisdiction of such courts; (b) consent to service of process by regular mail to your last known address; and (c) waive any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process.  In the event that you commence a legal action or other proceeding outside of Massachusetts against the Company concerning a dispute arising from or relating to this Noncompetition Covenant you shall reimburse the Company for its reasonable attorneys' fees, costs and expenses incurred in the event that the Company prevails in staying, transferring, dismissing or otherwise defending such action or proceeding, regardless of whether such fees, costs and expenses are incurred in the forum where you commenced the action or in a Massachusetts forum. This Noncompetition Covenant shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law.

**<u>YOU AND THE COMPANY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS NONCOMPETITION COVENANT. EACH PARTY HERETO CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY, AND VOLUNTARILY MADE.</u>**

(g) In the event that: (i) you breach, commit a Threatened Breach or challenge the enforceability of this Noncompetition Covenant, or (ii) the Company seeks to enforce these Terms and Conditions, you agree to an extension of the duration of the covenant set forth in Section (a) on the same Terms and Conditions for an additional period of time equal to the time that elapses from the commencement of such breach, Threatened Breach or challenge to the later of: (i) the termination of such breach, Threatened Breach or challenge; or (ii) the final non-appealable resolution of any litigation or other legal proceeding stemming from such breach, Threatened Breach or challenge.

(h) The failure, delay or omission by the Company to enforce any of these Terms and Conditions will in no way be construed as a waiver of these Terms and Conditions and will not affect the right of the Company thereafter to enforce this Noncompetition Covenant in accordance with these Terms and Conditions. No waiver of any of these Terms and Conditions, or breach, Threatened Breach or challenge thereof, shall be deemed a waiver of any of the other Terms and Conditions or breach of this Noncompetition Covenant. In the event the Company provides a waiver or consent on one (1) particular occasion, it is effective only as to that occasion and does not affect other occasions. No Terms and Conditions may be waived or consented to by Company unless such waiver is in writing.

(i) These Terms and Conditions shall be construed as separable and divisible from every other term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant , and the enforceability of any one (1) term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant shall not limit the enforceability, in whole or in part, of any other term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant.  In the event that a court, arbitrator or other body of competent jurisdiction holds any of these Terms and Conditions to be invalid, illegal, void, or less than fully enforceable as to time, scope or otherwise, the parties agree that this Noncompetition Covenant shall be reformed to the minimum extent necessary to cause the term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant  to be valid, legal, and enforceable while preserving to the greatest extent permissible the original intent of the parties as expressed in, and the benefits to the parties provided by, this Noncompetition Covenant (including, but not limited to, the term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant held as invalid, illegal, void, or less than fully enforceable).

(j) Except as set forth in the Massachusetts Noncompetition Act, your obligations under this Noncompetition Covenant shall survive the termination of your Relationship with the Company regardless of the manner of such termination.

(k) The rights granted to the Company under this Noncompetition Covenant shall inure to the benefit of, and be enforceable by, the successors or assigns of Company.

(l) This Noncompetition Covenant shall not become effective until the later of (a) at least ten (10) business days after you have received this Restricted Stock Unit Grant Notice, or (b) the date this Noncompetition Covenant is executed by you.  The obligations in this Noncompetition Covenant are intended to supplement – not replace – those in all prior noncompetition agreements between you and the Company; provided, however, that in the event a conflict arises between this Noncompetition Covenant and prior noncompetition covenants between you and the Company, then such conflict or inconsistency shall be resolved by giving precedence to this Noncompetition Covenant.

A100

(m)  Before agreeing to this Noncompetition Covenant, you have the right to consult with counsel. You understand and acknowledge that you have asked any questions needed for you to understand these Terms and Conditions, consequences and binding effect of this Noncompetition Covenant, and you fully understand them, including, but not limited to, the concept that you are waiving the right to a trial by jury.

(n)  In the event that you breach, commit a Threatened Breach, or challenge the enforceability of this Noncompetition Covenant, in addition to any other rights and remedies available to the Company, you agree that the Company shall have the right (in its sole and absolute discretion, for any reason or no reason) to deem that any and all vested RSUs (to the extent not settled in common shares) and unvested RSUs have been forfeited.

(o)  The parties agree that nothing in this Noncompetition Covenant is intended to guarantee your Relationship for any period of time.  The parties enter this Noncompetition Covenant with the understanding that your position, title, duties and responsibilities could change in a material way in the future and, in light of that understanding, the parties intend that this Noncompetition Covenant shall follow you throughout the entire course of your Relationship with the Company, and such subsequent material change shall not affect the enforceability or validity of this Noncompetition Covenant.

ACKNOWLEDGED AND AGREED:

Michael Hermalyn
(Signature)

Michael Hermalyn
Name

16-Aug-2023 06:59 MDT

DRAFTKINGS INC.:

Title:    Chief Executive Officer

DATE:  16-AUG-2023 06:59 MDT

A101

A102

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| DRAFTKINGS INC.,<br><br>               Plaintiff,<br><br>    v.<br><br>MICHAEL HERMALYN,<br><br>               Defendant. | Civil Action No. 1:24-cv-10299 |

**<u>MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

Pursuant to Federal Rule of Civil Procedure 65, DraftKings moves for the issuance of an order temporarily restraining and preliminary enjoining Defendant Michael Hermalyn from:

a)     using or disclosing any of DraftKings' Confidential Information (as defined in the Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement dated August 31, 2020) (the "Confidentiality Agreement");

b)     moving, destroying, deleting, altering, or otherwise disposing of any files, documents, and digital media that contain any DraftKings Confidential Information (as defined in the Confidentiality Agreement), and/or that are derived from such information;

c)     directly or indirectly providing any services to Fanatics, Inc., including its subsidiaries, affiliates, and joint ventures (individually and together, "Fanatics") relating to: (i) the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino

A103

games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing; or (ii) any other aspect of the Business of the Company for which he performed services or received Confidential Information (each as defined in the Noncompetition Covenant dated August 16, 2023) (the "Noncompetition Covenant") at any time during the six (6) month period prior to February 1, 2024;

d)      directly or indirectly soliciting or transacting business, or attempting to solicit or transact business with, any of DraftKings' customers, clients, vendors or partners, or with any of DraftKings' prospective customers, clients, vendors or partners about which Mr. Hermalyn learned confidential information or which Mr. Hermalyn had some involvement or knowledge relating to: (i) the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing; or (ii) any aspect of the Business of the Company (as defined in the Noncompetition Covenant);

e)      directly or indirectly: (i) soliciting, in person or through supervision or control of others, an employee, advisor, consultant or contractor of DraftKings for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with DraftKings or to change an existing business relationship to the detriment of DraftKings; (ii) hiring away an employee, advisor,

consultant or contractor of DraftKings; or (iii) helping another person or entity hire away a DraftKings employee, advisor, consultant or contractor.

DraftKings further respectfully requests that the Court order Mr. Hermalyn within three (3) days of the entry of its order, to: (a) return to DraftKings all DraftKings' Confidential Information (as defined in the Confidentiality Agreement) such that no Confidential Information remains in his possession, custody, or control; (b) identify to DraftKings in writing any disclosure of DraftKings' Confidential Information he made to any third party apart from any such disclosures he made in his ordinary course of business as an employee of DraftKings; and (c) certify to DraftKings his compliance with (a) and (b) above under the pains and penalties of perjury.

DraftKings respectfully requests that the Court's order as set forth above shall remain in effect until the Court rules on DraftKings' forthcoming motion for a preliminary injunction.

As set forth more fully in the Verified Complaint, Memorandum in Support of this Motion, and Affidavits of Gregory Karamitis and Brian Harris, Hermalyn misappropriated DraftKings' trade secrets in violation of his contractual obligation not to disclose or use DraftKings Confidential Information without authorization, breached his contractual obligation not to compete against DraftKings within a reasonable period after his employment, and breached his contractual obligation not to solicit DraftKings' employees. In the absence of the requested relief, DraftKings will suffer immediate and irreparable harm.

DraftKings respectfully requests that this Court schedule a hearing on this matter today, February 6, 2024, or as soon as is otherwise practicable. In support of this motion, DraftKings relies on the accompanying Memorandum, Affidavits of Gregory Karamitis and Brian Harris, and Verified Complaint.

A105

Dated: February 5, 2024                    Respectfully submitted,

                                           */s/ Andrew S. Dulberg*
                                           William F. Lee (BBO #291960)
                                           Andrew Scott Dulberg (BBO #675405)
                                           WILMER CUTLER PICKERING
                                               HALE AND DORR LLP
                                           60 State Street
                                           Boston, MA 02109
                                           617-526-6352 (t)
                                           william.lee@wilmerhale.com
                                           andrew.dulberg@wilmerhale.com

                                           Orin Snyder (*pro hac vice pending*)
                                           Harris M. Mufson (*pro hac vice pending*)
                                           Justin M. DiGennaro (*pro hac vice pending*)
                                           GIBSON, DUNN & CRUTCHER LLP
                                           200 Park Avenue
                                           New York, NY  10166-0193
                                           Tel:  212.351.4000
                                           Fax:  212.351.4035
                                           OSnyder@gibsondunn.com
                                           HMufson@gibsondunn.com
                                           JDiGennaro@gibsondunn.com

                                           Jason C. Schwartz (pro hac vice pending)
                                           GIBSON, DUNN & CRUTCHER LLP
                                           1050 Connecticut Avenue, N.W.
                                           Washington, D.C. 20036
                                           Tel:  202.955.8500
                                           JSchwartz@gibsondunn.com

                                           *Attorneys for Plaintiff DraftKings Inc.*

A106

**RULE 7.1(A)(2) CERTIFICATE**

I, Andrew S. Dulberg, hereby certify that on February 5, 2024, counsel for

DraftKings conferred with counsel for the Defendant and attempted in good faith to resolve

or narrow the issue.

*/s/ Andrew S. Dulberg*
Andrew S. Dulberg

**CERTIFICATE OF SERVICE**

I, Andrew S. Dulberg, counsel for DraftKings, hereby certify that this document has

been filed through the Court's ECF system and will be sent electronically to the registered

participants as identified on the Notice of Electronic Filing (NEF).  This document is being

sent by e-mail and will be sent by courier to counsel for the Defendant at the addresses below.

Brad D. Brian
Bethany W. Kristovich
Anne K. Conley
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-9100
Brad.Brian@mto.com
Bethany.Kristovich@mto.com
Anne.Conley@mto.com

*/s/ Andrew S. Dulberg*
Andrew S. Dulberg

A107

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| DRAFTKINGS INC.,<br><br>                              Plaintiff,<br><br>        v.<br><br>MICHAEL HERMALYN<br><br>                              Defendant. | Civil Action No.  1:24-cv-10299 |

**[PROPOSED] TEMPORARY RESTRAINING ORDER**

Upon Plaintiff DraftKings Inc.'s ("DraftKings") Motion for a Temporary Restraining Order, and upon consideration of the Verified Complaint, Exhibits, Memorandum of Law, and the Affidavits of Gregory Karamitis and Brian Harris in support of DraftKings' Motion, the Court hereby ORDERS that:

a)   Mr. Hermalyn is hereby restrained and enjoined from using or disclosing any of DraftKings' Confidential Information (as defined in the Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement dated August 31, 2020) (the "Confidentiality Agreement");

b)   Mr. Hermalyn is hereby restrained and prohibited from moving, destroying, deleting, altering, or otherwise disposing of any files, documents, and digital media that contain any DraftKings Confidential Information (as defined in the Confidentiality Agreement), and/or that are derived from such information;

c)   Mr. Hermalyn is hereby restrained and enjoined from directly or indirectly providing any services to Fanatics, Inc., including its subsidiaries, affiliates, and joint ventures (individually and together, "Fanatics") relating to: (i) the research, design, development, marketing, sales, operations, maintenance and commercial

A108

exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing; or (ii) any other aspect of the Business of the Company for which he performed services or received Confidential Information (each as defined in the Noncompetition Covenant dated August 16, 2023) (the "Noncompetition Covenant") at any time during the six (6) month period prior to February 1, 2024;

d)   Mr. Hermalyn is hereby restrained and enjoined from directly or indirectly soliciting or transacting business, or attempting to solicit or transact business with, any of DraftKings' customers, clients, vendors or partners, or with any of DraftKings' prospective customers, clients, vendors or partners about which Mr. Hermalyn learned confidential information or which Mr. Hermalyn had some involvement or knowledge relating to: (i) the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing; or (ii) any aspect of the Business of the Company (as defined in the Noncompetition Covenant);

e)     Mr. Hermalyn is hereby restrained and enjoined from directly or indirectly: (i) soliciting, in person or through supervision or control of others, an employee, advisor, consultant or contractor of DraftKings for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with DraftKings or to change an existing business relationship to the detriment of DraftKings; (ii) hiring away an employee, advisor, consultant or contractor of DraftKings; or (iii) helping another person or entity hire away a DraftKings employee, advisor, consultant or contractor.

f)     Mr. Hermalyn is hereby directed, within three (3) days of the entry of this order, to: (a) return to DraftKings all DraftKings' Confidential Information (as defined in the Confidentiality Agreement) such that no Confidential Information remains in his possession, custody, or control; (b) identify to DraftKings in writing any disclosure of DraftKings' Confidential Information he made to any third party apart from any such disclosures he made in his ordinary course of business as an employee of DraftKings; and (c) certify to DraftKings his compliance with (a) and (b) above under the pains and penalties of perjury.

This order shall remain in effect until the Court rules on DraftKings' forthcoming motion for a preliminary injunction.

**SO ORDERED.**

_____
United States District Judge

Boston, Massachusetts

Dated: February ___, 2024

A110

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

DRAFTKINGS INC.,

        Plaintiff,

   v.

MICHAEL HERMALYN,

        Defendant.

Civil Action No. 1:24-cv-10299

---

**AFFIDAVIT OF GREGORY KARAMITIS IN SUPPORT**
**OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Gregory Karamitis, upon being duly sworn, do hereby testify under oath as follows:

1.      I am over the age of eighteen.  I make this affidavit in support of Plaintiff DraftKings Inc.'s ("DraftKings" or the "Company") Motion for Temporary Restraining Order.

2.      I am DraftKings' Chief Revenue Officer, and I have been employed by DraftKings since January 2014.

3.      DraftKings is a digital sports entertainment and gaming company.  Its business-to-consumer segment provides, among other things, users with online daily fantasy sports ("DFS"), online and retail sports betting (collectively, "Sportsbook"), and online casino ("iGaming") products.  DraftKings' DFS products are available to customers in more than 40 states; the Sportsbook currently operates in 24 states across America.  DraftKings also maintains offices and conducts business in Canada, Israel and parts of Europe.

4.      I started at DraftKings as a VP of analytics approximately ten years ago.  I was promoted to Chief Revenue Officer in November 2023 and have served in that role since that time.

A111

5. In my role as Chief Revenue Officer, I am responsible for driving DraftKings' revenue, including revenue from, among other things, DFS, Sportsbook, and iGaming product offerings. I am also responsible for overseeing the operational management of DraftKings product lines, including by defining content strategy and promotional strategy, forecasting, budgeting, pricing, and site merchandising.

6. I understand that DraftKings has brought this action against Michael Hermalyn. I know Mr. Hermalyn, and am aware that he most recently held the title of Vice President of VIP Management at DraftKings until February 1, 2024, when he left DraftKings. I understand that he alleges to now be working for Fanatics as President of VIP.

7. Mr. Hermalyn began working at DraftKings on September 14, 2020. He first held the position of Senior Vice President of Business Development. In that role, Mr. Hermalyn was responsible for increasing market share for DraftKings' products through sales, advertising, and developing relationships with external partners, including both businesses and individuals.

8. In May 2022, Mr. Hermalyn left our Business Development team to lead and grow DraftKings' VIP department as Vice President of VIP Management. His primary functions related to the supervision, operation, and development of DraftKings' VIP business. In that role, Mr. Hermalyn was responsible for increasing market share for DraftKings' products through developing and maintaining relationships with high-value individual customers.

9. High-value individual customers are important to generating revenue at DraftKings and other companies in the digital sports entertainment and gaming industry. A large portion of DraftKings' revenue from individual customers is generated by a relatively small number of customers. The activity of that relatively small number of customers significantly impacts the ability of DraftKings and similar companies to generate revenue. DraftKings and its

-2-

A112

competitors invest in developing and maintaining relationships with high-value individual customers.  These companies, including DraftKings, often refer to such customers as "VIP" customers.

10.    In his most recent role, Mr. Hermalyn developed and maintained relationships with VIP customers in two primary ways.

11.    First, Mr. Hermalyn managed DraftKings' VIP Hosts program.  VIP Hosts are DraftKings employees who serve as liaisons between the DraftKings and VIP customers.  VIP customers include high volume players and customers identified through DraftKings' loyalty program.  Once DraftKings identifies certain VIP customers, a VIP Host makes and maintains contact with that customer and serves as the face of the company to the VIP.  Through the VIP Host, DraftKings develops its relationship with the VIP customer, including by providing high-value benefits, such as trips, dinners, gifts, and access to special events.  As the manager of DraftKings' VIP Hosts program, Mr. Hermalyn had oversight over, and access to, detailed information regarding DraftKings' high-value individual customers.

12.    Second, Mr. Hermalyn managed events that DraftKings hosted for VIP customers.  Many of these events are around major sporting events that contribute in a meaningful way to DraftKings' gaming revenue.  Those events include, among others, the Super Bowl, the March Madness NCAA basketball tournament, and the NBA Finals.  The Super Bowl, in particular, has outsized importance for DraftKings—both generating business through DraftKings' Sportsbook and bringing together key DraftKings customers, clients, and business partners.

13.    Mr. Hermalyn managed VIP attendance at these events by identifying VIP customers with whom DraftKings has a relationship or is working to develop a relationship and

A113

inviting such customers—either directly or indirectly (through a VIP Host or other DraftKings point of contact)—to the events.

14.    Throughout his employment, including in the six months before his resignation, Mr. Hermalyn had access to DraftKings' proprietary and confidential information, including business plans, marketing plans, products, promotions, costs, pricing, customer data, and product development plans.  This information was especially commercially sensitive and was not generally available outside the Company.

15.    The proprietary and confidential information that Mr. Hermalyn had access to included, without limitation, sensitive, personal and gaming information concerning VIP customers, and the identities of their DraftKings' liaison; information concerning DraftKings' development of VIP programs, including DraftKings' loyalty program and how DraftKings identifies, segments, and measures its customers; information concerning DraftKings' ongoing and future plans to access new markets, including information concerning likely third-party partners when such partners are necessary to enter a new market; and documents that reflect DraftKings' business-development, sales, and marketing plans.  This information was important to DraftKings' business.

16.    Mr. Hermalyn also had access to compensation information related to VIP Hosts and other DraftKings employees who maintain relationships with VIP customers and information related to how such compensation has changed over time, including during the previous two years.

17.    DraftKings' above-described confidential and proprietary information is especially valuable in the context of the highly-competitive gaming industry.  Each year, new

-4-

companies enter the industry, and gaming companies like DraftKings compete to acquire and retain customers.

18.     One of the main reasons why competition in the gaming industry is so fierce is that, as I mentioned earlier, a primary driver of revenue is VIP customers.  Yet the number of such customers is small.  VIP customers make up a relatively small portion of the betting and gaming market despite generating a high portion of revenue in that market.  As a result, the personal relationships that companies, including DraftKings, develop with VIP customers are important to successfully competing in the gaming industry.  Indeed, when DraftKings seeks to enter new markets, including markets outside the United States, it prioritizes capturing high-value customers at the outset of its operations.

19.     Fanatics competes directly with DraftKings.  Like DraftKings, Fanatics offers online sports betting and iGaming products.  Both DraftKings and Fanatics make these products available through mobile applications.  The applications of both companies allow customers to engage in online sports betting and iGaming within the same mobile application.

20.     I understand that, shortly before his resignation, Mr. Hermalyn viewed and/or downloaded several internal DraftKings documents.  I have reviewed these documents.

21.     I understand that on January 30, 2024, Mr. Hermalyn downloaded a document entitled "(Master) SB 2024" to a non-DraftKings device.  At the time that Mr. Hermalyn downloaded the "(Master) SB 2024" document, Mr. Hermalyn had informed certain people at DraftKings that he needed some time off due to a friend's death.  He resigned from DraftKings two days later on February 1, 2024.

22.     I have reviewed that spreadsheet.  It reflects the list of business partners, such as representatives of teams and leagues, as well as athletes, celebrities, influencers, vendors, and

corporate officers and directors who DraftKings invited (or intends/intended to invite) to attend the 2024 Super Bowl, with information about their travel plans.  It categorizes those individuals by the organizations with which they are associate, and lists the DraftKings' point of contact for each person.  It shows which individuals have responded to invitations from DraftKings and which events hosted by DraftKings they are attending the weekend of Super Bowl LVIII, including the Super Bowl itself.  The spreadsheet also details the arrival and departure dates of the individuals and where they are staying.  It also reflects the number of DraftKings VIP customers attending each DraftKings event across Super Bowl weekend.  To be clear, the spreadsheet includes within it numerous worksheets, many of which contain highly sensitive information that is proprietary and confidential.  This includes a list of contacts associated with executives of DraftKings.

23.    The information contained in the DraftKings' "(Master) SB 2024" document is commercially valuable in the short and long term.  It contains proprietary and confidential information crucial for leveraging relationships in the next week—leading up to and during the Super Bowl—and beyond.  Disclosure of this information to a competitor like Fanatics would be competitively damaging and could harm DraftKings in the market during this pivotal revenue-generating time.  Business partners like those identified in this document—including celebrities, athletes, influencers, and organizations like leagues and teams—are important elements of DraftKings' strategy for engaging and retaining VIP customers by developing and promoting DraftKings' close relationships with prominent individuals and organizations and providing VIP customers with access to those business partners.  A competitor obtaining access to this information could seek to interfere with and commandeer the business partners with whom DraftKings has built relationships over time and attempt to use those relationships to drive their

A116

own VIP customer engagement and retention.  In addition, access to sensitive information about where DraftKings VIP customers will be located over Super Bowl weekend and when would present a prime target for a competitor to meet and seek to interfere with and hijack DraftKings' carefully cultivated relationships with those customers.  In the longer term, this document includes information on business partners that—if disclosed—might be used by a competitor to poach DraftKings' relationships.

24.     I understand that the week prior, on January 22, 2024, Mr. Hermalyn viewed a PowerPoint presentation that described a rewards program for VIP customers, entitled "VIP Founders Club."  The presentation is dated April 2021.  I have reviewed that presentation.  It provides a roadmap for designing and executing a VIP rewards program in the gaming industry to recruit high-value VIP players.  It lays out the vision, mission, and sizing of a VIP rewards program.  In short, this document provides a blueprint for building a VIP program.  Disclosure of this information to a DraftKings competitor would be beneficial and could harm Draftkings' business by allowing for the creation of a competing VIP program.

25.     Given the date appearing on the face of the document, it does not make any sense why Mr. Hermalyn would be viewing the presentation the week before his resignation.  Mr. Hermalyn was responsible for managing DraftKings' existing VIP program, which was developed and launched before Mr. Hermalyn occupied his role as the head of the VIP team.

26.     I understand that Mr. Hermalyn downloaded a document titled "BD Team Tracker Weekly Report" on January 24, 2024.  I have reviewed that document.  That document provides details on the business-development work of DraftKings on a weekly basis dating back to May 2022 up to November 27, 2023.  It identifies the teams and leagues, marketplaces, media and platforms, influencers, and content-distribution platforms with which DraftKings is then-in

negotiations or with which DraftKings recently signed a deal.  And it shows the priorities of DraftKings' business-development team and comments and questions from senior leadership of DraftKings.

27.     Its distribution is limited.  Disclosure of this business development tracker to a competitor would enable that competitor to identify DraftKings' business strategy, commercial opportunities and relationships.  It does not make any sense why Mr. Hermalyn would have viewed this document one week before leaving DraftKings.

28.     I also understand Mr. Hermalyn downloaded a document entitled "BD_Gaming101" on January 30 and 31, 2024, and then again on February 1, 2024, the day that he resigned from DraftKings.  This document is used by DraftKings' employees to make presentations on the online gaming industry to potential business partners like sports leagues, sports teams, and other organizations that are considering partnering with DraftKings. DraftKings requires potential business partners to execute a non-disclosure agreement before viewing this document.  The presentation is a pitch deck used to demonstrate DraftKings' value proposition to its prospective business partners.  It contains DraftKings' confidential strategies for building partnerships with potential business partners.  Once again, Mr. Hermalyn had no legitimate business reason to review this document while he was on leave and in California, as he was not participating in any partnership pitches and was not scheduled to participate in any partnership pitches in the near future.  It is especially clear that Mr. Hermalyn had no legitimate DraftKings business reason to access this document given that he downloaded it on February 1, 2024, the same day he resigned from DraftKings.

29.     Mr. Hermalyn's work for Fanatics and his viewing and accessing trade secrets and confidential documents of DraftKings could cause immediate and long-term competitive

damage to DraftKings in the market, as well as destroy DraftKings' long-term prospects.  Mr. Hermalyn's knowledge of DraftKings' strategies and the documents he accessed and downloaded in the final days before he resigned from DraftKings would allow him to set up a competing VIP customer team at a competitor business overnight, without the need for that competitor to invest the time and resources DraftKings invested to build its own successful VIP customer program over many years.  Most immediately, Mr. Hermalyn could disrupt and interfere with DraftKings' plans, including DraftKings' collaborations with its organizational and individual business partners at this week's Super Bowl LVIII based on the information reflected in the "(Master) SB 2024" spreadsheet that he downloaded, which again, indicates where those business partners will be located throughout Super Bowl weekend and who at DraftKings is responsible for working with those individuals.  Mr. Hermalyn could also seek to interrupt DraftKings' relationships with its VIP customers at this week's Super Bowl LVIII by attending events where, as reflected in the "(Master) SB 2024" spreadsheet he downloaded, a significant number of DraftKings VIP customers will be physically located.

30.     Mr. Hermalyn has accessed and downloaded documents that include information that is critical to the success of DraftKings.  This includes information relating to DraftKings' VIP strategy and DraftKings' business more broadly.  Based on the information Mr. Hermalyn downloaded from DraftKings, DraftKings is exposed to the risk that Fanatics will seek to recruit and hire DraftKings VIP-facing employees.  DraftKings also faces the risk that Fanatics will seek to engage DraftKings' VIP customers and divert those customers to game on Fanatics gaming products.  That Mr. Hermalyn is now in a role at Fanatics called "President of VIP" is deeply troubling.

I declare under the penalty of perjury that the foregoing facts are true and correct based on my personal knowledge and/or to the best of my knowledge and belief based on information that was provided to me from DraftKings' records.

Signed this 5th day of February 2024 under the pains and penalties of perjury.

Greg Karamitis

A120

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| |
|---|
| DRAFTKINGS, INC., |
| *Plaintiff*, |
| v. |
| MICHAEL Z. HERMALYN, |
| *Defendant.* |

Civil Action No. 1:24-cv-10299-JEK

**Oral Argument Requested**

**DEFENDANT'S EMERGENCY MOTION TO STAY**
**PURSUANT TO THE FIRST-FILED RULE**

Defendant Michael Z. Hermalyn ("Hermalyn") respectfully moves on an emergency basis for an entry of a stay of all claims asserted against him in Plaintiff DraftKings, Inc.'s ("DraftKings") Complaint (ECF No. 1) and that the Court defer any action on DraftKings' Motion for Temporary Restraining Order (ECF No. 3), pending the resolution of a first-filed action which is now pending in the U.S. District Court for the Central District of California, captioned: *Hermalyn et al. v. DraftKings, Inc.*, Case No. Case No. 2:24-cv-00997, and which was first filed on February 1, 2024.  As grounds for the present motion, Defendant states as follows, and respectfully requests that the Court **grant** this motion for the reasons set forth more fully in the accompanying memorandum of law.

Defendant Hermalyn—who has never lived or worked in the Commonwealth of Massachusetts—is a California resident who recently accepted an offer of employment with Fanatics VIP in Los Angeles, California.  On February 1, 2024, Hermalyn and his employer Fanatics VIP filed a complaint in the Superior Court of the State of California in the County of Los Angeles, seeking a declaratory judgment and injunctive relief to enjoin Plaintiff from prohibiting Hermalyn from working for Fanatics VIP through the enforcement of post-

1

A121

employment restrictive covenants, including a 12-month, worldwide non-compete and non-solicitation covenants contained in Hermalyn's agreements with DraftKings. Hermalyn submitted an application for a temporary restraining order and order to show cause on a preliminary injunction in that action, and a request is already pending for a hearing to be held on that application on February 7, 2024. DraftKings removed the California action to federal court late in the evening of February 5, 2024.

The key issue in DraftKings' claims in this litigation is the enforceability of the post-employment restrictive covenants, which Hermalyn and DraftKings are already actively litigating in the California action. Because the California action was filed first and involves the same parties, factual background, and overlapping legal issues as this action, interstate comity and judicial economy strongly favor staying this later-filed litigation pending resolution of the first-filed California action.

WHEREFORE, Defendant respectfully requests that the Court stay this action in its entirety, including any action on Plaintiff's Motion for a Temporary Restraining Order, pending the resolution of the California action, and that it grant such further relief as it deems just and proper.

A122

Dated: February 6, 2024

Respectfully submitted,

*Attorneys for Defendant Michael Z. Hermalyn*

/s/  *Russell Beck*
Russell Beck (BBO# 561031)
Stephen Riden (BBO# 644451)
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Boston, MA 02110
Tel.: (617) 500-8660
Fax: (617) 500-8665
rbeck@beckreed.com
sriden@beckreed.com

A123

## **LOCAL RULE 7.1 CERTIFICATION**

I certify that Defendant has complied with the provisions of Local Rule 7.1 by attempting to confer with counsel for Plaintiff regarding this motion on February 6, 2024, and that Plaintiff has responded that it intends to oppose this motion.

*/s/  Russell Beck*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was filed on February 6, 2024 through the ECF System and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  February 6, 2024                    */s/  Russell Beck*

A124

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

DRAFTKINGS, INC.,

*Plaintiff*,

v.

MICHAEL Z. HERMALYN,

*Defendant.*

Civil Action No. 1:24-cv-10299-JEK

**DECLARATION OF DEFENDANT MICHAEL Z. HERMALYN**
**IN SUPPORT OF DEFENDANT'S MOTION TO STAY**

1

A125

### DECLARATION OF MICHAEL Z. HERMALYN

I, Michael Z. Hermalyn, hereby declare, under penalty of perjury, the following:

1.     I am over the age of 18 and have personal knowledge of the facts set forth in this Declaration.  If called upon to do so, I could and would testify competently thereto.

## I.    CURRENT RESIDENCE IN CALIFORNIA AND EMPLOYMENT WITH FANATICS IN LOS ANGELES, CALIFORNIA

2.     I am a California citizen and resident of Los Angeles, California.  Prior to moving to Los Angeles on January 29, 2024, I lived in Bay Head, New Jersey. I intend to live and work in California for the foreseeable future. To that end, I leased an apartment in California, and I intend to move into a family home when my wife and children join me in California after the conclusion of the academic school year this spring. I intend to enroll my two daughters in school in Los Angeles for the next school year and have already contacted summer camps and joined various waitlists.

3.     Since moving to California, I obtained a California driver's license, purchased a car in California, registered the car in California, registered to vote in California, and obtained an appointment with a physician in California.

4.     On February 1, 2024, I accepted an offer for employment from FVP, LLC, also known as Fanatics VIP, which is headquartered in Los Angeles, California, to join as President of Fanatics VIP and to be the Head of Fanatics' Los Angeles office, located at 11601 Wilshire Blvd Los Angeles, CA, 90025.  Fanatics VIP does not have any offices or employees in Massachusetts.

5.     My position with Fanatics VIP requires that I live and work in person in Los Angeles, where I understand that Fanatics already employs approximately 80 people and where I plan to further build out my Fanatics VIP team.

2

A126

6.      Fanatics is a leading digital sports platform business in the United States, including California, and operates across a number of industries, including collectibles, commerce (the design, manufacturing, and sale of licensed apparel and hard goods), betting and gaming, and with emerging businesses in live events, media, and more.

7.      As Head of Fanatics' Los Angeles office, I will oversee and administer the operations of the Los Angeles office (which houses employees from multiple Fanatics businesses) and oversee the planned consolidation of the greater Los Angeles-area offices (including Fanatics' Irvine location) into a single location in Los Angeles.

## II.      PRIOR EMPLOYMENT WITH DRAFTKINGS

8.      Prior to joining Fanatics VIP, I worked for DraftKings, Inc. for less than 3.5 years—from September 2020 to January 2024. My internal title was Vice President of Growth. In that role, I was responsible for retaining and acquiring certain categories of customers.

9.      During my employment with DraftKings, I worked out of DraftKings' New York City office or from my home office in New Jersey. I have never resided in Massachusetts, was never employed in Massachusetts, and was never assigned to work out of DraftKings' Massachusetts office at any point.

I declare under penalty of perjury that the foregoing is true and correct.

Executed February  6, 2024, in Los Angeles, California.

By:  _____
        Michael Z. Hermalyn

3

A127

**Subject: Activity in Case 1:24-cv-10299-JEK DraftKings Inc. v. Hermalyn Order on Motion to Stay**
**Date:** February 6, 2024 at 5:51:20 PM EST
**To:** CourtCopy@mad.uscourts.gov

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

United States District Court

District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 2/6/2024 at 5:51 PM EST and filed on 2/6/2024
Case Name:     DraftKings Inc. v. Hermalyn
Case Number:     1:24-cv-10299-JEK
Filer:
Document Number: 29(No document attached)

Docket Text:
District Judge Julia E. Kobick: ELECTRONIC ORDER entered.

Defendant Michael Hemalyn's Emergency Motion to Stay [25] is DENIED. Invoking the first-to-file rule, also known as the prior pending action doctrine, Hemalyn asks this Court to stay this matter, because he filed two similar, but not entirely overlapping, lawsuits against DraftKings Inc. in California state court. Both California lawsuits were removed by DraftKings to federal court; one has since been remanded for lack of jurisdiction, *see* ECF 27-3 (Beck Decl., Ex. C), (In Chambers) Remand Order, *Hermalyn v. DraftKings, Inc.*, No. 2:24-cv-00918 (C.D. Cal. Feb. 5, 2024), and Hemalyn has argued that the other should likewise be immediately remanded for lack of jurisdiction, *see* ECF 6, Plaintiff's Notice of Related Case, *Hermalyn and FVP, LLC v. DraftKings, Inc.*, No. 2:24-cv-00997 (C.D. Cal. Feb. 6, 2024).

The prior pending action doctrine "covers scenarios in which 'actions involving the same parties and similar subject matter are pending in different federal district courts" and "the overlap between the two suits is nearly complete.'" *Maldonado-Cabrera v. Anglero-Alfaro*, 26 F.4th 523, 526 (1st Cir. 2022) (quoting *TPM Holdings, Inc. v. Intra-Gold Indus., Inc.*, 91 F.3d 1, 4 (1st Cir. 1996)). But that "general principle... to avoid duplicative litigation holds water only within the federal system." *Id.* at 527 (internal quotation marks omitted). Where there exists substantial overlap between parties and issues in federal and state court actions, "'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'" *Id.* "Except when warranted by a doctrine of abstention or comity recognized by the Supreme Court,... a federal court is not free to surrender jurisdiction-whether by outright dismissal or by a stay-to a parallel state-court action without a sufficient showing of the required exceptional circumstances." *Id.* (citations omitted).

2

A128

Hemalyn makes no argument that any abstention doctrine warrants a stay of this litigation in light of the pending California cases. And Hemalyn has taken the position that the federal court lacks subject matter jurisdiction in the case pending in the U.S. District Court for the Central District of California, because, he says, it is "exactly the same case" as the case already remanded to state court. ECF 6, at 2, Plaintiff's Notice of Related Case, *Hermalyn and FVP, LLC v. DraftKings, Inc.*, No. 2:24-cv-00997 (C.D. Cal. Feb. 6, 2024). Under the circumstances, the first-to-file rule does not apply. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, at a minimum, and it has a "virtually unflagging obligation" to exercise its jurisdiction in this case. *Maldonado-Cabrera*, 26 F.4th at 527 (internal quotation marks omitted).

But even if the first-to-file rule were to apply, the Court would decline to exercise its discretion to stay this case. "When deciding whether to apply the rule, courts must consider: (1) which action was filed first; (2) the similarity of the parties; and (3) the similarity of the issues." *Waithaka v. Amazon.com, Inc.*, 404 F. Supp. 3d 335, 350 (D. Mass. 2019), aff'd, 966 F.3d 10 (1st Cir. 2020). However, "the first-to-file rule is not to be applied in a mechanical way," and "[e]xceptions to the rule are not rare." *EMC Corp. v. Parallel Iron, LLC*, 914 F. Supp. 2d 125, 127 (D. Mass. 2012). While the California case was filed before this action and includes both Hermalyn and DraftKings as parties, the Courts exercise of jurisdiction here would "better serve the interests involved." *Id.*

Hermalyn signed a confidentiality agreement and a noncompetition covenant with DraftKings expressly stating that he "submit[s] to the personal jurisdiction of" "the United States District Court for the District of Massachusetts for any dispute arising hereunder" and "waive[s] any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process." ECF 1-1, at 6 (§ 9); ECF 1-2, at 15 (§ f). Hermalyn has thus "submit[ted]" to the Court's exercise of personal jurisdiction in this case. *See Inso Corp. v. Dekotec Handelsges, mbH*, 999 F. Supp. 165, 166 (D. Mass. 1998) ("A party to a contract may waive its right to challenge personal jurisdiction by consenting to personal jurisdiction in a forum selection clause.'" (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 11 (1972), and *Jacobson v. Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 575 (1995)). The parties also agreed, in those same contractual provisions, that their agreements "shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law." ECF 1-1, at 6 (§ 9); ECF 1-2, at 15 (§ f). Moreover, this case, unlike the California cases, involves a claim for misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836. *See* ECF 1, ¶¶ 130-143. The Court thus declines to exercise its discretion to stay this matter. (Currie, Haley)

**1:24-cv-10299-JEK Notice has been electronically mailed to:**

Russell Beck       rbeck@beckreed.com, ehahn@beckreed.com, pastl@beckreed.com

Orin Snyder       osnyder@gibsondunn.com

Stephen D. Riden       sriden@beckreed.com, pastl@beckreed.com

Jason C. Schwartz       jschwartz@gibsondunn.com

Andrew S. Dulberg       andrew.dulberg@wilmerhale.com, WHDocketing@wilmerhale.com

A129

**1:24-cv-10299-JEK Notice will not be electronically mailed to:**

A130

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| DRAFTKINGS, INC.,<br><br>                    *Plaintiff,*<br><br>          v.<br><br>MICHAEL Z. HERMALYN,<br><br>                         *Defendant.* | Civil Action No. 1:24-cv-10299-JEK |

**DECLARATION OF RUSSELL BECK IN SUPPORT OF**
**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**MOTION FOR TEMPORARY RESTRAINING ORDER**

A131

## **DECLARATION OF RUSSELL BECK**

I, Russell Beck, hereby declare under penalty of perjury, pursuant to 29 U.S.C. § 1746:

1.      I am an attorney admitted to practice before this Court, and a member in good standing of the bar of the Commonwealth of Massachusetts.

2.      I am a name Partner at the law firm of Beck Reed Riden LLP in Boston, Massachusetts, and counsel for Defendant Michael Z. Hermalyn ("Hermalyn").

3.      I entered my Notice of Appearance as counsel for Hermalyn in the above-captioned action on February 6, 2024 (ECF No. 15).

4.      I submit this declaration in support of Defendant's Opposition to Plaintiff's Motion for Temporary Restraining Order (the "Opposition"), filed concurrently herewith.

5.      I have personal knowledge of the facts presented in this declaration, and personal familiarity with the documents and filings at issue in the Opposition.

6.      A true and correct copy of the California State Assembly's Commission on Labor & Employment's *Background Information Request* for Senate Bill 699 from the 2023–2024 Regular Session is attached hereto as Exhibit A.

7.      A true and correct copy of the Senate Committee Bill Analysis for California Senate Bill 699 dated April 18, 2023 is attached hereto as Exhibit B.

8.      A true and correct copy of California Senate Bill 699 from the 2023–2024 Regular Session is attached hereto as Exhibit C.

2

A132

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed:  February 7, 2024

By:_____

Russell Beck (BBO# 561031)
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Boston, MA 02110
Tel.: (617) 500-8660
Fax: (617) 500-8665
rbeck@beckreed.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on Plaintiff's counsel on the date below via email and will be filed through the ECF System and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  February 7, 2024

/s/   *Russell Beck*

3

A133

# EXHIBIT A



## ASSEMBLY COMMITTEE ON LABOR AND EMPLOYMENT
### ASH KALRA, Chair

## BACKGROUND INFORMATION REQUEST

**Measure: SB 699**          **Author:** Senator Caballero

**Subject: Non-Compete Agreements**

**Staff Contact Name & Number:**          Michele Canales, 916-651-4014

**Bill Sponsor(s) (include contact information): None**

<u>**BACKGROUND WORKSHEET**</u>:  Submit a completed background worksheet, and accompanying background materials, within seven days of this request, or earlier upon request by the Committee, via email to our Committee Secretary: lorie.alvarez@asm.ca.gov  and to Republican Caucus Consultant: lauren.prichard@asm.ca.gov.

If no worksheet is received for a bill, then that bill will not be set in Committee, unless the Chair specifically waives this requirement.

<u>**SUPPORT AND OPPOSITION**</u>:  **All support and opposition letters must be submitted by 5:00 pm on Wednesday of the week prior to the hearing in order to be included in the analysis.**  All letters addressed to the Committee shall be submitted electronically through the CA Legislature Position Letter Portal at https://calegislation.lc.ca.gov/Advocates/.  Letters not submitted electronically through the Portal shall be emailed to the Committee and the Republican Caucus Consultant.

<u>***Please note***</u>:  *Policy Committees are responsible for analyses of measures that are to be heard on the Assembly Floor.  It is the responsibility of the Author's office to verify updated support and opposition to this Committee no less than two days prior to the bill being heard on the Assembly Floor.  If not verified within this time-frame the Committee may state that updated support and opposition could not be verified and therefore will not be listed.*

<u>**AMENDMENTS**</u>:  Let the Consultant know immediately if you are planning amendments.  When you submit amendment language to Legislative Counsel, please send a copy to the Committee at the same time.

**Deadline:  Submit your amendments to the Committee in Counsel form no later than Noon on the Monday of the week prior to the hearing.**  Send the Secured PDF from Legislative Counsel by email or deliver the signed original, three copies of the amendments, and one copy of the in-context amendments.

<u>***Please note***</u>:  *When submitting amendments to your bill(s) on the Assembly Floor-forward a copy to the Committee Consultant prior to putting them across the Assembly Desk.*

LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

1) What problem is your bill trying to solve, share evidence of the problem and relevant research?

The issue with current law is that it may not be enough to deter companies from trying to put non-competes in contracts. There also might not be enough awareness on the part of their employee that these types of contracts are not legal.

FTC Fact Sheet, referencing research that shows the harm non-competes have on the market and employee mobility, attached.

Up to 40 percent of workers have signed a non-compete at some time during their career. U.S. Department of the Treasury, Office of Economic Policy, Non-compete Contracts: Economic Effects and Policy Implications, March 2016, attached.

2) What does your bill do and how does this address the problem you identified above?

SB 699 would prohibit any employer from attempting to enforce a void contract, including seeking enforcement in a non-California court. The bill would provide that an employer that violates that provision is liable for actual damages and an additional penalty.
The bill would also authorize an employee or prospective employee to bring an action for injunctive relief and for the recovery of actual damages and penalties, and would provide that a prevailing or prospective employee is entitled to recover reasonable costs and attorney's fees.

3) Per HR 39 (Gipson 2021), how does your bill promote equity solutions and maximize benefits for underserved and marginalized communities?

This bill allows employees or potential employees to recover attorney's fees and other related costs, which is sometimes the difference between pursuing litigation and not, for folks who do not have the means. SB 699 not only increases the incentives not to restrict employees freedom of movement in the employment sense, but also ensures benefits to employees who prevail, helping to recover for the time they were left unemployed due to the noncompete as well.

4) Please include a statement from the Author about the need for the bill. *This statement will be quoted in the analysis as the Author's statement.*

Noncompete clauses in employment contracts are extremely common in the United States. Research shows that 1 in 5 workers are currently subject to a noncompete clause out of approximately 30 million workers nationwide. Despite California's strong laws and public policy against noncompetition agreements, companies that do business in California continue to attempt to enforce noncompete agreements against California residents. As the market for talent has become national and remote work has grown, California employers increasingly face the challenge of employers outside of California attempting to prevent the hiring of former employees. Employers who pursue frivolous noncompete litigation can have a chilling effect on employee mobility. SB 699 seeks to strengthen penalties for employers who attempt to utilize non-competes, making them liable for actual damages and penalties. The bill would also

LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917



AP1 - 2

A136

authorize a prospective employee to bring an action for injunctive relief and for the recovery of those damages and penalties, and would provide that a prevailing employee is entitled to recover reasonable costs and attorney's fees.

5)   Please share any additional information you would like us to have about your bill.

The Federal Trade Commission proposed a new rule that would prohibit employers from imposing noncompete agreements on their workers (Jan 5th, 2023).

Proposed Rule

The Federal Trade Commission proposes to add a new subchapter J, consisting of part 910, to chapter I in title 16 of the Code of Federal Regulations:

1. Add new subchapter J, consisting of part 910, to read as follows:

Subchapter J—Rules Concerning Unfair Methods of Competition

6)   Are any amendments planned for this bill?  If yes, provide a summary of the planned amendments and attach the request that you send to Legislative Counsel.

No amendments are planned.

7)   Has a similar bill been introduced before either this session or a previous session of the legislature?  Please identify the session, bill number, author, and disposition of the bill, including chapter number (if applicable).

AB 1076 (Bauer-Kahan) 2023 (senate Judiciary)

AB 747 (McCarty) 2023 (Inactive file)



LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

AP1 - 3

A137

# EXHIBIT B

Case 1:24-cv-10299-JEK    Document 34-2    Filed 02/07/24    Page 2 of 5

California Bill Analysis, S.B. 699 Sen., 4/18/2023, California Bill Analysis, S.B. 699...

CA B. An., S.B. 699 Sen., 4/18/2023

California Bill Analysis, Senate Committee, 2023-2024 Regular Session, Senate Bill 699

April 18, 2023
California Senate
2023-2024 Regular Session

**SENATE JUDICIARY COMMITTEE**

**Senator Thomas Umberg, Chair**

**2023-2024 Regular Session**

SB 699 (Caballero)

Version: April 10, 2023

Hearing Date: April 18, 2023

Fiscal: Yes

Urgency: No

ME

**SUBJECT**

Contracts in restraint of trade

**DIGEST**

This bill strengthens the law that voids contracts which restrain anyone from engaging in a lawful profession, trade, or business of any kind.

**EXECUTIVE SUMMARY**

California has long codified that contracts are void if they restrain anyone from engaging in a lawful profession, trade, or business of any kind. Noncompete agreements in employment contracts are void under this law. Legal scholars who wrote in support of this bill note that studies "show that noncompetes stifle economic development, limit firms' ability to hire and depress innovation and growth." The scholars assert that noncompetes are associated with "reduced entrepreneurship, job growth, firm entry, and innovation." They explain that "research further shows that the harms of noncompetes extend not only to employees but to also companies and regional innovation." Despite California's strong public policy against noncompete agreements, companies that do business in California continue to attempt to enforce noncompete agreements against California residents. The author seeks to stop this practice by strengthening restraint of trade law and providing a robust enforcement mechanism against those who violate these provisions.

The bill is author sponsored and supported by Miravai LifeSciences, the California Employment Lawyers Association, and a number of law school professors. There is no opposition to the bill.

**PROPOSED CHANGES TO THE LAW**

A139

Case 1:24-cv-10299-JEK   Document 34-2   Filed 02/07/24   Page 3 of 5

California Bill Analysis, S.B. 699 Sen., 4/18/2023, California Bill Analysis, S.B. 699...

Existing law:

1) Specifies that every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void. (Bus. & Prof. § 16600).

This bill:

1) Contains findings and declarations regarding noncompete clauses.

2) Provides that any contract that is void under California's restraint of trade law is unenforceable regardless of where and when the contract was signed.

3) Provides that an employer or former employer shall not attempt to enforce a contract that is void under California's longstanding restraint of trade law regardless of whether the contract was signed and the employment was maintained outside of California.

4) Provides that an employer shall not enter into a contract with an employee or prospective employee that includes a provision that is void under California's restraint of trade law.

5) Provides that an employer that enters into a contract that is void under California's restraint of trade law or attempts to enforce a contract that is void under California's restraint of trade law commits a civil violation.

6) Provides that the Attorney General may bring an action to enforce the above provisions.

7) Provides that an employee, former employee, or prospective employee may bring an action for injunctive relief or the recovery of actual damages, or both, to enforce these provisions. And, provides that a prevailing employee, former employee, or prospective employee shall be entitled to recover reasonable attorney's fees and costs.

## **COMMENTS**

1. <u>California's settled public policy in favor of open competition</u>

As explained by the California Supreme Court [FN1]:

 Under the common law, as is still true in many states today, contractual restraints on the practice of a profession, business, or trade, were considered valid, as long as they were reasonably imposed. [citations omitted] This was true even in California. […] However, in 1872 California settled public policy in favor of open competition, and rejected the common law "rule of reasonableness," when the Legislature enacted the Civil Code. […]

 Section 16600 states: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." The chapter excepts noncompetition agreements in the sale or dissolution of corporations ( § 16601), partnerships (*ibid.;* § 16602), and limited liability corporations (§ 16602.5). […]

 Under the statute's plain meaning, therefore, an employer cannot by contract restrain a former employee from engaging in his or her profession, trade, or business unless the agreement falls within one of the exceptions to the rule ( § 16600.)

The author explains the following:

 Noncompete clauses in employment contracts are extremely common in the United States. Research shows that 1 in 5 workers are currently subject to a noncompete clause out of approximately 30 million workers nationwide. Despite California's strong laws and public policy against noncompetition agreements, companies that do business in California continue to attempt to enforce noncompete agreements against California residents. As the market for talent has become national and remote work has grown, California employers increasingly face the challenge of employers outside of California attempting to prevent the hiring of former employees. Employers who pursue frivolous noncompete litigation can have a chilling effect on employee mobility. SB 699 seeks to strengthen penalties for employers who attempt to utilize non-competes[.].

A140

Case 1:24-cv-10299-JEK Document 34-2 Filed 02/07/24 Page 4 of 5

California Bill Analysis, S.B. 699 Sen., 4/18/2023, California Bill Analysis, S.B. 699...

The California Employment Lawyers Association, in support of SB 699, explains that "although noncompete clauses have been unlawful in California since 1872, our attorneys routinely see these clauses included in employment agreements with California employees. These clauses restrict workers from freely switching jobs, which lowers overall wages, and undermines fair competition. These clauses can have a significant chilling effect on workers who may not understand that such agreements are void under California law."

2. <u>Strengthening California's law in order to stop the use of noncompete clauses</u>

Maravail LifeSciences, a supporter of this bill, explains that their "industry is heavily reliant on attracting top talent from across the country and around the world to continue driving innovation and economic growth. However, the use of noncompete clauses in employment contracts can hinder this process, preventing companies from recruiting the best candidates and limiting employee mobility. This is especially problematic in the biopharmaceutical industry, where the need for highly skilled workers with specialized knowledge is particularly acute." As Maravail further explains, the "use of noncompete clauses in employment contracts, can have a chilling effect on employee mobility and stifle economic development. Research has shown that noncompete clauses limit firms' ability to hire and depress innovation, growth, and are associated with suppressed wages and exacerbated racial and gender pay gaps."

This bill strengthens California's restraint of trade prohibitions by making it clear that any contract that is void under California's restraint of trade law is unenforceable regardless of where and when the contract was signed. Additionally, the bill prohibits an employer or former employer from attempting to enforce a contract that is void under California's restraint of trade law regardless of whether the contract was signed and the employment was maintained outside of California. Further, the bill prohibits an employer from entering into a contract with an employee or prospective employee that includes a provision that is void under restraint of trade law. The bill also provides that an employer that enters into a contract that is void under California's restraint of trade law or attempts to enforce a contract that is void under California's restraint of trade law commits a civil violation. The bill provides robust enforcement mechanisms for the enforcement of these provisions. Specifically, the bill provides that the Attorney General may bring an enforcement action. Additionally, an employee, former employee, or prospective employee may bring an action to enforce these provisions for injunctive relief or the recovery of actual damages, or both. A prevailing employee, former employee, or prospective employee is also entitled to recover reasonable attorney's fees and costs.

Proponents believe that these enforcement mechanisms and enhancements to the restraint of trade law will deter employers from pushing noncompete clauses into employment contracts and from threatening employees with lawsuits over contract provisions that are void.

### SUPPORT

California Employment Lawyers Association

Maravai LifeSciences

46 Law School Professors

### OPPOSITION

None known

### RELATED LEGISLATION

<u>Pending Legislation</u>:

AB 747 (McCarty, 2023) provides, among other things, that an employer shall not enter into, present an employee or prospective employee as a term of employment, or attempt to enforce any contract in restraint of trade that is void under the chapter regarding

A141

contracts in restrain to trade, which is Sections 16600 through 16607 of the Business and Professions Code. AB 1076 is in the Assembly Judiciary Committee.

AB 1076 (Bauer-Kahan, 2023) codifies the case of *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4[th] 937, which provides that noncompete agreements in an employment context and noncompete clauses within employment contracts are void, even if the agreements are narrowly tailored, unless an exception applies. AB 1076 is in the Assembly Labor and Employment Committee.

<u>Prior Legislation</u>: None known.

  [FN1]. Edwards II, v. Arthur Andersen LLP (2008), 44 Cal. 4th 937, 945-46.

CA B. An., S.B. 699 Sen., 4/18/2023

**End of Document**                                             © 2024 Thomson Reuters. No claim to original U.S. Government Works.

A142

# EXHIBIT C



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

## Senate Bill No. 699

### CHAPTER 157

An act to add Section 16600.5 to the Business and Professions Code, relating to business.

[Approved by Governor September 1, 2023. Filed with Secretary of State September 1, 2023.]

LEGISLATIVE COUNSEL'S DIGEST

SB 699, Caballero. Contracts in restraint of trade.

Existing law regulates business activities in order to maintain competition. Existing law voids contractual provisions by which a person is restrained from engaging in a lawful profession, trade, or business of any kind, except as otherwise provided.

This bill would establish that any contract that is void under the law described above is unenforceable regardless of where and when the contract was signed. The bill would prohibit an employer or former employer from attempting to enforce a contract that is void regardless of whether the contract was signed and the employment was maintained outside of California.

The bill would prohibit an employer from entering into a contract with an employee or prospective employee that includes a provision that is void under the law described above. The bill would establish that an employer who violates that law commits a civil violation. The bill would authorize an employee, former employee, or prospective employee to bring an action to enforce that law for injunctive relief or the recovery of actual damages, or both, and would provide that a prevailing employee, former employee, or prospective employee is entitled to recover reasonable attorney's fees and costs.

The bill would also make a related statement of legislative findings and declarations.

*The people of the State of California do enact as follows:*

SECTION 1.   The Legislature finds and declares the following:

(a)  Noncompete clauses in employment contracts are extremely common in the United States. Research shows that one in five workers are currently subject to a noncompete clause out of approximately 30 million workers nationwide. The research further shows that California employers continue to have their employees sign noncompete clauses that are clearly void and unenforceable under California law. Employers who pursue frivolous noncompete litigation has a chilling effect on employee mobility.

94

(b) California's public policy provides that every contract that restrains anyone from engaging in a lawful profession, trade, or business of any kind is, to that extent, void, except under limited statutory exceptions. California has benefited significantly from this law, fueling competition, entrepreneurship, innovation, job and wage growth, equality, and economic development.

(c) Over the past two decades, research on the harm of noncompete clauses and other contract clauses involving restraint of trade to pursue one's profession has been accelerating. Empirical research shows that noncompete clauses stifle economic development, limit firms' ability to hire and depress innovation and growth. Noncompete clauses are associated with suppressed wages and exacerbated racial and gender pay gaps, as well as reduced entrepreneurship, job growth, firm entry, and innovation.

(d) Recent years have shown that employers utilizing broad noncompete agreements attempt to subvert this longstanding policy by requiring employees to enter void contracts that impact employment opportunities once an employee has been terminated from the existing employer. Moreover, as the market for talent has become national and remote work has grown, California employers increasingly face the challenge of employers outside of California attempting to prevent the hiring of former employees.

(e) The California courts have been clear that California's public policy against restraint of trade law trumps other state laws when an employee seeks employment in California, even if the employee had signed the contractual restraint while living outside of California and working for a non-California employer.

(f) California has a strong interest in protecting the freedom of movement of persons whom California-based employers wish to employ to provide services in California, regardless of the person's state of residence. This freedom of employment is paramount to competitive business interests.

SEC. 2.   Section 16600.5 is added to the Business and Professions Code, to read:

16600.5.  (a) Any contract that is void under this chapter is unenforceable regardless of where and when the contract was signed.

(b) An employer or former employer shall not attempt to enforce a contract that is void under this chapter regardless of whether the contract was signed and the employment was maintained outside of California.

(c) An employer shall not enter into a contract with an employee or prospective employee that includes a provision that is void under this chapter.

(d) An employer that enters into a contract that is void under this chapter or attempts to enforce a contract that is void under this chapter commits a civil violation.

(e) (1) An employee, former employee, or prospective employee may bring a private action to enforce this chapter for injunctive relief or the recovery of actual damages, or both.

(2) In addition to the remedies described in paragraph (1), a prevailing employee, former employee, or prospective employee in an action based

A145

**Ch. 157**

on a violation of this chapter shall be entitled to recover reasonable attorney's
fees and costs.

O

94

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DRAFTKINGS, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>MICHAEL Z. HERMALYN,<br><br>*Defendant.* | Civil Action No. 1:24-cv-10299-JEK |

**DECLARATION OF DEFENDANT MICHAEL Z. HERMALYN**
**IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR**
**TEMPORARY RESTRAINING ORDER**

1

A147

## DECLARATION OF MICHAEL Z. HERMALYN

I, Michael Z. Hermalyn, hereby declare, under penalty of perjury, the following:

1.      I am over the age of 18 and have personal knowledge of the facts set forth in this Declaration.  If called upon to do so, I could and would testify competently thereto.

2.      I have been falsely accused by DraftKings, Inc. ("DraftKings") of "hatch[ing] a secret plan over the past year to steal and use confidential information, solicit customers and employees, and join a key competitor, Fanatics, Inc. [*sic*]."  **I did no such thing**.  Other than leaving DraftKings for a once-in-a-lifetime opportunity to report directly to the Chair and CEO of Fanatics Holdings, Inc., Michael Rubin, and have the opportunity to work alongside his executive team, DraftKings' narrative is entirely fabricated.  There was no secret plan to steal or use information or to solicit customers or employees, much less a year-long plan.

3.      When I decided to leave, I knew from past experience with DraftKings that they would likely come after me aggressively and malign me as they have done with others.  However, I am shocked and disappointed to see that they would go so far as they have and actually make so many completely false and fabricated accusations against me in court.  I had specifically done everything I could to make sure they could not – truthfully – claim that I engaged in some unlawful conduct, and I worked closely with counsel to do my level best to ensure that I retained no DraftKings information or property.  And, pending authorization from a court, I have also been very careful to avoid soliciting a single client or former colleague.  As a result, as far as I am aware, not a single client or employee has moved from DraftKings to Fanatics Holdings, Inc., its California-based affiliate, FVP, LLC ("Fanatics VIP"), or any other Fanatics affiliate (collectively, "Fanatics") since I have been at Fanatics.

A148

4.      Contrary to DraftKings' false narrative, last month, January 2024, was the first time that I looked into joining Fanatics.  As discussed below, my decision was easy and quick, and the opportunity at Fanatics VIP is far better for me, my wife and children, and my career.

**I.      CURRENT RESIDENCE IN CALIFORNIA AND EMPLOYMENT WITH FANATICS IN LOS ANGELES, CALIFORNIA**

5.      I am a California citizen and resident of Los Angeles, California.

6.      Prior to moving to California, I lived in Bay Head, New Jersey.  I have never lived or worked in Massachusetts.

7.      On January 27, 2024, I received an initial, exciting job offer from Fanatics.  After discussing it with my wife, I decided I was likely going to take the job.  The next morning, January 28, I decided I was going to take the job (subject to agreeing on key offer terms) and booked a ticket to fly out to Los Angeles that night.  A true and correct copy of my eTicket Itinerary and Receipt is attached as Exhibit A.

8.      I began the process of moving to California the next day, January 29, 2024, to allow me to accept a unique opportunity to significantly advance my career by joining Fanatics' executive team and reporting directly to Mr. Rubin.  Because of that, I intend to live and work in California for the foreseeable future.

9.      To that end, I leased an apartment in California, and I intend to move into a family home when my wife and children join me in California after the conclusion of the academic school year this spring.  I intend to enroll my two daughters in school in Los Angeles for the next school year and have already contacted summer camps and joined various waitlists.

10.     Since moving to California, I obtained a California driver's license, I purchased a car in California, I registered the car in California, I registered to vote in California, and I obtained appointments with a physician and a dentist in California.

3

A149

11.     On February 1, 2024, I accepted an offer for employment from Fanatics VIP, which is headquartered in Los Angeles, California, to join as its President and to be the Head of Fanatics' Los Angeles office, located at 11601 Wilshire Blvd Los Angeles, California  90025.

12.     Contrary to DraftKings, Inc.'s accusation that I "secretly hatched a plan over the past year" to join Fanatics, I did not seriously consider leaving DraftKings to join Fanatics (or any of its affiliates) until I met with Fanatics CEO, Michael Rubin, on January 27, 2024, in Pennsylvania.

13.     Prior to that, I first contemplated leaving and considering Fanatics as a possibility earlier in January, when I had heard a rumor about Fanatics looking for a head of VIP.  I reached out to Mr. Rubin on January 11, 2024.  We spoke that night and arranged for me to meet him during the week of January 23, 2024.  Our meeting was ultimately held on January 23, and later that week, I met with other members of the Fanatics executive team.

14.     The next day, January 27, I met with Mr. Rubin in person in Pennsylvania.  We talked about the other meetings and the team, and to my surprise, he made me an offer on the spot.

15.     I went home that night and discussed the opportunity with my wife.  The next morning when I woke up, it all sank in.  That was the moment that it was clear to me that I wanted to work with that team, and that I could not turn down the opportunity.

16.     To be clear:  the January 27, 2024 meeting was the first time that I was ever given an offer to join Fanatics.  I had no offer prior to that.  I had never even thought seriously about leaving DraftKings, much less joining Fanatics, until January 11, 2024, and really not until I had my meetings starting on January 23, 2024.

A150

17.    I did not visit Fanatics' Los Angeles office—or any Fanatics office—prior to accepting Fanatics VIP's offer of employment.  The first day I was in Fanatics' Los Angeles office was February 6, 2024 – after I resigned from DraftKings.

18.    My position with Fanatics VIP requires that I live and work in person in Los Angeles, where I understand that Fanatics already employs approximately 80 people and where I plan to further build out my Fanatics VIP team.

19.    Fanatics is a leading digital sports platform business in the United States, including California, and operates across a number of industries, including collectibles, commerce (the design, manufacturing, and sale of licensed apparel and hard goods), betting and gaming, and with emerging businesses in live events, media, and more.

20.    As Head of Fanatics' Los Angeles office, I will oversee and administer the operations of the Los Angeles office (which houses employees from multiple Fanatics businesses) and oversee the planned consolidation of Fanatics' multiple Los Angeles-area offices into a single location.

## II.    PRIOR EMPLOYMENT WITH DRAFTKINGS

21.    Prior to joining Fanatics VIP, I worked for DraftKings for less than 3.5 years— from September 2020 to January 2024.  My internal title was Vice President of Growth.  In that role, I was responsible for managing and acquiring certain categories of customers.

22.    During my employment with DraftKings, I worked out of DraftKings' New York City office or from my home office in New Jersey.  I have never resided in Massachusetts, was never employed in Massachusetts, and was never assigned to work out of DraftKings' Massachusetts office at any point.

23.    DraftKings' Complaint is filled with false accusations.

A151

***The SAGA Restaurant Group Accusations are False***

24.     Among other things, DraftKings alleges "on information and belief" that I "engag[ed] in self-dealing by funneling a DraftKings contract to restaurants owned by an entity with which [I] was affiliated without disclosing such information." Compl. ¶ 167. That accusation is false. As part of my responsibilities for DraftKings, I successfully leveraged my friendship with one of the owners of the SAGA restaurant group and secured an arrangement for DraftKings to have preferred access to difficult-to-secure reservations, including on short notice.

25.     I received absolutely no benefit from this transaction. To the contrary, I used my friendship to help advance DraftKings' interests.

26.     Several DraftKings executives, including DraftKings Co-Founder Matt Kalish, as well as DraftKings' (1) Senior Director, VIP Strategy & Operations, (2) Senior Manager, Player Development, and (3) Manager, VIP New Business, were aware of my connection to SAGA. In fact, Mr. Kalish took advantage of that relationship on at least one occasion. Following a golf outing with former President Donald Trump attended by Mr. Kalish, he contacted me to ask for assistance in securing a dinner reservation, and I directed him to my friend at CrownShy, which is owned by the SAGA restaurant group.

***The HR Investigation Allegations are Exaggerated***

27.     On January 3, 2024, DraftKings advised me that there was an internal HR investigation involving a complaint concerning me.

28.     I was not suspended during the investigation. I was not terminated or threatened with termination based on the results of the investigation.

29.     On January 26, 2024, I was informed by Jessica Nokes, a member of the human resources department at DraftKings, and Shawn Henley, my direct supervisor and DraftKings'

Chief Customer Officer, during an hour-long Zoom call, that the investigation had been completed and was closed. So everyone was on the same page, I asked Ms. Nokes and Mr. Henley to confirm that the investigation was, in fact, closed, and both responded "yes."

### *The Accusations Concerning My Friend's Death Are Horrid*

30.    On Saturday, January 27, 2024, my close friend for more than a decade, Ben Jankowski, lost his battle with cancer. I was devastated by this loss, both for myself and for Mr. Jankowski's family.

31.    Over the following days, I communicated with Ben's family and tried to participate in efforts to set up a fund in his memory. I also communicated with many people who knew Ben and with people who knew my relationship with him and had reached out to express their condolences. Some of those communications are reflected in my LinkedIn account. A true and correct copy of a printout of those communications is attached hereto as <u>Exhibit B</u>.

32.    DraftKings' accusation that I falsely claimed to be mourning the death of my friend in late January is both wrong and disappointing.

33.    The week of January 29, 2024 was particularly difficult for me emotionally.

34.    In addition to grieving the death of my friend, I was contemplating an opportunity to make a significant advancement in my career by joining Fanatics VIP – an offer that I had decided that I wanted to accept, which meant an immediate move to California, uprooting my family. It was a big decision, though in some ways it was an easy decision to make, especially after discussing it with my wife. Adding to the complexity of that week, I had several meetings relating to my employment at DraftKings scheduled for that week (the week of January 29). However, given that I expected to join Fanatics VIP, to avoid hearing information about DraftKings while I had an offer pending from Fanatics, I purposely did not attend these meetings,

A153

as I thought that was in DraftKings' and my best interests.  So, I took some personal time away from work and responded to outreach from colleagues only when I believed they urgently needed my assistance.

35.     To be clear:  the time I took off to avoid creating any further issues with DraftKings was just over *three days*.

36.     That was the time needed to allow me to move to California and negotiate the final terms of an offer from Fanatics VIP.  Given that, I worked extremely hard during those few days to balance finalizing my negotiations and expected job change with making sure that I did my best to avoid causing any issues for DraftKings beyond what would naturally be caused by an employee leaving a company.

### III.    HISTORY WITH FANATICS

37.     My conversations concerning the opportunity to work for Fanatics VIP and my decision to do so did not begin until last month (January 2024), shortly before I accepted Fanatics VIP's offer on February 1, 2024.  As stated above, I did not even have an offer to join Fanatics VIP or any of its affiliates until January 27, 2024 – after I met with Mr. Rubin in Pennsylvania. That offer was not finalized until February 1, 2024.

38.     Prior to my January 27, 2024 discussion with Mr. Rubin, I had met him briefly only a few times.  The first time I met Mr. Rubin was in 2023, in passing at a Super Bowl party.  We had a cursory encounter that lasted no more than ten seconds and did not concern me working for Fanatics or any of its affiliates.  I met Mr. Rubin for a second time at a party in April or May of 2023, where I reintroduced myself.  That encounter was similarly brief and non-substantive. Several months later, I received a call from Mr. Rubin in which he asked me about coming to Fanatics.  I told him that I was not interested.  That was around the time that I was working to retain three people who had received offers from Fanatics, two of whom I solely and successfully

convinced to stay at DraftKings.  I saw Mr. Rubin for a third time in November 2023 at two different Formula One events.  These interactions were also brief, and we did not discuss any employment opportunities.

39.     I did not discuss joining Fanatics or any of its affiliates with Mr. Rubin or anyone else during 2023.  Nor have I *ever* encouraged any of my DraftKings colleagues to do so, or put any of my colleagues in touch with Fanatics' CEO or any other Fanatics executives.

40.     Since my resignation from DraftKings, I have not conducted any outreach to DraftKings' customers or clients, and I have not solicited any DraftKings employees.

### *DraftKings' "Presumed" Interpretation of My Email is False*

41.     DraftKings alleges that an email I sent on July 20, 2023 to my former colleague Robert Ferrara, "presumably" refers to Mr. Rubin and reflects me "encouraging members of [my] team to explore employment opportunities" with Fanatics.  Compl. ¶ 93.  That is false.

42.     In that correspondence, I was providing Mr. Ferrara, who was leaving DraftKings, with an email script to send to a current customer.  The script was to explain that *Mr. Ferrara*—not I—was leaving the industry, and to encourage the client to meet with "Mike"—*me, not Mr. Rubin*—so I could further develop the client relationship *for DraftKings*.  The email says that the client had met "Mike"—again, me—at a Super Bowl party because I had met that client at a Super Bowl party.

43.     This script was prepared by a team that included me, DraftKings' in-house lawyers, and DraftKings' Chief Customer Officer Shawn Henley.  Outside counsel at Gibson Dunn – counsel for DraftKings in this matter – was also involved.  For DraftKings and its counsel to now portray the script otherwise in this case is a shocking misrepresentation to the Court.

## IV.    I DO NOT POSSESS AND HAVE NOT DISCLOSED DRAFTKINGS' INFORMATION OR PROPERTY

44.     DraftKings alleges "on information and belief" that I "stole" confidential information and trade secrets.  That accusation is false.

45.     Prior to my resignation, on February 1, 2024, I undertook in good faith to ensure to the best of my ability that I was no longer in possession of any DraftKings property or confidential information:

- I gave my DraftKings-issued devices – two computers – and my personal phone to my counsel, and I purchased a new personal phone.  I also returned my corporate credit card and a mifi device.

- I ceded access to my personal email and iCloud accounts to my counsel.

- I also segregated my personal information from any information I accumulated from my work at DraftKings, which I also gave to my counsel.

46.     I informed DraftKings at the time of my resignation that I undertook this process.

47.     The other day, I found an old laptop.  I have not used or otherwise accessed this laptop in several months, and certainly not since my resignation from DraftKings.  I do not know whether it belongs to DraftKings; it may or may not belong to DraftKings, and I have no reason to believe that it does.  However, in an abundance of caution, I turned this additional laptop over to my counsel as well.

A156

***Use of My Personal Phone Was Permitted
and Explains the False Accusations***

48.     The phone that I used for work while employed at DraftKings was not a device that DraftKings issued to me; it was my personal phone.  DraftKings allowed the use of personal devices, including my personal phone.  No DraftKings VIP employee has a company-issued phone.

49.     I regularly accessed DraftKings' documents on this phone while performing work for DraftKings, particularly when I was traveling.

50.     It is my understanding and belief that when DraftKings alleges that I downloaded or accessed documents on a "non-DraftKings device," *e.g.*, Compl. ¶ 67, that device was my personal phone.  As noted above, I gave this phone to my counsel *prior to my resignation* from DraftKings.

51.     I no longer possess any DraftKings information that may have been on that phone.

***DraftKings' Accusations That I Took, Used,
or Disclosed Its Information Are False***

52.     I did not, before or after my departure from DraftKings, provide DraftKings' confidential information or any DraftKings documents to Fanatics or any of its affiliates, including Fanatics VIP.

53.     In other words, contrary to DraftKings' unsubstantiated fears and allegations, I did not give Fanatics or any of its affiliates, including Fanatics VIP, the opportunity to access, view, copy, or otherwise record DraftKings' information.

***DraftKings' Accusations That I Improperly
Accessed Its Information Are False***

54.     While employed at DraftKings, I had authorization to access various internal documents that related to my job responsibilities.  I regularly accessed these documents to do my

A157

job.  I continued to perform my duties to DraftKings up until my resignation, therefore, I continued to access many of these documents in that capacity and only in that capacity.

55.     The Complaint claims that I accessed four documents: (1) a "VIP Founders Club" PowerPoint presentation; (2) a "BD Team Tracker – Weekly Report;" (3) a "(Master) SB 2024" spreadsheet; and (4) a "BD_Gaming 101" presentation.  These are each documents that I had access to during the normal course of my work at DraftKings.  I did not access these documents to give them, or the information in them, to Fanatics or any of its affiliates, including Fanatics VIP or anyone else.  I did not give these documents, or the information in them, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else.  As of my resignation from DraftKings on February 1, I do not have access to, or any copies of, any of these documents.

56.     I accessed the "VIP Founders Club" Presentation on January 23, 2024.  I did so to prepare to onboard a new employee who was starting work at DraftKings during the following week.  This new employee, Chika Chandrashekar, had been hired to work as a Vice President of Loyalty and E-Commerce at DraftKings, and I thought that the presentation would have relevant information for his onboarding.  I did not disclose this presentation or the information in it to Fanatics or any of its affiliates, including Fanatics VIP or anyone else.  Additionally, the information in it—consisting of outdated plans for a program that DraftKings never implemented—would not be of any competitive value to Fanatics or any of its affiliates, including Fanatics VIP.

57.     I did not access the "VIP Founders Club" presentation to give it, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else.  I did not give the "VIP Founders Club" presentation, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP.  Rather, it was a presentation that I created that I thought might have some

A158

helpful information to aid the new Vice President of Loyalty in his onboarding.  As of my resignation from DraftKings on February 1, I do not have access to, or any copies of, the "VIP Founders Club" presentation.

58.     As of January 23, when I accessed the "VIP Founders Club" presentation, I had not received an offer to join Fanatics VIP and had no reason to think that I would be leaving DraftKings any time soon.  I do not believe that I accessed or downloaded the "BD Team Tracker – Weekly Report" on January 24, 2024 (or thereafter).  This report is something I would have regularly reviewed in advance of weekly team calls for the non-casino business development meeting that I attended about once a month.  It was my customary practice to review this report in advance of the team calls I planned to attend.  Again, as of January 24, 2024, I had not received an offer to join Fanatics VIP and did not expect that I would be leaving DraftKings any time soon.

59.     If I did access or download the "BD Team Tracker – Weekly Report," I did not do so to give it, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else.  I did not give the "BD Team Tracker – Weekly Report," or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else.  As of my resignation from DraftKings on February 1, I do not have access to, or any copies of, the "BD Team Tracker – Weekly Report."

60.     I accessed the "(Master) SB 2024" spreadsheet on January 30, 2024.  I did so because a DraftKings employee named Brittany Goodman contacted me.  Ms. Goodman worked on the DraftKings team that was running the upcoming Super Bowl events.  She communicated to me that there were certain VIPs who had not yet been sent invitations to Super Bowl events DraftKings was hosting.  I accessed the "(Master) SB 2024" spreadsheet to review the list of VIP customer names and direct Ms. Goodman and other DraftKings employees on which customers

still needed invitations and how to contact them.  I did not access or download the "(Master) SB 2024" spreadsheet to give it, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else.  I did not give the "(Master) SB 2024" spreadsheet, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP.  As of my resignation from DraftKings on February 1, I do not have access to, or any copies of, the "(Master) SB 2024" spreadsheet.

61.     I do not believe that I accessed or downloaded a "BD_Gaming 101" presentation on January 29 or 30.  If I did access or download the ""BD_Gaming 101" presentation, I did not do so to give it, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else.  I did not give the "BD_Gaming 101" presentation, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else.  As of my resignation from DraftKings on February 1, I do not have access to, or any copies of, the "BD_Gaming 101" presentation.

**V.     DRAFTKINGS' NONCOMPETE AND NONSOLICIT AGREEMENTS**

62.     When I joined DraftKings in September 2020, I was required to sign a nonsolicitation agreement and a noncompete agreement as a condition of employment.  To the best of my recollection, I signed these agreements with DraftKings while I was located at my then-home in New Jersey, at my work in New York, or otherwise remotely with DocuSign.

63.     I was not independently represented by counsel at the time I signed any of the aforementioned agreements.

64.     I did not negotiate any of these agreements, and it was my understanding that any attempt to do so would be a non-starter, resulting in termination and/or equity (a significant part of my compensation) not being granted.

14

A160

## VI.    HARM FROM THE ENFORCEMENT OF THE AGREEMENTS

65.    My new role at Fanatics VIP represents an important growth opportunity for me professionally and personally.

66.    If DraftKings uses the noncompetition and nonsolicitation agreements to prohibit me from working for Fanatics VIP in California, I will not only effectively be entirely prohibited from working in my chosen field and from working for a company for which I wish to work, but I will lose a unique opportunity to significantly advance my career.  This will impact me, my wife and children, and the plans for our future.

67.    In addition, being forced to sit out of my industry during the pendency of litigation will cause me significant harm in professional growth, opportunities, and contacts that I have personally developed over decades.

68.    It would be extremely burdensome in time and cost, and highly inconvenient, if I were forced to defend against an action brought against me by my former employer in Massachusetts—particularly when I have never lived or worked in Massachusetts, and now live and work in California, where my wife and daughters will also be living after the end of the current school year.

69.    In contrast, I do not believe that my working for Fanatics VIP would irreparably harm DraftKings.  I am fully able to perform my work for Fanatics VIP without causing any harm to DraftKings beyond that which would naturally arise from ordinary competition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed February  7 , 2024.

By: _____
    Michael Z. Hermalyn

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served on Plaintiff's counsel on the date below via email and will be filed through the ECF System and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  February 7, 2024

/s/   *Russell Beck*

16

A162



Wed, Feb 07, 2024

# Thank you for choosing United.

A receipt of your purchase is shown below. Please retain this email receipt for your records.

**Get ready for your trip:** Visit the Travel-Ready Center, your one-stop digital assistant, to find out about important travel requirements specific to your trip.

Confirmation Number:

# L2N0RV

| Flight 1 of 1 UA2458 | Class: United Business (D) |
|---|---|

| | |
|---|---|
| Sun, Jan 28, 2024 | Sun, Jan 28, 2024 |
| **07:10 PM** | **10:20 PM** |
| New York/Newark, NJ, US (EWR) | Los Angeles, CA, US (LAX) |

## Traveler Details

HERMALYN/MICHAELZACHARY
eTicket number: **0162360136919**                       Seats: **EWR-LAX 06G**
Frequent Flyer: **UA-XXXXX804 Premier Gold**

## Purchase Summary

| | |
|---|---|
| Method of payment: | **Visa ending in 2345** |
| Date of purchase: | **Sun, Jan 28, 2024** |

| | |
|---|---|
| Airfare: | **1872.56** |
| U.S. Transportation Tax: | **140.44** |
| U.S. Flight Segment Tax: | **5.00** |
| September 11th Security Fee: | **5.60** |
| U.S. Passenger Facility Charge: | **4.50** |

| | |
|---|---|
| Total Per Passenger: | **2028.10 USD** |

A163

**Total:**                                                          **2028.10 USD**

## Fare Rules

Additional charges may apply for changes in addition to any fare rules listed.

NONREF/0VALUAFTDPT

Cancel reservations before the scheduled departure time or TICKET HAS NO VALUE.

## MileagePlus Accrual Details

| Michaelzachary Hermalyn | | | | | | |
|---|---|---|---|---|---|---|
| Date | Flight | From/To | | Award Miles | PQP | PQF |
| Sun, Jan 28, 2024 | 2458 | New York/Newark, NJ, US (EWR) to Los Angeles, CA, US (LAX) | | 14984 | 1873 | 1 |
| MileagePlus accrual totals: | | | | 14984 | 1873 | 1 |

## Baggage allowance and charges for this itinerary

| Origin and destination for checked baggage | 1st bag charge | 2nd bag charge | 1st bag weight and dimensions | 2nd bag weight and dimensions |
|---|---|---|---|---|
| Sun, Jan 28, 2024 New York/Newark, NJ, US (EWR - Liberty) to Los Angeles, CA, US (LAX) | 0.00 USD | 0.00 USD | 70lbs(32kg) - 62in(157cm) | 70lbs(32kg) - 62in(157cm) |

Baggage check-in must occur with United or United Express, and you must have valid MileagePlus Premier® Gold membership at time of check-in to qualify for waiver of service charges for up to three checked bags (within specified size and weight limits).

## Important Information about MileagePlus Earning

- Accruals vary based on the terms and conditions of the traveler's frequent flyer program, frequent flyer status, and the selected program. United MileagePlus® mileage accrual is subject to the rules of the MileagePlus program. Once travel has started, accruals will no longer display. You can always view your MileagePlus account for posted accrual.
- You can earn up to 75,000 award miles per ticket. The 75,000 award miles cap may be applied to your posted flight activity in an order different than shown. Accrual is only displayed for MileagePlus members who choose to accrue to their MileagePlus account.

## eTicket Reminders

- **Check-in Requirement** - Bags must be checked and boarding passes obtained at least 45 minutes prior to scheduled departure. Baggage will not be accepted and advance seat assignments may be cancelled if this condition is not met.

**EXCEPTION**: When departing from Anchorage, Atlanta, Austin, Baltimore, Chicago, Cincinnati, Cleveland, Dallas/Ft. Worth, Denver, Detroit, Fort Lauderdale, Greenville-Spartanburg, Guam, Honolulu, Houston, Indianapolis, Jacksonville, Kona, Las Vegas, Los Angeles, Maui, Miami, New York (LGA), Newark, Orange County (SNA), Orlando, Philadelphia, Phoenix, Pittsburgh, Raleigh/Durham, Reno, San Diego, San Francisco, San Juan, PR (60 minutes), Savannah, Seattle, St. Louis, St. Thomas, U.S. Virgin Islands (60 minutes), Tampa, Washington, DC (both IAD and DCA), the check in requirement time for Passengers and Bags is 45 minutes except where noted.

A164

- **Boarding Requirement** - Passengers must be prepared to board at the departure gate with their boarding pass at least 15 minutes prior to scheduled departure.
- Failure to meet the **Boarding Requirements** may result in cancellation of reservations, denied boarding, removal of checked baggage from the aircraft and loss of eligibility for denied boarding compensation.
- Bring your boarding pass or this eTicket Receipt along with photo identification to the airport.
- The FAA now restricts carry-on baggage to one bag plus one personal item (purse, briefcase, laptop computer, etc.) per passenger. The fare rules for your ticket may restrict your carry-on baggage allowance even further.
- For up to the minute flight information, sign-up for our Flight Status Updates or call 1-800-824-6200; in Spanish 1-800-426-5561.
- If flight segments are not flown in order, your reservation will be cancelled. Rebooking will be subject to the fare rules governing your ticket.
- For the most current status of your reservation, go to our Flight Status page.
- Your eTicket is non transferable and valid for 1 year from the issue date unless otherwise noted in the fare rules.

## Data Protection Notice

Your personal data will be processed in accordance with the applicable carrier's privacy policy and if your booking is made via a reservation system provider ("GDS"), with its privacy policy. These are available at http://www.iatatravelcenter.com/privacy or from the carrier or GDS directly. You should read this documentation, which applies to your booking and specifies, for example, how your personal data is collected, stored, used, disclosed and transferred

## Customer Care Contact Information

We welcome your compliments, comments or complaints regarding United or a United travel experience. You may contact us using our Customer Care form

## Hazardous materials

Federal law forbids the carriage of hazardous materials on board aircraft in your luggage or on your person. A violation can result in five years' imprisonment and penalties of $250,000 or more (49 U.S.C. 5124). Hazardous materials include explosives, compressed gases, flammable liquids and solids, oxidizers, poisons, corrosives and radioactive materials. Common examples of hazardous materials/dangerous goods include spare or loose lithium batteries, fireworks, strike-anywhere matches, aerosols, pesticides, bleach and corrosive materials. Additional information can be found on:

- united.com restricted items page
- FAA website Pack Safe page
- TSA website Prohibited Items page

## Refunds Within 24 Hours

When you book and ticket a reservation through united.com, the United mobile app, the United Customer Contact Center, at our ticket counters or city ticket offices, or if you use MileagePlus® miles to book an award ticket, we will allow you to cancel the ticketed reservation without penalty and receive a 100 percent refund of the ticket price to the original form of payment if you cancel the reservation within 24 hours of purchase and if the reservation is made one week or more prior to scheduled flight departure.

## Disinsection Notice

Certain countries require that the passenger cabins of aircraft be treated with insecticides. For additional information and a list of those countries, please visit the U.S. Department of Transportation's disinsection website.

## IMPORTANT CONSUMER NOTICES

**Changes/Cancellations** - Most tickets, other than Basic Economy tickets or those for travel originating outside the United States, other than for travel between the United States and Mexico or the Caribbean, may be changed to a different itinerary, or cancelled and the value of the ticket retained so that it can be applied to a new ticket, without a change fee. Such change or cancellation must be made prior to the scheduled departure time. Travelers making changes will be responsible for the fare difference if the new itinerary has a higher fare than the original ticketed itinerary. Regarding non-refundable tickets, if the new itinerary has a lower fare than the original ticketed itinerary, changes can be made without charge, but the traveler is not entitled to any residual value. United may, in its sole discretion, provide partial or full residual credit under certain circumstances. A change fee may apply for changes or cancellations made to tickets for travel originating outside the United States, other than for travel between the United States and Mexico or the Caribbean. Policies concerning your ability to make reservation changes and cancellations and any fees associated with such changes can be found at Important travel notices | United Airlines.

**Notice of Baggage Liability Limitations** - For domestic travel between points within the United States (except for domestic portions of international journeys), United's liability for loss of, damage to, or delay in delivery of a customer's checked baggage is limited to $3,800 per ticketed customer unless a higher value is declared in advance and additional charges are paid (not applicable to wheelchairs or other assistive devices). For such travel, United assumes no liability for high value, fragile, perishable, or otherwise excluded items; excess valuation may not be declared on certain types of valuable articles. Further information may be obtained from the carrier. For international travel governed by the Warsaw Convention (including the domestic portions of the trip), maximum liability is approximately 640 USD per bag for checked baggage, and 400 USD per passenger for unchecked baggage. For international travel governed by the Montreal Convention (including the domestic portions of the trip), maximum liability is 1,288 SDRs per passenger for baggage, whether checked or unchecked. For baggage lost, delayed, or damaged in connection with domestic travel, United requires that customers provide preliminary notice within 24 hours after arrival of the flight on which the baggage was or was to be transported and submit a written claim within 45 days of the flight. For baggage damaged or delayed in connection with most international travel (including domestic portions of international journeys), the Montreal Convention and United require customers to provide carriers written notice as follows: (a) for damaged baggage, within seven days from the date of receipt of the damaged baggage; (b) for delayed baggage, within 21 days from the date the baggage should have been returned to the customer. Please refer to Rule 28 of United's Contract of Carriage for important information relating to baggage and other limitations of liability.

**Notice of Incorporated Terms** - Transportation is subject to the terms and conditions of United's Contract of Carriage, which are incorporated herein by reference. Incorporated terms may include, but are not limited to: 1. Limits on liability for personal injury or death of the customer, and for loss, damage, or delay of goods and baggage, including high value, fragile, perishable, or otherwise excluded items. 2. Claims restrictions, including time periods within which customers must file a claim or bring an action against the carrier. 3. Rights of the carrier to change terms of the contract. 4. Rules about reconfirmation of reservations, check-in times, and refusal to carry. 5. Rights of the carrier and limits on liability for delay or failure to perform service, including schedule changes, substitution of an alternate air carrier or aircraft, and rerouting. The full text of United's Contract of Carriage is available at united.com or you may request a copy at any United ticket counter. Passengers have the right, upon request at any location where United's tickets are sold within the United States, to receive free of charge by mail or other delivery service the full text of United's Contract of Carriage.

**Notice of Certain Terms** - If you have purchased a restricted ticket, depending on the rules applicable to the fare paid, one or more restrictions including, but not limited to, the following may apply to your travel: (1) the ticket may not be refundable but can be exchanged for a fee for another restricted fare ticket meeting all the rules/restrictions of the original ticket (including the

A166

payment of any difference in fares); (2) a fee may apply for changing/canceling reservations; or (3) select tickets may not be eligible for refunds or changes even for a fee; (4) select tickets have no residual value and cannot be applied towards the purchase of future travel; or (5) travel may be restricted to specific flights and/ or times and a minimum and/or maximum stay may be required. United reserves the right to refuse carriage to any person who has acquired a ticket in violation of any United tariffs, rules, or regulations, or in violation of any applicable national, federal, state, or local law, order, regulation, or ordinance. Notwithstanding the foregoing, you are entitled to a full refund if you cancel a ticket purchased at least a week prior to departure within 24 hours of purchase.

**Notice of Boarding Times** - For Domestic flights, customers must be at the boarding gate at least 15 minutes prior to scheduled departure. For International flights, customers must be at the boarding gate at least 30 minutes prior to scheduled departure. The time limits provided by United in this Notice are minimum time requirements. Customer and baggage processing times may differ from airport to airport. Please visit <u>united.com</u> for information regarding airport-specific boarding times. It is the customer's responsibility to arrive at the airport with enough time to complete check-in, baggage, and security screening processes within these minimum time limits. Please be sure to check flight information monitors for the correct boarding gate and the departure time of your flight. Failure to be at the boarding gate by the required time could result in the loss of your seat without compensation, regardless of whether you are already checked in or have a confirmed seat and boarding pass.

**Advice to International Passengers on Carrier Liability** - Passengers on a journey involving an ultimate destination or a stop in a country other than the country of departure are advised that international treaties known as the Montreal Convention, or its predecessor, the Warsaw Convention, including its amendments, may apply to the entire journey, including any portion thereof within a country. For such passengers, the treaty, including contracts of carriage embodied in applicable tariffs, governs, and may limit the liability of the Carrier in respect of death or injury to passengers, and for destruction or loss of, or damage to, baggage, and for delay of passengers and baggage.

**Notice - Overbooking of Flights** - Airline flights may be overbooked, and there is a slight chance that a seat will not be available on a flight for which a person has a confirmed reservation. If the flight is overbooked, no one will be denied a seat until airline personnel first ask for volunteers willing to give up their reservation in exchange for compensation of the airline's choosing. If there are not enough volunteers, the airline will deny boarding to other persons in accordance with its particular boarding priority. With few exceptions, including failure to comply with the carrier's check-in deadlines, which are available upon request from the air carrier, persons, denied boarding involuntarily are entitled to compensation. The complete rules for the payment of compensation and each airline's boarding priorities are available at all airport ticket counters and boarding locations. *Some airlines do not apply these consumer protections to travel from some foreign countries, although other consumer protections may be available. Check with your airline or your travel agent.*



Copyright © 2024 United Airlines, Inc. All Rights Reserved

**E-mail Information**
**Please do not reply to this message using the "reply" address.**
The information contained in this email is intended for the original recipient only.

View our Privacy Policy          View our Legal Notices

 

       



**Michael Hermalyn**

Sports & Entertainment Executive

**View full profile**

 **Michael Hermalyn** · You

Sports & Entertainment Executive

1w · 🌐

Death.
The finality of it is striking.
Sobering maybe? Perspective driving… 1000000000%.

**Ben Jankowski** was a friend of mine. Friend of the Advertising / Media industry. Dude was VERY legit. One of those old school big bad a$$ marketing execs that everyone (everyone) in sales wanted to call on. Literally everyone knew his name. Big personality, BIG. Ben was smart… super smart. He was a guy that knew your business better than you did. He prepared. He understood people. A++++++++.

We would always bet (experiences) and I would always lose (NY Giants have been off for the past decade). One year, the loser had to buy the other person the jersey of his choice. My GMEN lost (classic), he picked out a Reggie White jersey. #92. I found out today that he is being buried wearing it.

Net. Call your friends, call your family, tell them you love them. Take in every minute. If you are having a bad day, week, month, year… just know that you will be ok. Everything will be ok. Prioritize your health. Drink water. Go to the doctor. Cold plunge. Breathe in and out and just live. But seriously, call someone today and tell them how much you care about them. It matters. Ben, love you dude. We all miss you. And yes, same page, watching the Cowboys lose to the Packers in the first round was the best day of 2024, by far.

****this photo was taken after Iowa hit a buzzer beater in the NCAA tournament over Temple (2016). Hahahahah, he did not know I took it.



🔵❤️ Frank Trofa and 1,040 others                    97 comments · 9 reposts

Reactions

A168



...

Like Comment Repost Send

300,282 impressions View analytics

Add a comment...

Most relevant

**Gary Vaynerchuk** • 1st 1w
Chairman - VaynerX, CEO - VaynerMedia & Veefriends , Co-Founder VaynerSports, VCR Group and VaynerWatt

this hit my heart :( i miss him already ..RIP BEN!

Like · 40 | Reply · 4 Replies

Load previous replies

**Nick Marucci** • 3rd+ 51m
Director of Operations for Liquor & Wine for Sunrise Shop-Rite

**Gary Vaynerchuk** What's up Gary, hope you are well. Let's connect soon

Like | Reply

**Traci Spiegelman** • 2nd 1w
Vice President, Global Media at Mastercard

Love this, Mike. One of of my fave pictures of Ben- even though he hated it, he still shared it ;).

Like · 10 | Reply · 2 Replies

Load previous replies

**Traci Spiegelman** • 2nd 1w
Vice President, Global Media at Mastercard

**Michael Hermalyn** aww man here come the tears again...thank you so much for saying that...means a lot ❤️ . Also know that the stories he told about your times together were always the ones that got the best laughs. And you're right- he would love it- and he would also be floored- he knew he was what we called the mayor, but I ...see more

Like · 2 | Reply

**Elizabeth Firth** • 1st 1w
VP Brand Partnerships at Influential

**Michael Hermalyn** this may just be the best tribute yet. What an impact he made on all of us!

Like · 4 | Reply · 2 Replies

Load previous replies

**Elizabeth Firth** • 1st 6d
VP Brand Partnerships at Influential

**Michael Hermalyn** this will happen in short order!

Like · 1 | Reply

**Taylor Wood** • 1st 1w
Director of Inventory Strategies

Mike - thanks for sharing this. I didn't know. I sat outside Ben's office at my first job at OMD. A true legend. He was the nicest, kindest mentor I've ever had. He left a mark on many of us.

Like · 10 | Reply · 2 Replies

Load previous replies

**Natan Cohen** (He/Him) • 1st 6d
Brand & Performance Marketing Strategy / Digital Marketing / Diversity Champion / #GirlDad / Servant Leader / Podcast Host / Ex New York Life (my views are my own)



**Taylor Wood** it's so nice to see your name

Like | Reply

**Will Wiseman** (He/Him) • 1st    1w •••
U.S. Chief Strategy Officer at Initiative

I love the story about the Reggie White jersey. Fly Eagles Fly!
We love you Ben. Rest assured your fan club will remain loud and proud.

Like • 😊❤️👍 6 | Reply

**Paul Furia** • 1st    1w •••
Senior Executive in Entertainment, Content, Marketing and Strategy;
William Morris Agency alumni

Thank you, **Michael Hermalyn**. Ben was very gracious to me many --
many many mannnny -- times over the years. Always happy to grab a
drink or a meal and talk things through and share advice. To your point, I
thought to reach out just a couple weeks ago to catch up...and didn't.
He'll be very missed.                                    ...see more

Like • 😊👍 10 | Reply

**Tom Healey** • 2nd    6d (edited) •••
Global Sports Marketing & Brand Partnerships | Sponsorships I Financial
Services | Marketing Academy Scholar 2021

Thank you for sharing a wonderful tribute.

Whilst working together in Tokyo, Ben joined me in a sports bar to watch
my beloved Sydney Roosters play in the NRL Grand Final. He quickly
jumped on the Roosters bandwagon & by the time the full time  ...see more

Like • 😊❤️👍 5 | Reply

**Trixie Ferguson Gray** (She/Her) • 1st    6d •••
Accelerator of Transformational Brand Ideas | Creative Marketing Leader
Cultivating Ideal Mix of Culture, Content & Channels for Business Impact
and Growth | Board Member | Bias Towards Diversity & Inclusion

Beautiful tribute **Michael Hermalyn!** I wouldn't have met you without Ben.
Gone too soon. Thank you, **Ben Jankowski** for the education, the
memories and the laughs!

Like • 👍 4 | Reply

**Steve Pacheco** (He/Him) • 2nd    6d (edited) •••
President / CEO at American Advertising Federation

Ben was the realest of the real! I will miss him and I know you all will too.

Like • 👍 5 | Reply

**Susan P. Johnson** • 1st    4d •••
Interior Design

I ❤️ you, Mike. So sorry for your loss.

Like | Reply

**Load more comments**

Ad •••

Is your Sales Intelligence tool costing you more
than it's making?

SMARTe

Connect with precision, sell with
confidence.

**Book a Demo**

About    Accessibility    Help Center    Privacy & Terms ▾    Ad Choices    Advertising

Business Services ▾    Get the LinkedIn app    More

**Linked**in  LinkedIn Corporation © 2024

A170

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DRAFTKINGS INC.,

                         Plaintiff,                    Civil Action No.  1:24-cv-10299

         v.

MICHAEL HERMALYN

                         Defendant.

## [PROPOSED] TEMPORARY RESTRAINING ORDER

Upon Plaintiff DraftKings Inc.'s ("DraftKings") Motion for a Temporary Restraining Order, and upon consideration of the Verified Complaint, Exhibits, Memorandum of Law, and the Affidavits of Gregory Karamitis and Brian Harris in support of DraftKings' Motion, the Court hereby ORDERS that:

a)    Mr. Hermalyn is hereby restrained and enjoined from using or disclosing any of DraftKings' Confidential Information (as defined in the Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement dated August 31, 2020) (the "Confidentiality Agreement");

b)    Mr. Hermalyn is hereby restrained and prohibited from moving, destroying, deleting, altering, or otherwise disposing of any files, documents, and digital media that contain any DraftKings Confidential Information (as defined in the Confidentiality Agreement), and/or that are derived from such information;

c)    Mr. Hermalyn is hereby restrained and enjoined from directly or indirectly providing any services to Fanatics, Inc., including its subsidiaries, affiliates, and joint ventures (individually and together, "Fanatics") relating to: (i) the research, design, development, marketing, sales, operations, maintenance and commercial

A171

exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing; or (ii) any other aspect of the Business of the Company for which he performed services or received Confidential Information (each as defined in the Noncompetition Covenant dated August 16, 2023) (the "Noncompetition Covenant") at any time during the six (6) month period prior to February 1, 2024;

d)     Mr. Hermalyn is hereby restrained and enjoined from directly or indirectly soliciting or transacting business, or attempting to solicit or transact business with, any of DraftKings' customers, clients, vendors or partners, or with any of DraftKings' prospective customers, clients, vendors or partners about which Mr. Hermalyn learned confidential information or which Mr. Hermalyn had some involvement or knowledge relating to: (i) the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing; or (ii) any aspect of the Business of the Company (as defined in the Noncompetition Covenant);

e)      Mr. Hermalyn is hereby restrained and enjoined from directly or indirectly: (i) soliciting, in person or through supervision or control of others, an employee, advisor, consultant or contractor of DraftKings for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with DraftKings or to change an existing business relationship to the detriment of DraftKings; (ii) hiring away an employee, advisor, consultant or contractor of DraftKings; or (iii) helping another person or entity hire away a DraftKings employee, advisor, consultant or contractor.

f)      Mr. Hermalyn is hereby directed, within three (3) days of the entry of this order, to: (a) return to DraftKings all DraftKings' Confidential Information (as defined in the Confidentiality Agreement) such that no Confidential Information remains in his possession, custody, or control; (b) identify to DraftKings in writing any disclosure of DraftKings' Confidential Information he made to any third party apart from any such disclosures he made in his ordinary course of business as an employee of DraftKings; and (c) certify to DraftKings his compliance with (a) and (b) above under the pains and penalties of perjury.

This order shall remain in effect until the Court rules on DraftKings' forthcoming motion for a preliminary injunction.

**SO ORDERED.**

_____
United States District Judge

Boston, Massachusetts

Dated: February 8, 2024

*Notwithstanding Section 8 of the Non-Solicitation and Non-Disclosure Agreement and similar provisions, and pursuant to Fed. R. Civ. P. 65(c), DraftKings shall pay a security bond of $20,000, which shall be due immediately. See Avaya Inc. v. Ali, 2012 WL 2888474, at *9 (D. Mass. July 13, 2012).*

A173

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

DRAFTKINGS, INC.,

     Plaintiff,               Civil Action No.
                                1:24-cv-10299-JEK

    v.

MICHAEL HERMALYN,

     Defendant.

_____


BEFORE THE HONORABLE JULIA E. KOBICK, DISTRICT JUDGE


MOTION



Thursday, February 8, 2024
12:59 p.m.







John J. Moakley United States Courthouse
Courtroom No. 3
One Courthouse Way
Boston, Massachusetts

Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

1    from their perspective, about an exchange of written

2    discovery and a deposition.  If we're going to get into

3    protocols, we have to negotiate the protocol, we have to line

4    up vendors -- and I do this frequently -- we're looking at

5    six to eight weeks time frame for that.

6         So this isn't -- there's a lot to be done if

7    they're going to focus -- if they're going to focus on what

8    they want to focus on in a short amount of time, over a

9    period of time with school vacation week.  So I think six to

10   eight weeks, and preferably eight weeks, would be the better

11   time frame if we want to do this expedited discovery, which

12   we don't think is necessary.  The parties will have plenty of

13   time to conduct discovery.  The federal rules are set up to

14   explore each other's competing areas, and I think that's the

15   proper place for this.

16        THE COURT:  Okay.  Thank you.  What I'm going to

17   do -- I know you've been arguing for an hour.  I'll give

18   everyone a break.  I'm going to take a brief recess, and then

19   I'll come back on the bench.

20        (Court in recess at 1:59 p.m.

21        and reconvened at 2:05 p.m.)

22        THE COURT:  Okay.  I want to start by thanking the

23   parties for your arguments.  All sides, both sides, did an

24   excellent job.  And I know that we've been on a very

25   expedited briefing schedule in this case, and you put

together excellent submissions.

        MR. SCHWARTZ:  Thank you.

        THE COURT:  So I want to thank you for that.  I appreciate your efforts.

        I'm going to read a decision onto the record here and enter orders to follow after I'm done.

        So I am going to grant DraftKings' motion and issue a temporary restraining order in part.  My aim in doing that is primarily to preserve the status quo until more of the facts can be determined and the parties can have a full opportunity for briefing DraftKings' forthcoming preliminary injunction motion, and I understand Mr. Hermalyn might also be moving to dismiss.

        At this very early stage in the case, and only for purposes of considering the motion for a temporary restraining order, I have concluded that DraftKings has demonstrated a likelihood of success on the merits on at least some of its claims and will suffer irreparable harm if the order is not granted.

        DraftKings has shown a likelihood of success on the merits of its trade secrets misappropriation claims.  Under both the state and federal statute, DraftKings must show the existence of a trade secret that Mr. Hermalyn -- excuse me, that DraftKings, the plaintiff, took reasonable steps to secure the confidentiality of that trade secret and that the

1  defendant, Mr. Hermalyn, used improper means in breach of a

2  confidential relationship to acquire and use the trade

3  secret.

4          The first two elements, in my view, are met here

5  based on DraftKings' declarations.

6          I note that, contrary to Mr. Hermalyn's argument,

7  in the Karamitis declaration DraftKings has identified with

8  specificity the nature of the trade secrets and the

9  confidential information contained in the documents that

10  Mr. Hermalyn accessed.

11          As to the third element, I am convinced that the

12  evidence warrants the temporary restraining order.

13  DraftKings' declarations, and specifically Mr. Harris's

14  declaration, established that Mr. Hermalyn accessed, he says

15  downloaded -- I don't see a material difference in those

16  words -- three of DraftKings' highly confidential documents,

17  which contained trade secrets, on January 29th and

18  January 30th, 2024, the same days he was linked to an IP

19  address, titled, quote, fanatics.ear2.losangles1.leve3.net,

20  in Los Angeles, California.

21          Mr. Hermalyn has not directly denied that he

22  downloaded those documents on those days; indeed, he admits

23  to accessing one of them.  He also admits that he was in

24  California on those days; that he had received a job offer

25  from Fanatics on January 27th; and then he had decided that

1    he would likely accept the job offer on January 28th.

2            During the days that he took off from DraftKings,

3    which is January 29th through January 30th, he had told

4    DraftKings that he needed time off because of a friend's

5    passing.  And I don't question the evidence that he did, in

6    fact, lose a dear friend during that time, but also admit

7    that at the same time he was in Los Angeles, meeting with

8    Fanatics employees to finalize the job offer.

9            On these facts, again, in this very early stage in

10   the case, DraftKings has shown a reasonable likelihood of

11   success on the third element.  And I refer the parties to the

12   court's analogous decision in *G&L Plumbing, Inc. v. Kibbe*,

13   which is at 2023, Westlaw 6881597, which was issued in

14   October of 2023.

15           With respect to the breach of contract claims, and

16   again, at this early stage in the proceedings, my view is

17   that Massachusetts law applies to this dispute.  Mr. Hermalyn

18   signed two choice of law provisions in the nondisclosure and

19   nonsolicitation and noncompetition agreements saying that

20   those contracts shall be governed by the internal substantive

21   laws of Massachusetts, without regard to the doctrine of

22   conflicts of law.

23           And under Massachusetts law, the general rule as

24   stated in the *Oxford* case, as we discussed, *Oxford Global*

25   *Resources, LLC, v. Hernandez*, 480 Mass. 462, a 2018 decision,

as this:

       "Where, as here, the parties have expressed a specific intent as to the governing law, Massachusetts courts will uphold the parties' choice, as long as the result is not contrary to public policy."

       To determine whether a choice of law agreement is contrary to public policy, the Court looks to whether the chosen state has no substantial relationship to the parties or the transaction, and there's no other reasonable basis for the parties' choice, or application of the law of the chosen state would be contrary to the fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and is the state that's law would apply in the absence of the parties' choice of law provision.

       So first, under Massachusetts law, the parties' chosen state, which is Massachusetts, has a substantial relationship to the parties or transaction, because DraftKings is headquartered here.  It says -- for that I'll rely on the SJC's decision in *Oxford* and also its 2013 decision in *Taylor v. Eastern Connection Operating, Inc.*, 465 Mass. 191.

       Second, I don't think California has a materially greater interest than Massachusetts in this litigation.  The contracts were negotiated between a company with its

principle place of business in Massachusetts and its
employee, who visited Massachusetts on occasion for work, but
who worked primarily in New York and lived in New Jersey, not
California, when he negotiated the contract and worked for
DraftKings. Any harm caused by a violation of the agreements
will be felt in Massachusetts.

California has little connection to this case, in
my view, other than the fact that Mr. Hermalyn moved to
California one week ago. And I refer the parties to this
Court's decision in *Aspect Software, Inc., v. Barnett*,
787 F.Supp.2d 118. That's a 2011 decision.

I think this case is different from *Oxford Global
Resources* because, among other things, the employee in that
case worked in California when he signed the confidentiality,
noncompetition, and nonsolicitation agreements.

Turning to DraftKings' breach of contract claims --
and again, at this very preliminary stage -- DraftKings has
demonstrated the likelihood of success on the merits at a
minimum on its claim for breach of nondisclosure agreement.
And that is for similar reasons as their likelihood of
success on the merits on the misappropriation of trade
secrets claims.

As to irreparable harm, as I said, DraftKings'
declarations established a possible misappropriation of
DraftKings' trade secrets when Mr. Hermalyn downloaded or

1    accessed its confidential documents while in California and

2    after receiving a job offer from Fanatics.  This possible

3    misappropriation of trade secrets -- here DraftKings business

4    partner lists, VIP list, and business plans, ahead of a major

5    revenue generating event, the Super Bowl -- threatens

6    irreparable harm to DraftKings.

7            On the other hand, I am not convinced that

8    DraftKings will suffer irreparable harm if Mr. Hermalyn

9    continues to work for Fanatics pending a more fulsome

10   consideration of DraftKings' claims on a preliminary

11   injunction motion.  The other provisions of the proposed

12   temporary restraining order, in my view, adequately protect

13   DraftKings from loss of its trade secrets and confidential

14   information.

15           So I am going to enter the temporary restraining

16   order in substantially the same form proposed by DraftKings,

17   but without the third clause -- that is clause C -- which

18   pertains to Mr.  Hermalyn's ability to work for and provide

19   services to Fanatics.

20           There is precedent for enjoining a new employee

21   from working for an employer when the court finds a

22   likelihood of success on the merits of a breach of a

23   noncompetition agreement, and I intend to consider whether

24   DraftKings has met its burden to obtain that form of relief

25   at the preliminary injunction phase of this case.  But for

now, I will not temporarily enjoin -- restrain Mr. Hermalyn
from working for Fanatics.

In all other respects, however, I'll enter the
order to restrain Mr. Hermalyn from making any use of
DraftKings' confidential information and trade secrets, as
well as from soliciting DraftKings' clients and employees.
And it will stay in effect until resolution of the
preliminary injunction motion.

Again, I want to emphasize, these conclusions are
based only on the record before me, and that was put together
on a highly expedited schedule, and with discovery, the facts
could present in a different light.  So these preliminary
determinations are wholly distinct from my consideration of a
forthcoming preliminary injunction motion.

Turning to the motion for expedited discovery,
Mr. Hermalyn opposes that motion on the basis that DraftKings
has failed to establish a likelihood of success on the merits
and irreparable harm.  As I said, I disagree.  But
nevertheless, DraftKings still needs to establish good cause
for expedited discovery ahead of its preliminary injunction
motion, and any discovery order must be reasonable.

It is reasonable, in my view, for DraftKings to
take narrowly tailored discovery on the allegations
concerning misappropriation of trade secrets and solicitation
of DraftKings' customers and employees.  The interrogatories,

1   as drafted, allow adequate discovery on these topics and not

2   unduly burdensome to Mr. Hermalyn.

3         But in my view, the document requests, and

4   especially the request to conduct a forensic audit of all of

5   Mr. Hermalyn's devices are overbroad and highly little

6   burdensome, particularly where Mr. Hermalyn bought a new

7   device after turning over his devices to DraftKings or

8   counsel.

9         The process of searching for a broad range of

10   documents -- searching, segregating, reviewing, redacting,

11   compilation of privilege log would take months.  I agree with

12   Mr. Hermalyn's counsel on that.  And that doesn't comport

13   with a need to proceed expeditiously to the preliminary

14   injunction motion.  So I'm going to grant DraftKings' motion

15   to issue the proposed interrogatories ahead of the

16   preliminary injunction motion, and deny its request to issue

17   proposed document requests.

18         I will also order Mr. Hermalyn to sit for a

19   deposition lasting no longer than four hours, limited to the

20   topics addressed in the interrogatories.  Mr. Hermalyn may

21   choose to sit for the deposition remotely or in person.

22         I will also allow Mr. Hermalyn to, likewise, depose

23   Mr. Harris, on the topics covered in Mr. Harris's

24   declaration, for no more than four hours, either remotely or

25   in person.

1        And I will grant leave to Mr. Hermalyn to draft

2    interrogatories to propound on DraftKings.  I will order you

3    to do that within the next three days.  Submit it to the

4    Court for review.  I want the interrogatories to be narrow

5    and tight, focused on just the -- either the Harris

6    declaration and the narrow dispute about what Mr. Hermalyn

7    has in his possession now and whether he has turned over

8    confidential information.

9        I will say to the parties that my initial

10   inclination is to allow two weeks, possibly three, for

11   discovery, because I want to get to the preliminary

12   injunction phase sooner, rather than later.  I'm restraining

13   Mr. Hermalyn, and the order will last until a ruling on the

14   preliminary injunction motion but I want it done quickly.  So

15   I'll hear both sides on whether two weeks is reasonable for

16   that amount of discovery.

17       I guess I'll ask DraftKings first.

18       MR. SCHWARTZ:  Certainly reasonable from our

19   perspective, Your Honor.

20       I did have one question.  We have the DraftKings'

21   devices, so obviously we would conduct forensics on those.

22   The devices they were surrendered of counsel, may we have

23   leave of the Court to conduct forensic analysis on those?

24       THE COURT:  No.  I agree with them that forensic

25   analysis takes a long time.  I want this case to move along

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

DRAFTKINGS, INC.,

                        *Plaintiff,*

    v.

MICHAEL Z. HERMALYN,

                        *Defendant.*

Civil Action No. 1:24-cv-10299-JEK

**ORAL ARGUMENT SCHEDULED FOR APR. 2, 2024 (ECF NO. 43)**

---

**DEFENDANT'S MOTION TO DISMISS OR,
IN THE ALTERNATIVE, TO STAY**

---

Defendant Michael Z. Hermalyn hereby moves to dismiss the Complaint (Dkt. No. 1) pursuant to the doctrine of *forum non conveniens*.  In the alternative, Hermalyn moves to stay the instant action under the *Colorado River* abstention doctrine.  As grounds for this motion, Hermalyn relies on and incorporates fully the following supporting documents submitted herewith: (i) the Memorandum of Law; (ii) the Declaration of Stephen D. Riden and exhibits thereto; and (iii) the Declaration of Michael Z. Hermalyn.

A185

Dated: March 14, 2024

Respectfully submitted,

*Attorneys for Defendant Michael Z. Hermalyn*

/s/  *Russell Beck*
Russell Beck (BBO# 561031)
Stephen D. Riden (BBO# 644451)
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Boston, MA 02110
Tel.: (617) 500-8660
Fax: (617) 500-8665
rbeck@beckreed.com
sriden@beckreed.com

## LOCAL RULE 7.1(A)(2) CERTIFICATION

I certify that Defendant has complied with the provisions of Local Rule 7.1(a)(2) by conferring with counsel for Plaintiff regarding this motion on March 14, 2024. Plaintiff opposes the relief sought in this motion.

/s/  *Russell Beck*
Russell Beck

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was filed on March 14, 2024, through the ECF System and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  March 14, 2024

/s/  *Russell Beck*
Russell Beck

A186

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

DRAFTKINGS, INC.,

                                        *Plaintiff*,

          v.

MICHAEL Z. HERMALYN,

                                        *Defendant.*

Civil Action No. 1:24-cv-10299

---

**DECLARATION OF STEPHEN D. RIDEN IN SUPPORT OF DEFENDANT'S**
**MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY**

---

1

## <u>DECLARATION OF STEPHEN D. RIDEN</u>

I, Stephen D. Riden, hereby declare under penalty of perjury, pursuant to 29 U.S.C. § 1746:

1.     I am an attorney admitted to practice before this Court, and a member in good standing of the bar of the Commonwealth of Massachusetts.

2.     I am a name Partner at the law firm of Beck Reed Riden LLP in Boston, Massachusetts, and counsel for Defendant Michael Z. Hermalyn ("Hermalyn").

3.     I entered my Notice of Appearance as counsel for Hermalyn in the above-captioned action on February 6, 2024 (ECF No. 16).

4.     I submit this declaration in support of Defendant's Motion to Dismiss or, In the Alternative, to Stay (the "Motion"), filed concurrently herewith.

5.     I have personal knowledge of the facts presented in this declaration, and personal familiarity with the documents and filings at issue in the Opposition and the Motion.

6.     A true and correct copy of excerpts of DraftKings' March 1, 2024 first amended responses and objections to Hermalyn's first set of interrogatories is attached hereto as <u>Exhibit A</u>.

7.     A true and correct copy of the Complaint filed in the California Superior Court in Los Angeles County, Central District on February 1, 2024, styled *Michael Z. Hermalyn et al. v. DraftKings, Inc.*, No. 24STCV02694 is attached hereto as <u>Exhibit B</u>.

8.     A true and correct copy of a document titled "(In Chambers) Remand Order (ECF Nos. 10, 12 (JS-6)," issued by the Hon. Mark C. Scarsi, United States District Judge, in *Hermalyn v. DraftKings, Inc.*, Case No. 2:24-cv-00918-MCS-E, on February 5, 2024 (ECF No. 14), is attached hereto as <u>Exhibit C</u>.

9.     A true and correct copy of a document titled "(In Chambers) Remand Order (ECF Nos. 8-9) (JS-6)," issued by the Hon. Mark C. Scarsi, United States District Judge, in *Hermalyn v.*

A188

*DraftKings, Inc.*, Case No. 2:24-cv-00997-MCS-E, on February 8, 2024 (ECF No. 19), is attached hereto as Exhibit D.

10.    A true and correct copy of the transcript of February 22, 2024 hearing before the California Superior Court in the County of Los Angeles in the case styled *Michael Z. Hermalyn et al. v. DraftKings, Inc.*, No. 24STCV02694 on the plaintiffs' application for temporary restraining order is attached hereto as Exhibit E.

11.    A true and correct copy of the Supplemental Declaration of Anne K. Conley in Support of *Ex Parte* Application for (1) a Temporary Restraining Order and (2) an Order to Show Cause Regarding Preliminary Injunction filed on February 22, 2024 with the California Superior Court in the County of Los Angeles in the case styled *Michael Z. Hermalyn et al. v. DraftKings, Inc.*, No. 24STCV02694 is attached hereto as Exhibit F.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed:  March 14, 2024

By: _____
          Stephen D. Riden (BBO# 644451)
          Beck Reed Riden LLP
          155 Federal Street, Suite 1302
          Boston, MA 02110
          Tel.: (617) 500-8660
          Fax: (617) 500-8665
          sriden@beckreed.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served on Plaintiff's counsel on the date below via email and will be filed through the ECF System and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  March 14, 2024

          /s/ *Russell Beck*
          Russell Beck

3

A189

# Exhibit B

Electronically FILED by
Superior Court of California,
County of Los Angeles
2/01/2024 9:06 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk

1   BRAD D. BRIAN (SBN 79001)
    brad.brian@mto.com
2   BETHANY W. KRISTOVICH (SBN 241891)
    bethany.kristovich@mto.com
3   ANNE K. CONLEY (SBN 307952)
    anne.conley@mto.com
4   MUNGER, TOLLES & OLSON LLP
    350 South Grand Avenue, 50th Floor
5   Los Angeles, California 90071-3426
    Telephone:    (213) 683-9100
6   Facsimile:    (213) 687-3702

7   *Attorneys for Plaintiff*
    *MICHAEL Z. HERMALYN*

8

9   Michael B. Carlinsky (*pro hac vice forthcoming*)
    michaelcarlinsky@quinnemanuel.com
    QUINN EMANUEL URQUHART & SULLIVAN, LLP
10  51 Madison Ave, 22nd Floor
    New York, New York 10010
11  Telephone:    (212) 849-7000
    Facsimile:    (212) 849-7100

12

13  David C. Armillei (SBN 284267)
    davidarmillei@quinnemanuel.com
    QUINN EMANUEL URQUHART & SULLIVAN, LLP
14  865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
15  Telephone:    (213) 443-3000
    Facsimile:    (213) 443-3100

16

17  *Attorneys for Plaintiff*
    *FVP, LLC*

18            SUPERIOR COURT OF THE STATE OF CALIFORNIA

19            COUNTY OF LOS ANGELES, CENTRAL DISTRICT

20

21  MICHAEL Z. HERMALYN and          Case No.   24STCV02694
    FVP, LLC,
22
              Plaintiffs,            **COMPLAINT FOR DECLARATORY
23                                   RELIEF, INJUNCTIVE RELIEF, AND
         vs.                         VIOLATIONS OF CAL. BUS. & PROF.
24                                   CODE SECTIONS 16600, 16600.1, 16600.5,
    DRAFTKINGS, INC.,                AND 17200**
25
              Defendant.
26
                                     **JURY TRIAL DEMANDED**
27

28

_____

                          COMPLAINT

A191

1    Plaintiffs Michael Z. Hermalyn, a California resident, and FVP, LLC ("Fanatics VIP"), a
2    California Limited Liability Company (together, "Plaintiffs"), allege against Defendant
3    DraftKings Inc. ("DraftKings") causes of action for declaratory relief, injunctive relief, and
4    violations of California Business & Professions Code Sections 16600, 16600.1, 16600.5, and
5    17200, as follows:

6    **INTRODUCTION**

7    1.    Plaintiff Mr. Hermalyn, a California resident, recently accepted an offer of
8    employment from Plaintiff Fanatics VIP, a California-based affiliate of the global digital sports
9    platform Fanatics Holdings, Inc. (together with its subsidiaries and affiliates, including Fanatics
10   VIP, "Fanatics").  Mr. Hermalyn serves as the President of Fanatics VIP and the Head of Fanatics'
11   Los Angeles, California office.  This position requires Mr. Hermalyn to live and work in Los
12   Angeles, California, where Fanatics currently employs approximately 80 people.  Fanatics
13   believes Mr. Hermalyn's unique skills and talents will contribute to Fanatics' ability to thrive in
14   California, growing its economic impact in the State and serving California consumers, while
15   providing additional corporate leadership in California specifically and the West Coast more
16   generally.

17   2.    Defendant DraftKings, Mr. Hermalyn's former employer, has sought to improperly
18   constrain Mr. Hermalyn from pursuing a lawful profession of his choosing with Fanatics VIP in
19   California, and to improperly restrict Fanatics VIP from employing him, in direct violation of
20   California law and public policy.  DraftKings' employment-related agreements with
21   Mr. Hermalyn contain overbroad and illegal post-employment restrictive covenants, including
22   global, 12-month noncompete, client nonsolicitation and no-service, and employee nonsolicitation
23   and no-hire prohibitions.  These sweeping provisions purport to prohibit Mr. Hermalyn from being
24   employed in the betting and gaming space in which he has worked for 16 years, from engaging in
25   any work pertaining to fantasy sports, betting and gaming, and various other industries, and from
26   communicating with his former clients and co-workers.  The restrictions have no geographic
27   limitation, and purport to extend to "any place within the United States or anywhere else in the
28   world."  DraftKings' employment-related agreements also call for litigation in Massachusetts,

-2-
COMPLAINT

A192

1   under Massachusetts law—despite the fact that Mr. Hermalyn has never resided or worked there.

2   When Mr. Hermalyn worked for DraftKings, he resided in New Jersey and worked from

3   DraftKings' New York office space when he was in an office.  And Mr. Hermalyn is now a

4   resident of California, has been offered lawful, California-based employment for a California

5   company, and DraftKings is attempting to interfere in California with that employment

6   opportunity.

7           3.      The State of California has a long-standing law and public policy against such post-

8   employment restrictive covenants.  California has instead espoused a public policy in favor of

9   employee mobility and robust competition.  California Business & Professions Code Section

10  16600, subdivision (a) provides that "every contract by which anyone is restrained from engaging

11  in a lawful profession, trade, or business of any kind is to that extent void."  For decades,

12  California courts have relied on this statute to prohibit noncompete, client nonsolicit, and

13  employee nonsolicit agreements with employees in California like those at issue here.

14          4.      To further protect California residents and employees, California courts have

15  declined to enforce foreign state forum selection clauses in restrictive covenant cases.  And

16  California courts have further declared restrictive covenant provisions illegal and unenforceable

17  under California law, even where the employees at issue *did not ever reside in California—for*

18  *their prior or new employers* (but became employed by a California company), and the

19  agreements at issue called for application of another state's law (rather than California law).

20          5.      Last year, the California Legislature reinforced its commitment to these principles

21  by passing two new laws, codified at California Business & Professions Code Sections 16600.5

22  and 16600.1, effective January 1, 2024, which codify California's prohibition on restrictive

23  covenant agreements even to *agreements between employers and employees in other states*.

24  These laws also impose new, mandatory notification requirements on businesses that utilize

25  restrictive covenants, provide that violations of the restraint of trade laws constitute acts of unfair

26  competition, and grant employees a private right of action for injunctive and/or monetary relief

27  arising from such violations.

28

---

-3-

COMPLAINT

A193

6.     In passing the laws, the Legislature emphasized that they "would prohibit any employer from attempting to enforce a void contract, including seeking enforcement in a non-California court."

7.     Mr. Hermalyn seeks to continue his employment with Fanatics VIP as President and as the Head of Fanatics' Los Angeles office, without any unenforceable prohibitions and restraints imposed by his agreements with DraftKings.  By contrast, DraftKings seeks to improperly squash such business activities and perceived competition based on its unlawful post-employment restrictive covenants and unenforceable foreign law and forum provisions.

8.     Accordingly, in light of this ripe dispute, and to prevent DraftKings' further contravention of California law, Mr. Hermalyn and Fanatics VIP file this action requesting declaratory judgment that the post-employment restrictive covenants, including the foreign state law and forum provisions, in Mr. Hermalyn's agreements with DraftKings are void and unenforceable under California law.

9.     Specifically, Mr. Hermalyn and Fanatics VIP request a declaratory judgment from the Court that: (i) Mr. Hermalyn may freely compete against DraftKings, including by working as the President of Fanatics VIP and the Head of Fanatics' Los Angeles, California, office, including by providing services to the businesses across the Fanatics portfolio of companies (*e.g.*, companies engaged in the collectibles, betting and gaming, licensed merchandise, and media and events business), soliciting and servicing clients on behalf of Fanatics VIP, and recruiting, soliciting, and hiring employees to Fanatics VIP; (ii) Fanatics VIP may continue to employ Mr. Hermalyn in this capacity; (iii) Mr. Hermalyn's post-employment restrictive covenants with DraftKings, including the noncompete, client nonsolicit and no-service, and employee nonsolicit and no-hire prohibitions, are void and unenforceable under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1; and (iv) the Massachusetts choice of law and forum provisions are void and unenforceable under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1.

COMPLAINT

A194

10.     Mr. Hermalyn seeks injunctive relief against DraftKings voiding under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600, his post-employment restrictive covenants and the Massachusetts law and forum provisions contained in Mr. Hermalyn's agreements with DraftKings, and enjoining violations of these laws by DraftKings, and all related available relief.

11.     Finally, Mr. Hermalyn and Fanatics VIP seek all available relief under California's Unfair Competition Law, California Business & Professions Code Section 17200 et seq., including monetary damages, as a result of DraftKings' unfair business practices and unenforceable restrictive covenants that chill lawful competition.

## THE PARTIES, JURISDICTION, AND VENUE

12.     Plaintiff Mr. Hermalyn is an individual who currently resides in Los Angeles County, California.  As of February 1, 2024, Mr. Hermalyn is employed by Fanatics VIP.  He serves as the President of Fanatics VIP and the Head of Fanatics' Los Angeles, California office.  Mr. Hermalyn was previously employed by DraftKings, and during that time, he lived in Bay Head, New Jersey, and worked from DraftKings' New York City office when he was in an office.

13.     Plaintiff Fanatics VIP is a limited liability company formed in California, with headquarters in Los Angeles, California.  Fanatics VIP is a California-based affiliate of the global digital sports platform Fanatics Holdings, Inc.  Fanatics has had a Los Angeles office since 2022, and currently employs approximately 80 people there.  Fanatics also maintains offices in Irvine and San Mateo, California.

14.     Defendant DraftKings is a Nevada corporation that is headquartered in Boston, Massachusetts.  DraftKings is publicly traded on the Nasdaq Stock Exchange under the ticker symbol "DKNG."  DraftKings is a global daily fantasy sports contest, sports betting, and online gaming company.  According to DraftKings' noncompete agreements with Mr. Hermalyn from 2023, "the Business of the Company [DraftKings] is global in nature."  DraftKings does business in California.  DraftKings is registered to do business in California as an out-of-state corporation, and it has a registered agent in California for the service of process.   DraftKings also has multiple

A195

1  licensees and distributors based in California, including Bleacher Report, Alphabet, and Apple,
2  among others.

3        15.    As an example of DraftKings' business activities in California, DraftKings' daily
4  fantasy sports contests are advertised and made available to consumers in California, including in
5  this County.  DK Horse (DraftKings' affiliated horse racing product) is available to residents of
6  California.  DraftKings operates a NFT (non-fungible token) Marketplace that is available in
7  California for California residents.  California residents are offered sign-up, odds browsing, and
8  free-to-play pools and fantasy sport leagues with DraftKings through websites and mobile
9  applications available in California.  Consistent with these California business activities,
10  DraftKings' privacy policy, available on its website, has a standalone section (Section 12)
11  specifically for California consumers.  Based on information and belief, DraftKings' Senior Vice
12  President of Business Development is based in California.  And DraftKings has engaged in
13  substantial outreach to California—including, on information and belief, to lawmakers and voters
14  in this County—through advocacy efforts and advertising related to a sports-betting ballot
15  measure in California, reporting in its SEC filings that it has spent tens of millions of dollars on
16  these efforts in recent years.

17        16.    Venue is proper in Los Angeles County, California, as Mr. Hermalyn resides in Los
18  Angeles County and works for California-based Fanatics VIP as its President and as the Head of
19  Fanatics' Los Angeles office in this County.  Fanatics VIP is a limited liability company formed in
20  California, with headquarters in Los Angeles, California.  DraftKings' liability arises in Los Angeles
21  County, as both Mr. Hermalyn and Fanatics VIP are being harmed by DraftKings' anticompetitive
22  conduct here, and DraftKings is interfering with their business relationships here.  As noted above,
23  DraftKings is registered to do, does, and actively seeks to expand its business in California,
24  including, on information and belief, in this County.

25        **FACTUAL ALLEGATIONS**

26      **A.**    **Mr. Hermalyn's Employment With DraftKings**

27        17.    From approximately September 14, 2020 through February 1, 2024, Mr. Hermalyn
28  was an employee of DraftKings.

A196

18.     His internal title was Vice President of Growth.  In that role, Mr. Hermalyn was responsible for retaining and acquiring certain categories of customers for DraftKings.

19.     During his employment with DraftKings, Mr. Hermalyn resided in Bay Head, New Jersey, and was based out of DraftKings' office in New York, New York.

20.     While DraftKings is a Massachusetts-headquartered company, during his employment with DraftKings, Mr. Hermalyn never resided in Massachusetts, and was never based out of DraftKings' Massachusetts office.

**B.     Mr. Hermalyn's Resignation From DraftKings**

21.     On February 1, 2024, Mr. Hermalyn resigned from DraftKings.  He informed DraftKings in his resignation notice that he intended to accept employment with Fanatics in California.

22.     Prior to resigning, Mr. Hermalyn took steps to ensure he was no longer in possession of any DraftKings property or confidential information.  He returned any DraftKings-issued devices.  He worked with his counsel to ensure that any documents and information developed in connection with his work for DraftKings were no longer in his possession.  He even sent his personal phone to his counsel, and bought a new phone, to ensure that it did not contain any DraftKings information.  He confirmed to DraftKings in his resignation notice that he had turned over all DraftKings property (e.g., his work computer, corporate credit card, portable wifi) and information to his lawyer.

**C.     Mr. Hermalyn's Employment With Fanatics VIP and Residence in California**

23.     After resigning from DraftKings, Mr. Hermalyn accepted his offer of employment from Fanatics VIP.  He presently serves as the President of Fanatics VIP and the Head of Fanatics' Los Angeles office.

24.     Fanatics is a leading digital sports platform, operating businesses across the United States, including California, and across a number of industries, including collectibles, commerce (the design, manufacturing, and sale of licensed apparel and hard goods), and betting and gaming, and with emerging businesses in live events, media, and more.  Fanatics VIP is a California company.

A197

1     25.    For years, Fanatics has conducted business in California and maintained offices here.

2  Fanatics has had an office in San Mateo, California since 2016, and in Irvine, California and Los

3  Angeles, California, since 2022.  There are approximately 80 people currently working in Fanatics'

4  Los Angeles Office alone, across a number of Fanatics' business units.

5     26.    Fanatics hired Mr. Hermalyn for his unique skills and talents to help Fanatics VIP

6  thrive.  As Head of Fanatics' Los Angeles office, Mr. Hermalyn will oversee and administer the

7  operations of the Los Angeles office (which houses employees from multiple Fanatics businesses),

8  and oversee the planned consolidation of the greater Los Angeles-area offices (including Fanatics'

9  Irvine location) into a single location in Los Angeles.

10     27.    This position requires Mr. Hermalyn to live and work in Los Angeles, California,

11  where Mr. Hermalyn plans to further build out his Fanatics VIP team and have a number of

12  additional direct reports with him in Los Angeles.

13     28.    Before accepting this position with Fanatics VIP, Mr. Hermalyn moved his

14  residence to Los Angeles, California, on January 29, 2024.  Mr. Hermalyn signed a rental agreement

15  for an apartment in Los Angeles, California.  He purchased a car in California, obtained a California

16  driver's license, registered to vote in California, and obtained an appointment with a physician in

17  California.  Mr. Hermalyn is planning on enrolling his two daughters in school in Los Angeles for

18  the next school year and already has contacted summer camps and joined various waitlists.

19     29.    Mr. Hermalyn's role at Fanatics VIP represents an important growth opportunity

20  for Mr. Hermalyn.  Being forced by way of a noncompete and nonsolicit agreement to sit out of the

21  betting and gaming space—and beyond—for an entire year would cause serious damage to his

22  professional reputation and future.  It would be unfair, prejudicial, and contrary to California's

23  public policy to force Mr. Hermalyn either to continue working at DraftKings and pass up the

24  opportunity to work in California at Fanatics VIP, or otherwise risk having to be benched or restart

25  his career in an entirely new field.  So too would it prejudice California-based Fanatics VIP from

26  hiring an employee of its choice, as well as the California consumers who would be served and

27  benefitted by the professional opportunities generated by this employment engagement.

28

<div align="center">

-8-

**COMPLAINT**

</div>

**D.** **DraftKings' Restrictive Covenants and Foreign Law/Forum Provisions**

30.   In connection with his employment by DraftKings, Mr. Hermalyn signed a series of agreements containing post-employment restrictive covenants.  These agreements include about a dozen similar non-competition covenants (the "Noncompete Agreements"), and a Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement (the "Nonsolicit Agreement").

31.   Signing these Noncompete Agreements and the Nonsolicit Agreement was a condition to Mr. Hermalyn's employment by DraftKings, and a condition to Mr. Hermalyn's receipt from DraftKings of a signification portion of his compensation.  Mr. Hermalyn was not independently represented by counsel at the time he signed the agreements.  He did not negotiate the agreements, and it was his understanding that any attempt to do so would be a non-starter. These provisions were included in agreements but never explained to employees like Mr. Hermalyn.  Mr. Hermalyn signed each of the agreements from his home in New Jersey or remotely via DocuSign but, upon information and belief, never in Massachusetts.

32.   The Noncompete Agreements and the Nonsolicit Agreements contain several provisions that are illegal, void, and unenforceable under California law and public policy, including post-employment restrictive covenants and Massachusetts law and forum provisions.

**1.** **The Noncompete Agreements**

33.   DraftKings required Mr. Hermalyn to agree to around a dozen Noncompete Agreements as a condition of his employment and compensation at DraftKings.

34.   The terms of the various Noncompete Agreements are similar, but not identical. Indeed, DraftKings made the Agreements even more burdensome over time.

35.   For instance, the most recent versions of the Noncompete Agreements issued by DraftKings purport to restrict Mr. Hermalyn's ability, for an entire year, to do any work in the same industries as DraftKings and beyond, anywhere in the world, including California.  This is an extension of the restricted period from 6 months to 12 months, and an expansion of the geographic scope from the entire United States to the entire world.

A199

36.     The change from 6 months to 12 months was never discussed with Mr. Hermalyn, and he perceived that not signing the Noncompete Agreements would result in equity not being granted and likely termination.

37.     For avoidance of doubt, Plaintiffs are challenging all versions of the Noncompete Agreements as illegal, void, and unenforceable under California law and public policy.

38.     As a specific example of DraftKings' illegal and unenforceable Noncompete Agreements, the 2023 Noncompete Agreement contains in Section (a) a global, 12-month post-termination noncompete covenant that provides:

> For a period of twelve (12) months following termination of your Relationship[1] with the Company[2] you agree to not, anywhere within the Restricted Area[3] acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company): (1) provide services to a Competing

---

[1]  "Relationship" is defined as the employee's "relationship with the Company, whether as an owner, shareholder, partner, employee, contractor, agent, advisor or consultant." (Attachment III, section (a)(xv).)  This provision was added in later versions of the Noncompete Agreement.

[2]  "Company" is defined as "DraftKings Inc., a Nevada corporation, and any person or entity controlled by, controlling, or under common control with DraftKings Inc., a Nevada corporation, including affiliates and subsidiaries." (*Id.* (a)(iii).)

[3]  "Restricted Area" is defined in the 2023 Noncompete Agreements as "any place within the United States or anywhere else in the world, since Competing Businesses operate globally and without meaningful limitation to compete caused by geographic locations." (*Id.* (a)(vii).) Previous Noncompete Agreements covered the entire United States.

A200

Business[4] that relate to any aspect of the Business of the Company[5] (*i.e.*, FSC,[6] Gaming,[7] Marketplace,[8] Media,[9] Other Products and Services,[10] and /or Incidental Products and Services[11]) for which you performed services or received Confidential

---

[4]  "Competing Business" is defined as "any person, firm, association, corporation or any other entity that is engaged in a business or activity (whether online, at a physical location or otherwise) that is competitive with any aspect of the Business of the Company, including, but not limited to" a list of over 50 companies in the 2023 Noncompete Agreements, and "any of the foregoing persons or entities later known by a different name, any person or entity that acquires, is acquired by, merges with, is spun off by, or otherwise combines with or separates from any of the foregoing persons or entities or enters into an agreement to do so, any person or entity directly or indirectly controlling, controlled by, or under common control with any of the foregoing persons or entities, including, but not limited to, any direct and indirect subsidiaries, affiliates, and ventures of any of the foregoing persons or entities, and any successor or assign of any of the foregoing persons or entities or any person or entity." (*Id.* (a)(iv).)  The list of companies in and breadth of this provision have expanded over versions of the Noncompete Agreement.

[5]  "Business of the Company" is defined as "the research, design, development, marketing, broadcasting, streaming, promotion, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for: (1) [ ] ("FSC"); (2) Gaming; (3) Marketplace; (4) Media; (5) all other products and services that exist, are in development, or are under consideration by the Company during your Relationship with the Company [ ]; and (6) all products and services incidentally related to, or which are an extension, development or expansion of, FSC, Gaming, Marketplace, Media or Other Products and Services []." (*Id.* (a)(i).)  The breadth of this provision has increased from the first Noncompete Agreement imposed on Mr. Hermalyn.

[6]  "FSC" is defined as "any fantasy or simulated activity or contest where winning outcomes are determined predominantly by accumulated statistical results of the performance of individuals in athletic or other events; the wining outcome reflects the knowledge and skill of the participant; and a winning outcome is not based solely on the performance of a single team or individual." (*Id.* (a)(vii).)

[7]  "Gaming" is defined as "games of chance or skill, pari-mutuel, fixed odds, pools or otherwise (including, but not limited to, lottery, pari-mutuel betting, bingo, horse and dog racing, simulated racing and sporting events, jai alai, sports betting, online casino games/iGaming, social casino, poker and keno) whether played for real money or cash equivalent, virtual currency, free, or otherwise and any type of ancillary service or product related to the foregoing." (*Id.* (a)(viii).)

[8]  "'Marketplace' shall mean a digital platform facilitating the purchase and sale of nonfungible tokens and other collectibles." (*Id.* (a)(x).)  This provision was added in later versions of the Noncompete Agreement.

[9]  "'Media' shall mean the development, distribution, procurement and programming of content offerings in audio and video focused media related to sports, Gaming, FSC, Marketplace or Other Products and Services." (*Id.* (a)(xi).)  This provision was added in later versions of the Noncompete Agreement.

[10]  "Other Products and Services" is defined as "all other products and services that exist, are in development, or are under consideration by the Company during [Plaintiff's] Relationship with the Company." (*Id.* (a)(i).)

[11]  "Incidental Products and Services" is defined as "all products and services incidentally related to, or which are an extension, development or expansion of, FSC, Gaming, Marketplace, Media or Other Products and Services." (*Id.*)

-11-
COMPLAINT

A201

Information[12] at any time during the six (6) month period prior to such termination;[13] or (2) commit a Threatened Breach[14] of the obligation set forth in the immediately preceding clause.

For example, in the event that you performed services for the FSC aspect of the Business of the Company and received Confidential Information about the Gaming aspect of the Business of the Company during the six (6) month period prior to the termination of your Relationship with the Company, then for twelve (12) months after such termination, you shall not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of the Company), provide services to a Competing Business that relates to FSC or Gaming, or commit a Threatened Breach of that obligation. The foregoing shall not be construed to preclude you from owning up to one percent (1%) of the outstanding stock of a publicly held corporation that constitutes or is affiliated with a Competing Business. . . .[15]

39.     DraftKings' other Noncompete Agreements likewise purport to broadly bar Mr. Hermalyn in a substantially similar way, with the breadth of the restraints growing over time and with subsequent iterations of DraftKings' Noncompete Agreement.

40.     The scope of the Noncompete Agreements are vastly overbroad, including but not limited to the defined terms "Business of the Company," "Competing Business," and

---

[12]  "Confidential Information" is defined as "all information or a compilation of information, in any form (tangible or intangible or otherwise), that is not generally known to competitors of the Company or the public, which Company considers to be confidential and/or proprietary, including, but not limited to: research and development; techniques; methodologies; strategies; product information, designs, prototypes and technical specifications; algorithms, source codes, object codes, trade secrets and technical data; training materials and methods; internal policies and procedures; marketing plans and strategies; pricing and cost policies; customer, supplier, vendor and partner lists and accounts; customer and supplier preferences; contract terms and rates; financial data, information, reports, and forecasts; inventions, improvements and other intellectual property; product plans and proposed product plans; know-how; designs, processes and formulas; software and website applications; computer passwords; market and sales information, plans and strategies; business plans, prospects and opportunities (including, but not limited to, possible acquisitions or dispositions of businesses or facilities); information concerning existing or potential customers, partners or vendors. Confidential information shall also mean information related to Company's current or potential customers. vendors or partners that is considered to be confidential or proprietary to the applicable customer, vendor or partner." (*Id.* (a)(v).)

[13]  Certain versions of the Noncompete Agreement do not contain any temporal limitation as to services provided or information obtained before termination of employment.

[14]  "Threatened Breach" is defined as "any attempt by you to engage in conduct that would breach these Terms and Conditions." (*Id.* (a)(xviii).)  This provision was added in later versions of the Noncompete Agreement.

[15]  In-text defined terms are omitted from this block quote.

-12-

COMPLAINT

A202

"Confidential Information."  They would seemingly prevent Mr. Hermalyn from taking *any job* in the industries in which DraftKings and its competitors operate and beyond.

41.    The Noncompete Agreements effectively contain no geographic limitation.  In the most recent versions, the Noncompete Agreements apply everywhere in the **world**.  Even in the earlier versions, the restrictions applied everywhere in the United States.

42.    The Noncompete Agreements state that in the event of breach—or, in the most recent versions, even in the event of a mere "Threatened Breach" or "challenge" to "the enforceability" of the Noncompete Agreements—DraftKings has the "sole and absolute discretion, for any reason or no reason" to deem "forfeited" any unvested or vested but unsettled equity.[16]  This equity was a significant part of Mr. Hermalyn's compensation as an employee of DraftKings.  DraftKings' one-sided provisions purport to give DraftKings boundless discretion to take away this compensation for engaging or even seeming to "threaten" to engage in protected conduct regarding challenging the enforceability of this illegal contractual restraint.

43.    The Noncompete Agreements contain procedurally unfair terms that are substantively disconnected from the equity compensation awards, such as requiring Mr. Hermalyn to forego any jury trial right (section (f))[17] and to agree that DraftKings is entitled to extraordinary remedies (section (e)).  Section (e) provides that "any breach, Threatened Breach or challenge to the enforceability of this Noncompetition Covenant would cause the Company to suffer immediate and irreparable harm for which monetary damages are inadequate" such that DraftKings "shall be automatically entitled to a temporary, preliminary and permanent injunction restraining such breach, Threatened Breach or challenge requiring specific performance, in addition to any and all rights and remedies at law and equity."[18]  It provides that DraftKings "shall not be obligated to present additional evidence of irreparable harm or the insufficiency of monetary damages and, to

---

[16]    See Attachment III, Section (n) in Noncompete Agreements from 2023.  Prior versions of the Noncompete Agreement similarly contained equity forfeiture provisions.

[17]    DraftKings added the purported jury trial waiver in 2022 and 2023 versions of the Noncompete Agreement.

[18]    See Attachment III, Section (e) in Noncompete Agreements from 2023.  Prior versions of the Noncompete Agreement contained similar extraordinary remedy provisions for DraftKings.

A203

1  the extent permitted by law or under applicable court rule, does not need to post a bond or other

2  surety."[19]  It further provides that DraftKings is entitled to attorneys' fees and costs related to any

3  of breach or challenge before the employee "relent[s]."[20]

4       44.     The Noncompete Agreements Section (f) contain a Massachusetts law and forum

5  provision.  DraftKings purports to select Massachusetts law as the basis for its broad and unfair

6  Noncompete Agreements, but it attempts to *avoid* Massachusetts's choice-of-law doctrine, under

7  which the Massachusetts Supreme Court has applied *California*'s law invalidating non-

8  competition provisions for a California-based employee, even where the employee and former

9  employer had a contractual choice-of-law and forum provision selecting Massachusetts, as is the

10  case here.

11       45.     As an example, the 2023 Noncompete Agreement Section (f) provides:

> You and the Company hereby mutually agree to the exclusive jurisdiction of the Business Litigation Session ("BLS") of the Suffolk Superior Court of the Commonwealth of Massachusetts (and, in the event that the BLS declines to accept jurisdiction, to the exclusive jurisdiction of the Suffolk Superior Court of the Commonwealth of Massachusetts) or the United States District Court for the District of Massachusetts for any dispute arising hereunder. Accordingly. with respect to any such court action, you (a) submit to the personal jurisdiction of such courts; (b) consent to service of process by regular mail to your last known address; and (c) waive any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process.  In the event that you commence a legal action or other proceeding outside of Massachusetts against the Company concerning a dispute arising from or relating to this Noncompetition Covenant you shall reimburse the Company for its reasonable attorneys' fees, costs and expenses incurred in the event that the Company prevails in staying, transferring, dismissing or otherwise defending such action or proceeding, regardless of whether such fees, costs and expenses are incurred in the forum where you commenced the action or in a Massachusetts forum.  This Noncompetition Covenant shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law.

23       46.     In sum, DraftKings forced on Mr. Hermalyn, as a requirement of his employment

24  and compensation, an escalating series of one-sided, over-broad versions of DraftKings'

25  Noncompete Agreement, purporting to impose enormously burdensome restraints on

---

[19]  *Id.*

[20]  *Id.*  This part of the provision was added in 2022 and 2023 versions of the Noncompete Agreement.

A204

1  Mr. Hermalyn's ability to obtain any other employment in his chosen field and engage in

2  protected activity challenging these unlawful restraints.

3  **2.     The Nonsolicit Agreement**

4  47.     DraftKings required Mr. Hermalyn to agree to a Nonsolicit Agreement as a

5  condition of his employment at DraftKings.

6  48.     The Nonsolicit Agreement purports to restrict Mr. Hermalyn's ability, for an entire

7  year, to solicit or service clients, vendors, and employees of DraftKings, irrespective of the desires

8  of those clients, vendors, and employees to associate with Mr. Hermalyn and a subsequent

9  employer, anywhere in the world, including California.

10  49.     Specifically, the Nonsolicit Agreement Section (2) contains a customer, client or

11  vendor nonsolicitation and no-service provision that provides:

12  During the period of Employee's relationship with the Company[21] and for a period
of twelve (12) months after termination of such relationship (for any reason),
13  Employee shall not directly or indirectly either for him/herself or for any other
person, partnership, legal entity, or enterprise, solicit or transact business, or attempt
14  to solicit or transact business with, any of the Company's customers, clients, vendors
or partners, or with any of the Company's prospective customers, clients, vendors or
15  partners about which Employee learned Confidential Information[22] … or which
Employee had some involvement or knowledge related to the Business of the
16  Company.[23]

17

18

19  [21] "Company" is defined as "any entity controlled by, controlling, or under common control with
DraftKings Inc., including affiliates and subsidiaries." (Definitions, section (i).)

20  [22] "Confidential Information" is defined as "all information or a compilation of information, in
21  any form (tangible or intangible or otherwise), that is not generally known to competitors or the
public, which Company considers to be confidential and/or proprietary, including but not limited
22  to" a list of twenty-one broad categories, such as "research and development" and "techniques," as
well as information "of or related to [the] Company's current or potential customers, vendors or
23  partners that is considered to be confidential or proprietary to the applicable customer, vendor or
partner." (Definitions, section (iii).)

24  [23] "Business of the Company" is defined as "the research, design, development, marketing, sales,
operations, maintenance and commercial exploitation pertaining to the operation of, and providing
25  products and services for: (1) fantasy sports contests ('FSC'); (2) Regulated Gaming ([defined as
"the operation of games of chance or skill or parimutuel or fixed odds games … and any type of
26  ancillary service or product related to or connected with the foregoing"]); (3) all other products
and services that exist, are in development, or are under consideration by the Company during
27  your relationship with the Company ('Other Products and Services'); and (4) all products and
services incidentally related to, or which are an extension, development or expansion of, FSC,
28  Regulated Gaming and/or Other Products and Services ('Incidental Products and Services')."
(Definitions, sections (ii).)

A205

50.     The Nonsolicit Agreement Section (3) contains an employee nonsolicitation and no- hire provision that provides:

> During the period of Employee's relationship with the Company and for a period of twelve (12) months after termination of such relationship (for any reason), Employee will not directly or indirectly either for him/herself or for any other person, partnership, legal entity, or enterprise: (i) solicit, in person or through supervision or control of others, an employee, advisor, consultant or contractor of the Company for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with the Company or to change an existing business relationship to the detriment of the Company, (ii) hire away an employee, advisor, consultant or contractor of the Company; or (iii) help another person or entity hire away a Company employee, advisor, consultant or contractor.

51.     The Nonsolicit Agreement is vastly overbroad, including as to the defined terms "Business of the Company" and "Confidential Information." They would seemingly prevent Mr. Hermalyn from working with the employees and clients of his choice, including those in California, even if they wish to work with him or even, arguably, maintaining relationships with others. Given the client-oriented nature of his role, the client nonsolicit is essentially another form of a noncompete ban. Given Mr. Hermalyn's new Head of Office role, the employee no-hire ban could seemingly restrict his entire office, in violation of federal law against no-poach agreements.

52.     The Nonsolicit Agreement contains no geographic limitation and applies everywhere in the United States and everywhere in the world.

53.     The Nonsolicit Agreement Section (9) contains a Massachusetts law and forum provision that provides:

> The parties hereby mutually agree to the exclusive jurisdiction of the Superior Court (inclusive of the Business Litigation Session) of the Commonwealth of Massachusetts or the United States District Court for the District of Massachusetts for any dispute arising hereunder. Accordingly, with respect to any such court action, Employee (a) submits to the personal jurisdiction of such courts; (b) consents to service of process by regular mail to your last known address; and (c) waives any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process. If Employee commences a legal action or other proceeding against the Company concerning a dispute arising from or relating to this Agreement outside of Massachusetts, Employee shall reimburse the Company for its reasonable attorneys' fees, costs and expenses if Company prevails in staying, transferring, dismissing or otherwise defending such action or proceeding based on the location of the action or proceeding, regardless of whether such fees, costs and expenses are incurred in the forum where you commenced the action or in a Massachusetts forum. This Agreement shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law.

-16-

A206

54.     As with its unlawful Noncompete Agreement, DraftKings' Nonsolicit Agreement purports to bar Mr. Hermalyn from engaging in his chosen profession in California.

**E.     DraftKings' Restrictive Covenants and Foreign Law/ Forum Provisions Are Illegal, Void, and Unenforceable Under California Law and Public Policy**

55.     The State of California has long-standing law and public policy against post-employment restrictive covenants, and strongly favors employee mobility and disfavors anticompetitive restraints on trade.

56.     California Business & Professions Code Section 16600 provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

57.     For decades, California courts have relied on this statute to prohibit noncompete, client nonsolicit, and employee nonsolicit agreements with employees in California like those at issue here.[24]

58.     California courts have declined to enforce foreign state forum selection clauses in restrictive covenant cases involving California residents.[25]  California courts have further declared post-employment restrictive covenant provisions illegal and unenforceable under California law,

---

[24]  See, e.g., *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.* (2018) 28 Cal.App.5th 923, 940 [nonsolicitation of employees provision was void, because Section 16600 "precludes an employer from restraining an employee from engaging in his or her 'profession, trade, or business,' even if such an employee uses information that is confidential but not a trade secret" in soliciting employees or customers]; *Retirement Group v. Galante* (2009) 176 Cal.App.4th 1226, 1238 ["[S]ection 16600 bars a court from specifically enforcing (by way of injunctive relief) a *contractual* clause purporting to ban a former employee from soliciting former customers to transfer their business away from the former employer to the employee's new business[.]"]; *Dowell v. Biosense Webster, Inc.* (2009) 179 Cal.App.4th 564, 575 [nonsolicitation provision that prevented employees from soliciting customers who sold or rendered services to the employee's clients was invalid]; *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 948 [noncompetition and customer nonsolicitation provisions void, where they restricted accountant from performing work for his former employer's clients and practicing his profession of choice].)

[25]  See e.g., *Am. Online, Inc. v. Super. Ct.* (2001) 90 Cal.App.4th 1, 12 (2001), *as modified* (July 10, 2001) ["California courts will refuse to defer to the selected forum if to do so would substantially diminish the rights of California residents in a way that violates our state's public policy"]; *G Cos. Management, LLC v. LREP Ariz., LLC* (2023) 88 Cal.App.5th 342, 350 [refusing enforcement of forum selection clause for California resident and employee]; *Verdugo v. Alliantgroup, L.P.* (2015) 237 Cal.App.4th 141, 147 [refusing enforcement of forum selection clause for California resident and employee].)

A207

even where the employees at issue **did not reside in California** (but were employed by a California company), and the agreements at issue called for application of another state's law (rather than California law).[26]

59.     Last year, the California legislature passed two new laws, California Business & Professions Code Sections 16600.5 and 16600.1, effective January 1, 2024, which codify California's prohibition on noncompete agreements even to **agreements between employers and employees in other states**.  These laws impose new, mandatory notification requirements on businesses that utilize noncompetes, provide that violations of the restraint of trade laws would constitute acts of unfair competition, and permit a private right of action for injunctive relief and/or monetary damages for such violations.

60.     One of these new laws, codified at California Business & Professions Code Section 16600.5, codify the reach of California's prohibition against noncompete agreements by specifying that any contract that is void under Section 16600 "is unenforceable **regardless of where and when the contract was signed**."  (Bus. & Prof. Code, § 16600.5, subd. (a), emphasis added.)

61.     Section 16600.5 adds that an employer may not "enter into a contract with an employee or prospective employee that includes a provision that is void" under Section 16600, and bars "an employer or former employer" from attempting "to enforce a contract that is void under this chapter regardless of whether the contract was signed and the employment was maintained outside of California."  (Bus. & Prof. Code, § 16600.5, subd. (b).)

62.     The Legislature's underlying findings for Section 16600.5 state that "California's public policy against restraint of trade law trumps other state laws when an employee seeks employment in California, even if the employee had signed the contractual restraint while living outside of California and working for a non-California employer."  (Sen. Bill No. 699 (2023–2024 Reg. Sess.) § 1(e).)

---

[26]   See *Application Grp., Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 900–901, 905 [noting that "California has a strong interest in protecting the freedom of movement of persons whom California-based employers [ ] wish to employ to provide services in California, regardless of the person's state of residence or precise degree of involvement in California projects"].)

A208

63.     The Legislature went on to express the importance of an employee's freedom of movement, stating: "California has a strong interest in protecting the freedom of movement of persons whom California-based employers wish to employ to provide services in California, regardless of the person's state of residence. This freedom of employment is paramount to competitive business interests."  (*Id*. § 1(f).)

64.     Indeed, the legislative history explicitly recognizes that the amendments "would prohibit any employer from attempting to enforce a void contract, ***including seeking enforcement in a non-California court***" and authorize remedies when an employer violates this prohibition. (Assem. Com. on Lab. & Employment, Background Information Request for Sen. Bill 699 (2023–2024 Reg. Sess.) p. AP1-2, emphasis added.)

65.     Section 16600.5 creates a private right of action for employees, former employees, and prospective employees to seek injunctive relief, actual damages, or both if an employer either (i) enters into a contract that is void under Section 16600 or 16600.5 or (ii) attempts to enforce such a contract.  (Bus. & Prof. Code, § 16600.5.)  The law entitles employees to recover their attorneys' fees for enforcing their rights.  (*Id*. § 16600.5, subd. (e)(2).)

66.     The second of the new laws codified California Business & Professions Code Section 16600.1 and amended Section 16600 to be "read broadly" to "void the application of any noncompete agreement in an employment context . . . ."  (Bus. & Prof. Code, § 16600, subd. (b)(1).)  The amendments to Section 16600 confirm that it is not "limited to contracts where the person being restrained from engaging in a lawful profession, trade, or business is a party to the contract."  (*Id*. § 16600, subd. (c).)

67.     Section 16600.1 specifies that it is "unlawful" to include a noncompete clause in an employment contract or to require an employee to enter a noncompete agreement as a condition of employment.  (Bus. & Prof. Code, § 16600.1, subd. (a).)

68.     Section 16600.1 imposes an affirmative notice obligation on employers who have utilized noncompete agreements.  By February 14, 2024, all such employers must notify any current or former employees (employed after January 1, 2022) that the noncompete provisions in

their agreements are void.  An individualized communication to the employee or former employee is required.  (Bus. & Prof. Code, § 16600.1, subd. (b).)

69.  Section 16600.1 adds that any violation of these requirements "constitutes an act of unfair competition" within the meaning of California's Unfair Competition Law, codified at California Business & Professions Code sections 17200 et seq.  (Bus. & Prof. Code, § 16600.1, subd. (c).)  California's Unfair Competition Law, in turn, allows for enforcement either by private parties or state regulators, and restitution or injunctive relief.  (*Id.* § 17200 et seq.)

70.  Under this California law and public policy, the post-employment restrictive covenants, including the Massachusetts law and forum provisions, in all of DraftKings' Noncompete Agreements and the Nonsolicit Agreement are illegal, void, and unenforceable under California law and public policy as applied to Mr. Hermalyn.

**F.  DraftKings' Enforcement of the Restrictive Covenants and Foreign Law/Forum Provisions Violates California Law**

71.  DraftKings has improperly sought to constrain Mr. Hermalyn from pursuing a lawful profession of his choosing with Fanatics VIP in California, and to improperly restrict Fanatics VIP from employing him.  DraftKings is expected to attempt to enforce the illegal, void, and unenforceable restrictive covenants and foreign law and forum provisions against Mr. Hermalyn and Fanatics VIP in Massachusetts.  These actions directly violate California law and public policy.

72.  Given the parties' dispute over the validity and enforceability of the restrictive covenants and foreign law and forum provisions, a justiciable controversy ripe for judicial resolution now exists between Mr. Hermalyn and Fanatics VIP, on one hand, and DraftKings, on the other hand.  This Court should grant the requested relief to clarify and redress the illegality of DraftKings' anti-mobility restrictive covenants with Mr. Hermalyn and any other contractual impediments to his ability to lawfully continue his employment with Fanatics VIP in California.

A210

1

## FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF
## CODE CIV. PROC. SECTION 1060
### (By All Plaintiffs Against DraftKings)

2

3      73.    Plaintiffs repeat, allege, and incorporate by reference as though fully set forth

4    herein all the allegations contained in Paragraphs 1 through 72.

5      74.    Pursuant to California Code of Civil Procedure Section 1060, an actual, present,

6    and justiciable controversy exists between Mr. Hermalyn, Fanatics VIP, and DraftKings

7    concerning the enforceability of the Noncompete Agreements and the Nonsolicit Agreement, and

8    specifically whether the restrictive covenants and the Massachusetts law and forum provisions are

9    void under California law and public policy banning restraints of trade and employee mobility.

10     75.    Mr. Hermalyn and Fanatics VIP believe that the restrictive covenants and

11   Massachusetts law and forum provisions in the Noncompete Agreements and the Nonsolicit

12   Agreement are illegal, void, and unenforceable under California law and public policy, including

13   California Business & Professions Code Sections 16600, 16600.5, and 16600.1.  Under Sections

14   16600.5 and 16600.1, effective January 1, 2024, California's prohibition on noncompete

15   agreements was codified even to *agreements between employers and employees in other states*—

16   including Mr. Hermalyn's agreements with DraftKings.  The restrictive covenants are overbroad as

17   to duration, scope, and geographic territory, and are not narrowly tailored to protect DraftKings'

18   trade secrets or confidential information.

19     76.    California is the appropriate forum for this action and has a materially greater

20   interest than Massachusetts given that Mr. Hermalyn, Fanatics VIP, and Mr. Hermalyn's new role

21   are located here. Forcing Plaintiffs to litigate in Massachusetts would be unreasonable and

22   prejudicial, particularly given that neither has any ties to Massachusetts.  For the same reasons,

23   California—not  Massachusetts—law should govern.

24     77.    DraftKings contends that the restrictive covenants and Massachusetts law and

25   forum provisions in the Noncompete Agreements and the Nonsolicit Agreement are valid and

26   enforceable under Massachusetts law, and, as such, that Mr. Hermalyn must comply with these

27   provisions and Fanatics VIP must not interfere with them.  DraftKings has sought to improperly

28   constrain Mr. Hermalyn from pursuing a lawful profession of his choosing with Fanatics VIP in

A211

California, and to improperly restrict Fanatics VIP from employing him.  DraftKings is further

expected to attempt to enforce the illegal, void, and unenforceable restrictive covenants and

foreign law and forum provisions against Mr. Hermalyn and Fanatics VIP in Massachusetts.

78.     Given the parties' ongoing dispute over enforceability of contractual provisions at

issue, the requested declaratory relief is needed to clarify the rights and obligations of the parties.

79.     Specifically, Mr. Hermalyn and Fanatics VIP request a declaratory judgment from

the Court that: (i)  Mr. Hermalyn may freely compete against DraftKings, including by working as

the President of Fanatics VIP and the Head of Fanatics' Los Angeles, California office, providing

services to the businesses across the Fanatics portfolio of companies (including companies

engaged in the collectibles, betting and gaming, licensed merchandise, media and events business),

soliciting and servicing clients on behalf of Fanatics VIP, and recruiting, soliciting, and hiring

employees to Fanatics VIP; (ii) Fanatics VIP may continue to employ Mr. Hermalyn in this

capacity; (iii) Mr. Hermalyn's post-employment restrictive covenants with DraftKings, including

the noncompete, client nonsolicit and no-service, employee nonsolicit and no-hire prohibitions,

are void and unenforceable under California law and public policy, including California Business

& Professions Code Sections 16600, 16600.5, and 16600.1; (iv) the Massachusetts choice of law

and forum provisions are void and unenforceable under California law and public policy,

including California Business & Professions Code Sections 16600, 16600.5, and 16600.1; (v) the

jury trial waiver provision is void under California law and public policy, including California

Business & Professions Code Sections 16600, 16600.5, and 16600.1, as part of an illegal and

unenforceable noncompete agreement, and under California Civil Code Section 631.

80.     Plaintiffs' request for declaratory relief should be granted.

**SECOND CAUSE OF ACTION FOR INJUNCTIVE RELIEF**
**BUS. & PROF. CODE SECTION 16600.5**
**(By Mr. Hermalyn Against DraftKings)**

81.     Mr. Hermalyn repeats, alleges, and incorporates by reference as though fully set

forth herein all the allegations contained in Paragraphs 1 through 80.

82.     Mr. Hermalyn seeks injunctive relief against DraftKings affirmatively voiding his

post-employment restrictive covenants and the Massachusetts law and forum provisions contained

1  in Mr. Hermalyn's agreements with DraftKings under California law and public policy, including

2  California Business & Professions Code Sections 16600, 16600.5, and 16600.1, enjoining

3  DraftKings from violating these laws, and enjoining related suits by DraftKings.

4       83.    Section 16600.5 expressly provides for a private right of action for an employee to

5  sue for injunctive relief.  It states: "[a]n employer that enters into a contract that is void under this

6  chapter or attempts to enforce a contract that is void under this chapter commits a civil violation,"

7  and violation of this statute empowers a past, present or prospective employee to bring "a private

8  action to enforce this chapter for injunctive relief or the recovery of actual damages, or both."

9  (Bus. & Prof. Code, § 16600.5, subds. (d), (e)(1).)

10       84.    The restrictive covenants and Massachusetts law and forum provisions in the

11  Noncompete Agreements and the Nonsolicit Agreement are illegal, void, and unenforceable under

12  California law and public policy, including California Business & Professions Code Sections

13  16600, 16600.5, and 16600.1.  Under Sections 16600.5 and 16600.1, effective January 1, 2024,

14  California's prohibition on noncompete agreements was codified even to ***agreements between***

15  ***employers and employees in other states***—including Mr. Hermalyn's agreements with DraftKings

16  here.  The restrictive covenants are overbroad as to duration, scope, and geographic territory, and

17  are not narrowly tailored to protect DraftKings' trade secrets or confidential information.

18       85.    DraftKings has sought to improperly constrain Mr. Hermalyn from pursuing a

19  lawful profession of his choosing with Fanatics VIP in California, and to improperly restrict

20  Fanatics VIP from employing him.  DraftKings is further expected to enforce the illegal, void, and

21  unenforceable restrictive covenants and foreign law and forum provisions against Mr. Hermalyn

22  and Fanatics VIP in Massachusetts.

23       86.    Accordingly, Mr. Hermalyn is entitled to the injunctive relief requested.

24  Mr. Hermalyn additionally reserves his rights to recover damages and reasonable attorneys' fees

25  and costs as provided in the statute.  (Bus. & Prof. Code, § 16600.5, subd. (e)(2).)

26

27

28

A213

1

2

**THIRD CAUSE OF ACTION FOR UNFAIR COMPETITION**
**BUS. & PROF. CODE SECTIONS 17200 ET SEQ.**
**(By All Plaintiffs Against DraftKings)**

3    87.    Plaintiffs repeat, allege, and incorporate by reference as though fully set forth

4    herein all the allegations contained in Paragraphs 1 through 86.

5    88.    It has long been held in California that "[a]n employer's use of an illegal

6    noncompete agreement also violates the UCL."  (See *Dowell v. Biosense Webster, Inc.* (2009) 179

7    Cal.App.4th 564, 575 [citing *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th

8    881, 906–908; see also *Robinson v. U-Haul Co. of Cal.* (2016) 4 Cal.App.5th 304, 314–316

9    [affirming grant of permanent injunction against employer whose unlawful non-competition

10   agreement and attempts to enforce it constituted an unfair business practice]; *Khan v. K2 Pure*

11   *Solutions, LP* (N.D. Cal. 2013) 981 F. Supp. 2d 860, 864 [use of an agreement that contained an

12   illegal noncompete provision "by definition, violates the UCL"].)

13   89.    Section 16600.1 separately specifies that it is "unlawful" to include a noncompete

14   clause in an employment contract or to require an employee to enter a noncompete agreement as a

15   condition of employment and that a violation of this "constitutes an act of unfair competition"

16   within the meaning of California's Unfair Competition Law, codified at California Business &

17   Professions Code Sections 17200 et seq.  (Bus. & Prof. Code, §§ 16600.1, 17200 et seq.)

18   90.    The restrictive covenants and Massachusetts law and forum provisions in the

19   Noncompete Agreement and the Nonsolicit Agreement are illegal, void, and unenforceable under

20   California law and public policy, including California Business & Professions Code Sections

21   16600, 16600.5, and 16600.1.  Under Sections 16600.5 and 16600.1, effective January 1, 2024,

22   California's prohibition on noncompete agreements was codified even to *agreements between*

23   *employers and employees in other states*—including Mr. Hermalyn's agreements with DraftKings

24   here.  The restrictive covenants are overbroad as to duration, scope, and geographic territory, and

25   are not narrowly tailored to protect DraftKings' trade secrets or confidential information.

26   91.    DraftKings has sought to improperly constrain Mr. Hermalyn from pursuing a

27   lawful profession of his choosing with Fanatics VIP in California, and to improperly restrict

28   Fanatics VIP from employing him.  DraftKings is further expected to attempt to enforce the

-24-
COMPLAINT

A214

illegal, void, and unenforceable restrictive covenants and foreign law and forum provisions against Mr. Hermalyn and Fanatics VIP in Massachusetts.

92.    DraftKings' restrictive covenants and Massachusetts law and forum provisions in the Noncompete Agreement and the Nonsolicit Agreement with Mr. Hermalyn, as alleged herein, contain unenforceable restrictive covenants, and DraftKings' maintenance of same constitute unlawful, unfair, deceptive, and misleading business practices, prohibited by California Business & Professions Code Sections 17200.  (Bus. & Prof. Code, §§ 16600.1, 17200.)

**<u>PRAYER FOR RELIEF</u>**

*WHEREFORE,* Mr. Hermalyn and Fanatics VIP demand judgment against DraftKings as follows:

93.    For a judicial declaration that (i) Mr. Hermalyn may freely compete against DraftKings, including by working as the President of Fanatics VIP and Head of Fanatics' Los Angeles, California office, including by providing services to the businesses across the Fanatics portfolio of companies (including companies engaged in the collectibles, betting and gaming, licensed merchandise, and media and events business), soliciting and servicing clients on behalf of Fanatics VIP, and recruiting, soliciting, and hiring employees to Fanatics VIP; (ii) Fanatics VIP may continue to employ Mr. Hermalyn in this capacity; (iii) Mr. Hermalyn's post-employment restrictive covenants with DraftKings, including the noncompete, client nonsolicit and no-service, and employee nonsolicit and no-hire prohibitions, are void and unenforceable under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1; (iv) the Massachusetts choice of law and forum provisions are void and unenforceable under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1; and (v) the jury trial waiver provision is void under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1, as part of an illegal and unenforceable noncompete agreement, and under California Civil Code Section 631.

94.    Injunctive relief voiding the post-employment restrictive covenants and the Massachusetts law and forum provisions contained in Mr. Hermalyn's agreements with

A215

1  DraftKings under California law and public policy, including California Business & Professions

2  Code Sections 16600, 16600.5, and 16600.1, and enjoining DraftKings from violating same or

3  enforcing same in court.

4      95.     Actual damages arising from DraftKings' inclusion and maintenance of unlawful

5  restrictive covenants, requirement that Mr. Hermalyn enter such agreements, as well as reasonable

6  attorneys' fees and costs as provided in California Business & Professions Code Sections 16600.5

7  (e)(2), 16600.1, and 17200.

8      96.     For such other and further relief as the Court deems proper and just.

9                              **JURY DEMAND**

10     97.     Plaintiffs demand a trial by jury on all issues so triable.

11
   DATED:  February 1, 2024                   Respectfully Submitted,
12
                                              MUNGER, TOLLES & OLSON LLP
13

14

15                                            By: _____

16                                                BRAD D. BRIAN
                                                  BETHANY 1. KRISTOVICH
17                                                ANNE K. CONLEY
                                              Attorneys for Plaintiff
18                                            MICHAEL Z. HERMALYN

19

20                                            QUINN EMANUEL URQUHART
                                                & SULLIVAN, LLP
21

22
                                              By: _____
23
                                                  DAVID C. ARMILLEI
24                                                MICHAEL B. CARLINSKY
                                              Attorneys for Plaintiff
25                                            FVP, LLC

26

27

28

                                    -26-
                                 COMPLAINT

                                   A216

# Exhibit C

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

JS-6

| | |
|---|---|
| Case No. | **2:24-cv-00918-MCS-E** |
| Title | ***Hermalyn v. DraftKings, Inc.*** |

Date February 5, 2024

Present: The Honorable    Mark C. Scarsi, United States District Judge

| Stephen Montes Kerr | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    (IN CHAMBERS) REMAND ORDER (ECF NOS. 10, 12) (JS-6)

Plaintiffs Michael Z. Hermalyn and FVP, LLC, bring this action against Defendant DraftKings, Inc., for declaratory relief, injunctive relief, and violations of the California Business and Professions Code. (Compl., ECF No. 1-3.) Asserting diversity jurisdiction, Defendant removed this action from the Los Angeles County Superior Court, No. 24STCV02694. (Notice of Removal, ECF No. 1.)

The Court on its own motion remands the case. *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (obliging courts to examine subject-matter jurisdiction issues sua sponte). Federal courts are of limited jurisdiction, having subject-matter jurisdiction only over matters authorized by the Constitution and Congress. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). A defendant may remove a civil action in state court to federal court if the federal court has original jurisdiction. 28 U.S.C. § 1441(a). Federal courts have original jurisdiction over cases between citizens of different states where the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a). There is a "strong presumption" against removal jurisdiction, and the removing party bears the burden of proving that removal is proper. *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). A court may remand without briefing or argument where "the court's lack of subject matter jurisdiction

A218

over an action is clear and inarguable." *Cooper v. Wash. Mut. Bank*, No. C 03-554 VRW, 2003 U.S. Dist. LEXIS 4559, at *5 (N.D. Cal. Mar. 19, 2003) (citing, inter alia, *Maniar v. FDIC*, 979 F.2d 782 (9th Cir. 1992)).

In its notice of removal, Defendant invokes the Court's diversity jurisdiction. (Notice of Removal 8–11.) Defendant offers insufficient allegations about the citizenship of FVP. Plaintiffs allege FVP "is a limited liability company formed in California, with headquarters in Los Angeles, California." (Compl. ¶ 13.) From this, Defendant submits FVP is a citizen of California. (Notice of Removal 9.) But a limited liability company like FVP "is a citizen of every state of which its owners/members are citizens." *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006). Defendant does not offer facts probative of the citizenship of FVP's owners or members and thus has not established its citizenship, as is its burden on removal. *See Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001) ("[A] party seeking to invoke diversity jurisdiction should be able to allege affirmatively the actual citizenship of the relevant parties."). Plaintiffs, on the other hand, offer evidence that FVP's sole member is a citizen of Nevada. (Winiarski Decl. ¶¶ 6–7, ECF No. 12-1.) Defendant, like FVP, is a citizen of Nevada, (Henley Decl. ¶ 3, ECF No. 1-1), so complete diversity of citizenship is lacking, 28 U.S.C. § 1332(a). Remand is appropriate. 28 U.S.C. § 1447(c).

The Court lacks jurisdiction over this action and remands it to the Los Angeles County Superior Court, No. 24STCV02694. The Court directs the Clerk to effect the remand immediately and close the case.

The Court denies as moot Plaintiffs' ex parte application to shorten time on a motion to remand. (Appl., ECF No. 10.) The Court denies as moot Plaintiffs' motion to remand, (Mot., ECF No. 12), but retains jurisdiction to consider any post-remand motion by Plaintiffs to recover fees and costs under 28 U.S.C. § 1447(c), *see Moore v. Permanente Med. Grp., Inc.*, 981 F.2d 443, 445 (9th Cir. 1992); (*see also* Mot. 11 (requesting an award of fees and costs)). The Court sets the following schedule for briefing and argument directed to that issue:

| Event | Date |
| --- | --- |
| Deadline to file motion for fees and costs | February 12, 2024 |
| Deadline to file response to motion | February 20, 2024 |
| Deadline to file reply in support of motion | February 26, 2024 |
| Hearing on motion | March 11, 2024, at 9:00 a.m. |

A219

Alternatively, the parties may elect to resolve the issue by stipulation, which would advance the "just, speedy, and inexpensive determination" of this matter by obviating the need for further expenditure of resources in federal court. Fed. R. Civ. P. 1.

**IT IS SO ORDERED.**

A220

# Exhibit D

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

# JS-6

| | |
|---|---|
| Case No. **2:24-cv-00997-MCS-E** | Date February 8, 2024 |
| Title ***Hermalyn v. DraftKings, Inc.*** | |

Present: The Honorable   Mark C. Scarsi, United States District Judge

| Stephen Montes Kerr | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:   (IN CHAMBERS) REMAND ORDER (ECF NOS. 8–9) (JS-6)**

Plaintiffs Michael Z. Hermalyn and FVP, LLC, bring this action against Defendant DraftKings, Inc., for declaratory relief, injunctive relief, and violations of the California Business and Professions Code. (Compl., ECF No. 1-3.) Asserting diversity jurisdiction, Defendant removed this action from the Los Angeles County Superior Court, No. 24STCV02694. (Notice of Removal, ECF No. 1.) This is the second time Defendant removed the case; upon the first removal, the Court remanded the case on its own motion because the parties were not diverse. Remand Order, *Heramlyn v. DraftKings, Inc.*, No. 2:24-cv-00918-MCS-E (C.D. Cal. Feb. 5, 2024), ECF No. 14.

*Repetita iuvant*. The Court on its own motion remands the case. *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (obliging courts to examine subject-matter jurisdiction issues sua sponte). Federal courts are of limited jurisdiction, having subject-matter jurisdiction only over matters authorized by the Constitution and Congress. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). A defendant may remove a civil action in state court to federal court if the federal court has original jurisdiction. 28 U.S.C. § 1441(a). Federal courts have original jurisdiction over cases between citizens of different states where the amount in

A222

controversy exceeds $75,000. 28 U.S.C. § 1332(a). There is a "strong presumption" against removal jurisdiction, and the removing party bears the burden of proving that removal is proper. *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). A court may remand without briefing or argument where "the court's lack of subject matter jurisdiction over an action is clear and unarguable." *Cooper v. Wash. Mut. Bank*, No. C 03-554 VRW, 2003 U.S. Dist. LEXIS 4559, at *5 (N.D. Cal. Mar. 19, 2003) (citing, inter alia, *Maniar v. FDIC*, 979 F.2d 782 (9th Cir. 1992)).

Defendant, like FVP, LLC, is a citizen of Nevada. (Notice of Removal ¶¶ 23, 40.) This time around, Defendant submits that FVP was fraudulently joined to the action, so FVP's citizenship should be disregarded. (*Id.* ¶¶ 33–37.) The Court assumes without deciding the fraudulent joinder doctrine applies where the purportedly fraudulently joined party is a plaintiff. *See Apilado v. Bank of Am., N.A.*, No. 19-00285 JAO-KJM, 2019 U.S. Dist. LEXIS 145454, at *7–10 (D. Haw. Aug. 27, 2019) (collecting cases for the proposition that "Ninth Circuit cases addressing the doctrine apply it exclusively to defendants"). In evaluating diversity jurisdiction, the Court "may disregard the citizenship of a non-diverse [party] who has been fraudulently joined." *GranCare, LLC v. Thrower*, 889 F.3d 543, 548 (9th Cir. 2018). There is a presumption against fraudulent joinder, and "defendants who assert fraudulent joinder carry a heavy burden of persuasion." *Tanner v. Ford Motor Co.*, 424 F. Supp. 3d 666, 670 (N.D. Cal. 2019). "There are two ways to establish fraudulent joinder: '(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court.'" *GranCare*, 889 F.3d at 548 (quoting *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1044 (9th Cir. 2009)).

Defendant relies on the first method of establishing fraudulent joinder, actual fraud in the pleading of jurisdictional facts. It offers conjecture and invective to suggest that FVP and its member corporation were organized last week for the purpose of defeating diversity jurisdiction in this action. (Notice of Removal ¶¶ 22– 25, 33–37.) Beyond speculation, Defendant offers no evidence of fraud. It supposes that a nascent company can have no headquarters, can employ no people, and can maintain no business relationships. No facts support these arguments, which blissfully ignore the possibility that FVP may have inherited these components of its business from a predecessor organization. Defendant offers no evidence of untoward acts by FVP that might support a finding of fraud, as was the situation in the sole case Defendant offers where a court found fraudulent joinder of a plaintiff. *See Overrated Prods., Inc. v. Univ. Music Grp.*, No. CV 19-2899-RSWL-RAO, 2019 WL 6729718, at *5–7 (C.D. Cal. July 31, 2019) (finding party was fraudulently joined

A223

after detailed analysis of evidence showing a collusive assignment); *cf., e.g.*, *Iowa Pub. Serv. Co. v. Med. Bow Coal Co.*, 556 F.2d 400, 404 (8th Cir. 1977) ("[I]f the nondiverse plaintiff is a real party in interest, the fact that his joinder was motivated by a desire to defeat federal jurisdiction is not material."); *Kimbrough v. Wyeth*, No. CV-S-04-0819-RLH (PAL), 2004 U.S. Dist. LEXIS 35544, at *4 n.3 (D. Nev. Nov. 8, 2004) ("[A] Plaintiff has every right to structure and implement suit such that diversity does not exist, and to do so with the intention of reaching that result; to assert otherwise is nonsense and would imply that a Plaintiff is obliged to provide Defendants with the opportunity to litigate in federal court.").

Nor has Defendant identified a fraud *in the pleading of jurisdictional facts*. The paradigmatic situation for this species of fraudulent joinder is when a plaintiff makes false statements in a pleading about a party's citizenship. See Karen L. Stevenson & James E. Fitzgerald, *Rutter Group Practice Guide: Federal Civil Procedure Before Trial* § 2:2425 (Cal. & 9th Cir. ed.) (citing *Stillwell v. Allstate Ins. Co.*, 663 F.3d 1329, 1332–33 (11th Cir. 2011), and *Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1318–19 (9th Cir. 1998)). Plaintiffs have not falsely pleaded anything bearing on jurisdiction in federal court. Indeed, they have not pleaded *anything* about FVP's citizenship, as their complaint presents no allegations about FVP's members or the citizenship of those members that might be relevant to diversity jurisdiction. (*See* Compl. ¶¶ 13, 16 (asserting facts about FVP relevant to state court jurisdiction and venue inquiry).)

The Court cannot disregard the citizenship of FVP, so complete diversity of citizenship is lacking. 28 U.S.C. § 1332(a). Remand is appropriate. 28 U.S.C. § 1447(c).

The Court lacks jurisdiction over this action and remands it to the Los Angeles County Superior Court, No. 24STCV02694. The Court directs the Clerk to effect the remand immediately and close the case.

The Court denies as moot Plaintiffs' ex parte application to shorten time on a motion to remand. (Appl., ECF No. 8.) The Court denies as moot Plaintiffs' motion to remand, (Mot., ECF No. 9), but retains jurisdiction to consider any post-remand motion by Plaintiffs to recover fees and costs under 28 U.S.C. § 1447(c), *see Moore v. Permanente Med. Grp., Inc.*, 981 F.2d 443, 445 (9th Cir. 1992); (*see also* Mot. 13–14 (requesting an award of fees and costs)). The Court sets the following schedule for briefing and argument directed to that issue:

---

A224

| Event | Date |
|---|---|
| Deadline to file motion for fees and costs | February 12, 2024 |
| Deadline to file response to motion | February 20, 2024 |
| Deadline to file reply in support of motion | February 26, 2024 |
| Hearing on motion | March 11, 2024, at 9:00 a.m. |

Alternatively, the parties may elect to resolve the issue by stipulation, which would advance the "just, speedy, and inexpensive determination" of this matter by obviating the need for further expenditure of resources in federal court. Fed. R. Civ. P. 1.

**IT IS SO ORDERED.**

A225

# Exhibit E

```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2            COUNTY OF LOS ANGELES, CENTRAL DISTRICT

 3   DEPARTMENT 86          HON. MITCHELL L. BECKLOFF, JUDGE
                                -o0o-
 4   MICHAEL Z. HERMALYN and       )
     FVP, LLC,                     )
 5                                 )
             Plaintiffs,           )
 6                                 )        No. 24STCV02694
        vs.                        )
 7                                 )
     DRAFTKINGS, INC.,             )
 8                                 )
             Defendant.            )
 9   _____)

10

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              THURSDAY, FEBRUARY 22, 2024

17

18

19

20    [PARTIES AND COUNSEL CONTINUE ON THE FOLLOWING PAGE]

21

22

23

24

25

26

27   REPORTED BY:            JEAN KIM, CSR NO. 13555
                             COURT REPORTER PRO TEMPORE
28
```

**Abrams, Mah & Kahn**

A227

2

```
1    APPEARANCES:

2    FOR PLAINTIFF MICHAEL Z. HERMALYN
              MUNGER, TOLLES & OLSON, LLP
3             BY:  BRAD D. BRIAN
                   BETHANY W. KRISTOVICH
4                  ANNE K. CONLEY
                   Attorneys at Law
5             350 South Grand Avenue
              50th Floor
6             Los Angeles, California  90071
              213.683.9100
7

8
     FOR PLAINTIFF FVP LLC
9             QUINN EMANUEL
              BY:  DAVID C. ARMILLEI
10                 Attorney at Law
              865 South Figueroa Street
11            10th Floor
              Los Angeles, California  90017
12            213.443.3000

13

14   FOR DEFENDANTS
              GIBSON, DUNN & CRUTCHER, LLP
15            BY:  JAMES FOGELMAN
                   KATHERINE V.A. SMITH
16                 Attorneys at Law
              333 South Grand Avenue
17            Los Angeles, California  90071
              213.229.7000
18

19

20

21

22

23

24

25

26

27

28
```

**Abrams, Mah & Kahn**

A228

3

1                           I N D E X

2

3

4                          SESSIONS

5                                                    PAGE

6    THURSDAY, FEBRUARY 22, 2024

7          A.M. SESSION                                4

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Abrams, Mah & Kahn**

A229

```
 1   CASE NUMBER:                        24STCV02694
 2   CASE NAME:             HERMALYN V DRAFTKINGS, INC.
 3   LOS ANGELES, CALIFORNIA     THURSDAY, FEBRUARY 22, 2024
 4   DEPARTMENT 86          HON. MITCHELL L. BECKLOFF, JUDGE
 5   APPEARANCES:                    (AS HERETOFORE NOTED)
 6   REPORTER:                  JEAN KIM, CSR NO. 13555
 7   TIME:                     A.M. SESSION - 8:43 A.M.
 8
 9                        --o0o--
10           (The following proceedings were held in
11           open court.  The court reporter
12           appeared in person:)
13           JUDICIAL ASSISTANT:  Remain seated and come to
14   order.  Department 86 is now in session.
15           THE COURT:  You can have a seat.
16           JUDICIAL ASSISTANT:  The Honorable Mitchell L.
17   Beckloff, judge presiding.
18           THE COURT:  Good morning.
19           And, Marissa, the phone's on?
20           JUDICIAL ASSISTANT:  Phone's on.
21           THE COURT:  Okay.  Thank you.
22           Good morning.  Welcome to Department 86.
23   Let's start with Siry Investments.
24           (Unrelated matters were heard.)
25           THE COURT:  Parties on Hermalyn.
26           Okay.  Let me start by getting appearances of
27   the attorneys in the courtroom, please.
28           MR. BRIAN:  Your Honor, Brad Brian of Munger,
```

**Abrams, Mah & Kahn**

A230

```
1   Tolles & Olsen for the plaintiff, Michael Hermalyn.
2           THE COURT:  Thank you very much.
3           MS. KRISTOVICH:  Bethany Kristovich, Munger,
4   Tolles & Olsen, also on behalf of plaintiff, Michael
5   Hermalyn.
6           MS. CONLEY:  Anne Conley of Munger, Tolles &
7   Olsen on behalf of plaintiff, Hermalyn.
8           MR. ARMILLEI:  David Armillei of Quinn Emanuel
9   Urquhart & Sullivan on behalf of coplaintiff, FVP LLC.
10          THE COURT:  Thank you very much.
11          MR. FOGELMAN:  Hi.  Good morning, Your Honor.
12  James Fogelman and Katherine Smith of Gibson Dunn,
13  specially appearing for defendant, DraftKings.
14          THE COURT:  Thank you very much.
15          I'm assuming that you all are the parties I
16  need to get appearances from and nobody on the
17  computer.  Is that right?
18          MR. BRIAN:  I think that's right, Your Honor.
19          MR. FOGELMAN:  Correct.
20          THE COURT:  So let me -- I'm really not
21  inclined to make any orders today.  I think that, by
22  looking at what I was given in the opposition, the
23  federal court's order, I think that all that is --
24          I will admit that one of the paragraphs is a
25  bit unclear to me.  That's paragraph D.
26          But, otherwise, what has been restrained is
27  Mr. Hermalyn's use of confidential information.  And
28  the federal court made it clear in the -- well, what
```

**Abrams, Mah & Kahn**

A231

```
 1    she believed -- the judge believed to be a
 2    reconsideration order or looked at it that way -- that
 3    she was preserving the status quo.
 4            So my thought was you all should have your
 5    hearing on April 2nd and if -- after that hearing, you
 6    could come back to court.
 7            I just -- I don't see that the agreement --
 8    there's no question he can't use trade secrets and
 9    confidential information; right?
10            MR. BRIAN:  There's no question under that
11    order that he cannot use confidential information and
12    trade secrets.  Correct.
13            THE COURT:  Okay.  But he can't use it under
14    the terms of his agreement; right?
15            MR. BRIAN:  Well, his agreement -- yes,
16    Your Honor.  That's correct.
17            THE COURT:  And there's a severance clause in
18    the agreement.
19            MR. BRIAN:  Yes, there is.
20            THE COURT:  So, even assuming part of the
21    agreement or some part of the agreement is invalid
22    under the Business and Professions Code and void, all
23    that's happening here is he's restrained from using
24    trade secrets, which there's nothing unique about that.
25            MR. BRIAN:  He's also restrained from
26    contacting any clients or customers or partners of
27    DraftKings.  And that restrictive covenant, we think,
28    violates California law.
```

**Abrams, Mah & Kahn**

```
 1              THE COURT:  About which Mr. Hermalyn learned
 2    confidential information.  Right?  So it's really tied
 3    to and linked to confidential information.
 4              MR. BRIAN:  We would argue that.  I'm not sure
 5    that the DraftKings would agree.
 6              But I would like, Your Honor, a chance to
 7    address your first point because I do think that we do
 8    need an order from this Court.  And let me explain why.
 9              THE COURT:  Okay.  I have read all of the
10    papers.  I've read the transcript from that
11    February 8th hearing.  So I don't -- and I've read the
12    order from yesterday from the judge.
13              So I don't need you to repeat what's in the
14    papers.
15              MR. BRIAN:  I don't plan to do that,
16    Your Honor.
17              First of all, I would say this.  I don't need
18    to recite, then.
19              The California law, the new California law and
20    the state legislature --
21              THE COURT:  Understood.
22              MR. BRIAN:  -- makes very clear, explicit,
23    that it doesn't matter where a restrictive covenant was
24    signed, whether it's outside of California.  And --
25              THE COURT:  Understood.  I've read the
26    statutes.
27              MR. BRIAN:  I understand.
28              THE COURT:  And I have them printed out.  I've
```

1    got your judicial notice request.

2          MR. BRIAN:  The Massachusetts judge, in

3    issuing his order, expressly said that California had a

4    limited interest in this matter.

5          THE COURT:  Yes.  She did.

6          MR. BRIAN:  And he cited two things -- she

7    did.  I'm sorry.

8          She said two things.  One, she said that

9    Mr. Hermalyn had only become a recent California

10   resident.  Therefore, that meant California had a

11   limited interest.

12         And, secondly, she cited -- she distinguished

13   a case that Mr. Beck and his colleagues cited, saying

14   that was the case that was signed by California parties

15   in California.

16         Neither of those is correct.  Neither is

17   correct.  The new statute in California and the

18   California legislature -- the legislative history is

19   explicit that one of the purposes of the statute is to

20   encourage California companies to recruit out-of-state

21   employees to come to California to work.  That's

22   exactly what happened here.

23         Now, DraftKings argues that it's a sham, that

24   he's not really a resident.  It doesn't matter.  The

25   California statute --

26         First of all, he is a resident.  He's rented

27   an apartment.  He's got a driver's license.  He's

28   moving to California.  He's working for a California

```
 1   company.  But it doesn't even matter whether he's a
 2   resident under the --
 3           So the judge was wrong on that point.  And,
 4   secondly, on the second point, she's also wrong.
 5           Now, why do I say that?  Two reasons.
 6           Because the order the judge in Massachusetts
 7   entered was only an interim order.
 8           THE COURT:  Yes.  Until April 2nd.
 9           MR. BRIAN:  Until April 2nd.
10           And one of the things that California
11   legislature expressly says is the purpose of the
12   statute is to allow California residents to take this
13   showing, a strong judicial order from Your Honor, to
14   the Court in Massachusetts.
15           We are not seeking to enjoin the proceeding.
16   We are seeking to educate the Court about the strong
17   governmental interest in California.
18           THE COURT:  You are well capable of making
19   that showing in Massachusetts.
20           MR. BRIAN:  Well, but the --
21           THE COURT:  My decision -- you're asking for
22   me to advise a federal judge in Massachusetts that
23   California has a strong interest in this because it's a
24   California employer who recruited someone to move to
25   the state, who's registered to vote, who's leased an
26   apartment --
27           There are all these factual issues raised by
28   the defendant about whether they're sleeping there.  I
```

**Abrams, Mah & Kahn**

A235

1   have a declaration that says "my kids are moving here

2   after the term is ended for school" --

3          All of that.  You don't need an order from me.

4          MR. BRIAN:  So I think we do.  I think --

5          Well, we're obviously going to make the

6   argument.  I agree with Your Honor.  We're going to

7   make those arguments.  We're going to make them as

8   forcefully as we can.  But an order from this Court is

9   important.

10          The second reason we need an order, the order

11   in Massachusetts -- they say, well, we lost three

12   times.  No, we didn't.

13          Take a look at that order.  They sought an

14   order to enjoin my client from working for Fanatics.

15   They lost that.

16          THE COURT:  Yes.

17          MR. BRIAN:  That was stricken from the order.

18          THE COURT:  Yes.

19          MR. BRIAN:  So my client is permitted to work

20   for Fanatics.  He attended the Super Bowl, sat in the

21   Fanatics suite, wore a Fanatics jacket, is intending to

22   work for Fanatics.

23          THE COURT:  And is working for Fanatics.

24          MR. BRIAN:  And is.

25          But they are taking steps right now to

26   interfere with that.  They are taking steps to

27   disparage him with his employer; with management; we

28   think, with prospective clients that are not based on

**Abrams, Mah & Kahn**

A236

```
 1   the use of confidential information.
 2          And DraftKings itself is not subject to the
 3   order in Massachusetts.  That order was directed to our
 4   client.
 5          We want an order that's directed to DraftKings
 6   that says they cannot enforce those restrictive
 7   covenants against Mr. Hermalyn, to the extent that they
 8   are inconsistent with the law.
 9          THE COURT:  So why can't you go have your
10   hearing in federal court on April 2nd and, if you're
11   aggrieved, come right back here?
12          MS. KRISTOVICH:  So, Your Honor, one thing is
13   that he is allowed to work for Fanatics.  But there are
14   several aspects of his job that are being constrained
15   by some of DraftKings' conduct.
16          For example, he segregated all of his
17   contacts -- people he's met over the last three and a
18   half years -- because he wants to be holier than
19   Caesar's wife on this.
20          So he segregated everything.  And we have been
21   trying to get DraftKings, for three weeks now, to
22   engage in some process by which people who are
23   rightfully his contacts can go to him.
24          So, in other words, even his work that is
25   permitted under the Massachusetts order is being
26   inhibited by DraftKings' conduct.  And so we're not in
27   any way trying to get you to undercut --
28          THE COURT:  How is it being inhibited if it's
```

Abrams, Mah & Kahn

A237

```
 1   not within the scope of the federal court's order?

 2          MS. KRISTOVICH:  Sure.  So he took certain

 3   steps to make sure that he was not --

 4          THE COURT:  Yes.  I read that.  Yes.

 5          MS. KRISTOVICH:  -- going to be accused of

 6   anything.

 7          So DraftKings is refusing to engage in conduct

 8   that would allow the parties to sort out their

 9   respective interests in various contacts.

10          So, in other words, from now until April 2nd,

11   he can't pick up the phone and call someone --

12          Just let me give you a real-life example.

13          On a meet-and-confer call with DraftKings'

14   counsel, the counsel that's handling the Boston action,

15   I said, "What if his grandmother ever contemplated

16   placing a bet on DraftKings' website?  Would that turn

17   her into a potential customer that DraftKings would

18   consider confidential information?"

19          And the lawyer said, "Look.  Don't hold me to

20   this.  But, yes."

21          So that type of stuff is being done, and that

22   is inhibiting his ability to work.  And an order from

23   this Court would allow, actually, the implementation of

24   the Massachusetts Court --

25          THE COURT:  It's an interpretation of the

26   federal court order and the agreement that the parties

27   entered into.  Right?

28          MS. KRISTOVICH:  So not exactly.
```

**Abrams, Mah & Kahn**

A238

```
 1            MR. BRIAN:  But that agreement, Your Honor,
 2    under California law, is not valid.
 3            THE COURT:  It is as to trade secrets.
 4            MR. BRIAN:  No -- as to trade secrets, yes.
 5    As to trade secrets.
 6            But not as to his ability to pursue his
 7    employment with Fanatics.  And what Ms. Kristovich is
 8    saying -- they are interfering with that, and that is
 9    not permissible under the California law.
10            THE COURT:  Before I got the opposition on
11    your proposed form of order, I wrote a note to myself
12    that it was overbroad and inconsistent with what you
13    professed that you're asking for.
14            So the way I see the federal court order is:
15    "Mr. Hermalyn, you go to California.  Mr. Hermalyn, you
16    work for Fanatics.  You do whatever you want to do for
17    Fanatics, whatever Fanatics wants you to do for them.
18    But you cannot use confidential trade secret
19    information."
20            That's what the federal judge said about
21    status quo; that's what the federal judge said in the
22    February 8th hearing about not restraining him from
23    working for Fanatics.
24            It was all about the trade secret -- you know,
25    the transcript, which is quite lengthy for an ex parte
26    hearing, goes on and on and on about, you know, the
27    downloading of certain documents and the Super Bowl
28    plan and all of that stuff and where the downloading
```

14

```
 1   occurred and the IP address and all of that.
 2          I don't think -- I'm not inclined to issue any
 3   order today because you're not aggrieved.
 4          Because no one is disputing that California
 5   law would uphold trade secret.  Right?  That this is
 6   consistent with California law.  That's what the
 7   federal court does.
 8          This conversation between advocates about
 9   what -- "my grandmother, she wanted to place a bet,"
10   however you do it -- okay.  That's one person's
11   position.  That's one company's position.
12          You have the other position.  Somebody has to
13   litigate that at some point.
14          Yes, sir.
15          MR. BRIAN:  I guess the question,
16   Your Honor -- maybe it's a question that I would ask
17   you to put to DraftKings' counsel -- is:  Do they
18   contend that Mr. Hermalyn, in working for DraftKings,
19   is permitted to go out and solicit customers?  Do they
20   agree with that?
21          THE COURT:  Sure.
22          Would it be your position that Mr. Hermalyn
23   could solicit customers, so long as he doesn't have
24   trade secret information about them?
25          MR. BRIAN:  Yes.
26          THE COURT:  Would you concede that?
27          MR. BRIAN:  Yes.  Yes, he can.
28          THE COURT:  Don't you think that's the way the
```

**Abrams, Mah & Kahn**

1   federal court order reads?

2          MR. BRIAN:  I hope it does.  I'm not sure

3   DraftKings agrees with that.

4          THE COURT:  Okay.  But I started out to give

5   you a tentative about where I am, and I don't know that

6   I've moved from that.  That's the only reason I haven't

7   talked to DraftKings.

8          MR. BRIAN:  But, again, Your Honor, I go back.

9   And two things.

10         One, we're not seeking to enjoin that order.

11  We are seeking to get a ruling from this Court that

12  enforces the restrictive covenants to the extent

13  they're not inconsistent with that because we do think

14  the law --

15         The California legislature said expressly that

16  it's important for the California law to be used to

17  educate a Court in a non-California forum.

18         THE COURT:  So which statute tells me that?

19  I've got the three statutes you all cite in front of

20  me.

21         MR. BRIAN:  We cite that on pages 22 and 23 --

22         THE COURT:  Which Business and Professions --

23         MR. BRIAN:  -- of our opposition.

24         It's in the legislative history, I believe.

25         THE COURT:  Okay.  So I'm not sure I really

26  need to get to the legislative history, given the clear

27  language in the statute.  Right?

28         If you go to federal court on April 2nd and an

**Abrams, Mah & Kahn**

```
 1   order is made that would restrict Mr. Hermalyn,
 2   wouldn't you then have something to complain about
 3   here?
 4          I mean -- and I don't know what Mr. Fogelman's
 5   statement is going to be.  But if I read the order and
 6   the federal judge seems to emphasize in her most recent
 7   order and didn't, then, discuss during the hearing
 8   about trade secrets, isn't that really the focus of
 9   that order?
10          MR. BRIAN:  I think so.  But if the judge
11   there does what you just hypothesized and goes broader
12   than that, I suspect that DraftKings are going to take
13   the position that we're bound by that.
14          And that's exactly why we need an order now so
15   that the Court in Massachusetts has the benefit of a
16   judicial ruling in California that says, "DraftKings,
17   you are restricted in applying the covenants, to the
18   extent you do X, Y, and Z."
19          I thought about the order this morning.  Early
20   this morning, you can imagine.  We got the papers, I
21   think, at 11:38 p.m.  So I was up very early, reading
22   the papers.  And I looked at the order.  And I
23   anticipated that Your Honor might say that the order is
24   too broad.
25          And I would say this:  With all respect,
26   that's not a basis, I would argue, for denying our
27   request.
28          I'm happy to redraft the order.  We can do it
```

**Abrams, Mah & Kahn**

A242

 1   now.  We can submit a revised order.

 2          THE COURT:  Sure.  I -- of course.  Right.

 3          Before I even had the opposition, I knew -- as

 4   I said, I noted for myself that the scope of the order

 5   is just too broad.  It's not consistent with your

 6   papers.

 7          So let's say I make the order.  This is really

 8   sort of this rush to the courthouse.  Right?  The two

 9   redemands, all -- the two removals, all of that.

10          So I make the order.

11          Do you think the federal judge is going to

12   say, you know, "Judge Beckloff in Los Angeles, this

13   nice state court judge, made that order, and I'm not

14   going to make any order because it doesn't matter to a

15   citizen of my state"?

16          MR. BRIAN:  I think the judge in Massachusetts

17   will rule on the preliminary injunction.

18          THE COURT:  Right.

19          MR. BRIAN:  I think the judge, with all

20   respect to her there, was misled, to some extent,

21   because DraftKings' counsel argued, for example, that

22   he was only a resident for six days in California.

23          THE COURT:  Sure.

24          MR. BRIAN:  That is an irrelevant factor in

25   California.

26          In fact, the legislature expressly encourages

27   people to move to California to take advantage of this.

28          And they go so far in their papers to suggest,

**Abrams, Mah & Kahn**

A243

1    one, the residence is a sham; the whole thing is a

2    sham --

3            You know, companies decide to reside in states

4    or jurisdictions every day to take advantage of the

5    favorable laws here.  There's nothing wrong with that.

6    People move there because of tax laws.  People make

7    films in Georgia or Canada because it's advantageous.

8    There's nothing wrong if that's what happened here.

9            Mr. Hermalyn doesn't even need to be a

10   resident under the California law.  He can be not a

11   resident, so long as he's working for a

12   California-based employer, which he is.

13           So I think it would be helpful for

14   Your Honor --

15           We're not asking for an advisory opinion.

16   We're asking for a temporary restraining order that

17   restrains DraftKings from enforcing the restrictive

18   covenant to bar him from doing certain things while

19   he's at Fanatics.  Not to use confidential information.

20   We're not saying that.

21           But they are interfering right now with his

22   ability to go out and get clients.  They're calling up

23   his management at Fanatics and telling them he's a bad

24   guy and doing all that kind of stuff.  Why are they

25   doing that?

26           They are trying to undercut his ability to

27   engage in a profession for a California-based employer,

28   which is precisely what the statute is intended to

**Abrams, Mah & Kahn**

A244

1   police.

2           THE COURT:  Okay.  Mr. Fogelman.

3           MR. FOGELMAN:  Thank you, Your Honor.  And

4   thank you for reading all the papers, given the limited

5   time we had to give them to you.

6           THE COURT:  Thank you for getting them filed

7   last night.

8           MR. FOGELMAN:  I appreciate that, Your Honor.

9           Let me start by saying, as I think you've read

10  from our papers, that there is no jurisdiction over

11  DraftKings.  The general jurisdiction set up by the

12  supreme court is very clear.  You've got to be

13  registered in California, or you've got to have your

14  principal place of business here.

15          It's not about alleged contacts, and it's not

16  about, you know, some potential effect.  That's well

17  said.  So there's no personal jurisdiction here.

18          We are specially appearing today without

19  waiving the right to file, and we intend to file a

20  motion to quash, which isn't due until March 11th

21  because service didn't take place until February 9th.

22          But we are intending to file a motion to quash

23  based on the lack of personal jurisdiction.  That's

24  where we start.

25          The odd part about today is it's untethered to

26  anything.  It's untethered to the complaint; it's

27  untethered to the application, this order; and it's

28  untethered to the law.  It's untethered to reality.

**Abrams, Mah & Kahn**

A245

1          I looked at this proposed order, as you did.

2     So I'll start there, and I'll work back the argument to

3     respond to some of the points made.

4          They claim in the papers that they're not

5     seeking any kind of injunctive relief against the

6     federal court in Massachusetts, which they can't, as a

7     matter of law.  There's a statute expressly on point,

8     3423 in the Civil Code, prohibiting it, as well as law

9     prohibiting it.  You can't do it.

10          But, in the order, they're asking for just

11     that.  This order asks for a complete prior restraint.

12          Let's just start from the basis here.

13          The complaint.  The complaint says, for a guy

14     who lives in New Jersey but claims he's going to be

15     here soon -- "I am moving to California, and I want to

16     be able to compete."  And that's it.

17          It doesn't say, "I have trade secrets of

18     DraftKings.  I'm asking the Court to nullify them" or

19     "asking the Court for permission to use them or steal

20     them."

21          And there's evidence in the record, primarily

22     in the Harris declaration, but also in the Karamitis

23     declaration -- and you can see it in the Court's order

24     in Boston -- already found, with Mike Hermalyn's

25     access, that he has actually stolen information.

26          And we will put in evidence that he's deleted

27     evidence and spoliated it, trying to hide his tracks.

28          But there's nothing in the statute which

A246

```
 1    governs the right to steal and use trade secrets.  The
 2    statute issue, we'll talk about in a moment.
 3           And there's nothing in the complaint asking
 4    for a ruling from this Court or any Court to make a
 5    ruling on the trade secrets of DraftKings.
 6           Also, nothing about harassment that they're
 7    alleging for the first time in these papers and the
 8    declaration.  No claim of harassment or post-filing --
 9    literally, that would have to be -- post-filing
10    conduct.
11           It's simply a dec relief, basically.  They
12    want to avoid a statute under a new law which just took
13    effect last month and which is constitutionally suspect
14    when applied to the facts here, at the very least.
15           Look at the order, though.  Okay?  The order
16    says they want a broad bar, attempting to -- barring
17    DraftKings to enforce its contractual rights.  That is,
18    by definition, the anti-injunction or anti-lawsuit
19    injunction they're saying in the papers they're not
20    seeking.
21           Can't have that under the precedent and the
22    statutes we've talked about.  But that's what that is.
23    It's also prior restraint is what that would be.
24           We're in federal court.  We have a federal
25    court order which just preserves the status quo, as you
26    know, allows him, at least for now, to work at
27    "DraftKings."
28           And I would also note it just limits it to not
```

Abrams, Mah & Kahn

A247

1    stealing the information; using stolen information,

2    trade secrets, confidential and propriety information;

3    or soliciting employees or customers in the same vein.

4            In the next point I want to make, they also

5    have a part two.  They say no harassment.

6            Not in the complaint.  Don't know what they're

7    talking about.  It seems like a prior restraint, which

8    would be an anti-SLAPP issue if this were

9    jurisdictioned here.

10           But, again, not in the complaint.  Not even in

11   the TRO itself.  Not even tethered to the application.

12   So this order itself is crazy.

13           But, like I said, there's no legal basis for

14   it, even if there were jurisdiction, and there's not.

15           Now let's look at the points that were made

16   just now.

17           Let's start with why we're here.

18           Asking this Court to issue an advisory opinion

19   is not proper.  We cited authority.  I cited a lot of

20   things.

21           The Salazar case, 9 Cal.4th 836, jump cite

22   860.  Can't issue an advisory opinion.

23           And the federal court in Boston is not asking

24   anyone for advice.  The federal court is hearing the

25   same arguments from these counsel that they're putting

26   before Your Honor today.

27           They're arguing that the statute applies and

28   the California law applies, et cetera.  And the Court

**Abrams, Mah & Kahn**

A248

1    has made rulings, to date, denying relief.

2          Now, they say that they're unclear of what the

3    order means.  But we put before Your Honor motions to

4    clarify they've also filed, which she found were

5    motions to reconsider.

6          They've had the ability to ask for

7    clarification.  They have done it.  Okay?  They have to

8    comply with the federal court order, or they'll be in

9    contempt.

10         They cannot ask this Court to enjoin that

11   Court or to tell that Court what the right result is.

12         And they cannot ask DraftKings, as they do in

13   the proposed order, not to seek redress in the courts

14   or to mention the lawsuit or talk about things that

15   they're allowed to talk about legally, like their

16   business.

17         But that's what this order would have you do.

18         You can't issue an advisory opinion.  But even

19   if you could, what would the emergency be?

20         As Your Honor said, they're litigating the

21   issue.  The only reason it's being heard on April 2nd

22   is because they themselves, Mr. Hermalyn's counsel,

23   asked for a very lengthy delay, as confirmed yesterday

24   in the order by the Court too.  It was delayed to

25   April 2nd at Mr. Hermalyn's request.

26         If it wasn't an emergency to have the issue

27   resolved in Boston, it isn't an emergency to get an

28   advisory opinion from this Court today.

A249

```
 1            Now, that doesn't make any sense.  There's no
 2     emergency and no rights to the relief sought.
 3            With regard to the statute, there's
 4     substantial reason to doubt that he's a resident.  But
 5     we need to resolve the personal jurisdiction issue
 6     before we can engage in discovery on that point.
 7            Again, he's making those arguments in Boston.
 8     Therefore, there's no emergency to have this Court
 9     issue an advisory opinion today -- which also isn't
10     allowed.
11            So I could go on and on and on, Your Honor --
12            THE COURT:  So you raise a contract claim
13     issue.  I suspect you'll raise a retroactivity
14     argument.  All kinds of issues about the statute for
15     which there is not yet some appellate authority.
16            Let me ask you a question.
17            Is it DraftKings' position that, if
18     Mr. Hermalyn's mother -- grandmother had at one time
19     considered or contemplated making a bet on DraftKings,
20     however that works, that he could not contact her?
21            That was the hypothetical.  I'm just
22     wondering, Mr. Fogelman, what --
23            Because, to me, I think paragraph D of the
24     federal court's order, presumably prepared by
25     DraftKings, is a little bit unclear because there's the
26     "or" in the language -- "about which Mr. Hermalyn
27     learned confidential information or which Mr. Hermalyn
28     had some involvement or knowledge relating to."
```

A250

1          That's a little loose.  But is it your
2    position that, somebody who contemplated making a bet
3    on DraftKings at some point in the past, Mr. Hermalyn
4    could not contact without violating this order?
5          MR. FOGELMAN:  Your Honor, I would reserve for
6    the Boston Court what I think the Boston Court's order
7    covers.  With all due respect, I haven't thought
8    through all the hypotheticals.
9          I can tell you the order, to me, appears to be
10   clear on the inability to solicit DraftKings' employees
11   and -- which is also not prohibited by the statute
12   we're talking about.
13         THE COURT:  I agree.
14         MR. FOGELMAN:  It's clear on not using the
15   confidential information.
16         I cannot tell you all the circumstances under
17   which that confidential information could have arisen.
18         But I can tell you, if you look at the Harris
19   declaration, this person has stolen the most sensitive
20   trade secrets this company has, and he's telling you in
21   a declaration today that he can't operate without using
22   those trade secrets.
23         That's not something they can come to any
24   Court, including this Court, and ask for permission to
25   do.
26         So asking DraftKings' counsel on the fly to
27   talk about a conversation I wasn't party to, a
28   grandmother I don't know even exists, facts which I'm

 1   not aware of isn't really the point.

 2         The point is they do not have the right to

 3   seek an order from this Court to advise the Court in

 4   Boston -- let alone on a TRO basis -- of what it should

 5   do in Boston.

 6         They have made these arguments not just in the

 7   original TRO; they made them in multiple post-TRO

 8   motions that the Court has ruled upon, including as

 9   late as yesterday.  They can make the argument if they

10   think there's an exception to the rule.

11         And as the Court said yesterday, all aspects

12   of the order are subject to review on April 2nd.  All

13   aspects.

14         So there's no reason to worry about whether

15   there's some potential reading of it that they think is

16   broader than they would like it to be because they're

17   going to challenge the entirety of the order on

18   April 2nd.  Could have been earlier, but they asked for

19   it to be delayed.

20         THE COURT:  Would you concede that there's a

21   distinction to be drawn about Mr. Hermalyn using

22   confidential trade secret in his position --

23   information in his position with Fanatics and just

24   going out and doing business?

25         I mean, that's the problem.  Right?

26         Because, if you are -- if DraftKings is taking

27   the position that he may not solicit customers, even if

28   they're not related to confidential trade secrets or

1    confidential information, then that's a problem because

2    it prevents him from doing his job.

3            MR. FOGELMAN:  Well, Your Honor, I can only

4    tell you the following.

5            The order in Boston is clear that he cannot do

6    the things outlined in the order as being prohibited,

7    which includes taking the confidential information.

8            It is also clear he can work at Fanatics.

9            So nothing would stop him, for example, from

10   calling someone brand new tomorrow and saying, "Hey" --

11   maybe that's his grandmother, for all I know -- "would

12   you like to place a bet at Fanatics?"

13           Until April 2nd, that issue is decided.  He

14   can work at Fanatics, and he can compete.  But he can't

15   do the things prohibited by the order.

16           The Court in Boston is the one who will decide

17   whether they are violating the order.  The Court in

18   Boston will decide if they're in contempt of that

19   order.

20           It isn't for this Court to start thinking

21   about whether there's an interpretation of that order,

22   which is broad.

23           And I recognize it's of prudent interest to

24   everybody, including Your Honor.  But it's not before

25   the Court.

26           The Court today is being asked to issue this

27   proposed order -- I've got notes.  I'm not holding the

28   order itself up -- which has the prior restraints, both

1   a lawsuit and a speech, and an anti-suit injunction of

2   a federal court in Boston.

3           None of which is allowed, period, full stop.

4           And against the defendant, which has no

5   business being in this court because there's no

6   personal jurisdiction over the defendant.

7           That's what we're here on today.  And if you

8   look at the papers alone -- forget the proposed order,

9   which has to be stricken no matter what.

10          If you look at the papers alone, it's asking

11  only for an advisory opinion, which isn't allowed and

12  isn't an emergency and isn't necessary.

13          They can go to court on April 2nd.  They'll

14  file the papers before then.  They've got a right to

15  discovery and a right to make whatever arguments they

16  want to the Court in Boston.

17          This is not the time.  This is not the

18  procedural posture.  And this is not the court for

19  those arguments to be made.

20          THE COURT:  Okay.  Mr. Brian.

21          MR. BRIAN:  Your Honor, that long answer is

22  precisely why we're here today.  Precisely.

23          With all respect to my colleague, he did not

24  answer your question.

25          The clients of DraftKings are not exclusive to

26  DraftKings.  They are not.

27          Mr. Hermalyn has the right to solicit those

28  clients so long as he does not use the confidential

A254

```
 1   information.
 2           You asked counsel that exact question, and he
 3   refused to answer it.
 4           And that is exactly what they're interfering
 5   now.
 6           Now, he says, "Well, the complaint doesn't
 7   argue that."
 8           Because they've taken the steps after we filed
 9   the complaint.
10           The only reason that they had a hearing in
11   Massachusetts before we were here is because they
12   frivolously removed the case twice and it was remanded
13   to this Court twice with an order from the federal
14   court inviting us to file a motion for attorneys' fees.
15           That's why we're now second, so to speak.
16           We acted very promptly.  They acted wrongly in
17   doing that and got an order from a Court who did not
18   have the benefit of the California law.
19           They come in here now and say there's no
20   personal jurisdiction?
21           If they thought -- Your Honor, if they thought
22   there was no personal jurisdiction, they should have
23   filed a motion to dismiss.
24           We filed this complaint on February 1st.
25           We filed a declaration this morning.  I don't
26   know if Your Honor had an opportunity to read it, the
27   supplemental declaration of my colleague Anne Conley.
28           And I'll say this.
```

**Abrams, Mah & Kahn**

1          It is very clear that there was personal

2    jurisdiction.  There was specific jurisdiction because

3    DraftKings has acted in a way that has caused negative

4    consequences on California residents.

5          That's the law in Calder versus Jones,

6    465 U.S. 783-789, where the United States Supreme Court

7    said that a nonresident defendant may be hailed into

8    the forum state where its acts or omission caused an

9    effect in that forum state.

10          Same result in Taylor-Rush versus Multitech

11    Corp., 217 Cal.App.3d 103 at 112.  We also filed

12    papers -- their own papers, their 10-K, their filings

13    with the State of California where they concede they

14    can be sued in the State of California.

15          So, this -- I mean, to me, when I read their

16    papers at 3:00 o'clock this morning, it was quite

17    telling that it wasn't until page 18 of their papers

18    that they dealt with the merits of the statute.

19    Because they can't win that argument.

20          So the arguments they make are no personal

21    jurisdiction, which is wrong.  And that, somehow,

22    they're excused from the restrictive covenants because

23    of their contested accusations that Mr. Hermalyn

24    somehow misappropriated trade secrets.

25          First of all, he didn't.  He denies all of

26    that.

27          Secondly, the allegations they make are based

28    on conduct while he was working at DraftKings.  They

**Abrams, Mah & Kahn**

A256

1   have no evidence at all of his supposed use of

2   confidential information after he left DraftKings.

3           They submitted an affidavit or declaration

4   from some IT guy at DraftKings, not the employees with

5   who Mr. Hermalyn was working.

6           So, Your Honor, we need an order from

7   Your Honor that addresses exactly the question that

8   Mr. Fogelman refused to answer, which is our client has

9   a right to go out and do business with customers,

10  existing customers of DraftKings, so long as he does

11  not do that under -- with the use of confidential

12  information.

13          And we think they are taking steps right now

14  to interfere with that.

15          They also have the ability to forfeit his

16  equity under that contract.  We need an order that

17  prevents them from doing that.

18          And, again, Your Honor, just to go back to

19  where I started, we would have been here two weeks ago

20  but for the wrongful conduct by DraftKings in removing

21  these actions.

22          Now, I'm not arguing that, because we were

23  first, we necessarily win.  I get that.

24          But it does say, to me, and I hope it says to

25  you, that the fact that the judge did not have the

26  benefit of a judicial order in California restraining

27  them from acting was harmful to us.  And it's harming

28  Mr. Hermalyn now.

**Abrams, Mah & Kahn**

A257

```
 1              MR. FOGELMAN:  Your Honor, I appreciate the
 2    Court has a tentative.
 3              I'm offended by what I've just heard, and I'd
 4    like to respond to some of them briefly.
 5              First of all, there's been no finding of
 6    wrongful removal.  None.  There won't be a finding of
 7    wrongful removal.
 8              These people created a company in
 9    California -- or they claim to have it in Nevada -- the
10    day before they filed.
11              While he was supposedly on bereavement leave,
12    he supposedly -- like, out for a friend.  He's in
13    California, claiming he rented an apartment.  There's
14    no evidence he's ever been to that apartment.
15              There's lots of things going on here, but
16    there's no wrongful conduct on the part of DraftKings.
17              DraftKings removed it.  We'll defend it.
18    We're in federal court defending that claim now, and
19    we'll deal with it in that court.
20              Once again, it's not this Court who is the
21    appropriate forum to hear that.
22              They can ask the federal court to make that
23    ruling.
24              There's been no wrongful conduct by DraftKings
25    or its counsel.
26              There has been absolute proof in the record by
27    the Harris declaration we submitted and the Karamitis
28    declaration that he has stolen the most important
```

A258

1    documents at DraftKings and then deleted the evidence
2    of it.
3            And there's a finding by a federal court of
4    that wrongful conduct being likely to be proved at
5    trial.
6            So the suggestion of, quote, "no evidence" for
7    it is wrong.
8            And then, finally, there is no complaint
9    alleging wrongful contacts with California, and there's
10   no complaint about harassment.
11           Just so you have it because I'm sure you want
12   to know it just offhand -- the Walden versus Fiore
13   case, 571 U.S. 277 from 2014, says, even if there was
14   an alleged effect in California -- and there's no
15   allegation of that -- it wouldn't be enough for
16   jurisdiction.
17           So there's no jurisdiction.  We'll let you
18   decide that on the hearing of our motion to quash.  But
19   the suggestion that we should have been here earlier
20   with our response --
21           The complaint wasn't served until eight days
22   after the complaint and ex parte were filed on
23   February 9th.
24           Our answer and our motion to quash aren't even
25   due yet, Your Honor.
26           So suggesting that we were the ones who are
27   holding off on that is silly.
28           And just one last thing.  The reason they

A259

 1  didn't have an ex parte here in this court is they

 2  didn't file the ex parte.  The Court said it wasn't

 3  filed.  That's just a misstatement by counsel.  I'm

 4  sure inadvertent.

 5           MR. BRIAN:  So two final things.

 6           One, we e-mailed them within hours of our

 7  filling the complaint.  Within hours.

 8           Secondly, I was in a hearing in Las Vegas a

 9  couple weeks ago.  And counsel stood up and accused

10  somebody of stealing.  And the judge said to counsel,

11  "Before you accuse somebody of stealing, you'd better

12  have proof."

13           And talk about offensive.  There is no proof

14  that Mr. Hermalyn stole confidential information that

15  he is using after he left.  None.  It is speculative,

16  Your Honor.

17           THE COURT:  I don't need to go there.  I don't

18  need to go there in the theft.  Right?  That is all

19  going to be adjudicated on April 2nd, at least for

20  purposes of a preliminary injunction.

21           I'm not going to issue an order today.  You're

22  welcome to come back.

23           As I read the transcript from February 8th and

24  this order from February 21st, Mr. Hermalyn is not

25  restrained from working for Fanatics and doing his job

26  at Fanatics, except to the extent that it uses

27  confidential or trade secret information.

28           And I acknowledge and concede that paragraph D

A260

 1   is a little bit unclear.

 2          But it seems to me, based on the conversation

 3   that counsel had with the federal judge or the argument

 4   and the statement made by the judge on 2/21, which

 5   emphasizes the line about confidential information,

 6   that that's what Mr. Hermalyn is restrained from using

 7   in his new position, which we all concede is

 8   enforceable in this contract based on the severance

 9   clause.

10          I appreciate that the new statute, on its

11   face, would say that the noncompete clause is

12   unenforceable.  Whether there's a contract clause

13   problem, whether there's a jurisdiction problem,

14   whether there's a retroactivity problem is for another

15   day.

16          So I understand the statutes are -- you know,

17   it's not like a government code statute that can go on

18   for pages and pages.  Very clear, very concise.  So

19   it's pretty clear about what the legislature did.

20          When and if Mr. Hermalyn is aggrieved or there

21   is some clarification that he may not solicit random

22   people because they might have thought, like his

23   grandmother, of placing a bet, then that would be a

24   different fact than we have today.

25          So I'm denying the ex parte application today,

26   without prejudice to some change in facts.

27          If you're aggrieved on April 2nd, you're

28   welcome to come back.  All right?

```
 1              MR. FOGELMAN:  Thank you, Your Honor.
 2              MS. KRISTOVICH:  Thank you, Your Honor.
 3              Just one point of clarification.  I just want
 4    to make sure that I'm understanding.
 5              We will continue to work on sorting out the
 6    issue in paragraph D that Your Honor identified.  If we
 7    can't, we may seek Your Honor's guidance before
 8    April 2nd.  And I just want to make sure that that's --
 9              THE COURT:  As long as you file it before
10    10:00 a.m. the day before.
11              MS. KRISTOVICH:  We understand.  And get the
12    filing accepted --
13              THE COURT:  Can I just ask a real practical
14    question.
15              So the scope of the clause is 12 months.
16    Right?  So I suppose, in a lot of ways, the preliminary
17    injunction sort of decides the case, I mean, whether
18    here or there, because you're not going to have it
19    litigated in 12 months.
20              I understand there's a lot of conflict.
21    Right?
22              With a 12-month noncompete clause, doesn't it
23    make sense for them to sit down early on, before all
24    of --
25              I mean, you've been to federal court.  You've
26    got, now, an invitation to file a motion for fees.
27    You've been to a federal court here.  You've been in a
28    federal court in the Commonwealth of Massachusetts.
```

**Abrams, Mah & Kahn**

A262

```
 1              You know, it's a 12-month noncompete clause.
 2              I think it would behoove the parties to just
 3   get it resolved early on.
 4              MR. BRIAN:  I appreciate that, Your Honor.
 5              THE COURT:  I mean, instead of a constant,
 6   consistent clash of the titans.
 7              MR. BRIAN:  Thank you, Your Honor.
 8              MR. ARMILLEI:  One small point on the 12-month
 9   noncompete clause.
10              THE COURT:  Yes.
11              MR. ARMILLEI:  There's a provision in
12   Mr. Hermalyn's contracts that essentially says, for the
13   period between a challenge by Mr. Hermalyn to a final
14   adjudication on the merits -- so, when that period is
15   outstanding, it will extend the period of his
16   restrictive covenant.
17              THE COURT:  Okay.  I didn't see that.
18              MR. ARMILLEI:  So there is a possibility that
19   this is beyond 12 months.
20              THE COURT:  I didn't see that.  Very simple,
21   simplistic view --
22              MR. FOGELMAN:  Your Honor, I want to say the
23   counsel who spoke is not a moving party, should not be
24   speaking on the application at all.  Also --
25              THE COURT:  I do get to call the shots.
26   Right?
27              MR. FOGELMAN:  I understand, Your Honor.
28              And I would also say that I'm not going to
```

**Abrams, Mah & Kahn**

1    argue what it does.

2           We'll be back in the appropriate court at the

3    right time, arguing what it does and whether it's

4    enforceable.  Today is not that day.  This is not the

5    court.

6           THE COURT:  Okay.

7           Waive notice?

8           MR. BRIAN:  Yes, Your Honor.

9           MR. FOGELMAN:  Yes, Your Honor.

10          THE COURT:  Thank you.  Take care.

11          (Proceedings adjourned at 9:24 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Abrams, Mah & Kahn**

A264

```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2             COUNTY OF LOS ANGELES, CENTRAL DISTRICT

 3    DEPARTMENT 86          HON. MITCHELL L. BECKLOFF, JUDGE

 4

 5    MICHAEL Z. HERMALYN and    )
      FVP, LLC,                   )
 6                               )
              Plaintiffs,        )     SUPERIOR COURT
 7                               )     No. 24STCV02694
          vs.                    )
 8                               )
      DRAFTKINGS, INC.,          )
 9                               )     REPORTER'S
              Defendant.         )     CERTIFICATE
10    _____)

11

12            I, JEAN KIM, Reporter Pro Tempore of the

13    Superior Court of the State of California, for the

14    County of Los Angeles, do hereby certify that I did

15    correctly report the proceedings contained herein and

16    that the foregoing pages 1 through 38, inclusive,

17    comprise a full, true, and correct transcript of the

18    proceedings and testimony taken in the matter of the

19    above-entitled cause on 22nd of February, 2024.

20

21            Dated this 23rd of February, 2024.

22

23                         _____

24                         JEAN KIM, CSR NO. 13555
                           COURT REPORTER PRO TEMPORE
25

26

27

28
```

**Abrams, Mah & Kahn**

A265

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

DRAFTKINGS, INC.,

*Plaintiff,*

v.

MICHAEL Z. HERMALYN,

*Defendant.*

Civil Action No. 1:24-cv-10299-JEK

---

**DECLARATION OF DEFENDANT MICHAEL Z. HERMALYN**
**IN SUPPORT OF HIS MOTION TO DISMISS OR, IN THE**
**ALTERNATIVE, TO STAY**

---

## <u>DECLARATION OF MICHAEL Z. HERMALYN</u>

I, Michael Z. Hermalyn, hereby declare, under penalty of perjury, the following:

1.      I am over the age of 18 and have personal knowledge of the facts set forth in this Declaration.  If called upon to do so, I could and would testify competently thereto.

2.      On January 28, 2024, I decided that, subject to an agreement on key offer terms, I was going to accept a job to be the head of Fanatics' Los Angeles office and President of VIP—a job that requires me to live and work in person in Los Angeles.  That night, I took a flight to Los Angeles and moved there one day later.  Since January 28, I have spent the vast majority of my time in California.

3.      On March 6, 2024, I was in New York for Fanatics' board meeting and my deposition in this matter.  On March 7, 2024, my wife and children traveled back with me to California, where my wife remains.  During this period, my wife and I engaged a Los Angeles-area real estate broker and toured Los Angeles neighborhoods to identify our preferred location for a home for our young family.  On March 14 and March 15, my wife and I are scheduled to look at homes for potential purchase and tour elementary and pre-schools for our daughters.

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 14, 2024, in Los Angeles, California.

By: _____

Michael Z. Hermalyn

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served on Plaintiff's counsel on the date below via email and will be filed through the ECF System and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: March 14, 2024

Russell Beck

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| DRAFTKINGS INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL HERMALYN <br><br> Defendant. | Civil Action No. 1:24-cv-10299-JEK |

## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

Pursuant to Federal Rule of Civil Procedure 65, DraftKings Inc. ("DraftKings" or the "Company") respectfully moves for the issuance of a preliminary injunction finding that:

1. There is a likelihood of success on the merits for all of DraftKings' claims in the Verified Complaint;

2. DraftKings will be irreparably harmed in the absence of a preliminary injunction restraining and enjoining Defendant as set forth below, and monetary damages would provide inadequate relief;

3. The balance of equities favors granting a preliminary injunction restraining and enjoining Defendant as set forth below;

4. A preliminary injunction restraining and enjoining Defendant as set forth below is in the public interest;

5. During the six (6) month period prior to February 1, 2024, Defendant performed services and/or received Confidential Information[1] concerning the following aspects of DraftKings' business: (i) FSC;  (ii) Gaming;  (iii) Marketplace; (iv) eCommerce; and (v) Media.

---

[1] All defined terms shall have the meaning ascribed to such terms in the [Proposed] Preliminary Injunction filed contemporaneously herewith.

6.      Section (g) of the Noncompetition Covenant extends the duration of Defendant's non-competition obligations as set forth therein.

7.      Pursuant to Section (f) of the Noncompetition Covenant and Section 9 of the Confidentiality Agreement, the internal substantive laws of Massachusetts govern those agreements.

DraftKings further moves for the issuance of a preliminary injunction restraining and enjoining Defendant from:

a)      using or disclosing any of DraftKings' Confidential Information.

b)      moving, destroying, deleting, altering, or otherwise disposing of any files, documents, and digital media that contain any Confidential Information and/or that are derived from such information;

c)      acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise, (1) providing any services to Fanatics relating to FSC, Gaming, Marketplace, eCommerce and/or Media and any type of ancillary service or product related to or connected with the foregoing; and/or (2) providing any services to Fanatics relating to any other aspect of the Business of DraftKings for which Defendant performed services and/or received Confidential Information at any time during the six (6) month period prior to February 1, 2024; and/or (3) committing a Threatened Breach of the obligations set forth in this paragraph;

d)      directly or indirectly, either for himself or for any other person, partnership, legal entity, or enterprise, (i) soliciting or transacting business, or attempting to solicit or transact business with, any of DraftKings' customers, clients, vendors or partners, or with any of DraftKings' prospective customers, clients, vendors or partners about which Defendant learned Confidential Information or which Defendant had some

A270

involvement or knowledge related to the Business of DraftKings; and/or (ii) committing a Threatened Breach of the obligations set forth in this paragraph.

e)       directly or indirectly, either for himself or for any other person, partnership, legal entity, or enterprise: (i) soliciting, in person or through supervision or control of others, an employee, advisor, consultant or contractor of DraftKings for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with DraftKings or to change an existing business relationship to the detriment of DraftKings; (ii) hiring away an employee, advisor, consultant or contractor of DraftKings; (iii) helping another person or entity hire away a DraftKings employee, advisor, consultant or contractor; and/or (iv) committing a Threatened Breach of the obligations set forth in this paragraph.

DraftKings respectfully requests that the Court's preliminary injunction pertaining to paragraphs (a)-(b) above shall remain in effect, and that the Court's preliminary injunction pertaining to paragraphs (c)-(e) shall remain in effect for twelve (12) months from the date of the Court's preliminary injunction.

As set forth more fully in DraftKings' Memorandum of Law, Affidavits, and Exhibits,[2] among other things, Defendant misappropriated DraftKings' trade secrets and confidential information in violation of his contractual obligation not to use or disclose DraftKings' Confidential Information without authorization as well as federal and Massachusetts law, breached his contractual obligation not to compete against DraftKings, and breached his contractual obligation not to solicit DraftKings' employees, customers, and partners.  In the absence of a preliminary injunction, DraftKings will continue to suffer immediate and

---

[2] DraftKings provides detailed descriptions of certain relevant documents in the accompanying Memorandum of Law and Affidavits, but is not filing those documents as exhibits because they are voluminous and contain DraftKings' confidential and highly sensitive business and trade secret information.  To the extent the Court's consideration would benefit from review of such documents, DraftKings stands ready to provide them to the Court in camera.

irreparable harm.   The balance of equities favors entering a preliminary injunction.   A preliminary injunction is in the public interest.

In support of this motion, DraftKings relies upon the accompanying Memorandum of Law, Affidavits, and Exhibits.

DraftKings reserves all of its rights to pursue all available relief from Defendant, including its right to seek, among other things, reasonable attorneys' fees, costs, and expenses arising from the successful enforcement of the Noncompetition Covenant and Confidentiality Agreement, and hereby waives none.

Dated: March 14, 2024                       Respectfully submitted,

                                            /s/   Andrew S. Dulberg
                                            William F. Lee (BBO #291960)
                                            Andrew S. Dulberg (BBO #675405)
                                            WILMER CUTLER PICKERING
                                                HALE AND DORR LLP
                                            60 State Street
                                            Boston, MA 02109
                                            Telephone: (617) 526-6000
                                            E-mail:  andrew.dulberg@wilmerhale.com

                                            GIBSON, DUNN & CRUTCHER LLP
                                            Orin Snyder (*pro hac vice*)
                                            Harris M. Mufson (*pro hac vice*)
                                            Justine M. Goeke (*pro hac vice*) Christine
                                            Demana (*pro hac vice*)
                                            Justin M. DiGennaro (*pro hac vice*)
                                            200 Park Avenue
                                            New York, NY  10166-0193
                                            Tel:  212.351.4000
                                            Fax:  212.351.4035
                                            OSnyder@gibsondunn.com
                                            HMufson@gibsondunn.com
                                            JGoeke@gibsondunn.com
                                            CDemana@gibsondunn.com
                                            JDiGennaro@gibsondunn.com

                                            Jason C. Schwartz (*pro hac vice*)
                                            Jacob T. Spencer (*pro hac vice pending*)
                                            1050 Connecticut Avenue, N.W.

A272

Washington, D.C. 20036
Tel:  202.955.8500
JSchwartz@gibsondunn.com
JSpencer@gibsondunn.com

*Attorneys for Plaintiff DraftKings, Inc.*

A273

**CERTIFICATE OF SERVICE**

I, Andrew S. Dulberg, counsel for Plaintiff, hereby certify that on March 14, 2024, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will simultaneously serve notice of such filing to counsel of record to their registered electronic mail addresses.

/s/ Andrew S. Dulberg
Andrew S. Dulberg

**RULE 7.1(A)(2) CERTIFICATE**

I, Christine Demana, hereby certify that on March 14, 2024, counsel for DraftKings conferred with counsel for the Defendant, and were unable to resolve or narrow the issue.

/s/ Christine Demana
Christine Demana

-6-

A274

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

DRAFTKINGS INC.,

                        Plaintiff,

            v.                                                    Civil Action No. 1:24-cv-10299-JEK

MICHAEL HERMALYN

                        Defendant.

---

## [PROPOSED] PRELIMINARY INJUNCTION

Upon Plaintiff DraftKings Inc.'s ("DraftKings" or the "Company") Motion for Preliminary Injunction (the "Motion"), and upon consideration of the Memorandum of Law, Affidavits, and Exhibits in support of the Motion, the Court hereby FINDS that:

1.  There is a likelihood of success on the merits for all of DraftKings' claims in the Verified Complaint;

2.  DraftKings will be irreparably harmed in the absence of a preliminary injunction restraining and enjoining Mr. Hermalyn as set forth below and monetary damages would provide inadequate relief;

3.  The balance of equities favors granting a preliminary injunction restraining and enjoining Mr. Hermalyn as set forth below;

4.  A preliminary injunction restraining and enjoining Mr. Hermalyn as set forth below is in the public interest;

5.  During the six (6) month period prior to February 1, 2024, Mr. Hermalyn performed services and/or received Confidential Information (as defined below) concerning the following aspects of DraftKings' business: (i) any fantasy or simulated activity or contest where winning outcomes are determined predominantly by accumulated statistical results of the performance of individuals in athletic or other events; the

A275

wining outcome reflects the knowledge and skill of the participant; and a winning outcome is not based solely on the performance of a single team or individual (hereinafter "FSC"); (ii) games of chance or skill, pari-mutuel, fixed odds, pools or otherwise (including, but not limited to, lottery, pari-mutuel betting, bingo, horse and dog racing, simulated racing and sporting events, jai alai, sports betting, online casino games/iGaming, social casino, poker and keno) whether played for real money or cash equivalent, virtual currency, free, or otherwise and any type of ancillary service or product related to the foregoing (hereinafter "Gaming"); (iii) the digital platform facilitating the purchase and sale of nonfungible tokens and other collectibles (hereinafter "Marketplace"); (iv) the sale and distribution of nonfungible tokens, collectibles, clothing, accessories, and other apparel (hereinafter "eCommerce"); (v) the development, distribution, procurement and programming of content offerings in audio and video focused media related to sports and/or any aspects of DraftKings' business, including but not limited to those aspects of DraftKings' business set forth in (i)-(iv) above (hereinafter "Media").

6.    Section (g) of the Noncompetition Covenant between Mr. Hermalyn and DraftKings dated August 16, 2023 (ECF 1-2, the "Noncompetition Covenant") extends the duration of Mr. Hermalyn's non-competition obligations as set forth therein.

7.    Pursuant to Section (f) of the Noncompetition Covenant and Section 9 of the Confidentiality Agreement between Mr. Hermalyn and DraftKings dated August 31, 2020 (ECF 1-1, the "Confidentiality Agreement"), the internal substantive laws of Massachusetts govern those agreements.

Upon consideration of the Motion, Memorandum of Law, Affidavits, and Exhibits in support of the Motion, as well as the above findings, the Court hereby ORDERS that:

a) **Nondisclosure.** Mr. Hermalyn is hereby restrained and enjoined from using or disclosing any of DraftKings' Confidential Information, which is defined as: information or compilations of information in any form (tangible or intangible or otherwise), that is not generally known to competitors or the public, which DraftKings considers to be confidential and/or proprietary, including but not limited to: research and development; techniques; methodologies; strategies; product information, designs, prototypes and technical specifications; algorithms, source codes, object codes, trade secrets or technical data; training materials methods; internal policies and procedures; marketing plans and strategies; pricing and cost policies; customer, supplier, vendor and partner lists and accounts; customer and supplier preferences; contract terms and rates; financial data, information, reports, and forecasts; inventions, improvements and other intellectual property; product plans or proposed product plans; know-how; designs, processes or formulas; software and website applications; computer passwords; market or sales information, plans or strategies; business plans, prospects and opportunities (including, but not limited to, possible acquisitions or dispositions of businesses or facilities); information concerning existing or potential customers, partners or vendors, as well as information of or related to DraftKings' current or potential customers, vendors or partners that is considered to be confidential or proprietary to the applicable customer, vendor or partner (collectively, "Confidential Information"). For the avoidance of doubt, Mr. Hermalyn is not restrained or enjoined from using or disclosing DraftKings' information: (i) in the public domain (other than as a result of disclosure by Mr. Hermalyn); (ii) approved in writing for unrestricted release by DraftKings; or (iii) produced or disclosed pursuant to a valid court order, provided that Mr. Hermalyn has given DraftKings written notice of

such request such that DraftKings has an actual, reasonable opportunity to defend, limit or protect such production or disclosure.

b) **Preservation.**  Mr. Hermalyn is hereby restrained and enjoined from moving, destroying, deleting, altering, or otherwise disposing of any files, documents, and digital media that contain any Confidential Information and/or that are derived from such information.

c) **Noncompetition.**  Mr. Hermalyn is hereby restrained and enjoined for a period of twelve (12) months from the date of this Order, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise, from directly or indirectly: (1) providing any services to Fanatics, Inc. and Fanatics, Inc.'s subsidiaries, affiliates, and joint ventures (individually and together, "Fanatics") relating to FSC, Gaming, Marketplace, eCommerce and/or Media and any type of ancillary service or product related to or connected with the foregoing; and/or (2) providing any services to Fanatics relating to any other aspect of the Business of DraftKings for which Mr. Hermalyn performed services and/or received Confidential Information at any time during the six (6) month period prior to February 1, 2024; and/or (3) committing a Threatened Breach of the obligations set forth in this paragraph.

    i.   "Business of DraftKings" shall mean the research, design, development, marketing, broadcasting, streaming, promotion, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for: (1) FSC; (2) Gaming; (3) Marketplace; (4) eCommerce; (5) Media; (6) all other products and services that existed, were in development, or were under consideration by DraftKings during Mr. Hermalyn's employment with DraftKings (hereinafter "Other Products and

A278

Services"); and (7) all products and services incidentally related to, or which were an extension, development, or expansion of FSC, Gaming, Marketplace, eCommerce, Media or Other Products and Services.

ii.   "Threatened Breach" shall mean any attempt be Mr. Hermalyn to engage in conduct that would breach paragraph (c), (d) or (e) of this Order.

d)   **Nonsolicitation of Customers, Clients, Vendors or Partners.**  Mr. Hermalyn is hereby restrained and enjoined for a period of twelve (12) months from the date of this Order from, directly or indirectly, either for himself or for any other person, partnership, legal entity, or enterprise: (i) soliciting or transacting business, or attempting to solicit or transact business with, any of DraftKings' customers, clients, vendors or partners, or with any of DraftKings' prospective customers, clients, vendors or partners about which Mr. Hermalyn learned Confidential Information or which Mr. Hermalyn had some involvement or knowledge related to any aspect of the Business of DraftKings; and/or (ii) committing a Threatened Breach of the obligations set forth in this paragraph.

e)   **Nonsolicitation of Employees.**  Mr. Hermalyn is hereby restrained and enjoined for a period of twelve (12) months from the date of this Order from directly or indirectly, either for himself or for any other person, partnership, legal entity, or enterprise: (i) soliciting, in person or through supervision or control of others, an employee, advisor, consultant or contractor of DraftKings for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with DraftKings or to change an existing business relationship to the detriment of DraftKings; (ii) hiring away an employee, advisor, consultant or contractor of DraftKings; (iii) helping another person or entity hire

A279

away a DraftKings employee, advisor, consultant or contractor; and/or (iv) committing a Threatened Breach of the obligations set forth in this paragraph.

**SO ORDERED.**

_____
Judge Julia Kobick

Boston, Massachusetts

Dated: April ___, 2024

A280

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| |
|---|
| DRAFTKINGS INC., |
|        Plaintiff, |
|   v. |
| MICHAEL HERMALYN, |
|        Defendant. |

Civil Action No. 1:24-cv-10299-JEK

## AFFIDAVIT OF MITCHELL GREEN IN SUPPORT OF PLAINTIFF'S MOTION
## <u>FOR PRELIMINARY INJUNCTION</u>

I, Mitchell Green, upon being duly sworn, do hereby testify under oath as follows:

1.       I make this affidavit in support of Plaintiff DraftKings Inc.'s ("DraftKings") Motion for Preliminary Injunction.  I am over the age of eighteen.

2.       I work for Stroz Friedberg as a Manager in the Digital Forensics and Incident Response Group.  I hold a bachelor's degree in computer and digital forensics from Champlain College in Burlington, Vermont.   My work regularly involves conducting digital forensic preservations, examinations, and analyses in support of civil litigations, criminal matters, internal investigations, data breach investigations, and incident response efforts.  In my employment with Stroz Friedberg, I have led incident response teams in significant matters, including investigating data breaches within large financial networks, ransomware attacks, and state-sponsored cyber-attacks.

3.       Stroz Friedberg is a leading risk management firm that specializes in digital forensics, incident response and investigation, and due diligence matters.

4.       Stroz Friedberg was engaged to conduct a forensic investigation of the DraftKings devices issued to Michael Hermalyn during his employment with DraftKings, as well as activity logs and other files relating to Mr. Hermalyn's computer and internet usage that were retained by DraftKings in the ordinary course of business.   The primary purpose of Stroz Friedberg's engagement is to enable Gibson Dunn to render legal advice to DraftKings in connection with DraftKings' ongoing litigation against Mr. Hermalyn.   Stroz Friedberg is working under the instruction of Gibson Dunn.

5.       I am the person responsible for the opinions contained in this affidavit.  I have been assisted in this matter by Stroz Friedberg personnel.  All analysis and other assistance in connection with the preparation of this affidavit was performed and provided by me or by Stroz Friedberg staff under my supervision and direction.  References to "I" or "me" refer to both myself and the

1

staff members who assisted me in preparing this report.  All opinions expressed in this affidavit are mine alone.

6.      While the investigation is ongoing, an overview of my preliminary findings is below.

**A. <u>Sources of Evidence Analyzed by Stroz Friedberg</u>**

7.      To date, Stroz Friedberg has analyzed the following DraftKings devices, which I understand were issued to Mr. Hermalyn during his employment and returned to DraftKings after he tendered his resignation: 16-inch Apple MacBook with Serial Number WRLHQV76XG ("Laptop 1"), 14-inch Apple MacBook with Serial Number HTXY6960MH ("Laptop 2"), 16-inch Apple MacBook with serial number C02CG0VWMD6P ("Laptop 3").

8.      For ease of reference, I have included a summary table below reflecting the device name we assigned each device, the serial number, the date DraftKings reports that it issued the devices to Mr. Hermalyn, the date DraftKings reports the devices were returned to it, and the model of the device.

**<u>Table 1</u>**

| Device Name | Serial Number | Issue Date | Return Date | Model |
|---|---|---|---|---|
| Laptop 1 | WRLHQV76XG | June 27, 2022 | Feb. 4, 2024 | MacBook Pro (16-inch, 2021) |
| Laptop 2 | HTXY6960MH | Nov. 27, 2023 | Feb. 4, 2024 | MacBook Pro (14-inch, 2023) |
| Laptop 3 | C02CG0VWMD6P | Sept. 4, 2020 | Feb. 9, 2024 | MacBook Pro (16-inch, 2019) |

9.      At the time of receipt, Laptops 1 and 3 were powered off, and Laptop 2 was powered on.  The laptops were protected by passwords, which were provided to Stroz Friedberg by DraftKings in order to permit examination of the laptops.

A283

10.     Upon receipt of Laptop 3, I observed indications that the laptop had previously been wiped or otherwise reset.  Based on timestamps associated with the data storage volume, it is likely that Laptop 3 was wiped or otherwise reset on or about March 7, 2023, such that all user configurations and data were no longer present on the device.

11.     I have also reviewed historical backup data captured by Carbonite and exported by DraftKings.  Carbonite is an online backup service that automatically seeks out new and changed files on a user's computer and backs them up to the cloud.  The Carbonite backup data shows the names and contents of certain files historically present on a user's device.  I have reviewed Carbonite backup data collected by DraftKings' IT from Laptop 1 ("Backup 1") and Laptop 2 ("Backup 2").[1]  I considered these backups as a source of evidence due to the data deletion on both laptops, which I explain below.

12.     Further, I have reviewed the following materials and logs: a log export collected by DraftKings IT from the messaging platform, Slack, detailing Mr. Hermalyn's file-related activity occurring between August 7, 2023 and February 1, 2024 (the "Slack Log"); multiple Office 365 Logs (the "Office 365 Logs"); and a Google Drive Logs Export collected by DraftKings IT, detailing activity occurring between August 7, 2023 and February 1, 2024.

**B. File and Event Activity on January 16, 2024:  Laptop 1 (16-inch laptop)**

13.     My forensic investigation of Laptop 1 revealed operating system events and file activity on January 16, 2024, that appear consistent with user efforts to transfer or attempt to transfer files from Laptops 1 to other devices, including non-DraftKings devices as described below.

---

[1] Multiple exports were attempted and completed in order to create backups of Laptop 1 and Laptop 2.

14.     **4:19–4:22 p.m. EST**: The web browsing history collected from Laptop 1 indicates that Mr. Hermalyn[2] conducted Google searches for "dropbox," and visited the website Dropbox.com and various sub-pages—including the log in page—of the Dropbox website at or about 4:20 p.m. EST.   The web browsing history indicates he accessed at least six different subpages, including the account security page.   Mr. Hermalyn navigated away from Dropbox.com or otherwise disconnected more than 3 hours later at 8:39 p.m. EST.   Without access to Mr. Hermalyn's Dropbox account, we cannot identify if particular files were transferred when he visited Dropbox.com.[3]

15.     **7:40 p.m. EST:** Logs from Laptop 1 indicate that shortly after this Dropbox activity, Mr. Hermalyn made seven "AirDrop" attempts from Laptop 1 to an iPhone 15 Pro Max named "MZH X (3)."   AirDrop is a file transfer service built into Apple devices—including MacBooks, iPhones, and iPads—that permits users to wirelessly send photos, videos, documents, and other files to other nearby devices.   Five of the seven AirDrops Mr. Hermalyn attempted on January 16 were completed successfully, but two of the AirDrops were declined or otherwise not completed because there was insufficient free storage space on the target device.   To date, our investigation has not revealed the specific files transmitted via AirDrop or the serial number of the iPhone used to receive the AirDrop file transfers.   "MZH X (3)" could be the iPhone 15 Pro Max previously connected to Laptop 1 or synced to Mr. Hermalyn's DraftKings Google Workspace Account (described in ¶¶ 45 – 46 herein) or another device entirely.   Without access to the devices

---

[2] I refer to Mr. Hermalyn's use of Laptops 1 and 2 throughout this affidavit.  Both laptops were password protected, and I have seen no indication of another user accessing the DraftKings laptops returned by Mr. Hermalyn.

[3] As described in ¶ 48 herein, since at least June 29, 2022—and until approximately January 16, 2024—the Dropbox application was installed locally on Laptop 1.  It is unclear why Mr. Hermalyn visited the Dropbox website rather than accessing Dropbox through the application.

Mr. Hermalyn synced or connected to DraftKings' systems, we cannot definitively identify this device.

16.     Five seconds after the last AirDrop event, an unidentified iPhone was connected to Laptop 1 via USB.  Available system logs do not indicate the name, model, or serial number of the device or the purpose of the connection, including whether files were transferred.  Based on investigation to date, Stroz Friedberg has been unable to confirm whether this is the same iPhone used in the AirDrop events described above.

17.     **8:26 – 8:27 p.m. EST:**  Based on a review of DraftKings' Slack logs, beginning at or about 8:26 p.m. EST, Mr. Hermalyn sent a series of Slack messages to his DraftKings Slack user account attaching 18 unique documents.  (One document was sent twice.)  The files Mr. Hermalyn sent to his own Slack account are listed in Appendix A.  Appendix A indicates when the files were sent, if and when they were deleted from Laptop 1, and if and when they were later viewed or downloaded on another device.

18.     **8:42 p.m. EST:** Web browsing history and activity logs from Laptop 1 reveal that approximately fifteen minutes after sending the Slack messages to his DraftKings Slack user account, Mr. Hermalyn conducted a Google search for "move big files" and subsequently visited a website called "Transfernow.net."[4]  We cannot determine whether any files were uploaded to Transfernow.net and transferred to another device.

19.     **10:02 p.m. EST:**  Based on a review of DraftKings' Slack logs, at or about 10:02 p.m., Mr. Hermalyn viewed or downloaded at least seven of the files sent to his own Slack account using an iPhone running iOS version 17.1.2.  Mr. Hermalyn viewed or downloaded those

---

[4] I have visited "Transfernow.net," and confirmed that this is an online platform designed for transferring large files and data.

files again on an iPhone running iOS version 17.1.2 on January 16 at or about 10:02 p.m. EST. *See* Appendix A.

**C.  Deletion Activity:  Laptop 1 (16-inch laptop) and Laptop 2 (14-inch laptop)**

20.     Based on my forensic investigation to date, including review of FSEvents logs, Mr. Hermalyn deleted or attempted to delete a significant amount of files and data from both Laptop 1 (Mr. Hermalyn's 16-inch laptop) and Laptop 2 (Mr. Hermalyn's 14-inch laptop) in mid to late January 2024.

21.     When a file is changed on a MacBook—for example, by deleting the file—this change is recorded in an operating system log called "FSEvents."  This log does not record the date and time each file change happens.  Rather, a limited number of new FSEvents log files are created collectively to record these changes.  Because the computer does not contain logs showing the specific time each file was modified, the time each new log file was created can be used as a proxy for the time of file modification.  The FSEvents logs indicate the names of the files that existed on the device and the approximate date and time of file modification events, such as deletion, but they do not include the underlying content of the files.

22.     Additionally, the FSEvents logs by default retain a limited amount of data.  Over time and as new changes are made to files on the system, older FSEvents log entries will be removed from the system.  We are only able to see FSEvents log activity dating back to January 16, 2024, at or about 4:06 p.m. EST for Laptop 1 and January 17, 2024, at or about 10:39 p.m. EST for Laptop 2.  Based on my analysis of the deletion activity in the FSEvents logs and the files

present in the backup data, there may have been additional deletion activity predating the events reflected in the FSEvents logs.[5]

23.     The deletion activity identified on Laptops 1 and 2 is consistent with an intentional effort to manually delete substantially all user-created files from the laptops.  The devices were not wiped using a factory reset, and Stroz Friedberg has not identified evidence of automated file deletion tools on either device.  Instead, the FSEvents logs reflect a pattern of deleting files and data from multiple locations by moving them to the trash and then permanently deleting them from the devices.  It is unlikely that this pattern of deletion resulted from an accidental or automated process.

24.     Based on analysis of the names of the files that were deleted from Laptops 1 and 2, Mr. Hermalyn likely intentionally deleted files used in the course of his employment with DraftKings—beginning by at least January 16 and continuing through January 28, 2024.

**January 16, 2024: Deletion Activity on Laptop 1 (16-inch laptop)**

25.     Operating system logs, including the FSEvents log, confirm that at least 237,351 files were moved to the trash and then permanently deleted from Laptop 1 between January 16 and 17, 2024.

26.     A graph illustrating the file deletion events on Laptop 1 is included in Figure 1 below.  This data is based on the available evidence from the FSEvents log.

---

[5] There are files in the backup data for Laptop 2, which were not on the laptops when they were returned to DraftKings but for which we do not see deletion activity in the FSEvents logs.  This suggests that the files were historically present on the devices but were deleted prior to the earliest bounds of the FSEvents logs.

A288

**Figure 1**



27.     **User-created Files.**[6]  One user-created file existed on Laptop 1, when Stroz Friedberg received the device: a video of Mr. Hermalyn speaking on a panel at a conference with the file name "FSS_JasmineMaietta_MikeHermalyn_RichKleiman.mov."  The FSEvents log indicates that at least 347 user-created files were moved to the trash and then permanently deleted from Laptop 1 on January 16, 2024.

28.     The file deletion activity on Laptop 1 likely included the deletion of the locally synced files uploaded to Mr. Hermalyn's Dropbox through the Dropbox application described in ¶ 48 herein.  Based on my review of the Laptop 1 FSEvents log and Backup 1, certain of the files associated with the Dropbox installation were historically saved to a Dropbox folder called "miscdk."  A listing of 130 files saved to the "miscdk" folder is attached as Appendix B.[7]  Based on the FSEvents timestamp associated with the directory "Users/m.hermalyn/.Trash/Dropbox," the Dropbox deletion activity likely occurred at or about 4:23 p.m. EST on January 16.

---

[6] Throughout this declaration, I use the phrase "user-created files" to refer to files with any of the following extensions: .docx, .doc, .xlsx, .xls, .pptx, .ppt, .pdf, .jpeg, .jpg, .png, .zip.

[7] I understand DraftKings previously represented that 132 documents were saved to the "miscdk" file path.  Based on further testing, we have determined that the correct number is 130.

29.    Because the deletion of files from the laptop likely began before the earliest bounds of the FSEvents logs present on the device, additional deletion activity may have occurred that is not detectable by our review.

30.    **Web Browsing History.**   In addition to deleting nearly all user-created files, Mr. Hermalyn's activity is consistent with efforts to delete all Google Chrome ("Chrome") web browsing data from Laptop 1.   Based on our analysis, Chrome appears to have been the primary web browser used on Mr. Hermalyn's DraftKings laptops.   Chrome allows users to create profiles to store and track their information, such as bookmarked websites, browser history, and passwords.[8]   Users can maintain multiple profiles under a single Google account.   A user can remove a profile from Chrome and effectively delete this information from a device by navigating to the profile settings on the Chrome browser and deleting their profile.[9]   When a profile is removed in this manner, the removal activity is captured by, among other things, FSEvents logs but does not generate any files in the user's trash.

31.    Mr. Hermalyn had at least three Chrome profiles on Laptop 1 (labeled as Profiles 2, 4, and 5 within Chrome).[10]   Profiles 4 and 5 were successfully removed from the device on

---

[8] I have reviewed the transcript of Mr. Hermalyn's deposition and understand that he volunteered familiarity with the ability to browse privately online.  *See* Hermalyn Dep. Tr. 158:18–19; 159:5–8.   When a user browses the web using Chrome's private browsing option, Incognito Mode, Chrome does not retain the user's web browsing history.   If Mr. Hermalyn browsed the internet using Incognito Mode, his web browsing activity was not saved to his Chrome profiles and is not recoverable from any device.

[9] Guides explaining how to create and remove profiles are available on Google and other websites. *See* https://support.google.com/chrome/answer/2364824?co=GENIE.Platform%3DDesktop&hl=en& sjid=8048893872562987881-NA.

[10] Based on my understanding of Chrome, profiles are generally numbered sequentially.   The presence of profiles labeled 2, 4, and 5 on Laptop 1 suggests that Profiles labeled 1 and 3 previously existed on the device but were deleted some time before the earliest available entries on the FSEvents log.

January 16, 2024. Both profiles appear to have been removed by deleting the profiles from within the Chrome browser. The FSEvents log indicates that while Profile 5 was in the process of being deleted, certain files related to the profile were also moved to the trash and deleted from the device. Individual file deletion events such as these are not triggered by standard profile deletion from within the Chrome browser and instead suggest the user navigated to a local directory that a typical user would not use or access and manually moved these files to the trash.[11] Evidence in the FSEvents log indicates that the user also attempted to manually delete locally stored files related to Profile 2. However, the removal was unsuccessful and at least some data related to Profile 2 remained on Laptop 1. Stroz Friedberg was thus able to recover web browsing history from Profile 2.

32.    **iMessages.** Forensic analysis indicates that during his DraftKings employment, Mr. Hermalyn synced his iMessage account to Laptop 1 via iCloud, meaning that messages sent or received by Mr. Hermalyn on his iPhone, iPad, or any other Apple device linked to his iMessage account were synced with the Messages application on Laptop 1. When an iMessage account is synced to a MacBook, the Messages Application stores chat and message data, including iMessage and text messages and other metadata, in a database file called "chat.db." Based on testing, if an iMessage account is merely unlinked from a MacBook, messages are removed from the Messages application, but the "chat.db" database and its contents remain intact on the operating system— meaning the messages and metadata remain saved to the device. In order to remove the contents of the "chat.db" database, a user must engage in more sophisticated deletion efforts, such as

---

[11] There are online guides that explain how to delete locally stored Chrome browser data in this manner. *See, e.g.*, https://crunchify.com/how-to-purge-all-your-google-chrome-user-data-on-mac-os-x/; https://nira.com/delete-chrome-history/.

A291

navigating to a location within the operating system that a typical user would not access and manually deleting the database.[12]

33.     On January 16 at 9:41 p.m. EST, the entire "chat.db" database on Laptop 1 was moved to the trash and then permanently deleted, effectively wiping the messages and metadata from the device.   A "chat.db" database without any messages or metadata therein was then recreated in the original path four minutes later at 9:45 p.m. EST.   Based on my testing, when a "chat.db" database file is deleted, the operating system automatically generates a new database file within the same path when the user restarts and logs back into the device.   Accordingly, this recreation of the database was likely triggered automatically by the operating system.   As explained in ¶ 43 below, Stroz Friedberg was nonetheless able to recover some messages from the "KnowledgeC.db" database within the operating system.[13]

34.     There was no user activity on Laptop 1 post-dating January 16, 2024, when substantially all user-created files and activity were deleted from the device.

***January 28, 2024: Deletion Activity on Laptop 2 (14-inch laptop)***

35.     Operating system logs, including the FSEvents log, confirm that at least 120 files were moved to the trash and then permanently deleted from Laptop 2 between January 17, 2024 and January 28, 2024.   Based on the files present on Backup 2, it appears additional files existed on Laptop 2 and were presumably deleted prior to January 17, 2024.

---

[12]     There are online guides that explain how to do this.   *See, e.g.*, https://www.groovypost.com/howto/delete-messages-on-mac/;   https://macpaw.com/how-to/delete-all-messages-mac.

[13] The "KnowledgeC.db" database stores among other things certain data related to Apple's "App Intents" framework,  The App Intents framework makes an application's content and functionality available to system services like Siri and the Shortcuts app.

36.     A graph illustrating the file deletion events on Laptop 2 is included in Figure 2 below.  This data is based on the available evidence from the FSEvents log.

**<u>Figure 2</u>**



37.     **User-created Files.**  Two user-created files existed on Laptop 2 (the 14-inch laptop), when Stroz Friedberg received the device: a PDF version of a presentation providing an overview of DraftKings' VIP program with the file name "2024 - VIP.pdf" and a PDF providing an overview of Mr. Hermalyn's role and responsibilities at DraftKings with the file name "Mike Hermalyn - Roles & Responsibilities - Google Docs.pdf".  The FSEvents log indicates that at least 115 user-created files were moved to the trash and then permanently deleted from Laptop 2 between January 17 and 28, 2024.  Because the deletion of files from the laptop likely began before the earliest bounds of the FSEvents logs we were able to collect, additional deletion activity may have occurred that is not detectable by our review.

38.     The activity on Laptop 2 is consistent with a user-initiated pattern of manual deletion that began on January 17, 2024 and concluded on January 28, 2024, while the laptop was located in the Pacific Time Zone, in the Los Angeles area.  System logs indicate that at or about 3:37 p.m. PST on January 28, 2024, Laptop 2 accessed the United Airlines in-flight Wi-Fi network ("unitedwifi.com").[14]

---

[14] *See* https://www.united.com/en/us/fly/travel-experience/inflight-wifi.html.

A293

39.     **Web Browsing History.**  In addition to deleting nearly all user-created files, Mr. Hermalyn removed all user profiles containing Chrome-related data, which substantially deleted his web browsing history from the device.  Mr. Hermalyn had three Chrome profiles on Laptop 2 (labeled as Profiles 1 through 3 within Chrome).  The FSEvents log indicates the Chrome profiles were removed on January 31, 2024.

40.     **iMessages.**  As with Laptop 1, forensic analysis indicates that Mr. Hermalyn had synced his iMessage account to Laptop 2 but deleted messages from the device prior to returning it to DraftKings.  The FSEvents log on Laptop 2 does not contain the specific "chat.db" deletion event observed on Laptop 1.  However, Backup 2 contains a "chat.db" database file with the messages and metadata intact, suggesting that the database was deleted prior to the earliest bounds of the FSEvents log.  Additionally, system logs indicate that a new database file without any messages or metadata therein was created on Laptop 2 on January 17, 2024, at 10:39 p.m. EST, which is concurrent with the earliest bounds of the FSEvents log on the device.  As described in ¶ 33, it appears that when a "chat.db" database is deleted, the MacBook operating system automatically generates a new database file when the user restarts and logs back into the device.  Given this evidence and the volume of deletion activity reflected in the FSEvents log on January 17, 2024, it is likely the user manually deleted the "chat.db" database at some point before 10:39 p.m. EST on January 17 in the same manner the database was deleted from Laptop 1.

41.     There was no user activity on Laptop 2 post-dating January 31, 2024.

**D.  Recovered Data**

42.     **Local Files.**  As described in ¶¶ 27, 37, substantially all user-created files were deleted from both laptops.  Stroz Friedberg and DraftKings were able to recover some of these files from the laptops' backup data.  However, there are 118 user-created files referenced in the

deletion events in the FSEvents log that are not present on the backups.  To date, we have been unable to recover those files.[15]

43.    **iMessage.**  As described in ¶¶ 32–33 and 40, the device activity observed in the FSEvents logs is consistent with efforts to delete the iMessage and text message data synced to Laptops 1 and 2 prior to the return of the devices to DraftKings.  Through analysis of other databases within the operating systems of the laptops, Stroz Friedberg has recovered up to 18,159 deleted iMessages and SMS messages sent or received between November 29, 2023 and January 16, 2024.[16]  However, the recovered text message conversations appear to be incomplete, and there are likely messages and potentially entire text threads that were completely deleted and are no longer recoverable from the devices.  Stroz Friedberg has also recovered 10,473 deleted iMessages and SMS messages from Backup 1 and 6,295 deleted iMessages and SMS messages from Backup 2.[17]  The backup data does not include any messages sent or received after December 29, 2023.  Accordingly, there are likely messages and potentially entire text threads from the month preceding Mr. Hermalyn's resignation that Stroz Friedberg remains unable to recover.  It is

---

[15] Significantly, the unrecovered files include 61 screenshots.  On October 23, 2023, Laptop 1's web browsing history indicates that Mr. Hermalyn conducted Google searches for "how to shut off screenshot noise on apple computer."  Evidence suggests that he frequently screenshotted content on his device(s).  Within the evidence available, we have identified reference to 91 files for which the file names are consistent with Apple's screenshot naming convention ("Screenshot" or "Screen Shot" followed by YYYY-MM-DD H.MM.SS AM/PM).  Based on our testing, screenshots taken on systems running MacOS 12 (such as Laptop 1) are named using "Screen Shot" by default, and screenshots taken on systems running MacOS 13 (such as Laptop 2) are named using "Screenshot" by default.  A list of all likely screenshots taken within the 60 days leading up to Mr. Hermalyn's departure and indicating whether the files have been recovered is included as Appendix C.

[16] The recovered iMessages and text messages were found within the KnowledgeC.db database file within the macOS operating system.

[17] Many of the messages recovered from the backups are duplicative of messages recovered from the devices.

possible that the unrecovered messages continue to exist on another device that is or was linked to Mr. Hermalyn's iCloud account.

**E.   Connected Devices and Accounts**

44.     Based on investigation, Stroz Friedberg has identified devices and accounts—likely belonging to Mr. Hermalyn—that interacted with DraftKings' networks, systems, and devices. These devices and accounts are identified in ¶¶ 45–49 below alongside a description of the interaction with DraftKings' networks, systems, and devices.

45.     Based on a review of operating system logs on Laptops 1 and 2, at least four different Apple devices were connected with Mr. Hermalyn's DraftKings-issued laptops via USB. Operating system logs include limited information regarding these USB connection events, which permitted us to discern certain identifying information about the devices such as serial number, model, and, in limited instances, device name or iOS software version.[18]   Without access to the devices, we cannot determine additional identifying information or whether files were transferred to the devices while they were connected.

   (a)     **iPhone 14 Pro Max bearing serial number T0XR477FVK.**  On February 9, 2023, this device was connected to Laptop 1 via USB.  According to operating system logs, the device was named "MZH X (2)."

   (b)     **iPad Pro 10.5-inch (Wi-Fi Only[19]) bearing serial number DLXV20NFHP83**.  On December 9, 2023 at 1:43 a.m. EST, this device was connected to Laptop 1 via USB.  This same device was connected to Laptop 2 via USB on December 30, 2023 at 9:00 p.m. EST.

---

[18] Device model was determined by entering the serial numbers into Apple's device lookup feature available at https://checkcoverage.apple.com/.

[19] "Wi-Fi Only" means the device was provisioned for Wi-Fi connection, but not cellular data.

(c)  **iPad Pro 11-inch (Wi-Fi + Cellular[20]) bearing serial number DMPXL1P5KD8C**.  On December 9, 2023 at 1:24 a.m. EST, this device was connected to Laptop 1 via USB.

(d)  **iPhone 15 Pro Max bearing serial number GQMH5WT41F**.  On December 8, 2023, this device was connected to Laptop 1 via USB.  According to operating system logs, the device was running iOS 17.1.2 at the time it was connected to Laptop 1.

46.  Based on a review of DraftKings' Google Workspace Activity logs, five different personal devices were synced with Mr. Hermalyn's DraftKings Google Workspace Account:

- an iPhone identified as "iPhone 16,2," which is consistent with an iPhone 15 Pro Max, and which was last synced on January 31, 2024;

- an iPad identified as device model "iPad Pro (3rd generation)," which was last synced on January 7, 2024;

- an iPhone identified as device model "iPhone 14 Pro Max," which was last synced on September 26, 2023;

- an iPhone identified as device model "iPhone 14 Pro Max," which was last synced on February 5, 2023; and

- an iPhone identified as device model "iPhone 11 Pro Max," which was last synced on August 2, 2022.

47.  Based on a review of DraftKings' Slack log, up to 5 different devices were used by Mr. Hermalyn to view or download documents from his DraftKings Slack account since December 1, 2023.  The Slack log identifies the iOS or MacOS operating system used by the device but not the serial number or model of the device.  Over time, an Apple device's operating system software may update, so some of the devices listed below may be duplicates:

- An iPhone running iOS 17.2.1.

- An iPad running 16.6.1.

---

[20] "Wi-Fi + Cellular" means the device was provisioned for Wi-Fi connection and also was provisioned with cellular data.

A297

- An Apple MacBook running macOS 12.6.6.

- An Apple MacBook running macOS 10.15.7.

- An Apple MacBook running macOS 13.5.0.

48.     **Dropbox.**     Since at least June 29, 2022—and until approximately January 16, 2024—Dropbox was installed on Laptop 1.  Due to the nature of how Dropbox works, any content introduced to the Dropbox account through the installation on this system, including the files identified in Appendix B, could have been, or could still be, synced to numerous other devices and/or accessible from the web-based interface for Dropbox.  Due to the nature of potential syncing or web-based access, documents synced to the Dropbox account could have been synced down, or otherwise downloaded to, the local storage of any number of devices, personal or otherwise.

49.     **iCloud Account.**     An iCloud account associated with the Gmail address ███████@gmail.com was synced with Laptops 1 and 2.  iCloud allows users to sync photos, files, and backups across all devices synced to their iCloud account.  Without access to Mr. Hermalyn's iCloud account, Stroz Friedberg cannot confirm if data historically accessed or downloaded on Laptops 1 and 2 was synced to his iCloud account and shared with other connected devices.

F.   **Inconsistencies Between Forensic Findings and Deposition Statements**

50.     I have reviewed excerpts of the transcript of Mr. Hermalyn's deposition and identified several, specific statements that are inconsistent with the findings of Stroz Friedberg's forensic investigation described above.

51.     **Alleged Transfer of Materials to Laptop 2.**  Mr. Hermalyn represented multiple times that he exported, or attempted to export, files off of Laptop 1, on January 16, 2024, as

17

A298

described in ¶¶ 14–19, because he was transitioning to a new laptop (Laptop 2) and needed to transfer the files to his new device.  Hermalyn Dep. Tr. 135:6–9; 136:19–22; 137:13–18.  However, this explanation is inconsistent with the findings of Stroz Friedberg's investigation for several reasons:

52.     First, based on user activity and the date Laptop 2 was first synced to Mr. Hermalyn's Google Workspace account, Mr. Hermalyn began using the device by at least December 18, 2024, nearly one month before he began exporting files off of Laptop 1 to purportedly transfer them to his new device.  Among other user activity observed on December 18, browser history from Backup 2 indicates that Mr. Hermalyn began using Google Chrome on that date.  Specifically, he conducted a Google search for "how to set up iMessage."

53.     Second, the majority of the files Mr. Hermalyn transferred from Laptop 1 were never downloaded to Laptop 2.  Specifically, of the 18 unique documents he sent on January 16 to his own Slack account—14 were never downloaded to, or even viewed, from Slack on Laptop 2.  Further, we do not see any of the 130 documents historically saved to the "miscdk" Dropbox folder on Laptop 1 present on Laptop 2 or referenced in the FSEvents log for the device.[21]  Finally, all of the "AirDrop" events initiated from Laptop 1 on January 16 were sent to an iPhone 15 Pro Max named "MZH X (3)"—not Laptop 2 or any other DraftKings device.  Stroz Friedberg's review of the FSEvents log for Laptop 2 indicates that only 60 user-created files from any source were added to Laptop 2 after January 17.

54.     Third, as explained in ¶¶ 35–41, the FSEvents log indicates that Mr. Hermalyn began deleting files from Laptop 2, on January 17, 2024, less than 24 hours after he allegedly

---

[21]  It is possible that these Dropbox documents were downloaded or saved to Laptop 2 and then deleted from the device at some point before January 17, 2024, which is the earliest date reflected in the FSEvents log.

A299

"chang[ed] computers" from Laptop 1 to 2.  Hermalyn Dep. Tr. 135:8–9.  And all user-created files on Laptop 2 with the exception of two PDFs were deleted by January 28, 2024.

55.     **iMessage Deletion.**  To the extent Mr. Hermalyn's deposition statement is meant to suggest that he removed iMessage data from his laptops by simply "deactivat[ing] [his] iCloud from [his] work computer," the findings of our forensic investigation are inconsistent with his claim.  *See* Hermalyn Deposition Trans. 99:11–13.  As described in ¶¶ 33, 40, system logs indicate that Mr. Hermalyn manually deleted the "chat.db" database file on at least Laptop 1 and possibly Laptop 2 by moving it to the trash and then permanently deleting it.  If Mr. Hermalyn merely unlinked his iCloud account from the devices, the database file would have remained intact on the system.  Additionally, his iCloud contacts would have been deleted from the devices, but they remained on both Laptops 1 and 2.  By deleting the "chat.db" database, Mr. Hermalyn engaged in a more sophisticated and effective deletion effort.

I declare under the penalty of perjury that the foregoing facts are true and correct based on my personal knowledge.


Signed this 14th day of March 2024 under the pains and penalties of perjury.



_____

Mitchell Green

19

A300

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

DRAFTKINGS INC.,

        Plaintiff,

   v.

MICHAEL HERMALYN,

        Defendant.

Civil Action No. 1:24-cv-10299-JEK

**AFFIDAVIT OF ANDREW LARRACEY IN SUPPORT OF PLAINTIFF'S MOTION
<u>FOR PRELIMINARY INJUNCTION</u>**

I, Andrew Larracey, upon being duly sworn, do hereby testify under oath as follows:

1.      I am a Director, VIP Operations at DraftKings effective March 1, 2024, where I have worked since February 1, 2021.  I am over the age of eighteen.

2.      I know Michael Hermalyn, and worked with him before he resigned his employment from DraftKings on February 1, 2024.

3.      Shortly after 1:00 PM ET on February 1, 2024, Hayden Metz and I learned from DraftKings' IT department that Mr. Hermalyn's Salesforce account had been shut off.

4.      Mr. Metz and I then called Mr. Hermalyn from a conference room in DraftKings' Boston, Massachusetts office.  Mr. Hermalyn did not answer but immediately called us back.  Mr. Hermalyn asked us to confirm that we were the only people in the conference room.  He then ended the telephone call and connected with us by FaceTime video call.  He asked us to use the phone's camera to scan the room so that Mr. Hermalyn could confirm that Mr. Metz and I were alone in the DraftKings conference room.  Mr. Hermalyn told Mr. Metz and me that he had tendered his resignation with DraftKings to work for Fanatics, and that there were two positions on the Fanatics website to which we should apply.  Mr. Hermalyn mentioned a Senior Director position for me and a VP position for Mr. Metz.  This conversation was brief, lasting fewer than five minutes.  A true and correct screenshot of the call log reflecting this conversation is attached hereto as Exhibit A.

5.      After ending the call with Mr. Hermalyn, Mr. Metz and I discussed the news over lunch.  Later that evening, I texted Mr. Metz asking if he wished to speak; he replied that he did. A true and correct screenshot of this text message exchange with Mr. Metz on February 1, 2024 is attached hereto as Exhibit B.

6.      I called Mr. Metz at or about 10:16 PM ET.  A true and correct screenshot reflecting this phone call is attached hereto as Exhibit C.  I then used my wife's cell phone, rather than my own, to call Mr. Hermalyn.  I then put Mr. Hermalyn (on my wife's phone) and Mr. Metz (on my phone) on speaker, so that the three of us could talk.  I used my wife's cell phone to place the call because Mr. Metz and I were under the impression that Mr. Hermalyn did not want us to call him from our own cell phones.  Over the course of the evening of February 1, 2024 and the early morning hours of February 2, 2024, Mr. Metz, Mr. Hermalyn, and I had a series of phone calls lasting multiple hours using this speaker phone approach.  A true and correct screenshot of the call history reflecting my calls with Mr. Metz's cell phone on February 1, 2024 and February 2, 2024 is attached hereto as Exhibit D.  A true and correct copy of screenshots of the calls to Mr. Hermalyn from my wife's phone that began on the evening of February 1, 2024 is attached hereto as Exhibit E.

7.      During these discussions, Mr. Hermalyn provided additional details about the roles in the Fanatics VIP department that were available to Mr. Metz and me—namely a Senior Director role for me and a Vice President role for Mr. Metz.  During the course of the conversations, I searched the "Careers" page on Fanatics' website for the role Mr. Hermalyn said he had for me; it was listed as "Director, VIP Customer Development," rather than "Senior Director." I raised the difference with Mr. Hermalyn and he said he was offering me the title of Senior Director at Fanatics.  As described by Mr. Hermalyn, both of these roles were in Fanatics Enterprise VIP department which includes online sports betting.

8.      During our discussion, Mr. Hermalyn made specific offers of compensation to incentivize me and Mr. Metz to accept roles with Fanatics.  Mr. Hermalyn offered us base salary, annual bonuses, signing bonuses, and initial equity allocations.  At an early stage in these

2

discussions, and in connection with the Fanatics Senior Director position, Mr. Hermalyn represented that he had authority and would offer me a $400,000 base salary, a $150,000 annual bonus, a $750,000 signing bonus, and an initial equity allocation of at least $2,000,000. Mr. Hermalyn also communicated a compensation package to Mr. Metz. During these discussions, Mr. Metz and I indicated that the initial offers Mr. Hermalyn communicated was not enough of an incentive to leave DraftKings given the risk and disruption that would result from accepting the offers to work at Fanatics, including potential litigation risk since we would be violating our non-competition obligations. After initial discussions, Mr. Hermalyn said that he would speak with someone at Fanatics. Mr. Hermalyn then called me back and relayed increased offers. Ultimately, Hermalyn represented that he had authority and would offer me $400,000 base salary, a $150,000 annual bonus, a $1,500,000 signing bonus, and an initial equity allocation of $4,000,000. This was significantly more compensation than I earn at DraftKings, which Mr. Hermalyn knew. During our discussions, Mr. Hermalyn communicated to me that the initial equity allocation used a $28 billion valuation for Fanatics. Following our conversations, I wrote down the terms of the offers communicated by Mr. Hermalyn in my notes application on my phone. A true and correct screenshot my notes from this call with Mr. Hermalyn on February 1, 2024 and February 2, 2024 is attached hereto as Exhibit F.

9.     Mr. Hermalyn represented that he had authority from Fanatics to make these offers. In fact, Mr. Hermalyn represented to us that he was taking the phone call from inside the home of Michael Rubin, the CEO of Fanatics  and even offered to put Mr. Rubin on the line to speak with me and  Mr. Metz.

3

10.     During our  conversations, Mr. Hermalyn reiterated that, despite his assurances regarding these roles with Fanatics, Mr. Metz and I would need to formally apply for the positions to receive written offers.

11.     Mr. Hermalyn also mentioned that these positions would likely entail relocating to Los Angeles.  He stated that he himself had moved to Los Angeles, in part because of his noncompetition agreements.  Mr. Hermalyn indicated Fanatics would indemnify Mr. Metz and me and pay any legal fees associated with any potential dispute with DraftKings regarding our violation of our non-competition obligations to DraftKings.

12.     As an alternative to moving to Los Angeles and accepting a role in Mr. Hermalyn's VIP department, Mr. Hermalyn communicated to Mr. Metz and me that we could discuss options concerning other roles that would not require relocating.

13.     After around two-and-a-half hours, our call ended with Mr. Hermalyn expressing frustration that Mr. Metz would not entertain the Fanatics offer based on the compensation he had offered.  Once we hung up with Mr. Hermalyn, I called Mr. Metz at 1:07 AM ET to discuss our conversation with Mr. Hermalyn.  Shortly into our discussion, Mr. Hermalyn again called me— such that all three of us were back on the line—and continued his pitch for us to join Fanatics. This follow-up call lasted nearly an hour.  Mr. Hermalyn repeatedly restated his position that Mr. Metz not considering the offer to apply to the VP position within his department was a bad decision.

14.     On February 2, 2024—during the discussions with Mr. Hermalyn and Mr. Metz that began in the evening of February 1, 2024—I submitted an application through the Fanatics website for a position as Director, VIP Customer Development.  Attached hereto as Exhibit G is a

4

true and correct copy of the email from Fanatics confirming receipt of my application for the Director, VIP Customer Development position, dated February 2, 2024 at 1:16 AM ET.

15.     I spoke with Mr. Hermalyn on the morning of February 2, 2024 when he called my wife's phone from a number with a New Jersey area code. Mr. Hermalyn communicated to me that Mr. Hermalyn and Mr. Rubin were excited about my interviewing with Fanatics. A representative from the Fanatics Human Resources department also contacted me on February 2, 2024 to schedule an initial interview at 1:00 PM ET. I responded that I was unavailable. An interview panel was later scheduled for Sunday, February 4, 2024 starting at 1:00 PM ET. Attached hereto as Exhibit H is a true and correct copy of the email correspondence between myself, Niles Brandon, and Deirdre Parlon of Fanatics, dated February 2, 2024 and February 3, 2024.

16.     On Saturday, February 3, 2024 at 7:55 AM ET, Mr. Hermalyn contacted me from a phone number with an Austin, Texas area code by calling my wife's cell phone. The call lasted 30 minutes. On this call, Mr. Hermalyn encouraged me to take the meetings with Fanatics and said that it would reflect poorly on him if I did not. Attached hereto as Exhibit I is a true and correct copy of a screenshot of the call from Mr. Hermalyn to my wife's phone, dated February 3, 2024. I have not spoken to Mr. Hermalyn regarding employment at Fanatics since February 3, 2024.

17.     At some point in time between February 1 and February 3, Mr. Hermalyn told me that if I was approached by lawyers and asked if we had conversations regarding employment offers at Fanatics I had to say no.

18.     On Sunday, February 4, 2024, I had four meetings over Zoom with Fanatics starting at 1:00 PM ET. I met with Tucker Kain, the Chief Strategy and Growth Officer of Fanatics:

Orlando Ashford, the Chief People Officer of Fanatics; Alex Lee, the Senior Vice President and
General Manager of Loyalty at Fanatics; and Niles Brandon, VP, Fanatics Human Resources. *See*
Ex. H.

19.     On the week of February 5, 2024, a representative from Fanatics' Human Resources
department called me and said Fanatics would contact me regarding the position the following
week.

20.     On Friday, February 16, 2024 at 9:13 AM ET, I received a text message from
Tucker Kain regarding employment with Fanatics.  Mr. Kain congratulated me on the birth of my
son and said that he "[c]ame out of our conversation really energized" and asked if I wanted to
"catch up this weekend or next week." Mr. Kain texted me again on February 19, 2024 to schedule
a call for 11:00 AM ET on February 20, 2024.  Attached hereto as Exhibit J is a true and correct
copy of the text messages between Tucker Kain and myself, dated February 16, 2024 and February
19, 2024.

21.     I spoke with Mr. Kain again when he called me on February 20, 2024.   He
acknowledged my paternity leave at DraftKings and said he would call me again in the coming
weeks.  Attached hereto as Exhibit K is true and correct copy of a screenshot of the call from Mr.
Kain, dated February 20, 2024.

22.     On Wednesday, February 28, 2024, I searched the Fanatics website for the
"Director, VIP Customer Development" role Mr. Hermalyn had communicated was available for
me.  To the best of my recollection, the job listing for "Director, VIP Customer Development" that
I viewed on February 28 is identical to the listing I reviewed when I searched for the role Mr.
Hermalyn communicated to me on February 1, 2024.  As of February 28, the role remained open;
however, the compensation associated with that role, as reflected on the public job posting, was

6

significantly less than Mr. Hermalyn had offered me when we spoke on February 1, 2024. A true and correct copy of the job posting for the "Director, VIP Customer Development" role as of February 28, 2024 is attached hereto as Exhibit L.

I declare under the penalty of perjury that the foregoing facts are true and correct based on my personal knowledge.

Signed this 28th day of February 2024 under the pains and penalties of perjury.

Andrew Larracey

7

A308

# EXHIBIT B

A309



# EXHIBIT C

A311



A312

# EXHIBIT D

A313



A314



A315

# EXHIBIT K

A316



# EXHIBIT L

A318



# Director, VIP Customer Development

**New York - New York / California - Los Angeles**
**Fanatics Inc. – Strategic Development /   Salaried /   Hybrid**

**Company Overview**

Fanatics is building a leading global digital sports platform. The company ignites the passions of global sports fans and maximizes the presence and reach for hundreds of sports partners globally by offering innovative products and services across Fanatics Commerce, Fanatics Collectibles, and Fanatics Betting & Gaming, allowing sports fans to Buy, Collect and Bet. Through the Fanatics platform, sports fans can buy licensed fan gear, jerseys, lifestyle and streetwear products, headwear, and hardgoods; collect physical and digital trading cards, sports memorabilia, and other digital assets; and bet as the company builds its Sportsbook and iGaming platform. Fanatics has an established database of over 100 million global sports fans, a global partner network with over 900 sports properties, including major national and international professional sports leagues, teams, players associations, athletes, celebrities, colleges, and college conferences, and over 2,000 retail locations, including its Lids retail business stores.

As a market leader with more than 18,000 employees, and hundreds of partners, suppliers, and vendors worldwide, we take responsibility for driving toward more ethical and sustainable practices. We are committed to building an inclusive Fanatics community, reflecting and representing society at every level of the business, including our employees, vendors, partners and fans. Fanatics is also dedicated to making a positive impact in the communities where we all live, work, and play through strategic philanthropic initiatives.

Overview

A319

This individual will leverage Fanatics' differentiated position with leagues, players, and teams as well as their current 90M users to create build out our unprecedented loyalty program, with focus on growth of our VIP program and customer base.  They leverage data and insights from Fanatics' multiple lines of business to grow our high value customer segment. Furthermore, this individual will create new loyalty offerings and partnerships that unlock the value of the full Fanatics digital sports platform, including apparel, gaming, collectibles, tickets, and other offerings. Through a suite of innovative and compelling loyalty experiences, they will develop the strategy to acquire new customers and to reengage and enhance the lifetime value of existing Fanatics customers.

Fanatics **Director of Customer Development** will be instrumental in building strong relationships with high value customers, acquiring new business and driving incremental revenue throughout the Fanatics portfolio.  They will also be critical in helping develop a personalized, strategic approach to building a top-tier customer base and driving brand loyalty. This individual should have deep relationships with high value sports and online gaming and/or collectibles customers, and utilize their networking skills to integrate, and maintain them, into the business.  He or she will be entrepreneurial, passionate about launching new initiatives, and highly experienced at building a book of business across various categories.  They will create long-lasting relationships with these high value customers by providing exemplary customer service, driving incremental revenue and finding new business through all appropriate networks. The VP of Customer Development will report directly to the head of VIP Customer Development and work closely with leadership, account managers and marketing teams, along the broader Fanatics businesses.


**What You'll Do:**

·   Utilize Fanatics programs, partnerships and strategic roadmaps to drive revenue, while maintaining strong brand affinity to the company and value to our customers

·   Develop strong relationships with high value customers to create brand loyalty and incremental revenue through all Fanatics businesses

·   Utilize existing networks to meet new customers, develop new leads and build long lasting relationships

·   Travel to prospect regions and markets to find key strategic relationships and high value customers to introduce to the Fanatics brand



·   Work with regional and local team members on all events and activations to ensure valued clients are in attendance, receive premium experiences and understand the long-term benefits being a Fanatics customer

·   Market Fanatics assets to new and existing customers to build and maintain strong relationships and brand loyalty while upholding the Fanatics brand

·   Assist other teams in building a pipeline of prospective customers, develop deep industry relationships, and formalize partnerships with top brands to generate value exchange between companies

A320

· Observe and report back on key competitive insights and value propositions provided to customers of competing brands

**What We're Looking For:**

· 7 – 10+ years of business development and relationship marketing experience with a concentration in loyalty and experiential marketing for companies with an array of product offerings

· A successful track record in building strong, multi-dimensional customer relationships that create value for all customers, and ultimately both parties (i.e. Fanatics and customer) involved

· Experience working with internal and external teams to drive high impact partnerships

· Ability to travel to other cities to work remote, host events, meet customers and find new business through all marketing efforts available

· Experience building and maintaining relationships with high value customers on a continual basis

· Excellent decision making when it comes to customer reinvestment, building loyalty and maximizing customer gross profit

· A visionary marketing and industry leader laser-focused on Fanatics customers  and their experience

· Intellectually curious, with the ability to make quick and nimble decisions

· Entrepreneurial with a "roll up your sleeves" attitude; comfortable with ambiguity

· An inspired marketing leader who can work cross functionally with the leadership team

· Humble, kind, and strong collaborator with all team members and partners

· A true believer in Fanatics' mission, and someone who embodies the values and embraces the goal of the company

· Exceptional communication skills; strong ability to distill complexity into crisp, easily comprehensible and compelling messaging; capacity for storytelling

The salary range for this position is **$150,000 to $200,000**, which represents base pay only and does not include short-term or long-term incentive compensation. When determining base pay, as part of a final compensation package, we consider several factors such as location, experience, qualifications, and training.

Ensure your Fanatics job offer is legitimate and don't fall victim to fraud.  Fanatics never seeks payment from job applicants. Feel free to ask your recruiter for a phone call or other type of communication for interview, and ensure your communication is coming from a Fanatics or Fanatics Brand email address.  For added security, where possible, apply through our company website at www.fanaticsinc.com/careers

*Tryouts are open at Fanatics! Our team is passionate, talented, unified, and charged with creating the fan experience of tomorrow. The ball is in your court now.*

Fanatics is committed to responsible planning and purchasing (RPP) practices, working with its business partners across its global and multi-layered supply chain, to ensure that planning, sourcing, and purchasing decisions, along with other supporting processes, do not impede or conflict with the fulfillment of Fanatics' fair labor practices.

**NOTICE TO CALIFORNIA RESIDENTS/APPLICANTS**: In connection with your application, we collect information that identifies, reasonably relates to or describes you ("Personal Information"). The categories of Personal Information that we collect include your name, government issued identification number(s), email address, mailing address, other contact information, emergency contact information, employment history, educational history, criminal record, and demographic information.  We collect and use those categories of Personal Information about you for human resources and other business management purposes, including identifying and evaluating you as a candidate for potential or future employment or other types of positions, recordkeeping in relation to recruiting and hiring, conducting criminal background checks as permitted by law, conducting analytics, and ensuring compliance with applicable legal requirements and Company policies. For additional information on how we collect and use personal information in connection with your job application, review our Candidate Privacy Policy-CA

Fanatics Home Page

Jobs powered by LEVER

A322

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DRAFTKINGS INC.,

        Plaintiff,

   v.

MICHAEL HERMALYN,

        Defendant.

Civil Action No. 1:24-cv-10299-JEK

**AFFIDAVIT OF HAYDEN METZ IN SUPPORT OF PLAINTIFF'S MOTION
<u>FOR PRELIMINARY INJUNCTION</u>**

A323

I, Hayden Metz, upon being duly sworn, do hereby testify under oath as follows:

1.      I am a Vice President ("VP") of Growth and Development at DraftKings Inc. ("DraftKings" or "the Company"), where I have worked for more than five years.  I am over the age of eighteen.

2.      I know Michael Hermalyn and worked on the VIP team reporting directly to Mr. Hermalyn until he tendered his resignation on February 1, 2024.

3.      Shortly after 1:00 PM ET on February 1, 2024, Andrew Larracey and I learned from DraftKings' IT department that Mr. Hermalyn's Salesforce account had been shut off.

4.      Mr. Larracey and I then called Mr. Hermalyn from a conference room in DraftKings' Boston, Massachusetts office.  Mr. Hermalyn did not answer the call but immediately called us back.  Mr. Hermalyn asked us to confirm that we were the only people in the conference room.  He then ended the telephone call and connected with us by FaceTime video call.  He asked us to use the phone's camera to scan the room so that Mr. Hermalyn could confirm that Mr. Larracey and I were alone in the DraftKings conference room.  Mr. Hermalyn told Mr. Larracey and me that he had tendered his resignation with DraftKings to work for Fanatics, and that there were two positions on the Fanatics website to which we should apply.  Mr. Hermalyn mentioned a VP position for me and a Senior Director position for Mr. Larracey.  This conversation was brief, lasting fewer than five minutes.

5.      After ending the call with Mr. Hermalyn, Mr. Larracey and I discussed the news over lunch.  That afternoon, I met with Shawn Henley, Chief Customer Officer at DraftKings, who informed me of the Company's decision to promote me to my current position as VP.  In the evening, I attended a Boston Celtics game.  During the event, I received a text message from Mr. Larracey asking if I wished to speak after the game; I replied that I did.  A true and correct

1

screenshot of this text message exchange with Mr. Larracey on February 1, 2024 is attached hereto as Exhibit A.

6.      After the game, Mr. Larracey called me at or about 10:16 PM ET.  Mr. Larracey then used his wife's cell phone, rather than his own, to call Mr. Hermalyn.  Mr. Larracey then put Mr. Hermalyn (on Mr. Larracey's wife's phone) and me (on Mr. Larracey's phone) on speaker, so that the three of us could talk.  Mr. Larracey used his wife's cell phone to place the call because Mr. Larracey and I were under the impression that Mr. Hermalyn did not want us to call him from our own cell phones.  Over the course of the evening of February 1, 2024 and the early morning hours of February 2, 2024, Mr. Larracey, Mr. Hermalyn, and I had a series of phone calls lasting multiple hours using this speaker phone approach.  A true and correct copy of screenshots of the call history reflecting my calls with Mr. Larracey's cell phone beginning on February 1, 2024 and ending on February 2, 2024 is attached hereto as Exhibit B.

7.      During these discussions, Mr. Hermalyn provided additional details about the roles in the Fanatics VIP department that were available to Mr. Larracey and me—namely a Vice President role for me, and a Senior Director role for Mr. Larracey.  During the course of the conversations, I searched the "Careers" page on Fanatics' website for the role Mr. Hermalyn said he had for me; I was able to find a VP level role with a similar description as the Director position listed for Mr. Larracey, a position to which I understand Mr. Larracey applied.  According to Mr. Hermalyn, the VP position would report directly to him, as he now "owned VIP across Fanatics." As described by Mr. Hermalyn, both of these roles were in Fanatics Enterprise VIP department which includes online sports betting.  During our discussion, Mr. Hermalyn made specific offers of compensation to incentivize us to accept roles with Fanatics.  Mr. Hermalyn offered us base salary, annual bonuses, signing bonuses, and initial equity allocations.  At an early stage in these

2

discussions, and in connection with the Fanatics VP position, Mr. Hermalyn represented that he had authority and would offer me a $500,000 base salary, a $250,000 annual bonus, a $1,000,000 signing bonus, and an initial equity allocation of $3,500,000.  Mr. Hermalyn also communicated a compensation package to Mr. Larracey.  During these discussions, Mr. Larracey and I indicated that we would not consider the initial offers Mr. Hermalyn communicated given the risk and disruption that would result from accepting the offers to work at Fanatics, including potential litigation risk since we would be violating our non-competition obligations.  After initial discussions, Mr. Hermalyn briefly left the call, rejoined, and relayed increased offers after claiming to have spoken with someone at Fanatics.  Ultimately, Hermalyn represented that he had authority and would offer me $500,000 in base salary, a $250,000 annual bonus, a $3,000,000 signing bonus, and an initial equity allocation of $4,000,000.   During our discussions, Mr. Hermalyn communicated to me that the initial equity allocation used a $28 billion valuation for Fanatics.  During our conversations, I wrote down the terms of the offers communicated by Mr. Hermalyn in my notes application on my phone.  A true and correct screenshot of my notes from my conversations with Mr. Hermalyn that began on the evening of February 1, 2024 and concluded in the early morning hours of February 2, 2024 is attached hereto as Exhibit C.  The notes from these calls reflect the initial offer made and what I told Mr. Hermalyn the minimum compensation for me to consider the position was and therefore the notes do not match the maximum offer he made during our conversations.

8.     Mr. Hermalyn represented that he had authority from Fanatics to make these offers. In fact, Mr. Hermalyn represented to us that he was taking the phone call from inside the home of Michael Rubin, the CEO of Fanatics and even offered to put Mr. Rubin on the line to speak with me and  Mr. Larracey.

3

9.     During our conversations, Mr. Hermalyn reiterated that, despite his assurances regarding these roles with Fanatics, Mr. Larracey and I would need to formally apply for the positions in order to receive written offers.  Mr. Hermalyn told Mr. Larracey and me that it would be the "nuclear option" for either of us to report the information from our phone conversations to DraftKings or use his offer to negotiate higher compensation with DraftKings.  I understood that to mean that the conversation was to remain between the three of us.

10.    Mr. Hermalyn also mentioned that these positions would likely entail relocating to Los Angeles.  He stated that he himself had moved to Los Angeles, in part because of his noncompetition agreements.  Mr. Hermalyn indicated Fanatics would indemnify Mr. Larracey and me and pay any legal fees associated with any potential dispute with DraftKings regarding our violation of our non-competition obligations to DraftKings.

11.    As an alternative to moving to Los Angeles and accepting a role in Mr. Hermalyn's VIP department, Mr. Hermalyn communicated to Mr. Larracey and me that we could discuss options concerning other roles that would not require relocating.

12.    After around two-and-a-half hours, our call ended with Mr. Hermalyn expressing frustration that I would not entertain the Fanatics offer at the level of compensation he had offered.  Mr. Larracey expressed more openness to learning more about the details of a written offer with Fanatics.

13.    After we hung up with Mr. Hermalyn, Mr. Larracey called me at 1:07 AM ET to discuss our conversation with Mr. Hermalyn.  Shortly into our discussion, Mr. Hermalyn again called Mr. Larracey—such that all three of us were back on the line—and continued his pitch for us to join Fanatics.  This follow-up call lasted nearly an hour.  Mr. Hermalyn repeatedly restated his position that not considering the offer to apply to the VP position within his department was a

4

bad decision. I remained unconvinced, especially in light of my conversations earlier that day with DraftKings leadership which made me feel secure in my future with the Company. I was aware and understand that Mr. Larracey applied for a position at Fanatics during the February 1-2 conversations with Mr. Hermalyn.

14.     Since the call into the early morning hours of February 2, 2024, I have not spoken with Mr. Hermalyn. I attempted to contact Mr. Hermalyn one other time on February 4, 2024 by placing two back to back phone calls in short order. These calls were to the same phone number Mr. Hermalyn had used to call Mr. Larracey several times in the preceding days, 737-███████. In doing so, I intended to ask Mr. Hermalyn to refrain from recruiting Mr. Larracey, whom Mr. Hermalyn had continued to solicit following our February 1 conversations. However, Mr. Hermalyn did not answer the phone, and I did not attempt to call again.

I declare under the penalty of perjury that the foregoing facts are true and correct based on my personal knowledge.

Signed this 28th day of February 2024 under the pains and penalties of perjury.

Hayden Metz

5

A328

# EXHIBIT A

A329



# EXHIBIT B





A333

# EXHIBIT C

A334

500/250/1M/3.5M

500/250/3/6.3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| |
|---|
| DRAFTKINGS INC., |
|                Plaintiff, |
| v. |
| MICHAEL HERMALYN, |
|                Defendant. |

Civil Action No. 1:24-cv-10299-JEK

**DECLARATION OF JACOB T. SPENCER IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY**

I, Jacob T. Spencer, declare under penalty of perjury, pursuant to 29 U.S.C. § 1746:

1.      I am an attorney authorized to practice before this Court *pro hac vice*, and a member in good standing of the bars of the Commonwealth of Virginia and the District of Columbia.

2.      I am a partner at the law firm of Gibson, Dunn & Crutcher LLP, attorneys for Plaintiff DraftKings Inc. ("DraftKings").  I am fully familiar with the facts set forth in this Declaration.

3.      I make this declaration in opposition to Defendant Michael Hermalyn's Motion to Dismiss or, in the Alternative, to Stay in this action.

4.      Attached hereto as **Exhibit A** is a true and correct copy of DraftKings's Third Amended Responses and Objections to Defendant Michael Z. Hermalyn's Interrogatory No. 9, dated March 20, 2024.

5.      Attached hereto as **Exhibit B** is a true and correct copy of DraftKings's Notice of Removal filed in *Michael Z. Hermalyn & FVP, LLC v. DraftKings, Inc.*, No. 2:24-cv-00997 (C.D. Cal.), dated February 5, 2024.

A336

6.      Attached hereto as **Exhibit C** is a true and correct copy of Michael Z. Hermalyn and FVP, LLC's Emergency Motion to Remand filed in *Michael Z. Hermalyn & FVP, LLC v. DraftKings, Inc.*, No. 2:24-cv-00997 (C.D. Cal.), dated February 6, 2024.

7.      Attached hereto as **Exhibit D** is a true and correct copy of Michael Z. Hermalyn's *Ex Parte* Application for (1) a Temporary Restraining Order and (2) an Order to Show Cause Regarding Preliminary Injunction; Memorandum of Points and Authorities in Support Thereof in *Michael Z. Hermalyn & FVP, LLC v. DraftKings, Inc.*, No. 24STCV02694 (Cal. Super. Ct.), dated February 20, 2024.

8.      Attached hereto as **Exhibit E** is a true and correct copy of a Minute Order issued in *Michael Z. Hermalyn & FVP, LLC v. DraftKings, Inc.*, No. 24STCV02694 (Cal. Super. Ct.), dated February 22, 2024.

9.      Attached hereto as **Exhibit F** is a true and correct copy of Specially Appearing Defendant DraftKings Inc.'s Notice of Motion and Motion to Quash Service of Summons for Lack of Personal Jurisdiction; Memorandum in Support in *Michael Z. Hermalyn & FVP, LLC v. DraftKings, Inc.*, No. 24STCV02694 (Cal. Super. Ct.), dated February 29, 2024 and filed March 1, 2024.

A337

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed: March 21, 2024

Jacob T. Spencer (*pro hac vice*)

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Tel:  202.887.3792
Fax:  202.530.4253
JSpencer@gibsondunn.com

A338

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served on Defendant's counsel on the date below via email and will be filed through the ECF System and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: March 21, 2024                                   _____/s/ Jacob T. Spencer_____

A339

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DRAFTKINGS INC.,<br><br>        *Plaintiff,*<br><br>  v.<br><br>MICHAEL HERMALYN,<br><br>        *Defendant.* | Civil Action No. 1:24-cv-10299-JEK |

### PLAINTIFF DRAFTKINGS INC.'S THIRD AMENDED RESPONSES AND OBJECTIONS TO DEFENDANT MICHAEL Z. HERMALYN'S INTERROGATORY NO. 9

Pursuant to the Court's February 8, 2024 Order (Dkt. 42) and February 16, 2024 Order (Dkt. 53) (together, the "Orders"), as well as Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Federal Rules") and Rule 33.1 of the Local Rules of the United States District Court for the District of Massachusetts (the "Local Rules"), Plaintiff DraftKings Inc., ("DraftKings" or "the Company"), by its undersigned counsel, hereby serves the following third amended responses and objections to Defendant Michael Z. Hermalyn's ("Defendant" or "Hermalyn") First Set of Interrogatories, dated February 16, 2024 ("Interrogatories").

### GENERAL OBJECTIONS

The following General Objections apply to each and every Interrogatory and are incorporated by reference into each and every specific response as if fully set forth in each such response.

1.    DraftKings' responses herein are based on a reasonably diligent and good faith inquiry and represent DraftKings' current knowledge as of the date of these responses and

1

A341

objections.  Further investigation may reveal additional facts or information that could lead to additions to, changes in, and/or variations from the responses herein.  Unless otherwise stated, DraftKings construes the Interrogatories only to require DraftKings to use reasonable diligence to provide responsive information.

2.      DraftKings' factual and legal investigation of this matter is ongoing.  The following responses and objections are based solely on the information that is presently available and specifically known to DraftKings.  DraftKings reserves the right, but does not assume any obligation, except as required by law, to supplement, amend, correct, clarify, or modify the objections and responses herein, including, without limitation, as further information becomes available.  Further, DraftKings reserves the right, at the preliminary injunction hearing, trial, or during any other proceedings in this action, to rely on documents, evidence, and other materials in addition to the information produced in response to the Interrogatories, whether or not such documents, evidence, or other materials are newly discovered or are now in existence but have not been located, despite reasonably diligent and good faith efforts.

3.      These objections are provided without prejudice to DraftKings' right to object on any basis to the admission or use of any information produced in response to these Interrogatories.

4.      DraftKings objects to the Interrogatories, including the Definitions and Instructions, to the extent they purport to impose obligations that are inconsistent with, or broader in scope than, those contemplated by the Orders, the Federal Rules, the Local Rules of this Court, any other order entered in or applicable to this action, or any other applicable law or rule.

5.      DraftKings objects to the Interrogatories, including the Definitions and Instructions, to the extent they seek information that is not relevant to any claims or defenses in this action, impose a burden disproportionate to the needs of the case, or are of such marginal

2

A342

relevance that their probative value is substantially outweighed by the burden imposed on DraftKings in having to search for and provide such information.

6.      DraftKings objects to the Interrogatories to the extent they seek information that is subject to a claim of privilege or otherwise protected from disclosure, including seeking information protected by the attorney-client privilege, work-product doctrine, or other immunity.

7.      DraftKings objects to the Interrogatories, including the Definitions and Instructions, to the extent they are vague, ambiguous, overbroad, and/or unduly burdensome, including to the extent they seek "all" information concerning the subject matters referenced therein, do not contain date restrictions, or seek information outside of the time period relevant to the claims and defenses asserted in this action.

8.      DraftKings objects to the Interrogatories, including the Definitions and Instructions, to the extent they purport to seek discovery more appropriately obtained by means other than these Interrogatories.

9.      DraftKings objects to the Interrogatories, including the Definitions and Instructions, to the extent they are argumentative, lack foundation, or incorporate allegations and assertions that are disputed or erroneous.  By responding and objecting to the Interrogatories, DraftKings does not admit the correctness of such assertions.

10.      DraftKings objects to the Interrogatories, including the Definitions and Instructions, to the extent they call for a legal conclusion.

11.      DraftKings objects to the Interrogatories, including the Definitions and Instructions, to the extent they purport to require the production of information that is public, already in the possession, custody, or control of Defendant, equally available to Defendant, available from sources to which Defendant also has access, or obtainable from some other source

3

A343

that is more convenient, less burdensome, or less expensive, including, without limitation, non-parties.

12.     DraftKings objects to the Interrogatories, including the Definitions and Instructions, to the extent they seek confidential commercial, business, financial, or competitively sensitive information, trade secrets, or any other proprietary information belonging to DraftKings, its respective employees, its clients, and its business partners, including information subject to confidentiality agreements with third parties, to the extent not relevant to DraftKings' causes of action in this case.

13.     DraftKings objects to the Interrogatories, including the Definitions and Instructions, to the extent they seek to require DraftKings to produce any information that constitutes the private, confidential, or privileged information of non-parties, including, but not limited to, third-party business or technical information and/or user or customer personal information, which DraftKings is under an obligation not to disclose.

14.     DraftKings objects to the Interrogatories, including the Definitions and Instructions, to the extent they seek information not in DraftKings' possession, custody, or control and to the extent they purport to impose upon DraftKings a duty to secure and produce information not in its possession, custody, or control.  DraftKings' responses and objections shall not be construed as representations regarding the existence or non-existence of specific information in its possession, custody, or control.

15.     DraftKings objects to the Interrogatories, including the Definitions and Instructions, to the extent they seek information that are subject to any privilege, immunity, or obligation of confidentiality, including, without limitation, the attorney-client privilege, the attorney work product doctrine, the joint defense privilege, the common interest privilege, or any

4

A344

other privilege or immunity recognized by the Federal Rules and Local Rules, federal statute, or any other applicable federal or state rule or law.  Specific objections on the grounds of privilege are provided for emphasis and clarity only, and the absence of a specific objection should not be interpreted as evidence that DraftKings does not object to an Interrogatory on the basis of an applicable privilege.

16.     Any inadvertent disclosure of any privileged or protected information to Defendant shall not be deemed or construed to constitute a waiver of any privilege or protection, any other doctrine against disclosure, or DraftKings' right to object to the use of any information inadvertently disclosed.  DraftKings has not previously waived any applicable privilege and specifically states that it does not intend to do so through the production of any information in response to the Interrogatories.

17.     DraftKings objects to the Interrogatories, including the Definitions and Instructions, to the extent they seek production of information in the absence of a stipulated Protective Order.

18.     DraftKings objects to the Interrogatories, including the Definitions and Instructions, to the extent they seek information also sought by other Interrogatories on the grounds that such Interrogatories are unnecessarily duplicative and cumulative.

19.     DraftKings objects to the Interrogatories to the extent they are improper in form, including insofar as they are not framed with the required specificity and particularity.

20.     DraftKings objects to the "Definitions" for the Interrogatories, to the extent they purport to impose discovery burdens greater than the obligations imposed by the Federal Rules of Civil Procedure and the Local Rules of this Court.

5

A345

21.     DraftKings objects to the definition of "DraftKings" as overbroad, unduly burdensome, and improper to the extent it seeks to require DraftKings to search for and produce information outside of DraftKings' possession, custody, or control and/or from entities other than DraftKings Inc.  DraftKings further objects to the definition's reference to "any predecessors or successors in interest, divisions, departments, and any present or former officers, directors, employees, partners, corporate parents, subsidiaries, affiliates, representatives, agents, attorneys, and any person or entity acting, purporting to act, or having acted or purported to act, directly or indirectly, on behalf of DraftKings, Inc.," as overly broad.  In responding to the Interrogatories, DraftKings will provide information within its possession, custody and control and on behalf of DraftKings Inc. only, unless expressly stated otherwise.

## SPECIFIC OBJECTIONS AND RESPONSES[1]

Subject to the foregoing General Objections, which are incorporated by reference into each response below, and the specific objections set forth below, and without waiving any objections that may be interposed in the future, DraftKings respond to Interrogatory No. 9 as follows:

## INTERROGATORY NO. 9:

Identify with specificity each contact or connection that DraftKings alleges Hermalyn had with the Commonwealth of Massachusetts while employed by and concerning his work for DraftKings, including a description of each of Hermalyn's alleged business travels to Massachusetts as alleged in Paragraph 78 of the Complaint.

## RESPONSE TO INTERROGATORY NO. 9:

---

[1] DraftKings has copied and included the text of Defendant's First Set of Interrogatories verbatim as they were served upon DraftKings, without correcting any typos or other errors.

6

A346

DraftKings restates and incorporates the General Objections as though fully set forth herein.  DraftKings objects to this Interrogatory as premature, including on the ground that discovery is in its early stages and further discovery will reveal the full scope of Defendant's "contact[s] or connection[s] . . . with the Commonwealth of Massachusetts."  DraftKings further objects to this Interrogatory as vague and ambiguous, including based on its use of the undefined term "with specificity," which is subject to multiple meanings in the context of this Interrogatory, and the terms "contact" and "connection."  DraftKings further objects to this Interrogatory to the extent Defendant construes the language of Paragraph 78 of the Verified Complaint differently than DraftKings' intended construction.

Subject to and without waiving the foregoing General and Specific Objections, and subject to further discovery in this matter and reserving its right to supplement its response, DraftKings responds as follows based upon the information known to it as of the date of this response:

The below list of contacts or connections with Massachusetts is based on Company records of travel and accommodation expenses paid on Mr. Hermalyn's behalf as well as expense reports from Mr. Hermalyn's Company credit card.  These records were kept in the ordinary course of business.  Based on these records, Mr. Hermalyn traveled to Boston for DraftKings business as set forth below:

1.  According to flight and hotel expense records maintained by the Company, on May 11, 2021, Defendant traveled to Boston, Massachusetts to attend a Company meeting and stayed at the Westin Copley Place until May 14, 2021.

2.  According to flight expense records maintained by the Company, on June 17, 2021, Defendant traveled to Boston, Massachusetts to attend a Company meeting, returning the same day.

3.  According to hotel expense records maintained by the Company, on August 9-10, 2021, Defendant was in Boston, Massachusetts for a customer visit, and stayed at the Westin Copley Place.

7

4.      According to hotel expense records maintained by the Company, on September 2, 2021, Defendant was in Boston, Massachusetts to attend a Company meeting, and stayed at the Loews Boston Hotel.

5.      According to flight expense records maintained by the Company, on September 27, 2021, Defendant traveled to Boston, Massachusetts to attend a Company meeting, returning the same day.

6.      According to flight expense records maintained by the Company, on November 11, 2021, Defendant traveled to Boston, Massachusetts to attend a Company meeting.

7.      According to flight and hotel expense records maintained by the Company, on March 1, 2022, Defendant traveled to Boston, Massachusetts to work at the DraftKings Boston office, and stayed at the Loews Boston Hotel for one night.

8.      According to flight and hotel expense records maintained by the Company, on May 10-12, 2022, Defendant traveled to Boston, Massachusetts to attend a Company meeting, and stayed at the Loews Boston Hotel.

9.      According to flight and hotel expense records maintained by the Company, on May 16-17, 2022, Defendant was in Boston, Massachusetts for a Company meeting, and stayed at the Commonwealth Hotel.

10.     According to flight, train, and hotel expense records maintained by the Company, on June 13-14, 2022, Defendant traveled to Boston, Massachusetts for a customer visit, and stayed at the Loews Boston Hotel.

11.     According to flight and train expense records maintained by the Company, on June 16-17, 2022, Defendant traveled to Boston, Massachusetts for a work-related event.

12.     According to flight and hotel expense records maintained by the Company, on October 6, 2022, Defendant traveled to Boston, Massachusetts to attend a Company meeting, and stayed at the Loews Boston Hotel.

13.     According to flight and hotel expense records maintained by the Company, on October 24-26, 2022, Defendant traveled to Boston, Massachusetts to attend a Company meeting, and stayed at the Loews Boston Hotel.

14.     According to flight expense records maintained by the Company, on November 9, 2022, Defendant traveled to and from Boston, Massachusetts for a customer visit, returning the same day.

15.     According to flight and hotel expense records maintained by the Company, on January 26-27, 2023, Defendant traveled to Boston, Massachusetts to attend a Company meeting, and stayed at the Hotel AKA Back bay.

A348

16.     According to flight expense records maintained by the Company, on March 9, 2023, Defendant traveled to Boston, Massachusetts to attend a Company meeting, returning the same day.

17.     According to flight and hotel expense records maintained by the Company, on March 17, 2023, Defendant traveled to Boston, Massachusetts for a work-related event.

18.     According to flight and hotel expense records maintained by the Company, on April 25-26, 2023, Defendant traveled to Boston, Massachusetts for a Company meeting, and stayed at the Encore Boston Harbor Resort & Casino.

19.     According to flight expense records maintained by the Company, on May 31, 2023, Defendant traveled to and from Boston, Massachusetts for a Company meeting, returning the same day.

20.     According to flight expense records maintained by the Company, on July 24, 2023, Defendant traveled to and from Boston, Massachusetts to attend a work-related event, returning the same day.

21.     According to flight and hotel expense records maintained by the Company, on August 2-3, 2023, Defendant was in Boston, Massachusetts for a Company meeting, and stayed at the Westin Copley Place, Boston Hotel.

22.     According to flight and hotel expense records maintained by the Company, on August 7-9, 2023, Defendant traveled to Boston, Massachusetts to attend a Company meeting, and stayed at the Moxy Boston Downtown Hotel.

23.     According to flight and hotel expense records maintained by the Company, on September 18-19, 2023, Defendant traveled to Boston, Massachusetts to attend a Company meeting, and stayed at the Westin Copley Place, Boston Hotel.

24.     According to flight expense records maintained by the Company, on October 5-6, 2023, Defendant traveled to Boston, Massachusetts to attend a work-related event.

25.     According to flight expense records maintained by the Company, on November 14, 2023, Defendant traveled to Boston, Massachusetts to attend a Company meeting.

26.     Most recently, DraftKings reserved Mr. Hermalyn a room at The Westin Copley Place to begin on January 30, 2024 and continue through February 2, 2024 for a Company meeting.  On January 29, 2024, Mr. Hermalyn informed Shawn Henley, multiple DraftKings employees, and others that a friend had passed away.  Hermalyn told DraftKings he "need[ed] the rest of today and tomorrow," in reference to January 29 and January 30, and canceled DraftKings meetings

9

A349

scheduled for January 29, 2024.  Unbeknownst to DraftKings at the time, Hermalyn spent January 28, 2024 and the following days in California.  He did not take his scheduled trip to Boston.

10

Dated: March 20, 2024

/s/ Andrew S. Dulberg
Andrew S. Dulberg (BBO #675405)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
E-mail:  andrew.dulberg@wilmerhale.com

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (admitted *pro hac vice*)
Harris M. Mufson (admitted *pro hac vice*)
Justine Goeke (admitted *pro hac vice*)
Christine Demana (admitted *pro hac vice*)
Justin M. DiGennaro (admitted *pro hac vice*)
200 Park Avenue
New York, NY  10166-0193
Tel:  212.351.4000
Fax:  212.351.4035
Osnyder@gibsondunn.com
Hmufson@gibsondunn.com
Jgoeke@gibsondunn.com
Cdemana@gibsondunn.com
JdiGennaro@gibsondunn.com

Jason C. Schwartz (admitted *pro hac vice*)
Jacob T. Spencer (admitted *pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel:  202.955.8500
Jschwartz@gibsondunn.com
Jspencer@gibsondunn.com

11

A351

## <u>CERTIFICATE OF SERVICE</u>

I, Justine M. Goeke, counsel for DraftKings, hereby certify that this document was served upon counsel of record for Defendant Michael Hermalyn through electronic mail, this 20th day of March 2024.

<div align="right">
<i>/s/ Justine Goeke</i>_____<br>
Justine Goeke
</div>

12

A352

**<u>VERIFICATION</u>**

I, Shawn Henley, hereby state that I am Chief Customer Officer at DraftKings Inc.  I am verifying DraftKings' third amended response to Defendant Michael Hermalyn's Interrogatory No. 9.  This response was prepared with the assistance of counsel.  I verify under penalty of perjury under the laws of the United States that DraftKings' response to Interrogatory No. 9 is true and correct based on my personal knowledge and belief and/or based on information that was provided to me.

Executed this 20th day of March 2024 at _____9:28pm_____

_____
Shawn Henley

A353

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| DRAFTKINGS INC., <br><br>       Plaintiff, <br><br>   v. <br><br> MICHAEL HERMALYN, <br><br>       Defendant. | Civil Action No. 1:24-cv-10299-JEK |

**AFFIDAVIT OF BRIAN HARRIS IN OPPOSITION TO DEFENDANT'S**
**<u>MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY</u>**

A354

I, Brian Harris, upon being duly sworn, do hereby testify under oath as follows:

1.       I previously submitted affidavits in support of Plaintiff DraftKings Inc.'s ("DraftKings" or the "Company") Motion for Temporary Restraining Order ("TRO"), in opposition to Defendant Michael Hermalyn's ("Hermalyn") Motion for Clarification and Refinement, and in support of DraftKings' Motion for Preliminary Injunction.  I also verified DraftKings' Responses to Interrogatories 1-3 propounded by Hermalyn in this action.

2.       I submit this fourth affidavit in opposition to Hermalyn's Motion to Dismiss.

3.       I joined DraftKings as its Director of IT in December 2014, and have managed the Company's information technology and security program continuously since then.  Today, I hold the title of Chief Information Security Officer and Senior Vice President of Technical Operations. I am responsible for all aspects of DraftKings' information technology and security.

4.       DraftKings has recovered a draft email from Hermalyn's DraftKings email account, with a date and time of January 28, 2024 at 10:10:46 PM (UTC).  There is no subject line.  The text of the email lists the following words: "Vote Apt Lease Doctor."  A screenshot of that email is included below.  A true and correct copy of the draft email recovered from Mr. Hermalyn's DraftKings email account is attached hereto as Exhibit A.



5.       I have reviewed this specific draft email from the personal storage table ("PST") file containing Hermalyn's email communications sent or received using his DraftKings email account.  A PST file is a file format used by Microsoft Exchange to store items such as email

A355

messages, calendar events, and contacts.  Based on my review of the email from the PST file, I was able to confirm that this email is a draft email because the email contained the Microsoft "Drafts" icon and it was not sent.

6.      Based on my review of the email from the PST file, I also identified efforts undertaken by Hermalyn to permanently delete the draft email.  First, Hermalyn deleted the draft from his mailbox, which caused it to be moved to the "Deleted Items" folder.  Moving an email to the "Deleted Items" folder does not permanently delete the email as it can still be viewed in the "Deleted Items" folder and moved to a different folder.[1]  Second, Hermalyn manually deleted the item from the "Deleted Items" folder.  Upon deletion from the "Deleted Items" folder, the draft would be retained in Outlook's "Recoverable Items" folder.[2]  Third, Hermalyn "purged" the draft from the "Recoverable Items" folder; this is also known as a "store hard delete."[3]

7.      Because DraftKings' default retention policy, which applied to Hermalyn's DraftKings email account, does not allow for any permanent deletion actions by users, Outlook items (including drafts) that are purged from the "Recoverable Items" folder are saved in a separate "purges" folder, which is not visible to the user.[4]  Thus, though the draft would have appeared to Hermalyn to be permanently deleted, DraftKings retained the draft in the PST file for Hermalyn's email pursuant to its retention policy.

---

[1] *See* Microsoft, *Recoverable Items folder in Exchange Online*, Feb. 21, 2023 (https://learn.microsoft.com/en-us/exchange/security-and-compliance/recoverable-items-folder/recoverable-items-folder).
[2] *Id.*
[3] *Id.*
[4] *Id.*

A356

I declare under the penalty of perjury that the foregoing facts are true and correct based on my personal knowledge and/or to the best of my knowledge and belief based on information that was provided to me from DraftKings' records.

Signed this 20th day of March 2024 under the pains and penalties of perjury.

_____

Brian Harris

-3-

A357

# EXHIBIT A

**Sent:**    Sun 1/28/2024 10:10:46 PM (UTC)

Vote
Apt
Lease
Doctor

**APPENDIX C**

**Hermalyn's Requested Revisions to DK's Proposed PI in Event Court Enters Injunctive Relief[1]**

| Row No. | Provision of DK Proposed PI With Hermalyn Requested Revisions (In Red)[2] | Hermalyn's Explanation For Proposed Revisions |
|---|---|---|
| 1 | 5. During the six (6) month period prior to February 1, 2024, Mr. Hermalyn performed services and/or received Confidential Information (as defined below) concerning the following aspects of DraftKings' business:<br><br>(i) ~~any fantasy or simulated activity or contest where winning outcomes are determined predominantly by accumulated statistical results of the performance of individuals in athletic or other events; the winning outcome reflects the knowledge and skill of the participant; and a winning outcome is not based solely on the performance of a single team or individual (hereinafter "FSC");~~<br><br>(ii) games of chance or skill, ~~pari-mutuel~~, fixed odds, pools or otherwise (including, but not limited to, ~~lottery, pari-mutuel betting, bingo, horse-and dog racing, simulated racing and sporting events, jai-alai, social casino, poker and keno~~) whether games/Gaming, sports betting, online casino played for real money or cash equivalent, virtual currency, free, or otherwise and any type of ancillary service or product related to the foregoing (hereinafter "Gaming"); | The Court should strike the noncompetition provision and this related provision entirely, but if it is inclined to enforce to some extent, it should modify as indicated.<br><br>The Court should limit the restricted department to Gaming and remove the FSC, Marketplace, eCommerce, and Media departments.<br><br>DK describes Hermalyn's role as limited to "developing and maintaining relationships with VIP customers'" in its Gaming department, Henley Dec. ¶ 5, and does not contend, much less put forth evidence of, his involvement in other departments.<br><br>The vast majority of Hermalyn's focus during his last six months at DK, both in terms of his time, and in terms of the volume of associated customers and DK business, was Gaming, specifically sports betting and gaming and casino business. MH PI Dec. ¶ 10. With respect to Gaming, Hermalyn did not engage in work at DK related |

---

[1] While Hermalyn objects to DK's proposed PI in its entirety for the reasons set forth in Hermalyn's accompanying Opposition brief, in the event the Court is inclined to enter some form of DK's proposed PI, it should, at minimum, be appropriately narrowed, and Hermalyn respectfully requests that the Court consider his requested revisions herein to address specific scope issues. In submitting this Appendix, Hermalyn reserves all objections, and waives none, to the proposed PI.

[2] Hermalyn proposes additions to DK's proposed PI in red, and deletions to DK's proposed PI in ~~red strikethrough~~.

1

| Row No. | Provision of DK Proposed PI With Hermalyn Requested Revisions (In Red)[2] | Hermalyn's Explanation For Proposed Revisions |
|---|---|---|
| | ~~(iii) the digital platform facilitating the purchase and sale of nonfungible tokens and other collectibles (hereinafter "Marketplace");~~ | to lottery, pari-mutuel betting, bingo, and dog racing, or simulated racing, so those aspects should be stricken. *Id.* |
| | ~~(iv) the sale and distribution of nonfungible tokens, collectibles, clothing, accessories, and other apparel (hereinafter "eCommerce");~~ | Hermalyn devoted relatively little attention during his last six months at DK to any business or work related to FSC. *Id.* |
| | ~~(v) the development, distribution, procurement and programming of content offerings in audio and video focused media related to sports and/or any aspects of DraftKings' business, including, but not limited to those aspects of DraftKings' business set forth in (i)-(iv) above (hereinafter "Media").~~ | Hermalyn devoted virtually no attention to any business or work during his last six months at DK related to Marketplace or Ecommerce; indeed, DK generally does not engage in the collectibles business (whereas Fanatics does). *Id.* |
| | | Hermalyn did not perform work related to Media during his last six months at DK. *Id.* |
| **2** | ~~6. Section (g) of the Noncompetition Covenant between Mr. Hermalyn and DraftKings dated August 16, 2022 (ECF 1-2, the "Noncompetition Covenant") extends the duration of Mr. Hermalyn's non-competition obligations as set forth therein.~~ | The Court should strike this provision entirely.

Section (g) does not just "extend" the duration of the Noncompetition Covenant, it does so for an undetermined period. It extends noncompetition obligations for a period equal "to the later of" (1) the time until any breach, threatened breach, or challenge to the restrictions is terminated, or (2) a "final non-appealable resolution of any [related] litigation or other legal proceeding." Noncompetition Covenant § (g) (Dkt. No. 1-2). This provision thus allows the Noncompetition Covenant to extend far beyond the Massachusetts Noncompetition Agreement Act's permissible limits. *See* M.G.L. c. 149, § 24L(b)(iv). |

2

| Row No. | Provision of DK Proposed PI With Hermalyn Requested Revisions (In Red)[2] | Hermalyn's Explanation For Proposed Revisions |
|---|---|---|
| | | DK has waived enforcing this provision by repeatedly arguing its contractual restrictions are reasonable because they last "no more than twelve months." PI Mem. 30; *see also id.* at 8, 21, 23. DK cannot now seek to impose an indefinite period far longer than 12 months. |
| 3 | **c) Noncompetition.** Mr. Hermalyn is hereby restrained and enjoined, for a period of twelve (12) months from the date of ~~this Order~~ his February 1, 2024 resignation from DraftKings, from using or disclosing DraftKings' Confidential Information to do the following: ~~(1)~~ acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise, from directly or indirectly ~~(1)~~ providing any services to Fanatics, Inc. and Fanatics, Inc.'s subsidiaries, affiliates, and joint ventures (individually and together, "Fanatics") relating to ~~FSC,~~ Gaming, ~~Marketplace, eCommerce and/or Media and any type of ancillary service or product related to or connected with the foregoing; and/or (2) providing any services to Fanatics relating to any other aspect of the Business of DraftKings for which Mr. Hermalyn performed services and/or received Confidential Information at any time during the six (6) month period prior to February 1, 2024; and/or (3) committing a Threatened Breach of the obligations set forth in this paragraph.~~ ~~(i) "Business of DraftKings" shall mean the research, design, development, marketing, streaming, promotion, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for: (1) FSC; (2) Gaming; (3) Marketplace; (4) eCommerce; (5) Media; (6) all other~~ | The Court should strike the noncompetition provision entirely, but if it is inclined to enforce to some extent, it should modify as indicated. The Court should only limit Hermalyn's ability to engage in competitive activity to the extent he is using or disclosing DK's Confidential Information to do so. The Court should specify that the period of restriction is 12 months or less from the date of Hermalyn's February 1, 2024 resignation from DK. *See* Noncompetition Covenant § (a) (Dkt. No. 1-2) ("twelve (12) months following termination of your Relationship with the Company"). The Court should limit the restricted department to "Gaming" and remove the FSC, Marketplace, eCommerce and/or Media departments, as well as the open-ended reference to any other aspect of the "Business of DraftKings," for the reasons stated in Row 1 above. As written, DK's request is broader than the Noncompetition Covenant, which only applies to departments "for which [Hermalyn] performed services or received Confidential Information [] at any time during the six (6) month period prior to such termination." *See id.* Hermalyn's work at DK primarily pertained to Gaming. |

3

| Row No. | Provision of DK Proposed PI With Hermalyn Requested Revisions (In Red)[2] | Hermalyn's Explanation For Proposed Revisions |
|---|---|---|
| | ~~products and services that existed, were in development, or were under consideration by DraftKings during Mr. Hermalyn's employment with DraftKings (hereinafter "Other Products and Services"); and (7) all products and services incidentally related to, or which were an extension, development, or expansion of FSC, Gaming, Marketplace, eCommerce, Media or Other Products and Services.~~<br><br>~~ii. "Threatened Breach" shall mean any attempt be Mr. Hermalyn to engage in conduct that would breach paragraph (c), (d) or (e) of this Order.~~<br><br>The restrictions in this Paragraph (c) only apply to Mr. Hermalyn to the extent his activities are conducted in the states of New York, New Jersey, or Massachusetts; to the extent his activities are conducted in other states, Mr. Hermalyn will remain subject to the confidentiality and non-disclosure restrictions.<br><br>None of the restrictions in this Paragraph (c) apply to Mr. Hermalyn to the extent his activities are conducted in the state of California; to the extent his activities are conducted in California, Mr. Hermalyn will remain subject to the confidentiality and non-disclosure restrictions. | The Court should limit the geographic scope of the restriction to the geographic regions in which Hermalyn actually worked or, at most, allegedly worked for DK (i.e., New York, New Jersey, and Massachusetts). As drafted, the restriction applies globally, which is patently overbroad, especially given that DK only conducts business in a few select states. See Beck Dec., Ex. I. DK has put forth no evidence showing Hermalyn conducted, or was involved in business, outside of New Jersey, New York, and Massachusetts. Hermalyn has confirmed that during his employment at DK, he worked from DK's New York office or his New Jersey home office. MH TRO Dec. ¶22.<br><br>Given California's laws on non-competition agreements and Hermalyn's status as a California resident, see PI Opp'n at 16, the Court should clarify that none of the restrictions apply to Hermalyn to the extent his activities are conducted in California.<br><br>The Court should strike language regarding "Threatened Breach" as vague and ambiguous. |
| 4 | **d) Nonsolicitation of Customers, Clients, Vendors or Partners.** Mr. Hermalyn is hereby restrained and enjoined, for a period of twelve (12) months from the date of ~~this Order~~ his February 1, 2024 resignation from DraftKings, from using | The Court should strike the customer nonsolicitation provision entirely, but if it is inclined to enforce to some extent, it should modify as indicated. |

4

| Row No. | Provision of DK Proposed PI With Hermalyn Requested Revisions (In Red)[2] | Hermalyn's Explanation For Proposed Revisions |
|---|---|---|
| | or disclosing DraftKings' Confidential Information to do the following: | The Court should only limit Hermalyn's ability to engage in customer, client, vendor, or partner-related activity to the extent he is using or disclosing DK's Confidential Information to do so. |
| | from, directly or indirectly, either for himself or for any other person, partnership, legal entity, or enterprise (i) soliciting ~~or transacting business~~, or attempting to solicit ~~or transact business with~~ any of DraftKings' customers, or clients; ~~vendors or partners, or with any of DraftKings' prospective customers, clients, vendors or partners about which~~ that Mr. Hermalyn worked with at DraftKings ~~learned Confidential Information or which Mr. Hermalyn had some involvement or knowledge related to any aspect of the Business of DraftKings; and/or (ii) committing a Threatened Breach of the obligations set forth in this paragraph.~~ | The Court should specify that the period of restriction is 12 months or less from the date of Hermalyn's February 1, 2024 resignation. *See* Nonsolicit Covenant ¶ 2 (Dkt. No. 1-1) ("twelve (12) months after termination of such Relationship"). |
| | None of the restrictions in this Paragraph (d) apply with respect to persons that are or were current customers, clients, vendors, or partners of Fanatics as of February 1, 2024. | The Court should limit the restriction to exclude Fanatics' current customers, clients, vendors, or partners. Given the non-exclusive nature of sports betting, many customers use multiple sports betting applications. PI Opp'n at 14. There is, therefore, significant overlap between DK's customers and Fanatics' customers. *Id.* Hermalyn should not be prohibited from soliciting or doing any type of business with current Fanatics customers simply because they are also current or prospective DK customers, as this would not harm DK's goodwill. Likewise, many major sportsbooks use the same vendors and have the same partners, and Hermalyn should not be restricted from related work for Fanatics just because the vendors and partners also do business with DK. *Id.* |
| | Notwithstanding anything in this Order, Hermalyn is permitted to receive and respond to unsolicited outreach concerning Fanatics from any DraftKings customer, client, vendor, or partner. | |
| | The restrictions in this Paragraph (d) only apply to Mr. Hermalyn to the extent his activities are conducted in the states of New York, New Jersey, or Massachusetts; to the extent his activities are conducted in other states, Mr. Hermalyn will remain subject to the confidentiality and non-disclosure restrictions. | The Court should strike "transacting business" and "transact business with" because the term is vague, ambiguous, and overbroad. Hermalyn should not be prohibited from transacting business with customers (or |

A364

| Row No. | Provision of DK Proposed PI With Hermalyn Requested Revisions (In Red)[2] | Hermalyn's Explanation For Proposed Revisions |
|---|---|---|
| | None of the restrictions in this Paragraph (d) apply to Hermalyn to the extent his activities are conducted in California; to the extent his activities are conducted in California, Mr. Hermalyn will remain subject to the confidentiality and non-disclosure restrictions. | others) that he does not solicit and that he does not use confidential DK information to support. Such a restriction would not be justified. |
| | | The Court should strike the "vendors or partners" language, as these terms are not defined and could extend to a potentially unlimited and unknowable group of entities and individuals. |
| | | The Court should limit the scope of the restriction to customers, clients, vendors, or partners Hermalyn actually worked with at DK. DK's attempt to exclude any actual or even prospective customer about whom Hermalyn "learned Confidential Information" or had "some involvement or knowledge related to any aspect of the Business of DraftKings" is overbroad and vague, especially given the overbroad, unspecified, and subjective nature of these defined terms. |
| | | For the reasons discussed in row 3 above, the Court should limit the geographic scope of the restriction to cover activities conducted in the geographic regions in which Hermalyn worked or allegedly worked for DK (*i.e.*, New York, New Jersey, and Massachusetts). |
| | | For the reasons discussed in Row 3 above, the Court should clarify that none of the restrictions apply to Hermalyn to the extent his activities are conducted in California. |
| | | The Court should strike language regarding Threatened Breach as vague and ambiguous. |

6

A365

| Row No. | Provision of DK Proposed PI With Hermalyn Requested Revisions (In Red)[2] | Hermalyn's Explanation For Proposed Revisions |
|---|---|---|
| 5 | e) Nonsolicitation of Employees. Mr. Hermalyn is hereby restrained and enjoined, for a period of twelve (12) months from the date of this Order his February 1, 2024 resignation from DraftKings, from using or disclosing DraftKings' Confidential Information to do the following: from directly or indirectly, either for himself or for any other person, partnership, legal entity, or enterprise (i) soliciting, in person or through supervision or control of others, an employee, advisor, consultant or contractor of DraftKings for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with DraftKings or to change an existing business relationship to the detriment of DraftKings; (ii) hiring away an employee, advisor, consultant or contractor of DraftKings; (iii) helping another person or entity hire away a DraftKings employee, advisor, consultant or contractor; and/or (iv) committing a Threatened Breach of the obligations set forth in this paragraph.

Notwithstanding anything in this Order, Hermalyn is permitted to receive and respond to unsolicited outreach from any DraftKings employee, advisor, consultant or contractor.

Nothing in this Order shall restrain Fanatics from soliciting or hiring any employee, advisor, consultant or contractor, without the involvement of Hermalyn.

The restrictions in this Paragraph (e) only apply to Mr. Hermalyn to the extent his activities are conducted in the states of New York, New Jersey, or Massachusetts; to the extent his activities are conducted in other states, Mr. | The Court should strike the employee nonsolicitation provision entirely, but if it is inclined to enforce to some extent, it should modify as indicated.

The Court should only limit Hermalyn's ability to engage in employee, advisor, consultant, or contractor-related activity to the extent he is using or disclosing DK's Confidential Information to do so.

The Court should specify that the period of restriction is 12 months or less from the date of Hermalyn's February 1, 2024 resignation. See Nonsolicit Covenant ¶ 3 (Dkt. No. 1-1) ("twelve (12) months after termination of such Relationship").

The Court should strike the "hiring away" and "hire away" language as vague and ambiguous. DK does not have a protectible interest in preventing Hermalyn (or Fanatics) from hiring DK employees that Hermalyn was not involved in soliciting.

For the reasons discussed in Row 3 above, the Court should limit the geographic scope of the restriction to activities conducted in New Jersey, New York, and Massachusetts.

For the reasons discussed in Row 3 above, the Court should clarify that none of the restrictions apply to Hermalyn to the extent his activities are conducted in California. |

A366

| Row No. | Provision of DK Proposed PI With Hermalyn Requested Revisions (In Red)[2] | Hermalyn's Explanation For Proposed Revisions |
|---|---|---|
| | Hermalyn will remain subject to the confidentiality and non-disclosure restrictions.<br><br>None of the restrictions in this Paragraph (e) apply to Mr. Hermalyn to the extent his activities are conducted in California; to the extent his activities are conducted in California, Mr. Hermalyn will remain subject to the confidentiality and non-disclosure restrictions. | The Court should strike language regarding Threatened Breach as vague and ambiguous. |

8

A367

DocuSign Envelope ID: 77B4B7EA-D54D-4BE2-9ABB-5CA20BC06638

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

DRAFTKINGS, INC.,

　　　　　　　　　　*Plaintiff*,

　　v.

MICHAEL Z. HERMALYN,

　　　　　　　　　　*Defendant.*

Civil Action No. 1:24-cv-10299

## DECLARATION OF RUSSELL BECK IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1

A368

## DECLARATION OF RUSSELL BECK

I, Russell Beck, hereby declare under penalty of perjury, pursuant to 29 U.S.C. § 1746:

1.      I am an attorney admitted to practice before this Court, and a member in good standing of the bar of the Commonwealth of Massachusetts.

2.      I am a name Partner at the law firm of Beck Reed Riden LLP in Boston, Massachusetts, and counsel for Defendant Michael Z. Hermalyn ("Hermalyn").

3.      I entered my Notice of Appearance as counsel for Hermalyn in the above-captioned action on February 6, 2024 (ECF No. 15).

4.      I submit this declaration in support of Defendant's Opposition (the "Opposition") to Plaintiff's Motion for Preliminary Injunction (the "Motion"), filed concurrently herewith.

5.      I have personal knowledge of the facts presented in this declaration, and personal familiarity with the documents and filings at issue in the Opposition and the Motion.

6.      A true and correct copy of the transcript of Hermalyn's March 6, 2024 deposition is attached hereto as Exhibit A.

7.      A true and correct copy of the transcript of Brian Harris' March 5, 2024 deposition is attached hereto as Exhibit B.

8.      A true and correct copy of the Certification of Defendant Michael Z. Hermalyn of Compliance with Court Order dated February 12, 2024 is attached hereto as Exhibit C.

9.      A true and correct copy of Letter from Russell Beck, Esq. of Beck Reed Riden LLP to Harris M. Mufson, Esq. of Gibson, Dunn & Crutcher LLP (Mar. 12, 2024) is attached hereto as Exhibit D.

10.     A true and correct copy of Letter from Russell Beck, Esq. of Beck Reed Riden LLP to Harris M. Mufson, Esq. of Gibson, Dunn & Crutcher LLP (Feb. 21, 2024) is attached hereto as

A369

Exhibit E.

11.     A true and correct copy of Hermalyn's February 20, 2024 Responses and Objections to Plaintiff DraftKings, Inc.'s Amended First Set of Interrogatories is attached hereto as Exhibit F.

12.     A true and correct copy of California Senate Bill 699 from the 2023–2024 Regular Session is attached hereto as Exhibit G.

13.     A true and correct copy of the Specially Appearing Defendant DraftKings Inc.'s Notice of Motion and Motion to Quash Service of Summons for Lack of Personal Jurisdiction and Memorandum in Support filed in the California Superior Court in Los Angeles County, Central District on February 29, 2024, styled *Michael Z. Hermalyn et al. v. DraftKings, Inc.*, No. 24STCV02694 is attached hereto as Exhibit H.

14.     A true and correct copy of the webpage Legal Sports Betting in the United States published by DraftKings Sportsbook available at https://sportsbook.draftkings.com/help/sports-betting/where-is-sports-betting-legal?_ga=2.174681058.1723692992.1710968948-911722006.1710968948&_gl=1*4y8ah7*_ga*OTExNzIyMDA2LjE3MTA5Njg5NDg.*_ga_QG8WHJSQMJ*MTcxMDk2ODk0OC4xLjEuMTcxMDk2ODk3Ni4zMi4wLjA (accessed Mar. 21, 2024), and a true and correct copy of the webpage Legal Online Gambling in the United States published by DraftKings Casino available at https://casino.draftkings.com/where-is-online-gambling-legal (accessed Mar. 21, 2024), are attached hereto as Exhibit I.

15.     A true and correct copy of the Form 10-K for DraftKings, Inc. for the fiscal year ending December 31, 2023 filed with the United States Securities and Exchange Commission available at https://draftkings.gcs-web.com/static-files/359784ba-66a0-4b4c-9e41-1ec1aa21e9ed (accessed Mar. 20, 2024), is attached hereto as Exhibit J.

A370

DocuSign Envelope ID: 77B4B7EA-D54D-4BE2-9ABB-53A20BC06628

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed: March 21, 2024

By      *Russell Beck*

Russell Beck (BBO# 561031)
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Boston, MA 02110
Tel.: (617) 500-8660
Fax: (617) 500-8665
rbeck@beckreed.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on Plaintiff's counsel on the date below via email and will be filed through the ECF System and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: March 21, 2024

/s/ *Russell Beck*
Russell Beck

A371

# EXHIBIT G



**Senate Bill No. 699**

CHAPTER 157

An act to add Section 16600.5 to the Business and Professions Code, relating to business.

[Approved by Governor September 1, 2023. Filed with Secretary
of State September 1, 2023.]

LEGISLATIVE COUNSEL'S DIGEST

SB 699, Caballero. Contracts in restraint of trade.

Existing law regulates business activities in order to maintain competition. Existing law voids contractual provisions by which a person is restrained from engaging in a lawful profession, trade, or business of any kind, except as otherwise provided.

This bill would establish that any contract that is void under the law described above is unenforceable regardless of where and when the contract was signed. The bill would prohibit an employer or former employer from attempting to enforce a contract that is void regardless of whether the contract was signed and the employment was maintained outside of California.

The bill would prohibit an employer from entering into a contract with an employee or prospective employee that includes a provision that is void under the law described above. The bill would establish that an employer who violates that law commits a civil violation. The bill would authorize an employee, former employee, or prospective employee to bring an action to enforce that law for injunctive relief or the recovery of actual damages, or both, and would provide that a prevailing employee, former employee, or prospective employee is entitled to recover reasonable attorney's fees and costs.

The bill would also make a related statement of legislative findings and declarations.

*The people of the State of California do enact as follows:*

SECTION 1.   The Legislature finds and declares the following:

(a)  Noncompete clauses in employment contracts are extremely common in the United States. Research shows that one in five workers are currently subject to a noncompete clause out of approximately 30 million workers nationwide. The research further shows that California employers continue to have their employees sign noncompete clauses that are clearly void and unenforceable under California law. Employers who pursue frivolous noncompete litigation has a chilling effect on employee mobility.

94

(b)  California's public policy provides that every contract that restrains anyone from engaging in a lawful profession, trade, or business of any kind is, to that extent, void, except under limited statutory exceptions. California has benefited significantly from this law, fueling competition, entrepreneurship, innovation, job and wage growth, equality, and economic development.

(c)  Over the past two decades, research on the harm of noncompete clauses and other contract clauses involving restraint of trade to pursue one's profession has been accelerating. Empirical research shows that noncompete clauses stifle economic development, limit firms' ability to hire and depress innovation and growth. Noncompete clauses are associated with suppressed wages and exacerbated racial and gender pay gaps, as well as reduced entrepreneurship, job growth, firm entry, and innovation.

(d)  Recent years have shown that employers utilizing broad noncompete agreements attempt to subvert this longstanding policy by requiring employees to enter void contracts that impact employment opportunities once an employee has been terminated from the existing employer. Moreover, as the market for talent has become national and remote work has grown, California employers increasingly face the challenge of employers outside of California attempting to prevent the hiring of former employees.

(e)  The California courts have been clear that California's public policy against restraint of trade law trumps other state laws when an employee seeks employment in California, even if the employee had signed the contractual restraint while living outside of California and working for a non-California employer.

(f)  California has a strong interest in protecting the freedom of movement of persons whom California-based employers wish to employ to provide services in California, regardless of the person's state of residence. This freedom of employment is paramount to competitive business interests.

SEC. 2.   Section 16600.5 is added to the Business and Professions Code, to read:

16600.5.   (a)  Any contract that is void under this chapter is unenforceable regardless of where and when the contract was signed.

(b)  An employer or former employer shall not attempt to enforce a contract that is void under this chapter regardless of whether the contract was signed and the employment was maintained outside of California.

(c)  An employer shall not enter into a contract with an employee or prospective employee that includes a provision that is void under this chapter.

(d)  An employer that enters into a contract that is void under this chapter or attempts to enforce a contract that is void under this chapter commits a civil violation.

(e) (1)  An employee, former employee, or prospective employee may bring a private action to enforce this chapter for injunctive relief or the recovery of actual damages, or both.

(2)  In addition to the remedies described in paragraph (1), a prevailing employee, former employee, or prospective employee in an action based

94

A374

— 3 —                                    **Ch. 157**

on a violation of this chapter shall be entitled to recover reasonable attorney's fees and costs.

O

94

# EXHIBIT H

GIBSON, DUNN & CRUTCHER LLP
JAMES P. FOGELMAN, SBN 161584
jfogelman@gibsondunn.com
ALAYNA MONROE, SBN 329061
amonroe@gibsondunn.com
2029 Century Park East, Ste. 4000
Los Angeles, CA 90067
Telephone:  310.552.8500
Facsimile:  310.551.8741

KATHERINE V.A. SMITH, SBN 247866
ksmith@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  213.229.7000
Facsimile:  213.229.7520

*Attorneys for Specially Appearing
Defendant DraftKings Inc.*

Electronically FILED by
Superior Court of California,
County of Los Angeles
3/01/2024 3:38 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By K. Hung, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| Michael Z. Hermalyn and FVP, LLC, | CASE NO. 24STCV02694 |
| Plaintiffs, | **SPECIALLY APPEARING DEFENDANT DRAFTKINGS INC.'S NOTICE OF MOTION AND MOTION TO QUASH SERVICE OF SUMMONS FOR LACK OF PERSONAL JURISDICTION; MEMORANDUM IN SUPPORT** |
| v. | |
| DraftKings, Inc. | |
| Defendant. | |

**HEARING:**
Reservation ID:    888360502014
Date:                   June 13, 2024
Time:                  8:30 a.m.
Dept:                  39
Judge:                 Hon. Stephen I. Goorvitch

Action Filed:       February 1, 2024
Trial Date:          None set

1
SPECIALLY APPEARING DEFENDANT DRAFTKINGS' NOTICE OF MOTION AND MOTION
TO QUASH SERVICE OF SUMMONS

A377

1

**NOTICE OF MOTION TO QUASH SERVICE OF SUMMONS**

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

  PLEASE TAKE NOTICE that on June 13, 2024, at 8:30 a.m., in Department 39 of the Los

4

Angeles Superior Court, the Honorable Stephen I. Goorvitch presiding, specially appearing Defendant

5

DraftKings Inc. will, and hereby does, move the Court for an order quashing service of summons of

6

Plaintiffs' complaint for lack of personal jurisdiction pursuant to Code of Civil Procedure section

7

418.10.

8

  The Court lacks general personal jurisdiction over DraftKings because the company is not at

9

home in California.  The Court lacks specific personal jurisdiction over DraftKings because Plaintiffs'

10

claims do not arise out of or relate to DraftKings' alleged contacts with California.

11

  This motion is based on this notice of motion and motion; the concurrently filed declaration of

12

Katherine V.A. Smith, and the exhibits attached to the declarations; all other matters of which the Court

13

may take judicial notice; all records and pleadings on file with the Court in this matter; and all further

14

evidence and argument that may be presented in briefs or at the hearing on this motion.

15

DATED:  February 29, 2024     GIBSON, DUNN & CRUTCHER LLP

16

         By: */s/ James P. Fogelman*

17

           James P. Fogelman

18

         *Attorneys for Specially Appearing*
         *Defendant DraftKings Inc.*

19

20

21

22

23

24

25

26

27

28

2

SPECIALLY APPEARING DEFENDANT DRAFTKINGS' NOTICE OF MOTION AND MOTION
TO QUASH SERVICE OF SUMMONS

A378

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION .................................................................................................. 6

II.  BACKGROUND ................................................................................................... 8

    A.   DraftKings Is Incorporated in Nevada and Headquartered in Massachusetts ............. 8

    B.   Hermalyn Executes Several Agreements with DraftKings While in New Jersey ........ 8

    C.   Hermalyn Joins Fanatics and Races to Court to Escape His Obligations to DraftKings ...................................................................................................... 8

    D.   A Federal Court in Massachusetts Exercises Jurisdiction over the Parties' Dispute and Temporarily Restrains Hermalyn from Violating His Agreements with DraftKings .............................................................................................. 9

    E.   This Court Denies Hermalyn's Ex Parte TRO Application ..................................... 11

III. LEGAL STANDARD ........................................................................................... 11

IV.  ARGUMENT ....................................................................................................... 12

    A.   This Court Lacks General Personal Jurisdiction over DraftKings ........................... 12

    B.   This Court Lacks Specific Personal Jurisdiction over DraftKings ........................... 13

        1.   Plaintiffs' Claims Do Not Relate to or Arise out of DraftKings' Alleged Contacts with California ............................................................... 14

            a.   Plaintiffs' Claims Are Unrelated to DraftKings' California Contacts ................................................................................... 14

            b.   Plaintiffs' Unilateral Conduct Cannot Support Specific Jurisdiction ........................................................................... 15

            c.   Plaintiffs' Claim That They Will Be Harmed in California Is Insufficient ........................................................................... 18

        2.   Exercising Specific Jurisdiction over DraftKings Would Be Unreasonable ....................................................................................... 20

V.   CONCLUSION ..................................................................................................... 20

Gibson, Dunn & Crutcher LLP

3

A379

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Briskin v. Shopify, Inc.* (9th Cir. 2023)
  87 F.4th 404 .................................................................................15, 17, 18

*Bristol-Myers Squibb Co. v. Superior Court* (2017)
  582 U.S. 255 .................................................................................13, 14, 15

*Burger King Corp. v. Rudzewicz* (1985)
  471 U.S. 462 .................................................................................11, 16, 17

*Calder v. Jones* (1984)
  465 U.S. 783 .......................................................................................... 19

*Core-Vent Corp. v. Nobel Indus. AB* (9th Cir. 1993)
  11 F.3d 1482 ........................................................................................... 20

*Daimler AG v. Bauman* (2014)
  571 U.S. 117 ..................................................................................... 12, 13

*DVI, Inc. v. Superior Court* (2002)
  104 Cal.App.4th 1080 .............................................................................. 12

*Elkman v. National States Ins. Co.* (2009)
  173 Cal.App.4th 1305 .............................................................................. 16

*Floveyor Internat., Ltd. v. Superior Court* (1997)
  59 Cal.App.4th 789 .................................................................................. 11

*Ford Motor Co. v. Montana Eighth Judicial District Court* (2021)
  592 U.S. 351 ....................................................... 7, 12, 13, 15, 17

*Goodyear Dunlop Tires Ops., S.A. v. Brown* (2011)
  564 U.S. 915 ..................................................................................... 13, 15

*Greenwell v. Auto-Owners Ins. Co.* (2015)
  233 Cal.App.4th 783 ................................................................................ 11

*Halyard Health, Inc. v. Kimberly-Clark Corp.* (2019)
  43 Cal.App.5th 1062 .......................................................................... 12, 13

*Hanson v. Denckla* (1958)
  357 U.S. 235 ........................................................................................... 16

*Helicopteros Nacionales de Colombia, S.A. v. Hall* (1984)
  466 U.S. 408 ........................................................................................... 16

*LG Chem, Ltd. v. Superior Court* (2022)
  80 Cal.App.5th 348 .................................................... 12, 13, 14, 15, 20

*Pavlovich v. Superior Court* (2002)
  29 Cal.4th 262 .............................................................................11, 14, 16

SPECIALLY APPEARING DEFENDANT DRAFTKINGS' NOTICE OF MOTION AND MOTION
TO QUASH SERVICE OF SUMMONS

Gibson, Dunn & Crutcher LLP

A380

*Regents of Univ. of Cal. v. Universal Health Care Grp., Inc.* (C.D.Cal. Apr. 19, 2011)
2011 WL 13228075 ................................................................................................. 16, 17

*Strasner v. Touchstone Wireless Repair & Logistics, LP* (2016)
5 Cal.App.5th 215 ....................................................................................................... 12

*Taylor-Rush v. Multitech Corp.* (1990)
217 Cal.App.3d 103 ............................................................................................... 18, 19

*Vons Cos., Inc. v. Seabest Foods, Inc.* (1996)
14 Cal.4th 434 ............................................................................................................. 11

*Walden v. Fiore* (2014)
571 U.S. 277 ............................................................................. 7, 13, 14, 15, 16, 17, 18, 19, 20

*World-Wide Volkswagen Corp. v. Woodson* (1980)
444 U.S. 286 .......................................................................................................... 16, 17

*Zehia v. Superior Court* (2020)
45 Cal.App.5th 543 ................................................................................................. 19, 20

*Ziller Electronics Lab GmbH v. Superior Court* (1988)
206 Cal.App.3d 1222 .................................................................................................. 12

**Statutes**

Code Civ. Proc., § 410.10 ............................................................................................ 11

SPECIALLY APPEARING DEFENDANT DRAFTKINGS' NOTICE OF MOTION AND MOTION
TO QUASH SERVICE OF SUMMONS

Gibson, Dunn &
Crutcher LLP

A381

# I.     INTRODUCTION

This case cannot be pursued in California because this Court lacks personal jurisdiction over DraftKings.  DraftKings, incorporated in Nevada and headquartered in Massachusetts, is not "at home" in California for purposes of general personal jurisdiction.  Because none of Plaintiffs' claims has any connection to activities in California, this Court does not have specific jurisdiction over DraftKings either.  The Court should quash the service of summons and dismiss the case for lack of jurisdiction.

For years, Michael Hermalyn worked and lived 2,500 miles away from California as a senior executive at DraftKings, a preeminent digital sports entertainment company headquartered in Boston, Massachusetts.  Just before Super Bowl 2024, while taking time off allegedly due to the death of a friend, he left his family in New Jersey and purportedly "moved" to California to accept a job at FVP, LLC, a Fanatics affiliate and DraftKings' competitor.  As he prepared to leave, he stole confidential information about DraftKings' customers, clients, employees, vendors, and partners.

DraftKings promptly filed a complaint in Massachusetts federal court as required by the forum-selection clause in the parties' agreements.  Rejecting Hermalyn's plea that the court stay proceedings in favor of this case, the Honorable Julia Kobick concluded that the exercise of jurisdiction in Massachusetts would "better serve the interests involved," and that "California has little connection" to the parties' disputes "other than the fact that Mr. Hermalyn moved to California" shortly before filing litigation.  As Judge Kobick correctly recognized, this dispute should be adjudicated in Massachusetts and not in California—leading her to conclude that she has a "virtually unflagging obligation to exercise its jurisdiction in this case."  To that end, Judge Kobick has already issued five orders in the Massachusetts action, including a temporary restraining order prohibiting Hermalyn from using DraftKings trade secrets and trying to poach DraftKings customers, vendors, partners and employees.  This TRO is in place until April 2, when the Massachusetts federal court will hear DraftKings' motion for a preliminary injunction.

Hermalyn now comes to this Court with the same arguments that failed in Massachussetts— that he is a brand-new California resident who, under California law, is free to dishonor the many agreements he signed, and received millions for signing, with DraftKings.  But not only did Hermalyn and DraftKings agree to resolve their disputes in Massachusetts (and are in the process of litigating

Gibson, Dunn & Crutcher LLP

SPECIALLY APPEARING DEFENDANT DRAFTKINGS' NOTICE OF MOTION AND MOTION
TO QUASH SERVICE OF SUMMONS

A382

1  those disputes there), this Court lacks *power* to adjudicate the claims asserted in this case because it

2  lacks personal jurisdiction over DraftKings.  As the U.S. Supreme Court has explained, there are "two

3  kinds of personal jurisdiction:  general (sometimes called all-purpose) jurisdiction and specific

4  (sometimes called case-linked) jurisdiction."  (*Ford Motor Co. v. Montana Eighth Judicial District

5  Court* (2021) 592 U.S. 351, 358.)  Neither exists here.

6          **General jurisdiction.**  "A state court may exercise general jurisdiction only when a defendant

7  is 'essentially at home' in the State."  (*Ford*, 592 U.S. at p. 358.)  A corporate defendant is generally

8  "at home" only at its place of "incorporation and principal place of business."  (*Id.* at p. 359.)

9  DraftKings is not at home in California.  It is at home only in Nevada, where it is incorporated, and

10  Massachusetts, where it is headquartered.  DraftKings does business in California, but that does not

11  mean that it could be sued in California for any reason—any more than it could be sued in Alaska,

12  Oklahoma, or any other state where it is not "at home."  DraftKings can be be sued for any reason only

13  in its two home states, and California is not one of them.

14          **Specific jurisdiction.**  A court may exercise specific jurisdiction over a defendant when "[t]he

15  plaintiff's claims . . . arise out of or relate to the defendant's contacts with the forum."  (*Ford*, 592 U.S.

16  at p. 359.)  In other words, "the defendant's suit-related conduct must create a substantial connection

17  with the forum State."  (*Walden v. Fiore* (2014) 571 U.S. 277, 284.)  DraftKings has done nothing in

18  California that has any connection to the claims asserted in this case.  It employed Hermalyn thousands

19  of miles away, mainly in New Jersey, under employment agreements signed there, not in California.

20  Those agreements call for all disputes to be resolved in Massachusetts, where DraftKings is currently

21  enforcing the agreements.  The *only* connection between California and this case is Hermalyn claims

22  to have recently moved here and FVP, LLC hired him.  But the U.S. Supreme Court has repeatedly

23  held that plaintiffs cannot manufacture specific jurisdiction based on their "unilateral activity," and that

24  "mere injury to a forum resident is not a sufficient connection to the forum" to create jurisdiction.  (*Id.*

25  at pp. 286, 290.)  Were it otherwise, the doctrine of personal jurisdiction would be meaningless—easily

26  defeated whenever a plaintiff claims to have moved wherever the law is most favorable to his claims.

27          The Court should quash the service of summons and dismiss this case for lack of jurisdiction.

28

Gibson, Dunn &
Crutcher LLP

SPECIALLY APPEARING DEFENDANT DRAFTKINGS' NOTICE OF MOTION AND MOTION
TO QUASH SERVICE OF SUMMONS

A383

## II.   BACKGROUND

### A.   DraftKings Is Incorporated in Nevada and Headquartered in Massachusetts

DraftKings is a leader in the digital sports entertainment and gaming industry, best known for fantasy sports and mobile sports betting.  (Compl. ¶ 14.)  DraftKings is incorporated in Nevada and is headquartered in Massachusetts.  (*Id.* ¶¶ 14, 20.)

Plaintiffs allege that DraftKings has contracted with California-based companies, and makes certain gaming services "available to residents of California." (Compl. ¶¶ 14-15.)  Plaintiffs also allege that DraftKings has conducted outreach "to lawmakers and voters in this County," and conducted "advocacy efforts and advertising related to a sports-betting ballot measure in California."  (*Id.* ¶ 15.)  Plaintiffs do not explain how any of these alleged California activities relate to their claims here.

### B.   Hermalyn Executes Several Agreements with DraftKings While in New Jersey

From September 2020 to February 1, 2024, Hermalyn was a DraftKings employee who lived and worked out of his home in Bay Head, New Jersey, and occasionally commuted to DraftKings' New York City office.  (Compl. ¶¶ 12, 17, 19; Smith Decl. Ex. F ¶ 4; Feb. 13, 2024 Hermalyn Decl. ¶ 9.)  While employed at DraftKings, he led DraftKings' VIP team as Senior Vice President of Growth.  (Compl. ¶ 18; Smith Decl. Ex. F ¶ 5; Feb. 13, 2024 Hermalyn Decl. ¶ 8.)  The VIP team builds and maintains relationships with DraftKings' most loyal customers, recruiting and retaining the customers responsible for a significant share of DraftKings' business.  (Smith Decl. Ex. F ¶ 6.)

"In connection with his employment by DraftKings," Hermalyn was offered the opportunity to receive valuable equity in the company in exchange for his agreement to abide by certain non-competition agreements, and agreed to non-solicitation, and confidentiality agreements as a condition of employment.  (Compl. ¶¶ 30-32, 42.)  Hermalyn repeatedly accepted this bargain and agreed to these terms "about a dozen" times.  (*Id.* ¶¶ 30, 33.)  In doing so, he repeatedly agreed any disputes between the parties would be resolved in Massachusetts federal court.  (*Id.* ¶¶ 32, 44-45.)  Plaintiffs acknowledge that Hermalyn "signed each of the agreements from his home in New Jersey or remotely via DocuSign" (*Id.* ¶ 31; Feb. 13, 2024 Hermalyn Decl. ¶ 16); he did not sign any agreements in California.

### C.   Hermalyn Joins Fanatics and Races to Court to Escape His Obligations to DraftKings

Despite his contractual obligations to DraftKings, the unique position of trust he held, and the

SPECIALLY APPEARING DEFENDANT DRAFTKINGS' NOTICE OF MOTION AND MOTION
TO QUASH SERVICE OF SUMMONS

A384

1  significant compensation he received, Hermalyn jumped ship to Fanatics (a competing digital sports

2  platform) on February 1, 2024.  He timed his move to Fanatics to occur just before the Super Bowl—

3  the most critical and demanding day for any sports-betting business.  (Smith Decl. Ex. F ¶ 9.)

4       In the week leading up to his resignation, Hermalyn told DraftKings that he needed to take time

5  off to "mourn" the death of a close friend from Pennsylvania.  (Smith Decl. Ex. F ¶ 10.)  But rather

6  than travel to Pennsylvania, Hermalyn flew to Fanatics' California offices to finalize the terms under

7  which he would defect from DraftKings and begin new employment with Fanatics in the critical days

8  before the Super Bowl.  (*Ibid.*)  DraftKings' data records, including geolocation information, confirm

9  that Hermalyn accessed and downloaded DraftKings' trade secrets and prized confidential information

10  to a non-DraftKings' device while at Fanatics' California office.  (*Id.* ¶ 11.)  This included the "(Master)

11  SB 2024" spreadsheet with details about the key partners attending the Super Bowl, such as

12  employment or other affiliation, his or her travel itinerary, and what events he or she will attend.  (*Ibid.*)

13       On February 1, Hermalyn tendered his purported resignation from DraftKings, even though he

14  had already been secretly competing against it.  (Compl. ¶ 21.)  "He informed DraftKings . . . that he

15  intended to accept employment with Fanatics in California."  (*Ibid.*)  Minutes later, Plaintiffs filed their

16  complaint, alleging DraftKings "has sought to improperly constrain Mr. Hermalyn from pursing a

17  lawful profession of his choosing with Fanatics VIP in California, and to improperly restrict Fanatics

18  VIP from employing him."  (*Id.* ¶ 2.)  Plaintiffs seek a judicial declaration that Hermalyn may continue

19  working for Fanatics, and that the non-compete, choice-of-law, and forum-selection provisions are void

20  and unenforceable under California law.  (*Id.* ¶ 79.)  Plaintiffs also seek an injunction voiding those

21  provisions and enjoining DraftKings from enforcing them in court.  (*Id.* ¶¶ 81-86.)

22  **D.   A Federal Court in Massachusetts Exercises Jurisdiction over the Parties' Dispute and
23       Temporarily Restrains Hermalyn from Violating His Agreements with DraftKings**

24       On February 5, DraftKings sued Hermalyn in federal district court in Massachusetts.

25  (*DraftKings v. Hermalyn*, No. 1:24-cv-10299 (D. Mass.); Smith Decl. Ex. A.)  DraftKings asserts

26  claims for trade-secret misappropriation arising from Hermalyn's theft of DraftKings' information, as

27  well as for breach of Hermalyn's confidentiality, non-solicitation, and non-compete agreements with

28  DraftKings.  DraftKings also asserts common-law claims arising out of Hermalyn's deceptive conduct

A385

and misuse of corporate funds.  (Smith Decl. Ex. A.)  DraftKings sought a TRO preventing Hermalyn from soliciting its clients and customers and using its confidential information.  (*Hermalyn*, Dkts. 3-4.)

Hermalyn moved to stay the Massachusetts case in favor of this one, but the Massachusetts court denied the motion.  (*Hermalyn*, Dkts. 25-26.)  The court concluded:

> [I]t has a "virtually unflagging obligation" to exercise its jurisdiction in this case. . . . [¶] While the California case was filed before this action and includes both Hermalyn and DraftKings as parties, the Courts [sic] exercise of jurisdiction here would "better serve the interests involved." [¶] Hermalyn signed a confidentiality agreement and a noncompetition covenant with DraftKings expressly stating that he "submit[s] to the personal jurisdiction of" "the United States District Court for the District of Massachusetts for any dispute arising hereunder" and "waive[s] any other requirement . . . with respect to personal jurisdiction or service of process."

(Smith Decl. Ex. B.)

On February 8, the court granted DraftKings' motion for a TRO, prohibiting Hermalyn from, among other things, "using or disclosing any of DraftKings' Confidential Information"; "soliciting or transacting business . . . with any of DraftKings' customers, clients, vendors, or partners . . . about which [he] learned confidential information or which [he] had some involvement or knowledge"; and "hiring away an employee, advisor, consultant, or contractor of DraftKings."  (Smith Decl. Ex. C.)  The court reasoned that "DraftKings ha[d] shown a likelihood of success on the merits of its trade secrets misappropriation claims" because the evidence shows Hermalyn "used improper means in breach of a confidential relationship to acquire and use [DraftKings'] trade secret[s]."  (*Id.* Ex. D at 51:20-52:3.)  Specifically, the evidence shows Hermalyn downloaded—and admitted downloading—"three of DraftKings' highly confidential documents, which contained trade secrets, on January 29th and January 30th, 2024, the same days he was linked to an IP address" in a network containing the word "fanatics" "in Los Angeles, California."  (*Id.* at 52:11-53:1.)  And in connection with the forum-selection clauses in Hermalyn's agreements, the Massachusetts court expressed doubt that "California has a materially greater interest than Massachusetts in this litigation," including because Hermalyn didn't negotiate the contract in California or work in California, but did sometimes work in Massachusetts, where DraftKings is headquartered and where "[a]ny harm caused by a violation of the agreements will be felt."  (*Id.* at 54:23-55:6.)  As the court saw it, "California has little connection to this case . . . other than the fact that Mr. Hermalyn moved to California one week ago."  (*Id.* at 55:7-9.)

On February 14, 2024, Hermalyn moved to clarify the scope of the TRO, but the Massachusetts

10

Gibson, Dunn & Crutcher LLP

A386

1  court denied the motion.  (Smith Decl. Ex. E.)  The court ruled that the limitations imposed by the

2  challenged portion of the TRO "prevent Mr. Hermalyn from disclosing any of DraftKings' confidential

3  information and trade secrets in connection with his new role at Fanatics."  (*Ibid.*)  The court also

4  reiterated that the TRO will remain in effect until April 2, 2024, when the Massachusetts court will

5  hold a hearing on DraftKings' motion for a preliminary injunction.  (*Ibid.*; *Hermalyn*, Dkt. 43.)

6  **E.      This Court Denies Hermalyn's Ex Parte TRO Application**

7       On February 20, 2024, Hermalyn filed an ex parte application for a TRO and issuance of an

8  order to show cause regarding a preliminary injunction.  DraftKings filed its opposition the next day,

9  arguing that Hermalyn was not entitled to such extraordinary relief because, among other reasons, this

10 Court lacks personal jurisdiction over DraftKings.  The following morning, Hermalyn's counsel filed

11 a declaration responding to DraftKings' personal jurisdiction arguments.  (Feb. 22, 2024 Conley Decl.)

12 After holding a hearing, Judge Beckloff denied Hermalyn's application in full.  (Feb. 22, 2024 Order.)

13                **III.     LEGAL STANDARD**

14      A court "may exercise jurisdiction on any basis not inconsistent with the Constitution of this

15 state or of the United States."  (Code Civ. Proc., § 410.10.)  Under the California and U.S.

16 Constitutions, all defendants have "a liberty interest in not being subject to the judgments of a forum

17 with which [they have] established no meaningful 'contacts, ties, or relations.'"  (*Vons Cos., Inc. v.*

18 *Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 445, quoting *Burger King Corp. v. Rudzewicz* (1985) 471

19 U.S. 462, 471-472.)  Thus, a court has personal jurisdiction over only those defendants who have

20 "minimum contacts" with the forum such that the assertion of jurisdiction does not violate "'traditional

21 notions of fair play and substantial justice.'"  (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 268.)

22      A defendant may secure dismissal of a case by serving and filing a motion to quash service of

23 summons because California courts lack jurisdiction over it.  (Code Civ. Proc., § 418.10, subd. (a)(1);

24 *Floveyor Internat., Ltd. v. Superior Court* (1997) 59 Cal.App.4th 789, 793.)  When a nonresident

25 defendant challenges personal jurisdiction, "the plaintiff bears the burden of establishing by a

26 preponderance of the evidence that minimum contacts exist between the defendant and the forum to

27 justify imposition of personal jurisdiction."  (*Greenwell v. Auto-Owners Ins. Co.* (2015) 233

28 Cal.App.4th 783, 789.)  A plaintiff must present "competent evidence in affidavits and authenticated

1   documentary evidence" to meet that burden.  (*Ziller Electronics Lab GmbH v. Superior Court* (1988)

2   206 Cal.App.3d 1222, 1233.)  "An unverified complaint," like Plaintiffs' complaint in this case, "may

3   not be considered as an affidavit supplying necessary facts."  (*Ibid.*; see also *DVI, Inc. v. Superior*

4   *Court* (2002) 104 Cal.App.4th 1080, 1091 [unverified complaint has no evidentiary value].)

5      "There are 'two kinds of personal jurisdiction:  general (sometimes called all-purpose)

6   jurisdiction and specific (sometimes called case-linked) jurisdiction.'"  (*LG Chem, Ltd. v. Superior*

7   *Court* (2022) 80 Cal.App.5th 348, 360, quoting *Ford*, 592 U.S. at p. 358.)  If a plaintiff cannot prove

8   either kind exists, his case must be dismissed.  (See *Halyard Health, Inc. v. Kimberly-Clark Corp.*

9   (2019) 43 Cal.App.5th 1062, 1070.)

10   **IV.    ARGUMENT**

11      This Court should quash the service of summons and dismiss the case because it lacks personal

12   jurisdiction over DraftKings.  General jurisdiction is lacking because DraftKings is not at home in

13   California.  It is incorporated in Nevada and headquartered in Massachusetts.  Specific jurisdiction also

14   is lacking, as Plaintiffs' claims do not arise out of or relate to DraftKings' alleged California contacts.

15   **A.    This Court Lacks General Personal Jurisdiction over DraftKings**

16      The U.S. Supreme Court has set a high bar for establishing general personal jurisdiction over a

17   corporate defendant.  "[A] court may assert [general] jurisdiction over a foreign corporation 'to hear

18   any and all claims against [it]' only when the corporation's affiliations with the State in which suit is

19   brought are so constant and pervasive 'as to render [it] essentially *at home* in the forum State.'"

20   (*Daimler AG v. Bauman* (2014) 571 U.S. 117, 122, italics added; see also *Ford*, 592 U.S. at p. 358 ["A

21   state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the

22   State"].)  Outside of "exceptional case[s]" unlike this one, a corporation is "at home" *only* in its State

23   of "incorporation or principal place of business."  (*Daimler*, 571 U.S. at p. 139, fn. 19; see also *Strasner*

24   *v. Touchstone Wireless Repair & Logistics, LP* (2016) 5 Cal.App.5th 215, 222 ["For a corporation, its

25   domicile, place of incorporation, and/or principal place of business within a state constitute the

26   paradigm bases for establishing general jurisdiction"].)

27      As Plaintiffs admit in their complaint, "Defendant DraftKings is a Nevada corporation that is

28   headquartered in Boston, Massachusetts."  (Compl. ¶ 14.)  As a result, "[i]t is obvious California courts

SPECIALLY APPEARING DEFENDANT DRAFTKINGS' NOTICE OF MOTION AND MOTION
TO QUASH SERVICE OF SUMMONS

**A388**

do not have general jurisdiction over" DraftKings. (*Halyard*, 43 Cal.App.5th at p. 1070.)

In connection with Hermalyn's ex parte TRO application, Plaintiffs emphasized that "DraftKings has engaged in substantial contact with the forum for this Court to exercise personal jurisdiction over DraftKings." (Feb. 22, 2024 Conley Decl. ¶ 2.)  But the U.S. Supreme Court has expressly declined to "approve the exercise of general jurisdiction in every State in which a corporation engages in a substantial, continuous, and systematic course of business," explaining that such a "formulation . . . is unacceptably grasping." (*Daimler*, 571 U.S. at pp. 137-138.)  As a result, "[a] corporation's continuous activity of some sorts within a state . . . is not enough to support the demand that the corporation be amenable to suits unrelated to that activity." (*Goodyear Dunlop Tires Ops., S.A. v. Brown* (2011) 564 U.S. 915, 927.)  That is why, for example, the Court of Appeal in *Halyard* deemed it "obvious" that Kimberly-Clark is not subject to general jurisdiction in California, even though its products (like Kleenex tissues and Huggies diapers) are available throughout the state and generated "6 percent of [Kimberly-Clark's] global net sales." (*Halyard*, 43 Cal.App.5th at p. 1065.)  It is also why California courts had no general jurisdiction over Bristol-Myers Squibb, even though it "sold almost 187 million Plavix pills in the State and took in more than $900 million from those sales" (*Bristol-Myers Squibb Co. v. Superior Court* (2017) 582 U.S. 255, 259), or over Daimler, even though it sells "tens of thousands" of cars in California every year (*Daimler*, 517 U.S. at pp. 136-139; *id.* at p. 142 [Sotomayor, J. concurring].)  The same is true here.  While DraftKings may do business in California, it is not at home here.  This Court lacks general jurisdiction over DraftKings.

## B.   This Court Lacks Specific Personal Jurisdiction over DraftKings

Plaintiffs also cannot show that this Court has specific jurisdiction over DraftKings.  "A court may exercise specific jurisdiction over a nonresident defendant only if:  (1) the defendant has purposefully availed itself of forum benefits; (2) the plaintiff's claims are related to or arise out of the defendant's contacts with the forum state; and (3) the forum state's assertion of personal jurisdiction would comport with fair play and substantial justice." (*LG Chem*, 80 Cal.App.5th at p. 361; see also *ibid.* [plaintiff must present "competent evidence" on "first two requirements"].)  This inquiry "focuses on the relationship among the defendant, the forum, and the litigation" (*Walden*, 571 U.S. at pp. 283-284), and permits courts to exercise jurisdiction only over "a narrow[] class of claims" (*Ford*, 592 U.S.

SPECIALLY APPEARING DEFENDANT DRAFTKINGS' NOTICE OF MOTION AND MOTION
TO QUASH SERVICE OF SUMMONS

Gibson, Dunn &
Crutcher LLP

A389

at p. 359).  Plaintiffs' claims do not fall within that narrow class because they have no connection to DraftKings' limited contacts in California, and thus it would not be "reasonable" or "fair" to compel DraftKings to defend itself in this forum.  (*Pavlovich*, 29 Cal.4th at p. 268.)

**1.   Plaintiffs' Claims Do Not Relate to or Arise out of DraftKings' Alleged Contacts with California**

"[F]or a state court to exercise specific jurisdiction, the *suit* must arise out of or relate to the defendant's contacts with the *forum*."  (*Bristol-Myers*, 582 U.S. at p. 262.)  This "element of the minimum contacts test requires a connection between the plaintiff's claims and the nonresident defendant's forum activities." (*LG Chem*, 80 Cal.App.5th at p. 364.)  Put another way, "the defendant's suit-related conduct must create a substantial connection with the forum State." (*Walden*, 571 U.S. at p. 284.)  "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." (*Bristol-Myers*, 582 U.S. at p. 264.)  Here, Plaintiffs cannot demonstrate their claims arise out of or relate to DraftKings' alleged contacts with California.  All that connects this case to California is Hermalyn's unilateral conduct and purported harm in California, which cannot satisfy the defendant-centric analysis for specific personal jurisdiction.

**a.   Plaintiffs' Claims Are Unrelated to DraftKings' California Contacts**

Plaintiffs claim the non-compete provisions in the dozen agreements Hermalyn signed as a DraftKings employee are void and unenforceable, and seek to prevent DraftKings from enforcing those provisions against him.  But all of DraftKings' "suit-related conduct" (*Walden*, 571 U.S. at p. 284) occurred on the opposite side of the country, not in California.  Plaintiffs admit that Hermalyn executed all the agreements while living and working in New Jersey (and sometimes New York City). (Compl. ¶¶ 12, 19, 31.)  And Plaintiffs do not contend that Hermalyn signed any of the agreements in California or that DraftKings sent him those agreements from California.  Nor can Plaintiffs dispute that DraftKings is enforcing the non-compete provisions outside of California, in Massachusetts—where Hermalyn repeatedly agreed that all his disputes with DraftKings would be resolved.  (*Id.* ¶¶ 2, 32.)

Plaintiffs allege that DraftKings "has multiple licensees and distributors based in California," advertises gaming services "to residents of California," and conducts political activities here.  (Compl. ¶¶ 14-15; Feb. 22, 2024 Conley Decl. ¶¶ 7, 10.)  But none of these alleged contacts has a "causal

---

14

SPECIALLY APPEARING DEFENDANT DRAFTKINGS' NOTICE OF MOTION AND MOTION TO QUASH SERVICE OF SUMMONS

A390

relationship" or "close connection" to Plaintiffs' claims, as required to support specific jurisdiction. (*Briskin v. Shopify, Inc.* (9th Cir. 2023) 87 F.4th 404, 414.)  The "bare fact" that DraftKings "contracted with" a few "California distributor[s] is not enough to establish [specific] personal jurisdiction in the State."  (*Bristol-Myers*, 582 U.S. at p. 268.)  Nor is it enough that DraftKings "'serves a market' for [certain gaming services] in California," since Plaintiffs' claims have nothing to do with those services, much less Hermalyn's involvement with them here.  (*LG Chem*, 80 Cal.App.5th at p. 367; see also *Goodyear*, 564 U.S. at p. 930, fn. 6 ["regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales"].)  And DraftKings' purported political activities in California are entirely unrelated to Plaintiffs' claims; they are the type of "general connections" that cannot provide the necessary "link between the State and the . . . claims."  (*Bristol-Myers*, 582 U.S. at p. 264.)

Plaintiffs also cite DraftKings' acknowledgement that it is subject to the "California Consumer Privacy Act and its implementing regulations," DraftKings' "Privacy Notice" applicable to "California residents" who use DraftKings' services, and DraftKings' "Privacy Notice for California Personnel" applicable to "employees of DraftKings who are in California."  (Feb. 22, 2024 Conley Decl. ¶¶ 4, 8-9.)  But Plaintiffs' claims do not "arise out of or relate" to California's privacy laws or DraftKings' privacy policies.  (*Ford*, 592 U.S. at p. 359.)  Plaintiffs are not claiming in this lawsuit that DraftKings violated those privacy laws or breached those privacy policies.  As a result, these purported California contacts have no "affiliation . . . [to] the underlying controversy."  (*Id.* at pp. 359-360.)

**b.      Plaintiffs' Unilateral Conduct Cannot Support Specific Jurisdiction**

Plaintiffs cannot make up for the lack of any case-specific allegations tying DraftKings to California with allegations of *their own* California connections.  Hermalyn's alleged choice to move to California, FVP, LLC's decision to employ him, and Plaintiffs' decision to sue in California so they could invoke California law in an effort to invalidate the non-compete provisions, does not mean that *DraftKings* has done anything in California that might give rise to specific personal jurisdiction.  As the U.S. Supreme Court has held, "contacts between the plaintiff[s] . . . and the forum state" are irrelevant, and "the plaintiff[s] cannot be the only link between the defendant and the forum."  (*Walden*, 571 U.S. at pp. 284-285.)  The *only* contacts that count are those "that the 'defendant *himself*' creates

SPECIALLY APPEARING DEFENDANT DRAFTKINGS' NOTICE OF MOTION AND MOTION
TO QUASH SERVICE OF SUMMONS

Gibson, Dunn &
Crutcher LLP

A391

with the forum State," as "it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." (*Id.* at pp. 284-285.)

Courts have repeatedly held that the "unilateral activity of another party . . . is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." (*Helicopteros Nacionales de Colombia, S.A. v. Hall* (1984) 466 U.S. 408, 417; see, e.g., *Burger King*, 471 U.S. at p. 475 ["a defendant [may] not be haled into a jurisdiction solely as a result of . . . the unilateral activity of another party"]; *Pavlovich*, 29 Cal.4th at p. 276 ["the mere unilateral activity of those who claim some relationship with a nonresident defendant cannot" support specific jurisdiction].) Consider a few cases decided by the U.S. Supreme Court:

- In *Hanson v. Denckla* (1958) 357 U.S. 235, the Court held that Florida courts could not exercise personal jurisdiction over a Delaware trustee to resolve a dispute over the validity of a Delaware trust because Florida's only connection to the case was that the trust's settlor had moved there. (*Id.* at pp. 238-239, 253-254.)

- In *World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, the Court held that Oklahoma courts could not exercise personal jurisdiction over an out-of-state automobile distributor based only on an automobile purchaser's unilateral act of driving it on Oklahoma highways. (*Id.* at p. 298.)

- And in *Walden*, the Court held that the plaintiffs' unilateral act of traveling from Georgia (where the alleged constitutional violation occurred) to Nevada (where the plaintiffs lived) was insufficient to support specific jurisdiction. (471 U.S. at pp. 289-291.) In doing so, the Court rejected any approach that would "impermissibly allow[] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." (*Id.* at p. 289.)

Courts in California have reached the same result. In *Elkman v. National States Insurance Co.* (2009) 173 Cal.App.4th 1305, for example, the Court of Appeal held the plaintiff's "unilateral decision[] . . . to relocate to California" could not support the exercise of specific jurisdiction over a Missouri corporation that had contracted with the plaintiff while she was a Florida resident. (*Id.* at p. 1321.) And in *Regents of the University of California v. Universal Health Care Group, Inc.* (C.D.Cal. Apr. 19, 2011) 2011 WL 13228075, an out-of-state corporation could not be sued here as a

result of "the unilateral action[] of [a college student] deciding to travel to California." (*Id.* at *3.)

Here, too, DraftKings may not be sued in California based solely on Plaintiffs' unilateral activity here. DraftKings is a Nevada corporation with its headquarters in Massachusetts. (Compl. ¶ 14.) DraftKings did not send Hermalyn employment agreements from any California office. And Hermalyn executed those agreements while he resided and worked in New Jersey (and sometimes New York). (Compl. ¶ 31; Feb. 13, 2024 Hermalyn Decl. ¶ 16.) The *only* connection to California is Hermalyn's unilateral decision to allegedly move to California for a direct competitor, and FVP, LLC's decision to employ him. But the limits on specific jurisdiction exist to "protect the liberty of the nonresident defendant" (*Walden*, 571 U.S. at 284), and "[t]he contacts" giving rise to specific jurisdiction "must be the defendant's own choice and not random, isolated, or fortuitous" (*Ford*, 592 U.S. at p. 359).

Moreover, "the implication" of exercising specific jurisdiction based on a *plaintiff's* forum-related contacts would be to subject *every* corporation "to specific jurisdiction in *every* state" to which a former employee decides to move and, "[c]ontrary to *Walden*'s clear command, . . . effectively tie personal jurisdiction to the unilateral activity" of former employees. (*Briskin*, 87 F.4th at p. 423, italics added.) That theory would nullify the protections of personal jurisdiction and violate due process, as nothing about DraftKings' decision to execute, and later enforce, the non-compete provisions on the other side of the country provided DraftKings with "fair warning" that it "may [be] subject . . . to the jurisdiction of a foreign sovereign" like California. (*Burger King*, 471 U.S. at p. 472.) "[T]he foreseeability that is critical to [a] due process analysis is not the mere likelihood that [a former employee] will find [their] way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." (*World-Wide Volkswagen*, 444 U.S. at p. 297.)

These authorities shows why Plaintiffs are wrong that jurisdiction exists because "DraftKings' efforts to interfere with Mr. Hermalyn's fundamental employment rights are intentionally directed at preventing a California resident (Hermalyn) from working for a California company (Fanatics)," and "DraftKings' ongoing efforts to interfere with Mr. Hermalyn's relationships that he has built while in California is sufficient." (Feb. 22, 2024 Conley Decl. ¶ 2.) Nothing about these alleged "efforts" has

A393

1  anything to do with California other than Hermalyn's decision to purportedly move to California and

2  FVP, LLC's decision to employ him.  DraftKings' attempt to halt Hermalyn's theft is occurring entirely

3  in Massachusetts—*not* in California.  Plaintiffs have not—and cannot—identify anything DraftKings

4  itself has done in *California* that has any connection to the claims they have asserted here.

5          **c.    Plaintiffs' Claim That They Will Be Harmed in California Is Insufficient**

6          Specific jurisdiction also cannot be predicated on Plaintiffs' allegations that they will be harmed

7  in California as a result of DraftKings' efforts in Massachusetts to enforce the non-compete provisions.

8  Under the U.S. Supreme Court's decision in *Walden*, a plaintiff's claim that he "experienced injury in

9  [the forum State] or that the [defendant] might have known that [its] conduct would produce foreseeable

10  harm there" is "insufficient" to create specific jurisdiction.  (*Briskin*, 87 F.4th at p. 416.)

11          In *Walden*, a Georgia police officer seized nearly $100,000 from two travelers at the Atlanta

12  airport.  (571 U.S. at pp. 279-280.)  The travelers, residents of California and Nevada, were traveling

13  to Las Vegas, and sued the officer in Nevada for violating their Fourth Amendment rights.  (*Id.* at

14  pp. 280-281.)  The travelers argued Nevada had specific jurisdiction because the officer "knew his

15  allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to

16  Nevada." (*Id.* at p. 279.)  The Supreme Court disagreed.  "[N]o part of [the officer's] course of conduct

17  occurred in Nevada," and "mere injury to a forum resident is not a sufficient connection to the forum."

18  (*Id.* at pp. 288, 290.)  The "question is not where the plaintiff experienced a particular injury or effect

19  but whether the defendant's conduct connects him to the forum in a meaningful way." (*Id.* at p. 290.)

20          As in *Walden*, no part of DraftKings' course of conduct occurred in California.  To the contrary,

21  DraftKings has taken steps to enforce the non-compete provisions solely in Massachusetts.  Those

22  efforts do not "have anything to do with California itself," and DraftKings would have undertaken the

23  same efforts had Hermalyn accepted an offer to work at any other Fanatics office in the country.

24  (*Briskin*, 87 F.4th at p. 416.)  And "the mere fact that [DraftKings'] conduct affected plaintiffs with

25  connections to the forum State does not suffice to authorize jurisdiction." (*Walden*, 571 U.S. at 291.)

26          Ignoring *Walden*, Plaintiffs cited three cases in support of Hermalyn's TRO application, but the

27  propositions for which those cases were cited are either no longer good law or not applicable to the

28  facts here.  For instance, Plaintiffs relied on *Taylor-Rush v. Multitech Corp.* (1990) 217 Cal.App.3d

Gibson, Dunn &
Crutcher LLP

18

SPECIALLY APPEARING DEFENDANT DRAFTKINGS' NOTICE OF MOTION AND MOTION
TO QUASH SERVICE OF SUMMONS

A394

103, 112, for the proposition that "personal jurisdiction may be exercised over a defendant who has caused an effect in the forum state by an act or omission occurring elsewhere." (Feb. 22, 2024 Conley Decl. ¶ 2.) But the U.S. Supreme Court in *Walden* later rejected that proposition when it held personal jurisdiction may *not* be exercised over a nonresident defendant solely because it purportedly caused the plaintiff to "experience[] a particular injury or effect" in the state. (571 U.S. at p. 290.) After all, "mere injury to a forum resident is not a sufficient connection to the forum." (*Ibid.*)

*Taylor-Rush* also is inapposite, as the evidence there "show[ed] that, *while in California*, [the defendant] made fraudulent misrepresentations and nondisclosures which induced [the plaintiff] to execute" certain agreements, and it was those "[mis]representations [and] nondisclosures to the plaintiff which constitute[d] the gravamen of the action." (217 Cal.App.3d at pp. 113-114.) By contrast, DraftKings has done nothing in California relating to Plaintiffs' claims.

Plaintiffs also have cited *Calder v. Jones* (1984) 465 U.S. 783 and *Zehia v. Superior Court* (2020) 45 Cal.App.5th 543 to support the theory that DraftKings' out-of-state conduct causing in-state harm gives rise to jurisdiction. (Feb. 22, 2024 Conley Decl. ¶ 2.) But the claims in those cases arose out of the defendants' intentional contacts with California—which is not the case here.

In *Calder*, the U.S. Supreme Court "focused on the relationship among the defendant, the forum, and the litigation," and upheld the exercise of specific jurisdiction in light of "the various contacts the defendants had created with California (and not just with the plaintiffs) by writing the allegedly libelous story." (*Walden*, 571 U.S. at p. 287 [discussing *Calder*].) Specifically, "[t]he defendants relied on phone calls to 'California sources' for the information in their article; they wrote the story about the plaintiff's activities in California; they caused reputational injury in California by writing the allegedly libelous article that was widely circulated in the State; and the 'brunt' of that injury was suffered by the plaintiff in that State." (*Ibid.*) By contrast, Plaintiffs make no such allegations regarding DraftKings' purported contacts with California—nor could they.

*Zehia* is even further afield, as the court there upheld the exercise of specific jurisdiction over an out-of-state defendant who "sent *private* social media messages aimed exclusively at a California audience." (45 Cal.App.5th at p. 557.) In particular, the defendant "sen[t] direct messages on social media" to the plaintiff, a California resident, "questioning him about his relationship" with the

A395

1  defendant's relative, also a California resident; "fabricat[ed] direct message and text message
2  conversations that contained allegedly defamatory statements about [the plaintiff] and impersonations
3  of [the plaintiff]"; and "sen[t] the fabricated conversations directly to [the defendant's relative] on
4  social media." (*Id.* at p. 556.)  Here, Plaintiffs do not allege that DraftKings sent any private social
5  media message, or any other facts that at all resemble those at issue in *Zehia*.  As a result, that case,
6  along with *Calder*, are entirely inapplicable.

7       **2.    Exercising Specific Jurisdiction over DraftKings Would Be Unreasonable**

8       Because Plaintiffs cannot show that their claims arise out of or relate to DraftKings' forum-
9  related contacts, there is no need to address whether "the forum state's assertion of personal jurisdiction
10 would comport with fair play and substantial justice." (*LG Chem*, 80 Cal.App.4th at p. 361.)  But
11 should the Court reach this element, it too would weigh against specific jurisdiction for several reasons.

12      DraftKings has *no* case-specific contacts with California, and none of its conduct outside the
13 forum provided fair notice that it could be haled into Court in this State.  (See *Walden*, 571 U.S. at
14 p. 284 ["[d]ue process limits on the State's adjudicative authority principally protect the liberty of the
15 nonresident defendant"].)  In addition, there is a substantial risk of "conflict with the sovereignty of
16 [DraftKings'] state" of Massachusetts should this Court exercise jurisdiction, and thus "the most
17 efficient" course would be to allow the parties to resolve their dispute in the agreed-upon "alternative
18 forum." (*Core-Vent Corp. v. Nobel Indus. AB* (9th Cir. 1993) 11 F.3d 1482, 1487-1488.)

19      DraftKings and Hermalyn are litigating the same and other issues in Massachusetts federal
20 court, which has determined that the "exercise of jurisdiction [in Massachusetts] would better serve the
21 interests involved" (Smith Decl. Ex. B), and temporarily restrained Hermalyn from, among other
22 things, "using or disclosing any of DraftKings' Confidential Information," "soliciting or transacting
23 business . . . with any of DraftKings' customers," and "hiring away an employee, advisor, consultant,
24 or contractor of DraftKings." (*Id.* Ex. C.)  Given the absence of any case-specific contacts, the
25 sovereignty concerns at play, and the existence of an alternative, agreed-upon forum where parties are
26 litigating the same dispute, exercising specific jurisdiction over DraftKings would be unreasonable.

27           **V.    CONCLUSION**

28      The Court should quash the service of summons and dismiss this case.

1

Dated:  February 29, 2024

2

Respectfully submitted,

3

By:     /s/ James P. Fogelman

4

James P. Fogelman

5

GIBSON, DUNN & CRUTCHER LLP

6

*Attorneys for Specially Appearing*
*Defendant DraftKings Inc.*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

21
SPECIALLY APPEARING DEFENDANT DRAFTKINGS' NOTICE OF MOTION AND MOTION
TO QUASH SERVICE OF SUMMONS

A397

# Journal Technologies Court Portal

# Make a Reservation

### MICHAEL Z HERMALYN, et al. vs DRAFTKINGS, INC.

Case Number: 24STCV02694   Case Type: Civil Unlimited   Category: Other Contract Dispute (not breach/insurance/fraud/negligence)
Date Filed: 2024-02-01   Location: Stanley Mosk Courthouse - Department 39

## Reservation

| | |
|---|---|
| Case Name:<br>MICHAEL Z HERMALYN, et al. vs DRAFTKINGS, INC. | Case Number:<br>24STCV02694 |
| Type:<br>Motion to Quash Service of Summons | Status:<br>RESERVED |
| Filing Party:<br>DraftKings, Inc. (Defendant) | Location:<br>Stanley Mosk Courthouse - Department 39 |
| Date/Time:<br>06/13/2024 8:30 AM | Number of Motions:<br>1 |
| Reservation ID:<br>888360502014 | Confirmation Code:<br>CR-YQDJYFVLYVITXFAOA |

## Fees

| Description | Fee | Qty | Amount |
|---|---|---|---|
| Motion to Quash Service of Summons | 0.00 | 1 | 0.00 |
| TOTAL | | | **$0.00** |

## Payment

| | |
|---|---|
| Amount:<br>$0.00 | Type:<br>NOFEE |
| Account Number:<br>n/a | Authorization:<br>n/a |
| Payment Date:<br>1969-12-31 | |

🖨 Print Receipt      ➕ Reserve Another Hearing

Chat

A398

Copyright © Journal Technologies, USA. All rights reserved.

# EXHIBIT I

Case 1:24-cv-10299-JEK Document 123-9 Filed 06/04/24 Page 2 of 18
Legal Online Gambling in the United States

DAILY FANTASY | SPORTSBOOK | CASINO | PICK6 | MARKETPLACE | REIGNMAKERS | DK SHOP

Home  Games  Promos  Dynasty  Casino Credits  How to Play  VIP



Legal, DraftKings
Online and Mobile
App Live

Legal, DraftKings
Not Live

Not Legal

RG Responsible Gaming

LOG IN | SIGN UP

# LEGAL ONLINE GAMBLING IN THE UNITED STATES

A401

3/21/24, 2:21 PM

Play DraftKings Casino today.

SIGN UP

# Where can you legally gamble online?

Online gambling differs from state to state. Once it's legalized in a state, casino operators like DraftKings Casino must meet regulations and licensing requirements specific to that state. Therefore, DraftKings Casino in one state may have different offerings than it does in a different state. Check below for states where online gambling is legal — and an outline of what types of games you can play.

## Connecticut

Mobile and online gambling has been legalized and are live in Connecticut. The DraftKings Casino app is available on mobile and online.

Learn more on our Connecticut state page.

**PLAY NOW**

## Michigan

Mobile and online gambling has been legalized and are live in Michigan. Games legalized through the legislation include poker, slots, and other table games. DraftKings Casino is available in Michigan through the DraftKings Casino app and the DraftKings Casino website. Learn more about DraftKings Michigan online casino.

**PLAY NOW**

## New Jersey

## Pennsylvania

A402

Case 1:24-cv-10299-JEK Document 103-9 Filed 02/21/24 Page 4 of 18

Mobile and online gambling has been legalized and are live in New Jersey. Games legalized through the legislation include poker, slots, live dealer and other table games. DraftKings Casino is available in New Jersey through the DraftKings Casino app and the DraftKings Casino website. Learn more about DraftKings New Jersey online casino.

**Play Now**

Mobile and online gambling has been legalized and are live in Pennsylvania. Games legalized through the legislation include poker, slots, live dealer and other table games. DraftKings Casino is available in Pennsylvania through the DraftKings Casino app and the DraftKings Casino website. Learn more about DraftKings Pennsylvania online casino.

**Play Now**

### West Virginia

Mobile and online gambling has been legalized and are live in West Virginia. Games legalized through the legislation include slots, and other table games. DraftKings Casino is available in West Virginia through the DraftKings Casino app and the DraftKings Casino website. Learn more about DraftKings West Virginia online casino.

**Play Now**

# Play Casino games while outside the U.S.

### Ontario, Canada

Online casino games have been legalized and are live in Ontario, Canada. DraftKings Casino is available in Ontario through the DraftKings Casino app and the DraftKings Casino website.

A403

Case 1:24-cv-10299-JEK  Document 63-9  Filed 02/21/24  Page 5 of 18

Check out our Ontario Online Casino page to learn more.

# Looking for where daily fantasy sports is legal?

Daily Fantasy Sports are available in many places across the United States. Check out our page on **where Daily Fantasy Sports is legal** to find the most up to date information on where you can play.

# Looking for where sports betting is legal?

Sports betting is available in a growing number of places across the United States. Check out our page on **where sports betting is legal** to find the most up to date information on where you can bet on sports.

A404



# Play DraftKings Casino today.

About DraftKings    Careers    Mobile Apps    Affiliates    Refer a Friend    Contact Us    Terms Of Use    Privacy Policy    Casino Partners

Retail Sportsbook Locations    Fair & Regulated Terms    DK Nation Sports News    Casino Education Hub    Accessibility    Where Is Online Gambling Legal

Get Help    Do Not Sell or Share My Personal Information

Online Slots    Online Blackjack    Online Roulette    Craps Online    Video Poker

A405

How to Play Slots    How to Play Blackjack    How to Play Roulette    How to Play Rocket    How to Play Live Dealer Games    How to Play Baccarat    How to Play Video Poker    How to Play Craps

How to Play Spanish 21    How to Play 21    What is a Casino Deposit Bonus?

## DraftKings Inc.

Boston, MA

We are licensed and regulated by the New Jersey Division of Gaming Enforcement as an Internet gaming operator in accordance with the Casino Control Act N.J.S.A. 5:12-1 and its implementing regulations. Our games are tested by the New Jersey Division of Gaming Enforcement to provide games that are fair and operate correctly. Only customers 21 and over are permitted to play our games. If you or someone you know has a gambling problem and wants help, call 1-800-GAMBLER

US Office: 222 Berkeley Street Boston, MA 02116

UK Office: 15 Ingestre Place Suite 265 Soho, London W1F OJH

New Jersey Office: 221 River St. 9th Floor Hoboken, NJ 07030

© 2012-2024 DraftKings All Rights Reserved.

A406

Where is Sports Betting Legal? DraftKings Sportsbook

Log In

Responsible Gaming

DAILY FANTASY    SPORTSBOOK    CASINO    MORE ∨

Home    My Bets    Live In-Game    Promos ∨

WHERE IS SPORTS BETTING LEGAL?

# LEGAL SPORTS BETTING IN THE UNITED STATES



Legal, DraftKings
Online and Mobile
App Live

Not Legal

Legal, DraftKings
Retail Only

Legal, DraftKings
Not Live



A407

# Bet with DraftKings Sportsbook today.

SIGN UP

# Where can you legally bet on sports?

The states below offer sports betting or have passed legislation to allow sports betting, either in a casino or online via web or mobile app. You do not need to be a resident of one of these states to place a bet, but you must be located in the state at the time you bet. That means placing a bet while on vacation is fair game. Don't miss the chance to place a bet with DraftKings Sportsbook while you're visiting a state where DraftKings is live!

## Arizona

Mobile and online sports betting are legal in Arizona. DraftKings is live with sports betting in the state. Download DraftKings Sportsbook today.

Check out our Arizona Sports Betting page to learn more.

BET NOW

## Colorado

Retail, mobile, and online sports betting are legal in Colorado. DraftKings is live with sports betting in the state online and with our retail partner Mardi Gras Casino in Black Hawk. Download DraftKings Sportsbook today.

Check out our Colorado Sports Betting page to learn more.

BET NOW

## Connecticut

## Illinois

A408

Retail, mobile, and online sports betting are legal in Connecticut. DraftKings, together with Foxwoods, is live with sports betting in the state online and at DraftKings Sportsbook at Foxwoods.

Check out our Connecticut Sports Betting page to learn more.

**BET NOW**

## Indiana

Retail, mobile, and online sports betting are legal in Indiana. DraftKings is live with sports betting in the state online and with our retail partner Ameristar Casino. Download DraftKings Sportsbook today.

Check out our Indiana Sports Betting page to learn more.

**BET NOW**

## Kansas

DraftKings at Casino Queen Sportsbook is now live in the state of Illinois. Download the DraftKings at Casino Queen Sportsbook app to start placing bets.

Check out our Illinois Sports Betting page to learn more.

**CONTACT YOUR LAWMAKERS**

## Iowa

Retail, mobile, and online sports betting are legal in Iowa. DraftKings is live with sports betting in the state online and with our retail partner Wild Rose. Download DraftKings Sportsbook today.

Check out our Iowa Sports Betting page to learn more.

**BET NOW**

## Kentucky

A409

3/20/24, 5:35 PM
Where Is Sports Betting Legal? DraftKings Sportsbook

Case 1:24-cv-10299-JEK   Document 103-9   Filed 09/21/24   Page 15 of 18

Mobile and online sports betting are now live in the state of Kansas. Download DraftKings Sportsbook to place a bet today.

Check out our Kansas Sports Betting page to learn more.

BET NOW

## Louisiana

Retail, mobile, and online sports betting is live in Louisiana. DraftKings is live with sports betting in the state online and with our retail partner Golden Nugget Casino Lake Charles. Download DraftKings Sportsbook today. Availability varies by Parish.

Check out our Louisiana Sports Betting page to learn more.

BET NOW

## Maryland

Mobile and online sports betting is live in the state of Maryland. Download DraftKings Sportsbook to place a bet today.

Retail and mobile sports betting is live in Kentucky.

Check out our Kentucky Sports Betting page to learn more.

BET NOW

## Maine

Mobile and online sports betting is live in Maine. Download DraftKings Sportsbook to place a bet today.

Check out our Maine Sports Betting page to learn more.

BET NOW

## Massachusetts

Mobile and online sports betting is live in the state of Massachusetts. Download DraftKings Sportsbook to place a bet today.

A410

3/20/24, 5:35 PM

Check out our Maryland Sports Betting page to learn more.

**BET NOW**

## Michigan

Mobile sports betting is now live in the state of Michigan. Download DraftKings Sportsbook to place a bet today. Check out our Michigan Sports Betting page to learn more.

**BET NOW**

## New Jersey

Both mobile and retail sports betting are legal in New Jersey. DraftKings offers its mobile sportsbook in New Jersey as well as retail sports betting in partnership with Resorts Casino. Download DraftKings Sportsbook today.

Check out our Massachusetts Sports Betting page to learn more.

**BET NOW**

## New Hampshire

Mobile and retail sports betting are legal in New Hampshire. DraftKings is live with sports betting in the state online and with our retail partners The Brook (DraftKings Sportsbook at the Brook) and Filotimo Casino (DraftKings Sportsbook at Manchester).

Check out our New Hampshire Sports Betting page to learn more.

**BET NOW**

## New York

Retail, mobile, and online sports betting are legal in New York. DraftKings is live with sports betting in the state online and with our retail partner at DraftKings Sportsbook at Del Lago Resort.

Download DraftKings Sportsbook today. Check out our NY Sports Betting page to learn more

A411

Check out our New Jersey Sports Betting page to learn more.

**BET NOW**

## North Carolina

Online sports betting is live in North Carolina. Download DraftKings Sportsbook to place a bet today.

Check out our North Carolina Sports Betting page to learn more.

**BET NOW**

## Oregon

Mobile and online sports betting are now live in the state of Oregon through DraftKings Sportsbook – Official Provider of the Oregon Lottery. Download the DraftKings Sportsbook app or place a bet online now.

Check out our Oregon Sports Betting page to learn more.

**BET NOW**

**BET NOW**

## Ohio

Mobile and online sports betting is live in the state of Ohio. Download DraftKings Sportsbook to place a bet today.

Check out our Ohio Sports Betting page to learn more.

**BET NOW**

## Pennsylvania

Retail, mobile, and online sports betting are legal in Pennsylvania. DraftKings is live with sports betting in the state. Download DraftKings Sportsbook today.

Check out our Pennsylvania Sports Betting page to learn more.

**BET NOW**

A412

## Tennessee

Mobile and online sports betting are live in the state of Tennessee. Download DraftKings Sportsbook today.

Check out our Tennessee Sports Betting page to learn more.

**BET NOW**

## Vermont

Mobile sports betting is live in Vermont. Download DraftKings Sportsbook to place a bet today.

Check out our Vermont Sports Betting page to learn more.

**BET NOW**

## Virginia

Mobile and online sports betting are live in the state of Virginia. Download DraftKings Sportsbook today.

Check out our Virginia Sports Betting page to learn more.

**BET NOW**

## West Virginia

Retail, mobile, and online sports betting are legal in West Virginia. DraftKings is live with sports betting in the state. Download DraftKings Sportsbook today.

Check out our West Virginia Sports Betting page to learn more.

**BET NOW**

## Wyoming

A413

3/20/24, 5:35 PM
Case 1:24-cv-10299-JFK Document 103-9 Filed 08/21/24 Page 15 of 18
Where is sports betting legal? - DraftKings Resource Center

Mobile and online sports betting are legal in Wyoming. DraftKings is live with sports betting in the state. Download DraftKings Sportsbook today.

Check out our Wyoming Sports Betting page to learn more.

**BET NOW**

# Bet on sports while outside the U.S.

### Ontario, Canada

Mobile sports betting with DraftKings Sportsbook is live in Ontario, Canada. Download the DraftKings Sportsbook app to start placing bets.

Check out our **Ontario Sports Betting** page to learn more.

### Puerto Rico

Sports betting is legal in Puerto Rico. DraftKings does not currently offer sports betting in the territory.

## Looking for where daily fantasy sports is legal?

A414

Daily Fantasy Sports are available in many places across the United States. Check out our page on **where Daily Fantasy Sports is legal** to find the most up to date information on where you can play.

# Looking for where online gambling is legal?

Online Gambling is available in a growing number of places across the United States. Check out our page on **where Online Gambling is legal** to find the most up to date information on where you can play.

A415



# Bet with DraftKings Sportsbook today.

If you or someone you know has a gambling problem, crisis counseling and referral services can be accessed by calling 1-800-GAMBLER (1-800-426-2537) (IL). Gambling problem? Call 1-800-GAMBLER (NJ/WV/P. ...**Read More**

| COMPANY | SPORTSBOOK ODDS | LOCATIONS | |
|---|---|---|---|
| **About DraftKings** | **NFL Odds** | **US Office** | Must be 21+ and physically present in New York to place wagers. If you or someone you |

## DraftKings Inc.
Boston, MA

https://sportsbook.draftkings.com/help/sports-betting/where-is-sports-betting-legal?_ga=2.174681058.1723692992.1710968948-911722006.1710968948&_gl=1*4y8ah7*_ga*OTExNzIyMDA2LjE3MT...    10/11

A416

Careers

Mobile Apps

Affiliates

Refer a Friend

Get Help

Terms Of Use

Privacy Policy

Responsible Gaming

Retail Sportsbook Locations

Accessibility

Reignmakers

DKNation Sports News

Do Not Sell or Share My Personal Information

NBA Odds

MLB Odds

UFC Odds

NHL Odds

PGA Odds

Soccer Odds

Tennis Odds

College Basketball Odds

College Football Odds

Live Odds

Super Bowl Odds

NFL Playoffs Odds

BETTING GUIDES

How To Bet

How to Bet on Football

How to Bet on Basketball

How to Bet on UFC

How to Bet on Baseball

How to Bet on Hockey

How to Bet on Golf

How to Bet on Soccer

How to Bet on Tennis

222 Berkeley Street

Boston, MA

02116

**New Jersey Office**

PO Box 399

Hoboken, NJ

07030

**UK Office**

15 Ingestre Place

Suite 265

Soho, London

W1F OJH

know has a gambling problem, text HOPENY (467369) or call 877-846-7369. Subject to regulatory licensing requirements.

21+

© 2012-2024 DraftKings All Rights Reserved.

A417