# United States Court of Appeals

*for the*

# First Circuit

---

Case No. 24-1443

DRAFTKINGS INC.,

*Plaintiff-Appellee,*

v.

MICHAEL HERMALYN,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON, IN CASE NO. 1:24-CV-10299-JEK,
HONORABLE JULIA ELEANOR KOBICK, JUDGE

---

## JOINT APPENDIX
### VOLUME II OF III, PAGES A418 – A909

---

ANDREW S. DULBERG
MARK C. FLEMING
WILLIAM F. LEE
WILMER CUTLER PICKERING HALE
    AND DORR LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-5000
-and-
JUSTINE GOEKE
HARRIS MUFSON
ORIN S. SNYDER
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000
-and-
JACOB T. SPENCER
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

*Attorneys for Plaintiff-Appellee*

CHRISTOPHER G. MICHEL
GREGG M. BADICHEK
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000

-and-

ALIKI SOFIS
ALEXANDER S. DEL NIDO
ISAAC SAIDEL-GOLEY
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
(617) 712-7100

-and-

RUSSELL BECK
STEPHEN D. RIDEN
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, Massachusetts 02110
(617) 500-8660

*Attorneys for Defendant-Appellant*

---

## TABLE OF CONTENTS

**Page**

Docket Entries ............................................................................................. A1

Verified Complaint, filed February 5, 2024 ....................................... A22

    Exhibit A: Nondisclosure & Assignment of Inventions Agreement
    dated August 31, 2020 ............................................................... A71

    Exhibit B: Noncompetition Covenant dated August 16, 2023 ............... A85

Motion for a Temporary Restraining Order, filed February 5, 2024 ............... A103

[Proposed] Temporary Restraining Order, filed February 5, 2024 ................. A108

Affidavit of Gregory Karamitis in Support of Plaintiff's Motion for
    Temporary Restraining Order, filed February 5, 2024 ........................... A111

Defendant's Emergency Motion to Stay Pursuant to the First Filed Rule,
    filed February 6, 2024 ...................................................................... A121

Declaration of Defendant Michael Z. Hermalyn in Support of Defendant's
    Motion to Stay, filed February 6, 2024 .................................................. A125

Order Denying Motion to Stay, filed February 6, 2024 ................................. A128

Declaration of Russell Beck in Support of Defendant's Opposition to
    Plaintiff's Motion for Temporary Restraining Order,
    filed February 7,2024 ....................................................................... A131

    Exhibit A: Assembly Committee on Labor and Employment ............... A134

    Exhibit B: Senate Judiciary Committee ................................................ A138

    Exhibit C: Senate Bill No. 699 ............................................................. A143

Declaration of Defendant Michael Z. Hermalyn in Support of Defendant's
    Opposition to Plaintiff's Motion for Temporary Restraining Order,
    filed February 7, 2024 ....................................................................... A147

    Exhibit A: E-Ticket ............................................................................. A163

    Exhibit B: Printout of Communications ............................................... A168

Temporary Restraining Order, filed February 8, 2024 ................................... A171

Excerpts of Transcript of Motion Hearing Held on February 8, 2024 ............. A174

329536_tst_ind

i

**Page**

Defendant's Motion to Dismiss or, in the Alternative, to Stay,
March 14, 2024 ................................................................................... A185

Declaration of Stephen D. Riden in Support of Defendants Motion to
Dismiss or, in the Alternative, to Stay, filed March 14, 2024 ............... A187

Exhibit B: Complaint for Declaratory Relief, Injunctive Relief , and
Violations of Cal. Bus. & Prof. Code Sections 16600, 16600.1,
16600.5, and 17200 ................................................................... A190

Exhibit C: Remand Order, February 5, 2024 ......................................... A217

Exhibit D: Remand Order, February 8, 2024 ......................................... A221

Exhibit E: Transcript of Proceedings, February 22, 2024 ....................... A226

Declaration of Defendant Michael Z. Hermalyn in Support of His Motion to
Dismiss or, in the Alternative, to Stay, filed March 14, 2024 ............... A266

Motion for Preliminary Injunction, filed March 14, 2024 ............................... A269

[Proposed] Preliminary Injunction, filed March 14, 2024 ............................... A275

Affidavit of Mitchell Green in Support of Plaintiff's Motion for Preliminary
Injunction, filed March 14, 2024 ......................................................... A281

Affidavit of Andrew Larracey in Support of Plaintiff's Motion for
Preliminary Injunction, filed March 14, 2024 ..................................... A301

Exhibit B: Screenshot of Text Message Exchange with Mr. Metz on
February 1, 2024 ........................................................................ A309

Exhibit C: Screenshot of Phone Call ..................................................... A311

Exhibit D: Screenshot of the Call History .............................................. A313

Exhibit K: Screenshot of Call from Mr. Kain dated February 20, 2024   A316

Exhibit L: Job Posting for the "Director, VIP Customer Development.   A318

Affidavit of Hayden Metz in Support of Plaintiff's Motion for Preliminary
Injunction, filed March 14, 2024 ......................................................... A323

Exhibit A: Text Message Exchange ....................................................... A329

Exhibit B: Screenshot of Call History .................................................... A331

Exhibit C: Screenshot of Notes of Conversations .................................. A334

ii

**Page**

Declaration of Jacob T. Spencer in Opposition to Defendant's Motion to Dismiss or, in the Alternative, to Stay, filed March 21, 2024 ............... A336

Exhibit A: Plaintiff Draftkings Inc.'s Third Amended Responses and Objections to Defendant Michael Z. Hermalyn's Interrogatory No. 9, filed March 21, 2024 ................................................................. A340

Affidavit of Brian Harris in Opposition to Defendant's Motion to Dismiss or, in the Alternative, to Stay, filed March 21, 2024 ............................. A354

Exhibit A: Copy of Email Draft ............................................... A358

Appendix C: Hermalyn's Requested Revisions to DK's Proposed PI in Event Court Enters Injunctive Relief ....................................... A360

Declaration of Russell Beck in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction, filed March 21, 2024 .... A368

Exhibit G: Senate Bill No. 699 ............................................... A372

Exhibit H: Specially Appearing Defendant Draftkings Inc.'s Notice of Motion and Motion to Quash Service of Summons for Lack of Personal Jurisdiction; Memorandum in Support ................................. A376

Exhibit I: Webpage Legal Online Gambling in the United States ......... A400

Exhibit J: 2023 Form 10-K ................................................... A418

Declaration of Defendant Michael Z. Hermalyn in Support of His Opposition to Plaintiff's Motion for Preliminary Injunction, filed March 21, 2024 ................................................................. A562

Transcript of Evidentiary Hearing Held on April 16, 2024 ............................. A568

Memorandum and Order on Plaintiff's Motion for Preliminary Injunction and Defendant's Motion to Dismiss or Alternatively to Stay this Action, filed April 30, 2024 ................................................................. A845

Order on Preliminary Injunction, filed April 30, 2024 ................................... A905

Notice of Appeal, filed May 2, 2024 ............................................... A907

**Sealed Volume:**

Affidavit of Mitchell Green in Support of Plaintiff's Motion for Preliminary Injunction, filed March 15, 2024 ........................................... A910

Appendix A: Slack Documents Activity Across Sources ..................... A930

iii

**Page**

Appendix B: Stroz Friedbert Digital Forensics and Incident Response.  A932

Appendix C: Identified References to File Names Consistent with
Mac OS Screenshots ............................................................................. A937

Affidavit of Andrew Larracey in Support of Plaintiff's Motion for
Preliminary Injunction, filed March 15, 2024 ......................................... A940

Exhibit A: Screenshot of Call .................................................... A948

Exhibit E: Screenshot of Calls .................................................. A951

Exhibit F: Screenshot of Notes ................................................. A956

Exhibit G: Email Correspondence .............................................. A961

Exhibit H: Email Correspondence .............................................. A963

Exhibit I: Screenshot of Call .................................................... A972

Exhibit J: Text Messages ......................................................... A974

Affidavit of Shawn Henley in Support of Plaintiff's Motion for Preliminary
Injunction, filed March 15, 2024 .............................................. A977

Exhibit A: Text Messages ........................................................ A995

Affidavit of Brian Harris in Support of Plaintiff's Motion for Preliminary
Injunction, filed March 15, 2024 .............................................. A997

Appendix A: Google Workspace Report ..................................... A1015

Exhibit A: Email Correspondence .............................................. A1021

Exhibit B: Computer Asset Return & Tracking .............................. A1023

Exhibit C: Direct Messages Between Michael Hermalyn and George
Hernandez ...................................................................... A1030

Affidavit of Samuel Russell in Support of Plaintiff's Motion for Preliminary
Injunction, filed March 15, 2024 .............................................. A1032

# EXHIBIT J

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

---

**FORM 10-K**

---

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2023

or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

Commission file number 001-41379

**DRAFTKINGS INC.**
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Nevada** | **87-2764212** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**222 Berkeley Street, 5th Floor**
**Boston, MA 02116**
(Address of principal executive offices) (Zip Code)

**(617) 986-6744**
(Registrant's telephone number, including area code)

**Securities Registered Pursuant to Section 12(b) of the Act:**

| Title of each class | Trading symbol | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, $0.0001 par value | DKNG | The Nasdaq Stock Market LLC |

**Securities Registered Pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Registration S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

A419

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐    No ☒

The aggregate market value of the voting and non-voting stock held by non-affiliates of the registrant as of June 30, 2023, the last business day of the registrant's most recently completed second fiscal quarter, was $10.9 billion based upon the closing price reported for such date on the Nasdaq Global Select Market.

As of February 14, 2024, there were 473,619,528 shares of the registrant's Class A common stock, par value $0.0001 per share, and 393,013,951 shares of the registrant's Class B common stock, par value $0.0001 per share, outstanding.

**Documents Incorporated by Reference:**

Portions of the registrant's definitive proxy statement for its 2024 Annual Meeting of Stockholders, or the Proxy Statement, to be filed within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K, are incorporated by reference in Part III. Except with respect to information specifically incorporated by reference in this Annual Report, the Proxy Statement shall not be deemed to be filed as part hereof.

A420

**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| Cautionary Statement Regarding Forward-Looking Statements |  |  | 2 |
| Part I. |  |  |  |
|  | Item 1. | Business | 3 |
|  | Item 1A. | Risk Factors | 12 |
|  | Item 1B. | Unresolved Staff Comments | 44 |
|  | Item 2. | Properties | 44 |
|  | Item 3. | Legal Proceedings | 45 |
|  | Item 4. | Mine Safety Disclosures | 53 |
| Part II. |  |  |  |
|  | Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 54 |
|  | Item 6. | [Reserved] | 55 |
|  | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 56 |
|  | Item 7A. | Quantitative and Qualitative Disclosures About Market Risks | 67 |
|  | Item 8. | Financial Statements and Supplementary Data | 67 |
|  | Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 67 |
|  | Item 9A. | Controls and Procedures | 67 |
|  | Item 9B. | Other Information | 68 |
|  | Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 68 |
| Part III. |  |  |  |
|  | Item 10. | Directors, Executive Officers and Corporate Governance | 69 |
|  | Item 11. | Executive Compensation | 69 |
|  | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 69 |
|  | Item 13. | Certain Relationships and Related Transactions, and Director Independence | 69 |
|  | Item 14. | Principal Accountant Fees and Services | 69 |
| Part IV. |  |  |  |
|  | Item 15. | Exhibits, Financial Statement Schedules | 70 |
|  | Item 16. | Form 10-K Summary | 77 |
| Signatures |  |  | 78 |

A421

**Cautionary Statement Regarding Forward-Looking Statements**

This Annual Report on Form 10-K (this "Annual Report") contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995 that reflect future plans, estimates, beliefs and expected performance. The forward-looking statements depend upon events, risks and uncertainties that may be outside of our control. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intends," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "will," "would," "forecast," "propose," and similar expressions or the negative of these words may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. You are cautioned that our business and operations are subject to a variety of risks and uncertainties, many of which are beyond our control, and, consequently, our actual results may differ materially from those projected.

Factors that could cause or contribute to such differences include, but are not limited to, those identified below and those discussed in the section entitled "Risk Factors" included elsewhere in this Annual Report. Any statements contained herein that are not statements of historical fact may be forward-looking statements.

- factors relating to our business, operations and financial performance, including:
  - our ability to effectively compete in the global entertainment and gaming industries;
  - our ability to successfully acquire and integrate new operations;
  - our ability to obtain and maintain licenses with gaming authorities;
  - our inability to recognize deferred tax assets and tax loss carryforwards;
- market and global conditions and economic factors beyond our control, as well as the potential impact of general economic conditions, including inflation and rising interest rates, on our liquidity, operations and personnel;
- significant competition and competitive pressures from other companies worldwide in the industries in which we operate;
- our ability to raise financing in the future;
- our success in retaining or recruiting officers, key employees or directors; and
- litigation and the ability to adequately protect our intellectual property rights.

Due to the uncertain nature of these factors, management cannot assess the impact of each factor on the business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements.

Any forward-looking statement speaks only as of the date on which such statement is made, and we undertake no obligation to update any of these statements to reflect events or circumstances occurring after the date of this Annual Report, except as required by applicable law. New factors may emerge and it is not possible to predict all factors that may affect our business and prospects.

A422

**PART I**

*On May 5, 2022 (the "GNOG Closing Date"), DraftKings Inc. (formerly New Duke Holdco, Inc.) consummated the acquisition of Golden Nugget Online Gaming, Inc., a Delaware corporation (together with its subsidiaries unless the context requires otherwise, "GNOG"), pursuant to a definitive agreement and plan of merger, dated August 9, 2021 (the "GNOG Merger Agreement"), in an all-stock transaction (the "GNOG Transaction"). In connection with the GNOG Transaction, DraftKings Inc. undertook a holding company reorganization whereby DraftKings Inc. became the going-forward public company and the direct parent company of both DraftKings Holdings Inc. (formerly DraftKings Inc.), a Nevada corporation ("Old DraftKings"), and GNOG. DraftKings Inc. is the registrant filing this Annual Report on Form 10-K as the successor registrant for Old DraftKings. Unless otherwise indicated or the context otherwise requires, the terms "DraftKings", the "Company", "we", "us" and "our" refer to DraftKings Inc. (or, in respect of periods prior to the GNOG Closing Date, Old DraftKings), together with its consolidated subsidiaries.*

**Item 1. Business.**

**Overview**

We are a digital sports entertainment and gaming company. We provide users with online sports betting ("Sportsbook"), online casino ("iGaming") and daily fantasy sports ("DFS") product offerings, as well as retail sportsbook, media and other consumer product offerings. We are also involved in the design and development of sports betting and casino gaming software for online and retail sportsbooks and iGaming operators.

Our mission is to make life more exciting by responsibly creating the world's favorite real-money games and betting experiences. We accomplish this by creating an environment where our users can find enjoyment and fulfillment through Sportsbook, iGaming, and DFS, as well as media and other online consumer product offerings. We are also highly focused on our responsibility as a steward of this new era in real-money gaming. Our ethics guide our decision making, with respect to both the tradition and integrity of sports and our investments in regulatory compliance and consumer protection.

We continue to make deliberate and substantial investments in support of our mission and long-term growth. For example, we have invested in our product offerings and technology in order to continuously launch new product innovations; improve marketing, merchandising, and operational efficiency through data science; and deliver a great user experience. We also make significant investments in sales and marketing and incentives to grow and retain our paid user base, including personalized cross-product offers and promotions, and promote brand awareness to attract the "skin-in-the-game" sports fan. Together, these investments have enabled us to create a leading product built on scalable technology, while attracting a user base that has resulted in the rapid growth of our business.

Our priorities are to (a) continue to invest in our product offerings, (b) launch our product offerings in new jurisdictions, (c) create replicable and predictable state-level unit economics in sports betting and iGaming and (d) expand our consumer product offerings. When we launch Sportsbook and iGaming product offerings in a new jurisdiction, we invest heavily in user acquisition, retention and cross-selling until the new jurisdiction provides a critical mass of users engaged across our product offerings.

Our current technology is highly scalable with relatively minimal incremental spend required to launch our product offerings in new jurisdictions. We will continue to manage our fixed-cost base in conjunction with our market entry plans and focus our variable spend on marketing, user experience and support and regulatory compliance to become the product of choice for users and to maintain favorable relationships with regulators. We also expect to improve our profitability over time as our revenue and gross profit expand as states mature, and our variable marketing expenses and fixed costs stabilize or grow at a slower rate.

Our path to profitability on an annual basis is based on the acceleration of positive contribution profit growth driven by increased revenue and gross profit generation from ongoing efficient customer acquisition enabled by the transition from local to regional to national advertising, strong customer retention, improved monetization from frequency and higher hold percentage, as well as scale benefits from investments in our product offerings and technology and general and administrative functions. On a consolidated Adjusted EBITDA basis, we expect to achieve profitability on an annual basis when total contribution profit exceeds the fixed costs of our business, which depends, in part, on the percentage of the U.S. adult population that has access to our product offerings and the other factors summarized in the section entitled "Cautionary Statement Regarding Forward-Looking Statements".

A423

During the fiscal years ended December 31, 2023, 2022 and 2021, we had revenue of $3,665.4 million, $2,240.5 million, and $1,296.0 million, respectively, average monthly unique payers ("MUPs") of 2.7 million, 1.9 million, and 1.5 million, respectively, and average revenue per MUP ("ARPMUP") of $113, $96, and $67, respectively. Refer to the section entitled "Key Performance Indicators" within Management's Discussion and Analysis of Financial Condition and Results of Operations included herein for additional information regarding our MUPs and ARPMUP.

**Our Product Offerings**

Our revenues are predominantly generated through our three online gaming product offerings — Sportsbook, iGaming, and DFS. For Sportsbook and iGaming, we operate under both our DraftKings brand and our GNOG brand. We consider these three product offerings to be of a similar product class, and together they accounted for 96%, 94%, and 88% of DraftKings' revenues for the fiscal years ended December 31, 2023, 2022 and 2021, respectively. DFS, which was our sole product offering until 2018, historically drove our results; however, since we launched Sportsbook and iGaming in 2018, states where Sportsbook and iGaming are operating have accounted for a rapidly growing proportion of our users, which has contributed, in part, to our revenue growth. In addition to our three online gaming product offerings, we also offer non fungible tokens ("NFTs") on DraftKings Marketplace ("Marketplace"), NFT-based DFS-style contests, gaming software services, and advertising and sponsorship packages to targeted advertisers across our DFS product offering, free games, and media content.

Below is a description of each of our primary product offerings and services:

*Online Gaming Product Offerings*

**Sportsbook** - Sportsbook engages consumers in their sports viewing experience. Sports betting involves a user placing a bet by wagering money on an event at fixed odds ("proposition") determined by DraftKings. In the event the user wins, DraftKings pays out the bet. Our Sportsbook revenue is generated by setting odds that are intended to provide a built-in theoretical margin for each proposition offered to our users. While the actual betting patterns of our users and outcomes of individual events may cause short-term volatility in our revenue and profitability, we believe we can deliver a stable and attractive betting win margin over the long term.

Revenue is realized by taking the settled handle for betting markets that have been resolved and subtracting the payouts for these betting markets such that the difference is our gross revenue, or "hold."

**iGaming** - iGaming, or online casino, product offerings typically include the full suite of games available in land-based casinos, such as blackjack, roulette, baccarat and slot machines. For these product offerings, we function similarly to land-based casinos, generating revenue through hold, or gross winnings, as users play against the house. In iGaming, we believe there is typically lower volatility in hold percentage versus land-based casinos since the average return to a player for specific games is easier to predict in advance based on game rules and statistics.

Our iGaming product offering consists of a combination of games that we have built in-house and licensed content from suppliers such as International Gaming Technology, iForium, Light & Wonder Inc., Spin, and Evolution for live dealer services. The latter are subject to standard revenue-sharing agreements specific to each supplier, whereby the supplier receives a percentage of the gaming revenue generated from their respective casino games played utilizing our technology. In exchange, DraftKings receives a limited license to offer the games to users in jurisdictions where use is approved by regulatory authorities. Revenue generated through our self-developed major casino games such as blackjack results in decreased overall revenue share payments as a percent of revenue.

**Daily Fantasy Sports** - Since our launch, we have monetized our DFS product offering by facilitating peer-to-peer play, whereby contestants compete against each other for prize money. We provide contestants with technology that establishes DFS contests, scores the contests, distributes the prizes and performs other administrative activities to enable the "skin-in-the-game" sports fan experience. Our revenue from DFS consists of the difference between the entry fees collected and the amounts paid out to contestants as prizes in a period.

*Other Consumer Product Offerings*

4

A424

**Retail Sportsbook -** In addition to our online Sportsbook, we also maintain retail distribution in thirteen states, in which our retail revenue is subject to individual agreements with third parties that provide for a revenue share. Retail distribution leverages the foot traffic for existing casino and other properties to convert their customers to engage with our retail sportsbook while on the premises. Similar to our online Sportsbook, retail sportsbook revenue is realized by taking the settled handle for betting markets that have been resolved and subtracting the payouts for these betting markets such that the difference is our gross revenue, or "hold."

**Media, Advertising and Sponsorship -** Our advertising packages range from standard ad placements and background ad placements to more high-touch integrations, such as sponsored DFS contest series or custom site takeovers. These are typically served and tracked by a range of advertising methods that have been built directly into our product offerings and feature partnerships with brand categories ranging from entertainment to food to automotive. Each advertising package is bespoke, and we offer each client a custom "menu" of advertising options, which include online media (such as display, video and audio advertisements and page and "skin" sponsorship takeovers), custom content, including branded video content, live events such as sponsored watch parties and sponsored free or paid games, including daily fantasy, pick'em and bracket games. Each advertising package has a different pricing model, with a variety of factors affecting the pricing of a particular package including, but not limited to, (i) the sport to which the package relates and (ii) the demand for, and supply of, the individual package components. Sponsorships and custom-built games and content typically have fixed fee pricing. Other packages, such as custom-branded video content or online advertisements, are sold with a guaranteed number of impressions, which are priced per a certain number of guaranteed impressions. Each time a consumer sees an advertisement while playing, watching, reading or listening to a piece of content or playing a game, an impression is counted.

**DraftKings Marketplace -** We launched DraftKings Marketplace during the third quarter of 2021. Marketplace is a NFT ecosystem designed for mainstream accessibility that offers curated initial NFT drops ("Primary Sales") and allows owners of NFTs on Marketplace to list their NFTs for sale to other Marketplace customers ("Secondary Sales"). Once marked for sale with a chosen selling price, the NFT will appear on the Marketplace secondary market. Customers can browse all available NFTs within the secondary market and can opt to purchase based on the selling price. The revenue we earn on Primary Sales and Secondary Sales is based on a specific percentage of the gross value of each such sale. We also offer NFT-based DFS-style contests through our Reignmakers franchise.

### Gaming Software Services

We supply business-to-business sports betting and iGaming services globally, primarily in Europe and the United States, for various gaming operators and government-run lotteries. Our gaming software services are primarily comprised of the operations of SBTech (Global) Limited ("SBTech"), which we acquired on April 23, 2020, with principal activities involving the design and development of sports betting and casino gaming software. Our services are delivered through our proprietary software, and our complementary service offerings include trading and risk management and support for reporting, customer management and regulatory reporting requirements. Our gaming software services generate revenue from operators by providing sports betting and integration to iGaming content directly to operators in exchange for a share of operators' revenues.

Offsetting the revenues attributable to our Sportsbook, iGaming, DFS, and Marketplace product offerings is the portion of gross revenue that we allocate to new and existing user incentives and promotions, which are awarded as a result of game play or at our discretion, through loyalty programs, free plays, deposit bonuses, discounts, rebates or other rewards and incentives. These offsets can be redeemed across multiple product offerings and are generally used to acquire new users, reactivate prior users and increase monetization from active users; therefore, these offsets are not directly attributable to a specific product offering, but rather attributable at a customer level. We leverage our return-on-investment models that are based on gross profit paybacks, lifetime value, player segmentation and customer and revenue retention to determine appropriate promotional levels.

### Seasonality

Our business experiences seasonality primarily based on the relative popularity of certain sports. Although sporting events occur throughout the year, our users are typically most active in the fourth quarter due to the overlapping calendars of the NFL and NBA seasons, which are the most popular sports on our Sportsbook product offering.

### Our Technology and Product Development

In order to build the best real-money games and product offerings, we have invested in core disciplines across our technology, analytics and marketing, which have allowed us to rapidly innovate and bring new experiences to market while gaining a unique understanding of our users. The result has been leadership in our industry, fueled by a brand reputation and a depth of user trust that we believe has set us apart from our competitors.

A425

Our product offerings are comprised of varying levels of proprietary and third-party software. Our DraftKings-branded product offerings are bound together with a common account management and regulatory compliance service and can be accessed with the same account and wallet. Across our product offerings, we have endeavored to own the technology in-house for any critical component and to utilize a combination of technologies, including data science and machine learning, to optimize conversion and efficiency.

DraftKings' core product offerings are built on top of integrated, proprietary account management technology. This technology provides our users with access to their account history across all DraftKings-branded product offerings and a uniform identity verification system, which is critical to enabling seamless navigation from our national DFS audience to our DraftKings-branded Sportsbook and iGaming product offerings and vice versa, as existing users need not manage a separate set of account credentials and payment methods for each product offering. Our users also enjoy a highly functional wallet which, in many cases, permits user funds to flow freely from product offering to product offering. The technology is certified to safely store user payment information, which reduces our dependency on any particular payment processor, provides redundancy and gives us the flexibility to route our payment volume to a processor of our choosing. In addition, our technology is built to be customizable to the specific regulations of individual jurisdictions.

Across our product offerings, we actively use data science and machine learning to help optimize conversion and monetization. Within our DFS product offering, data science algorithms are used to customize a contestant's home screen based upon his or her past entry history. We build recommendations by identifying the type of contests that a contestant is most likely to enter, along with the entry fee and prize structure that he or she will find most appealing. In addition, contest-pacing algorithms identify contests that might present a financial exposure and increase the contests' visibility within the product appropriately. Similarly, within our Sportsbook product offering, recommendation engines are used to present betting markets to users based upon their past play history and location. These services are also critical to our back-end infrastructure, as they drive key elements of our fraud and compliance program.

**Marketing**

**User Acquisition and Retention -** Our ability to effectively market is paramount to our operational success. Utilizing a blend of analytics and data science as our foundation, we leverage our marketing to acquire, retain and reactivate users while building a trusted consumer-facing brand. We use a variety of free and paid marketing channels, in combination with compelling offers and exciting games, to achieve our objectives. Furthermore, we optimize our marketing spend using data collected since the beginning of our operations, as well as additional data that we collect from vendors, partners and data providers. Our marketing spend is based on a return-on-investment model that considers a variety of factors, including the performance of different marketing channels, predicted lifetime value and behavior of users across various product offerings, the location of our users and our estimate of when enabling legislation and regulations for sports betting and iGaming may come to fruition.

Where paid marketing is concerned, we leverage a broad array of advertising channels, including television, radio, social media platforms such as Facebook, Instagram, X and Snapchat, affiliates and paid and organic search, and other digital channels such as mobile display. For Sportsbook and iGaming, these efforts are concentrated within the specific jurisdictions that have passed enabling legislation and regulations, and in which we operate or intend to operate (which vary on a per-offering basis). Our marketing expenditures tend to be highly seasonal, with most spend correlating with the start of a sports season and during its playoffs and championships.

In addition to traditional paid advertising channels, we cross-promote our product offerings to our existing user base through internal channels such as mobile push notifications, email and text messages, and external channels such as Facebook, Twitter, Instagram and Snapchat. Through those channels, we use a combination of content, contests and promotions to engage existing users. Additionally, we incentivize our users to refer new users through our "Refer-a-Friend" program, offering incentives such as free entries into tournaments or free bets if the referred user ultimately interacts with our product offerings.

**League, Team, and Media Relationships** - We engage in relationships with sports leagues, including the NFL, NBA, MLB, NHL, and UFC, and professional sports teams to improve our brand awareness, improve user retention and create unique collaborative integrations for our users.

We also engage in relationships with media partners including Amazon, which selected DraftKings as a sponsor and official pre-game odds provider for Thursday Night Football ("TNF") on Prime Video in September 2022. Under the multi-year agreement, TNF on Prime Video will feature DraftKings integrations in its live pregame, including odds and

6

A426

additional sports betting insights, as well as other TNF-themed offerings. We also have established partnerships with media entities like Meadowlark Media and iHeartMedia as we seek to grow our audience of U.S. sports fans and potential users.

**Distribution**

We distribute our Sportsbook, iGaming, DFS and Marketplace product offerings through various channels, including traditional websites, direct app downloads and global direct-to-consumer digital platforms such as the Apple App Store and the Google Play store. These two digital platforms are the main distribution channels for our product offerings. Our DFS product offering is delivered as a free application through both the Apple App Store and Google Play Store and is also accessible via mobile and traditional websites. Our Sportsbook and iGaming product offerings are primarily distributed through the Apple App Store and a traditional website. We allow our Android Sportsbook and iGaming users to install our Sportsbook and iGaming product offerings through the Google Play Store and our website. We derive nearly all of our revenue through product offerings distributed via the Apple App Store, Google Play Store and via traditional websites. For all of our product offerings, neither Apple nor Google take any revenue share for distribution.

For our gaming software services, Sportsbook and iGaming product offerings and services are distributed online via the Apple App Store, Google Play Store and traditional websites by operators that have licensed such products and services directly from us, while retail product offerings and services are distributed primarily via self-service betting terminals and standalone computer terminals. Similarly, Apple and Google do not take any revenue share for distributing those product offerings and services.

**Intellectual Property**

Our business substantially relies on the creation, acquisition, use and protection of intellectual property. Some of this intellectual property is in the form of software code, patented technology and trade secrets that we use to develop and properly run our Sportsbook, iGaming, and DFS product offerings and related services. We also create intellectual property that includes proprietary sports betting, iGaming, and DFS-related technology and content, as well as proprietary data acquired from the use of those product offerings.

While most of the intellectual property we use is created by us, we have obtained rights to use the intellectual property of third parties through licenses and service agreements with those third parties. Although we believe these licenses are sufficient for the operation of the Company, these licenses typically limit our use of the third parties' intellectual property to specific uses and for specific time periods.

We protect our intellectual property rights by relying on federal, state and common law rights, as well as contractual restrictions. We control access to our proprietary technology by entering into confidentiality and invention assignment agreements with our employees and contractors, and confidentiality agreements with third parties. We also engage in monitoring the activities of third parties with respect to potential infringing uses of our intellectual property by third parties.

We actively seek patent protection covering inventions originating from us and, from time to time, review opportunities to acquire patents to the extent we believe such patents may be useful or relevant to our business.

In addition to these contractual arrangements, we also rely on a combination of trade secret, copyright, trademark, trade dress, domain name and patents to protect our product offerings and other intellectual property. We typically own the copyright to the software code to our content, as well as trademarks under which our Sportsbook, iGaming, and DFS product offerings and related services are marketed. We pursue the registration of our domain names, trademarks, and service marks in the United States and in locations outside the United States. Our registered trademarks in the United States include "DraftKings," and the names of certain of our services and applications, among others.

**Competition**

We operate in the global entertainment and gaming industries, primarily with our Sportsbook, iGaming, DFS, and Marketplace product offerings. Our users face a vast array of entertainment choices. Other forms of entertainment, such as television, movies, sporting events and in-person casinos, are more well established and may be perceived by our users to offer greater variety, affordability, interactivity and enjoyment. We compete with these and other forms of entertainment for the discretionary time and income of our users.

The specific industries in which we operate are characterized by dynamic customer demand and technological advances, and there is significant competition among online gaming and entertainment providers. A number of established, well-financed

7

A427

companies producing online gaming and/or interactive entertainment products and services compete with our product offerings, and other well-capitalized companies may introduce competitive services. There has also been consolidation among competitors in the entertainment and gaming industries and such consolidation and future consolidation could result in the formation of larger competitors with increased financial resources and altered cost structures, which may enable them to offer more competitive products, gain larger market share, expand their product offerings and broaden their geographic scope of operations.

**Human Capital Resources**

As a multinational technology company with over 4,400 employees located in six countries, our business success is driven by our highly skilled workforce. With our global technology and product team consisting of over 1,900 employees (which includes over 1,400 engineers), we are well positioned to deliver new, innovative and exciting products to our growing base of customers.

At DraftKings, we recognize that engaging and developing our employees is a key to our success and we rely on attracting and retaining our talent to deliver on DraftKings' goal to be a leader in today's fast-growing global entertainment and gaming industries. We routinely measure our employees' level of engagement and satisfaction through a comprehensive annual engagement survey followed by quarterly pulse surveys. These surveys ensure we hear directly from our valuable employees on how we can better focus on the following areas: (i) alignment with DraftKings' mission/vision and in-role clarity, (ii) manager effectiveness, (iii) growth opportunities, (iv) inclusion, equity and belonging, (v) work-life balance, (vi) rewards and recognition, (vii) enablement and (viii) overall satisfaction.

We have committed to and formalized employee development programs that support inclusion, equity and belonging, and promote creativity and innovation through various leadership and talent management programs. DraftKings' talent training programs are designed to provide increased career and internal mobility for our employees, identify development opportunities, and proactively support succession planning.

We also offer our employees a holistic total rewards package with competitive compensation and premier health and welfare programs for employees and their dependents. In addition, most full-time employees receive an equity award upon hire and are also eligible for equity awards on a recurring basis to align compensation with long-term stockholder interests and to allow them to participate in the Company's financial success. Our paid time off programs enable our workforce to enjoy personal time away from their job responsibilities.

**Government Regulation**

DraftKings is subject to various U.S. and foreign laws and regulations that affect our ability to operate our Sportsbook, iGaming, and DFS product offerings. These product offerings are generally subject to extensive and evolving regulations that could change based on political and social norms and that could be interpreted in ways that could negatively impact our business.

The gaming industry (inclusive of our Sportsbook and iGaming product offerings) is highly regulated and we must maintain licenses and pay gaming taxes or a percentage of revenue where required by the jurisdictions in which we operate in order to continue our operations. Our business is subject to extensive regulation under the laws, rules and regulations of the jurisdictions in which we operate. These laws, rules and regulations generally concern the responsibility, financial stability, integrity and character of the owners, managers and persons with material financial interests in the gaming operations along with the integrity and security of sports betting and iGaming product offerings. Violations of laws or regulations in one jurisdiction could result in disciplinary action in that and other jurisdictions.

Gaming laws are generally based upon declarations of public policy designed to protect gaming consumers and the viability and integrity of the gaming industry. Gaming laws also may be designed to protect and maximize state and local tax revenues, as well as to enhance economic development and tourism. To accomplish these public policy goals, gaming laws establish stringent procedures to ensure that participants in the gaming industry meet certain standards of character and responsibility.

*Licensing and Suitability Determinations*

8

A428

In order to operate in certain jurisdictions, we must obtain either a temporary or permanent license or determination of suitability from the responsible authorities. We seek to ensure that we obtain all necessary licenses and approvals to develop and put forth our product offerings in the jurisdictions in which we operate and where our users are located.

Gaming laws in certain jurisdictions require DraftKings Inc., and each of its subsidiaries engaged in gaming operations, certain of our directors, officers and employees, and in some cases, certain of our stockholders, to obtain licenses from gaming authorities. Such licenses typically require a determination that the applicant qualifies or is suitable to hold the license. When determining whether to grant such a license to an applicant, gaming authorities generally consider: (i) the financial stability, integrity and responsibility of the applicant (including verification of the applicant's sources of funding); (ii) the quality and security of the applicant's online real-money gaming platform, hardware and related software (including the platform's ability to operate in compliance with local regulation, as applicable); (iii) the applicant's history; (iv) the applicant's ability to operate its gaming business in a socially responsible manner; and (v) in certain circumstances, the effect on competition.

Gaming authorities may, subject to certain administrative procedural requirements, (i) deny an application, or limit, condition, revoke or suspend any license issued by them; (ii) impose fines, either on a mandatory basis or as a consensual settlement of regulatory action; (iii) demand that named individuals or stockholders be disassociated from a gaming business; and (iv) in serious cases, liaise with local prosecutors to pursue legal action, which may result in civil or criminal penalties.

Events that may trigger revocation of such a gaming license or another form of sanction vary by jurisdiction. However, typical events include, among others: (i) conviction in any jurisdiction of certain persons with an interest in, or key personnel of, the licensee of an offense that is punishable by imprisonment or may otherwise cast doubt on such person's integrity; (ii) failure without reasonable cause to comply with any material term or condition of the gaming license; (iii) declaration of, or otherwise engaging in, certain bankruptcy, insolvency, winding-up or discontinuance activities, or an order or application with respect to the same; (iv) obtaining the gaming license by a materially false or misleading representation or in some other improper way; (v) violation of applicable anti-money laundering or terrorist financing laws or regulations; (vi) failure to meet commitments to users; (vii) failure to pay in a timely manner all gaming or betting taxes or fees due; or (viii) determination by the gaming authority that there is another material and sufficient reason to revoke or impose another form of sanction upon the licensee.

### *Product-Specific Licensing*

*Sportsbook*

As of February 13, 2024, 35 U.S. states, the District of Columbia and Puerto Rico have legalized some form of sports betting. Of those 37 legal jurisdictions, 32 have legalized online sports betting. Of those 32 jurisdictions, 31 are live, and DraftKings operates in 24 of them. As of February 13, 2024, we operate our online sports betting product offering via the DraftKings Sportsbook app in Arizona, Colorado, Connecticut, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Ohio, Oregon, Pennsylvania, Tennessee, Vermont, Virginia, West Virginia, Wyoming and Ontario, Canada pursuant to our licenses, temporary licenses, or executed vendor agreements granted by the gaming or lottery commission of such states, specifically, the Arizona Department of Gaming, State of Colorado Department of Revenue Division of Gaming, State of Connecticut Department of Consumer Protection, the Illinois Gaming Board, the Indiana Gaming Commission, the Iowa Racing and Gaming Commission, the Kansas Racing and Gaming Commission, the Louisiana Gaming Control Board, the Maine Gambling Control Unit, the Maryland Lottery and Gaming Control Agency, the Massachusetts Gaming Commission, the Michigan Gaming Control Board, the New Hampshire Lottery Commission, the New Jersey Division of Gaming Enforcement, the New York State Gaming Commission, the Ohio Casino Control Commission, the Oregon State Lottery, the Pennsylvania Gaming Control Board, the Tennessee Sports Wagering Council, the Vermont Department of Liquor and Lottery, the Virginia Lottery, the West Virginia Lottery Commission, and the Wyoming Gaming Commission. Additionally, DraftKings operates its online sports betting product offering in the Canadian province of Ontario pursuant to a registration approved by the Alcohol and Gaming Commission of Ontario.

In addition to our DraftKings-branded sports betting product offering, we operate our GNOG-branded online sports betting product offering via the GNOG Sportsbook app in Arizona and New Jersey pursuant to our licenses granted by the respective state's gaming or lottery commission as described above.

We also operate retail sportsbooks in Arizona, Colorado, Connecticut, Illinois, Iowa, Kansas, Kentucky, Louisiana, Michigan, Mississippi, New Hampshire, New Jersey and Washington pursuant to state and/or tribal regulatory regimes.

On May 14, 2018, the U.S. Supreme Court issued an opinion determining that the Professional and Amateur Sports Protection Act ("PASPA") was unconstitutional. PASPA prohibited certain states from "authorizing by law" any form of

A429

sports betting. In striking down PASPA, the U.S. Supreme Court opened the potential for state-by-state authorization of sports betting. Several states and territories, including Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Dakota, Tennessee, Vermont, Virginia, Washington, Washington, D.C., West Virginia, and Wyoming already have laws authorizing and regulating some form of sports betting online or in brick-and-mortar establishments. Sports betting in the United States is subject to additional laws, rules and regulations at the state level. See "Risk Factors — Risk Factors Relating to our Business and Industry — Our business is subject to a variety of U.S. and foreign laws, many of which are unsettled and still developing and which could subject us to claims or otherwise harm our business. Any change in existing regulations or their interpretation, or the regulatory climate applicable to our products and services, or changes in tax rules and regulations or interpretation thereof related to our products and services, could adversely impact our ability to operate our business as currently conducted or as we seek to operate in the future, which could have a material adverse effect on our financial condition and results of operations."

*iGaming*

As of February 13, 2024, we operate our DraftKings-branded iGaming product offering in New Jersey pursuant to a transactional waiver granted by the New Jersey Division of Gaming Enforcement, in Connecticut pursuant to a license granted by the State of Connecticut Department of Consumer Protection, in Michigan pursuant to a license granted by the Michigan Gaming Control Board, in the Canadian Province of Ontario pursuant to a license granted by the Alcohol and Gaming Commission of Ontario, in Pennsylvania pursuant to a license granted by the Pennsylvania Gaming Control Board, and in West Virginia pursuant to a license granted by the West Virginia Lottery. In addition, we operate our GNOG-branded iGaming product offering in Michigan, New Jersey, Pennsylvania and West Virginia, subject to licenses or transactional waiver issued by the Michigan Gaming Control Board, the New Jersey Division of Gaming Enforcement, Pennsylvania Gaming Control Board and the West Virginia Lottery, respectively.

Generally, online gambling in the United States is only lawful when specifically permitted under applicable state law. At the federal level, several laws provide federal law enforcement with the authority to enforce and prosecute gambling operations conducted in violation of underlying state gambling laws. These enforcement laws include the Unlawful Internet Gambling Enforcement Act (the "UIGEA"), the Illegal Gambling Business Act and the Travel Act. No violation of the UIGEA, the Illegal Gambling Business Act or the Travel Act can be found absent a violation of an underlying state law or other federal law.

In addition, the Wire Act of 1961 (the "Wire Act") provides that anyone engaged in the business of betting or wagering knowingly using a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, may be fined or imprisoned, or both. However, the Wire Act notes that it shall not be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a state or foreign country where betting on that sporting event or contest is legal into a state or foreign country in which such betting is legal. Although there was previous litigation in the First Circuit as to whether the Wire Act applied beyond sports betting, on January 20, 2021, the United States Court of Appeals for the First Circuit held, among other things, that the Wire Act's prohibitions are limited to bets or wagers on sporting events or contests.

*Daily Fantasy Sports*

As of February 13, 2024, our DFS product offering is available in 44 U.S. states, the District of Columbia, certain provinces in Canada and the United Kingdom. In those states that currently require a license or registration for DFS operations, DraftKings has either obtained the appropriate license or registration or a provisional license from the relevant regulatory authority or is operating pursuant to a grandfathering clause that allows operation pending the availability of licensing applications and subsequent grant of a license. DraftKings also has a foreign DFS license in the United Kingdom. Various state laws and regulations govern our licenses, but generally such state laws and regulations define paid fantasy sports, establish the rules concerning the application and licensure procedures for gaming operators in the fantasy sports business and regulate practices for paid fantasy sports deemed to be detrimental to the public interest. As part of the licensing process, we must submit, in some jurisdictions, extensive materials on our operations, including our technology and data security, age verification of contestants, segregation of account funds and responsible gaming initiatives.

In the United States, our DFS licenses are generally granted for a predetermined period of time (typically ranging from one to four years) or require documents to be supplied on a regular basis in order to maintain our licenses.

A430

Outside the United States, we maintain a DFS license in the United Kingdom. In the United Kingdom, online gaming and sports betting is subject to the Gambling Act 2005 (the "GA2005"), as amended by the Gambling (Licensing and Advertising) Act 2014, and the regulations promulgated thereunder. Under the GA2005, entities wishing to offer online sports betting (which for purposes of GA2005 is defined to include DFS) and/or online casino services to persons located in the United Kingdom must first obtain a remote gambling operating license from the Gambling Commission. We hold a remote-pool-betting operating license authorizing us to offer our DFS product offering to residents of the United Kingdom. That license may be varied to add further product categories permitting, for example, fixed-odds-sports betting and online casinos. We also hold a gambling software operating license issued by the Gambling Commission, which authorizes us to develop the DFS software we use. Our British licenses are not limited by a term, subject to the payment of annual fees and compliance with license conditions.

*Gaming Software*

Our gaming software services, formerly the operations of SBTech, are licensed in various states in the United States and in the United Kingdom, Sweden, and Belgium. Additionally, our gaming software is certified in multiple regulated jurisdictions in accordance with local licenses held by operators utilizing our gaming software in these jurisdictions.

As of February 13, 2024, we supplied our SBTech gaming software to U.S operators in Arizona, Colorado, Connecticut, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, Tennessee, Virginia, West Virginia, and Wyoming, and we supplied retail sportsbook gaming software services in Arizona, Colorado, Connecticut, Illinois, Iowa, Kansas, Louisiana, Michigan, Mississippi, New Hampshire, New Jersey and Washington pursuant to state and/or tribal regulatory regimes.

*Data Protection and Privacy*

In addition to our licensing regime for our product offerings, we also take significant measures to protect users' privacy and data. Our programs are described in further detail below.

Because we handle, collect, store, receive, transmit and otherwise process certain personal information of our users and employees, we are subject to U.S. federal and state laws and foreign laws related to the privacy and protection of such data, and we may also face particular privacy, data security and data protection risks in connection with requirements under the amended California Consumer Privacy Act and its implementing regulations, Virginia's Consumer Data Protection Act, the General Data Protection Regulation of the European Union (EU) 2016/679 (the "GDPR"), and other data protection regulations. Any failure to comply with these rules may result in regulatory fines or penalties including orders that require us to change the way we process data. In the event of a data breach, we are also subject to breach notification laws in the jurisdictions in which we operate, including under the GDPR, and the risk of litigation and regulatory enforcement actions.

Any significant change to applicable laws, regulations, interpretations of laws or regulations, or market practices, regarding the use of personal data, or regarding the manner in which we seek to comply with applicable laws and regulations, could require us to make modifications to our product offerings, services, policies, procedures, notices, and business practices, including potentially material changes. Such changes could potentially have an adverse impact on our business.

*Compliance*

We have developed and implemented an internal compliance program to help ensure that we comply with legal and regulatory requirements imposed on us in connection with our Sportsbook, iGaming and DFS product offerings. Our compliance program focuses on, among other things, reducing and managing problematic gaming and providing tools to assist users in making educated choices related to gaming activities.

Our compliance program services have been built from the ground up to meet the needs of differing regulatory regimes, including configurable regulatory and responsible gaming controls such as responsible gaming tests, operator alerts on player behavior, deposit limits, betting limits, loss limits, timeout facilities, session limits, reality checks, balance thresholds and intended gaming amounts. These features allow the operators' customers to control their gaming and play responsibly.

*Responsible and Safer Gaming*

We view the safety and welfare of our users as critical to our business and have made associated investments in our processes and systems. We are committed to industry-leading responsible gaming practices and seek to provide our users with the resources and services they need to play responsibly. Additionally, all of our employees take responsible gaming training with mandatory periodic refresher training, overseen by our compliance team.

---

11

A431

**Available Information**

Our Internet address is www.DraftKings.com. Our website and the information contained therein or linked thereto are not part of this Annual Report. We make available free of charge through our internet website our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, proxy statements, registration statements and amendments to those reports filed or furnished pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as soon as reasonably practicable after we electronically file such material with, or furnish them to the U.S. Securities and Exchange Commission (the "SEC"). The SEC maintains a website that contains reports, proxy statements and other information regarding issuers that file electronically with the SEC. These materials may be obtained electronically by accessing the SEC's website at www.sec.gov.

**Item 1A. Risk Factors.**

Our business is subject to numerous risks and uncertainties that you should be aware of in evaluating our business. If any such risks and uncertainties actually occur, our business, prospects, financial condition and results of operations could be materially and adversely affected. The risks described below are not the only risks that we face. Additional risks and uncertainties not currently known to us, or that we currently deem to be immaterial, may also materially adversely affect our business, prospects, financial condition and results of operations. The risk factors described below should be read together with the other information set forth in this Annual Report, including our consolidated financial statements and the related notes, as well as in other documents that we file with the SEC.

**Summary of Material Risk Factors**

Our business is subject to a number of risks, which are discussed more fully below and include, but are not limited to, the following:

- There is significant competition within the global entertainment and gaming industries and our existing and potential users may be attracted to competing forms of entertainment such as television, movies and sporting events, as well as other entertainment and gaming options on the Internet. If our product offerings do not continue to be popular, our business could be harmed.

- Reductions in discretionary consumer spending could have an adverse effect on our business, financial condition, results of operations and prospects.

- Our projections are subject to significant risks, assumptions, estimates and uncertainties, including assumptions regarding future legislation and changes in regulations, both inside and outside of the United States. As a result, our projected revenues, market share, expenses and profitability may differ materially from our expectations.

- The success, including win or hold rates, of existing or future sports betting and iGaming product offerings depends on a variety of factors, including sport outcomes, and is not completely controlled by us.

- We rely on information technology and other systems and services, and any failures, errors, defects or disruptions in our systems or services could diminish our brand and reputation, subject us to liability, disrupt our business, affect our ability to scale our technical infrastructure and adversely affect our operating results and growth prospects. Our games and other software applications and systems, and the third-party platforms upon which they are made available could contain undetected errors.

- Despite our security measures, our information technology and infrastructure are vulnerable to attacks by hackers or breaches due to employee error, malfeasance or other disruptions. Any such breach could compromise our networks and the information stored there could be accessed, publicly disclosed, lost or stolen, which could damage our reputation, cause a loss of confidence in our product offerings or services, or otherwise adversely affect our business.

- We rely on strategic relationships with casinos, tribes and horse-tracks in order to be able to offer our Sportsbook and iGaming product offerings in certain jurisdictions. If we cannot establish and manage such relationships with such partners, our business, financial condition and results of operations could be adversely affected.

- Our business model depends upon the continued compatibility between our apps and the major mobile operating systems and upon third-party platforms for the distribution of our product offerings. If Google Play or the Apple App Store prevents users from downloading our apps or augments the restrictions on advertising to our users, our ability to grow our revenue, profitability and prospects may be adversely affected.

- We may invest in or acquire other businesses, and our business may suffer if we are unable to successfully integrate acquired businesses into our Company or otherwise manage the growth and complexity associated with multiple acquisitions.

- Our business is subject to a variety of U.S. and foreign laws, many of which are unsettled and still developing and which could subject us to claims or otherwise harm our business. Any change in existing regulations or their interpretation, or the regulatory climate applicable to our product offerings and services, or changes in tax rules and regulations or interpretation thereof related to our product offerings and services, could adversely impact our ability to operate our business as currently conducted or as we seek to operate in the future, which could have a material adverse effect on our financial condition and results of operations.

- Our growth prospects depend on the legal status of real-money gaming in various jurisdictions, predominantly within the United States, and legalization may not occur in as many jurisdictions as we expect, or may occur at a slower pace than we anticipate. Additionally, even if jurisdictions legalize real-money gaming, this may be accompanied by legislative or regulatory restrictions and/or taxes that make it impracticable or less attractive to operate in those jurisdictions, or the process of implementing regulations or securing the necessary licenses to operate in a particular jurisdiction may take longer than we anticipate, or existing laws or regulations may be changed or interpreted adversely, any of which could adversely affect our future results of operations and make it more difficult to meet our expectations for financial performance.

- Our growth prospects and market potential will depend on our ability to obtain licenses to operate in a number of jurisdictions, and if we fail to obtain and subsequently maintain such licenses, our business, financial condition, results of operations and prospects could be impaired.

- We have been, and continue to be, the subject of governmental investigations and inquiries with respect to the operation of our businesses, and we could be subject to future governmental investigations and inquiries, legal proceedings and enforcement actions. Any such investigation, inquiry, proceeding or action, could adversely affect our business.

- Negative events or negative media coverage relating to, or a declining popularity of, sports betting, online sports betting, daily fantasy sports, or the underlying sports or athletes, or iGaming, or other negative coverage may adversely impact our ability to retain or attract users, which could have an adverse impact on our business.

- Due to the nature of our business, we are subject to taxation in a number of jurisdictions and changes in, or new interpretations of, tax laws, tax rulings or their application by tax authorities could result in additional tax liabilities and could materially affect our financial condition and results of operations. We have been, and continue to be, subject to periodic audits and examinations by the Internal Revenue Service (the "IRS"), as well as state and local taxing authorities, the results of which may materially impact our financial statements in the period in which the audit or examination occurs.

- The trading price of our Class A common stock has been, and will likely continue to be, volatile and you could lose all or part of your investment.

- Because we are a "controlled company" under The Nasdaq Stock Market listing standards, our stockholders may not have certain corporate governance protections that are available to stockholders of companies that are not controlled companies.

- Our dual class structure has the effect of concentrating voting power with our Chief Executive Officer and Chairman, which limits an investor's ability to influence the outcome of important transactions, including a change in control.

13

A433

The summary risk factors described above should be read together with the text of the full risk factors below and the other information set forth in this Annual Report, including our consolidated financial statements and the related notes, as well as in other documents that we file with the SEC. If any such risks and uncertainties actually occur or are further aggravated, our business, prospects, financial condition and results of operations could be materially and adversely affected. The risks summarized above or described in full below are not the only risks that we face. Additional risks and uncertainties not currently known to us, or that we currently deem to be immaterial may also materially adversely affect our business, prospects, financial condition and results of operations.

**Risk Factors Relating to Our Business and Industry**

*There is significant competition within the global entertainment and gaming industries and our existing and potential users may be attracted to competing forms of entertainment such as television, movies and sporting events, as well as other entertainment and gaming options on the Internet. If our product offerings do not continue to be popular, our business could be harmed.*

We operate in the global entertainment and gaming industries with our Sportsbook, iGaming and DFS product offerings and our gaming software services. Our users face a vast array of entertainment choices. Other forms of entertainment, such as television, movies, sporting events and in-person casinos, are more well-established and may be perceived by our users to offer greater variety, affordability, interactivity and enjoyment. We compete with these other forms of entertainment for the discretionary time and income of our users. If we are unable to sustain sufficient interest in our Sportsbook, iGaming and DFS product offerings in comparison to other forms of entertainment, including new forms of entertainment, our business model may not continue to be viable.

The specific industries in which we operate are characterized by dynamic customer demand and technological advances, and there is significant competition among online gaming and entertainment providers. A number of established, well-financed companies producing online gaming and/or interactive entertainment products and services compete with our product offerings, and other well-capitalized companies may introduce competitive services. Such competitors may spend more money and time on developing and testing products and services, undertake more extensive marketing campaigns, adopt more aggressive pricing or promotional policies or otherwise develop more commercially successful products or services than ours, which could negatively impact our business. Our competitors may also develop products, features, or services that are similar to ours or that achieve greater market acceptance. Such competitors may also undertake more far-reaching and successful product development efforts or marketing campaigns, or may adopt more aggressive pricing policies. Furthermore, new competitors, whether licensed or not, may enter the gaming industry. There has also been considerable consolidation among competitors in the entertainment and gaming industries and such consolidation and future consolidation could result in the formation of larger competitors with increased financial resources and altered cost structures, which may enable them to offer more competitive products, gain a larger market share, expand product offerings and broaden their geographic scope of operations. If we are not able to maintain or improve our market share, or if our product offerings do not continue to be popular, our business could suffer.

*Economic downturns and political and market conditions beyond our control could adversely affect our business, financial condition and results of operations.*

Our financial performance is subject to global and U.S. economic conditions and their impact on levels of spending by users and advertisers. Economic recessions have had, and may continue to have, far reaching adverse consequences across many industries, including the global entertainment and gaming industries, which may adversely affect our business and financial condition.

The global and U.S. economies experienced tepid growth immediately following the global financial crisis in 2008 – 2009 and more recently experienced a period of increased volatility during the global COVID-19 pandemic. Ongoing or intensifying economic weakness, including recessions, economic slowdowns, uncertainties in the global financial markets and other adverse economic conditions, including inflation, changes in monetary policy and increased interest rates, or other changes in economic and political conditions may result in a material adverse effect on our business, financial condition, results of operations or prospects.

In addition, changes in general market, economic and political conditions in domestic and foreign economies or financial markets, including fluctuation in stock markets resulting from, among other things, trends in the economy as a whole may

14

A434

reduce users' disposable income and advertisers' budgets. Any one of these changes could have a material adverse effect on our business, financial condition, results of operations or prospects.

***Certain of our operations are in non-U.S. jurisdictions and are subject to the economic, political, regulatory, and other risks of international operations.***

We conduct business in numerous countries that carry high levels of currency, political, compliance and economic risk. For example, we have offices in Ukraine and Israel, and the military conflict between Russia and Ukraine and the evolving conflict in Israel and Gaza and any business interruptions or other spillover effects from such conflicts could adversely affect our operations. Operations in non-U.S. jurisdictions can present many risks, including volatility in gross domestic product and rates of economic growth, financial and governmental instability, cultural differences (such as employment and business practices) and the imposition of exchange and capital controls.

Instability and uncertainties arising from the global geopolitical environment and the evolving international and domestic political, regulatory, and economic landscape, including the potential for changes in global trade policies, including sanctions and trade barriers, and trends such as populism, economic nationalism and negative sentiment toward multinational companies, as well as the cost of compliance with increasingly complex and often conflicting regulations worldwide, can impair our flexibility in modifying our product offerings, marketing, hiring or other strategies for growing our businesses, as well as our ability to improve productivity and maintain acceptable operating margins.

The United States and other countries may implement actions, including trade actions, tariffs, export controls, and sanctions, against other countries or localities, which along with any retaliatory measures could increase costs, adversely affect our operations, or adversely affect our ability to meet contractual and financial obligations. For example, in response to the conflict between Russia and Ukraine, the U.S. government and other governments have imposed a series of sanctions against certain Russian government, government-related, and other entities and individuals, together with enhanced export controls on certain products and financial and economic sanctions on certain industry sectors and parties in Russia. The governments of other jurisdictions in which we operate, such as the European Union and Canada, have also implemented additional sanctions or other restrictive measures. Additionally, it is possible that the Russia-Ukraine conflict or the evolving conflict in Israel and Gaza may escalate or expand, and the scope, extent and duration of the military action, current or future sanctions and resulting market and geopolitical disruptions could be significant. While to date sanctions and export controls have not had a material impact on our business, it is possible that these measures, as well as any countervailing responses from Russia, could adversely affect us and/or our supply chain, business partners or customers.

While these factors and their impact are difficult to predict, any one or more of them could have a material adverse effect on our competitive position, results of operations, financial condition or liquidity.

***Reductions in discretionary consumer spending could have an adverse effect on our business, financial condition, results of operations and prospects.***

Our business is particularly sensitive to reductions from time to time in discretionary consumer spending. Demand for entertainment and leisure activities, including gaming, can be affected by changes in the economy and consumer tastes, both of which are difficult to predict and beyond our control. Unfavorable changes in general economic conditions, including recessions, economic slowdowns, sustained high levels of unemployment, and rising prices or the perception by consumers of weak or weakening economic conditions, may reduce our users' disposable income or result in fewer individuals engaging in entertainment and leisure activities, such as sports betting, online gaming or daily fantasy sports. As a result, we cannot ensure that the demand for our product offerings will remain consistent. Adverse developments affecting economies throughout the world, and particularly in the United States, including a general tightening of availability of credit, decreased liquidity in certain financial markets, inflation, increased interest rates, foreign exchange fluctuations, increased energy costs, acts of war or terrorism, transportation disruptions, natural disasters, declining consumer confidence, sustained high levels of unemployment or significant declines in stock markets, as well as concerns regarding pandemics, epidemics and the spread of contagious diseases, could lead to a reduction in discretionary spending on leisure activities, such as our Sportsbook, iGaming and DFS product offerings.

***We may experience fluctuations in our operating results, which could make our future results difficult to predict and could cause our operating results to fall below expectations.***

15

A435

Our financial results have fluctuated in the past, and we expect our financial results to fluctuate from quarter to quarter in the future. These fluctuations may be due to a variety of factors, some of which are outside of our control and may not fully reflect the underlying performance of our business.

Our financial results in any given quarter may be influenced by numerous factors, many of which we are unable to predict or are outside of our control, including the impact of seasonality and our betting results, and the other risks and uncertainties set forth herein. In particular, our Sportsbook and DFS operations have significant exposure to, and may be materially impacted by, sporting events and seasons, which can result in short-term volatility in betting win margins and user engagement, thus impacting revenues. While we have been able to forecast revenues from our DFS business with greater precision than for newer product offerings, we cannot provide assurances that consumers will engage with our DFS product offering on a consistent basis. Consumer engagement with our Sportsbook, iGaming and DFS product offerings may decline or fluctuate as a result of a number of factors, including the popularity of the underlying sports, the user's level of satisfaction with our product offerings, our ability to improve and innovate, our ability to adapt our product offerings, outages and disruptions of online services, the availability of live sporting events, the services offered by our competitors, our marketing and advertising efforts or declines in consumer activity generally as a result of economic downturns, among others. Any decline or fluctuation in the recurring portion of our business may have a negative impact on our business, financial condition, results of operations or prospects.

In our iGaming product offering, operator losses are limited per stake to a maximum payout. When looking at bets across a period of time, however, these losses can potentially be significant. Our quarterly financial results may also fluctuate based on whether we pay any jackpots to our iGaming users during the relevant quarter. As part of our iGaming product offering, we offer progressive jackpot games. Each time a progressive jackpot game is played, a portion of the amount wagered by the user is contributed to the jackpot for that specific game or group of games. Once a jackpot is won, the progressive jackpot is reset with a predetermined base amount. While we maintain a reserve for these progressive jackpots, the cost of the progressive jackpot payout would be a cash outflow for our business in the period in which it is won with a potentially significant adverse effect on our financial condition and cash flows. Because winning a progressive jackpot is underpinned by a random mechanism, we cannot predict with certainty when any such jackpot will be won. In addition, we do not insure against random outcomes or jackpot wins.

***Our projections are subject to significant risks, assumptions, estimates and uncertainties, including assumptions regarding future legislation and changes in regulations, both inside and outside of the United States. As a result, our projected revenues, market share, expenses and profitability may differ materially from our expectations.***

We operate in rapidly changing and competitive industries and our projections are subject to the risks and assumptions made by management with respect to our industries. Operating results are difficult to forecast because they generally depend on our assessment of the timing of adoption of future legislation and regulations by different jurisdictions, which are uncertain. Furthermore, if we invest in the development of new products or distribution channels that do not achieve significant commercial success, whether because of competition or otherwise, we may not recover the often substantial "up front" costs of developing and marketing those products and distribution channels or recover the opportunity cost of diverting management and financial resources away from other product offerings or distribution channels.

Additionally, as described above, our business may be affected by reductions in consumer spending from time to time as a result of a number of factors that may be difficult to predict. This may result in decreased revenue levels, and we may be unable to adopt measures in a timely manner to compensate for any unexpected shortfall in revenue. This inability could cause our operating results in a given quarter to be higher or lower than expected. If actual results differ from our estimates, analysts may react negatively and our stock price could be materially impacted. You should not rely upon our historical financial results as indicators of our future financial performance, and our financial results and stock price may be volatile.

***We have a history of losses and we may continue to incur losses in the future.***

Since we were incorporated in 2011, we have experienced net losses and negative cash flows from operations. We experienced net losses in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") of $802.1 million and $1,378.0 million in the years ended December 31, 2023 and 2022, respectively. We may continue to experience losses in the future, and we cannot assure you that we will achieve profitability. We may continue to incur significant losses in future periods. We expect our operating expenses to increase in the future as we expand our operations. If our revenue does not grow at a greater rate than our expenses, we will not be able to achieve or maintain profitability. We may incur significant losses in the future for many reasons, including those described in the other risks and uncertainties described in this Annual Report. Additionally, we may encounter unforeseen expenses, operating delays, or other

16

A436

unknown factors that may result in losses in future periods. If our expenses exceed our revenue, our business may be negatively impacted, and we may never achieve or maintain profitability.

***Our results of operations may fluctuate due to seasonality and other factors and, therefore, our periodic operating results will not be guarantees of future performance.***

Our Sportsbook and DFS operations fluctuate due to seasonal trends and other factors. A majority of our current Sportsbook and DFS handle and entry fees are and will continue to be generated from bets placed on, or contests relating to, the NFL and the NBA. As such, our historical revenues generally have been highest in the fourth quarter primarily due to the overlapping time frame of the NFL and NBA seasons. In addition, the NFL and NBA have their own respective off-seasons, which may cause decreases in our revenues during such periods. In addition, we believe that significant sporting events such as the playoffs and championship games tend to impact, among other things, revenues from operations, key metrics and customer activity, and, as such, our revenues may be impacted when those games occur. Our revenues have been, and in the future may be, affected by the scheduling of major sporting events that do not occur annually, such as the World Cup, or the cancellation or postponement of sporting events, such as the postponement of the 2020 Summer Olympic Games that took place in Summer 2021 due to the global COVID-19 pandemic. In addition, certain individuals or teams advancing or failing to advance and their scores and other results within specific tournaments, games or events may impact our financial performance.

***The success, including win or hold rates, of existing or future sports betting and iGaming product offerings depends on a variety of factors and is not completely controlled by us.***

The sports betting and iGaming industries are characterized by an element of chance. Accordingly, we employ theoretical win rates to estimate what a certain type of sports bet or iGame, on average, will win or lose in the long run. Net win is impacted by variations in the hold percentage (the ratio of net win to total amount wagered), or actual outcome, on our iGames and sports bets we offer to our users. We use hold percentage as an indicator of an iGame's or sports bet's performance against its expected outcome. Although each iGame or sports bet generally performs within a defined statistical range of outcomes, actual outcomes may vary for any given period. In addition to the element of chance, win rates (hold percentages) may also (depending on the game involved) be affected by the spread of limits and factors that are beyond our control, such as a user's experience and behavior, the mix of games played, the financial resources of users, the volume of bets placed and the amount of time spent engaging with our product offerings. As a result of the variability in these factors, the actual win rates on our iGames and sports bets may differ from the theoretical win rates we have estimated and could result in the winnings of our users exceeding those anticipated. The variability of win rates (hold rates) also has the potential to negatively impact our financial condition, results of operations, and cash flows.

Our success also depends in part on our ability to anticipate and satisfy user preferences in a timely manner. As we operate in a dynamic environment characterized by rapidly changing industry and legal standards, our product offerings will be subject to changing consumer preferences that cannot be predicted with certainty. We need to continually introduce new product offerings and identify future product offerings that complement our existing technology, respond to our users' needs and improve and enhance our existing technology to maintain or increase our user engagement and growth of our business. We may not be able to compete effectively unless our product offering selection keeps up with trends in the digital sports entertainment and gaming industries in which we compete, or trends in new gaming product offerings.

***We use artificial intelligence, machine learning, data science and similar technologies in our business, and challenges with properly managing such technologies could result in reputational harm, competitive harm, and legal liability, and adversely affect our results of operations.***

We use artificial intelligence, machine learning, data science and similar technologies (collectively, "AI") in our technology and infrastructure, which may become more important in our operations over time. Our competitors or other third parties may incorporate AI in a similar or different manner, and may do so more quickly or more successfully than us, which could impair our ability to compete effectively and adversely affect our results of operations. Additionally, if the content, analyses, materials or recommendations that AI produces or assists in producing are, or are alleged to be, infringing or otherwise violating others' rights (including intellectual property rights), or illegal, we may be subject to legal liability or our business, financial condition, and results of operations may otherwise be adversely affected. In addition, the use of AI may result in violations of applicable data security or data privacy laws, or in cybersecurity incidents that implicate the personal data of end customers, employees or other third parties. Any such violation or cybersecurity incidents related to our use of AI could result in legal liability or otherwise adversely affect our reputation and results of operations. If our use of AI becomes controversial, we may experience brand or reputational harm or competitive harm. The rapid evolution of AI, including with respect to compliance with existing and potential government regulation of AI, may require significant resources, including to develop, test and maintain platforms, offerings, services, and features to help us implement AI in accordance with applicable law, and to minimize other adverse effect on our results of operations.

17

A437

***We rely on information technology and other systems and services, and any failures, errors, defects or disruptions in our systems or services could diminish our brand and reputation, subject us to liability, disrupt our business, affect our ability to scale our technical infrastructure and adversely affect our operating results and growth prospects. Our games and other software applications and systems, and the third-party platforms upon which they are made available, could contain undetected errors.***

Our technology infrastructure is critical to the performance of our product offerings and to user satisfaction. We devote significant resources to network and data security to protect our systems and data. However, our systems may not be adequately designed with the necessary reliability and redundancy to avoid performance delays or outages that could be harmful to our business. We cannot assure you that the measures we take to prevent or hinder cybersecurity incidents; protect our systems, data and user information; prevent outages, data or information loss and fraud; and prevent or detect security breaches, including a disaster recovery strategy for server and equipment failure and back-office systems and the use of third parties for certain cybersecurity services, will provide absolute security. We have experienced, and we may in the future experience, website disruptions, outages and other performance problems due to a variety of factors, including infrastructure changes, human or software errors and capacity constraints. Such disruptions have not had a material impact on us; however, future disruptions from unauthorized access to, fraudulent manipulation of, or tampering with our computer systems and technological infrastructure, or those of third parties, could result in a wide range of negative outcomes, each of which could materially adversely affect our business, financial condition, results of operations and prospects.

Additionally, our product offerings from time to time contain errors, bugs, flaws or corrupted data, and these defects have in certain instances only become apparent after their launch. If a particular product offering is unavailable when users attempt to access it or navigation through our product offerings is slower than they expect, users may be unable to place their bets or submit their line-ups in a timely manner and may be less likely to return to our product offerings as often, if at all. Furthermore, programming errors, defects and data corruption could disrupt our operations, adversely affect the experience of our users, harm our reputation, cause our users to stop utilizing our product offerings, divert our resources and delay market acceptance of our product offerings, any of which could result in legal liability to us or harm our business, financial condition, results of operations and prospects.

If our user base and engagement continue to grow, and the amount and types of product offerings continue to grow and evolve, we will need an increasing amount of technical infrastructure, including network capacity and computing power, to continue to satisfy our users' needs. Such infrastructure expansion may be complex, and unanticipated delays in completing these projects or availability of components may lead to increased project costs, operational inefficiencies, or interruptions in the delivery or degradation of the quality of our product offerings. In addition, there may be issues related to this infrastructure that are not identified during the testing phases of design and implementation, which may only become evident after we have started to fully use the underlying equipment or software, that could further degrade the user experience or increase our costs. As such, we could fail to continue to effectively scale and grow our technical infrastructure to accommodate increased demands. In addition, our business may be subject to interruptions, delays or failures resulting from adverse weather conditions, other natural disasters, power loss, terrorism, cybersecurity incidents, public health emergencies or other catastrophic events.

We believe that if our users have a negative experience with our product offerings, or if our brand or reputation is negatively affected, users may be less inclined to continue or resume utilizing our product offerings or to recommend our product offerings to other potential users. As such, a failure or significant interruption in our service could harm our reputation, business and operating results.

***Despite our security measures, our information technology and infrastructure are vulnerable to attacks by hackers or breaches due to employee error, malfeasance or other disruptions. Any such breach could compromise our networks and the information stored there could be accessed, publicly disclosed, lost or stolen, which could damage our reputation, cause a loss of confidence in our product offerings or services, or otherwise adversely affect our business.***

The secure maintenance and transmission of user information is a critical element of our operations. Our information technology and other systems that maintain and transmit user information, or those of service providers, business partners or employee information have in the past been, and in the future may be, compromised by a malicious third-party penetration of our network security, or that of a third-party service provider or business partner, or impacted by intentional or unintentional actions or inaction by our employees, or those of a third-party service provider or business partner. As a result, our users' information and funds may be lost, disclosed, accessed or taken without our users' consent. We have experienced cybersecurity incidents, attempts to breach our systems and other similar incidents in the past. For example, we have been and expect that we will continue to be subject to attempts to gain unauthorized access to or through our information systems or those we develop

18

A438

for our customers, whether by our employees or third parties, including cyber-attacks by computer programmers and hackers who may develop and deploy viruses, worms or other malicious software programs. To date, these attacks have not had a material impact on our operations or financial results, but we cannot provide assurance that they will not have a material impact in the future.

We rely on encryption and authentication technology licensed from third parties in an effort to securely transmit confidential and sensitive information, including credit card numbers. Advances in computer capabilities, new technological discoveries or other developments may result in the whole or partial failure of this technology to protect transaction data or other confidential and sensitive information from being breached or compromised. In addition, websites are often attacked through compromised credentials, including those obtained through phishing and credential stuffing. Our security measures, and those of our third-party service providers, may not detect or prevent all attempts to breach our systems, denial-of-service attacks, viruses, malicious software, break-ins, phishing attacks, social engineering, security breaches or other attacks and similar disruptions that may jeopardize the security of information stored in or transmitted by our websites, networks and systems or that we or such third parties otherwise maintain, including payment card systems, which may subject us to fines or higher transaction fees or limit or terminate our access to certain payment methods. We and such third parties may not anticipate or prevent all types of attacks until after they have already been launched. For example, beginning in November 2022, DraftKings was the target of potential credential stuffing attacks, in which it appears that one or more bad actors may have obtained login credentials from a non-DraftKings source and used the credentials to access certain DraftKings players' accounts. Further, techniques used to obtain unauthorized access to or sabotage systems change frequently and may not be known until launched against us or our third-party service providers.

In addition, cybersecurity incidents can also occur as a result of non-technical issues, including intentional or inadvertent breaches by our employees or by third parties. These risks may increase over time as the complexity and number of technical systems and applications we use also increases. Breaches of our security measures or those of our third-party service providers or cybersecurity incidents have in the past been, and in the future could, result in unauthorized access to our sites, networks and systems; unauthorized access to and misappropriation of user information, including users' personally identifiable information, or other confidential or proprietary information of ourselves or third parties; viruses, worms, spyware or other malware being served from our sites, networks or systems; deletion or modification of content or the display of unauthorized content on our sites; interruption, disruption or malfunction of operations; costs relating to breach remediation, deployment of additional personnel and protection technologies, response to governmental investigations and media inquiries and coverage; engagement of third-party experts and consultants; litigation, regulatory action and other potential liabilities. In the past, we have experienced social engineering, phishing, malware and similar attacks and threats of denial-of-service attacks, none of which to date has been material to our business; however, such attacks could in the future have a material adverse effect on our operations. If any of these breaches of security should occur and be material, our reputation and brand could be damaged, our business may suffer, we could be required to expend significant capital and other resources to alleviate problems caused by such breaches, and we could be exposed to a risk of loss, litigation or regulatory action and possible liability. We cannot guarantee that recovery protocols and backup systems will be sufficient to prevent data loss. Actual or anticipated attacks may cause us to incur increasing costs, including costs to deploy additional personnel and protection technologies, train employees and engage third-party experts and consultants. While we maintain cybersecurity insurance coverage that we believe is adequate for our business, such coverage may not cover all potential costs and expenses associated with cybersecurity incidents that may occur in the future.

In addition, any party who is able to illicitly obtain a user's password could access the user's transaction data or personal information, resulting in the perception that our systems are insecure. Any compromise or breach of our security measures, or those of our third-party service providers, could violate applicable privacy, data protection, data security, network and information systems security and other laws and cause significant legal and financial exposure, adverse publicity and a loss of confidence in our security measures, which could have a material adverse effect on our business, financial condition, results of operations and prospects. We continue to devote significant resources to protect against cybersecurity incidents or we may need to in the future to address problems caused by breaches, including notifying affected users and responding to any resulting litigation, which in turn, diverts resources from the growth and expansion of our business.

***We rely on Amazon Web Services to deliver our product offerings to users, and any disruption of or interference with our use of Amazon Web Services could adversely affect our business, financial condition, results of operations and prospects.***

We host certain of our product offerings and support our operations using Amazon Web Services ("AWS"), a third-party provider of cloud infrastructure services, along with other service providers. We do not, and will not, have control over the operations of the facilities or infrastructure of the third-party service providers that we use. Such third parties' facilities are vulnerable to damage or interruption from natural disasters, cybersecurity incidents, terrorist attacks, power outages and similar

19

A439

events or acts of misconduct. Our technology's continuing and uninterrupted performance is critical to our success. We have experienced, and we expect that in the future we will experience, interruptions, delays and outages in service and availability from these third-party service providers from time to time due to a variety of factors, including infrastructure changes, human or software errors, website hosting disruptions, cybersecurity incidents and capacity constraints. In addition, any changes in these third parties' service levels may adversely affect our ability to meet the requirements of our users. Since our technology's continuing and uninterrupted performance is critical to our success, sustained or repeated system failures would reduce the attractiveness of our product offerings. It may become increasingly difficult to maintain and improve our performance, especially during peak usage times, as we expand and the usage of our product offerings increases. Any negative publicity arising from these disruptions could harm our reputation and brand and may adversely affect the usage of our product offerings.

Our commercial agreement with AWS will remain in effect until terminated by AWS or us. AWS may only terminate the agreement for convenience after complying with the contractual prior notice requirement of two years. AWS may also terminate the agreement for cause upon a breach of the agreement or for failure to pay amounts due, in each case, subject to AWS providing prior written notice and a 30-day cure period. In the event that our agreement with AWS is terminated or we add additional cloud infrastructure service providers, we may experience significant costs or downtime in connection with the transfer to, or the addition of, new cloud infrastructure service providers. Although alternative providers could host our product offerings on a substantially similar basis to AWS, transitioning the cloud infrastructure currently hosted by AWS to alternative providers could potentially be disruptive and we could incur significant one-time costs.

Any of the above circumstances or events may harm our reputation and brand, reduce the availability or usage of our technology, lead to a significant loss of revenue, increase our costs and impair our ability to attract new users, any of which could adversely affect our business, financial condition and results of operations.

***We rely on third-party providers to validate the identity and identify the location of our users, and if such providers fail to perform adequately or provide accurate information or we do not maintain business relationships with them, our business, financial condition and results of operations could be adversely affected.***

There is no guarantee that the third-party geolocation and identity verification systems that we rely on will perform adequately, or be effective. We rely on our geolocation and identity verification systems to ensure we are in compliance with certain applicable laws and regulations, and any service disruption to those systems would prohibit us from operating our product offerings, and would adversely affect our business. Additionally, incorrect or misleading geolocation and identity verification data with respect to current or potential users received from third-party service providers may result in us inadvertently allowing access to our product offerings to individuals who should not be permitted to access them, or otherwise inadvertently deny access to individuals who should be able to access our product offerings, in each case based on inaccurate identity or geographic location determination. Our third-party geolocation services provider relies on its ability to obtain information necessary to determine geolocation from mobile devices, operating systems, and other sources. Changes, disruptions or temporary or permanent failure to access such sources by our third-party services providers may result in their inability to accurately determine the location of our users. Moreover, our inability to maintain our existing contracts with third-party services providers, or to replace them with equivalent third parties, may result in our inability to access geolocation and identity verification data necessary for our day-to-day operations. If any of these risks materializes, we may be subject to disciplinary action, fines or lawsuits, and our business, financial condition and results of operations could be adversely affected.

***Our technology contains third-party open source software components, and failure to comply with the terms of the underlying open source software licenses could restrict our ability to provide our product offerings.***

Our technology contains software modules licensed to us by third-party authors under "open source" licenses. Use and distribution of open source software may entail greater risks than use of third-party commercial software, as open source licensors generally do not provide support, warranties, indemnification or other contractual protections regarding infringement claims or the quality of the source code. In addition, the public availability of such software may make it easier for others to compromise our technology.

Some open source licenses contain requirements that we make available source code for modifications or derivative works we create based upon the type of open source software we use, or grant other licenses to our intellectual property. If we combine our proprietary software with open source software in a certain manner, we could, under certain open source licenses, be required to release the source code of our proprietary software to the public. This would allow our competitors to create similar product offerings with lower development effort and time and ultimately could result in a loss of our competitive advantages. Alternatively, to avoid the public release of the affected portions of our source code, we could be required to expend substantial time and resources to re-engineer some or all of our software.

A440

Although we monitor our use of open source software to avoid subjecting our technology to conditions we do not intend, there is a risk that these licenses could be construed in a way that could impose unanticipated conditions or restrictions on our ability to provide or distribute our technology. From time to time, there have been claims challenging the ownership of open source software against companies that incorporate open source software into their solutions. As a result, we could be subject to lawsuits by parties claiming ownership of what we believe to be open source software. Moreover, we cannot assure you that our processes for controlling our use of open source software in our technology will be effective. If we are held to have breached or failed to fully comply with all the terms and conditions of an open source software license, we could face infringement or other liability, or be required to seek costly licenses from third parties to continue providing our product offerings on terms that are not economically feasible, to re-engineer our technology, to discontinue or delay the provision of our product offerings if re-engineering could not be accomplished on a timely basis or to make generally available, in source code form, our proprietary code, any of which could adversely affect our business, financial condition and results of operations.

***We rely on third-party payment processors to process deposits and withdrawals made by our users, and if we cannot manage our relationships with such third parties and other payment-related risks, our business, financial condition and results of operations could be adversely affected.***

We rely on a limited number of third-party payment processors to process deposits and withdrawals made by our users. If any of our third-party payment processors terminates its relationship with us or refuses to renew its agreement with us on commercially reasonable terms, we would need to find an alternate payment processor, and may not be able to secure similar terms or replace such payment processor in an acceptable time frame. Further, the software and services provided by our third-party payment processors may not meet our expectations, contain errors or vulnerabilities, be compromised or experience outages. Any of these risks could cause us to lose our ability to accept online payments or other payment transactions, make timely payments to our users or access funds or credit in such payment processors or systems, any of which could make our technology less trustworthy and convenient, adversely affect our ability to attract and retain our users and negatively impact our working capital position.

Nearly all of our payments are made by credit card, debit card or through other third-party payment services, which subjects us to certain regulations and the risk of fraud. We may in the future offer new payment options to users that may be subject to additional regulations and risks. We are also subject to a number of other laws and regulations relating to the payments we accept from our users, including with respect to money laundering, money transfers, privacy and information security. If we fail to comply with applicable rules and regulations, we may be subject to civil or criminal penalties, fines and/or higher transaction fees and may lose our ability to accept online payments or other payment card transactions, which could make our product offerings less convenient and attractive to our users. If any of these events were to occur, our business, financial condition and results of operations could be adversely affected.

For example, if we are deemed to be a money transmitter as defined by applicable regulations, we could be subject to certain laws, rules and regulations enforced by multiple authorities and governing bodies in the United States and numerous state and local agencies who may define money transmitter differently. For example, certain states may have a more expansive view of who qualifies as a money transmitter. Additionally, outside of the United States, we could be subject to additional laws, rules and regulations related to the provision of payments and financial services, and if we expand into new jurisdictions, the foreign regulations and regulators governing our business that we are subject to will expand as well. If we are found to be a money transmitter under any applicable regulation and we are not in compliance with such regulations, we may be subject to fines or other penalties in one or more jurisdictions levied by federal or state or local regulators, including state Attorneys General, as well as those levied by foreign regulators. In addition to fines, penalties for failing to comply with applicable rules and regulations could include criminal and civil proceedings, forfeiture of significant assets or other enforcement actions. We could also be required to make changes to our business practices or compliance programs as a result of regulatory scrutiny.

Additionally, our payment processors require us to comply with payment card network operating rules, which are set and interpreted by the payment card networks. The payment card networks could adopt new operating rules or interpret or reinterpret existing rules in ways that might prohibit us from providing certain product offerings to some users, be costly to implement or difficult to follow. We have agreed to reimburse our payment processors for fines they are assessed by payment card networks if we or our users violate these rules. Any of the foregoing risks could adversely affect our business, financial condition and results of operations.

***We rely on third-party sports data providers for real-time and accurate data for sporting events, and if such third parties do not perform adequately or terminate their relationships with us, our costs may increase and our business, financial condition and results of operations could be adversely affected.***

21

A441

We rely on third-party sports data providers such as SportRadar and BetGenius to obtain accurate information regarding schedules, results, performance and outcomes of sporting events. We rely on this data to determine when and how bets are settled and how contestants rank in their DFS contests. We have experienced, and may continue to experience, errors in these data feeds, which may result in us incorrectly settling bets or ranking contestants in their DFS contests. If we cannot adequately resolve the issue with our users, our users may have a negative experience with our product offerings, our brand or reputation may be negatively affected and our users may be less inclined to continue or resume utilizing our product offerings or recommend our product offerings to other potential users. As such, a failure or significant interruption in our data feed service may harm our reputation, business and operating results.

Furthermore, if any of our sports data partners terminates its relationship with us or refuses to renew its agreement with us on commercially reasonable terms, we would need to find an alternate provider, and may not be able to secure similar terms or replace such providers in an acceptable time frame, or at all. Any of these risks could increase our costs and adversely affect our business, financial condition and results of operations. Further, any negative publicity related to any of our third-party partners, including any publicity related to regulatory concerns, could adversely affect our reputation and brand, and could potentially lead to increased regulatory or litigation exposure.

***We rely on other third-party service providers and if such third parties do not perform adequately or terminate their relationships with us, our costs may increase and our business, financial condition and results of operations could be adversely affected.***

Our success depends in part on our relationships with other third-party service providers. For example, we rely on third parties for content delivery, load balancing and protection against distributed denial-of-service attacks. If those providers do not perform adequately, our users may experience issues or interruptions with their product offering experiences. Furthermore, if any of our partners terminates its relationship with us or refuses to renew its agreement with us on commercially reasonable terms, we would need to find an alternate provider, and may not be able to secure similar terms or replace such providers in an acceptable time frame, or at all. We also rely on other software and services supplied by third parties, such as communications and internal software, and our business may be adversely affected to the extent such software and services do not meet our expectations, contain errors or vulnerabilities, are compromised or experience outages. Any of these risks could increase our costs and adversely affect our business, financial condition and results of operations. Further, any negative publicity related to any of our third-party partners, including any publicity related to regulatory concerns, could adversely affect our reputation and brand, and could potentially lead to increased regulatory or litigation exposure.

We incorporate technology from third parties into our product offerings. We cannot be certain that our licensors are not infringing the intellectual property rights of others or that the suppliers and licensors have sufficient rights to the technology in all jurisdictions in which we may operate. Some of our license agreements may be terminated by our licensors for convenience. If we are unable to obtain or maintain rights to any of this technology because of intellectual property infringement claims brought by third parties against our suppliers and licensors or against us, or if we are unable to continue to obtain the technology or enter into new agreements on commercially reasonable terms, our ability to develop our product offerings containing that technology could be severely limited and our business could be harmed.

Additionally, if we are unable to obtain necessary technology from third parties, we may be forced to acquire or develop alternate technology, which may require significant time and effort and may be of lower quality or performance standards. This would limit and delay our ability to provide new or competitive product offerings and increase our costs. If alternate technology cannot be obtained or developed, we may not be able to offer certain functionality as part of our product offerings, which could adversely affect our business, financial condition and results of operations.

***If we fail to detect fraud or theft, including by our users and employees, our reputation may suffer which could harm our brand and reputation and negatively impact our business, financial condition and results of operations and can subject us to investigations and litigation.***

We have in the past incurred, and may in the future incur, losses from various types of financial fraud, including use of stolen or fraudulent credit card data, claims of unauthorized payments by a user and attempted payments by users with insufficient funds. Bad actors use increasingly sophisticated methods to engage in illegal activities involving personal information, such as unauthorized use of another person's identity, account information or payment information and unauthorized acquisition or use of credit or debit card details, bank account information and mobile phone numbers and

22

A442

accounts. Under current credit card practices, we may be liable for use of funds on our products with fraudulent credit card data, even if the associated financial institution approved the credit card transaction.

Acts of fraud may involve various tactics, including collusion. Successful exploitation of our systems could have negative effects on our product offerings, services and user experience and could harm our reputation. Failure to discover such acts or schemes in a timely manner could result in harm to our operations. In addition, negative publicity related to such schemes could have an adverse effect on our reputation, potentially causing a material adverse effect on our business, financial condition, results of operations and prospects. In the event of the occurrence of any such issues with our existing technology or product offerings, substantial engineering and marketing resources and management attention may be diverted from other projects to correct these issues, which may delay other projects and the achievement of our strategic objectives.

In addition, any misappropriation of, or access to, users' or other proprietary information or other breach of our information security could result in legal claims or legal proceedings, including regulatory investigations and actions, or liability for failure to comply with privacy and information security laws, including for failure to protect personal information or for misusing personal information, which could disrupt our operations, force us to modify our business practices, damage our reputation and expose us to claims from our users, regulators, employees and other persons, any of which could have an adverse effect on our business, financial condition, results of operations and prospects. For example, beginning in November 2022, DraftKings was the target of potential credential stuffing attacks, in which it appears that one or more bad actors may have obtained login credentials from a non-DraftKings source and used the credentials to access certain DraftKings players' accounts.

Despite measures we have taken to detect and reduce the occurrence of fraudulent or other malicious activity on our platform, we cannot guarantee that any of our measures will be effective or will scale efficiently with our business. Our failure to adequately detect or prevent fraudulent transactions could harm our reputation or brand, result in litigation or regulatory action and lead to expenses that could adversely affect our business, financial condition and results of operations.

***If Internet and other technology-based service providers experience service interruptions, our ability to conduct our business may be impaired and our business, financial condition and results of operations could be adversely affected.***

A substantial portion of our network infrastructure is provided by third parties, including Internet service providers and other technology-based service providers. See "—We rely on Amazon Web Services to deliver our product offerings to users and any disruption of or interference with our use of Amazon Web Services could adversely affect our business, financial condition, results of operations and prospects." We require technology-based service providers to implement cyber-attack-resilient systems and processes. However, if Internet service providers experience service interruptions, including because of cybersecurity incidents, or due to an event causing an unusually high volume of Internet use, communications over the Internet may be interrupted and impair our ability to conduct our business. Internet service providers and other technology-based service providers may in the future roll out upgraded or new mobile or other telecommunications services, such as 5G or 6G services, which may not be successful and thus may impact the ability of our users to access our product offerings in a timely fashion or at all. In addition, our ability to process e-commerce transactions depends on bank processing and credit card systems. To prepare for system problems, we continuously seek to strengthen and enhance our current facilities and the capabilities of our system infrastructure and support. Nevertheless, there can be no assurance that the Internet infrastructure or our own network systems will continue to be able to meet the demand placed on us by the continued growth of the Internet, the overall online gaming industry and our users. Any difficulties these providers face, including the potential of certain network traffic receiving priority over other traffic (i.e., lack of net neutrality), may adversely affect our business, and we exercise little control over these providers, which increases our vulnerability to problems with the services they provide. Any system failure as a result of reliance on third parties, such as network, software or hardware failure, including as a result of cybersecurity incidents, which causes a loss of our users' property or personal information or a delay or interruption in our online services and product offerings and e-commerce services, including our ability to handle existing or increased traffic, could result in a loss of anticipated revenue, interruptions to our product offerings, cause us to incur significant legal, remediation and notification costs, degrade the customer experience and cause users to lose confidence in our product offerings, any of which could have a material adverse effect on our business, financial condition, results of operations and prospects.

***We rely on strategic relationships with casinos, tribes and horse-tracks in order to be able to offer our Sportsbook and iGaming product offerings in certain jurisdictions. If we cannot establish and manage such relationships with such partners, our business, financial condition and results of operations could be adversely affected.***

Under the sports betting and iGaming laws of certain states, online Sportsbook and iGaming are limited to a finite number of retail operators, such as casinos, tribes or tracks, who own a "skin" or "skins" under that state's law. A "skin" is a legally-authorized license from a state to offer online Sportsbook or iGaming services provided by such a retail operator. The "skin"

23

A443

provides a market access opportunity for mobile operators to operate in the jurisdiction pending licensure and other required approvals by the state's regulator. The entities that control those "skins," and the numbers of "skins" available, are typically determined by a state's law authorizing sports betting or iGaming. In most of the jurisdictions in which we offer Sportsbook and iGaming, we currently rely on a casino, tribe or track in order to get a "skin." These "skins" are what allow us to gain access to jurisdictions where online operators are required to have a retail relationship. If we cannot establish, renew or manage such relationships, those relationships could terminate and we would not be allowed to operate in those jurisdictions until we enter into new ones. As a result, our business, financial condition and results of operations could be adversely affected.

***Our growth depends, in part, on the success of our strategic relationships with third parties. Overreliance on certain third parties, or our inability to extend existing relationships or agree to new relationships, may cause unanticipated costs for us and impact our financial performance in the future.***

We rely on relationships with sports leagues and teams, professional athletes and athlete organizations, advertisers, casinos and other third parties in order to attract users to our product offerings. These relationships along with providers of online services, search engines, social media, directories and other websites and e-commerce businesses direct consumers to our product offerings. In addition, many of the parties with whom we have advertising arrangements provide advertising services to other companies, including other fantasy sports and gaming product offerings with whom we compete. While we believe there are other third parties that could drive users to our product offerings, adding or transitioning to them may disrupt our business and increase our costs. In the event that any of our existing relationships or our future relationships fails to provide services to us in accordance with the terms of our arrangement, or at all, and we are not able to find suitable alternatives, this could impact our ability to attract consumers cost effectively and harm our business, financial condition, results of operations and prospects.

***Our growth prospects may suffer if we are unable to develop successful product offerings or if we fail to pursue additional product offerings. In addition, if we fail to make the right investment decisions in our product offerings and technology, we may not attract and retain key users and our revenue and results of operations may decline.***

We were founded in 2011 with a singular focus on the DFS industry and initially focused our efforts on growing our DFS product offering. In 2018, we expanded our product offerings to include our Sportsbook and iGaming product offerings. In 2021, we expanded our media offering and launched DraftKings Marketplace. We have rapidly expanded and we anticipate expanding further as new product offerings mature and as we pursue our growth strategies.

The industries in which we operate are subject to rapid and frequent changes in standards, technologies, products and services, as well as in customer demands and expectations and regulations. We must continuously make decisions regarding in which product offerings and technology we should invest to meet customer demand in compliance with evolving industry standards and regulatory requirements and must continually introduce and successfully market new and innovative technologies, product offerings and enhancements to remain competitive and effectively stimulate customer demand, acceptance and engagement. Our ability to engage, retain, and increase our user base and to increase our revenue will depend heavily on our ability to successfully create new product offerings, both independently and together with third parties. We may introduce significant changes to our existing technology and product offerings or develop and introduce new and unproven products and services, with which we have little or no prior development or operating experience. The process of developing new product offerings and systems is inherently complex and uncertain, and new product offerings may not be well received by users, even if well-reviewed and of high quality. If we are unable to develop technology and product offerings that address users' needs or enhance and improve our existing technology and product offerings in a timely manner, that could have a material adverse effect on our business, financial condition, results of operations and prospects.

Although we intend to continue investing in our research and development efforts, if new or enhanced product offerings fail to engage our users or partners, we may fail to attract or retain users or to generate sufficient revenue, operating margin, or other value to justify our investments, any of which may seriously harm our business. In addition, management may not properly ascertain or assess the risks of new initiatives, and subsequent events may alter the risks that were evaluated at the time we decided to execute any new initiative. Developing and creating additional product offerings can also divert management's attention from other business issues and opportunities. Even if our new product offerings attain market acceptance, those new product offerings have in certain cases cannibalized, and in the future could continue to cannibalize, the market share of our existing product offerings or share of our users' wallets in a manner that may negatively impact our business. For example, we have historically observed that revenue from our DFS product offering tends to decline in a state following the launch of our Sportsbook product offering in that state. Furthermore, such expansion of our business increases the complexity of our business and places an additional burden on our management, operations, technical systems and financial resources and we may not recover the often-substantial up-front costs of developing and marketing new product offerings, or recover the opportunity cost of diverting management and financial resources away from other product offerings. In the event of continued growth of our

24

A444

operations, product offerings or in the number of third-party relationships, we may not have adequate resources, operationally, technologically or otherwise to support such growth and the quality of our technology, product offerings or our relationships with third parties could suffer. In addition, failure to effectively identify, pursue and execute new business initiatives, or to efficiently adapt our processes and infrastructure to meet the needs of our innovations, may adversely affect our business, financial condition, results of operations and prospects.

Any new product offerings may also require our users to utilize new skills to use our product offerings. This could create a lag in adoption of new product offerings and new user additions related to any new product offerings. To date, new product offerings and enhancements of our existing technology have not materially hindered our user growth or engagement, but that may be the result of a large portion of our user base being in a younger demographic and more willing to invest the time to learn to use our product offerings most effectively. To the extent that future users, including those in older demographics, are less willing to invest the time to learn to use our product offerings, and if we are unable to make our product offerings easy to learn to use, our user growth or engagement could be affected, and our business could be harmed. We may develop new product offerings that increase user engagement and costs without increasing revenue.

Additionally, we may make bad or unprofitable decisions regarding these investments. If new or existing competitors offer more attractive product offerings, we may lose users or users may decrease their spending on our product offerings. New customer demands, superior competitive product offerings, new industry standards or changes in the regulatory environment could render our existing product offerings unattractive, unmarketable or obsolete and require us to make substantial unanticipated changes to our technology or business model. Our failure to adapt to a rapidly changing market or evolving customer demands could harm our business, financial condition, results of operations and prospects.

***Our growth will depend on our ability to attract and retain users, and the loss of our users, failure to attract new users in a cost-effective manner, or failure to effectively manage our growth could adversely affect our business, financial condition, results of operations and prospects.***

Our ability to achieve growth in revenue in the future will depend, in large part, upon our ability to attract new users to our product offerings, retain existing users of our product offerings and reactivate users in a cost-effective manner. Achieving growth in our community of users may require us to increasingly engage in sophisticated and costly sales and marketing efforts, which may not have a favorable return on investment. We have used and expect to continue to use a variety of free and paid marketing channels, in combination with compelling offers and exciting games to achieve our objectives. For paid marketing, we leverage a broad array of advertising channels, including television, radio, social media platforms, such as Facebook, Instagram, Twitter and Snap, affiliates and paid and organic search, and other digital channels, such as mobile display. If the search engines on which we rely modify their algorithms, change their terms around gaming, or if the prices at which we may purchase listings increase, then our costs could increase, and fewer users may click through to our website. If links to our website are not displayed prominently in online search results, if fewer users click through to our website, if our other digital marketing campaigns are not effective, or if the costs of attracting users with any of our current methods significantly increase, then our ability to efficiently attract new users could be reduced, our revenue could decline and our business, financial condition and results of operations could be harmed.

In addition, our ability to increase the number of users of our product offerings will depend on continued user adoption of Sportsbook, iGaming and DFS. Growth in the gaming industry and the level of demand for and market acceptance of our product offerings will be subject to a high degree of uncertainty. We cannot assure you that consumer adoption of our product offerings will continue or exceed current growth rates, or that the industry will achieve more widespread acceptance.

Additionally, as technological or regulatory standards change and we modify our product offerings to comply with those standards, we may need users to take certain actions to continue playing, such as performing age verification checks or accepting new terms and conditions. Users may stop using our product offerings at any time, including if the quality of the user experience, including our support capabilities in the event of a problem, does not meet their expectations or keep pace with the quality of the customer experience generally offered by competitive product offerings.

***Our core values of focusing on our users first and acting for the long term may conflict with the short-term interests of our business.***

One of our operating principles is to put our users first, which we believe is essential to our success and serves the best, long-term interests of the Company and our stakeholders. Therefore, we have made in the past, and we may make in the future,

25

A445

certain investments or changes in strategy that we think will benefit our users, even if our decision negatively impacts our operating results in the short term.

***Our business model depends upon the continued compatibility between our apps and the major mobile operating systems and upon third-party platforms for the distribution of our product offerings. If Google Play or the Apple App Store prevents users from downloading our apps or augments the restrictions on advertising to our users, our ability to grow our revenue, profitability and prospects may be adversely affected.***

The substantial majority of our users access our Sportsbook, iGaming and DFS product offerings primarily on mobile devices, and we believe that this will continue to be increasingly important to our long-term success. Our business model depends upon the continued compatibility between our apps and the major mobile operating systems. Third parties with whom we do not have any formal relationships control the design of mobile devices and operating systems. These parties frequently introduce new devices, and from time to time they may introduce new operating systems or modify existing ones. Network carriers may also impact the ability to download apps or access specified content on mobile devices.

In addition, we rely upon third-party platforms for distribution of our product offerings. Our DFS product offering is delivered as a free application through both the Apple App Store and the Google Play Store and is also accessible via mobile and traditional websites. Our Sportsbook and iGaming product offerings are primarily distributed through the Apple App Store and a traditional website. The Google Play Store and Apple App Store are global application distribution platforms and the main distribution channels for our apps. As such, the promotion, distribution and operation of our apps are subject to the respective distribution platforms' standard terms and policies for application developers, which are broad and subject to frequent changes and interpretation. Furthermore, the distribution platforms may not enforce their standard terms and policies for application developers consistently and uniformly across all applications and with all publishers.

There is no guarantee that popular mobile devices will start or continue to support or feature our product offerings, or that mobile device users will continue to use our product offerings rather than competing product offerings. We are dependent on the interoperability of our technology with popular mobile operating systems, technologies, networks and standards that we do not control, such as the Android and iOS operating systems, and any changes, bugs, technical or regulatory issues in such systems, our relationships with mobile manufacturers and carriers, or in their terms of service or policies that degrade our product offerings' functionality, reduce or eliminate our ability to distribute our product offerings, give preferential treatment to competitive product offerings, limit our ability to deliver high quality product offerings, or impose fees or other charges related to delivering our product offerings, could adversely affect our product offering usage and monetization on mobile devices.

Moreover, our Sportsbook and DFS product offerings require high-bandwidth data capabilities in order to place time-sensitive bets. If the growth of high-bandwidth capabilities, particularly for mobile devices, is slower than we expect, our user growth, retention, and engagement may be seriously harmed. Additionally, to deliver high-quality content over mobile cellular networks, our product offerings must work well with a range of mobile technologies, systems, networks, regulations, and standards that we do not control. In particular, any future changes to the iOS or Android operating systems may impact the accessibility, speed, functionality, and other performance aspects of our product offerings, which issues are likely to occur in the future from time to time. In addition, the adoption of any laws or regulations that adversely affect the growth, popularity, or use of the Internet, including laws governing Internet neutrality, could decrease the demand for our product offerings and increase our cost of doing business. Specifically, any laws that would allow mobile providers in the United States to impede access to content, or otherwise discriminate against content providers like us, such as providing for faster or better access to our competitors, over their data networks, could have a material adverse effect on our business, financial condition, results of operations and prospects.

Furthermore, we may not successfully cultivate relationships with key industry participants or develop product offerings that operate effectively with these technologies, systems, networks, regulations, or standards. If it becomes more difficult for our users to access and use our product offerings on their mobile devices, if our users choose not to access or use our product offerings on their mobile devices, or if our users choose to use mobile product offerings that do not offer access to our product offerings, our user growth, retention, and engagement could be seriously harmed.

In addition, if any of the third-party platforms used for distribution of our product offerings were to limit or disable advertising on their platforms, either because of technological constraints or because the owners of these distribution platforms wished to impair our ability to serve ads on them, our ability to generate revenue could be harmed. Also, technologies have been, and may continue to be, developed by companies, such as Apple and Google, that, among other things, block or limit the display of our advertisements and some or all third-party cookies on mobile and desktop devices, limit cross-site and cross-device attribution, prevent measurement outside a narrowly-defined attribution window and prevent advertisement re-targeting

26

A446

and optimization. These developments could require us to make changes to how we collect information on, and track the actions of, our users and impact our marketing activities. While these changes have not had a material adverse impact on our business to date, they could materially impact the way we do business in the future, and if we or our advertising partners are unable to quickly and effectively adjust to new changes, there could be an adverse effect on our business, financial condition, results of operations or prospects.

***We may require additional capital to support our growth plans, and such capital may not be available on terms acceptable to us, if at all. This could hamper our growth and adversely affect our business.***

We intend to make significant investments to support our business growth and may require additional funds to respond to business challenges, including the need to develop new product offerings and features or enhance our existing product offerings and features, improve our operating infrastructure or acquire complementary businesses, personnel and technologies. Accordingly, we may need to engage in equity or debt financings to secure additional funds, which may involve increased funding costs due to rising interest rates. Our ability to obtain additional capital, if and when required, will depend on our business plans, investor demand, our operating performance, capital markets conditions and other factors. If we raise additional funds by issuing equity, equity-linked or debt securities, those securities may have rights, preferences or privileges senior to the rights of our currently issued and outstanding equity or debt, and our existing stockholders may experience dilution. If we are unable to obtain additional capital when required, or on satisfactory terms, our ability to continue to support our business growth or to respond to business opportunities, challenges or unforeseen circumstances could be adversely affected, and our business may be harmed.

***We may invest in or acquire other businesses, and our business may suffer if we are unable to successfully integrate acquired businesses into our Company or otherwise manage the growth associated with multiple acquisitions.***

As part of our business strategy, we have made, and may continue to make, acquisitions as opportunities arise to add new or complementary businesses, products, brands or technologies. In some cases, the costs of such acquisitions may be substantial, including as a result of professional fees, financing costs and due diligence efforts. There is no assurance that the time and resources expended on pursuing a particular acquisition will result in a completed transaction, or that any completed transaction will ultimately be successful. In addition, the assumptions we use to evaluate acquisition opportunities may not prove to be accurate, and intended benefits may not be realized. Our due diligence investigations may fail to identify all of the issues, liabilities or other challenges associated with an acquired business, which could result in increased risk of unanticipated or unknown issues or liabilities, including with respect to privacy, competition and other regulatory matters, and our mitigation strategies for such risks that are identified may not be effective. Further, we may be unable to identify suitable acquisition or strategic investment opportunities, or may be unable to obtain any required financing or regulatory approvals, and therefore may be unable to complete such acquisitions or strategic investments on favorable terms, if at all. We may decide to pursue acquisitions with which our investors may not agree, and we cannot assure investors that any acquisition or investment will be successful or otherwise provide a favorable return on investment. In addition, acquisitions and the integration thereof, such as the GNOG Transaction, require significant time and resources and place significant demands on our management, as well as on our operational and financial infrastructure. In addition, if we fail to successfully complete transactions or integrate new teams, or integrate the products and technologies associated with these acquisitions into our Company, our business could be materially harmed. Acquisitions have, and may continue to, expose us to operational challenges and risks, including:

- the ability to profitably manage acquired businesses or successfully integrate the acquired businesses' operations, personnel, financial reporting, accounting and internal controls, technologies and products into our business;

- increased indebtedness and the expense of integrating acquired businesses, including significant administrative, operational, economic, geographic or cultural challenges in managing and integrating the expanded or combined operations;

- entry into jurisdictions or acquisition of products or technologies with which we have limited or no prior experience, and the potential of increased competition with new or existing competitors as a result of such acquisitions;

- management challenges involved in maintaining geographically dispersed operations with different business cultures and compensation structures;

- diversion of management's attention and the over-extension of our operating infrastructure and our management systems, information technology systems, and internal controls and procedures, which may be inadequate to support growth;

27

A447

- the ability to fund our capital needs and any cash flow shortages that may occur if anticipated revenue is not realized or is delayed, whether by general economic or market conditions, or unforeseen internal difficulties; and

- the ability to retain or hire qualified personnel required for expanded operations.

Our acquisition strategy may not succeed if we are unable to remain attractive to target companies or expeditiously complete transactions. Issuing shares of our Class A common stock to fund an acquisition would cause economic dilution to our existing stockholders. If we develop a reputation for being a difficult acquirer or having an unfavorable work environment, or target companies view our Class A common stock unfavorably, we may be unable to consummate key acquisition transactions essential to our corporate strategy and our business may be seriously harmed.

Acquisitions may also disrupt our ongoing business, divert our resources and require significant management attention that would otherwise be available for ongoing development of our current business. In addition, we may be required to make additional capital investments or undertake remediation efforts to ensure the success of our acquisitions, which may reduce the benefits of such acquisitions. We also may be required to use a substantial amount of our cash or issue debt or equity securities to complete an acquisition, which could deplete our cash reserves and/or dilute our existing stockholders.

In addition, there has been, and we expect there will continue to be, significant competition within the gaming industry for acquisitions of businesses, technologies and assets. As such, even if we are able to identify an acquisition that we would like to pursue, the target may be acquired by another strategic buyer or we may otherwise not be able to complete the acquisition on commercially reasonable terms, or at all. Moreover, in addition to our failure to realize the anticipated benefits of any acquisition, including our revenues or return on investment assumptions, we may be exposed to unknown liabilities or impairment charges as a result of acquisitions we do complete.

***We are party to pending litigation in various jurisdictions and with various plaintiffs, and we may be subject to future litigation in the operation of our business. An adverse outcome in one or more proceedings could adversely affect our business.***

In the past we have been party to, and we may in the future increasingly face the risk of, claims, lawsuits, and other proceedings involving competition and antitrust, intellectual property, privacy, consumer protection, accessibility claims, securities, tax, labor and employment, commercial disputes, services and other matters. See "Business — Legal Proceedings." Litigation to defend us against claims by third parties, or to enforce any rights that we may have against third parties, may be necessary, which could result in substantial costs and diversion of our resources, causing a material adverse effect on our business, financial condition, results of operations and prospects.

Any litigation to which we are a party may result in an onerous or unfavorable judgment that may not be reversed upon appeal, or in payments of substantial monetary damages or fines, the posting of bonds requiring significant collateral, letters of credit or similar instruments, or we may decide to settle lawsuits on similarly unfavorable terms. These proceedings could also result in reputational harm, criminal sanctions, consent decrees or orders preventing us from offering certain product offerings or requiring a change in our business practices in costly ways or requiring development of non-infringing or otherwise altered products or technologies. Litigation and other claims and regulatory proceedings against us could result in unexpected disciplinary actions, expenses and liabilities, which could have a material adverse effect on our business, financial condition, results of operations and prospects.

***DraftKings Marketplace facilitates the purchase and sale of nonfungible tokens (NFTs). The Company is defending litigation claiming Marketplace NFTs are "securities" under federal and state securities laws. While the Company believes that Marketplace NFTs are not securities, the final determination by the court in which the litigation is pending, another court, or by the SEC or another state or foreign regulatory authority is subject to uncertainty and if determined or re-interpreted in the future to be a security, we may be subject to damages in litigation, regulatory scrutiny, investigations, fines, and other penalties.***

In developing, launching and operating DraftKings Marketplace, the Company analyzed whether the NFTs created for, offered, sold, or traded on, DraftKings Marketplace would be deemed "securities" under applicable law. The Company believes that such NFTs are not securities under the U.S. federal securities laws based, among other things, on the statutory definition of a security under the U.S. federal securities laws, Supreme Court decisions applying the definition of security, other judicial decisions applying the definition of a security, and factors articulated in public communications by representatives of the SEC, no-action letters, and enforcement actions.

28

A448

The Company is defending litigation filed in March 2023 in federal district court in Massachusetts alleging, among other things, that Marketplace NFTs are securities that were required to be, but were not, registered with the SEC in accordance with federal and Massachusetts law, and that Marketplace is a securities exchange that is not registered as required by federal and Massachusetts law. In addition, in July 2023, the Company received a subpoena from the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts seeking documents and requesting answers to interrogatories concerning, among other things, DraftKings Marketplace and Marketplace NFTs, and related matters. Our belief that Marketplace NFTs are not securities is a risk-based assessment and not a legal standard nor is it binding on any regulatory authority or court and, notwithstanding our conclusions, we could be subject to legal or regulatory action in the event a court, the SEC or a state or foreign regulatory authority were to determine that a particular NFT offered, sold, or traded on DraftKings Marketplace is a "security" under applicable law.

The legal test for determining whether a particular digital asset, such as Marketplace NFTs, is a security is a complex and fact-driven analysis and the SEC generally does not provide advance guidance or confirmation on the status of any particular digital asset as a security.

The classification of a digital asset as a security may have wide-ranging implications. For example, a security may generally only be offered or sold in the United States pursuant to a registration statement filed with the SEC or in a transaction that is exempt from registration; persons that effect transactions in assets that are securities in the United States may be subject to registration with the SEC as a "broker" or "dealer;" platforms that bring together purchasers and sellers to trade digital assets that are securities in the United States are generally subject to registration as securities exchanges, or must qualify for an exemption; persons facilitating clearing and settlement of securities may be subject to registration with the SEC as a clearing agency; and foreign jurisdictions may have similar licensing, registration, and qualification requirements.

If the court in which the litigation is pending, another court, the SEC or another state or foreign regulatory authority makes a final determination that Marketplace NFTs are securities under applicable law, we could be subject to, among other things, damages in litigation, regulatory scrutiny, investigations, sanctions, civil monetary penalties, injunctions, fines, reputational harm and other penalties, which could negatively impact our business, operating results, and financial condition.

***Our business is subject to a variety of U.S. and foreign laws, many of which are unsettled and still developing and which could subject us to claims or otherwise harm our business. Any change in existing regulations or their interpretation, or the regulatory climate applicable to our product offerings and services, or changes in tax rules and regulations or interpretation thereof related to our product offerings and services, could adversely impact our ability to operate our business as currently conducted or as we seek to operate in the future, which could have a material adverse effect on our financial condition and results of operations.***

We are generally subject to laws and regulations relating to fantasy sports, sports betting and iGaming in the jurisdictions in which we conduct our business or in some circumstances, in those jurisdictions in which we offer our services or those are available, as well as the general laws and regulations that apply to all e-commerce businesses, such as those related to privacy and personal information, tax and consumer protection. These laws and regulations vary from one jurisdiction to another and future legislative and regulatory action, court decisions or other governmental action, which may be affected by, among other things, political pressures, attitudes and climates, as well as personal biases, may have a material impact on our operations and financial results. In particular, some jurisdictions have introduced legislation or regulations attempting to restrict or prohibit online sport betting and online gaming, while others have taken the position that online sports betting and online gaming should be licensed and regulated and have adopted or are in the process of considering enabling legislation and regulations. Additionally, some jurisdictions in which we may operate could presently be unregulated or partially regulated and therefore more susceptible to the enactment or change of laws and regulations.

We offer our DFS product offering in 24 U.S. states that have adopted legislation permitting online fantasy sports. In those states that currently require a license or registration, we have either obtained the appropriate license or registration, have obtained a provisional license, or are operating pursuant to a grandfathering clause that allows operation pending the availability of licensing applications and subsequent grant of a license. We also operate DFS in the United Kingdom pursuant to a license issued by the United Kingdom Gambling Commission.

We also operate our DFS product offering in 20 U.S. states, Washington D.C., and certain provinces in Canada that, in each case, do not have fantasy sports-specific laws or regulations. In those jurisdictions, our business has been, and in the future may be, subject to future legislative and regulatory action, court decisions or other governmental action that could alter or

29

A449

eliminate our ability to operate. For example, in certain states in which we operate, including Texas and Florida, the applicable office of the Attorney General has issued an adverse legal opinion regarding DFS and other fantasy sports. In the event that one of those Attorneys General decides to take action on the opinion from their office, we may have to withdraw our paid DFS operations from such state, which could have a material adverse effect on our business, financial condition and results of operations.

In May 2018, the U.S. Supreme Court struck down PASPA as unconstitutional. This decision has the effect of lifting federal restrictions on sports betting and thus allowing states to determine the legality of sports betting for themselves. Since the repeal of PASPA, several states (and Washington D.C.) have legalized online sports betting. To the extent new real money gaming or sports betting jurisdictions are established or expanded, we cannot guarantee that we will be successful in entering such new jurisdictions or expanding our business or user base in line with the growth of existing jurisdictions. If we are unable to effectively develop and operate directly or indirectly within these new jurisdictions or if our competitors are able to successfully enter jurisdictions that we cannot access or where we face other restrictions, there could be a material adverse effect on our business, operating results and financial condition. Our failure to obtain or maintain the necessary regulatory approvals in jurisdictions, whether individually or collectively, would have a material adverse effect on our business. See "Business — Government Regulation." To expand into new jurisdictions, we may need to be licensed and obtain approvals of our product offerings. This is a time-consuming process that can be costly. Any delays in obtaining or difficulty in maintaining regulatory approvals needed for expansion within existing jurisdictions or into new jurisdictions can negatively affect our opportunities for growth, including the growth of our customer base, or delay our ability to recognize revenue from our product offerings in any such jurisdictions.

Future legislative and regulatory action, and court decisions or other governmental action, may have a material impact on our operations and financial results. Governmental authorities could view us as having violated local laws, despite our efforts to obtain all applicable licenses or approvals. There is also a risk that civil and criminal proceedings, including class actions, brought by or on behalf of prosecutors or public entities or incumbent monopoly providers, or private individuals, could be initiated against us, Internet service providers, credit card and other payment processors, advertisers and others involved in the offering of Sportsbook, iGaming and DFS product offerings. Such potential proceedings could involve substantial litigation expense, penalties, fines, seizure of assets, injunctions or other restrictions being imposed upon us or our licensees or other business partners, while diverting the attention of key executives. Such proceedings could have a material adverse effect on our business, financial condition, results of operations and prospects, as well as impact our reputation.

There can be no assurance that legally enforceable legislation will not be proposed and passed in jurisdictions relevant or potentially relevant to our business to prohibit, legislate or regulate various aspects of Sportsbook, iGaming and DFS product offerings (or that existing laws or regulations in those jurisdictions will not be changed or interpreted negatively). Compliance with any such legislation may have a material adverse effect on our business, financial condition and results of operations, either as a result of our determination that a jurisdiction should be blocked, or because a local license or approval may be costly for us or our business partners to obtain and/or such licenses or approvals may contain other commercially undesirable conditions.

Our income tax expense is computed based on tax rates at the time of the respective financial period. Our future effective tax rates, financial condition and results from operations could be unfavorably affected by changes in the tax rates in jurisdictions where our income is earned, by changes in the tax rules and regulations or the interpretation of tax rules and regulations in the jurisdictions in which we do business or by changes in the valuation of our deferred tax assets. For example, the Organization for Economic Cooperation and Development has been working on a Base Erosion and Profit Shifting Project and released an implementation package in December 2023 which provides a coordinated system to ensure that multinational enterprises pay a global minimum tax. The guidelines and proposals may change aspects of the existing framework under which our tax obligations are determined in many of the countries where we do business. Similarly, the European Commission and several countries have issued proposals that would change aspects of the current tax framework under which we are taxed. These proposals include changes to the existing income tax framework, possibilities of a global minimum tax, and proposals to change or impose new types of non-income taxes, including taxes based on a percentage of revenue.

***Compliance with data privacy and security laws and regulations could require us to incur significant expenses and failure to comply with such laws and regulations could carry penalties and potential criminal sanctions, as well as risk of litigation.***

In the context of our European Union ("EU") operations, we may be subject to specific compliance obligations under the General Data Protection Regulation (EU) 2016/679 (the "GDPR") and associated laws and regulations in different EU Member States in which we operate. In addition, portions of our business established outside the EU may be required to comply with the requirements of the GDPR and associated EU legislation with respect to the offering of products or services to, or the

30

A450

monitoring of, individuals in the EU. We may also be subject to the local privacy and data protection laws of the EU Member States in which we offer products or services. Failure to comply with these EU data protection and privacy laws can carry penalties and potential criminal sanctions, as well as the risk of litigation. In addition, Directive 2002/58/EC (as amended by Directive 2009/136/EC) (together, the "e-Privacy Directive") governs, among other things, the use of cookies and the sending of electronic direct marketing within the EU and, as such, will apply to our marketing activities within the EU. Following Brexit, the UK has adopted its own data protection and direct marketing laws (the "UK data protection laws") which are currently based on the corresponding EU legislation. Our UK-facing operations may therefore be subject to specific compliance obligations under the UK data protection laws.

In our efforts to comply with the GDPR, the e-Privacy Directive and the UK data protection laws, we rely on positions and interpretations of the law that have yet to be fully tested before the relevant courts and regulators. While the UK data protection laws are currently similar to the corresponding EU laws, it is possible that those laws will diverge in the future; to the extent that those laws do diverge, then that may increase the costs of maintaining regulatory compliance. There is also a risk that it may become more difficult to make cross-border transfers of personal data, as a result of diverging data protection regimes in the territories where our customers are located and the territories where our operations are based. If a regulator or court of competent jurisdiction determined that one or more of our compliance efforts does not satisfy the applicable requirements of the GDPR or the e-Privacy Directive, or the UK data protection laws, or if any party brought a claim in this regard, there could be potential governmental or regulatory investigations, enforcement actions, regulatory fines, compliance orders, litigation or public statements against us by consumer advocacy groups or others, and that could cause customers to lose trust in us and damage our reputation. Likewise, a change in guidance could be costly and have an adverse effect on our business.

We may also face similar compliance risks in connection with requirements under North American privacy and data protection laws, including the California Consumer Privacy Act and its implementing regulations, Virginia's Consumer Data Protection Act and certain other privacy and data protections laws enacted by other jurisdictions from time to time. Non-compliance with such requirements may result in civil penalties and orders that require us to change the way we process data. In the event of a data breach, we are also subject to breach notification laws in the jurisdictions in which we operate and the risk of litigation and regulatory enforcement actions.

***Our growth prospects depend on the legal status of real-money gaming in various jurisdictions, predominantly within the United States, and legalization may not occur in as many jurisdictions as we expect, or may occur at a slower pace than we anticipate. Additionally, even if jurisdictions legalize real money gaming, this may be accompanied by legislative or regulatory restrictions and/or taxes that make it impracticable or less attractive to operate in those jurisdictions, or the process of implementing regulations or securing the necessary licenses to operate in a particular jurisdiction may take longer than we anticipate, or existing laws or regulations may be changed or interpreted adversely, any of which could adversely affect our future results of operations and make it more difficult to meet our expectations for financial performance.***

A number of states have legalized, or are currently considering legalizing, real money online sports betting and iGaming, and our business, financial condition, results of operations and prospects are significantly dependent upon such legalization. Our business plan is partially based upon the legalization of real money online sports betting and iGaming for a specific percentage of the U.S. population on a yearly basis and such rate of legalization may not occur as we have anticipated. Additionally, if a large number of additional jurisdictions or the federal government enact real money sports betting or iGaming legislation and we are unable to obtain, or are otherwise delayed in obtaining, the necessary licenses to operate online sports betting or iGaming websites in such jurisdictions, our future growth in online sports betting and iGaming could be materially impaired. Furthermore, for those jurisdictions that have enacted real-money sports betting or iGaming laws or regulations, such laws and regulations could be amended or interpreted adversely, which could impose additional restrictions or costs that could have an adverse effect on our business.

As we enter into new jurisdictions, the relevant jurisdiction may legalize real money sports betting and iGaming in a manner that is unfavorable to us. As a result, we may encounter unexpected legal, regulatory and political challenges, which could result in an unforeseen adverse impact on planned revenues or costs associated with the new opportunity. For example, certain states require us to have a relationship with a retail operator in order to offer our online Sportsbook product offering, which tends to increase our costs of revenue. States that have established state-run monopolies may limit opportunities for private sector participants like us. States also impose substantial tax rates on online sports betting and iGaming revenue in addition to, in the case of online sports betting, the federal excise tax of 25 basis points on the amount of each wager. As most state product taxes apply to various measures of modified gross profit, tax rates, whether federal- or state-based, that are higher than we expect will make it more costly and less desirable for us to launch in a given jurisdiction, while tax increases in any of our existing jurisdictions may adversely impact our profitability.

31

A451

Therefore, even in cases in which a jurisdiction licenses and regulates Sportsbook, iGaming or DFS, the licensing and regulatory regimes can vary considerably in terms of their business-friendliness and at times may be intended to provide incumbent operators with advantages over new licensees. Therefore, certain "liberalized" regulatory regimes are considerably more commercially attractive than others.

***Failure to comply with regulatory requirements in a particular jurisdiction, or the failure to successfully obtain a license or permit applied for in a particular jurisdiction, could impact our ability to comply with licensing and regulatory requirements in other jurisdictions, or could cause the rejection of license applications or cancellation of existing licenses in other jurisdictions, or could cause financial institutions, online and mobile platforms, advertisers and distributors to stop providing services to us which we rely upon to receive payments from, or distribute amounts to, our users, or otherwise to deliver and promote our product offerings and services.***

Compliance with the various regulations applicable to fantasy sports and real money sports betting and iGaming is costly and time-consuming. Regulatory authorities at the non-U.S. and U.S. federal, state and local levels have broad powers with respect to the regulation and licensing of fantasy sports and real money gaming operations and may revoke, suspend, condition or limit our fantasy sports or real money gaming licenses, impose substantial fines on us and take other actions, any one of which could have a material adverse effect on our business, financial condition, results of operations and prospects. These laws and regulations are dynamic and subject to potentially differing interpretations, and various legislative and regulatory bodies may expand current laws or regulations or enact new laws and regulations regarding these matters. We endeavor to comply with all applicable laws and regulations relating to our business. It is possible, however, that these requirements may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another and may conflict with other rules. Non-compliance with any such law or regulations could expose us to claims, proceedings, litigation and investigations by private parties and regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect our business.

Any fantasy sports or real money gaming license could be revoked, suspended or conditioned at any time. The loss of a license in one jurisdiction could trigger the loss of a license or affect our eligibility for such a license in another jurisdiction, and any of such losses, or potential for such loss, could cause us to cease offering some or all of our product offerings in the impacted jurisdictions. We may be unable to obtain or maintain all necessary registrations, licenses, permits or approvals, and could incur fines or experience delays related to the licensing process, which could adversely affect our operations. Our delay or failure to obtain or maintain licenses in any jurisdiction may prevent us from distributing our product offerings, increasing our customer base and/or generating revenues. We cannot assure you that we will be able to obtain and maintain the licenses and related approvals necessary to conduct our Sportsbook, iGaming and DFS operations. Any failure to maintain or renew our existing licenses, registrations, permits or approvals could have a material adverse effect on our business, financial condition, results of operations and prospects.

***Our growth prospects and market potential will depend on our ability to obtain licenses to operate in a number of jurisdictions, and if we fail to obtain and subsequently maintain such licenses, our business, financial condition, results of operations and prospects could be impaired.***

Our ability to grow our business will depend on our ability to obtain and maintain licenses to offer our product offerings in a large number of jurisdictions or in heavily populated jurisdictions. Regulated gaming license applications and audits frequently involve an in-depth suitability review of the applicant's business and operations and associated individuals including certain officers, directors, key employees and significant stockholders. These applications and audits take substantial time to prepare, submit, and complete, often requiring the production of multiple years' worth of business and personal financial records and disclosures which take considerable time to compile, followed by the regulator's investigatory process which may take months or even years to complete. If we fail to obtain and maintain licenses in large jurisdictions or in a greater number of mid-market jurisdictions, this may prevent us from expanding the footprint of our product offerings, increasing our user base and/or generating revenues. We cannot be certain that we will be able to obtain and maintain licenses and related approvals necessary to conduct our Sportsbook, iGaming and DFS operations in a timely manner or at all. Any failure to obtain and maintain licenses, registrations, permits or approvals could have a material adverse effect on our business, financial condition, results of operations and prospects.

***We have been, and continue to be, the subject of governmental investigations and inquiries with respect to the operation of our businesses, and we could be subject to future governmental investigations and inquiries, legal proceedings and enforcement actions. Any such investigation, inquiry, proceeding or action, could adversely affect our business.***

---

32

A452

We have received formal and informal inquiries from time to time, from government authorities and regulators, including tax authorities and gaming regulators, regarding compliance with laws and other matters, and we may receive such inquiries in the future, particularly as we grow and expand our operations. Violation of existing or future regulations, regulatory orders or consent decrees could subject us to substantial monetary fines and other penalties that could negatively affect our financial condition and results of operations. In addition, it is possible that future orders issued by, or inquiries or enforcement actions initiated by, government or regulatory authorities could cause us to incur substantial costs, expose us to unanticipated liability or penalties, or require us to change our business practices in a manner materially adverse to our business.

***Participation in the sports betting industry exposes us to trading, liability management and pricing risk. We may experience lower than expected profitability and potentially significant losses as a result of a failure to determine accurately the odds in relation to any particular event and/or any failure of our sports risk management processes due to a variety of factors beyond our control.***

Our fixed-odds betting product offerings involve betting where winnings are paid on the basis of the stake placed and the odds quoted. Odds are determined with the objective of providing an average return to the bookmaker over a large number of events and therefore, over the long term, our gross win percentage has remained fairly constant. However, there can be significant variation in gross win percentage event-by-event and day-by-day. We have systems and controls that seek to reduce the risk of daily losses occurring on a gross-win basis, but there can be no assurance that these will be effective in reducing our exposure, and consequently our exposure to this risk in the future. As a result, in the short term, there is less certainty of generating a positive gross win, and we have from time to time experienced, and may in the future experience, significant losses with respect to individual events or betting outcomes, in particular if large individual bets are placed on an event or betting outcome or series of events or betting outcomes. Odds compilers and risk managers are capable of human error, thus even allowing for the fact that a number of betting products are subject to capped pay-outs, significant volatility can occur. In addition, it is possible that there may be such a high volume of trading during any particular period that even automated systems would be unable to address and mitigate all risks. Any significant losses on a gross-win basis could have a material adverse effect on our business, financial condition, results of operations and cash flows. In addition, if a jurisdiction where we hold or wish to apply for a license imposes a high turnover tax for betting (as opposed to a gross-win tax), this would also impact profitability, particularly with high value/low margin bets, and likewise have a material adverse effect on our business.

***Palpable (obvious) errors in Sportsbook odds making may occasionally occur in the normal course of business, sometimes for large liabilities. While it is a worldwide standard business practice to void bets associated with palpable errors or to correct the odds, there is no guarantee regulators will approve voiding palpable errors in every case.***

Our Sportsbook offers a huge spectrum of betting markets across dozens of sports, and the odds are set through a combination of algorithmic and manual odds making. Bet acceptance is also a combination of automatic and manual acceptance. In some cases, the odds offered on our Sportsbook constitute an obvious error. Examples of such errors are inverted lines between teams, or odds that are significantly different from the true odds of the outcome in a way that all reasonable persons would agree is an error. It is generally commonplace worldwide for operators to void bets associated with such palpable errors, and, in most mature jurisdictions, these bets can be voided without regulatory approval at operator discretion. In the U.S., it is unclear long term if state-by-state regulators will consistently approve the voiding of bets or re-setting odds to correct odds on such bets. In some cases, we require regulatory approval to void palpable errors ahead of time. If regulators were to not allow voiding of bets associated with large obvious errors in odds making, we could be subject to covering significant liabilities.

***We follow the industry practice of restricting and managing betting limits at the individual customer level based on individual customer profiles and risk level to the enterprise; however, there is no guarantee that jurisdictions will allow operators such as us to limit on the individual customer level.***

It is customary for sports betting operators to manage customer betting limits at the individual level to manage enterprise risk levels. We believe this practice is beneficial overall, because if it were not possible, betting options would be restricted globally and limits available to customers would be much lower to insulate overall risk due to the existence of a small segment of highly sophisticated syndicates and algorithmic bettors, or bettors looking to take advantage of errors and omissions on our platforms. We believe virtually all operators balance taking reasonable action from all customers against the risk of individual customers significantly harming business viability. We cannot assure you that all state legislation and regulators will always allow operators to execute limits at the individual customer level, or at their sole discretion.

33

A453

*Negative events or negative media coverage relating to, or a declining popularity of, sports betting, online sports betting, daily fantasy sports, or the underlying sports or athletes, or iGaming in particular, or other negative coverage may adversely impact our ability to retain or attract users, which could have an adverse impact on our business.*

Public opinion can significantly influence our business. Unfavorable publicity regarding us, for example, our product changes, product quality, litigation, or regulatory activity, or regarding the actions of third parties with whom we have relationships or the underlying sports (including declining popularity of the sports or athletes) could seriously harm our reputation. In addition, a negative shift in the perception of sports betting and iGaming by the public or by politicians, lobbyists or others could affect future legislation of sports betting and iGaming, which could cause jurisdictions to abandon proposals to legalize sports betting and iGaming, thereby limiting the number of jurisdictions in which we are permitted to operate. Furthermore, illegal betting activity by athletes could result in negative publicity for our industry and could harm our brand reputation. Negative public perception could also lead to new restrictions on, or the prohibition of, iGaming or sports betting in jurisdictions in which we currently operate. Such negative publicity could also adversely affect the size, demographics, engagement and loyalty of our customer base and result in decreased revenue or slower user growth rates, which could seriously harm our business.

*We may have difficulty accessing the service of banks, credit card issuers and payment processing service providers, which may make it difficult to offer our product offerings and services.*

Although financial institutions and payment processors are permitted to provide services to us and others in our industry, banks, credit card issuers and payment processing service providers may be hesitant to offer banking and payment processing services to real money gaming and fantasy sports businesses. Consequently, those businesses involved in our industry, including our own, may encounter difficulties in establishing and maintaining banking and payment processing relationships with a full scope of services and generating market rate interest. If we are unable to maintain our bank accounts or our users are unable to use their credit cards, bank accounts or e-wallets to make deposits and withdrawals from our product offerings, it would make it difficult for us to operate our business, increase our operating costs, and pose additional operational, logistical and security challenges which could result in an inability to implement our business plan.

*The requirements of being a public company may strain our resources and divert management's attention, and additional legal, accounting and compliance expenses may be greater than we anticipate.*

We became a public company following the consummation of the transactions contemplated by the Business Combination Agreement dated December 22, 2019, as amended on April 7, 2020 (the "DEAC Business Combination"), with Diamond Eagle Acquisition Corp. ("DEAC"), and as such, we have incurred, and will continue to incur, significant legal, accounting and other expenses that DraftKings and SBTech did not incur as private companies. We are subject to the reporting requirements of the Exchange Act, and we are required to comply with the applicable requirements of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and the Dodd-Frank Wall Street Reform and Consumer Protection Act, as well as the rules and regulations subsequently implemented by the SEC and the listing standards of The Nasdaq Stock Market, including changes in corporate governance practices and the establishment and maintenance of effective disclosure and financial controls. Compliance with these rules and regulations can be burdensome, and our management and other personnel are required to devote a substantial amount of time to these compliance initiatives.

*Failure to maintain adequate financial, information technology and management processes and controls could result in material weaknesses and lead to errors in our financial reporting, which could adversely affect our business as a public company.*

As a public company, we are required to maintain internal control over financial reporting and to report any material weaknesses in such internal controls. Section 404 of Sarbanes-Oxley requires that we evaluate and determine the effectiveness of our internal control over financial reporting. It also requires our independent registered public accounting firm to attest to our evaluation of our internal control over financial reporting with our Annual Report. Although our management has determined, and our independent registered public accounting firm has attested, that our internal control over financial reporting was effective as of December 31, 2023, we cannot assure you that we or our independent registered public accounting firm will not identify a material weakness in our internal controls in the future. Maintaining effective internal control over financial reporting is necessary for us to produce reliable financial reports and is important in helping to prevent financial fraud.

Our current controls and any new controls that we develop may become inadequate because of poor design and changes in our business, including increased complexity resulting from any expansion. Any failure to implement and maintain effective

34

A454

internal control over financial reporting could adversely affect the results of assessments by our independent registered public accounting firm and their attestation reports.

If we are unable to certify the effectiveness of our internal controls, or if our internal controls have a material weakness, we may not detect errors in a timely fashion, our consolidated financial statements could be misstated, we could be subject to regulatory scrutiny and a loss of confidence by stakeholders, which could harm our business and adversely affect the market price of our common stock. Failure to comply with Section 404 of Sarbanes-Oxley could potentially subject us to sanctions or investigations by the SEC, FINRA or other regulatory authorities, as well as increase the risk of liability arising from litigation based on securities law.

***Continued growth and success will depend on the performance of our current and future employees, including certain key employees. Recruitment and retention of these individuals is vital to growing our business and meeting our business plans. The loss of any of our key executives or other key employees could harm our business.***

We depend on a limited number of key personnel to manage and operate our business, including DraftKings' co-founders, our Chief Financial Officer and our Chief Legal Officer. The leadership of these key personnel has been, and we expect will continue to be, a critical element of our success. The departure, death or disability of any one of our executive officers or other extended or permanent loss of any of their services, or any negative market or industry perception with respect to any of them or their loss, could have a material adverse effect on our business. We are not protected by key man or similar life insurance covering executive officers or members of senior management.

In addition, certain of our other employees have made significant contributions to our growth and success. We believe our success and our ability to compete and grow will depend in large part on the efforts and talents of our employees and on our ability to retain highly skilled personnel. There is significant competition for these types of personnel, and we compete with other potential employers for the services of our employees. As a result, we may not succeed in retaining our executives and other key employees. Employees, particularly analysts and engineers, are in high demand, and we devote significant resources to identifying, hiring, training, successfully integrating and retaining these employees. In addition, experienced personnel in the technology industry are in high demand. We cannot provide assurance that we will be able to attract or retain such highly qualified personnel in the future. In addition, the loss of employees or the inability to hire additional skilled employees as necessary could result in significant disruptions to our business, and the integration of replacement personnel could be time-consuming and expensive and cause additional disruptions to our business. If we do not succeed in attracting, hiring, and integrating qualified personnel, or retaining and motivating existing personnel, we may be unable to grow effectively and our business could be seriously harmed.

All of our named executive officers are employees-at-will. The unexpected loss of services of one or more of these key employees could have a material adverse effect on our business, financial condition, results of operations and prospects.

***In some jurisdictions our key executives, certain employees or other individuals related to the business are, and will continue to be, subject to licensing or compliance requirements. Failure by such individuals to obtain the necessary licenses or comply with individual regulatory obligations could cause the business to be non-compliant with its obligations, or imperil its ability to obtain or maintain licenses necessary for the conduct of the business. In some cases, the remedy to such situation may require the removal of a key executive or employee and the mandatory redemption or transfer of such person's equity securities.***

As part of obtaining real money gaming licenses, the responsible gaming authority will generally determine suitability of certain directors, officers and employees and, in some instances, significant stockholders. The criteria used by gaming authorities to make determinations as to who requires a finding of suitability or the suitability of an applicant to conduct gaming operations varies among jurisdictions, but generally requires extensive and detailed application disclosures followed by a thorough investigation. If any gaming authority with jurisdiction over our business were to find an applicable officer, director, employee or significant stockholder of ours unsuitable for licensing or unsuitable to continue having a relationship with us, we would be required to sever our relationship with that person or entity. Furthermore, such gaming authorities may require us to terminate the employment of any person who refuses to file required applications. Either result could have a material adverse effect on our business, operations and prospects.

In addition, our amended and restated articles of incorporation provide that any of our common stock or other equity securities owned or controlled by any stockholder whom our board of directors determines in good faith (following consultation with reputable outside gaming regulatory counsel), pursuant to a resolution adopted by the unanimous affirmative vote of all of

35

A455

the disinterested members of our board of directors, is an unsuitable person, will be subject to mandatory sale and transfer to either us or one or more third-party transferees.

Additionally, a gaming regulatory body may refuse to issue or renew a gaming license or restrict or condition the same, based on our present activities or the past activities of DraftKings, SBTech or GNOG, or the past or present activities of their or our current or former directors, officers, employees, stockholders or third parties with whom we have relationships, which could adversely affect our operations or financial condition. If additional gaming regulations are adopted in a jurisdiction in which we operate, such regulations could impose restrictions or costs that could have a significant adverse effect on us. From time to time, various proposals are introduced in the legislatures of some of the jurisdictions in which we have existing or planned operations that, if enacted, could adversely affect our directors, officers, key employees, or other aspects of our operations. To date, we have obtained all governmental licenses, findings of suitability, registrations, permits and approvals necessary for our operations as currently conducted. However, we can give no assurance that any additional licenses, permits and approvals that may be required will be given or that existing ones will be renewed or will not be revoked. Renewal of licenses, permits and approvals are subject to, among other things, continued satisfaction of suitability requirements of our directors, officers, key employees and stockholders. Any failure to renew or maintain our licenses or to receive new licenses when necessary would have a material adverse effect on us.

***Due to the nature of our business, we are subject to taxation in a number of jurisdictions and changes in, or new interpretations of, tax laws, tax rulings or their application by tax authorities could result in additional tax liabilities and could materially affect our financial condition and results of operations. We have been, and continue to be, subject to periodic audits and examinations by the IRS, as well as state and local taxing authorities, the results of which may materially impact our financial statements in the period in which the audit or examination occurs.***

Our tax obligations are varied and include U.S. federal, state and local taxes and international taxes due to the nature of our business. The tax laws that are applicable to our business are subject to interpretation, and significant judgment is required in determining our worldwide provision for income taxes. In the course of our business, there are many transactions and calculations where the ultimate tax determination is uncertain. For example, compliance with the 2017 United States Tax Cuts and Jobs Act (the "TCJA") required the collection of information not regularly produced within our Company, the use of estimates in our consolidated financial statements, and the exercise of significant judgment in accounting for its provisions.

As of December 31, 2023, 25 countries in Europe, the Middle East, Africa, and Asia-Pacific have enacted various aspects of the Organization for Economic Co-operation and Development's Base Erosion and Profit Shifting ("BEPS") 2.0 Pillar Two global minimum tax (GMT). In 24 of those countries, the GMT is effective beginning in 2024. Based on currently enacted law, the impact of GMT on our 2024 results is not expected to be material.

The gaming industry also represents a significant source of tax revenue to the jurisdictions in which we operate. Gaming companies and business-to-business providers in the gaming industry (directly and/or indirectly by way of their commercial relationships with operators) are currently subject to significant taxes and fees in addition to normal corporate income taxes, and such taxes and fees are subject to increase at any time. From time to time, various legislators and other government officials have proposed and adopted changes in tax laws, or in the administration or interpretation of such laws, affecting the gaming industry. In addition, worsening of economic conditions and the large number of jurisdictions with significant current or projected budget deficits could intensify the efforts of governments to raise revenues through increases in gaming taxes and/or other taxes. It is not possible to determine with certainty the likelihood of changes in tax laws or in the administration or interpretation or enforcement of such laws. Any material increase, or the adoption of additional taxes or fees, could have a material adverse effect on our business, financial condition, results of operations and prospects.

Additionally, tax authorities may impose indirect taxes on Internet-related commercial activity based on existing statutes and regulations which, in some cases, were established prior to the advent of the Internet. Tax authorities may interpret laws originally enacted for mature industries and apply it to newer industries, such as the online sports betting and iGaming industries. The application of such laws may be inconsistent from jurisdiction to jurisdiction. Our in-jurisdiction activities may vary from period to period which could result in differences in nexus from period to period.

We have been, and continue to be, subject to periodic review and audit by domestic and foreign tax authorities. Tax authorities may disagree with certain positions that we or our predecessors have taken or that we will take, and any adverse outcome of such a review or audit could have a negative effect on our business, financial condition and results of operations. Although we believe that our tax provisions, positions and estimates are reasonable and appropriate, tax authorities may disagree with certain positions we have taken. In addition, economic and political pressures to increase tax revenue in various jurisdictions may make resolving tax disputes favorably more difficult. We are currently under IRS audit for prior tax years, with the primary unresolved issues relating to excise taxation of fantasy sports contests and informational reporting and

36

A456

withholding. The final resolution of that audit, and other audits or litigation, may differ from the amounts recorded in our consolidated financial statements included herein and may materially affect our consolidated financial statements in the period or periods in which that determination is made.

***Failure to protect or enforce our intellectual property rights or the costs involved in such enforcement could harm our business, financial condition and results of operations.***

We rely on trademark, copyright, patent, trade secret, and domain-name-protection laws to protect our proprietary rights. In the United States and internationally, we have filed various applications to protect aspects of our intellectual property, and currently hold a number of issued patents and registered trademarks in multiple jurisdictions. In the future we may acquire additional patents or patent portfolios or trademarks, which could require significant cash expenditures. However, third parties may knowingly or unknowingly infringe our proprietary rights, third parties may challenge proprietary rights held by us, and pending and future trademark and patent applications may not be approved. In addition, effective intellectual property protection may not be available in every country in which we operate or intend to operate our business. In any of these cases, we may be required to expend significant time and expense to prevent infringement or to enforce our rights. There can be no assurance that others will not offer products or services that are substantially similar to ours and compete with our business.

Circumstances outside our control could pose a threat to our intellectual property rights. For example, effective intellectual property protection may not be available in all jurisdictions in which our Sportsbook, DFS and iGaming product offerings are accessible. Also, the efforts we have taken to protect our proprietary rights may not be sufficient or effective. Any significant impairment of our intellectual property rights could harm our business or our ability to compete. Also, protecting our intellectual property rights is costly and time-consuming. Any unauthorized disclosure or use of our intellectual property could make it more expensive to do business, thereby harming our operating results. Furthermore, if we are unable to protect our proprietary rights or prevent unauthorized use or appropriation by third parties, the value of our brand and other intangible assets may be diminished, and competitors may be able to more effectively mimic our product offerings and services. Any of these events could have a material adverse impact on our business.

***We rely on licenses to use the intellectual property rights of third parties which are incorporated into our product offerings and services. Failure to renew or expand existing licenses may require us to modify, limit or discontinue certain product offerings, which could materially affect our business, financial condition and results of operations.***

We rely on products, technologies and intellectual property that we license from third parties for use in our product offerings and our gaming software services. Substantially all of our product offerings and services use intellectual property licensed from third parties. The future success of our business depends, in part, on our ability to obtain, retain and/or expand licenses for popular technologies and games in a competitive market. We cannot assure you that these third-party licenses, or support for such licensed products and technologies, will continue to be available to us on commercially reasonable terms, if at all. In the event that we cannot renew and/or expand existing licenses, we may be required to discontinue or limit our use of the product offerings that include or incorporate the licensed intellectual property.

Some of our license agreements contain minimum guaranteed royalty payments to the third party. If we are unable to generate sufficient revenue to offset the minimum guaranteed royalty payments, it could have a material adverse effect on our results of operations, cash flows and financial condition. Our license agreements generally allow for assignment in the event of a strategic transaction but contain some limited termination rights post-assignment. Certain of our license agreements grant the licensor rights to audit our use of their intellectual property. Disputes with licensors over uses or terms could result in the payment of additional royalties or penalties by us, cancellation or non-renewal of the underlying license or litigation.

The regulatory review process and licensing requirements also may preclude us from using technologies owned or developed by third parties if those parties are unwilling to subject themselves to regulatory review or do not meet regulatory requirements. Certain gaming authorities require gaming manufacturers to obtain approval before engaging in certain transactions, such as acquisitions, mergers, reorganizations, financings, stock offerings and share repurchases. Obtaining such approvals can be costly and time consuming, and we cannot assure you that such approvals will be granted or obtained on acceptable terms, or at all, or that the approval process will not result in delays or disruptions to our strategic objectives.

***Our insurance may not provide adequate levels of coverage against claims.***

We maintain insurance that we believe is customary for businesses of our size and type. However, there are types of losses we may incur that cannot be insured against or that we believe are not economically reasonable to insure. Moreover, any loss

37

A457

incurred could exceed policy limits and policy payments made to us may not be made on a timely basis. Such losses could adversely affect our business prospects, results of operations, cash flows and financial condition.

***We may incur successor liabilities due to conduct arising prior to the completion of the DEAC Business Combination.***

We may be subject to certain liabilities of DK Crown Holdings Inc. (formerly DraftKings Inc.), a Delaware corporation ("DK DE"), and SBTech. For example, DK DE and SBTech at times may each become subject to litigation claims in the operation of its business, including, but not limited to, with respect to employee matters and contract matters. From time to time, we may also face intellectual property infringement, misappropriation, or invalidity/non-infringement claims from third parties, and some of these claims may lead to litigation. We may initiate claims to assert or defend their own intellectual property against third parties. Any litigation may be expensive and time-consuming and could divert management's attention from its business and negatively affect its operating results or financial condition. The outcome of any litigation cannot be guaranteed, and adverse outcomes can affect us negatively.

We currently are, and in the future may be, the subject of inquiry and investigation by governmental authorities, which could in turn lead to fines, as the regulatory landscape of sports betting and iGaming changes.

***Our non-U.S. operations expose us to certain foreign currency transaction and translation risks. As a result, changes in the valuation of the U.S. dollar in relation to other currencies could have positive or negative effects on our profit and financial position.***

Our non-U.S. operations expose us to foreign currency transaction and translation risks. Currency transaction risk occurs in conjunction with purchases and sales of products and services that are made in currencies other than the local currency of the subsidiary involved, for example if the parent company pays, or transfers U.S. dollars to a subsidiary in order to fund its expenses in local currencies. Currency translation risks occurs when the income statement and balance sheet of a foreign subsidiary is converted into currencies other than the local currency of the company involved, for example when the results of these subsidiaries are consolidated in the results of a parent company with a different reporting currency. As a result, our non-U.S. operations historically have been, and will continue to be, exposed to currency transaction risk relating to adverse movements in foreign currency exchange rates, which may adversely impact our financial positions and results of operations.

Our functional currency is the U.S. dollar, and as a result, we will be subject to foreign currency fluctuation due to operations by subsidiaries in non-U.S. jurisdictions, including our SBTech operations and the offering of our Sportsbook and iGaming product offerings in Ontario, Canada, and the fact that certain of our revenues, operating expenses and assets and liabilities are non-U.S. dollar denominated. For example, an increase in the value of non-U.S. dollar currencies against the U.S. dollar could increase costs for delivery of products and services and also increase cost of local operating expenses and procurement of materials or services that we must purchase in foreign currencies by increasing labor and other costs that are denominated in such local currencies. These risks related to exchange rate fluctuations may increase in future periods in the event that our non-U.S. operations expand. In 2023 and 2022, our exposure to foreign currency transaction and translation risks were not material. While we do not otherwise hedge our foreign exchange exposure, we may consider doing so in the future.

Foreign currency exchange rate volatility, as well as the cost of any hedging arrangements entered into in the future, may negatively affect our financial position and results of operations, and may adversely impact the comparability of results between periods.

**Risk Factors Relating to our Indebtedness**

***We have substantial debt outstanding and may incur additional debt.***

As of December 31, 2023, our total long-term debt was approximately $1,253.8 million, net of issuance costs. Our debt levels could have significant consequences, including:

- making it more difficult to satisfy our obligations;

- a dilutive effect on our outstanding equity capital or future earnings;

- increasing our vulnerability to general adverse economic conditions;

38

A458

- requiring us to devote a substantial portion of our cash to make payments on our debt, thereby reducing the amount of cash available for other purposes. As a result, we would have limited financial and operating flexibility in responding to changing economic and competitive conditions;

- limiting our ability to raise additional debt because it may be more difficult for us to obtain debt financing on attractive terms; and

- placing us at a disadvantage compared to our competitors that are less leveraged.

In addition, we may incur substantial additional debt in the future. The terms of the indenture governing our zero-coupon convertible senior notes in an aggregate principal amount of $1,265.0 million, which includes proceeds from the full exercise of the over-allotment option (collectively, the "Convertible Notes"), and the loan and security agreement with Pacific Western Bank and Citizens Bank, as lenders, which provides the Company with a revolving line of credit of up to $125.0 million, permit us to incur additional debt, subject to certain limitations set forth therein. If new debt is incurred in addition to our current debt levels, the foregoing risks may be augmented.

***The conditional conversion features of the Convertible Notes, if triggered, may adversely affect our financial condition and operating results.***

In the event the conditional conversion features of the Convertible Notes are triggered, holders of the Convertible Notes will be entitled to convert the Convertible Notes at any time during specified periods at their option. If one or more holders elect to convert their Convertible Notes, unless we elect to satisfy our conversion obligation by delivering solely shares of our Class A common stock, we would be required to make cash payments to satisfy all or a portion of our conversion obligation based on the conversion rate, which could adversely affect our liquidity. In addition, even if holders do not elect to convert their Convertible Notes, we could be required under applicable accounting rules to reclassify all or a portion of the outstanding principal of the Convertible Notes as a current rather than long-term liability, which could result in a material reduction of our net working capital.

***The Capped Call Transactions may affect the value of the Convertible Notes and our Class A common stock.***

In connection with the issuance of the Convertible Notes, we entered into privately negotiated capped call transactions (the "Capped Call Transactions") with certain counterparties (the "Hedge Counterparties"). The Capped Call Transactions are expected to reduce the potential dilution to the holders of our Class A common stock and/or offset potential cash payments we are required to make in excess of the principal amount upon conversion of the Convertible Notes. In connection with establishing its initial hedge of a Capped Call Transaction, the applicable Hedge Counterparty and/or its affiliates may have purchased shares of our Class A common stock and/or entered into various derivative transactions with respect to our Class A common stock concurrently with or shortly after the pricing of the Convertible Notes.

This activity may increase (or reduce the size of any decrease in) the market price of our Class A common stock or the Convertible Notes at that time. In addition, each Hedge Counterparty or an affiliate thereof may modify its hedge position by entering into or unwinding various derivatives with respect to our Class A common stock and/or purchasing or selling our Class A common stock or other securities of ours in secondary market transactions prior to the maturity of the Convertible Notes (and are likely to do so during any observation period related to a conversion of Convertible Notes). Any of these activities could cause or prevent an increase or decline in the market price of our Class A common stock or the Convertible Notes. In addition, if the Capped Call Transactions fail to become effective, each Hedge Counterparty may unwind its hedge position with respect to our Class A common stock, which could adversely affect trading in and the value of our Class A common stock and the value of the Convertible Notes.

***We are subject to counterparty risk with respect to the Capped Call Transactions.***

The Hedge Counterparties to the Capped Call Transactions are financial institutions, and we will be subject to the risk that the Hedge Counterparties may default or otherwise fail to perform, or may exercise certain rights to terminate, their obligations under the Capped Call Transactions. Our exposure to the credit risk of the Hedge Counterparties under the Capped Call Transactions will not be secured by any collateral. In the past, economic conditions have resulted in the actual or perceived failure or financial difficulties of a number of financial institutions, including the bankruptcy of Lehman Brothers Holdings Inc. and various of its affiliates. If a Hedge Counterparty becomes subject to insolvency proceedings, we will be an unsecured creditor in those proceedings with a claim equal to our exposure at that time under our transactions with them. Our exposure

A459

will depend on many factors. Generally, the increase in our exposure will be correlated to the increase in the market price and in the volatility of our Class A common stock. In addition, as a result of a default by any counterparty to the Capped Call Transactions, we may suffer more dilution than we currently anticipate with respect to our Class A common stock. We can provide no assurances as to the financial stability or viability of any counterparty under the Capped Call Transactions.

**Risk Factors Relating to Our Common Stock**

***The trading price of our Class A common stock has been, and will likely continue to be, volatile and you could lose all or part of your investment.***

The trading price of our Class A common stock has been, and will likely continue to be, volatile and subject to wide fluctuations in response to various factors, some of which are beyond our control. Any of the factors listed below could have a material adverse effect on your investment in our Class A common stock, and our Class A common stock may trade at prices significantly below the price you paid for them. In such circumstances, the trading price of our securities may not recover and may experience a further decline.

Factors affecting the trading price of our Class A common stock may include:

- actual or anticipated fluctuations in our quarterly financial results or the quarterly financial results of companies perceived to be similar to us;

- changes in the market's expectations about our operating results;

- success of competitors;

- lack of adjacent competitors;

- our operating results failing to meet the expectation of securities analysts or investors in a particular period;

- changes in financial estimates and recommendations by securities analysts concerning DraftKings or the industries in which we operate in general;

- operating and stock price performance of other companies that investors deem comparable to us;

- our ability to market new and enhanced product offerings and services on a timely basis;

- changes in laws and regulations affecting our business;

- commencement of, or involvement in, litigation involving us;

- changes in our capital structure, such as future issuances of securities or the incurrence of additional debt;

- the volume of shares of our Class A common stock available for public sale;

- any major change in our board of directors or management;

- sales of substantial amounts of our Class A common stock by our directors, executive officers or significant stockholders or the perception that such sales could occur; and

- general economic and political conditions such as recessions, inflation, rising interest rates, fuel prices, international currency fluctuations and acts of war or terrorism.

Broad market and industry factors may materially harm the market price of our Class A common stock irrespective of our operating performance. The stock market in general, and securities traded on Nasdaq in particular, have experienced price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of the affected companies. The trading prices and valuations of these stocks, and of our Class A common stock, may not be predictable. A loss of investor confidence in the market for the stocks of other companies which investors perceive to be similar to us could depress our stock price regardless of our business, prospects, financial conditions or results of operations. A decline in the market price of our Class A common stock also could adversely affect our ability to issue additional securities and our ability to obtain additional financing in the future.

A460

*Sales of substantial amounts of Class A common stock in the public market, or the perception that such sales may occur, could cause the market price for our Class A common stock to decline.*

The sale of shares of our Class A common stock in the public market, or the perception that such sales could occur, could harm the prevailing market price of shares of our Class A common stock. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate.

There were a total of 472.7 million shares of our Class A common stock outstanding as of December 31, 2023. In addition, we have reserved shares of Class A common stock for issuance under the DraftKings Inc. 2020 Incentive Plan (the "Incentive Plan") and under the DraftKings Employee Stock Purchase Plan (the "ESPP"). Additionally, each of our Incentive Plan and ESPP currently provide for an automatic increase in the number of shares that will be reserved for issuance. Any shares of Class A common stock that we issue under our Incentive Plan, ESPP or other equity incentive plans that we may adopt in the future would dilute the percentage ownership held by holders of Class A common stock.

In connection with the DEAC Business Combination, the GNOG Transaction, and equity offerings by the Company, we, our executive officers and directors and selling stockholders entered into agreements restricting their ability to sell their shares of Class A common stock. As restrictions on resale end or if these stockholders exercise their sale, exchange or registration rights and sell shares or are perceived by the market as intending to sell shares, the market price of our shares of Class A common stock could drop significantly. These factors could also make it more difficult for us to raise additional funds through future offerings of our shares of Class A common stock or other securities.

In the future, we may also issue securities in connection with investments, acquisitions or capital raising activities. In particular, the number of shares of our Class A common stock issued in connection with an investment or acquisition, or to raise additional equity capital, could constitute a material portion of our then-outstanding shares of our Class A common stock. Any such issuance of additional securities in the future may result in additional dilution to you or may adversely impact the price of our Class A common stock.

*We may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and stock price, which could cause you to lose some or all of your investment.*

We may be forced to write-down or write-off assets, restructure our operations, or incur impairment or other charges that could result in losses. Even though these charges may be non-cash items and not have an immediate impact on our liquidity, the fact that we report charges of this nature could contribute to negative market perceptions about us or our securities. In addition, charges of this nature may cause us to violate net worth or other covenants to which we may be subject. Accordingly, a stockholder could suffer a reduction in the value of their shares of Class A common stock.

*The coverage of our business or our Class A common stock by securities or industry analysts or the absence thereof could adversely affect our securities and trading volume.*

The trading market for our Class A common stock is influenced in part by the research and other reports that industry or securities analysts publish about us or our business or industry from time to time. We do not control these analysts, or the content and opinions included in their reports. Analysts who publish information about our securities may have had relatively little experience with our Company given our limited history as a public company, which could affect their ability to accurately forecast our results and make it more likely that we fail to meet their estimates. If analysts do cover us and one or more of them downgrade our securities, or if they issue other unfavorable commentary about us or our industry or inaccurate research, our stock price would likely decline. Furthermore, if one or more of these analysts cease coverage or fail to regularly publish reports on us, we could lose visibility in the financial markets. Any of the foregoing would likely cause our stock price and trading volume to decline.

*Because we are a "controlled company" under The Nasdaq Stock Market listing standards, our stockholders may not have certain corporate governance protections that are available to stockholders of companies that are not controlled companies.*

So long as more than 50% of the voting power for the election of directors of DraftKings Inc. is held by an individual, a group or another company, we will qualify as a "controlled company" under The Nasdaq Stock Market listing requirements. Mr. Robins controls a majority of the voting power of our outstanding capital stock. As a result, we are a "controlled company"

41

A461

under The Nasdaq Stock Market listing standards and are not subject to the requirements that would otherwise require us to have: (i) a majority of independent directors; (ii) a nominating committee comprised solely of independent directors; (iii) compensation of our executive officers determined by a majority of the independent directors or a compensation committee comprised solely of independent directors; and (iv) director nominees selected, or recommended for the Board's selection, either by a majority of the independent directors or a nominating committee comprised solely of independent directors.

Mr. Robins may have his interest in DraftKings diluted due to future equity issuances or his own actions in selling shares of Class A common stock, in each case, which could result in a loss of the "controlled company" exemption under The Nasdaq Stock Market listing rules. We would then be required to comply with those provisions of The Nasdaq Stock Market listing requirements.

***Our dual class structure has the effect of concentrating voting power with our Chief Executive Officer and Chairman, which limits an investor's ability to influence the outcome of important transactions, including a change in control.***

Shares of our Class B common stock are entitled to 10 votes per share, while shares of our Class A common stock are entitled to one vote per share. Mr. Robins, our Chief Executive Officer and Chairman, holds all of the issued and outstanding shares of our Class B common stock. Accordingly, Mr. Robins holds approximately 89% of the voting power of our capital stock and will be able to control matters submitted to our stockholders for approval, including the election of directors, amendments of our organizational documents and any merger, consolidation, sale of all or substantially all of our assets or other major corporate transactions. Mr. Robins may have interests that differ from yours and may vote in a way with which you disagree, and which may be adverse to your interests. This concentrated control may have the effect of delaying, preventing or deterring a change in control of DraftKings, could deprive our stockholders of an opportunity to receive a premium for their capital stock as part of a sale of DraftKings, and might ultimately affect the market price of shares of our Class A common stock.

***Our dual class structure may affect the trading price of our Class A common stock.***

Our dual class structure may result in volatility in the market price of our Class A common stock whether due to adverse publicity or reaction from institutional or other investors or proxy advisory firms. For example, certain index providers have announced restrictions on including companies with multiple-class share structures in certain of their indices. In July 2017, FTSE Russell and S&P Dow Jones announced that they would cease to allow most newly public companies with dual or multi-class capital structures to be included in their indices. Beginning in 2017, MSCI, a leading stock index provider, opened public consultations on their treatment of no-vote and multi-class structures and temporarily barred new multi-class listings from certain of its indices; however, in October 2018, MSCI announced its decision to include equity securities "with unequal voting structures" in its indices and to launch a new index that specifically includes voting rights in its eligibility criteria. In 2023, S&P Dow Jones updated the share class eligibility rule to allow companies with multiple share class structures to be included in the S&P Composite 1500 Index and its component indices including the S&P 500. After this rule change by S&P Dow Jones, the Russell 2000 has, and other indices may have, limitations on inclusion based on multiple share class structures. Under the announced policies, our dual class capital structure would make us ineligible for inclusion in certain indices, and as a result, mutual funds, exchange-traded funds and other investment vehicles that attempt to passively track those indices will not be investing in our stock. These policies are still fairly new and it is as of yet unclear what effect, if any, they will have on the valuations of publicly traded companies excluded from the indices, but it is possible that they may depress these valuations compared to those of other similar companies that are included. Because of our dual class structure, we have been and will likely continue to be excluded from certain of these indexes and we cannot assure you that other stock indexes will not take similar actions. Given the sustained flow of investment funds into passive strategies that seek to track certain indexes, exclusion from stock indexes would likely preclude investment by many of these funds and could make shares of our Class A common stock less attractive to other investors. As a result, the market price of shares of our Class A common stock could be adversely affected.

***Nevada law and provisions of our amended and restated articles of incorporation and amended and restated bylaws could make a takeover proposal more difficult.***

Our organizational documents are governed by Nevada law. Certain provisions of Nevada law and of our amended and restated articles of incorporation and amended and restated bylaws could discourage, delay, defer or prevent a merger, tender offer, proxy contest or other change of control transaction that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares of Class A common stock held by our stockholders. These provisions provide for, among other things:

42

A462

- the ability of our board of directors to issue one or more series of preferred stock;

- stockholder action by written consent only until the first time when Mr. Robins ceases to beneficially own a majority of the voting power of our capital stock;

- certain limitations on convening special stockholder meetings;

- advance notice for nominations of directors by stockholders and for stockholders to include matters to be considered at our annual meetings;

- amendment of certain provisions of the organizational documents only by the affirmative vote of (i) a majority of the voting power of our capital stock so long as Mr. Robins beneficially owns shares representing a majority of the voting power of our capital stock and (ii) at least two-thirds of the voting power of the capital stock from and after the time that Mr. Robins ceases to beneficially own shares representing a majority of the voting power of our voting stock; and

- a dual class common stock structure, which provides Mr. Robins with the ability to control the outcome of matters requiring stockholder approval, even though Mr. Robins owns less than a majority of the outstanding shares of our capital stock.

These anti-takeover provisions as well as certain provisions of Nevada law could make it more difficult for a third party to acquire DraftKings, even if the third party's offer may be considered beneficial by many of our stockholders. As a result, our stockholders may be limited in their ability to obtain a premium for their shares of Class A common stock. If prospective takeovers are not consummated for any reason, we may experience negative reactions from the financial markets, including negative impacts on the price of our Class A common stock. These provisions could also discourage proxy contests and make it more difficult for our stockholders to elect directors of their choosing and to cause us to take other corporate actions.

***Our amended and restated articles of incorporation designate the Eighth Judicial District Court of Clark County, Nevada as the exclusive forum for certain types of actions and proceedings that may be initiated by our stockholders, which could limit stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, employees or agents.***

Our amended and restated articles of incorporation require that, to the fullest extent permitted by law, and unless we otherwise consent in writing to the selection of an alternative forum, the Eighth Judicial District Court of Clark County, Nevada (or if the Eighth Judicial District Court of Clark County, Nevada does not have jurisdiction, any other state district court located in the State of Nevada, and if no state district court in the State of Nevada has jurisdiction, any federal court located in the State of Nevada), will be the exclusive forum for each of the following:

- any action or proceeding brought in the name or right of DraftKings or on its behalf;

- any action asserting a claim for breach of any fiduciary duty owed by any director, officer, employee or agent of DraftKings to DraftKings or its stockholders;

- any action asserting a claim arising pursuant to any provision of NRS Chapters 78 or 92A, our amended and restated articles of incorporation or our amended and restated bylaws;

- any action to interpret, apply, enforce or determine the validity of our amended and restated articles of incorporation or our amended and restated bylaws; or

- any action asserting a claim governed by the internal affairs doctrine.

The exclusive forum provision provides federal courts located in the State of Nevada as the forum for suits brought to enforce any duty or liability for which Section 27 of the Exchange Act establishes exclusive jurisdiction with the federal courts, or any other claim for which the federal courts have exclusive jurisdiction. In addition, Section 22 of the Securities Act of 1933, as amended (the "Securities Act"), provides that federal and state courts have concurrent jurisdiction over lawsuits brought under the Securities Act or the rules and regulations thereunder. To the extent the exclusive forum provision restricts the courts in which claims arising under the Securities Act may be brought, there is uncertainty as to whether a court would enforce such a provision. We note that investors cannot waive compliance with the federal securities laws and the rules and regulations thereunder. Although we believe this provision will benefit DraftKings by providing increased consistency in the application of

43

A463

Nevada law in the types of lawsuits to which it applies, the provision may have the effect of discouraging lawsuits against our directors and officers.

**Item 1B. Unresolved Staff Comments.**

None.

**Item 1C. Cybersecurity**

The Company maintains a governance structure to address cybersecurity risk, which involves a dedicated Security Operations Team (the "Security Operations Team"), an executive security steering committee (the "Executive Security Steering Committee"), and the Compliance and Risk Committee of the Board and the Board.

The Company's Security Operations Team, led by our Chief Information Security Officer, is responsible for identifying, assessing, mitigating, and reporting on material cybersecurity risks to the Company's Executive Security Steering Committee. The Company's Chief Information Security Officer holds high-level licenses and certifications relating to information security, including a Certified Information Security Manager from the Information Systems Audit and Control Association and a Certified Information Systems Security Professional and a Certified Cloud Security Professional from the International Information Security System Security Certification Consortium. The Company's Executive Security Steering Committee, chaired by the Company's Chief Information Security Officer and comprised of various cross-functional members of senior management, drives awareness and alignment across broad stakeholder groups for cybersecurity governance and risk management and reporting. The Executive Security Steering Committee receives quarterly reports from the Company's Chief Information Security Officer. The Compliance and Risk Committee receives regular reports from the Company's Chief Information Security Officer. The Compliance and Risk Committee periodically reports to the Board.

The Company maintains an operational Incident Response Plan ("IRP") that defines how the Company handles cyber incidents, including escalation, reporting and remediation procedures. The IRP is reviewed annually both internally and by third parties during regular audits. In addition, the Company retains a preferred partner with expertise in cyber risks and incidents to advise on cybersecurity related matters. The Company's preferred partner is also part of the Company's IRP procedures and provides independent analysis and advice during cybersecurity investigations. The Company also maintains a Security Awareness Program, which is designed, implemented, and maintained by the Company's Chief Information Security Officer. The Company's Security Awareness Program includes training that reinforces the Company's information technology risk and security management policies, standards and practices, as well as the expectation that employees comply with these policies. The Security Awareness Program engages personnel through training on how to identify potential cybersecurity risks and protect the Company's resources and information, as well as how to respond to unauthorized access to or use of Company information. The Security Awareness Program training is mandatory for all employees globally at least annually, and it is supplemented by Company-wide assessment initiatives, including periodic testing. The Company provides specialized security training for certain employee roles, such as application developers.

The Company conducts periodic tests to assess the Company's processes and procedures and the threat landscape, which are designed with the goal of implementing and maintaining a robust cybersecurity program. Where appropriate, the Company takes additional and ongoing steps intended to strengthen the Company's cybersecurity capabilities and mitigate the risk of a breach or incident. The Company's security program and IT-related controls are regularly examined by internal auditors, external auditors and various regulators. For example, each year, the Company conducts various third-party audits, including SOC 2 Type2, PCI DSS, ISO 27001. The Company also engages third-party consultants for incident responses. These third-party consultants report directly to the Chief Information Security Officer and, depending on the nature of the incident, report directly to the Executive Security Steering Committee on various topics including, effects of the incident and recommendations on how to strengthen the Company's cybersecurity capabilities and mitigate the risk of a breach or incident. In addition to assessing the Company's cybersecurity preparedness, the Company also considers and evaluates cybersecurity risks associated with its use of third-party service providers. The Company maintains a vendor onboarding program, pursuant to which the Company regularly reviews third-party hosted applications and, when available, requests its vendors to provide SOC2 and/or ISO 27001 certificates. The Company's assessment of risks associated with use of third-party providers is part of the Company's overall cybersecurity risk management program.

Although we have designed our cybersecurity program and governance procedures above to mitigate cybersecurity risks, we face unknown cybersecurity risks, threats and attacks. To date, these risks, threats or attacks have not had a material impact on our operations, business strategy or financial results, but we cannot provide assurance that they will not have a material impact in the future. See the section entitled "Risk Factors" included elsewhere in this Annual Report for further information. We continuously work to enhance our cybersecurity risk management program.

**Item 2. Properties.**

44

A464

As of December 31, 2023, we had approximately 350,000 square feet of leased office space. Our corporate headquarters is located in Boston, Massachusetts and consists of approximately 125,000 square feet under a lease that expires in 2029, subject to our option to extend the term for two successive terms of five years each, or our right to early termination. Our lease and our rights under this lease are subordinated under a lien of mortgage. In addition to our corporate headquarters, we lease properties in several other cities in the United States, as well as in Ireland, Bulgaria, Ukraine, Israel and the United Kingdom. We use our corporate headquarters and our other facilities primarily for our management, technology, product design, sales and marketing, finance, legal, human resources, general administrative and information technology teams.

We believe that our current facilities are adequate to meet our needs for the immediate future and that suitable additional space will be available to accommodate any expansion of our operations as needed.

**Item 3. Legal Proceedings.**

We are involved in a number of legal proceedings (including those described below) concerning matters arising in connection with the conduct of our business activities. These proceedings are at varying stages, and many of these proceedings seek an indeterminate amount of damages. We regularly evaluate the status of the legal proceedings in which we are involved to assess whether a loss is probable or there is a reasonable possibility that a loss or an additional loss may have been incurred and to determine if accruals are appropriate. If accruals are not appropriate, we further evaluate each legal proceeding to assess whether an estimate of the possible loss or range of possible loss can be made.

For certain cases described on the following pages, management is unable to provide a meaningful estimate of the possible loss or range of possible loss because, among other reasons, (i) the proceedings are in various stages; (ii) damages have not been sought; (iii) damages are unsupported and/or exaggerated; (iv) there is uncertainty as to the outcome of pending appeals or motions; (v) there are significant factual issues to be resolved; and/or (vi) there are novel legal issues or unsettled legal theories to be presented or a large number of parties involved. For these cases, however, management does not believe, based on currently available information, that the outcomes of these proceedings will have a material adverse effect on our financial condition, though the outcomes could be material to our operating results for any particular period, depending, in part, upon the operating results for such period.

*Attorney General of Texas*

On January 19, 2016, the Texas Attorney General issued an opinion letter that "odds are favorable that a court would conclude that participation in paid daily fantasy sports leagues constitutes illegal gambling" under Texas law. In response to the opinion letter, we sued the Texas Attorney General on March 4, 2016 in Dallas County, Texas.

The lawsuit makes five claims: (1) a claim for a declaratory judgment that daily fantasy sports contests do not violate Texas law; (2) a claim of denial of due process under the Fifth and Fourteenth Amendments to the U.S. Constitution; (3) a claim of denial of due course of law under Article I of the Texas Constitution; (4) a claim of denial of equal protection under the Fourteenth Amendment to the U.S. Constitution; and (5) a claim of denial of equal rights under Article I of the Texas Constitution. We are also seeking reimbursement of our costs and attorneys' fees.

On May 2, 2016, the Texas Attorney General filed a motion to transfer venue to Travis County, Texas. On April 16, 2018, the parties filed a notice of agreed non-suit without prejudice, and we re-filed our lawsuit against the Texas Attorney General in Travis County. On April 17, 2018, the Dallas County court granted the parties' agreed non-suit without prejudice, thereby dismissing the Dallas County lawsuit without prejudice.

On May 24, 2018, the Texas Attorney General answered the complaint filed in Travis County, Texas.

FanDuel filed a petition in intervention on August 24, 2018, seeking essentially the same relief as the Company seeks. The Court entered an updated scheduling order setting the case for a non-jury trial on April 20, 2021. The parties subsequently filed an agreed motion to extend the scheduling order seeking, among other things, to change the non-jury trial date to January 27, 2025.

We intend to vigorously pursue our claims. In the event a court ultimately determines that daily fantasy sports contests violate Texas law, that determination could cause financial harm to us and loss of business in Texas.

We cannot predict with any degree of certainty the outcome of these matters or determine the extent of any potential liabilities.

45

A465

We do not believe, based on currently available information, that the outcome of this proceeding will have a material adverse effect on our financial condition, although the outcome could be material to our operating results for any particular period, depending, in part, upon the operating results for such period.

*Interactive Games LLC*

On June 14, 2019, Interactive Games LLC ("IG") filed suit against us in the U.S. District Court for the District of Delaware. In the Complaint, IG alleges that our DFS product offering infringes two patents: U.S. Patent No. 8,956,231 (the "231 Patent"), which is entitled "Multi-process communication regarding gaming information", and U.S. Patent No. 8,974,302 (the "302 Patent"), which is entitled "Multi-process communication regarding gaming information." That same Complaint alleges that our Sportsbook product offering infringes two additional patents: U.S. Patent No. 8,616,967 (the "967 Patent"), which is entitled "System and method for convenience gaming" and U.S. Patent No. 9,430,901 (the "901 Patent"), which is entitled "System and method for wireless gaming with location determination." All four of these patents are collectively referred to as the "IG Patents."

In response to the complaint, we filed a motion to dismiss the complaint under 35 U.S.C. Section 101, asserting the IG Patents are directed to non-patentable subject matter. The Court has not yet ruled on that motion, as the judge previously stayed the District Court litigation pending resolution of the inter partes reviews and dismissed the motion to dismiss (without ruling on the merits), but granted leave to refile such motion with updated briefing if the stay is lifted.

On June 17, 2020, we filed petitions for inter partes review with the Patent Trial and Appeal Board (the "PTAB") challenging the validity of each of the IG Patents. The PTAB instituted review for the '901 Patent, the '231 Patent, and the '967 Patent but denied institution for the '302 Patent. On February 5, 2021, we filed a request for rehearing regarding the decision on the '302 Patent, which was denied by the PTAB on March 2, 2021. On October 13, 2021, the PTAB heard oral argument on the '901 Patent, the '231 Patent, and the '967 Patent. On January 4, 2022, the PTAB issued a final written decision finding all challenged claims of the '901 Patent, the '231 Patent, and the '967 Patent unpatentable. On March 8, 2022, IG appealed the final written decisions for all three instituted inter partes reviews. On April 19, 2022, IG moved to voluntarily dismiss the appeal for the inter partes review related to the '901 Patent, which was granted on April 20, 2022. On July 15, 2022, IG filed its opening briefs in the appeals of the inter partes reviews for the '231 Patent and '967 Patent. On October 5, 2022, we filed our responsive briefs in the appeals of the IPRs related to the '231 Patent and '967 Patent. On November 23, 2022, IG filed its reply briefs in the appeals of the IPRs related to the '231 Patent and '967 Patent. Oral argument for both appeals was held on June 7, 2023. On June 9, 2023, the Federal Circuit affirmed the PTAB's decisions for the IPRs related to both the '231 Patent and '967 Patent.

The '302 Patent is currently subject to an ex parte reexamination proceeding at the U.S. Patent and Trademark Office (U.S. Patent Application No. 90/015,151) (the "'302 Reexam"). On October 31, 2023, a final office action was issued in the '302 Reexam, rejecting and objecting to certain claims in the '302 Patent.

The District Court litigation remains stayed pending resolution of both: (1) all appeals from the inter partes reviews, and (2) the '302 Reexam and any subsequent appeals therefrom.

We intend to vigorously defend this case. In the event that a court ultimately determines that we are infringing the asserted patents, we may be subject to substantial damages, which may include treble damages and/or an injunction that could require us to modify certain features that we currently offer.

We cannot predict with any degree of certainty the outcome of this matter or determine the extent of any potential liabilities. We also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in this matter could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, we do not believe, based on currently available information, that the outcome of this proceeding will have a material adverse effect on our financial condition, although the outcome could be material to our operating results for any particular period, depending, in part, upon the operating results for such period.

*Winview Inc.*

46

A466

On July 7, 2021, Winview Inc., a Delaware corporation ("Winview") filed suit against the Company in the U.S. District Court for the District of New Jersey. In the complaint, Winview alleges that the Company infringes two patents: U.S. Patent No. 9,878,243 ("the '243 Patent"), entitled "Methodology for Equalizing Systemic Latencies in Television Reception in Connection with Games of Skill Played in Connection with Live Television Programming", and U.S. Patent No. 10,721,543 ("the '543 Patent"), entitled "Method of and System for Managing Client Resources and Assets for Activities on Computing Devices". The allegations based on the '243 Patent are directed to Sportsbook, and the allegations based on the '543 Patent are directed to both Sportsbook and DFS.

On July 28, 2021, Winview filed an amended complaint, in which it alleges that the Company infringes two additional patents: U.S. Patent No. 9,993,730 ("the '730 Patent"), entitled "Methodology for Equalizing Systemic Latencies in Television Reception in Connection with Games of Skill Played in Connection with Live Television Programming", and U.S. Patent No. 10,806,988 ("the '988 Patent"), entitled "Method Of and System For Conducting Multiple Contests of Skill with a Single Performance". The allegations based on the '730 Patent are directed at Sportsbook, and the allegations based on the '988 Patent are directed at DFS.

On October 4, 2021, we filed a motion to dismiss Winview's direct infringement claims for the '543 Patent and the '730 Patent, as well as its claims for willful, induced, and contributory infringement for all four asserted patents. On October 29, 2021, the parties filed a stipulation that allowed Winview to file a second amended complaint on or before November 15, 2021, which the court signed and ordered on November 1, 2021.

On November 15, 2021, Winview filed a second amended complaint (the "SAC"), adding as defendants DK Crown Holdings Inc. and Crown Gaming Inc., a Delaware corporation, which are wholly-owned subsidiaries of the Company. The SAC, among other allegations, repeats the allegations of the first amended complaint that the defendants infringe the '243 Patent, the '543 Patent, the '730 Patent, and the '988 Patent. On December 15, 2021, the Company filed its motion to dismiss the SAC, again arguing that Winview failed to state a claim for direct infringement of the '543 Patent and the '730 Patent, and for willful, induced, and contributory infringement for all four asserted patents. Winview filed its memorandum in opposition to the motion to dismiss on January 24, 2022, and the Company filed its reply brief to Winview's opposition on January 31, 2022.

On August 3, 2022, we filed a petition for inter partes review with the PTAB challenging the validity of the '243 Patent. On September 20, 2022, the court entered an order staying the pending motion to dismiss and staying all discovery pending final resolution of the petition for inter partes review through a final written decision. On January 31, 2023, the PTAB granted institution of the inter partes review, and it is expected to issue a final written decision by January 31, 2024. On February 15, 2023, the District Court administratively terminated the lawsuit pending the PTAB's final written decision. On January 29, 2024, the PTAB issued final written decisions in the IPRs, finding unpatentable all challenged claims of the '243, '543, and '730 Patents.

We intend to vigorously defend this case. In the event that a court ultimately determines that we are infringing the asserted patents, we may be subject to substantial damages, which may include treble damages and/or an injunction that could require us to modify certain features that we currently offer.

We cannot predict with any degree of certainty the outcome of this matter or determine the extent of any potential liabilities. We also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in this matter could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, we do not believe, based on currently available information, that the outcome of this proceeding will have a material adverse effect on our financial condition, although the outcome could be material to our operating results for any particular period, depending, in part, upon the operating results for such period.

*Securities Matters Arising From the Hindenburg Report and Related Matters*

Beginning on July 9, 2021, the Company received subpoenas from the SEC seeking documents concerning, among other things, certain of the allegations concerning SBTech that were contained in a report published about the Company on June 15, 2021 by Hindenburg Research, as well as the Company's adherence to and disclosures regarding its compliance policies and procedures, and related matters. The Company intends to comply with the related requests and is cooperating with the SEC's ongoing inquiry.

A467

We cannot predict with any degree of certainty the outcome of the SEC matter or determine the extent of any potential liabilities. We also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in the SEC matter could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, we do not believe, based on currently available information, that the outcome of the SEC matter will have a material adverse effect on our financial condition, although the outcome could be material to our operating results for any particular period, depending, in part, upon the operating results for such period.

*Matters Related to the GNOG Transaction*

On August 12, 2022, a putative class action was filed in Nevada state District Court in Clark County against Golden Nugget Online Gaming, Inc. ("GNOG Inc."), the Company and one of its officers and two affiliates, as well as former officers or directors and the former controlling stockholder of GNOG Inc. and Jefferies LLC. The lawsuit asserts claims on behalf of a putative class of former minority stockholders of GNOG Inc. alleging that certain former officers and directors of GNOG Inc. and its former controlling stockholder (Tilman Fertitta and/or Fertitta Entertainment, Inc.) breached their fiduciary duties to minority stockholders of GNOG Inc. in connection with the GNOG Transaction, and the other defendants aided and abetted the alleged breaches of fiduciary duty. On November 1, 2022, defendants filed motions to dismiss the action on the procedural grounds of improper forum and lack of personal jurisdiction over certain defendants or, in the alternative, to stay the action pending resolution of parallel proceedings in the Delaware Court of Chancery. On May 24, 2023, the court (i) granted the motions to dismiss for improper forum with respect to GNOG Inc. and its former officers and directors other than Mr. Fertitta, as well as Jefferies LLC, (ii) denied the motions to dismiss for improper forum with respect to the Company and its officer and two affiliates, as well as Mr. Fertitta and Fertitta Entertainment, Inc., and (iii) granted the non-dismissed defendants' alternative request to stay the action for at least nine months pending resolution of parallel proceedings in the Delaware Court of Chancery. On June 29, 2023, the plaintiff filed a motion for reconsideration of the court's order insofar as it found certain claims subject to a Delaware forum requirement. On July 27, 2023, defendants filed oppositions to the plaintiff's motion for reconsideration, and certain defendants filed countermotions for certification of final judgment as to the claims that the court previously dismissed pursuant to its May 24, 2023 order. On October 1, 2023, the court entered an order (1) denying the motion for reconsideration and (2) granting the motion for certification of final judgment as to the defendants whose claims against them previously were dismissed. On January 18, 2024, the court entered a stipulated order extending the stay until resolution of the parallel proceedings in Delaware Chancery Court.

On September 9, 2022, two similar putative class actions were filed in the Delaware Court of Chancery against former directors of GNOG Inc. and its former controlling stockholder, one of which also names the Company and Jefferies Financial Group, Inc. as defendants. These pending actions in Delaware assert substantially similar claims on behalf of a putative class of former minority stockholders of GNOG Inc. alleging that certain former officers and directors of GNOG Inc. and its former controlling stockholder (Tilman Fertitta) breached their fiduciary duties to minority stockholders of GNOG Inc. in connection with the GNOG Transaction, and one of the actions also alleges that the Company and Jefferies Financial Group, Inc. aided and abetted the alleged breaches of fiduciary duty. On October 12, 2022, the Delaware Court of Chancery consolidated these two actions under the caption In re Golden Nugget Online Gaming, Inc. Stockholders Litigation. On October 29, 2022, the court appointed co-lead plaintiffs in the consolidated action. On November 3, 2022, co-lead plaintiffs designated an operative complaint in the consolidated action. On January 13, 2023, defendants filed a motion seeking dismissal of the action. On June 8, 2023, the court denied defendants' motion to dismiss. At a mediation held on January 24, 2024, the parties reached an agreement in principle to settle the Delaware action, subject to negotiation and execution of mutually agreeable definitive documentation and the performance and satisfaction of the terms and conditions set forth thereof.

The Company intends to vigorously defend against the Nevada action. The Company cannot predict with any degree of certainty the outcome the Nevada action or determine the extent of any potential liabilities. The Company also cannot provide an estimate of the possible loss or range of loss of the Nevada action. Any adverse outcome in the Nevada action could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of the Nevada action will have a material adverse effect on the Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

*AG 18, LLC d/b/a/ Arrow Gaming*

48

A468

On August 19, 2021, AG 18, LLC d/b/a/ Arrow Gaming ("Arrow Gaming") filed a complaint against the Company in the United States District Court for the District of New Jersey alleging that the Company's DFS and Casino product offerings infringe four patents. On October 12, 2021, Arrow Gaming filed an amended complaint to add one additional patent. The following U.S. Patents are asserted against one or both of the Company's DFS and Casino product offerings in the amended complaint: (1) U.S. Patent No. 9,613,498, entitled "Systems and Methods For Peer-to-Peer Gaming"; (2) U.S. Patent No. 9,978,205, entitled "Location Based Restrictions on Networked Gaming"; (3) U.S. Patent No. 10,497,220 entitled "Location Based Restrictions on Networked Gaming"; (4) U.S. Patent No. 10,614,657 entitled "Location Based Restrictions on Networked Gaming"; and (5) U.S. Patent No. 11,024,131 entitled "Location Based Restrictions on Networked Gaming" (collectively, the "Arrow Gaming Patents").

On November 9, 2021, we filed a motion to dismiss plaintiff's complaint. On November 10, 2021, we answered the complaint and filed counterclaims (the "Counterclaims"). In the Counterclaims we seek, among other things, a declaratory judgment that the Arrow Gaming Patents are invalid. On December 1, 2021, Arrow Gaming answered our Counterclaims. On December 20, 2021, Arrow Gaming filed a second amended complaint adding new allegations with respect to the alleged willful infringement.

On January 21, 2022, the Company filed a motion to dismiss plaintiff's second amended complaint. On February 22, 2022, plaintiff filed its opposition to the Company's motion to dismiss plaintiff's second amended complaint, and on March 25, 2022, the Company filed its reply thereto. On March 7, 2022, the Company filed a motion to disqualify plaintiff's counsel. On March 21, 2022, plaintiff filed its opposition to the Company's motion to disqualify plaintiff's counsel, and on March 28, 2022, the Company filed its reply thereto. On September 21, 2022, the Company's motion to dismiss was administratively terminated, pending the outcome of the disqualification motion. On October 4, 2022, the presiding Magistrate Judge denied the Company's motion to disqualify plaintiff's counsel. On October 21, 2022, the Company filed a renewed motion to dismiss plaintiff's complaint. On November 4, 2022, Arrow Gaming filed an opposition to the renewed motion to dismiss. On November 14, 2022, the Company filed its reply in support of the motion to dismiss. On November 4, 2022, the Company filed a motion to stay the case pending resolution of the below-referenced petitions for inter partes review. On November 23, 2022 Arrow Gaming filed an opposition to the motion to stay. On December 2, 2022, the Company filed a reply in support of the motion to stay.

Between August 22, 2022 and August 30, 2022, the Company filed petitions for inter partes review with the PTAB challenging the validity of each of the Arrow Gaming Patents. On March 14, 2023, the PTAB granted institution of all inter partes review petitions, and it is expected to issue final written decisions by March 14, 2024. On June 7, 2023, Arrow Gaming filed its responses to the petitions. On September 6, 2023, DraftKings filed its replies in support of the petitions. Oral argument occurred on December 13, 2023 and we are awaiting the final decision.

On April 3, 2023, the District Court administratively terminated the lawsuit pending the PTAB's final written decisions.

We intend to vigorously defend this case. In the event that a court ultimately determines that we are infringing the asserted patents, we may be subject to substantial damages, which may include treble damages and/or an injunction that could require us to modify certain features that we currently offer.

We cannot predict with any degree of certainty the outcome of this matter or determine the extent of any potential liabilities. We also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in this matter could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, we do not believe, based on currently available information, that the outcome of this proceeding will have a material adverse effect on our financial condition, although the outcome could be material to our operating results for any particular period, depending, in part, upon the operating results for such period.

*Beteiro, LLC*

On November 22, 2021, Beteiro, LLC ("Beteiro") filed a complaint against the Company in the United States District Court for the District of New Jersey alleging that the Company's Sportsbook and Casino product offerings infringe four patents. The following U.S. Patents are asserted against the Company's Sportsbook and Casino products in the complaint: U.S. Patent No. 9,965,920, entitled "Apparatus and Method for Facilitating Gaming Activity and/or Gambling Activity"; U.S. Patent No. 10,043,341, entitled "Apparatus and Method for Facilitating Gaming Activity and/or Gambling Activity"; U.S. Patent No.

A469

10,147,266, entitled "Apparatus and Method for Facilitating Gaming Activity and/or Gambling Activity"; and U.S. Patent No. 10,255,755, entitled "Apparatus and Method for Facilitating Gaming Activity and/or Gambling Activity" (collectively, the "Beteiro Patents").

The Company filed its motion to dismiss plaintiff's complaint on February 9, 2022. On April 7, 2022, Plaintiff filed its opposition to the Company's motion to dismiss, and on April 25, 2022, the Company filed its reply thereto. On September 7, 2022, the Company's motion to dismiss the complaint was granted. On September 22, 2022, Beteiro filed its notice to appeal the ruling on the motion to dismiss. On October 5, 2022, Beteiro filed a motion for reconsideration of the ruling on the motion to dismiss at the District Court, which was denied by the District Court on November 2, 2022. On March 9, 2023, Beteiro filed its opening appellate brief. DraftKings' responsive brief was filed on June 9, 2023. Beteiro's reply brief was filed on July 1, 2023.

On October 28, 2022, the Company filed petitions for inter partes review with the PTAB challenging the validity of each of the Beteiro Patents. Between May 11, 2023 and May 12, 2023, the PTAB instituted review for all Beteiro Patents. The PTAB is expected to issue a final written decision for the IPRs by May 12, 2024.

We intend to vigorously defend this case. In the event that a court ultimately determines that we are infringing the asserted patents, we may be subject to substantial damages, which may include treble damages and/or an injunction that could require us to modify certain features that we currently offer.

We cannot predict with any degree of certainty the outcome of this matter or determine the extent of any potential liabilities. We also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in this matter could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, we do not believe, based on currently available information, that the outcome of this proceeding will have a material adverse effect on our financial condition, although the outcome could be material to our operating results for any particular period, depending, in part, upon the operating results for such period.

*Diogenes Ltd. & Colossus (IOM) Ltd.*

On December 1, 2021, Diogenes Ltd. & Colossus (IOM) Ltd. ("Colossus"), filed a complaint against the Company in the United States District Court for the District of Delaware alleging that the Company's Sportsbook product offering infringes seven of its patents. The following U.S. Patents, each entitled "Wagering apparatus, methods and systems", are asserted against the Company's Sportsbook product offering in the complaint: U.S. Patent No. 8,721,439 ("the '439 patent"); U.S. Patent No. 9,117,341 ("the '341 patent"); U.S. Patent No. 9,275,516 ("the '516 patent"); U.S. Patent No. 9,424,716 ("the '716 patent"); U.S. Patent No. 9,704,338 ("the '338 patent"); U.S. Patent No. 10,970,969 ("the '969 patent"); and U.S. Patent No. 10,997,822 ("the '822 patent").

On January 24, 2022, the Company filed its motion to dismiss the original complaint. On February 7, 2022, Colossus filed an amended complaint (the "Amended Complaint") to, among other things, assert one additional patent against the Company, U.S. Patent No. 11,200,779 ("the '779 patent"). The patents asserted by Colossus are collectively referred to as the "Colossus Patents."

The Company filed its motion to dismiss the Amended Complaint on February 22, 2022. On March 15, 2022, plaintiffs filed their opposition to the Company's motion to dismiss, and on March 29, 2022, the Company's filed its reply thereto. On March 25, 2022, a scheduling order was entered in which, among other things, trial was scheduled for January 13, 2025. On July 18, 2022, Magistrate Judge Burke issued a report and recommendation (the "Report and Recommendation") that the motion to dismiss be granted-in-part and denied-in-part. The Company and Colossus each filed their objections to the Report and Recommendation on August 1, 2022. On August 26, 2022, District Court Judge Noreika overruled both parties' respective objections and adopted the Report and Recommendation of Magistrate Judge Burke regarding the motion to dismiss. On December 27, 2022, the Company filed an Answer to the Amended Complaint, including certain affirmative defenses. On January 17, 2023, Colossus filed a motion to strike the affirmative defense of unenforceability from the Company's Answer. On February 7, 2023, the Company filed an Amended Answer and Counterclaims to the Amended Complaint, and also filed a response to Colossus' motion to strike. On February 28, 2023, Colossus filed another motion to strike DraftKings' inequitable conduct affirmative defense and counterclaim. DraftKings filed its responsive brief on March 28, 2023. Colossus filed its reply brief on April 11, 2023. Magistrate Judge Burke held a hearing on Colossus' motion on June 6, 2023 and subsequently issued a report and recommendation (the "Second Report and Recommendation") that the motion be denied in part and granted in part.

50

A470

Colossus filed objections to the Second Report and Recommendation on June 21, 2023, and DraftKings filed its response to Colossus' objections on July 5, 2023. On August 2, 2023, Judge Noreika overruled Colossus' objections and adopted the Second Report and Recommendation.

Between November 29, 2022, and February 7, 2023, the Company filed petitions for inter partes review with the PTAB challenging the validity of the Colossus Patents. With respect to the seven patents remaining pending in the case, the PTAB granted institution of IPRs for each of the '341 patent, '969 patent, and the '822 patent. The PTAB is expected to issue final written decisions for these three IPRs by June 22, 2024. The PTAB denied institution of IPR for each of the '516 patent, '716 patent, '338 patent and the '779 patent. On September 11, 2023, the Company filed a request for Director review of the PTAB's decision not to institute review in the IPR for the '779 patent. On November 7, 2023, the Director of the U.S. Patent and Trademark Office delegated Director Review of the PTAB's institution decision in the IPR for the '779 Patent to the Delegated Review Panel to determine whether to grant rehearing.

On September 6, 2023, the parties stipulated to a stay of the district court litigation pending resolution of the instituted IPRs. The PTAB review of the '341, '969 and '822 patents are ongoing at this time.

We intend to vigorously defend this case. In the event that a court ultimately determines that we are infringing the asserted patents, we may be subject to substantial damages, which may include treble damages and/or an injunction that could require us to modify certain features that we currently offer.

We cannot predict with any degree of certainty the outcome of this matter or determine the extent of any potential liabilities. We also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in this matter could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, we do not believe, based on currently available information, that the outcome of this proceeding will have a material adverse effect on our financial condition, although the outcome could be material to our operating results for any particular period, depending, in part, upon the operating results for such period.

*Steiner*

Nelson Steiner filed suit against the Company and FanDuel Inc. in Florida state court on November 9, 2015. The action was subsequently transferred to In Re: Daily Fantasy Sports Litigation (Multi-District Litigation) (the "MDL"), and Mr. Steiner's action was consolidated into the MDL's amended complaint, which, in February 2016, consolidated numerous actions (primarily purported class actions) filed against the Company, FanDuel, and other related parties in courts across the United States. By June 23, 2022, the MDL was resolved, except for Mr. Steiner's action, and the court officially closed the MDL docket on July 8, 2022.

Mr. Steiner brings this action as a concerned citizen of the state of Florida alleging that, among other things, defendants' daily fantasy sports contests are illegal gambling under the state laws of Florida and seeks disgorgement of "gambling losses" purportedly suffered by Florida citizens on behalf of the state. On June 23, 2022, the MDL court remanded Mr. Steiner's action to the Circuit Court for Pinellas County, Florida. Plaintiff has not yet filed an amended pleading.

The Company intends to vigorously defend this suit. Any adverse outcome in this matter could subject the Company to substantial damages and it could be restricted from offering DFS contests in Florida. The Company cannot provide any assurance as to the outcome of this matter.

The Company cannot predict with any degree of certainty the outcome of the suit or determine the extent of any potential liability or damages. The Company also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in these matters could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of this matter will have a material adverse effect on Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

*Turley*

51

A471

On January 9, 2023, Simpson G. Turley, individually and on behalf of all others similarly situated, filed a purported class action against the Company in the United States District Court for the District of Massachusetts. Plaintiff alleges, among other things, that he was a contestant in the Company's daily fantasy showdown contest for the January 2, 2023, NFL game between the Cincinnati Bengals and the Buffalo Bills (the "Bengals-Bills Game"). The Bengals-Bills Game was postponed and eventually cancelled due to Damar Hamlin collapsing during the game. Plaintiff alleges that he was winning prizes in multiple showdown contests at the point in time that the Bengals-Bills Game was cancelled (with 5:58 remaining in the first quarter). Plaintiff alleges that, instead of paying out the prize money, the Company refunded entry fees to contestants that entered showdown or flash draft fantasy contests. On May 8, 2023, plaintiff Turley and a new plaintiff (Erik Ramos) filed a First Amended Class Action Complaint. On June 12, 2023, DraftKings filed a motion to dismiss the claims asserted by both plaintiffs or, in the alternative, strike the flash draft allegations. Plaintiffs filed an opposition on July 17, 2023. On August 3, 2023, Defendant filed its reply, and the motion remains pending. The plaintiffs assert claims for breach of contract, unfair and deceptive acts and practices, false advertising, and unjust enrichment. Among other things, plaintiffs seek statutory damages, monetary damages, punitive damages, attorney fees and interest.

The Company intends to vigorously defend this case. Any adverse outcome in this matter could subject the Company to substantial damages and /or require alterations to the Company's business. The Company cannot provide any assurance as to the outcome of this matter.

The Company cannot predict with any degree of certainty the outcome of the suit or determine the extent of any potential liability or damages. The Company also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in this matter could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of this matter will have a material adverse effect on Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

*Securities Matters Related to DraftKings Marketplace*

On March 9, 2023, a putative class action was filed in Massachusetts federal court by an alleged purchaser of non-fungible tokens ("NFTs") on the DraftKings Marketplace ("DK Marketplace"). The complaint asserts claims for violations of federal and state securities laws against the Company and three of its officers on the grounds that, among other things, the NFTs that are sold and traded on the DK Marketplace allegedly constitute securities that were not registered with the SEC in accordance with federal and Massachusetts law, and that the DK Marketplace is a securities exchange that is not registered in accordance with federal and Massachusetts law. Based on these allegations, the plaintiff brings claims seeking rescissory damages and other relief on behalf of himself and a putative class of persons who purchased NFTs on the DK Marketplace between August 11, 2021 and the present. On June 27, 2023, the court entered an order authorizing the plaintiff to file an amended complaint by August 4, 2023. On September 25, 2023, defendants filed a motion seeking dismissal of this action. On November 10, 2023, plaintiff filed an opposition to the motion to dismiss. On December 11, 2023, defendants filed a reply memorandum in support of the motion to dismiss. The Court heard oral argument on the motion to dismiss on December 19, 2023, and took the matter under advisement. We intend to vigorously defend this case.

On July 17, 2023, the Company received a subpoena from the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts seeking documents and requesting answers to interrogatories concerning, among other things, DK Marketplace and NFTs that are sold on DK Marketplace, and related matters. We intend to comply with these requests.

Any adverse outcome in these matters could subject the Company to substantial damages and/or require alterations to the Company's business. The Company cannot provide any assurance as to the outcome of these matters.

The Company cannot predict with any degree of certainty the outcome of these matters or determine the extent of any potential liability or damages. The Company also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in these matters could expose the Company to substantial damages, penalties and/or require alterations to the Company's that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of these matters will have a material adverse effect on Company's financial condition, although the outcome could

A472

be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

*Shareholder Derivative Litigation Related to DraftKings Marketplace*

On May 31, 2023, a putative shareholder derivative action was filed in Nevada state court by an alleged shareholder of the Company. The action asserts claims on behalf of the Company against certain senior officers and members of the Board of Directors of the Company for breach of fiduciary duty and unjust enrichment based primarily on allegations that the defendants caused or allowed the Company to disseminate misleading and inaccurate information to its shareholders in connection with NFTs that are sold and traded on the DK Marketplace. The action also alleges that certain individuals are liable for trading in Company stock at artificially inflated prices. The action seeks unspecified compensatory damages, changes to corporate governance and internal procedures, restitution, disgorgement, costs and attorney's fees, and other unspecified relief. All proceedings in this action have been stayed by agreement of the parties pending resolution of the above-referenced motion to dismiss in the putative class action in Massachusetts federal court.

The Company cannot predict with any degree of certainty the outcome of this matter or determine the extent of any potential liabilities. The Company also cannot provide an estimate of the possible loss or range of loss. Because this action alleges claims on behalf of the Company and purports to seek a judgment in favor of the Company, the Company does not believe, based on currently available information, that the outcome of the proceedings will have a material adverse effect on the Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

*Scanlon*

On December 8, 2023, plaintiffs Melissa Scanlon and Shane Harris, individually and on behalf of others similarly situated, filed a purported Massachusetts class action lawsuit against DraftKings in Middlesex County Superior Court of Massachusetts. Among other things, Plaintiffs allege that the Company's promotion that offered new customers an opportunity to earn up to 1,000 in site credits, and related advertisements, were: (1) unfair or deceptive practices in violation of Massachusetts General Laws ("M.G.L.") c. 93A, §§ 2, 9; and (2) untrue and misleading advertising in violation of M.G.L. c. 266, § 91. The Plaintiffs are seeking, among other things, injunctive relief, actual damages, double or treble damages, and attorneys' fees.

The Company intends to vigorously defend this case. Any adverse outcome in this matter could subject the Company to substantial damages and /or require alterations to the Company's business. The Company cannot provide any assurance as to the outcome of this matter.

The Company cannot predict with any degree of certainty the outcome of the suit or determine the extent of any potential liability or damages. The Company also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in this matter could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of this matter will have a material adverse effect on Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

*Other*

In addition to the above actions, we are subject to various other legal proceedings and claims that arise in the ordinary course of business. In our opinion, the amount of ultimate liability with respect to any of these actions is unlikely to materially affect our financial condition, results of operations or liquidity, though the outcomes could be material to our operating results for any particular period, depending, in part, upon the operating results for such period.

**Item 4. Mine Safety Disclosures.**

Not applicable.

A473

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

**Market Information**

DraftKings' Class A common stock trades on The Nasdaq Stock Market under the symbol "DKNG". Prior to April 24, 2020 and before the completion of the business combination with SBTech (Global) Limited and Diamond Eagle Acquisition Corp, the Class A common stock of Diamond Eagle Acquisition Corp traded on The Nasdaq Stock Market under the ticker symbol "DEAC".

**Holders**

As of February 13, 2024, there were 878 holders of record of our Class A common stock. In addition to holders of record of our Class A common stock, we believe there is a substantially greater number of "street name" holders or beneficial holders whose Class A common stock is held of record by banks, brokers and other financial institutions.

There is no public market for our Class B common stock and one holder of record of our Class B common stock as of February 13, 2024.

**Dividend Policy**

We have not paid any cash dividends on our Class A common stock to date. The payment of cash dividends is subject to the discretion of our board of directors and may be affected by various factors, including our future earnings, financial condition, capital requirements, share repurchase activity, current and future planned strategic growth initiatives, levels of indebtedness, and other considerations our board of directors deem relevant.

**Securities Authorized for Issuance under Equity Compensation Plans**

See Part III, Item 12 of this Annual Report for information about our equity compensation plans, which is incorporated by reference herein.

**Stock Price Performance**



**Comparison of Cumulative Total Return**

The graph above compares the cumulative total stockholder return on our Class A common stock with the cumulative total return on the Standard & Poor's ("S&P") 500 Consumer Discretionary Index and the Nasdaq Composite Index. The graph assumes an initial investment of $100 in our Class A common stock at the market close on July 25, 2019, which was our initial trading day. Data for the S&P 500 Consumer Discretionary Index and the Nasdaq Composite Index assume reinvestment of dividends. Total return equals stock price appreciation plus reinvestment of dividends.

**Recent Sales of Unregistered Securities; Use of Proceeds from Registered Offerings**

A474

None.

**Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

None, other than the shares repurchased pursuant to net settlement by employees in satisfaction of income tax withholding obligations incurred through the vesting of stock awards.

**Item 6. [Reserved]**

55

A475

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion and analysis should be read in conjunction with other sections of this Annual Report, including "Item 1. Business" and the accompanying consolidated financial statements and related notes included elsewhere in this Annual Report.*

*On May 5, 2022 (the "GNOG Closing Date"), DraftKings Inc. consummated its acquisition of Golden Nugget Online Gaming, Inc. (together with its subsidiaries unless the context requires otherwise, "GNOG"), pursuant to a definitive agreement and plan of merger, dated August 9, 2021 (the "GNOG Merger Agreement"), in an all-stock transaction (the "GNOG Transaction"). DraftKings' consolidated financial statements exclude GNOG's operations prior to the GNOG Closing Date, unless indicated otherwise. In connection with the GNOG Transaction, DraftKings Inc. became the going-forward public company and the direct parent company of both DraftKings Holdings Inc. (formerly DraftKings Inc.), a Nevada corporation ("Old DraftKings"), and GNOG, and DraftKings Inc. is the registrant filing this Annual Report as the successor registrant for Old DraftKings. Unless otherwise indicated, the terms "DraftKings," the "Company," "we," "us," or "our" refer to DraftKings Inc. (or, in respect of periods prior to the GNOG Closing Date, Old DraftKings), together with its consolidated subsidiaries.*

**Our Business**

We are a digital sports entertainment and gaming company. We provide users with online sports betting ("Sportsbook"), online casino ("iGaming") and daily fantasy sports ("DFS") product offerings, as well as retail sportsbook, media and other consumer product offerings. We are also involved in the design and development of sports betting and casino gaming software for online and retail sportsbooks and iGaming operators. On May 5, 2022, we acquired GNOG in an all-stock transaction to enable us to leverage Golden Nugget's established brand to broaden our reach into new customer segments and enhance the combined company's iGaming product offering through our vertically-integrated technology stack and GNOG's unique capabilities, including live dealer.

Our mission is to make life more exciting by responsibly creating the world's favorite real-money games and betting experiences. We accomplish this by creating an environment where our users can find enjoyment and fulfillment through Sportsbook, iGaming and DFS, as well as media and other online consumer product offerings. We are also highly focused on our responsibility as a steward of this new era in real-money gaming. Our ethics guide our decision making, with respect to both the tradition and integrity of sports and our investments in regulatory compliance and consumer protection.

We continue to make deliberate and substantial investments in support of our mission and long-term growth. For example, we have invested in our products and technology in order to continuously launch new product innovations; improve marketing, merchandising, and operational efficiency through data science; and deliver a great user experience. We also make significant investments in sales and marketing and incentives to grow and retain our paid user base, including personalized cross-product offers and promotions, and promote brand awareness to attract the "skin-in-the-game" sports fan. Together, these investments have enabled us to create a leading product built on scalable technology, while attracting a user base that has resulted in the rapid growth of our business.

Our priorities are to (a) continue to invest in our product offerings, (b) launch our product offerings in new jurisdictions, (c) create replicable and predictable state-level unit economics in Sportsbook and iGaming and (d) expand our other consumer product offerings. When we launch our Sportsbook and iGaming product offerings in a new jurisdiction, we invest heavily in user acquisition, retention and cross-selling until the new jurisdiction provides a critical mass of users engaged across our product offerings.

Our current technology is highly scalable with relatively minimal incremental spend required to launch our product offerings in new jurisdictions. We will continue to manage our fixed-cost base in conjunction with our market entry plans and focus our variable spend on marketing, user experience and support and regulatory compliance to become the product of choice for users and maintain favorable relationships with regulators. We also expect to improve our profitability on an annual basis over time as our revenue and gross profit expand as states mature, and our variable marketing expenses and fixed costs stabilize or grow at a slower rate.

Our path to profitability on an annual basis is based on the acceleration of positive contribution profit growth driven by increased revenue and gross profit generation from ongoing efficient customer acquisition enabled by the transition from local to regional to national advertising, strong customer retention, improved monetization from frequency and higher hold percentage, as well as scale benefits from investments in our product and technology and general and administrative functions. On a consolidated Adjusted EBITDA basis, we expect to achieve profitability on an annual basis when total contribution profit

A476

exceeds the fixed costs of our business, which depends, in part, on the percentage of the U.S. adult population that has access to our product offerings and the other factors summarized in the section entitled "Cautionary Statement Regarding Forward-Looking Statements".

**Financial Highlights and Trends**

The following table sets forth a summary of our financial results for the periods indicated and is derived from our consolidated financial statements for the years ended December 31, 2023, 2022, and 2021:

| (amounts in thousands) | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2023 | 2022 | 2021 |
| Revenue | $ | 3,665,393 | $ 2,240,461 | $ 1,296,025 |
| Net Loss | | (802,142) | (1,377,987) | (1,523,195) |
| Adjusted EBITDA [1] | | (151,035) | (721,781) | (676,133) |

(1)  Adjusted EBITDA is a non-GAAP financial measure. See "Non-GAAP Information" below for additional information about this measure and a reconciliation of this measure to the most directly comparable financial measure calculated in accordance with U.S. GAAP.

Revenue increased by $1,424.9 million in 2023, compared to 2022, primarily due to the strong performance of our Sportsbook and iGaming product offerings as a result of robust customer acquisition and retention, the successful launches of those product offerings in additional jurisdictions, and improved promotional reinvestment for Sportsbook and iGaming.

**Key Performance Indicators**

*Monthly Unique Payers ("MUPs")*. We define MUPs as the number of unique paid users per month who had one or more real-money, paid engagements across one or more of our Sportsbook, iGaming, DFS, or other consumer product offerings via our technology. For reported periods longer than one month, we average the MUPs for the months in the reported period. Although the number of unique paid users includes those users that have participated in a real-money, paid engagement using only promotional incentives (which has not been a material number of users to date), which are fungible with other funds deposited into their wallets on our technology, it does not include users who have made a deposit but have not yet had a real-money, paid engagement.

MUPs is a key indicator of the scale of our online gaming user base and awareness of our brand. We believe that year-over-year growth in MUPs is also generally indicative of the long-term revenue growth potential of our online gaming product offerings, although MUPs in individual periods may be less indicative of our longer-term expectations. We expect the number of MUPs to grow as we attract, retain and re-engage users in new and existing jurisdictions and expand our product offerings to appeal to a wider audience.

The chart below presents our average MUPs for 2021, 2022 and 2023:

A477



*Average Revenue per MUP ("ARPMUP").* We define and calculate ARPMUP as the average monthly revenue, excluding revenue from gaming software services, for a reporting period, divided by the average number of MUPs for the same period. ARPMUP is a key indicator of our ability to drive usage and monetization of our product offerings.

The chart below presents our ARPMUP for 2021, 2022 and 2023:



The increase in MUPs for 2023, compared to 2022, primarily reflects strong unique payer retention and acquisition across our Sportsbook and iGaming product offerings as well as the expansion of our Sportsbook and iGaming product offerings into new jurisdictions, partially offset by a decline in DFS MUPs.

ARPMUP increased in 2023 compared to 2022, primarily due to structural improvement in our Sportsbook hold rate and improved promotional reinvestment for Sportsbook and iGaming.

A478

**Non-GAAP Information**

This Annual Report includes Adjusted EBITDA, which is a non-GAAP financial measure that we use to supplement our results presented in accordance with U.S. GAAP. We believe Adjusted EBITDA is useful in evaluating our operating performance, similar to measures reported by our publicly-listed U.S. competitors, and regularly used by security analysts, institutional investors and other interested parties in analyzing operating performance and prospects. Adjusted EBITDA is not intended to be a substitute for any U.S. GAAP financial measure. As calculated, it may not be comparable to other similarly titled measures of performance of other companies in other industries or within the same industry.

We define and calculate Adjusted EBITDA as net loss before the impact of interest income or expense (net), income tax provision or benefit, and depreciation and amortization, and further adjusted for the following items: stock-based compensation; transaction-related costs; litigation, settlement and related costs; advocacy and other related legal expenses; gain or loss on remeasurement of warrant liabilities; and other non-recurring and non-operating costs or income, as described in the reconciliation below.

We include non-GAAP financial measures because they are used by management to evaluate our core operating performance and trends and to make decisions regarding the allocation of capital and new investments. Adjusted EBITDA excludes certain expenses that are required in accordance with U.S. GAAP because they are non-recurring items (for example, in the case of transaction-related costs and advocacy and other related legal expenses), non-cash expenditures (for example, in the case of depreciation and amortization, remeasurement of warrant liabilities and stock-based compensation), or non-operating items which are not related to our underlying business performance (for example, in the case of interest income and expense and litigation, settlement and related costs).

*Adjusted EBITDA*

The table below presents our net loss, which is the most directly comparable financial measure calculated in accordance with U.S. GAAP, reconciled to Adjusted EBITDA for the periods indicated:

| | | | Year Ended December 31, | | | |
|---|---|---|---|---|---|---|
| *(amounts in thousands)* | | **2023** | | **2022** | | **2021** |
| Net Loss | $ | (802,142) | $ | (1,377,987) | $ | (1,523,195) |
| *Adjusted for:* | | | | | | |
| Depreciation and amortization [1] | | 201,920 | | 169,252 | | 121,138 |
| Interest (income) expense, net | | (55,739) | | (18,702) | | (1,957) |
| Income tax (benefit) provision | | 10,170 | | (67,866) | | 8,269 |
| Stock-based compensation [2] | | 398,463 | | 578,799 | | 683,293 |
| Transaction-related costs [3] | | 3,060 | | 17,315 | | 25,316 |
| Litigation, settlement, and related costs [4] | | 34,500 | | 7,010 | | 10,392 |
| Advocacy and other related legal expenses [5] | | — | | 16,558 | | 40,415 |
| Loss (gain) on remeasurement of warrant liabilities | | 57,543 | | (29,396) | | (30,065) |
| Other non-recurring, special project and non-operating (income) costs [6] | | 1,190 | | (16,764) | | (9,739) |
| **Adjusted EBITDA** | $ | **(151,035)** | $ | **(721,781)** | $ | **(676,133)** |

(1)  The amounts include the amortization of acquired intangible assets of $117.3 million, $106.1 million, and $80.1 million for 2023, 2022, and 2021, respectively.
(2)  Reflects stock-based compensation expenses resulting from the issuance of awards under incentive plans.
(3)  Includes capital markets advisory, consulting, accounting and legal expenses related to evaluation, negotiation and integration costs incurred in connection with pending or completed transactions and offerings, including costs relating to the GNOG Transaction in 2022 and 2021.
(4)  Primarily includes external legal costs related to litigation and litigation settlement costs deemed unrelated to our core business operations.

59

A479

(5) Reflects non-recurring and non-ordinary course costs relating to advocacy efforts and other legal expenses in jurisdictions where we do not operate certain product offerings and are actively seeking licensure, or similar approval, for those product offerings. This adjustment excludes (i) costs relating to advocacy efforts and other legal expenses in jurisdictions where we do not operate that are incurred in the ordinary course of business and (ii) costs relating to advocacy efforts and other legal expenses incurred in jurisdictions where related legislation has been passed and we currently operate. For 2022, those costs primarily related to our support of Proposition 27 in California. For 2021, those costs primarily related to our support of Proposition 27 in California and our support of the sports betting ballot initiative in Florida.

(6) Primarily includes the change in fair value of certain financial assets, as well as our equity method share of investee's losses and other costs relating to non-recurring and non-operating items.

Due to the timing of the consummation of the GNOG Transaction, the above periods, to the extent applicable, exclude GNOG's operations prior to the GNOG Closing Date of May 5, 2022.

**Key Factors Affecting Our Results**

Our financial position and results of operations depend to a significant extent on the following factors:

*Industry Opportunity and Competitive Landscape*

We operate within the global entertainment and gaming industries, which are comprised of diverse product offerings that compete for consumers' time and disposable income. Our short-to-medium term focus is on the North American regulated gaming industry, particularly the opportunity in online Sportsbook and iGaming. We believe our industry-leading product offerings, strong technology services, more than a decade of U.S. online and mobile gaming experience, established brand and vertically integrated solutions make us a partner of choice for state regulators, professional sports leagues and teams, gaming companies, and other sports entertainment and related businesses.

When we enter new jurisdictions, we face significant competition from other established competitors, some of which may have more experience in sports betting and iGaming and access to more resources. We believe our analytics and technology, and the lessons learned from our DFS operations and prior launches of our online Sportsbook and iGaming product offerings, will enable us to capture significant share in newly available jurisdictions.

In addition, our growth prospects may suffer if we are unable to develop successful product offerings or if we fail to pursue additional product offerings. Further, if we fail to make the right investment decisions in our product offerings, technology and services, we may not effectively attract and retain users and our revenue and results of operations may be negatively impacted.

*Legalization, Regulation and Taxation*

Our growth prospects depend on the legalization of online sports betting and iGaming in additional jurisdictions, predominantly within the United States. Our strategy is to expand our Sportsbook and iGaming product offerings into new jurisdictions as they are legalized and become accessible to the extent it is economically beneficial to do so. As of February 13, 2024, 35 U.S. states, the District of Columbia and Puerto Rico have legalized some form of sports betting. Of those 37 legal jurisdictions, 32 have legalized online sports betting. Of those 32 jurisdictions, 31 are live, and DraftKings operates in 24 of them. The U.S. jurisdictions with statutes legalizing iGaming are Connecticut, Delaware, Michigan, New Jersey, Pennsylvania, Rhode Island and West Virginia.

The process of securing the necessary licenses or partnerships to operate in each jurisdiction may take longer than we anticipate. In addition, legislative or regulatory restrictions and product taxes may make it less attractive or more difficult for us to operate in a particular jurisdiction. For example, certain jurisdictions require us to have a relationship with a retail operator for online Sportsbook access, which tends to increase our cost of revenue. States that have established state-run monopolies may limit opportunities for private sector participants like us. We nonetheless believe our proprietary gaming software positions us to become a partner of choice to power state-run sportsbooks.

States impose taxes on regulated offerings, the rates of which may vary substantially between states and product offerings. Sales taxes may also apply in certain jurisdictions. We are also subject to a federal excise tax of 25 basis points on the amount of each sportsbook bet.

*Ability to Acquire, Retain and Monetize Users*

We grow our business by attracting new paid users to our product offerings and increasing their level of engagement with our product offerings over time. To effectively attract and retain paid users and to re-engage former paid users, we invest in a

60

A480

variety of marketing channels in combination with personalized customer promotions, most of which can be used across all of our product offerings (such as free contest entries or bets or matching deposits). These investments and personalized promotions are intended to increase consumer awareness and drive engagement.

### Managing Betting Risk

Sports betting and iGaming are characterized by an element of chance. Our revenue is impacted by variations in the hold percentage (the ratio of net win to total amount wagered) on bets placed on, or the actual outcome of, games or events on which users bet. Although our product offerings generally perform within a defined statistical range of outcomes, actual outcomes may vary for any given period, and a single large bet or the result of a significant sporting event can have a sizeable impact on our short-term financial performance. Our hold is also affected by factors that are beyond our control, such as a user's experience and behavior, the mix of games played, the financial resources of users and the volume of bets placed. As a result of variability in these factors, actual hold rates on our product offerings may differ from the theoretical win rates we have estimated and could result in the winnings of our gaming users exceeding those anticipated. We seek to mitigate these risks through data science and analytics and rules built into our technology, as well as active management of our amounts at risk at a point in time, but we may not always be able to do so successfully, particularly over short periods, which can result in financial losses as well as revenue volatility.

## Results of Operations

### 2023 Compared to 2022

The following table sets forth a summary of our consolidated results of operations for the years indicated, and the changes between periods. Due to the timing of the consummation of the GNOG Transaction, the below periods exclude GNOG's operations prior to the GNOG Closing Date of May 5, 2022.

| | | Year ended December 31, | | | |
|---|---|---|---|---|---|
| (amounts in thousands, except percentages) | | 2023 | 2022 | $ Change | % Change |
| Revenue | $ | 3,665,393 $ | 2,240,461 $ | 1,424,932 | 63.6 % |
| Cost of revenue | | 2,292,175 | 1,484,273 | 807,902 | 54.4 % |
| Sales and marketing | | 1,200,718 | 1,185,977 | 14,741 | 1.2 % |
| Product and technology | | 355,156 | 318,247 | 36,909 | 11.6 % |
| General and administrative | | 606,569 | 763,720 | (157,151) | (20.6) % |
| **Loss from operations** | | **(789,225)** | **(1,511,756)** | **722,531** | **47.8 %** |
| Interest income (expense), net | | 55,739 | 18,702 | 37,037 | 198.0 % |
| (Loss) gain on remeasurement of warrant liabilities | | (57,543) | 29,396 | (86,939) | (295.8) % |
| Other (loss) income, net | | (224) | 20,700 | (20,924) | (101.1) % |
| **Loss before income tax (benefit) provision and loss from equity method investment** | | **(791,253)** | **(1,442,958)** | **651,705** | **45.2 %** |
| Income tax (benefit) provision | | 10,170 | (67,866) | 78,036 | 115.0 % |
| Loss (gain) from equity method investment | | 719 | 2,895 | (2,176) | (75.2) % |
| **Net Loss** | $ | **(802,142)** $ | **(1,377,987)** $ | **575,845** | **41.8 %** |

*Revenue*. Revenue increased $1,424.9 million, or 63.6%, to $3,665.4 million in 2023, from $2,240.5 million in 2022. The increase was primarily attributable to our online gaming revenues, which increased $1,450.5 million, or 68.9%, to $3,557.2 million in 2023 primarily due to MUPs increasing by 39.5% as compared to 2022. The increase in MUPs was due to strong player retention and acquisition across our Sportsbook and iGaming product offerings, as well as the expansion of our Sportsbook and iGaming product offerings into new jurisdictions. Online gaming revenues also increased due to structural improvement in our Sportsbook hold rate and improved promotional reinvestment for our Sportsbook and iGaming product offerings, which contributed to ARPMUP growth of 17.7% compared to 2022.

*Cost of Revenue.* Cost of revenue increased $807.9 million, or 54.4%, to $2,292.2 million in 2023, from $1,484.3 million in 2022. Our online gaming product offerings accounted for substantially all of this increase, reflecting growth in revenue from our expanded product and jurisdictional footprint, including the launch of our Sportsbook product offering in Kentucky, Maine, Maryland, Massachusetts, and Ohio in 2023. In particular, the cost of revenue increase was primarily attributable to an increase in our variable expenses, such as product taxes and payment processing fees, which increased $516.1 million and

61

A481

$107.3 million, respectively. The remaining increase was primarily attributable to an increase in our variable platform costs and revenue share arrangements resulting from additional customer activity.

Cost of revenue as a percentage of revenue decreased by 3.7 percentage points to 62.5% in 2023 from 66.2% in 2022, reflecting, in part, structural improvement in our Sportsbook hold rate and improved promotional reinvestment for our Sportsbook and iGaming product offerings, partially offset by a change in revenue mix from our more mature DFS product offering to our Sportsbook and iGaming product offerings, which, in general, produce revenue at a higher cost per revenue dollar relative to our more mature DFS product offering.

*Sales and Marketing.* Sales and marketing expense increased $14.7 million, or 1.2%, to $1,200.7 million in 2023, from $1,186.0 million in 2022. The increase was primarily attributable to an increase of $19.5 million in advertising costs spent to acquire users, partially offset by a reduction in compensation expense.

*Product and Technology.* Product and technology expense increased $36.9 million, or 11.6%, to $355.2 million in 2023 from $318.2 million in 2022. The increase primarily reflects an increase of $35.1 million in compensation expense due to increases in our product operations and engineering headcount.

*General and Administrative.* General and administrative expense decreased $157.2 million, or 20.6%, to $606.6 million in 2023 from $763.7 million in 2022. This decrease was primarily driven by a decrease in stock-based compensation expense of $174.1 million, a reduction in transaction-related costs of $14.3 million and a reduction in advocacy expense of $16.6 million partially offset by an increase in non-core litigation costs of $27.5 million and in cash-based compensation expense due to an increase in headcount.

*Gain on Remeasurement of Warrant Liabilities.* We recorded a loss on remeasurement of warrant liabilities of $57.5 million in 2023, compared to a gain of $29.4 million in 2022 primarily due to changes in the underlying share price of our Class A common stock.

*Other Income, net.* Other income (loss), net was a loss of $0.2 million in 2023, as compared to income of $20.7 million in 2022. This decrease was primarily attributable to an increase in the fair value of certain financial assets recorded in 2022.

*Income Tax (Benefit) Provision.* We recorded an income tax provision of $10.2 million in 2023, as compared to an income tax benefit of $67.9 million in 2022. This change was primarily due to a discretely recorded income tax benefit of $70.1 million, which was attributable to non-recurring partial releases of the Company's U.S. valuation allowance as a result of the GNOG purchase price allocation in 2022.

*Net Loss.* Net loss improved by $575.8 million to $802.1 million in 2023 from $1,378.0 million in 2022 for the reasons discussed above.

### *2022 Compared to 2021*

A discussion of changes in our results of operations in 2022 compared to 2021 has been omitted from this Annual Report, but may be found in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" of our Form 10-K for the fiscal year ended December 31, 2022, filed with the SEC on February 17, 2023, which is available free of charge on the SEC's website at www.sec.gov and at www.DraftKings.com.

62

A482

**Quarterly Performance Trend and Seasonality**

Our user engagement and financial performance is seasonal in nature, as indicated by the following chart, which presents our average MUPs and ARPMUP for the last eight quarters, and the explanations that follow.



Our business experiences the effects of seasonality based on the relative popularity of certain sports. Although our technology supports contests and betting on sporting events throughout the year, the fourth quarter is when our users tend to be most engaged, primarily due to the overlapping time frame of the NFL and NBA seasons, which are the most popular sports amongst our users. As a result, we have historically generated higher revenues in our fourth quarter compared to other quarters. We anticipate that this trend will continue, though our mix of revenues in each quarter and our key performance indicators will also be impacted by the timing of new jurisdiction launches and the introduction of new product offerings.

In addition, revenue and key performance indicators for a given quarter or fiscal year may differ substantially due primarily to professional sports season scheduling, including the frequency of play. For example, during the NFL season, our user engagement and revenue is generally highest on Sundays. The number of Sundays in a fiscal reporting period may differ from quarter to quarter and year to year, resulting in revenue volatility between comparative periods. In contrast, the MLB season, which traditionally falls in our second and third quarters, is characterized by numerous, daily games throughout the season, which tends to result in higher DFS contestant engagement and more Sportsbook bets per paid user relative to the NFL season. Historically, MLB play has attracted a more dedicated but smaller user base to our product offerings. The timing of the MLB season in combination with these factors has tended to result in lower MUPs in our second quarter, but a higher ARPMUP.

The suspension, postponement, rescheduling, shortening and cancellation of major sports seasons and sporting events may materially impact our results of operations by, for example, reducing our customers' use of, and spending on, our Sportsbook and DFS product offerings. However, our product offerings that do not rely on sports seasons and sporting events, such as iGaming, may partially offset such an adverse impact on revenue.

**Liquidity and Capital Resources**

We had $1.3 billion in cash and cash equivalents as of December 31, 2023 (excluding restricted cash and cash reserved for users, which we segregate on behalf of our paid users for all jurisdictions and product offerings). We believe our cash on hand is sufficient to meet our current working capital and capital expenditure requirements for a period of at least twelve months. We will continue to evaluate our long-term operating performance and cash needs and believe we are well positioned to continue to fund the operations of our business long-term.

63

A483

Our material cash requirements include the following contractual and other obligations.

*Debt.* In March 2021, we issued zero-coupon convertible senior notes in an aggregate principal amount of $1,265.0 million (the "Convertible Notes"). The Convertible Notes mature on March 15, 2028, subject to earlier conversion, redemption or repurchase. In connection with the pricing of the Convertible Notes and the exercise of the option to purchase additional Convertible Notes, we entered into privately negotiated capped call transactions (the "Capped Call Transactions"). The Capped Call Transactions are expected generally to reduce potential dilution to DraftKings Inc.'s Class A common stock upon any conversion of the Convertible Notes. The net cost of $124.0 million incurred to enter into the Capped Call Transactions was recorded as a reduction to additional paid-in capital on the Company's consolidated balance sheet. As of December 31, 2023, the Convertible Notes, net of issuance costs, balance was $1,253.8 million.

*Leases.* We have lease arrangements for certain corporate office facilities, data centers and motor vehicles. As of December 31, 2023, the Company had lease commitments of $117.8 million, with $16.5 million payable within twelve months.

*Other Purchase Obligations.* We have certain non-cancelable contracts with vendors, licensors and others requiring us to make future cash payments. As of December 31, 2023, these purchase obligations were $1,404.6 million, with $467.6 million payable within twelve months.

**Cash Flows**

The following table summarizes our cash flows for the periods indicated. Due to the timing of the consummation of the GNOG Transaction, the below periods exclude GNOG's operations prior to the GNOG Closing Date of May 5, 2022.

| | | Year ended December 31, | |
|---|---|---|---|
| *(in thousands)* | **2023** | **2022** | **2021** |
| Net cash (used in) operating activities | $ (1,751) $ | (625,519) $ | (419,508) |
| Net cash (used in) investing activities | (90,360) | (208,766) | (195,022) |
| Net cash (used in) provided by financing activities | (63,221) | (16,732) | 1,138,813 |
| Effect of foreign exchange rates on cash and cash equivalents, restricted cash, and cash reserved for users | — | — | 583 |
| Net (decrease) increase in cash and cash equivalents, restricted cash, and cash reserved for users | (155,332) | (851,017) | 524,866 |
| Cash and cash equivalents, restricted cash, and cash reserved for users at beginning of period | 1,778,825 | 2,629,842 | 2,104,976 |
| **Cash and cash equivalents, restricted cash, and cash reserved for users at end of period** | **$ 1,623,493 $** | **1,778,825 $** | **2,629,842** |

**2023 Compared to 2022**

*Operating Activities.* Net cash used in operating activities in 2023 was $1.8 million, compared to $625.5 million in 2022, primarily reflecting an improvement in net loss, net of non-cash items, of $610.6 million for the reasons described above, slightly offset by changes in operating assets and liabilities.

*Investing Activities.* Net cash used in investing activities in 2023 decreased by $118.4 million to $90.4 million from $208.8 million in 2022, mainly reflecting $24.4 million of proceeds from the sale of marketable equity securities and other financial assets in 2023 and a reduction of $96.5 million from cash paid for acquisitions, net of cash acquired, related to the GNOG Transaction in 2022, partially offset by an increase in cash paid for internally developed software.

*Financing Activities.* Net cash used in financing activities in 2023 increased by $46.5 million to $63.2 million from $16.7 million in 2022, primarily reflecting an increase in purchases of treasury stock of $54.5 million related to the satisfaction of withholding taxes due upon the vesting of restricted stock units, offset by an increase in proceeds from the exercise of stock options.

**2022 Compared to 2021**

64

A484

A discussion of changes in cash flows in 2022 compared to 2021 has been omitted from this Annual Report, but may be found in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" of our Form 10-K for the fiscal year ended December 31, 2022, filed with the SEC on February 17, 2023, which is available free of charge on the SEC's website at www.sec.gov and at www.DraftKings.com.

**Critical Accounting Estimates**

Our consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP"). Preparation of the financial statements requires our management to make judgments, estimates and assumptions that impact the reported amount of revenue and expenses, assets and liabilities and the disclosure of contingent assets and liabilities. We consider an accounting judgment, estimate or assumption to be critical when (a) the estimate or assumption is complex in nature or requires a high degree of judgment and (b) the use of different judgments, estimates and assumptions could have a material impact on our consolidated financial statements. Our significant accounting policies are described in Note 2 of the consolidated financial statements included elsewhere in this Annual Report. Our critical accounting estimates are described below:

*Loss Contingencies*

Our loss contingencies, which are included within the "other long-term liabilities" caption on our consolidated balance sheets, are uncertain by nature and their estimation requires significant management judgment as to the probability of loss and estimation of the amount of loss. These contingencies include, but may not be limited to, litigation, regulatory investigations and proceedings and management's evaluation of complex laws and regulations, including those relating to indirect taxes, and the extent to which they may apply to our business and industry. See Notes 7 and 15 to our consolidated financial statements for more information.

We regularly review our contingencies to determine whether the likelihood of loss is probable or reasonably possible and to assess whether a reasonable estimate of the loss can be made. Determination of whether a loss estimate can be made is a complex undertaking that considers the judgment of management, third-party research, the prospect of negotiation and interpretations by regulators and courts, among other information. When a loss is determined to be probable, as that term is defined under U.S. GAAP, and the amount of the loss can be reasonably estimated, an estimated contingent liability is recorded. We continually reevaluate our indirect tax and other positions for appropriateness.

*Goodwill*

Goodwill is tested for impairment at the reporting unit level, which is the same or one level below an operating segment. In accordance with ASC Topic 350 Intangibles - Goodwill and Other, our business is classified into one reporting unit. Prior to October 1, 2023, the Company had three reporting units to which goodwill was allocated. On October 1, 2023, the Company reassessed its reporting units and determined it operated as a single reporting unit. In accordance with ASC 350, because such reassessment redefined previously determined reporting units, all goodwill was reassigned to the consolidated reporting unit. We review and evaluate our goodwill and indefinite life intangible assets for potential impairment at a minimum annually, in the fourth quarter, or more frequently if circumstances indicate that impairment is possible.

In testing goodwill for impairment, we have the option to begin with a qualitative assessment, commonly referred to as "Step 0", to determine whether it is more likely than not that the fair value of a reporting unit containing goodwill is less than its carrying value. This qualitative assessment may include, but is not limited to, reviewing factors such as macroeconomic conditions, industry and market considerations, cost factors, entity-specific financial performance and other events, including changes in our management, strategy and primary user base. If we determine that it is more likely than not that the fair value of a reporting unit is less its carrying value, we then perform a quantitative goodwill impairment analysis by comparing the carrying amount to the fair value of the reporting unit. In estimating the fair value of the reporting unit, we may use key assumptions such as revenue growth rates, gross margin, and estimated costs for future periods and well as peer group market valuation multiples and discount rates. If the carrying amount exceeds the fair value, goodwill will be written down to the fair value and recorded as impairment expense in the consolidated statements of operations. We perform our impairment testing annually and when circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. We performed our annual impairment assessment of goodwill as of October 1, 2023, which included consideration of the change in reporting units, and concluded that goodwill was not impaired.

65

A485

*Business Combinations*

We account for business acquisitions in accordance with ASC Topic 805, *Business Combinations* ("ASC 805"). We measure the cost of an acquisition as the aggregate of the acquisition date fair values of the assets transferred and liabilities assumed and equity instruments issued. Transaction costs directly attributable to the acquisition are expensed as incurred. We record goodwill for the excess of (i) the total costs of acquisition, fair value of any non-controlling interests and acquisition date fair value of any previously held equity interest in the acquired business over (ii) the fair value of the identifiable net assets of the acquired business.

The acquisition method of accounting requires us to exercise judgment and make estimates and assumptions based on available information regarding the fair values of the elements of a business combination as of the date of acquisition, including the fair values of identifiable intangible assets, deferred tax asset valuation allowances, liabilities related to uncertain tax positions and contingencies. We must also refine these estimates over a one-year measurement period, to reflect any new information obtained about facts and circumstances that existed as of the acquisition date that, if known, would have affected the measurement of the amounts recognized as of that date. If we are required to retroactively adjust provisional amounts that we have recorded for the fair value of assets and liabilities in connection with an acquisition, these adjustments could materially impact our results of operations and financial position. Estimates and assumptions that we must make in estimating the fair value of future acquired technology, user lists and other identifiable intangible assets include future cash flows that we expect to generate from the acquired assets. If the subsequent actual results and updated projections of the underlying business activity change compared with the assumptions and projections used to develop these values, we could record impairment charges. In addition, we have estimated the economic lives of certain acquired assets and these lives are used to calculate depreciation and amortization expenses. If our estimates of the economic lives change, depreciation or amortization expenses could be accelerated or slowed, which could materially impact our results of operations.

On the GNOG Closing Date of May 5, 2022, we completed our acquisition of 100% of the equity interests of GNOG pursuant to the GNOG Merger Agreement. The GNOG Transaction was accounted for under ASC 805. In accordance with the acquisition method, we recorded the fair value of assets acquired and liabilities assumed. The allocation of the consideration to the assets acquired and liabilities assumed is based on various estimates.

*Stock-based Compensation*

Our historical and outstanding stock-based compensation awards, including the issuances of options and other stock awards under our equity compensation plans, have typically included service-based or performance-based vesting conditions. For awards with only service-based vesting conditions, we record compensation cost for these awards using the straight-line method less an assumed forfeiture rate. For awards with performance-based or market-based vesting conditions, we recognize compensation cost on a tranche-by-tranche basis (the accelerated attribution method), based on the probability of achieving the performance criteria.

Stock-based compensation expense is measured based on the grant-date fair value of the stock-based awards and is recognized over the requisite service period of the awards. Prior to the DEAC Business Combination, our management and board of directors considered various objectives and subjective factors to determine the fair value of DK DE's common stock as of each grant date, including the value determined by a third-party valuation firm. These factors included, among other things, financial performance, capital structure, forecasted operating results and market performance analyses of similar companies in our industry. Following the DEAC Business Combination, the fair value of our Class A common stock is determined based on the quoted market price. To estimate the fair value of stock option awards, the Black-Scholes model is used to determine the fair value of grants with market-based conditions. The Black-Scholes model requires management to make a number of key assumptions, including risk-free interest rate, expected term, and expected volatility. The risk-free interest rate is estimated using the rate of return on U.S. treasury notes with a life that approximates the expected term. The expected term assumption used in the Black-Scholes model represents the period of time that the options are expected to be outstanding and is estimated using the midpoint between the requisite service period and the contractual term of the option. Expected volatility is based on an average volatility for a representative sample of comparable public companies, including the Company's own.

The assumptions underlying these valuations and management's assessment of achieving the performance criteria represent management's best estimates, which involve inherent uncertainties and the application of management judgment. As a result, if factors, probabilities, or expected outcomes change and our management uses significantly different assumptions or estimates, our stock-based compensation expense for future periods could be materially different.

A486

**Item 7A. Quantitative and Qualitative Disclosures about Market Risks.**

We are exposed to market risks in the ordinary course of our business. These risks primarily include interest rate risk, foreign currency risk and inflation risk as follows:

*Interest Rate Risk*

We had cash and cash equivalents totaling $1.3 billion and $1.3 billion at December 31, 2023 and December 31, 2022, respectively. Our cash and cash equivalents consist of highly liquid, unrestricted savings, checking and other bank accounts. The Company also utilizes money market funds and short-term deposits with original maturities of three months or less. The primary objectives of our investment activities are to preserve principal and provide liquidity without significantly increasing risk. Due to the relatively short-term nature of our portfolio, a hypothetical 100 basis point change in interest rates would not have a material effect on the fair value of our portfolio for the periods presented.

*Foreign Currency Risk*

The Company has exposure to changes in currency rates as a result of operations by subsidiaries in non-U.S jurisdictions. Revenue and income/loss generated by international operations will increase or decrease compared to prior periods as a result of changes in foreign currency exchange rates. The operations impacted by foreign currency risk are not significant relative to the U.S operations of the Company and, as a result, our exposure to foreign currency risk is not material. Currently, we do not otherwise hedge our foreign exchange exposure but may consider doing so in the future.

*Inflation Risk*

We do not believe that inflation has had a material effect on our business, financial condition, or results of operations. If our costs become subject to significant inflationary pressures, we may not be able to fully offset such higher costs through price increases. Our inability or failure to do so could harm our business, financial condition, and operating results.

**Item 8. Financial Statements and Supplementary Data.**

See financial statements included in Item 15 "*Exhibits, Financial Statement Schedules*" of this Annual Report.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures (as that term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of December 31, 2023, which is the end of the period covered by this Annual Report. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2023 to ensure that information required to be disclosed by the Company in reports we file or submit under the Exchange Act is (i) recorded, processed, summarized, evaluated and reported, as applicable, within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosures.

**Management's Report on Internal Control over Financial Reporting**

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Management conducted an assessment of the effectiveness of the Company's internal control over financial reporting based on the criteria set forth in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Internal control over financial reporting is a process to provide reasonable assurance regarding the reliability of our financial reporting for external purposes in accordance with U.S. GAAP. Based on the Company's assessment, management has concluded that its internal control over financial reporting was effective as of December 31, 2023 to provide reasonable assurance regarding the

67

A487

reliability of financial reporting and the preparation of financial statements in accordance with U.S. GAAP. Management has reviewed its assessment with the Audit Committee.

The Company's independent registered public accounting firm, BDO USA, P.C., has issued an audit report on the Company's internal control over financial reporting, which appears in Part II, Item 15 "*Exhibits, Financial Statement Schedules*" of this Annual Report.

**Changes in Internal Control Over Financial Reporting**

There has been no change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act), during the three months ended December 31, 2023 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Limitations on Effectiveness of Controls and Procedures**

Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives, as specified above. Our management recognizes that any control system, no matter how well designed and operated, is based upon certain judgments and assumptions and cannot provide absolute assurance that its objectives will be met.

**Item 9B. Other Information.**

*Rule 10b5-1 Trading Plans*

Certain of our directors and executive officers have made, and may from time to time enter into trading plans or make elections to have shares sold or withheld to cover withholding taxes or pay the exercise price of options, which may be designed to satisfy the affirmative defense conditions of Rule 10b5-1 under the Exchange Act or may constitute non-Rule 10b5-1 trading arrangements (as defined in Item 408(c) of Regulation S-K).

During the fiscal quarter ended December 31, 2023, except as noted above, none of our directors or executive officers adopted or terminated any contract, instruction or written plan for the purchase or sale of Company securities that was designed to satisfy the affirmative defense conditions of Rule 10b5-1(c) or any non-Rule 10b5-1 trading arrangement.

*Letter Agreements*

On February 14, 2024, the Company entered into letter agreements with each of Messrs. Jason Robins, the Company's Chief Executive Officer; Matthew Kalish, the Company's President, DraftKings North America; and Paul Liberman, the Company's President, Global Technology and Product, pursuant to which each executive officer agreed to a voluntary reduction in their respective base salaries to $1 for fiscal year 2024 (the "Base Salary Reductions"). The Base Salary Reductions do not modify any other rights under each of Messrs. Robins', Kalish's and Liberman's employment agreements that are determined by reference to such executive officer's base salary (other than to the extent otherwise described in such letter agreements), and such provisions will continue to be applied based on the base salary rate in effect without giving effect to any Base Salary Reductions. Furthermore, the Base Salary Reductions are not intended to reduce any Company employee benefit provided to Messrs. Robins, Kalish and Liberman that is determined by reference to base salary, except that life and disability insurance will not be provided to Messrs. Robins, Kalish and Liberman during the applicable Base Salary Reduction period.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable.

68

A488

**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance.**

The information required by this item will be included in our Proxy Statement for the 2024 Annual Meeting of Stockholders to be filed with the SEC, within 120 days of the fiscal year ended December 31, 2023 (the "2024 Proxy Statement"), and is incorporated herein by reference.

**Item 11. Executive Compensation.**

The information required by this item will be included in our 2024 Proxy Statement, which is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

The information required by this item will be included in our 2024 Proxy Statement, which is incorporated herein by reference.

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

The information required by this item will be included in our 2024 Proxy Statement, which is incorporated herein by reference.

**Item 14. Principal Accountant Fees and Services.**

The information required by this item will be included in our 2024 Proxy Statement, which is incorporated herein by reference.

69

A489

**PART IV**

**Item 15. Exhibits, Financial Statement Schedules.**

(a) Documents filed as part of this report

(a)(1) Financial Statements

**Audited Consolidated Financial Statements of DraftKings Inc. for the years ended December 31, 2023, December 31, 2022 and December 31, 2021:**

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firm (BDO USA P.C.); Boston, Massachusetts; PCAOB ID#243) | 71 |
| Consolidated Balance Sheets | F-1 |
| Consolidated Statements of Operations | F-3 |
| Consolidated Statements of Comprehensive Loss | F-4 |
| Consolidated Statements of Changes in Stockholders' Equity | F-5 |
| Consolidated Statements of Cash Flows | F-7 |
| Notes to the Consolidated Financial Statements | F-9 |

(2) Financial Statement Schedule

Financial statement schedules have been omitted because they are either not required or not applicable or the information is included in the consolidated financial statements or the notes thereto.

(3) Exhibits: The exhibits to this report are listed in the exhibit index below.

(3)(b) Description of Exhibits

| | |
|---|---|
| Exhibit Index | 74 |

70

A490

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Stockholders and Board of Directors
DraftKings Inc.
Boston, Massachusetts

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of DraftKings Inc. (the "Company") as of December 31, 2023 and 2022, the related consolidated statements of operations, comprehensive loss, changes in stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2023, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2023 and 2022, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2023, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2023, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated February 16, 2024 expressed an unqualified opinion thereon.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing separate opinions on the critical audit matter or on the accounts or disclosures to which it relates.

**Assessment of the probability of achieving the vesting performance criteria of performance-based stock compensation plan awards**

As described in Notes 2 and 11 to the consolidated financial statements, the Company issues stock options and other stock awards to employees with performance-based vesting conditions pursuant to its performance-based stock compensation plan ("PSP Awards"). The Company recognizes compensation cost for PSP Awards on a tranche-by-tranche basis (the accelerated attribution method), based on the probability of achieving the performance criteria. PSP Awards granted in 2023 and 2022 vest based on achievement of revenue and Adjusted EBITDA targets and have a range of payouts from 0% to 200%. For the year ended December 31, 2023, stock-based compensation expense attributable to all PSP Awards was $126.1 million.

We identified the assessment of the probability of achieving the performance-based vesting criteria and the related estimated payment of certain PSP Awards as a critical audit matter. The revenue and Adjusted EBITDA projections used in the probability assessment for certain PSP Awards require significant judgement due to the subjectivity of the revenue growth rates, Adjusted EBITDA margins and certain other assumptions used in the projections. Auditing these elements required especially challenging and subjective auditor judgment due to the nature and extent of effort required to address these matters.

71

A491

The primary procedures we performed to address this critical audit matter included evaluating the reasonableness of the revenue growth rates, Adjusted EBITDA margins and certain other assumptions used in the projections by:

•        Comparing the Company's revenue and Adjusted EBITDA projections for the current year to current year results.

•        Evaluating the consistency of the revenue growth rates and certain other assumptions with external industry data.

•        Comparing the forecasted growth in revenue, forecasted Adjusted EBITDA margins and certain other assumptions to historical results.


/s/ BDO USA, P.C.

We have served as the Company's auditor since 2016.
Boston, Massachusetts
February 16, 2024

A492

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Stockholders and Board of Directors
DraftKings Inc.
Boston, Massachusetts

**Opinion on Internal Control over Financial Reporting**

We have audited DraftKings Inc.'s (the "Company's") internal control over financial reporting as of December 31, 2023, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO criteria"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2023, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets of the Company as of December 31, 2023 and 2022, the related consolidated statements of operations, comprehensive loss, changes in stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2023, and the related notes and our report dated February 16, 2024 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying, "Item 9A, Management's Report on Internal Control over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of internal control over financial reporting in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ BDO USA, P.C.

Boston, Massachusetts
February 16, 2024

A493

**DRAFTKINGS INC.**

**CONSOLIDATED BALANCE SHEETS**
(Amounts in thousands, except par value)

| | | December 31, | | |
|---|---|---|---|---|
| | | **2023** | | **2022** |
| **Assets** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | $ | 1,270,503 | $ | 1,309,172 |
| Restricted cash | | 11,700 | | — |
| Cash reserved for users | | 341,290 | | 469,653 |
| Receivables reserved for users | | 301,770 | | 160,083 |
| Accounts receivable | | 47,539 | | 51,097 |
| Prepaid expenses and other current assets | | 98,565 | | 94,836 |
| **Total current assets** | | **2,071,367** | | **2,084,841** |
| Property and equipment, net | | 60,695 | | 60,102 |
| Intangible assets, net | | 690,620 | | 776,934 |
| Goodwill | | 886,373 | | 886,373 |
| Operating lease right-of-use assets | | 93,985 | | 65,957 |
| Equity method investments | | 10,280 | | 10,080 |
| Deposits and other non-current assets | | 131,546 | | 155,865 |
| **Total assets** | $ | **3,944,866** | $ | **4,040,152** |
| | | | | |
| **Liabilities and Stockholders' equity** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable and accrued expenses | $ | 639,599 | $ | 517,587 |
| Liabilities to users | | 851,898 | | 686,173 |
| Operating lease liabilities, current portion | | 11,499 | | 4,253 |
| Other current liabilities | | 46,624 | | 38,444 |
| **Total current liabilities** | | **1,549,620** | | **1,246,457** |
| Convertible notes, net of issuance costs | | 1,253,760 | | 1,251,103 |
| Non-current operating lease liabilities | | 80,827 | | 69,332 |
| Warrant liabilities | | 63,568 | | 10,680 |
| Long-term income tax liabilities | | 72,810 | | 69,858 |
| Other long-term liabilities | | 83,975 | | 70,029 |
| **Total liabilities** | $ | **3,104,560** | $ | **2,717,459** |
| Commitments and contingent liabilities (Notes 7 and 15) | | | | |
| | | | | |
| **Stockholders' equity:** | | | | |
| Class A common stock, $0.0001 par value; 900,000 shares authorized as of December 31, 2023 and December 31, 2022, respectively; 484,598 and 459,265 shares issued and 472,697 and 450,575 outstanding at December 31, 2023 and December 31, 2022, respectively | $ | 46 | $ | 45 |
| Class B common stock, $0.0001 par value; 900,000 shares authorized as of December 31, 2023 and December 31, 2022; 393,014 shares issued and outstanding at December 31, 2023 and December 31, 2022 | | 39 | | 39 |
| Treasury stock, at cost; 11,901 and 8,690 shares as of December 31, 2023 and December 31, 2022, respectively | | (412,182) | | (332,133) |
| Additional paid-in capital | | 7,149,858 | | 6,750,055 |
| Accumulated deficit | | (5,933,943) | | (5,131,801) |
| Accumulated other comprehensive income | | 36,488 | | 36,488 |
| **Total stockholders' equity** | | **840,306** | | **1,322,693** |
| **Total liabilities and stockholders' equity** | $ | **3,944,866** | $ | **4,040,152** |

See accompanying notes to consolidated financial statements.

F-1

A494

**DRAFTKINGS INC.**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
(Amounts in thousands, except per share amounts)

| | | Years ended December 31, | | |
|---|---|---|---|---|
| | | **2023** | **2022** | **2021** |
| **Revenue** | $ | **3,665,393** $ | **2,240,461** $ | **1,296,025** |
| Cost of revenue | | 2,292,175 | 1,484,273 | 794,162 |
| Sales and marketing | | 1,200,718 | 1,185,977 | 981,500 |
| Product and technology | | 355,156 | 318,247 | 253,655 |
| General and administrative | | 606,569 | 763,720 | 828,325 |
| **Loss from operations** | | **(789,225)** | **(1,511,756)** | **(1,561,617)** |
| Other income (expense): | | | | |
| Interest income | | 58,418 | 21,353 | 4,066 |
| Interest expense | | (2,679) | (2,651) | (2,109) |
| (Loss) gain on remeasurement of warrant liabilities | | (57,543) | 29,396 | 30,065 |
| Other (loss) gain, net | | (224) | 20,700 | 11,951 |
| **Loss before income tax provision (benefit) and loss (income) from equity method investment** | | **(791,253)** | **(1,442,958)** | **(1,517,644)** |
| Income tax (benefit) provision | | 10,170 | (67,866) | 8,269 |
| Loss (income) from equity method investment | | 719 | 2,895 | (2,718) |
| **Net loss attributable to common stockholders** | $ | **(802,142)** $ | **(1,377,987)** $ | **(1,523,195)** |
| **Loss per share attributable to common stockholders:** | | | | |
| Basic and diluted | $ | (1.73) $ | (3.16) $ | (3.78) |

See accompanying notes to consolidated financial statements.

*Due to the timing of the GNOG Transaction (as defined below), the above periods exclude the operations of GNOG (as defined below) prior to the closing date of May 5, 2022.*

F-2

A495

**DRAFTKINGS INC.**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
(Amounts in thousands)

| | Year ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| **Net loss attributable to common stockholders** | $ (802,142) $ | (1,377,987) $ | (1,523,195) |
| **Other comprehensive (loss) income** | | | |
| Foreign currency translation adjustments, net of nil tax | — | — | (47,046) |
| **Comprehensive loss** | $ **(802,142)** $ | **(1,377,987)** $ | **(1,570,241)** |

See accompanying notes to consolidated financial statements.

*Due to the timing of the GNOG Transaction (as defined below), the above periods exclude the operations of GNOG (as defined below) prior to the closing date of May 5, 2022.*

F-3

A496

**DRAFTKINGS INC.**

**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
(Amounts in thousands)

| | Class A Common Stock | | Class B Common Stock | | Additional Paid in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income | Treasury Stock Amount | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| **Balances at December 31, 2022** | 450,575 $ | 45 | 393,014 $ | 39 $ | 6,750,055 $ | (5,131,801) $ | 36,488 $ | (332,133) $ | 1,322,693 |
| Exercise of stock options | 3,943 | — | — | — | 16,540 | — | — | — | 16,540 |
| Stock-based compensation expense | — | — | — | — | 378,321 | — | — | — | 378,321 |
| Equity consideration issued for acquisitions | — | — | — | — | — | — | — | — | — |
| Exercise of warrants | 153 | — | — | — | 4,942 | — | — | — | 4,942 |
| Purchase of treasury stock | (3,211) | — | — | — | — | — | — | (80,049) | (80,049) |
| Restricted stock unit vesting | 21,237 | 1 | — | — | — | — | — | — | 1 |
| Net loss | — | — | — | — | — | (802,142) | — | — | (802,142) |
| **Balances at December 31, 2023** | 472,697 $ | 46 | 393,014 $ | 39 $ | 7,149,858 $ | (5,933,943) $ | 36,488 $ | (412,182) $ | 840,306 |

| | Class A Common Stock | | Class B Common Stock | | Additional Paid in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income | Treasury Stock Amount | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| **Balances at December 31, 2021** | 407,781 $ | 41 | 393,014 $ | 39 $ | 5,702,388 $ | (3,753,814) $ | 36,488 $ | (306,614) $ | 1,678,528 |
| Exercise of stock options | 3,267 | — | — | — | 8,743 | — | — | — | 8,743 |
| Stock-based compensation expense | — | — | — | — | 578,799 | — | — | — | 578,799 |
| Equity consideration issued for acquisition | 29,252 | 3 | — | — | 460,125 | — | — | — | 460,128 |
| Purchase of treasury stock | (1,560) | — | — | — | — | — | — | (25,519) | (25,519) |
| Restricted stock unit vesting | 11,835 | 1 | — | — | — | — | — | — | 1 |
| Net loss | — | — | — | — | — | (1,377,987) | — | — | (1,377,987) |
| **Balances at December 31, 2022** | 450,575 $ | 45 | 393,014 $ | 39 $ | 6,750,055 $ | (5,131,801) $ | 36,488 $ | (332,133) $ | 1,322,693 |

F-4

A497

| | Class A Common Stock | | Class B Common Stock | | Additional Paid in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income | Treasury Stock Amount | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| Balances at December 31, 2020 | 396,303 $ | 40 | 393,014 $ | 39 $ | 5,067,135 $ | (2,230,619) $ | 83,534 $ | (288,784) $ | 2,631,345 |
| Exercise of stock options | 9,421 | 1 | — | — | 31,478 | — | — | — | 31,479 |
| Stock-based compensation expense | — | — | — | — | 683,293 | — | — | — | 683,293 |
| Purchase of capped call options | — | — | — | — | (123,970) | — | — | — | (123,970) |
| Equity consideration issued for acquisition | 520 | — | — | — | 33,149 | — | — | — | 33,149 |
| Exercise of warrants | 337 | — | — | — | 9,205 | — | — | — | 9,205 |
| Purchase of treasury stock | (323) | — | — | — | — | — | — | (17,830) | (17,830) |
| Restricted stock unit vesting | 1,523 | — | — | — | — | — | — | — | — |
| Foreign currency translation | — | — | — | — | — | — | (47,046) | — | (47,046) |
| Other | — | — | — | — | 2,098 | — | — | — | 2,098 |
| Net loss | — | — | — | — | — | (1,523,195) | — | — | (1,523,195) |
| Balances at December 31, 2021 | 407,781 $ | 41 | 393,014 $ | 39 $ | 5,702,388 $ | (3,753,814) $ | 36,488 $ | (306,614) $ | 1,678,528 |

See accompanying notes to consolidated financial statements.

*Due to the timing of the GNOG Transaction (as defined below), the above periods exclude the operations of GNOG (as defined below) prior to the closing date of May 5, 2022.*

F-5

A498

**DRAFTKINGS INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(Amounts in thousands)

| | Year ended December 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| **Cash Flows from Operating Activities:** | | | |
| Net loss attributable to common shareholders | $ (802,142) $ | (1,377,987) $ | (1,523,195) |
| Adjustments to reconcile net loss to net cash flows used in operating activities: | | | |
| Depreciation and amortization | 201,920 | 169,252 | 121,138 |
| Non-cash interest expense, net | 386 | 870 | 2,109 |
| Stock-based compensation expense | 398,463 | 578,799 | 683,293 |
| Loss (gain) on remeasurement of warrant liabilities | 57,543 | (29,396) | (30,065) |
| Loss (gain) from equity method investment | 719 | 2,895 | (2,718) |
| Loss (gain) on marketable equity securities and other financial assets, net | 75 | (10,999) | (11,311) |
| Deferred income taxes | 5,849 | (73,407) | (15,509) |
| Other expenses, net | 554 | (7,268) | — |
| Change in operating assets and liabilities, net of effect of acquisitions: | | | |
| Receivables reserved for users | (141,687) | (105,320) | (21,700) |
| Accounts receivables | 3,558 | 2,506 | (1,787) |
| Prepaid expenses and other current assets | 2,451 | (26,217) | (10,078) |
| Deposits and other non-current assets | (19,355) | (4,921) | (6,458) |
| Operating leases, net | 6,558 | 1,304 | (1,059) |
| Accounts payable and accrued expenses | 103,593 | 95,269 | 167,927 |
| Liabilities to users | 165,725 | 152,985 | 210,932 |
| Long-term income tax liability | 2,952 | (9,267) | 13,227 |
| Other long-term liabilities | 11,087 | 15,383 | 5,746 |
| **Net cash flows used in operating activities** | **(1,751)** | **(625,519)** | **(419,508)** |
| **Cash Flows from Investing Activities:** | | | |
| Purchases of property and equipment | (20,902) | (32,402) | (15,925) |
| Cash paid for internally developed software costs | (80,378) | (64,030) | (46,542) |
| Acquisition of gaming licenses | (12,105) | (7,213) | (35,809) |
| Proceeds from (purchase of) marketable equity securities and other financial assets | 24,425 | — | (25,000) |
| Cash paid for acquisitions, net of cash acquired | — | (96,507) | (64,970) |
| Other investing activities, net | (1,400) | (8,614) | (6,776) |
| **Net cash flows used in investing activities** | **(90,360)** | **(208,766)** | **(195,022)** |
| **Cash Flow from Financing Activities:** | | | |
| Proceeds from issuance of convertible notes, net | — | — | 1,248,025 |
| Purchase of capped call options | — | — | (123,970) |
| Proceeds from exercise of warrants | 288 | 44 | 693 |
| Purchase of treasury stock | (80,049) | (25,519) | (17,830) |
| Proceeds from exercise of stock options | 16,540 | 8,743 | 31,479 |
| Other financing activities | — | — | 416 |
| **Net cash flows (used in) provided by financing activities** | **(63,221)** | **(16,732)** | **1,138,813** |
| Effect of foreign exchange rates on cash and cash equivalents, restricted cash, and cash reserved for users | — | — | 583 |

F-6

A499

| | | | | | | |
|---|---|---|---|---|---|---|
| **Net (decrease) increase in cash and cash equivalents, restricted cash, and cash reserved for users** | | **(155,332)** | | **(851,017)** | | **524,866** |
| Cash and cash equivalents, restricted cash, and cash reserved for users at the beginning of period | | 1,778,825 | | 2,629,842 | | 2,104,976 |
| **Cash and cash equivalents, restricted cash, and cash reserved for users at the end of period** | $ | **1,623,493** | $ | **1,778,825** | $ | **2,629,842** |
| **Disclosure of cash and cash equivalents, restricted cash, and cash reserved for users** | | | | | | |
| Cash and cash equivalents | $ | 1,270,503 | $ | 1,309,172 | $ | 2,152,892 |
| Restricted cash | | 11,700 | | — | | — |
| Cash reserved for users | | 341,290 | | 469,653 | | 476,950 |
| **Cash and cash equivalents, restricted cash, and cash reserved for users at the end of period** | $ | **1,623,493** | $ | **1,778,825** | $ | **2,629,842** |
| **Supplemental Disclosure of Noncash Investing and Financing Activities:** | | | | | | |
| Investing activities included in accounts payable and accrued expenses | | 569 | | 9,155 | | (3,758) |
| Equity consideration issued for acquisitions | | — | | 460,128 | | 33,149 |
| Decrease in warrant liabilities from cashless exercise of warrants | | 4,654 | | — | | — |
| **Supplemental Disclosure of Cash Activities:** | | | | | | |
| (Decrease) increase in cash reserved for users | | (128,363) | | (7,297) | | 189,232 |
| Cash paid for interest | | — | | — | | — |
| Cash paid for income taxes, net of refunds | | 8,341 | | 10,366 | | 5,632 |

See accompanying notes to consolidated financial statements.

*Due to the timing of the GNOG Transaction (as defined below), the above periods exclude the operations of GNOG (as defined below) prior to the closing date of May 5, 2022.*

F-7

A500

**DRAFTKINGS INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands, unless otherwise noted)**

**1.  Description of Business**

We are a digital sports entertainment and gaming company. We provide users with online sports betting ("Sportsbook"), online casino ("iGaming") and daily fantasy sports ("DFS") product offerings, as well as retail sportsbook, media and other consumer product offerings. We are also involved in the design and development of sports betting and casino gaming software for online and retail sportsbooks and iGaming operators.

In May 2018, the Supreme Court (the "Court") struck down on constitutional grounds the Professional and Amateur Sports Protection Act of 1992 ("PASPA"), a law that prohibited most states from authorizing and regulating sports betting. Since the Court's decision, many states have legalized sports betting. As of December 31, 2023, 35 U.S. states, the District of Columbia and Puerto Rico have legalized some form of sports betting. Of those 37 legal jurisdictions, 32 have legalized online sports betting. Of those 32 jurisdictions, 30 are live, and DraftKings operates in 23 of them. The U.S jurisdictions with statutes legalizing iGaming are Connecticut, Delaware, Michigan, New Jersey, Pennsylvania, Rhode Island and West Virginia.

As of December 31, 2023, we operate our online sports betting product offering in Arizona, Colorado, Connecticut, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Massachusetts, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, Tennessee, Virginia, West Virginia, Wyoming and Ontario, Canada and we operate retail sportsbooks in Arizona, Colorado, Connecticut, Illinois, Iowa, Kansas, Louisiana, Michigan, Mississippi, New Hampshire, New Jersey and Washington. As of December 31, 2023, the Company offers its iGaming product offering in Connecticut, Michigan, New Jersey, Pennsylvania, West Virginia and Ontario, Canada. The Company also has arrangements in place with land-based casinos to expand operations into additional states upon the passing of relevant legislation, the issuance of related regulations and the receipt of required licenses.

As further discussed in Note 3 hereof entitled "Acquisition of Golden Nugget Online Gaming, Inc.," on May 5, 2022 (the "GNOG Closing Date"), DraftKings Inc. (formerly New Duke Holdco, Inc.) consummated the acquisition of Golden Nugget Online Gaming, Inc., a Delaware corporation (together with its subsidiaries unless the context requires otherwise, "GNOG"), pursuant to a definitive agreement and plan of merger, dated August 9, 2021 (the "GNOG Merger Agreement"), in an all-stock transaction (the "GNOG Transaction"). In connection with the GNOG Transaction, DraftKings Inc. undertook a holding company reorganization whereby (i) each share of DraftKings Holdings Inc. (formerly DraftKings Inc.), a Nevada corporation ("Old DraftKings"), Class A common stock and Class B common stock was converted on a one-for-one basis into a share of DraftKings Inc. Class A common stock and Class B common stock, respectively, and (ii) DraftKings Inc. became the going-forward public company and the direct parent company of both Old DraftKings and GNOG. DraftKings Inc. is the registrant filing this Annual Report on Form 10-K as the successor registrant for Old DraftKings. Unless otherwise indicated or the context otherwise requires, the terms "DraftKings", the "Company", "we", "us" and "our" refer to DraftKings Inc. (or, in respect of periods prior to the GNOG Closing Date, Old DraftKings), together with its consolidated subsidiaries.

**2.  Summary of Significant Accounting Policies and Practices**

***Basis of Presentation and Principles of Consolidation***

The accompanying consolidated financial statements are presented in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP") and pursuant to the rules and regulations of the U.S. Securities and Exchange Commission (the "SEC"). The consolidated financial statements include the accounts and operations of the Company and its subsidiaries. All intercompany accounts and transactions are eliminated upon consolidation. Certain amounts, which are not material, in the prior years' consolidated financial statements have been reclassified to conform to the current year presentation.

The Company consummated the GNOG Transaction on the GNOG Closing Date. In the GNOG Transaction, the Company was determined to be the accounting acquirer and, as such, the acquisition is considered a business combination under Accounting Standards Codification ("ASC") Topic 805, *Business Combinations*, and was accounted for using the acquisition method of accounting. These consolidated financial statements include the accounts and operations of the Company, except that, due to the timing of the consummation of the GNOG Transaction, these consolidated financial statements exclude the operations of GNOG prior to the GNOG Closing Date.

F-8

A501

*Segments*

The Company regularly reviews its operating segments and the approach used by the chief operating decision maker ("CODM") to evaluate performance and allocate resources. Prior to the fourth quarter of 2022, the Company had two distinct operating segments: a business-to-consumer ("B2C") segment, which included its Sportsbook, iGaming and DFS product offerings, as well as media and other consumer product offerings, and a business-to-business ("B2B") segment, which had principal activities involving the design and development of gaming software.

However, beginning in the fourth quarter of 2022, as a result of the Company's integration of the technology and expertise of SBTech, the Company began to view the B2B segment primarily as a cost center of the B2C segment and, therefore, began to operate its business and report its results as a single operating segment. The Company's determination that it operates as a single segment is consistent with the CODM's regular review of consolidated financial information for the purposes of evaluating performance, allocating resources and planning and forecasting for future periods. Prior periods have been reclassified to conform to the new segment presentation.

*Foreign Currency and Comprehensive Loss*

Prior to January 1, 2022, the Company's reporting currency was the U.S. dollar while the functional currency of the Company's significant non-U.S. subsidiaries was the Euro. The financial statements of the Company's significant non-U.S. subsidiaries were translated into United States dollars in accordance with ASC 830, *Foreign Currency Matters*, using period-end rates of exchange for assets and liabilities, and average rates of exchange for the period for revenues, costs and expenses and historical rates for equity. For the period ending December 31, 2021, the translation gain is included in the consolidated statements of comprehensive loss. Effective as of January 1, 2022, the Company's reporting currency remained the U.S. dollar and the functional currency of the Company's significant non-U.S. subsidiaries' functional currency was changed from the Euro to the U.S. dollar. Accordingly, the Company did not have to translate the financial statements of its significant non-U.S. subsidiaries for the years ended December 31, 2023 and 2022.

During 2023, 2022 and 2021, foreign currency transactions did not have a material impact on net loss.

*Use of Estimates*

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. Significant estimates and assumptions reflected in the financial statements relate to and include, but are not limited to, the valuation and expensing of equity awards, accounting for contingencies and uncertainties, purchase price allocations, including fair value estimates of intangible assets, the estimated useful lives of fixed assets and intangible assets, internally developed software costs and accrued expenses.

*Going Concern*

The Company currently expects that its cash will be sufficient to fund its operating expenses and capital expenditure requirements for at least twelve months after February 16, 2024. The Company has experienced operating losses and negative operating cash flows for the years ended December 31, 2023, 2022 and 2021. While certain jurisdictions will experience improved operating cash flow, the Company expects to continue to incur annual operating losses for the next twelve months.

*Concentration Risks and Uncertainties*

Financial instruments that potentially subject the Company to concentrations of credit risk consist primarily of cash and cash equivalents, restricted cash, and cash reserved for users. The Company maintains separate accounts for cash and cash reserved for users primarily across several financial institutions. Some of the amounts held exceed federally insured limits. Management believes all financial institutions holding its cash are of high credit quality and does not believe the Company is subject to unusual credit risk beyond the normal credit risk associated with commercial banking relationships.

The Company relies on a limited number of vendors to support operations. In particular, a single vendor is currently the primary provider of web services that allow the Company to host its Sportsbook, iGaming and DFS product offerings. Any

F-9

A502

interruption in the services provided by this supplier could have a material adverse effect on its business, financial condition and results of operations.

The Company's growth prospects and market potential will depend on its ability to obtain and maintain licenses to operate in a number of jurisdictions, and if the Company fails to obtain and maintain such licenses, its business, financial condition, results of operations and prospects could be impaired.

We conduct business in numerous countries that carry high levels of currency, political, compliance and economic risk. For example, we have offices in Ukraine and Israel, and the military conflict between Russia and Ukraine and the evolving conflict in Israel and Gaza and any business interruptions or other spillover effects from such conflicts could adversely affect our operations.

### Business Combinations

The Company accounts for business combinations under the acquisition method of accounting, in accordance with ASC 805, which requires assets acquired and liabilities assumed to be recognized at their fair values as of the acquisition date. Any fair value of purchase consideration in excess of the fair value of the assets acquired less liabilities assumed is recorded as goodwill. The fair values of the assets acquired and liabilities assumed are determined based upon the valuation of the acquired business and involve management making significant estimates and assumptions.

### Cash and Cash Equivalents

Cash and cash equivalents consist of highly liquid, unrestricted savings, checking, money market funds with original maturities of less than three months and other bank accounts.

### Restricted Cash

Restricted cash refers to cash that is held by the company but cannot be used for continuing operations. Restricted cash as of December 31, 2023, primarily relates to collateral for a letter of credit in connection with a cyber-security insurance policy entered into in 2023.

### Cash Reserved for Users

The Company maintains separate bank accounts to segregate users' funds from operational funds. In certain regulated jurisdictions, user funds are held by DK Player Reserve LLC, a Delaware limited liability company and wholly owned subsidiary of DraftKings Inc., which was organized for the purpose of protecting users' funds in the event of creditor claims and complying with certain regulatory requirements of gaming authorities in certain jurisdictions.

### Receivables Reserved for Users

Receivables for user deposits not yet received are stated at the amount the Company expects to collect from a payment processor, which includes an allowance for credit losses if appropriate. These receivables arise, primarily, due to process timing between when a user deposits and when the Company receives that deposit from the payment processor. The allowance for credit losses is determined based on the Company's assessment of the probability of the non-payment of the receivable. This provision is netted against the receivable balance with the loss being recognized within general and administrative expenses in the consolidated statements of operations. As of and for the years ending December 31, 2023 and December 31, 2022, the provision did not have a material impact on the Company's consolidated financial statements.

### Accounts Receivables

Accounts receivables are recorded at amortized cost, less any allowance for credit losses. The allowance for credit losses is determined based on the Company's assessment of the probability of non-payment of the receivable after all means of collection have been exhausted and the potential for recovery is considered remote. This provision is netted against the receivable balance with the loss being recognized within general and administrative expenses in the consolidated statements of operations. As of and for the years ending December 31, 2023 and December 31, 2022, the provision did not have a material impact on the Company's consolidated financial statements.

### Digital Assets and Liabilities

F-10

A503

On March 31, 2022, the SEC issued Staff Accounting Bulletin No. 121 ("SAB 121"). SAB 121 sets out interpretive guidance from the staff of the SEC regarding the accounting for obligations to safeguard digital assets that an entity holds for its users, which was effective from the first interim period commencing after June 15, 2022, with retroactive application as of the beginning of the fiscal year to which the interim or annual period relates. In accordance with SAB 121, the Company recognized a liability for the obligation to safeguard its users' assets and recognized an associated asset for non-fungible tokens ("NFTs") held for its users. Both the liability and the associated asset are measured at the fair value of the NFTs being safeguarded. Refer to Note 8 hereof for disclosures required in accordance with ASC 820, *Fair Value Measurement*.

**Property and Equipment, Net**

Property and equipment are carried at cost, net of accumulated depreciation. Depreciation is computed utilizing the straight-line method over the estimated useful life of the asset. Leasehold improvements depreciation is computed over the shorter of the lease term or estimated useful life of the asset. Additions and improvements are capitalized, while repairs and maintenance are expensed as incurred. Useful lives of each asset class are generally as follows:

| | |
|---|---|
| Computer equipment and software | 3 years |
| Furniture and fixtures | 7 years |
| Leasehold improvements | Lesser of the lease terms or the estimated useful lives of the improvements, generally 1–10 years |

**Intangible Assets, Net**

The Company's intangible assets consist of developed technology, customer relationships, internally-developed software, gaming licenses, trademarks and tradenames and digital assets. The related amortization expense is classified as cost of revenue in the consolidated statements of operations. Estimates and assumptions that we must make in estimating the fair value of future acquired technology, user lists and other identifiable intangible assets include future cash flows that we expect to generate from the acquired assets.

*Developed Technology*

Developed technology primarily relates to the design and development of sports betting and casino gaming software for online and retail sportsbook and casino gaming products acquired from SBTech and other acquisitions and recorded at fair value at the date of acquisition.

*Internally Developed Software*

Software that is developed for internal use is accounted for pursuant to ASC 350-40, *Intangibles, Goodwill and Other—Internal-Use Software*. Qualifying costs incurred to develop internal-use software are capitalized when (i) the preliminary project stage is completed, (ii) management has authorized further funding for the completion of the project and (iii) it is probable that the project will be completed and perform as intended. These capitalized costs include compensation for employees who develop internal-use software and external costs related to development of internal use software. Capitalization of these costs ceases once the project is substantially complete and the software is ready for its intended purpose. Internally developed software is amortized using the straight-line method over an estimated useful life. All other expenditures, including those incurred in order to maintain an intangible asset's current level of performance, are expensed as incurred. When intangible assets are retired or disposed of, the cost and accumulated amortization thereon are removed, and any resulting gain or losses are included in the consolidated statements of operations.

*Gaming Licenses*

The Company incurs fees in connection with applying for and maintaining good standing in jurisdictions via business licenses. Fees incurred in connection with the application and subsequent renewals are capitalized and amortized using the straight-line method over an estimated useful life. In certain arrangements, the Company enters into agreements to operate on a business partner's license in exchange for upfront fees. These fees are capitalized and amortized over the shorter of their expected benefit under the partnership agreement or estimated useful life.

*Customer Relationships*

A504

Customer (or "user") relationships are finite-lived intangible assets, which are amortized over their estimated economic lives. Customer relationships are generally recognized as the result of business combinations.

*Trademarks and Tradenames*

The Company incurs fees in connection with applying for and maintaining trademarks and tradenames as well as trademarks and tradenames resulting from acquisitions. Fees incurred in connection with the application and subsequent renewals are capitalized and amortized using the straight-line method over an estimated useful life.

*Digital Assets*

The Company has purchased certain digital assets, including crypto currencies, with cash that is not required to currently support its operations. The Company accounts for digital assets in accordance with ASC 350, *Intangibles—Goodwill and Other (Topic 350)*. Accordingly, if the fair market value at any point during the reporting period is lower than the carrying value an impairment loss equal to the difference will be recognized in the consolidated statement of operations. We have not recorded any significant impairments.

**Impairment of Long-Lived Assets**

Long-lived assets, except for goodwill and indefinite-lived intangible assets, consist of property and equipment and finite-lived acquired intangible assets, such as internal-use software, developed software, gaming licenses, trademarks, tradenames, and customer relationships. Long-lived assets, except for goodwill and indefinite-lived assets, are tested for recoverability whenever events or changes in business circumstances indicate that the carrying amount of the asset may not be fully recoverable. Impairment expense is recognized to the extent an asset's expected undiscounted future cash flows are less than the asset's carrying amount. The Company determined that there was no impairment of long-lived assets during 2023, 2022, or 2021.

**Goodwill**

The Company regularly reviews its reporting units and the approach used by the CODM and segment management to evaluate performance and allocate resources. Prior to 2023, the Company's business was classified into three reporting units: B2C, Media and B2B. However, as a result of the Company's integration of its B2B business and change in reporting structure to the CODM, the Company determined that it only had one reporting unit as of October 1, 2023, the Company's annual goodwill impairment assessment date. In testing goodwill for impairment, the Company has the option to begin with a qualitative assessment, commonly referred to as "Step 0," to determine whether it is more likely than not that the fair value of a reporting unit containing goodwill is less than its carrying value. This qualitative assessment may include, but is not limited to, reviewing factors such as macroeconomic conditions, industry and market considerations, cost factors, entity-specific financial performance and other events, such as changes in the Company's management, strategy and primary user base. If the Company determines that it is more likely than not that the fair value of a reporting unit is less than its carrying value, the Company performs a quantitative goodwill impairment analysis by comparing the carrying amount to the fair value of the reporting unit. If the carrying amount exceeds the fair value, goodwill will be written down to the fair value and recorded as impairment expense in the consolidated statements of operations. The Company performs its impairment testing annually and when circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. The Company performed its annual impairment assessment of goodwill as of October 1, 2023 and, with consideration regarding the change in reporting units, concluded that goodwill was not impaired.

**Equity Method Investments**

The Company has a 49.9% membership interest in DKFS, LLC, also known as DRIVE by DraftKings as of December 31, 2023. In addition, the Company has committed to invest up to $17.5 million into DBDK Venture Fund I, LP, a Delaware limited partnership and a subsidiary of DKFS LLC. As of December 31, 2023, the Company had invested a total of $7.6 million of the total commitment, which represents ownership of approximately 28.6% in the fund.

The Company uses the equity method to account for investments in which the Company has the ability to exercise significant influence over the operating and financial policies of the investee, but it does not exercise control and is not the primary beneficiary. The Company's judgment regarding its level of influence over the equity method investee includes considering key factors, such as ownership interest, representation on the board of directors, and participation in policy-making decisions. The Company's carrying value in the equity method investee is reflected in the caption "Equity method investments"

F-12

A505

on the consolidated balance sheets. Changes in value of DKFS, LLC and DBDK Venture Fund I, LP are recorded in "Loss (income) from equity method investment" on the consolidated statements of operations.

Under the equity method, the Company's investment is initially measured at cost and subsequently increased or decreased to recognize the Company's share of income and losses of the investee, capital contributions and distributions and impairment losses. The Company performs a qualitative assessment annually and recognizes an impairment if there are sufficient indicators that the fair value of the investment is less than carrying value. There was no such impairment recorded during 2023, 2022, or 2021.

*Leases*

The Company determines if an arrangement is a lease at inception and categorizes it as either operating or finance based on the criteria of ASC 842. An arrangement contains a lease when the arrangement conveys the right to control the use of an identified asset over the lease term. Operating leases are recorded in the Consolidated Balance Sheets. The Company currently does not have any finance leases. The Company elects certain practical expedients that include not separating lease and non-lease components and it does not apply the right-of-use ("ROU") assets and lease liability recognition requirements to short-term leases.

Lease liabilities are recognized based on the present value of the future minimum lease payments over the lease term at the commencement date. These leases typically do not provide an implicit rate; therefore, the Company uses its incremental borrowing rate based on the information available at the commencement date in determining the present value of future lease payments. The incremental borrowing rate is the rate incurred to borrow on a collateralized basis over a similar term in an amount equal to the lease payments in a similar economic environment. ROUs are recognized at the lease commencement date at the value of the lease liability, adjusted for any lease payments made prior to commencement and exclude lease incentives and initial direct costs incurred. The lease terms include all non-cancelable periods and may include options to extend or terminate the lease when it is reasonably certain that we will exercise that option. Lease expense is recognized on a straight-line basis over the expected lease term.

*Liabilities to Users*

The Company records liabilities for user account balances and pending wagers. User account balances consist of user deposits, most promotional awards and user winnings less user withdrawals, tax withholdings and user losses. Liabilities for user account balances may be covered through a combination of cash reserved for users, receivables reserved for users and surety bonds for the benefit of users.

*Loss Contingencies*

The Company's loss contingencies, which are included within accounts payable and accrued expenses or other long-term liabilities in our consolidated balance sheets, are uncertain by nature and their estimation requires significant management judgment as to the probability of loss and estimation of the amount of such loss. These contingencies include, but may not be limited to, litigation, indirect taxes, regulatory investigations and proceedings and management's evaluation of complex laws and regulations, and the extent to which they may apply to our business and industry.

The Company regularly reviews its contingencies to determine whether the likelihood of loss is probable or reasonably possible and to assess whether a reasonable estimate of the loss can be made. Determination of whether a loss estimate can be made is a complex undertaking that considers the judgement of management, third-party research, the prospect of negotiation and interpretations by regulators and courts, among other information. When a loss is determined to be probable, and the amount of the loss can be reasonably estimated, an estimated contingent liability is recorded and the related legal costs are expensed as incurred.

*Revenue Recognition*

The Company records revenue in accordance with ASC Topic 606, *Revenue from Contracts with Customers* ("ASC 606"). ASC 606 requires companies to recognize revenue in a way that depicts the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. In addition, the standard requires more detailed disclosures to enable readers of the financial statements to understand the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers. See Note 9 (*Revenue Recognition*) for further information.

F-13

A506

The Company determines revenue recognition through the following steps:

- Identify the contract, or contracts, with the customer;

- Identify the performance obligations in the contract;

- Determine the transaction price;

- Allocate the transaction price to performance obligations in the contract; and

- Recognize revenue when, or as, the Company satisfies performance obligations by transferring the promised good or services.

The Company is currently engaged in the business of digital sports entertainment and gaming and provides its users with online gaming opportunities. The Company also provides online sportsbook and casino operators with technical infrastructure as well as related services with respect to its direct customers and distributors. The following is a description of the Company's revenue streams:

*Online gaming*

Sportsbook or sports betting involves a user wagering money on an outcome or series of outcomes occurring. When a user's wager wins, the Company pays the user a pre-determined amount known as fixed odds. Sportsbook revenue is generated by setting odds such that there is a built-in theoretical margin in each sports wagering opportunity offered to users. Sportsbook revenue is generated from users' wagers net of payouts made on users' winning wagers and incentives awarded to users.

iGaming, or online casino, typically includes digital versions of wagering games available in land-based casinos, such as blackjack, roulette and slot machines. For these product offerings, the Company functions similarly to land-based casinos, generating revenue through hold, as users play against the house. iGaming revenue is generated from user wagers net of payouts made on users' winning wagers and incentives awarded to users.

DFS is a peer-to-peer product offering in which contestants compete against one another for prizes. Contestants pay an entry fee to join a DFS contest and compete for prizes, which are distributed to the highest performing contestants in each contest as defined by each contest's prize table. DFS revenue is generated from contest entry fees from contestants, net of prizes and customer incentives awarded to contestants.

Sportsbook, iGaming, and DFS, each as described above, create a single performance obligation for the Company to operate contests or games and award prizes or payouts to users based on results. Revenue is recognized at the conclusion of each wager, wagering game hand or contest. Incentives can be used across online gaming product offerings. Additionally, certain incentives given to customers create material rights and represent separate performance obligations. User incentives in certain cases create liabilities when awarded to players and in those cases are generally recognized as revenue upon redemption.

*Gaming software*

The Company contracts with business customers to provide sports and casino betting software solutions. Gaming software revenue is recognized when control of the solutions is transferred to the customer in an amount that reflects the consideration to which the Company expects to be entitled to in exchange for providing control of the sports betting and casino software.

The Company's direct customer contract revenue is generally calculated as a percentage of the wagering revenue generated by the business customer using our software and is recognized in the periods in which those wagering and related activities conclude. Our direct customer arrangements do not provide the customers with the right to take possession of our software, but only the right to purchase access to the Company's sports and casino wagering software for a defined contractual period.

*Media and advertising revenue*

The Company enters contracts with businesses where it receives consideration in exchange for advertisement activities over the related campaign periods. These services are grouped into advertising promises and sponsored game promises. The advertising packages range from standard ad placements and background ad placements to more high-touch integrations, such as sponsored DFS contest series or custom site takeovers. Media and advertising revenue is generated from business users and recognized ratably over the respective ad periods.

F-14

A507

*Non-fungible token ("NFT") content*

The Company launched DraftKings Marketplace during the third quarter of 2021. Marketplace is a digital collectibles (non-fungible token or "NFT") ecosystem designed for mainstream accessibility that offers curated initial NFT drops ("Primary Sales"). In addition to Primary Sales, owners of NFTs on Marketplace can list their NFTs for sale to other Marketplace customers ("Secondary Sales"). The revenue that the Company earns from Marketplace is primarily based on a specific percentage of the gross value of each Primary Sale or Secondary Sale. The revenue is recognized for each sale when the NFT transfers to the end user.

*Transaction Price Considerations*

Variability in the transaction price arises primarily due to market-based pricing, cash discounts, revenue sharing and usage-based fees. DraftKings offers loyalty programs, free plays, deposit bonuses, discounts, rebates and other rewards and incentives to its customers. Revenue for Sportsbook, iGaming and DFS is collected prior to the contest or event and is fixed once the outcome is known. Prizes paid and payouts made to users are recognized when awarded to the player.

Contracts with customers may include multiple performance obligations. For such arrangements, the transaction price is allocated to performance obligations on a relative standalone selling price basis. Standalone selling prices are estimated based on observable data of the Company's sales of such products and services to similar customers and in similar circumstances on a standalone basis. For Online Gaming, which includes Sportsbook, iGaming and DFS, the Company allocates a portion of the transaction price to certain customer incentives that create material future customer rights. In addition, in the event of a multi-stage contest, the Company will allocate transaction price ratably from contest start to the contest's final stage.

*Certain costs to obtain or fulfill contracts*

Under ASC 606, certain costs to obtain or fulfill a contract with a customer must be capitalized, to the extent recoverable from the associated contract margin, and subsequently amortized as the products or services are delivered to the customer. These costs are capitalized as contract acquisition costs and are amortized over the period of benefit to the customer. For the Company, the period of benefit is typically less than or equal to one year. As such, the Company applied the practical expedient and contract acquisition costs are expensed immediately. Customer contract costs which do not qualify for capitalization as contract fulfillment costs are expensed as incurred.

*Contract balances*

Contract assets and liabilities represent the differences in the timing of revenue recognition from the receipt of cash from the Company's customers and billings to those customers. Contract assets reflect revenue recognized and performance obligations satisfied in advance of customer billing.

Deferred revenue primarily represents contract liabilities related to the Company's obligation to transfer future value in relation to in-period transactions in which the Company has received consideration. Such obligations are recognized as liabilities when awarded to users and are recognized as revenue when those liabilities are later resolved. The Company maintains various programs to incentivize user behavior, which allow users to earn awards. Incentive awards generally represent a material right to the user, and awards may be redeemed for future services. Incentive awards earned by users, but not yet redeemed, are generally recognized as a reduction to revenue and included within liabilities to users on our consolidated balance sheets. When a user redeems most types of awards, the Company recognizes revenue on its consolidated statements of operations. Certain player awards are not subject to expiration or have not been expired historically; on such awards the Company recognizes breakage (for amounts not expected to be redeemed) to the extent there is no requirement for remitting such balances to regulatory agencies. In addition to these incentive programs, the Company's deferred revenue balance also consists of wagered amounts that relate to unsettled or pending outcomes.

**Cost of Revenue**

Cost of revenue consists primarily of variable costs. These include mainly (i) product taxes, (ii) payment processing fees and chargebacks, (iii) platform costs directly associated with revenue-generating activities, including those costs that were originally capitalized for internally developed software, (iv) revenue share / market access arrangements, and (v) feed / provider services. The Company incurs payment processing fees on user deposits, withdrawals and deposit reversals from payment processors. Cost of revenue also includes expenses related to the distribution of our services, amortization of intangible assets and compensation of revenue associated personnel.

F-15

A508

*Sales and Marketing*

Sales and marketing expenses consist primarily of expenses associated with advertising, conferences, costs related to free to play contests, rent and facilities maintenance, and the compensation of sales and marketing personnel, including stock-based compensation expenses. Advertising costs are expensed as incurred and are included in sales and marketing expense in our consolidated statements of operations. Advertising costs include those costs associated with communicating with potential customers and generally use some form of media, such as internet, radio, print, television, or billboards. Advertising costs also include costs associated with strategic league and team partnerships. During the years ended December 31, 2023, 2022 and 2021, advertising costs calculated in accordance with U.S. GAAP were $984.4 million, $964.9 million and $831.1 million, respectively.

*Product and Technology*

Product and technology expenses consist primarily of research and development costs that are not capitalized and other costs not associated directly with revenue generating activities. Research and development costs primarily represent employee expenses (including stock-based compensation) for engineering product, design, analytical research and project management incurred for non-revenue generating activities. Other costs include related overhead for rent, facilities maintenance, third party software licenses and consulting services.

*General and Administrative*

General and administrative expenses consist of costs not related to sales and marketing, product and technology or revenue. General and administrative costs include professional services (including legal, regulatory, audit, accounting, lobbying and services related to acquisitions), rent and facilities maintenance, contingencies, insurance, allowance for credit losses, depreciation of leasehold improvements and furniture and fixtures and costs related to the compensation of executive and non-executive personnel, including stock-based compensation.

*Benefit Plans*

The Company maintains a defined contribution plan, which covers a majority of employees. The plan allows for employee salary deferrals, which are matched at our discretion. The Company contributions to these plans were $11.6 million, $9.3 million and $6.7 million in 2023, 2022 and 2021, respectively.

*Stock-based Compensation*

The Company measures compensation cost for stock options and other stock awards in accordance with ASC 718, *Compensation—Stock Compensation*. Stock-based compensation is measured at fair value on grant date and recognized as compensation cost over the requisite service period. Generally, the Company issues stock options and other stock awards to employees with service-based or performance-based vesting conditions. For awards with only service-based vesting conditions, the Company records compensation cost for these awards using the straight-line method less an assumed forfeiture rate. For awards with performance-based vesting conditions, the Company recognizes compensation cost on a tranche-by-tranche basis (the accelerated attribution method), based on the probability of achieving the performance criteria.

Under the provisions of ASC 505-50, *Equity-Based Payments to Non-Employees*, the Company measures stock-based awards granted to non-employees at the earlier of: (i) the performance commitment date, or (ii) the date the services required under the arrangement have been completed. Compensation cost is recognized over the period during which services are rendered by non-employees until service is completed.

F-16

A509

*Income Taxes*

The Company accounts for income taxes using the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in the consolidated financial statements or in the Company's tax returns. Deferred tax assets and liabilities are determined on the basis of the differences between U.S. GAAP treatment and tax treatment of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. Deferred tax liabilities are included in other long-term liabilities in the consolidated balance sheets. Changes in deferred tax assets and liabilities are included in the income tax (benefit) provision in the consolidated statement of operations. The Company assesses the likelihood that its deferred tax assets will be recovered from future taxable income and, to the extent it believes, based upon the weight of available evidence, that it is more likely than not that all or a portion of the deferred tax assets will not be realized, a valuation allowance is established through a charge to income tax expense. Potential for recovery of deferred tax assets is evaluated by considering taxable income of the appropriate source and character in carryback years, existing taxable temporary differences, prudent and feasible tax planning strategies and estimated future taxable profits.

The Company accounts for uncertainty in income taxes recognized in its consolidated financial statements by applying a two-step process to determine the amount of tax benefit to be recognized. First, the tax position must be evaluated to determine the likelihood that it will be sustained upon external examination by the taxing authorities. If the tax position is deemed more-likely-than-not to be sustained, the tax position is then measured to determine the amount of benefit to recognize in our consolidated financial statements. Liabilities for uncertain tax positions are included in long-term income tax liabilities in the consolidated balance sheets. The amount of the benefit that may be recognized is the largest amount that has a greater than 50% likelihood of being realized upon ultimate settlement. The income tax (benefit) provision includes the effects of any resulting tax reserves, or unrecognized tax benefits, that are considered appropriate, as well as the related net interest and penalties.

*Loss per share*

Basic loss per share is calculated using the two-class method. Under the two-class method, basic loss is computed by dividing net loss available to common stockholders by the weighted-average number of common shares outstanding during the period excluding the effects of any potentially dilutive instruments. The weighted-average number of common shares outstanding during the period includes Class A common stock but is exclusive of Class B common stock as these shares have no economic or participating rights. Diluted loss per share is computed similar to basic loss per share, except that the denominator is increased to include the number of additional common shares that would have been outstanding if potential common shares had been issued if such additional common shares were dilutive. Since the Company had net losses for all the periods presented, basic and diluted loss per share are the same, and additional potential common shares have been excluded, as their effect would be anti-dilutive.

*Recently Issued Accounting Pronouncements Not Yet Adopted*

In June 2022, the FASB issued ASU 2022-03, *Fair Value Measurement (Topic 820): Fair Value Measurement of Equity Securities Subject to Contractual Sale Restrictions* ("ASU 2022-03"), which clarifies the guidance in Accounting Standards Codification Topic 820, Fair Value Measurement ("Topic 820"), when measuring the fair value of an equity security subject to contractual restrictions that prohibit the sale of an equity security and introduces new disclosure requirements for equity securities subject to contractual sale restrictions that are measured at fair value in accordance with Topic 820. ASU 2022-03 is effective for fiscal years beginning after December 15, 2023, including interim periods within those fiscal years, and early adoption is permitted. While the Company is continuing to assess the potential impacts of ASU 2022-03, it does not expect ASU 2022-03 to have a material effect on the Company's consolidated financial condition, results of operations or cash flows.

In November 2023, the FASB issued ASU 2023-07, *Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures*, to improve reportable segment disclosures. The guidance expands the disclosures required for reportable segments in our annual and interim consolidated financial statements, primarily through enhanced disclosures about significant segment expenses. The standard will be effective for us beginning with our annual reporting for fiscal year 2024 and interim periods thereafter, with early adoption permitted. We are currently evaluating the impact of this standard on our segment disclosures.

In December 2023, the FASB issued ASU 2023-08, *Accounting for and Disclosure of Crypto Assets (Topic 820)*, a new standard designed to enhance decision-useful information about such assets and to better reflect the underlying economics of cryptocurrency transactions. The standard will be effective for us beginning with our annual reporting for fiscal year 2025 and interim periods thereafter, with early adoption permitted. We are currently evaluating the impact of this standard on our digital assets' accounting and disclosures.

F-17

A510

In December 2023, the FASB issued ASU 2023-09, Income Taxes—Income Taxes (Topic 740): Improvements to Income Tax Disclosures ("ASU 2023-09"). ASU 2023-09 modifies the rules on income tax disclosures to enhance the transparency and decision-usefulness of income tax disclosures, particularly in the rate reconciliation table and disclosures about income taxes paid. The amendments are intended to address investors' requests for income tax disclosures that provide more information to help them better understand an entity's exposure to potential changes in tax laws and the ensuing risks and opportunities and to assess income tax information that affects cash flow forecasts and capital allocation decisions. The guidance also eliminates certain existing disclosure requirements related to uncertain tax positions and unrecognized deferred tax liabilities. ASU 2023-09 is effective for public business entities for annual periods beginning after December 15, 2024. All entities are required to apply the guidance prospectively but have the option to apply it retrospectively. Early adoption is permitted. The Company is continuing to assess the timing of adoption and the potential impacts of ASC 2023-09.

**3.  Business Combinations**

*Acquisition of Golden Nugget Online Gaming, Inc.*

On May 5, 2022, DraftKings consummated the GNOG Transaction, and, under the terms of the GNOG Merger Agreement and subject to certain exclusions contained therein, GNOG stockholders received a fixed ratio of 0.365 shares of DraftKings Inc.'s Class A common stock for each share of GNOG that they held on the GNOG Closing Date. DraftKings Inc. issued approximately 29.3 million shares of its Class A common stock in connection with the consummation of the GNOG Transaction.

Operating results for GNOG on and after the GNOG Closing Date are included in the Company's consolidated statements of operations for the years ended December 31, 2023 and 2022. Because the Company is integrating GNOG's operations into its consolidated operating activities, the amount of revenue and earnings attributable to the GNOG business for 2022, which is included within revenue and net loss attributable to common stockholders in the Company's consolidated statements of operations, was impracticable to determine.

*Purchase Price Accounting for the GNOG Transaction*

On the GNOG Closing Date, the Company acquired 100% of the equity interests of GNOG pursuant to the GNOG Merger Agreement. The following is a summary of the consideration issued on the GNOG Closing Date:

| | | |
|---|---|---|
| Share consideration [1] | $ | 460,128 |
| Other consideration [2] | | 143,337 |
| **Total consideration** | **$** | **603,465** |

(1)  Includes the issuance of approximately 29.3 million shares of DraftKings Inc.'s Class A common stock issued at a price of $15.73.
(2)  Includes (i) $170.9 million of payments made by the Company on behalf of GNOG, including repayment of the outstanding portion of GNOG's term loan (including the associated prepayment premium) and payment of certain of GNOG's transaction expenses incurred in connection with the GNOG Transaction and (ii) warrants that were exercisable for shares of GNOG Class A common stock prior to the GNOG Closing Date, which were assumed by DraftKings in connection with the GNOG Transaction and became eligible to be converted into approximately 2.1 million shares of DraftKings Inc.'s Class A common stock in the aggregate. These payments were partially offset by commercial credits received by the Company from Fertitta Entertainment, Inc. ("FEI"), which can be applied by the Company from time to time to offset future amounts otherwise owed by it to FEI or its affiliates under commercial arrangements among such parties, subject to certain limited exceptions.

A511

The following table summarizes the consideration issued or paid in connection with the GNOG Transaction and the fair value of the assets acquired and liabilities assumed in connection with the consummation of the GNOG Transaction on the GNOG Closing Date:

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 66,709 |
| Cash reserved for users | | 7,633 |
| Receivables reserved for users | | 2,814 |
| Accounts receivables | | 7,783 |
| Prepaid expenses and other current assets | | 64 |
| Property and equipment, net | | 1,433 |
| Intangible assets, net | | 315,000 |
| Operating lease right-of-use assets | | 1,185 |
| Deposits and other non-current assets | | 47,395 |
| **Total identifiable assets acquired** | | **450,016** |
| **Liabilities assumed:** | | |
| Accounts payable and accrued expenses | | 32,989 |
| Liabilities to users | | 4,314 |
| Operating lease liabilities | | 1,185 |
| Other long-term liabilities | | 78,781 |
| **Total liabilities assumed** | | **117,269** |
| **Net assets acquired (a)** | | **332,747** |
| **Purchase consideration (b)** | | **603,465** |
| **Goodwill (b) – (a)** | $ | **270,718** |

Goodwill represents the excess of the gross consideration transferred over the difference between the fair value of the underlying net assets acquired and the underlying liabilities assumed. Qualitative factors that contribute to the recognition of goodwill include certain intangible assets that are not recognized as separate identifiable intangible assets apart from goodwill. Intangible assets not recognized apart from goodwill consist primarily of benefits from securing buyer-specific synergies that increase revenue and profits and are not otherwise available to a market participant, as well as acquiring a talented workforce and cost savings opportunities. Goodwill recognized is partially deductible for tax purposes, and the amount of deductible goodwill was determined to be $160.7 million.

*Intangible Assets*

| | | Fair Value | Weighted-Average Useful Life |
|---|---|---:|---:|
| Gaming licenses | $ | 145,000 | 12.2 years |
| Customer relationships | | 170,000 | 5.9 years |
| **Total** | $ | **315,000** | |

*Loan Receivable*

The Company acquired a long-term receivable in the amount of $30.1 million in connection with the GNOG Transaction, which originally resulted from a $30.0 million mezzanine loan (the "Danville GN Casino Loan") by GNOG to certain parties before the GNOG Closing Date to develop and construct a "Golden Nugget"-branded casino in Danville, Illinois, pending regulatory approvals, that would enable GNOG to obtain market access to the State of Illinois. There has been no significant deterioration of credit quality since the origination date of the Danville GN Casino Loan. The receivable related to the Danville GN Casino Loan is classified within deposits and other non-current assets on the Company's consolidated balance sheet.

F-19

A512

*Transaction Costs*

For the year ended December 31, 2022 and 2021, the Company incurred $14.9 million and $9.2 million, respectively, in advisory, legal, accounting and management fees in connection with the GNOG Transaction, which are included in general and administrative expenses on the Company's consolidated statements of operations.

*Unaudited Pro-Forma Information*

The financial information in the table below summarizes the combined results of operations of Old DraftKings and GNOG, on an actual and a pro forma basis, as applicable, as though the companies had been combined as of January 1, 2021. The pro forma financial information is presented for informational purposes only and is not indicative of the results of operations that would have been achieved if the GNOG Transaction had been consummated as of the beginning of the periods presented or of results that may occur in the future.

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2022 Pro Forma** | **2021 Pro Forma** |
| Revenue | $ 2,284,596 | $ 1,417,011 |
| Net loss | $ (1,375,161) | $ (1,660,125) |

The foregoing pro forma financial information is based on estimates and assumptions, which the Company believes are reasonable. The pro forma financial information includes adjustments primarily related to purchase accounting adjustments. Transaction costs and other non-recurring charges incurred are included in the earliest period presented.

***Vegas Sports Information Network, Inc. Acquisition***

On March 26, 2021, the Company acquired 100% of the equity of Vegas Sports Information Network, Inc. ("VSiN" and such acquisition, the "VSiN Acquisition") for $40.6 million of cash and approximately $29.4 million of the Company's Class A common stock.

The acquired assets and assumed liabilities of VSiN were recorded at their estimated fair values, including $21.8 million of intangible assets. Goodwill of $47.2 million represents the excess of the gross considerations transferred over the fair value of the underlying net assets acquired and liabilities assumed. Goodwill associated with the VSiN Acquisition is assigned as of the acquisition date to the Company's Media reporting unit. The purchase price allocation for the VSiN Acquisition was finalized as of December 31, 2021. Goodwill recognized is not deductible for tax purposes. As VSiN's financial results are not material to the Company's consolidated financial statements, the Company has elected to not include pro forma results.

***Blue Ribbon Software Ltd. Acquisition***

On April 1, 2021, the Company acquired 100% of the equity of Blue Ribbon Software Ltd. ("Blue Ribbon") for $17.8 million of cash and approximately $3.8 million of the Company's Class A common stock (the "Blue Ribbon Acquisition"). The acquired assets and assumed liabilities of Blue Ribbon were recorded at their estimated fair values. The purchase price allocation for the Blue Ribbon Acquisition was finalized as of December 31, 2021.

**4.  Property and Equipment**

Property and equipment, net consists of the following:

A513

| | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Computer equipment and software | $ 70,243 | $ 64,133 |
| Furniture and fixtures | 8,594 | 8,526 |
| Leasehold improvements | 57,309 | 43,046 |
| **Property and Equipment** | **136,146** | **115,705** |
| Accumulated depreciation | (75,451) | (55,603) |
| **Property and Equipment, net** | **$ 60,695** | **$ 60,102** |

During the years ended December 31, 2023, 2022, and 2021 the Company recorded depreciation expense on property and equipment of $20.4 million, $18.7 million, and $13.8 million, respectively. The value of property and equipment, net in foreign countries is $4.0 million.

**5.   Intangible Assets and Goodwill**

*Intangible Assets*

As of December 31, 2023, intangible assets, net consists of the following:

| | Weighted-Average Remaining Amortization Period | Gross Carrying Amount | Accumulated Amortization | Net |
|---|---|---|---|---|
| Amortized intangible assets: | | | | |
| Developed technology | 4.4 years | $ 422,900 | $ (193,247) | $ 229,653 |
| Internally developed software | 2.3 years | 236,644 | (108,169) | 128,475 |
| Gaming licenses | 10.6 years | 218,760 | (47,941) | 170,819 |
| Customer relationships | 4.1 years | 269,728 | (127,862) | 141,866 |
| Trademarks, tradenames and other | 3.3 years | 37,674 | (20,751) | 16,923 |
| | | 1,185,706 | (497,970) | 687,736 |
| Indefinite-lived intangible assets: | | | | |
| Digital assets, net of impairment | Indefinite-lived | 2,884 | N/A | 2,884 |
| **Intangible assets, net** | | **$ 1,188,590** | **$ (497,970)** | **$ 690,620** |

As of December 31, 2022, intangible assets, net consisted of the following:

| | Weighted-Average Remaining Amortization Period | Gross Carrying Amount | Accumulated Amortization | Net |
|---|---|---|---|---|
| Developed technology | 5.4 years | $ 422,900 | $ (140,200) | $ 282,700 |
| Internally developed software | 2.4 years | 168,277 | (70,575) | 97,702 |
| Gaming licenses | 11.0 years | 206,655 | (29,487) | 177,168 |
| Customer relationships | 4.6 years | 269,728 | (75,791) | 193,937 |
| Trademarks and tradenames | 3.8 years | 36,193 | (13,463) | 22,730 |
| | | 1,103,753 | (329,516) | 774,237 |
| Indefinite-lived intangible assets: | | | | |
| Digital assets, net of impairment | Indefinite-lived | 2,697 | — | 2,697 |
| **Intangible assets, net** | | **$ 1,106,450** | **$ (329,516)** | **$ 776,934** |

F-21

A514

During the years ended December 31, 2023, 2022, and 2021 the Company recorded amortization expense on intangible assets of $180.9 million, $150.6 million, and $107.3 million, respectively. Future cash flows associated with the Company's intangible assets are not expected to be materially affected by its ability to renew or extend its arrangements.

The table below shows expected amortization expense for the next five years of intangible assets recorded as of December 31, 2023:

| Year ending December 31, | | Estimated Amortization |
|---|---|---|
| 2024 | $ | 186,620 |
| 2025 | | 144,810 |
| 2026 | | 107,560 |
| 2027 | | 84,078 |
| 2028 | | 47,058 |

*Goodwill*

There were no changes in the carrying amount of goodwill for the year ended December 31, 2023. As of December 31, 2023, the Company had no accumulated goodwill impairment losses.

| | | Total |
|---|---|---|
| **Balance as of December 31, 2021** | $ | **615,65** |
| Goodwill resulting from acquisitions | | 270,71 |
| **Balance as of December 31, 2022** | $ | **886,37** |
| Changes in Goodwill | | – |
| **Balance as of December 31, 2023** | $ | **886,37** |

No impairment of goodwill was recorded in the years ended December 31, 2023, 2022 and 2021. As of December 31, 2023, the Company had no accumulated goodwill impairment losses.

6. **Accounts Payable and Accrued Expenses**

Accounts payable and accrued expenses consist of the following:

| | | December 31, 2023 | | December 31, 2022 |
|---|---|---|---|---|
| Accounts payable | $ | 34,127 | $ | 10,148 |
| Accrued compensation and related expenses | | 94,830 | | 78,819 |
| Accrued marketing | | 100,840 | | 146,569 |
| Accrued partnership fees | | 136,338 | | 99,633 |
| Accrued processor fees | | 21,357 | | 14,440 |
| Accrued product taxes | | 116,501 | | 70,891 |
| Accrued professional fees and litigation | | 53,870 | | 23,151 |
| Accrued software and license fees | | 25,829 | | 12,558 |
| Deferred revenue | | 43,634 | | 40,520 |
| Accrued other expenses | | 12,273 | | 20,858 |
| **Total** | $ | **639,599** | $ | **517,587** |

7. **Current and Long-term Liabilities**

F-22

A515

*Revolving Line of Credit*

On December 20, 2022, the Company entered into a loan and security agreement with Pacific Western Bank and Citizens Bank, as lenders (as amended, the "Credit Agreement"), which provides the Company with a revolving line of credit of up to $125.0 million (the "Revolving Line of Credit"). The Credit Agreement has a maturity date of December 20, 2024 and replaced the Company's amended and restated loan and security agreement entered into with Pacific Western Bank in October 2016 (the "Prior Credit Agreement"), which provided a revolving line of credit of up to $60.0 million and was terminated in connection with the Company's entry into the Credit Agreement.

Borrowings under the Credit Agreement bear interest at a variable annual rate equal to the greater of (i) 1.00% above the prime rate then in effect and (ii) 5.00%, and the Credit Agreement requires monthly, interest-only payments on any outstanding borrowings. In addition, the Company is required to pay quarterly in arrears a commitment fee equal to 0.25% per annum of the unused portion of the Revolving Line of Credit. As of December 31, 2023, the Credit Agreement provided a revolving line of credit of up to $125.0 million, and there was no principal outstanding under the Credit Agreement. Net borrowing capacity available from the Credit Agreement as of December 31, 2023 totaled $122.7 million. The Company is also subject to certain affirmative and negative covenants, including the restriction of dividends, under the Credit Agreement which it is in compliance with as of December 31, 2023. One such covenant involves maintaining compensating cash balances. The compensating balances may be withdrawn but the availability of the line of credit is dependent upon maintenance of such compensating balances. The performance of the Company's obligations under the Credit Agreement are secured by a first-priority security interest on substantially all of its assets.

*Convertible Notes and Capped Call*

In March 2021, Old DraftKings issued zero-coupon convertible senior notes in an aggregate principal amount of $1,265.0 million, which includes proceeds from the full exercise of the over-allotment option (collectively, the "Convertible Notes"). The Convertible Notes will mature on March 15, 2028 (the "Notes Maturity Date"), subject to earlier conversion, redemption or repurchase. In connection with the issuance of the Convertible Notes, Old DraftKings incurred $17.0 million of lender fees and $1.7 million of debt financing costs, which are being amortized through the Notes Maturity Date. The Convertible Notes represent senior unsecured obligations of Old DraftKings, which are being amortized through the Notes Maturity Date. On May 5, 2022, in connection with the consummation of the GNOG Transaction, (i) DraftKings Inc. agreed to fully and unconditionally guarantee all of Old DraftKings' obligations under the Convertible Notes and the indenture governing the Convertible Notes and (ii) each Convertible Note which was outstanding as of the consummation of the GNOG Transaction and previously convertible into shares of Old DraftKings Class A common stock became convertible into shares of DraftKings Inc. Class A common stock.

The Convertible Notes are convertible at an initial conversion rate of 10.543 shares of DraftKings Inc.'s Class A common stock per $1,000 principal amount of Convertible Notes, which is equivalent to an initial conversion price of approximately $94.85 per share of DraftKings Inc.'s Class A common stock. The conversion rate is subject to adjustment upon the occurrence of certain specified events and includes a make-whole adjustment upon early conversion in connection with a make-whole fundamental change (as defined in the indenture governing the Convertible Notes). For the years ended December 31, 2023, 2022 and 2021 there were no changes to the initial conversion price.

Prior to September 15, 2027, the Convertible Notes will be convertible by the holder only upon satisfaction of certain conditions and during certain periods, and thereafter, at any time until the close of business on the second scheduled trading day immediately preceding the Notes Maturity Date. Old DraftKings will satisfy any conversion election by paying or delivering, as the case may be, cash, shares of DraftKings Inc.'s Class A common stock or a combination of cash and shares of DraftKings Inc.'s Class A common stock. During 2022, the conditions allowing holders of the Convertible Notes to convert their Convertible Notes were triggered by the holding company reorganization in connection with the GNOG Transaction, whereby DraftKings Inc. became the going-forward public company and replaced Old DraftKings as the issuer of the Class A common stock issuable upon conversion of the Convertible Notes; such conversion window expired on June 27, 2022, and no holders of the Convertible Notes exercised their conversion rights. As of December 31, 2023, no conditions were met to allow for the conversion of the Convertible Notes by any holder.

In connection with the pricing of the Convertible Notes and the exercise of the over-allotment option to purchase additional notes, Old DraftKings entered into a privately negotiated capped call transaction ("Capped Call Transactions"). The Capped Call Transactions have a strike price of $94.85 per share, subject to certain adjustments, which corresponds to the initial conversion price of the Convertible Notes. The Capped Call Transactions have an initial cap price of $135.50 per share, subject to certain adjustments. The Capped Call Transactions are expected generally to reduce potential dilution to DraftKings Inc.'s Class A common stock upon any conversion of Convertible Notes. As the transaction qualifies for equity classification, the net

F-23

A516

cost of $124.0 million incurred in connection with the Capped Call Transactions was recorded as a reduction to additional paid-in capital on the Company's consolidated balance sheet.

As of December 31, 2023, the Company's convertible debt balance was $1,253.8 million, net of unamortized debt issuance costs of $11.2 million. The amortization of debt issuance costs were $2.7 million, $2.7 million and $2.1 million in 2023, 2022 and 2021, respectively, and these costs are included in the interest expense line-item on the Company's consolidated statements of operations. Although recorded at amortized cost on the Company's consolidated balance sheets, the estimated fair value of the Convertible Notes was $1,025.6 million and $786.5 million as of December 31, 2023 and 2022, respectively, which was calculated using the estimated or actual bids and offers of the Convertible Notes in an over-the-counter market on the last business day of the period, which is a Level 1 fair value measurement.

### *Indirect Taxes*

Taxation of e-commerce is becoming more prevalent and could negatively affect the Company's business as it primarily pertains to DFS and its contestants. The ultimate impact of indirect taxes on the Company's business is uncertain, as is the period required to resolve this uncertainty. The Company's estimated contingent liability for indirect taxes represents the Company's best estimate of tax liability in jurisdictions in which the Company believes taxation is probable. The Company frequently reevaluates its tax positions for appropriateness.

Indirect tax statutes and regulations are complex and subject to differences in application and interpretation. Tax authorities may impose indirect taxes on Internet-delivered activities based on statutes and regulations which, in some cases, were established prior to the advent of the Internet and do not apply with certainty to the Company's business. The Company's estimated contingent liability for indirect taxes may be materially impacted by future audit results, litigation and settlements, should they occur. The Company's activities by jurisdiction may vary from period to period, which could result in differences in the applicability of indirect taxes from period to period.

As of December 31, 2023, and December 31, 2022, the Company's estimated contingent liability for indirect taxes was $71.2 million and $60.3 million, respectively. The estimated contingent liability for indirect taxes is recorded within other long-term liabilities on our consolidated balance sheets and general and administrative expenses on our consolidated statements of operations.

### *Warrant Liabilities*

As part of the initial public offering of Diamond Eagle Acquisition Corp. ("DEAC") on May 14, 2019 (the "IPO"), DEAC issued 13.3 million warrants, each of which entitles the holder to purchase one share of DraftKings Inc.'s Class A common stock at an exercise price of $11.50 per share (the "Public Warrants"). Simultaneously with the closing of the IPO, DEAC completed the private sale of 6.3 million warrants to DEAC's sponsor (the "Private Warrants") where each whole warrant entitles the holder to purchase one share of DraftKings Inc.'s Class A common stock at an exercise price of $11.50 per share. As of December 31, 2023, there were no Public Warrants outstanding and 1.4 million Private Warrants outstanding. As of December 31, 2022, there were no Public Warrants outstanding and 1.6 million Private Warrants outstanding. On May 5, 2022, in connection with the consummation of the GNOG Transaction, Old DraftKings entered into an assignment and assumption agreement (the "Old DraftKings Warrant Assignment Agreement") with DraftKings Inc., Computershare Trust Company, N.A. and Computershare Inc. (together, "Computershare"), pursuant to which Old DraftKings assigned to DraftKings Inc. all of its rights, interests and obligations under the warrant agreement, dated as of May 10, 2019 (the "Old DraftKings Warrant Agreement"), by and between DEAC and Continental Stock Transfer & Trust Company, as warrant agent, as assumed by Old DraftKings and assigned to Computershare by that certain assignment and assumption agreement, dated as of April 23, 2020, governing Old DraftKings' outstanding Private Warrants, on the terms and conditions set forth in the Old DraftKings Warrant Assignment Agreement. In connection with the consummation of the GNOG Transaction and pursuant to the Old DraftKings Warrant Assignment Agreement, each of the outstanding Private Warrants became exercisable for one share of DraftKings Inc. Class A common stock on the existing terms and conditions, except as otherwise described in the Old DraftKings Warrant Assignment Agreement.

In addition, on May 5, 2022, in connection with the consummation of the GNOG Transaction, the Company assumed an additional 5.9 million warrants, each of which entitled the holder to purchase one share of GNOG's Class A common stock at an exercise price of $11.50 per share (the "GNOG Private Warrants"). Effective as of the consummation of the GNOG Transaction, each of the outstanding GNOG Private Warrants became exercisable, at a price of $31.50, for 0.365 of a share of DraftKings Inc.'s Class A common stock, or approximately 2.1 million shares of DraftKings Inc.'s Class A common stock in the aggregate, on the existing terms and conditions of such GNOG Private Warrants, except as otherwise described in the assignment and assumption agreement relating to the GNOG Private Warrants entered into on the GNOG Closing Date.

A517

The Company classified its Public Warrants, Private Warrants and GNOG Private Warrants pursuant to ASC 815 as derivative liabilities with subsequent changes in their respective fair values recognized in its consolidated statement of operations at each reporting date. As of December 31, 2023 and 2022, there were 5.9 million GNOG Private Warrants outstanding.

As of December 31, 2023, the fair value of the Company's warrant liability was $63.6 million. Due to fair value changes throughout 2023, the Company recorded a loss on remeasurement of warrant liabilities of $57.5 million and throughout 2022 and 2021, the Company recorded a gain on remeasurement of warrant liabilities of $29.4 million and $30.1 million, respectively. In 2023, 0.2 million Private Warrants were exercised resulting in a reclassification to additional paid-in-capital in the amount of $4.6 million, and no GNOG Private Warrants were exercised. In 2022, a de minimis number of Private Warrants and no GNOG Private Warrants were exercised. In 2021, 0.3 million Private Warrants were exercised, resulting in a reclassification to additional paid-in-capital in the amount of $9.2 million. See Note 8 (*Fair Value Measurements*) and Note 13 (*Loss Per Share*) for further information on the Company's warrant liabilities.

**8. Fair Value Measurements**

Certain assets and liabilities are carried at fair value under U.S. GAAP. Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value must maximize the use of observable inputs and minimize the use of unobservable inputs. Financial assets and liabilities carried at fair value and nonrecurring fair value measurements are to be classified and disclosed in one of the following three levels of the fair value hierarchy, of which the first two are considered observable and the last is considered unobservable:

- Level 1 — Quoted prices in active markets for identical assets or liabilities.

- Level 2 — Observable inputs (other than Level 1 quoted prices), such as quoted prices in active markets for similar assets or liabilities, quoted prices in markets that are not active for identical or similar assets or liabilities, or other inputs that are observable or can be corroborated by observable market data.

- Level 3 — Unobservable inputs that are supported by little or no market activity and that are significant to determining the fair value of the assets or liabilities, including pricing models, discounted cash flow methodologies and similar techniques.

The following tables set forth the fair value of the Company's financial assets and liabilities measured at fair value as of December 31, 2023 and 2022 based on the three-tier fair value hierarchy:

F-25

A518

|  | Level 1 | | Level 2 | | Level 3 | | Total |
|---|---|---|---|---|---|---|---|
| **December 31, 2023** | | | | | | | |
| **Assets** | | | | | | | |
| Cash equivalents: | | | | | | | |
| Money market funds | $ | 250,055 [1] | $ | — | $ | — | $ 250,055 |
| Other current assets: | | | | | | | |
| Digital assets held for users | | — | | 46,624 [2] | | — | $ 46,624 |
| Other non-current assets: | | | | | | | |
| Derivative instruments | | — | | — | | 19,999 [5] | $ 19,999 |
| Equity securities | | — | | 13,533 [4] | | — | 13,533 |
| **Total** | **$** | **250,055** | **$** | **60,157** | **$** | **19,999** | **$ 330,211** |
| **Liabilities** | | | | | | | |
| Other current liabilities: | | | | | | | |
| Digital assets held for users | $ | — | $ | 46,624 [2] | $ | — | $ 46,624 |
| Warrant liabilities | | — | | 63,568 [6] | | — | 63,568 |
| **Total** | **$** | **—** | **$** | **110,192** | **$** | **—** | **$ 110,192** |
| **December 31, 2022** | | | | | | | |
| **Assets** | | | | | | | |
| Cash equivalents: | | | | | | | |
| Money market funds | $ | 304,216 [1] | $ | — | $ | — | $ 304,216 |
| Other current assets: | | | | | | | |
| Digital assets held for users | | — | | 38,444 [2] | | — | 38,444 |
| Other non-current assets: | | | | | | | |
| Derivative instruments | | — | | — | | 26,248 [5] | 26,248 |
| Equity securities | | 18,250 [3] | | 13,533 [4] | | — | 31,783 |
| **Total** | **$** | **322,466** | **$** | **51,977** | **$** | **26,248** | **$ 400,691** |
| **Liabilities** | | | | | | | |
| Other current liabilities: | | | | | | | |
| Digital assets held for users | $ | — | $ | 38,444 [2] | $ | — | $ 38,444 |
| Warrant liabilities | | — | | 10,680 [6] | | — | 10,680 |
| **Total** | **$** | **—** | **$** | **49,124** | **$** | **—** | **$ 49,124** |

(1) Represents the Company's money market funds, which are classified as Level 1 because the Company measures these assets to fair value using quoted market prices.

(2) Represents the asset and liability balance for the digital assets held by the Company for its users, which are classified as Level 2 because the Company measures these digital assets to fair value using latest transaction price for similar transactions.

(3) Represents the Company's marketable equity securities, which are classified as Level 1 because the Company measures these assets to fair value using quoted market prices.

(4) Represents the Company's non-marketable equity securities, which are classified as Level 2 because the Company measures these assets to fair value using observable inputs for similar investments of the same issuer. The Company has elected the remeasurement alternative for these assets.

(5) Represents the Company's derivative instruments held in other public and privately held entities. The Company measures these derivative instruments to fair value using option pricing models and, accordingly, classifies these assets as Level 3.

A519

For the year ended December 31, 2023, the Company sold Level 3 derivative instruments with a fair value at December 31, 2022 of $6.3 million for proceeds of $5.2 million and recorded loss of $0.1 million related to this sale. There were no new Level 3 derivative instruments purchased by or issued to the Company for the year ended December 31, 2023. During 2022, the Company did not purchase or issue a significant amount of new derivative instruments. The table below includes a range and an average weighted by relative fair value of the significant unobservable inputs used to measure these Level 3 derivative instruments to fair value. A change in these significant unobservable inputs might result in a significantly higher or lower fair value measurement at the reporting date. Changes to fair value of these instruments are recorded in Other (loss) income, net on the consolidated statements of operations and Loss (gain) on marketable equity securities and other financial assets, net in the consolidated statement of cash flows.

| | December 31, 2023 Range (Weighted Average) | December 31, 2022 Range (Weighted Average) |
|---|---|---|
| **Significant Unobservable Input of Level 3 Investments** | **(amounts in dollars)** | **(amounts in dollars)** |
| Underlying stock price of Level 3 investments | $12.79 - $19.80 ($19.41) | $7.30 - $19.80 ($16.53) |
| Volatility of Level 3 investments | 75.0% - 80.0% (79.7%) | 56.0% - 80.0% (74.1%) |
| Risk-free rate of Level 3 investments | 1.3% - 4.2% (4.0%) | 1.3% - 4.3% (4.1%) |

(6) The Company measures its Private Warrants and the GNOG Private Warrants to fair value using a binomial lattice model or a Black-Scholes model, where appropriate, with the significant assumptions being observable inputs and, accordingly, classifies these liabilities as Level 2. Key assumptions used in the valuation of the Private Warrants and GNOG Private Warrants include term, risk free rate and volatility. See Note 7 Current and Long-term Liabilities and Note 13 Loss Per Share for further information on the Company's warrant liabilities.

During 2022, the Company recorded an unrealized gain of $19.9 million in the aggregate for its Level 3 financial assets. The Company did not record any unrealized gains or losses for its Level 3 financial assets during 2023 or 2021.

**9.    Revenue Recognition**

*Deferred Revenue*

The Company included deferred revenue within accounts payable and accrued expenses and liabilities to users in the consolidated balance sheets. The deferred revenue balances were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| Deferred revenue, beginning of the period | $ 133,851 | $ 91,554 | $ 30,627 |
| Deferred revenue, end of the period | $ 174,212 | $ 133,851 | $ 91,554 |
| Revenue recognized in the period from amounts included in deferred revenue at the beginning of the period | $ 129,246 | $ 74,837 | $ 28,319 |

Deferred revenue primarily represents contract liabilities related to the Company's obligation to transfer future value in relation to in period transactions in which the Company has received consideration. These obligations are primarily related to incentive programs and wagered amounts associated with unsettled or pending outcomes that fluctuate based on volume of activity. Such obligations are recognized as liabilities when awarded to users and are recognized as revenue when those liabilities are later resolved, often within the following year.

*Revenue Disaggregation*

Disaggregation of revenue for years ended December 31, 2023, 2022 and 2021 are as follows:

F-27

A520

|  | | Year Ended December 31, | | | |
|  | 2023 | | 2022 | | 2021 |
|---|---|---|---|---|---|
| Online gaming | $ | 3,557,191 | $ | 2,106,708 | $ | 1,145,539 |
| Gaming software | | 29,980 | | 43,000 | | 97,415 |
| Other | | 78,222 | | 90,753 | | 53,071 |
| **Total Revenue** | **$** | **3,665,393** | **$** | **2,240,461** | **$** | **1,296,025** |

Online gaming includes online Sportsbook, iGaming, and DFS, which have certain similar attributes and patterns of recognition. Other revenue primarily includes media, retail sportsbooks and other consumer product offerings. The opening and closing balances of the Company's accounts receivable from contracts with customers were $51.1 million and $47.5 million, respectively, for the year ended December 31, 2023, $45.8 million and $51.1 million, respectively, for the year ended December 31, 2022, and $44.5 million and $45.8 million, respectively, for the year ended December 31, 2021.

The following table presents the Company's revenue by geographic region for the periods indicated:

|  | | Year Ended December 31, | | | |
|  | 2023 | | 2022 | | 2021 |
|---|---|---|---|---|---|
| United States | $ | 3,595,622 | $ | 2,196,803 | $ | 1,198,748 |
| International | | 69,771 | | 43,658 | | 97,277 |
| **Total Revenue** | **$** | **3,665,393** | **$** | **2,240,461** | **$** | **1,296,025** |

**10. Stockholders' Equity (Deficit)**

*Class A Common Stock*

Holders of Class A common stock are entitled to cast one vote per share of Class A common stock. Holders of Class A common stock are not entitled to cumulate their votes in the election of directors. Holders of Class A common stock will share ratably (based on the number of shares of Class A common stock held) if and when any dividend is declared by the Board out of funds legally available therefor, subject to restrictions, whether statutory or contractual (including with respect to any outstanding indebtedness), on the declaration and payment of dividends and to any restrictions on the payment of dividends imposed by the terms of any outstanding preferred stock or any class or series of stock having a preference over, or the right to participate with, the Class A common stock with respect to the payment of dividends. On the liquidation, dissolution, distribution of assets or winding up of DraftKings, each holder of Class A common stock will be entitled, pro rata on a per share basis, to all assets of DraftKings of whatever kind available for distribution to the holders of common stock, subject to the designations, preferences, limitations, restrictions and relative rights of any other class or series of preferred stock of DraftKings then outstanding.

*Class B Common Stock*

Shares of Class B common stock may be issued only to, and registered in the name of, Mr. Robins and any entities wholly owned by Mr. Robins (including all subsequent successors, assigns and permitted transferees). Holders of Class B common stock are entitled to cast 10 votes per share of Class B common stock. Holders of Class B common stock are not entitled to cumulate their votes in the election of directors. Holders of Class B common stock will not participate in any dividend declared by the Board. On the liquidation, dissolution, distribution of assets or winding up of DraftKings, holders of Class B common stock will not be entitled to receive any distribution of DraftKings assets of whatever kind available until distribution has first been made to all holders of Class A common stock. Notwithstanding this, due to the liquidation rights of holders of Class A common stock described above in which all assets of DraftKings of whatever kind available will be distributed to holders of Class A common stock, no assets of DraftKings will be available for liquidating distributions in respect of Class B common stock.

*Preferred Stock*

The Company's amended and restated articles of incorporation provide that its Board has the authority, without action by the stockholders, to designate and issue shares of preferred stock in one or more classes or series, and the number of shares

F-28

A521

constituting any such class or series, and to fix the voting powers, designations, preferences, limitations, restrictions and relative rights of each class or series of preferred stock, including, without limitation, dividend rights, dividend rates, conversion rights, exchange rights, voting rights, rights and terms of redemption, dissolution preferences, and treatment in the case of a merger, business combination transaction, or sale of its assets, which rights may be greater than the rights of the holders of the common stock. As of December 31, 2023, the Company had 300.0 million shares authorized of preferred stock, $0.0001 par value, of which none were issued and outstanding as of December 31, 2023 or December 31, 2022.

**11. Stock-Based Compensation**

In 2012, the Company's board of directors adopted the 2012 Stock Option and Restricted Stock Incentive Plan (the "2012 Plan"), which provides for the granting of incentive and nonqualified stock options, shares of restricted stock and other equity interests or awards in the Company. The Company only issued time-based vesting awards under the 2012 Plan.

In 2017, the Company's board of directors approved the 2017 Equity Incentive Plan (the "2017 Plan"). No new awards have been issued under the 2012 Plan following the approval of the 2017 Plan. The 2017 Plan provides for the granting of incentive and nonqualified stock options, shares of restricted stock and other equity interests or awards in the Company. The Company issued time-based and performance-based vesting awards under the 2017 Plan.

In 2020, the Company's board of directors approved the 2020 Incentive Award Plan (the "2020 Plan", together with the 2012 Plan and the 2017 Plan, the "Plans"). The 2020 Plan provides for the granting of incentive and nonqualified stock options, restricted stock units ("RSUs") and other equity interests or awards in the Company. As of December 31, 2023, the total number of shares available for issuance under the 2020 Plan was 10.1 million shares. There are 10.4 million shares available for issuance under the 2017 Plan, however, we no longer issue awards under the 2017 Plan. There are no securities remaining available for future issuance under the 2012 Plan as this plan has expired pursuant to the terms. The Company issued time-based and performance-based vesting awards under the 2020 Plan. As of December 31, 2023, a share reserve established that the aggregate number of shares may not exceed 900.0 million shares under the Plans.

The Company has historically issued three types of stock-based compensation: time-based awards, long term incentive plan ("LTIP") awards and performance-based stock compensation plan ("PSP") awards. Time-based awards are equity awards that tie vesting to length of service with the Company. LTIP awards are performance-based equity awards that are used to establish longer-term performance objectives and incentivize management to meet those objectives. PSP awards are performance-based equity awards which establish performance objectives related to one or two particular fiscal years. As applicable, certain stock-based compensation awards expire seven to ten years after the grant date.

Time-based awards generally vest over a four-year period in annual and/or quarterly installments and, as applicable, expire no later than ten years from the date of grant. Time-based options are valued using the Black-Scholes option-pricing model with the assumptions noted in the table below. Shares issued from the exercise of options are issued from the available Class A shares available under the Plans. The fair value of time-based RSUs is estimated on the grant date using the underlying share price.

LTIP awards that were granted as RSUs subsequent to 2020 vest based on long-term revenue targets and used the underlying share price on the grant date to estimate their fair value. On and after November 2, 2022, certain DraftKings executives agreed to delay vesting of the third tranche of their restricted stock units granted under a long-term incentive plan and to add a service condition through an extended vesting date. This modification impacts the issuance of approximately 4 million shares of DraftKings Inc.'s Class A common stock, which vested approximately ten months after the performance condition was met.

PSP awards granted in 2023 and 2022 vest based on achievement of revenue and Adjusted EBITDA targets and have a range of payouts from 0% to 200%. PSP awards granted in 2021 and 2020 vest based on achievement of revenue targets and have a range of payouts from 0% to 300%. As these awards are performance-based RSUs, the fair value is estimated on the grant date using the underlying share price.

The fair value of each option is estimated on the grant date using the Black-Scholes option-pricing model and the assumptions noted in the table below. The fair value is recognized over the requisite service period of the awards, which is generally the vesting period. For awards with only service-based vesting conditions, the Company recognizes compensation cost using the straight-line method. Expected volatility is based on an average volatility for a representative sample of

F-29

A522

comparable public companies, including the Company. Stock options are generally granted with an exercise price equal to the fair value of the common stock at the grant date with a 10-year contractual term.

The expected term represents the period of time that the options are expected to be outstanding. The Company uses the simplified method as prescribed by the Securities and Exchange Commission Staff Accounting Bulletin No. 107, Share-Based Payment, to calculate the expected term for options granted, whereby, the expected term equals the average of the vesting term and the original contractual term of the options. The Company uses the simplified method because it does not have sufficient historical option exercise data to provide a reasonable basis upon which to estimate expected term. The risk-free interest rate is estimated using the rate of return on U.S. treasury notes with a life that approximates the expected life of the option. The fair value of the stock options issued was measured using the following assumptions:

|  | Year ended December 31, | | |
|  | 2023 | 2022 | 2021 |
| --- | --- | --- | --- |
| Risk free interest rate | 4.1 % | 3.1 % | 1.1 % |
| Expected term (in years) | 5.9 | 5.6 | 5.8 |
| Expected volatility | 55.7 % | 53.0 % | 43.0 % |
| Expected dividend yield | 0.0 % | 0.0 % | 0.0 % |

The following table shows stock award activity for the years ended December 31, 2023 and 2022:

| | Time-based | | PSP | | LTIP | | Total | | Weighted Average Exercise Price of Options | | Weighted Average FMV of RSUs | Weighted Average Remaining Term of Options (Years) | Aggregate Intrinsic Value of Options | |
| | Options | RSUs | Options | RSUs | Options | RSUs | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Outstanding at December 31, 2021 | 14,695 | 4,195 | 2,354 | 1,488 | 11,671 | 19,343 | 53,746 | $ | 5.46 | $ | 49.94 | 6.34 | $ | 622,108 |
| Granted | 400 | 15,254 | — | 12,523 | — | 1,390 | 29,567 | | 28.24 | | 17.79 | — | | — |
| Exercised options / vested RSUs | (2,672) | (2,913) | (76) | (2,671) | (519) | (6,251) | (15,102) | | 2.68 | | 43.19 | — | | — |
| Change in awards due to performance-based multiplier | — | — | — | 1,806 | — | — | 1,806 | | — | | 33.69 | — | | — |
| Forfeited | (164) | (1,263) | (5) | (27) | — | (618) | (2,077) | | 4.73 | | 34.94 | — | | — |
| Outstanding at December 31, 2022 | 12,259 | 15,273 | 2,273 | 13,119 | 11,152 | 13,864 | 67,940 | $ | 6.17 | $ | 29.64 | 5.49 | $ | 192,062 |
| Granted | 800 | 11,629 | — | 2,240 | — | 209 | 14,878 | | 29.02 | | 19.55 | — | | — |
| Exercised options / vested RSUs | (2,414) | (7,211) | (884) | (1,715) | (646) | (12,310) | (25,180) | | 4.16 | | 42.29 | — | | — |
| Change in awards due to performance-based multiplier | — | — | — | 1,141 | — | — | 1,141 | | — | | 60.25 | — | | — |
| Forfeited | (285) | (1,810) | — | (976) | — | (508) | (3,579) | | 4.39 | | 21.18 | — | | — |
| Outstanding at December 31, 2023 | 10,360 | 17,881 | 1,389 | 13,809 | 10,506 | 1,255 | 55,200 | $ | 7.10 | $ | 21.01 | 4.59 | $ | 645,885 |

The following table provides additional information for stock option awards outstanding as of December 31, 2023:

| | Awards Outstanding | Weighted Average Remaining Term of Options (Years) | Aggregate Intrinsic Value | | Weighted Average Exercise Price of Options |
| --- | --- | --- | --- | --- | --- |
| Stock options exercisable | 21,708 | 4.5 | $ | 643,350 | $ 6.44 |
| Stock options remaining to vest | 547 | 8.9 | $ | 2,535 | $ 33.10 |

F-30

A523

As of December 31, 2023, total unrecognized stock-based compensation cost of $597.5 million related to granted and unvested share-based compensation arrangements that are expected to vest is expected to be recognized over a weighted-average period of 2.6 years. The following table shows stock-based compensation cost for the years ended December 31, 2023, 2022 and 2021:

| | Year ended December 31, 2023 | | | Year ended December 31, 2022 | | | Year ended December 31, 2021 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Options | RSUs | Total[3] | Options | RSUs | Total | Options | RSUs | Total |
| Time Based [1] | $ 10,178 | $ 183,937 | $ 194,115 | $ 15,222 | $ 103,478 | $ 118,700 | $ 14,654 | $ 61,085 | $ 75,739 |
| PSP [2] | — | 126,071 | 126,071 | — | 90,180 | 90,180 | — | 82,089 | 82,089 |
| LTIP [2] | — | 78,277 | 78,277 | — | 369,919 | 369,919 | — | 525,465 | 525,465 |
| **Total** | **$ 10,178** | **$ 388,285** | **$ 398,463** | **$ 15,222** | **$ 563,577** | **$ 578,799** | **$ 14,654** | **$ 668,639** | **$ 683,293** |

(1) Time-based awards vest and are expensed over a defined service period.
(2) PSP and LTIP awards vest based on defined performance criteria and are expensed based on the probability of achieving such criteria.
(3) Total expenses includes $20.2 million of liability-classified awards recorded within accounts payable and accrued liabilities in the consolidated balance sheet as of December 31, 2023.

The weighted-average grant-date fair values of options granted during the years ended December 31, 2023, 2022 and 2021 were $8.59, $7.46 and $19.53 per share, respectively.

During the years ended December 31, 2023, 2022 and 2021 the Company received proceeds from the exercise of stock options of $16.5 million, $8.7 million and $31.5 million, respectively, and the aggregate intrinsic value of those stock options exercised was $101.7 million, $38.1 million and $473.4 million, respectively. The total grant date fair value of stock options that vested during the years ended December 31, 2023, 2022 and 2021 were $11.1 million, $15.3 million and $14.0 million, respectively.

**12.  Income Taxes**

Loss before income tax (benefit) provision for the years ended December 31, 2023, 2022 and 2021 consists of the following:

| | Year ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| United States | $ (753,105) | $ (1,329,931) | $ (1,391,154) |
| Foreign | (38,148) | (113,027) | (126,490) |
| **Loss before income tax (benefit) provision** | **$ (791,253)** | **$ (1,442,958)** | **$ (1,517,644)** |

The components of the provision (benefit) for income taxes consists of the following:

F-31

A524

| | | Year ended December 31, | | |
| | | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| Current: | | | | |
| Federal | $ | — $ | — $ | 90 |
| State | | 433 | 456 | 514 |
| Foreign | | 3,888 | 5,085 | 23,174 |
| Total current provision | | 4,321 | 5,541 | 23,778 |
| Deferred: | | | | |
| Federal | | 205 | (52,411) | (5,523) |
| State | | 2,643 | (17,624) | (2,075) |
| Foreign | | 3,001 | (3,372) | (7,911) |
| Total deferred (benefit) provision | | 5,849 | (73,407) | (15,509) |
| **Total income tax (benefit) provision** | $ | **10,170** $ | **(67,866)** $ | **8,269** |

The reconciliation between income taxes computed at the U.S. statutory income tax rate to our provision for income taxes for the years ended December 31, 2023, 2022 and 2021 is as follows:

| | | Year ended December 31, | | |
| | | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| Benefit for income taxes at 21% rate | $ | (166,217) $ | (303,028) $ | (318,705) |
| Prior year provision true-ups | | 1,321 | 938 | (16,878) |
| State taxes, net of federal benefit | | (40,385) | (17,265) | (142,119) |
| Internal restructurings | | — | — | (167,692) |
| Stock-based compensation (benefit) expense | | 26,155 | 28,015 | (70,150) |
| Non-deductible lobbying expenses | | 1,009 | 4,788 | 9,938 |
| Change in valuation allowance | | 130,817 | 166,978 | 575,225 |
| Non-deductible executive compensation | | 30,106 | 54,925 | 117,849 |
| (Gain) loss on remeasurement of warrant liabilities | | 12,084 | (6,173) | (6,301) |
| Foreign rate differential | | 3,348 | 1,802 | 16,588 |
| Income tax reserves | | 4,119 | (553) | 5,098 |
| Other | | 7,813 | 1,707 | 5,416 |
| **Total income tax provision (benefit)** | $ | **10,170** $ | **(67,866)** $ | **8,269** |

Significant components of the Company's deferred tax assets (liabilities) as of December 31, 2023 and 2022 are as follows:

F-32

A525

| | | Year ended December 31, | | |
| | | 2023 | | 2022 |
|---|---|---|---|---|
| Deferred tax assets: | | | | |
| Net operating loss carryforwards | $ | 1,042,874 | $ | 961,352 |
| Intangible assets | | 82,813 | | 72,299 |
| Accrual and other temporary differences | | 59,656 | | 57,281 |
| Operating lease | | 24,784 | | 18,213 |
| Stock-based compensation | | 51,065 | | 93,582 |
| Capitalized research and development costs | | 128,719 | | 61,584 |
| Fixed assets | | 2,451 | | 411 |
| Gross deferred tax assets | | 1,392,362 | | 1,264,722 |
| Valuation allowance | | (1,358,934) | | (1,228,117) |
| **Net deferred tax assets** | $ | **33,428** | $ | **36,605** |
| Deferred tax liabilities: | | | | |
| Capitalized software costs | $ | (4,535) | $ | (7,529) |
| Fixed assets | | (162) | | (3,590) |
| Operating lease | | (25,528) | | (16,102) |
| Other | | (7,798) | | (7,943) |
| Gross deferred tax liabilities | | (38,023) | | (35,164) |
| **Total net deferred tax (liabilities) assets** | $ | **(4,595)** | $ | **1,441** |

In assessing whether it is more likely than not that deferred tax assets will be realized, the Company considers all available evidence, both positive and negative, including its recent cumulative earnings or loss, experience and expectations of future available taxable income of the appropriate source and character by taxing jurisdiction, tax attribute carryback and carryforward periods available for tax purposes, and prudent and feasible tax planning strategies.

The Company records its deferred tax assets of $7.8 million and $10.7 million for 2023 and 2022, respectively, in deposits and other non-current assets and its deferred tax liabilities of $12.4 million and $9.3 million for 2023 and 2022, respectively, in other long-term liabilities in the consolidated balance sheets. The Company has provided a valuation allowance for the U.S. deferred tax assets as of December 31, 2023. For the year ended December 31, 2023, the U.S. valuation allowance increased by $130.8 million primarily due to the current year operating losses.

As of December 31, 2023, the Company had U.S. federal and state tax net operating loss ("NOL") carryforwards of $3.8 billion and $4.1 billion, respectively, which may be available to offset future income tax liabilities. Of the federal net operating loss carryforward, $0.7 billion expires at various dates beginning in 2032 through 2037 and $3.1 billion does not expire. Of the state NOL carryforward, $3.9 billion expires at various dates beginning in 2024 through 2043 and $0.2 billion does not expire.

Utilization of the NOL carryforwards may be subject to limitation under Section 382 of the Internal Revenue Code of 1986 based on ownership changes that have occurred previously or that could occur in the future. These ownership changes may limit the amount of NOL and tax credit carryforwards that can be utilized annually to offset future taxable income and tax, respectively. There could be additional ownership changes in the future, which may result in additional limitations on the utilization of the NOL and tax credit carryforwards. The Company has analyzed the impact of these limitations on its attributes and included the impact of these limitations in its U.S. deferred tax assets.

As of December 31, 2023, foreign earnings of $5.7 million have been retained by the Company's foreign subsidiaries for indefinite reinvestment. Upon repatriation of those earnings, in the form of dividends or otherwise, the Company could be subject to withholding taxes payable to the various foreign countries. Determination of the amount of unrecognized deferred income tax liability related to these outside basis differences is not practicable.

In addition to filing federal income tax returns, the Company files income tax returns in numerous states and foreign jurisdictions that impose an income tax. The Company is subject to U.S. federal, state and local income tax examinations by tax authorities for the years beginning in 2012. The Company is no longer subject to foreign income tax examinations for tax years prior to 2016.

F-33

A526

The following table presents a reconciliation of the total amounts of unrecognized tax benefits, excluding interest and penalties, included in long-term income tax liabilities on the Company's consolidated balance sheets:

| | Year ended December 31, | | |
| | 2023 | 2022 | 2021 |
|---|---|---|---|
| Unrecognized tax benefits at the beginning of the year | $ 58,011 | $ 72,407 | $ 70,341 |
| Additions for tax positions of prior years | 1,026 | 1,807 | — |
| Reduction for tax positions of prior years | (269) | — | — |
| Additions for tax positions of current year | 449 | — | — |
| Settlements | — | (7,412) | — |
| Foreign currency adjustments | (1,793) | (8,791) | 2,066 |
| **Unrecognized tax benefits at the end of the year** | $ **57,424** | $ **58,011** | $ **72,407** |

As of December 31, 2023, 2022 and 2021, the Company had $55.9 million, $58.0 million and $72.4 million, respectively, of net unrecognized tax benefits, which would affect the Company's tax rate if recognized. The Company does not anticipate any material changes to its unrecognized tax benefits within the next twelve months.

The Company recognizes interest and penalties accrued related to unrecognized tax benefits as income tax expense. During the years ended December 31, 2023, 2022 and 2021 the Company recognized $5.0 million, $6.4 million and $5.0 million in interest and penalties. The Company had $16.8 million and $11.8 million of interest and penalties accrued at December 31, 2023 and 2022, respectively.

Significant judgment is required in evaluating the Company's uncertain tax positions and determining its provision for income taxes. Although the Company believes that it has appropriately reserved for its uncertain tax positions, no assurance can be given that the final tax outcome of these matters will not be different than expectations. The Company will adjust these reserves in light of changing facts and circumstances, such as the closing of a tax audit, the refinement of an estimate, the closing of a statutory audit period or changes in applicable tax law. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences would impact the provision for income taxes in the period in which such determination is made. The provision for income taxes includes the impact of reserve provisions and changes to the reserves that are considered appropriate, as well as related net interest.

The Company recognizes liabilities for anticipated tax audit issues in the U.S. and other domestic and international tax jurisdictions based on its estimate of whether, and the extent to which, the tax positions are more likely than not to be sustained based on the technical merits. The Company believes that it has appropriate support for the income tax positions taken and to be taken on its tax returns and that its accruals for tax liabilities are adequate for all open years based on an assessment of many factors including past experience and interpretations of tax laws applied to the facts of each matter.

The Company believes it maintains appropriate reserves to offset any potential income tax liabilities that may arise upon final resolution of matters for open tax years. If such reserve amounts ultimately prove to be unnecessary, the resulting reversal of such reserves could result in tax benefits being recorded in the period the reserves are no longer deemed necessary. If such amounts prove to be less than an ultimate assessment, a future charge to expense would be recorded in the period in which the assessment is determined.

**13. Loss Per Share**

The computation of loss per share and weighted-average shares of the Company's Class A common stock outstanding for the periods presented are as follows:

A527

|  | Year ended December 31, | | |
|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| Net loss | $ (802,142) $ | (1,377,987) $ | (1,523,195) |
| Basic and diluted weighted-average common shares outstanding | 462,599 | 436,513 | 402,492 |
| **Loss per share attributable to common stockholders (in dollars):** | | | |
| Basic and diluted | $ (1.73) $ | (3.16) $ | (3.78) |

For the periods presented, the following securities were not required to be included in the computation of diluted shares outstanding:

|  | Year ended December 31, | | |
|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| Class A common stock resulting from exercise of all warrants | 3,524 | 3,761 | 1,613 |
| Stock options and RSUs | 55,200 | 67,941 | 53,746 |
| Convertible notes | 13,337 | 13,337 | 13,337 |
| **Total** | **72,061** | **85,039** | **68,696** |

**14. Related-Party Transactions**

*Financial Advisor*

On May 7, 2021, DraftKings entered into a master engagement letter (as amended, the "Master Engagement Letter"), with Raine Securities LLC (the "Financial Advisor"), an affiliate of Raine. John Salter, who served as a member of our Board of Directors until April 2022, is a partner of Raine. Pursuant to the Master Engagement Letter, Raine Securities will act as a financial advisor to DraftKings in connection with certain proposed transactions, and DraftKings will pay Raine Securities certain fees and expenses from time to time on the terms and conditions described in the related statements of work. During 2023, 2022 and 2021, the Company incurred $0.0 million, $8.5 million, $2.5 million, respectively, of professional fees in connection with certain business combination transactions and offerings undertaken by the Company, which are recorded within general and administrative expenses on the consolidated statement of operations.

*Receivables from Equity Method Investments*

The Company provides office space and general operational support to DKFS, LLC, an equity-method affiliate. The operational support is primarily general and administrative services. As of December 31, 2023, and 2022, the Company had $0.0 million and $0.2 million, respectively, of receivables from the entity related to those services and expenses to be reimbursed to the Company. The Company has committed to invest up to $17.5 million into DBDK Venture Fund I, LP, a Delaware limited partnership and a subsidiary of DKFS, LLC. As of December 31, 2023, the Company had invested a total of $7.6 million of the total commitment.

*Transactions with a Former Director and their Immediate Family Members*

During 2023, 2022 and 2021, the Company had $1.4 million, $2.3 million, and $4.5 million, respectively, in sales to entities related to an immediate family member of a former director. The Company had an associated accounts receivable balance of $0.0 million and $0.2 million as of December 31, 2023 and December 31, 2022, respectively, included in accounts receivable in its consolidated balance sheets.

*Aircraft*

Starting in 2022, from time to time, the Company has chartered, without mark-up, the private plane owned by Jason Robins, the Company's Chief Executive Officer, utilizing aircraft services from Jet Aviation Flight Services, Inc. for the business and personal travel of Mr. Robins and his family. The Company had no direct or indirect interest in such private plane. During 2023 and 2022, the Company incurred no expenses and $0.7 million of expense, respectively, for use of the aircraft under these chartering services, which was superseded by the lease referred to below.

F-35

A528

On March 30, 2022, the Company entered into a one-year lease of an aircraft from an entity controlled by Mr. Robins, pursuant to which Mr. Robins' entity leased the aircraft to the Company for $0.6 million for a one-year period (the "Original Aircraft Lease"). The Company covered all operating, maintenance and other expenses associated with the aircraft. The Original Aircraft Lease expired in accordance with its terms on March 30, 2023, and DraftKings entered into a new one-year lease of such aircraft from an entity controlled by Mr. Robins for $0.6 million and otherwise on terms and conditions substantially the same as the Original Aircraft Lease, effective upon the expiration of the Original Aircraft Lease (collectively with the Original Aircraft Lease, the "Aircraft Leases"). The audit and compensation committees of the Company's Board of Directors approved this arrangement, as well as the Aircraft Leases, based on, among other things, the requirements of the overall security program that Mr. Robins and his family fly private and the committees' assessment that such an arrangement is more efficient and flexible and better ensures safety, confidentiality and privacy. During 2023 and 2022, the Company incurred $0.6 million and $0.4 million of expense, respectively, under the aircraft lease.

**15. Leases, Commitments and Contingencies**

*Leases*

The Company leases corporate office facilities, data centers, and motor vehicles under operating lease agreements. Some of the Company's leases include one or more options to renew. For a majority of the Company's leases, it does not assume renewals in its determination of the lease term as the renewals are not deemed to be reasonably assured. The Company's lease agreements generally do not contain any material residual value guarantees or material restrictive covenants. As of December 31, 2023, the Company's lease agreements typically have terms not exceeding ten years.

Payments under the Company's lease arrangements may be fixed or variable, and variable lease payments primarily represent costs related to common area maintenance and utilities. The components of lease expense are as follows:

|  | December 31, 2023 | December 31, 2022 | December 31, 2021 |
|---|---|---|---|
| Operating lease cost | $ 19,175 | $ 20,003 | $ 16,551 |
| Short term lease cost | 2,616 | 6,004 | 3,273 |
| Variable lease cost | 4,644 | 4,462 | 4,261 |
| Sublease income | (704) | (849) | (774) |
| **Total lease cost** | **$ 25,731** | **$ 29,620** | **$ 23,311** |

Supplemental cash flow and other information for 2023 and 2022 related to operating leases was as follows:

|  | December 31, 2023 | December 31, 2022 |
|---|---|---|
| **Cash paid for amounts included in the measurement of lease liabilities:** |  |  |
| Operating cash flows from operating leases | $ 13,561 | $ 16,390 |
| **Right-of-use assets obtained in exchange for new operating lease liabilities** | $ 21,917 | $ 18,134 |

The weighted-average remaining lease term and weighted-average discount rate for the Company's operating leases were 7.3 years and 6.5% as of December 31, 2023. The Company calculated the weighted-average discount rates using incremental borrowing rates, which equal the rates of interest that it would pay to borrow funds on a fully collateralized basis over a similar term.

F-36

A529

Maturity of lease liabilities are as follows:

|  | December 31, |
|---|---|
| 2024 | $ 16,519 |
| 2025 | 15,127 |
| 2026 | 14,693 |
| 2027 | 15,542 |
| 2028 | 16,228 |
| Thereafter | 39,644 |
| Total undiscounted future cash flows | 117,753 |
| Less: Imputed interest | (25,427) |
| **Present value of undiscounted future cash flows** | **$ 92,326** |

*Other Contractual Obligations and Contingencies*

The Company is a party to several non-cancelable contracts with vendors where the Company is obligated to make future minimum payments under the terms of these contracts as follows:

|  | Year ending December 31, |
|---|---|
| 2024 | $ 467,609 |
| 2025 | 357,058 |
| 2026 | 199,339 |
| 2027 | 112,588 |
| 2028 | 86,802 |
| Thereafter | 181,228 |
| **Total** | **$ 1,404,624** |

*Surety Bonds*

As of December 31, 2023, the Company has been issued $215.0 million in surety bonds at a combined annual premium cost of 0.4% which are held for certain regulators' use and benefit in order for the Company to satisfy state license requirements. There have been no claims against such bonds and the likelihood of future claims is remote.

*Contingencies*

From time to time, and in the ordinary course of business, the Company may be subject to certain claims, charges and litigation concerning matters arising in connection with the conduct of the Company's business activities.

**Interactive Games LLC**

On June 14, 2019, Interactive Games LLC filed suit against the Company in the U.S. District Court for the District of Delaware, alleging that our Daily Fantasy Sports product offering infringes two patents and the Company's Sportsbook product offering infringes two different patents. The Company intends to vigorously defend this case. In the event that a court ultimately determines that the Company is infringing the asserted patents, it may be subject to substantial damages, which may include treble damages and/or an injunction that could require the Company to modify certain features that we currently offer.

The Company cannot predict with any degree of certainty the outcome of the suit or determine the extent of any potential liability or damages. The Company also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in these matters could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

F-37

A530

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of this proceeding will have a material adverse effect on the Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon our operating results for such period.

**Winview Inc.**

On July 7, 2021, Winview Inc., a Delaware corporation, filed suit against the Company in the U.S. District Court for the District of New Jersey, which was subsequently amended on July 28, 2021, alleging that our Sportsbook product offering infringes two patents, our Daily Fantasy Sports product offering infringes one patent, and that our Sportsbook product offering and Daily Fantasy Sports product offering infringe another patent. On November 15, 2021, Winview Inc. filed a second amended complaint (the "SAC"), adding as defendants DK Crown Holdings Inc. ("DK DE") and Crown Gaming Inc., a Delaware corporation, which are wholly-owned subsidiaries of the Company. The SAC largely repeats the allegations of the first amended complaint.

The Company intends to vigorously defend this case. In the event that a court ultimately determines that the Company is infringing the asserted patents, it may be subject to substantial damages, which may include treble damages and/or an injunction that could require the Company to modify certain features that we currently offer.

The Company cannot predict with any degree of certainty the outcome of the suit or determine the extent of any potential liability or damages. The Company also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in these matters could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of this proceeding will have a material adverse effect on the Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

**Securities Matters Arising From the Hindenburg Report and Related Matters**

Beginning on July 9, 2021, the Company received subpoenas from the SEC seeking documents concerning, among other things, certain of the allegations concerning SBTech that were contained in a report published about the Company on June 15, 2021 by Hindenburg Research, as well as the Company's adherence to and disclosures regarding its compliance policies and procedures, and related matters. The Company intends to comply with the related requests and is cooperating with the SEC's ongoing inquiry.

The Company cannot predict with any degree of certainty the outcome of the SEC matter or determine the extent of any potential liabilities. The Company also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in the SEC matter could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of the SEC matter will have a material adverse effect on the Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

**Matters Related to the GNOG Transaction**

On August 12, 2022, a putative class action was filed in Nevada state District Court in Clark County against Golden Nugget Online Gaming, Inc. ("GNOG Inc."), the Company and one of its officers and two affiliates, as well as former officers or directors and the former controlling stockholder of GNOG Inc. and Jefferies LLC. The lawsuit asserts claims on behalf of a putative class of former minority stockholders of GNOG Inc. alleging that certain former officers and directors of GNOG Inc. and its former controlling stockholder (Tilman Fertitta and/or Fertitta Entertainment, Inc.) breached their fiduciary duties to minority stockholders of GNOG Inc. in connection with the GNOG Transaction, and the other defendants aided and abetted the alleged breaches of fiduciary duty.

F-38

A531

On September 9, 2022, two similar putative class actions were filed in the Delaware Court of Chancery against former directors of GNOG Inc. and its former controlling stockholder, one of which also names the Company and Jefferies Financial Group, Inc. as defendants. These pending actions in Delaware assert substantially similar claims on behalf of a putative class of former minority stockholders of GNOG Inc. alleging that certain former officers and directors of GNOG Inc. and its former controlling stockholder (Tilman Fertitta) breached their fiduciary duties to minority stockholders of GNOG Inc. in connection with the GNOG Transaction, and one of the actions also alleges that the Company aided and abetted the alleged breaches of fiduciary duty. On October 12, 2022, the Delaware Court of Chancery consolidated these two actions under the caption *In re Golden Nugget Online Gaming, Inc. Stockholders Litigation*. At a mediation held on January 24, 2024, the parties reached an agreement in principle to settle the Delaware action, subject to negotiation and execution of mutually agreeable definitive documentation and the performance and satisfaction of terms and conditions set forth thereof. The estimated loss was accrued as of December 31, 2023 in the accounts payable and accrued expenses line-item on the consolidated balance sheet.

The Company intends to vigorously defend the Nevada action. The Company cannot predict with any degree of certainty the outcome of the Nevada action or determine the extent of any potential liabilities. The Company also cannot provide an estimate of the possible loss or range of loss of the Nevada action. Any adverse outcome in the Nevada action could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of the Nevada action will have a material adverse effect on the Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

**AG 18, LLC d/b/a/ Arrow Gaming**

On August 19, 2021, AG 18, LLC d/b/a/ Arrow Gaming ("Arrow Gaming") filed a complaint against the Company in the United States District Court for the District of New Jersey alleging that the Company's DFS and Casino product offerings infringe four patents. On October 12, 2021, Arrow Gaming filed an amended complaint to add one additional patent. On December 20, 2021, Arrow Gaming filed a second amended complaint adding new allegations with respect to alleged willful infringement.

The Company intends to vigorously defend this case. In the event that a court ultimately determines that the Company is infringing the asserted patents, it may be subject to substantial damages, which may include treble damages and/or an injunction that could require the Company to modify certain features that we currently offer.

The Company cannot predict with any degree of certainty the outcome of the suit or determine the extent of any potential liability or damages. The Company also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in these matters could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of this proceeding will have a material adverse effect on the Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

**Beteiro, LLC**

On November 22, 2021, Beteiro, LLC filed a complaint against the Company in the United States District Court for the District of New Jersey alleging that the Company's Sportsbook and Casino product offerings infringe four patents.

The Company intends to vigorously defend this case. In the event that a court ultimately determines that the Company is infringing the asserted patents, it may be subject to substantial damages, which may include treble damages and/or an injunction that could require the Company to modify certain features that we currently offer.

The Company cannot predict with any degree of certainty the outcome of the suit or determine the extent of any potential liability or damages. The Company also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in these matters could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

F-39

A532

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of this proceeding will have a material adverse effect on the Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

**Diogenes Ltd. & Colossus (IOM) Ltd.**

On December 1, 2021, Diogenes Ltd. & Colossus (IOM) Ltd. ("Colossus"), filed a complaint against the Company in the United States District Court for the District of Delaware alleging that the Company's Sportsbook product offering infringes seven patents. Colossus amended its complaint on February 7, 2022 to, among other things, add one additional patent.

The Company intends to vigorously defend this case. In the event that a court ultimately determines that the Company is infringing the asserted patents, it may be subject to substantial damages, which may include treble damages and/or an injunction that could require the Company to modify certain features that we currently offer.

The Company cannot predict with any degree of certainty the outcome of the suit or determine the extent of any potential liability or damages. The Company also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in these matters could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of this proceeding will have a material adverse effect on the Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

**Steiner**

Nelson Steiner filed suit against the Company and FanDuel Inc. in Florida state court on November 9, 2015. The action was subsequently transferred to In Re: Daily Fantasy Sports Litigation (Multi-District Litigation) (the "MDL"), and Mr. Steiner's action was consolidated into the MDL's amended complaint, which, in February 2016, consolidated numerous actions (primarily purported class actions) filed against the Company, FanDuel, and other related parties in courts across the United States. By June 23, 2022, the MDL was resolved, except for Mr. Steiner's action, and the court officially closed the MDL docket on July 8, 2022.

Mr. Steiner brings this action as a concerned citizen of the state of Florida alleging that, among other things, defendants' daily fantasy sports contests are illegal gambling under the state laws of Florida and seeks disgorgement of "gambling losses" purportedly suffered by Florida citizens on behalf of the state. On June 23, 2022, the MDL court remanded Mr. Steiner's action to the Circuit Court for Pinellas County, Florida. Plaintiff has not yet filed an amended pleading.

The Company intends to vigorously defend this suit. Any adverse outcome in this matter could be subject the Company to substantial damages and it could be restricted from offering DFS contests in Florida. The Company cannot provide any assurance as to the outcome of this matter.

The Company cannot predict with any degree of certainty the outcome of the suit or determine the extent of any potential liability or damages. The Company also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in these matters could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of this matter will have a material adverse effect on Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

**Turley**

On January 9, 2023, Simpson G. Turley, individually and on behalf of all others similarly situated, filed a purported class action against the Company in the United States District Court for the District of Massachusetts. Plaintiff alleges, among other things, that he was a contestant in the Company's daily fantasy showdown contest for the January 2, 2023, NFL game between the Cincinnati Bengals and the Buffalo Bills (the "Bengals-Bills Game"). The Bengals-Bills Game was postponed and

F-40

A533

eventually cancelled due to Damar Hamlin collapsing during the game. Plaintiff alleges that he was winning prizes in multiple showdown contests at the point in time that the Bengals-Bills Game was cancelled (with 5:58 remaining in the first quarter). Plaintiff alleges that, instead of paying out the prize money, the Company refunded entry fees to contestants that entered showdown or flash draft fantasy contests. On May 8, 2023, plaintiff Turley and a new plaintiff (Erik Ramos) filed a First Amended Class Action Complaint. The plaintiffs assert claims for breach of contract, unfair and deceptive acts and practices, false advertising, and unjust enrichment. Among other things, plaintiffs seek statutory damages, monetary damages, punitive damages, attorney fees and interest.

The Company intends to vigorously defend this case. Any adverse outcome in this matter could subject the Company to substantial damages and/or require alterations to the Company's business. The Company cannot provide any assurance as to the outcome of this matter.

The Company cannot predict with any degree of certainty the outcome of the suit or determine the extent of any potential liability or damages. The Company also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in this matter could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of this matter will have a material adverse effect on Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

**Securities Matters Related to DraftKings Marketplace**

On March 9, 2023, a putative class action was filed in Massachusetts federal court by alleged purchasers of non-fungible tokens ("NFTs") on the DraftKings Marketplace ("DK Marketplace"). The complaint asserts claims for violations of federal and state securities laws against the Company and three of its officers on the grounds that, among other things, the NFTs that are sold and traded on the DK Marketplace allegedly constitute securities that were not registered with the SEC in accordance with federal and Massachusetts law, and that the DK Marketplace is a securities exchange that is not registered in accordance with federal and Massachusetts law. Based on these allegations, plaintiff brings claims seeking rescissory damages and other relief on behalf of himself and a putative class of persons who purchased NFTs on the DK Marketplace between August 11, 2021 and the present. The Company intends to vigorously defend this matter.

On July 17, 2023, the Company received a subpoena from the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts seeking documents and requesting answers to interrogatories concerning, among other things, DK Marketplace and NFTs that are sold on DK Marketplace, and related matters. We intend to comply with these requests.

The Company cannot predict with any degree of certainty the outcome of these matters or determine the extent of any potential liability or damages. The Company also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in these matters could expose the Company to substantial damages, penalties and/or require alterations to the Company's business that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of these matters will have a material adverse effect on Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

**Shareholder Derivative Litigation Related to DraftKings Marketplace**

On May 31, 2023, a putative shareholder derivative action was filed in Nevada state court by an alleged shareholder of the Company. The action asserts claims on behalf of the Company against certain senior officers and members of the Board of Directors of the Company for breach of fiduciary duty and unjust enrichment based primarily on allegations that the defendants caused or allowed the Company to disseminate misleading and inaccurate information to its shareholders in connection with NFTs that are sold and traded on the DK Marketplace. The action also alleges that certain individuals are liable for trading in Company stock at artificially inflated prices. The action seeks unspecified compensatory damages, changes to corporate governance and internal procedures, restitution, disgorgement, costs and attorney's fees, and other unspecified relief.

The Company cannot predict with any degree of certainty the outcome of this matter or determine the extent of any potential liabilities. The Company also cannot provide an estimate of the possible loss or range of loss. Because this action

A534

alleges claims on behalf of the Company and purports to seek a judgment in favor of the Company, the Company does not believe, based on currently available information, that the outcome of the proceedings will have a material adverse effect on the Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

**Scanlon**

On December 8, 2023, plaintiffs Melissa Scanlon and Shane Harris, individually and on behalf of others similarly situated, filed a purported Massachusetts class action lawsuit against DraftKings in Middlesex County Superior Court of Massachusetts. Among other things, Plaintiffs allege that the Company's promotion that offered new customers an opportunity to earn up to 1,000 in site credits, and related advertisements, were: (1) unfair or deceptive practices in violation of Massachusetts General Laws ("M.G.L.") c. 93A, §§ 2, 9; and (2) untrue and misleading advertising in violation of M.G.L. c. 266, § 91. The Plaintiffs are seeking, among other things, injunctive relief, actual damages, double or treble damages, and attorneys' fees.

The Company intends to vigorously defend this case. Any adverse outcome in this matter could subject the Company to substantial damages and/or require alterations to the Company's business. The Company cannot provide any assurance as to the outcome of this matter.

The Company cannot predict with any degree of certainty the outcome of the suit or determine the extent of any potential liability or damages. The Company also cannot provide an estimate of the possible loss or range of loss. Any adverse outcome in this matter could expose the Company to substantial damages or penalties that may have a material adverse impact on the Company's operations and cash flows.

Despite the potential for significant damages, the Company does not believe, based on currently available information, that the outcome of this matter will have a material adverse effect on Company's financial condition, although the outcome could be material to the Company's operating results for any particular period, depending, in part, upon the operating results for such period.

**Internal Revenue Service**

The Company is currently under Internal Revenue Service audit for prior tax years, with the primary unresolved issues relating to excise taxation of fantasy sports contests and informational reporting and withholding. The final resolution of that audit, and other audits or litigation, may differ from the amounts recorded in these consolidated financial statements and may materially affect the Company's consolidated financial statements in the period or periods in which that determination is made.

**16. Subsequent Events**

*Pending Acquisition of Jackpocket Inc. ("Jackpocket")*

On February 11, 2024, the Company entered into a definitive agreement (the "Merger Agreement") to acquire Jackpocket for total consideration of $750 million, with approximately 55 percent of the consideration payable in cash funded from the Company's existing cash and cash equivalents balance, and approximately 45 percent of the consideration payable in the Company's Class A common stock, subject to customary purchase price adjustments and the collar mechanism described below (the "Jackpocket Transaction").

Under the terms of the Merger Agreement and subject to the terms and conditions set forth therein, the stock consideration will be subject to a collar pursuant to which a variable number of shares of DraftKings' Class A common stock will be issued to Jackpocket stockholders in order to deliver a value of $337.5 million, so long as the 30-trading-day volume weighted average price of DraftKings' Class A common stock as of the second trading day immediately preceding the closing of the Jackpocket Transaction (the "Closing Stock Price") remains between $31.68 and $42.86. In the event that DraftKings' Closing Stock Price is above $42.86 or below $31.68, Jackpocket stockholders will receive a fixed number of approximately 7,874,806 shares and 10,654,149 shares, respectively, of DraftKings' Class A common stock, subject to adjustment in certain limited circumstances to the minimum extent necessary to maintain a tax-free transaction.

The consummation of the Jackpocket Transaction is subject to the receipt of required regulatory approvals and other customary closing conditions.

F-42

A535

Exhibit Index

(b)    *Exhibits.* The following exhibits are being followed herewith:

| Exhibit No. | Description |
| --- | --- |
| 2.1† | Business Combination Agreement, dated as of December 22, 2019, among DraftKings Inc., SBTech (Global) Limited, SBTech's shareholders, Diamond Eagle Acquisition Corp., DEAC NV Merger Corp. and a wholly-owned subsidiary of DEAC (incorporated by reference to Exhibit 2.1 of DEAC NV Merger Corp.'s Registration Statement on Form S-4 (Reg. No. 333-235805), filed with the SEC on April 14, 2020). |
| 2.2 | Agreement and Plan of Merger, dated as of March 12, 2020, by and among Diamond Eagle Acquisition Corp. and DEAC NV Merger Corp. (incorporated by reference to Exhibit 2.3 of DEAC NV Merger Corp.'s Registration Statement on Form S-4 (Reg. No. 333-235805), filed with the SEC on April 14, 2020). |
| 2.3 | Amendment to Business Combination Agreement, dated as of April 7, 2020, among DraftKings Inc., SBTech (Global) Limited, SBTech's shareholders, Diamond Eagle Acquisition Corp., DEAC NV Merger Corp. and a wholly-owned subsidiary of DEAC (incorporated by reference to Exhibit 2.4 of DEAC NV Merger Corp.'s Registration Statement on Form S-4 (Reg. No. 333-235805), filed with the SEC on April 14, 2020). |
| 2.4*** | Agreement and Plan of Merger, by and among DraftKings Inc., New Duke Holdco, Inc., Golden Nugget Online Gaming, Inc., Duke Merger Sub, Inc. and Gulf Merger Sub, Inc., dated as of August 8, 2021 (incorporated by reference to Exhibit 2.1 of the Company's Current Report on Form 8-K, filed with the SEC on August 10, 2021). |
| 2.5*** | Agreement and Plan of Merger and Plan of Reorganization, dated as of February 11, 2024, by and among DraftKings Inc., DraftKings Holdings Inc., Fortune Merger Sub Inc., Fortune Merger Sub LLC, JackPocket, Inc. and Shareholder Representative Services LLC (incorporated by reference to Exhibit 2.1 of the Company's Current Report on Form 8-K, filed with the SEC on February 15, 2024). |
| 3.1 | Amended and Restated Articles of Incorporation of DraftKings Inc. (incorporated by reference to Exhibit 3.1 of the Company's Current Report on Form 8-K, filed with the SEC on May 5, 2022) |
| 3.2 | Amended and Restated Bylaws of DraftKings Inc. (incorporated by reference to Exhibit 3.2 of the Company's Current Report on Form 8-K, filed with the SEC on May 5, 2022). |
| 4.1* | Specimen Class A Common Stock Certificate of DraftKings. |
| 4.2 | Form of Warrant Certificate of DraftKings Inc. (incorporated by reference to Exhibit 4.2 of the Company's Current Report on Form 8-K, filed with the SEC on April 29, 2020). |
| 4.3 | Warrant Agreement, dated May 10, 2019, by and between Diamond Eagle Acquisition Corp. and Continental Stock Transfer & Trust Company, as warrant agent (incorporated by reference to Exhibit 4.1 of Diamond Eagle Acquisition Corp.'s Current Report on Form 8-K filed on May 14, 2019). |
| 4.4 | Assignment and Assumption Agreement, dated April 23, 2020, by and among DraftKings Inc., DEAC, Continental Stock Transfer & Trust Company, Computershare Trust Company, N.A. and Computershare Inc. (incorporated by reference to Exhibit 4.4 of the Company's Current Report on Form 8-K, filed with the SEC on April 29, 2020). |
| 4.5 | Indenture, dated as of March 18, 2021, between the Company and Computershare Trust Company, N.A., as trustee (including Form of 0% Convertible Senior Notes due 2028) (incorporated by reference to Exhibit 4.1 of the Company's Current Report on Form 8-K, filed with the SEC on March 18, 2021). |
| 4.6 | First Supplemental Indenture, dated as of May 5, 2022, between DraftKings Inc., Old DraftKings and Computershare Trust Company, N.A., as trustee (incorporated by reference to Exhibit 4.6 of the Company's Current Report on Form 8-K, filed with the SEC on May 5, 2022). |
| 4.7 | Description of DraftKings Inc.'s Capital Stock (incorporated by reference to DraftKings Inc.'s Registration Statement on Form S-4 (Reg. No. 333-260174), filed with the SEC on December 9, 2021). |
| 4.8 | Assignment and Assumption Agreement, dated May 5, 2022, by and among DraftKings Inc., GNOG, Continental and Computershare (incorporated by reference to Exhibit 4.2 of the Company's Current Report on Form 8-K, filed with the SEC on May 5, 2022). |
| 4.9 | Assignment and Assumption Agreement, dated May 5, 2022, by and among DraftKings Inc., Old DraftKings and Computershare (incorporated by reference to Exhibit 4.5 of the Company's Current Report on Form 8-K, filed with the SEC on May 5, 2022). |
| 10.1+ | DraftKings Inc. 2020 Incentive Award Plan (incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K, filed with the SEC on April 29, 2020). |
| 10.2 | Form of Subscription Agreement, dated December 22, 2019, by and between Diamond Eagle Acquisition Corp. and the undersigned subscriber party thereto (incorporated by reference to Exhibit 10.2 of DEAC NV Merger Corp.'s Registration Statement on Form S-4 (Reg. No. 333-235805), filed with the SEC on April 14, 2020). |
| 10.3+ | Executive Employment Agreement, dated April 23, 2020, between DraftKings Inc. and Matt Kalish (incorporated by reference to Exhibit 10.2 the Company's Current Report on Form 8-K, filed with the SEC on April 29, 2020). |

74

A536

| | |
|---|---|
| 10.4+ | Executive Employment Agreement, dated April 23, 2020, between DraftKings Inc. and Paul Liberman (incorporated by reference to Exhibit 10.3 the Company's Current Report on Form 8-K, filed with the SEC on April 29, 2020). |
| 10.5+ | Executive Employment Agreement, dated April 23, 2020, between DraftKings Inc. and Jason Robins (incorporated by reference to Exhibit 10.4 of the Company's Current Report on Form 8-K, filed with the SEC on April 29, 2020). |
| 10.6+ | DraftKings Inc. Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.5 of the Company's Current Report on Form 8-K, filed with the SEC on April 29, 2020). |
| 10.7 | Form of Indemnification Agreement (incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K, filed with the SEC on May 5, 2022). |
| 10.8 | Earnout Escrow Agreement, dated April 23, 2020, by and among DraftKings Inc., Shalom Meckenzie, in his capacity as SBT Sellers' Representative, Eagle Equity Partners LLC, Jeff Sagansky, Eli Baker, Harry Sloan, I.B.I. Trust Management, the trustee, and Computershare Trust Company, N.A., as escrow agent (incorporated by reference to Exhibit 10.8 of the Company's Current Report on Form 8-K, filed with the SEC on April 29, 2020). |
| 10.9 | Stockholders Agreement, dated April 23, 2020, by and among DraftKings Inc., the DK Stockholder Group, the SBT Stockholder Group and the DEAC Stockholder Group (incorporated by reference to Exhibit 10.9 of the Company's Current Report on Form 8-K, filed with the SEC on April 29, 2020). |
| 10.10 | Amendment to Stockholders Agreement, dated October 5, 2020, by and among DraftKings Inc., the DK Stockholder Group, the SBT Stockholder Group and the DEAC Stockholder Group (incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K, filed with the SEC on October 5, 2020). |
| 10.11 | Share Exchange Agreement, dated April 23, 2020, by and among DraftKings Inc., a Delaware corporation, Jason Robins and DEAC NV Merger Corp. (incorporated by reference to Exhibit 10.10 of the Company's Current Report on Form 8-K, filed with the SEC on April 29, 2020). |
| 10.12†** | Agreement for the Provision of a Sports Betting Solution ("License Agreement"), between Sports Information Services Limited and Crown Gaming Inc., dated as of June 19, 2018 (incorporated by reference to Exhibit 10.5 of DEAC NV Merger Corp.'s Registration Statement on Form S-4 (Reg. No. 333-235805), filed with the SEC on April 14, 2020). |
| 10.13†** | Addendum to License Agreement, between Sports Information Services Limited and Crown Gaming Inc., dated as of August 22, 2019 (incorporated by reference to Exhibit 10.6 of DEAC NV Merger Corp.'s Registration Statement on Form S-4 (Reg. No. 333-235805), filed with the SEC on April 14, 2020). |
| 10.14†** | Addendum, dated as of July 23, 2020 to the Agreement for the Provision of a Sports Betting Solution between Sports Information Services Limited and Crown Gaming Inc., dated as of June 19, 2018 (incorporated by reference to Exhibit 10.1 to DraftKings Inc.'s Current Report on Form 8-K (File No. 001-38908), filed with the SEC on July 23, 2020). |

75

A537

| 10.15+ | DraftKings Inc. 2017 Equity Incentive Plan, as amended from time to time (incorporated by reference to Exhibit 10.22 of the Company's Registration Statement on Form S-1 (No. 333-238051), filed with the SEC on May 6, 2020). |
| 10.16+ | Form of Stock Option Award Agreement (incorporated by reference to Exhibit 10.10 of the Company's Quarterly Report on Form 10-Q, filed with the SEC on May 15, 2020). |
| 10.17+ | Form of Restricted Stock Unit Award Agreement (incorporated by reference to Exhibit 10.11 of the Company's Quarterly Report on Form 10-Q, filed with the SEC on May 15, 2020). |
| 10.18 | Form of Base Capped Call Transaction Confirmation (incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K, filed with the SEC on March 18, 2021). |
| 10.19 | Form of Additional Capped Call Transaction Confirmation (incorporated by reference to Exhibit 10.2 of the Company's Current Report on Form 8-K, filed with the SEC on March 18, 2021). |
| 10.20 | Amended Executive Employment Agreement, dated August 5, 2021, between DraftKings Inc. and R. Stanton Dodge (incorporated by reference to Exhibit 10.1 of the Company's Quarterly Report on Form 10-Q, filed with the SEC on August 6, 2021). |
| 10.21 | Amended and Restated Executive Employment Agreement, dated August 5, 2021, between DraftKings Inc. and Jason Park (incorporated by reference to Exhibit 10.2 of the Company's Quarterly Report on Form 10-Q, filed with the SEC on August 6, 2021). |
| 10.22 | Support Agreement, by and among DraftKings Inc., Tilman J. Fertitta, Fertitta Entertainment, Inc., Landry's Fertitta, LLC, Golden Landry's LLC, Golden Fertitta, LLC and New Duke Holdco, Inc., dated as of August 8, 2021 (incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K, filed with the SEC on August 10, 2021). |
| 14.1 | Code of Business Ethics of the Company, dated April 23, 2020 (incorporated by reference to Exhibit 14.1 of the Company's Amended Annual Report on Form 10-K/A, filed with the SEC on May 3, 2021). |
| 21.1* | List of Subsidiaries. |
| 23.1* | Consent of BDO USA, P.C., independent registered public accounting firm. |
| 31.1* | Certification of Chief Executive Officer pursuant to Rules 13a-14 and 15d-14 promulgated under the Securities Exchange Act of 1934. |
| 31.2* | Certification of Chief Financial Officer pursuant to Rules 13a-14 and 15d-14 promulgated under the Securities Exchange Act of 1934. |
| 32.1* | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2* | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 97.1* | Executive Compensation Clawback Policy, dated as of December 1, 2023 |
| 99.1 | Loan and Security Agreement, dated as of December 20, 2022, by and among DraftKings Inc., as borrower, the guarantors listed therein, the lenders listed therein, Pacific Western Bank, as administrative agent, collateral agent and payment agent, Citizens Bank, N.A., as syndication agent, and Pacific Western Bank and Citizens Bank, N.A., as joint bookrunners and joint lead arrangers (incorporated by reference to Exhibit 99.1 of the Company's Annual Report on Form 10-K, filed with the SEC on February 17, 2023). |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |
| 104.1 | Cover Page Interactive Data File (Embedded within the Inline XBRL document and included in Exhibit). |

\* Filed herewith.

\*\* Certain portions of this exhibit have been omitted pursuant to Regulation S-K Item 601(b)(10)(iv). The Registrant agrees to furnish an unredacted copy of the exhibit to the SEC upon its request.

\*\*\* Annexes, schedules and/or exhibits have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The Company agrees to furnish supplementally a copy of any omitted attachment to the SEC on a confidential basis upon request.

† Certain of the exhibits and schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(a)(5). The Registrant agrees to furnish a copy of all omitted exhibits and schedules to the SEC upon its request.

+ Management contract or compensatory plan or arrangement.

76

A538

**Item 16. Form 10-K Summary.**

None.

77

A539

**Signatures**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: February 16, 2024

|        |                         |
|--------|-------------------------|
| By:    | /s/ Jason K. Park       |
| Name:  | Jason K. Park           |
| Title: | Chief Financial Officer |

**POWER OF ATTORNEY**

Each person whose individual signature appears below hereby authorizes and appoints Jason D. Robins, R. Stanton Dodge, and Jason K. Park, and each of them, with full power of substitution and resubstitution and full power to act without the other, as his or her true and lawful attorney-in-fact and agent to act in his or her name, place and stead and to execute in the name and on behalf of each person, individually and in each capacity stated below, and to file any and all amendments to this annual report on Form 10-K and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing, ratifying and confirming all that said attorneys-in-fact and agents or any of them or their or his or her substitute or substitutes may lawfully do or cause to be done by virtue thereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

78

A540

| Name | Position | Date |
|---|---|---|
| /s/ Jason D. Robins<br>Jason D. Robins | Chief Executive Officer and Chairman<br>(Principal Executive Officer) | February 16, 2024 |
| /s/ Jason K. Park<br>Jason K. Park | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | February 16, 2024 |
| /s/ Harry Evans Sloan<br>Harry Evans Sloan | Vice Chairman | February 16, 2024 |
| /s/ Matthew Kalish<br>Matthew Kalish | Director | February 16, 2024 |
| /s/ Woodrow H. Levin<br>Woodrow H. Levin | Director | February 16, 2024 |
| /s/ Paul Liberman<br>Paul Liberman | Director | February 16, 2024 |
| /s/ Jocelyn Moore<br>Jocelyn Moore | Director | February 16, 2024 |
| /s/ Ryan R. Moore<br>Ryan R. Moore | Director | February 16, 2024 |
| /s/ Valerie Mosley<br>Valerie Mosley | Director | February 16, 2024 |
| /s/ Steven J. Murray<br>Steven J. Murray | Director | February 16, 2024 |
| /s/ Marni M. Walden<br>Marni M. Walden | Director | February 16, 2024 |

79

A541



A542

A543

DRAFTKINGS INC., a Nevada corporation

THE COMPANY WILL FURNISH WITHOUT CHARGE TO EACH STOCKHOLDER WHO SO REQUESTS, A STATEMENT OF THE POWERS, DESIGNATIONS, PREFERENCES AND RELATIVE, PARTICIPATING, OPTIONAL OR OTHER SPECIAL RIGHTS OF EACH CLASS OF STOCK OR SERIES THEREOF OF THE COMPANY AND THE QUALIFICATIONS, LIMITATIONS, OR RESTRICTIONS OF SUCH PREFERENCES AND/OR RIGHTS. THIS CERTIFICATE AND THE SHARES REPRESENTED THEREBY ARE ISSUED AND SHALL BE HELD SUBJECT TO ALL OF THE PROVISIONS OF THE ARTICLES OF INCORPORATION OF THE COMPANY AND ALL AMENDMENTS THERETO AND RESOLUTIONS OF THE BOARD OF DIRECTORS PROVIDING FOR THE ISSUE OF SECURITIES (COPIES OF WHICH MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY), TO ALL OF WHICH THE HOLDER OF THIS CERTIFICATE BY ACCEPTANCE HEREOF ASSENTS.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

| TEN COM | - as tenants in common | UNIF GIFT MIN ACT | - .............................................Custodian ................................................ |
| | | | (Cust)                                    (Minor) |
| TEN ENT | - as tenants by the entireties | | under Uniform Gifts to Minors Act ........................................................ |
| | | | (State) |
| JT TEN | - as joint tenants with right of survivorship and not as tenants in common | UNIF TRF MIN ACT | - .............................................Custodian (until age ...............................) |
| | | | (Cust) |
| | | | ...............................under Uniform Transfers to Minors Act ................... |
| | | | (Minor)                                    (State) |

Additional abbreviations may also be used though not in the above list.

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

For value received, _____hereby sell, assign and transfer unto

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING POSTAL ZIP CODE, OF ASSIGNEE)

_____

_____

_____   Shares

of the Class A Common Stock represented by the within Certificate, and do hereby irrevocably constitute and appoint

_____   Attorney

to transfer the said stock on the books of the within-named Company with full power of substitution in the premises.

Dated: _____20 _____

Signature: _____

Signature: _____

Notice: The signature to this assignment must correspond with the name as written upon the face of the certificate, in every particular, without alteration or enlargement, or any change whatever.

Signature(s) Guaranteed: Medallion Guarantee Stamp

THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION (Banks, Stockbrokers, Savings and Loan Associations and Credit Unions) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM, PURSUANT TO S.E.C. RULE 17Ad-15.



The IRS requires that the named transfer agent ("we") report the cost basis of certain shares or units acquired after January 1, 2011. If your shares or units are covered by the legislation, and you requested to sell or transfer the shares or units using a specific cost basis calculation method, then we have processed as you requested. If you did not specify a cost basis calculation method, then we have defaulted to the first in, first out (FIFO) method. Please consult your tax advisor if you need additional information about cost basis.

If you do not keep in contact with the issuer or do not have any activity in your account for the time period specified by state law, your property may become subject to state unclaimed property laws and transferred to the appropriate state.

SECURITY INSTRUCTIONS

THIS IS WATERMARKED PAPER. DO NOT ACCEPT WITHOUT NOTING WATERMARK. HOLD TO LIGHT TO VERIFY WATERMARK.

A544

Exhibit 21.1

DRAFTKINGS INC.
LIST OF SUBSIDIARIES
(as of February 16, 2024)

| Name of Subsidiary | Country (State) | Percent Ownership |
|---|---|---|
| DraftKings Holdings Inc. | United States (Nevada) | 100% |
| DK Crown Holdings Inc. | United States (Delaware) | 100% |
| DK Player Reserve LLC | United States (Delaware) | 100% |
| DK Security Corporation | United States (Massachusetts) | 100% |
| Crown DFS Inc. | United States (Delaware) | 100% |
| Crown Gaming Inc. | United States (Delaware) | 100% |
| Crown PA DFS Inc. | United States (Delaware) | 100% |
| Crown MS Gaming Inc. | United States (Delaware) | 100% |
| Crown NJ Gaming Inc. | United States (Delaware) | 100% |
| Crown NV Gaming Inc. | United States (Delaware) | 100% |
| Crown NY Gaming Inc. | United States (Delaware) | 100% |
| Crown PA Gaming Inc. | United States (Delaware) | 100% |
| Crown WV Gaming Inc. | United States (Delaware) | 100% |
| DK-FH Inc. | United States (Delaware) | 100% |
| Crown Europe Malta Limited | Malta | 100% |
| Crown Gaming Malta Limited | Malta | 100% |
| Crown DFS Malta Limited | Malta | 100% |
| DraftKings Australia PTY Limited | Australia | 100% |
| DKUK Services LTD | United Kingdom | 100% |
| Crown IA Gaming LLC | United States (Delaware) | 100% |
| Crown MA Gaming LLC | United States (Delaware) | 100% |
| Crown IN Gaming LLC | United States (Delaware) | 100% |
| Crown Gaming Ireland Limited | Ireland | 100% |
| Crown NH Gaming LLC | United States (Delaware) | 100% |
| Crown CO Gaming LLC | United States (Delaware) | 100% |
| Crown TN Gaming LLC | United States (Delaware) | 100% |
| Crown IL Gaming LLC | United States (Delaware) | 100% |

A545

| | | |
|---|---|---|
| Crown MI Gaming LLC | United States (Delaware) | 100% |
| Crown VA Gaming LLC | United States (Delaware) | 100% |
| Crown AZ Gaming LLC | United States (Delaware) | 100% |
| Crown Gaming RT LLC | United States (Delaware) | 100% |
| DKDI LLC | United States (Delaware) | 100% |
| SBTech (Global) Limited | Isle of Man | 100% |
| Gaming Tech Ltd. | Israel | 100% |
| SBTech Subsidiary Bulgaria (branch) | Bulgaria | 100% |
| SBTech (Gibraltar) Limited | Gibraltar | 100% |
| SBTech US Inc. | United States (Delaware) | 100% |
| Sky Star Eight Limited | United Kingdom | 100% |
| Lucrative Green Leaf Limited | Ireland | 100% |
| Software Co-Work LLC | Ukraine | 100% |
| Software Co-Work Cyprus Limited | Cyprus | 100% |
| SBTech Malta Limited | Malta | 100% |
| Vegas Sports Information Network, LLC | United States (Nevada) | 100% |
| GUS I LLC | United States (Delaware) | 100% |
| GUS II LLC | United States (Delaware) | 100% |
| Crown OR Gaming LLC | United States (Delaware) | 100% |
| Crown CT Gaming LLC | United States (Delaware) | 100% |
| Crown WY Gaming LLC | United States (Delaware) | 100% |
| Crown WA Gaming LLC | United States (Delaware) | 100% |
| Crown DK CAN Ltd. | Canada (Alberta) | 100% |
| Scarcity Labs Inc. | Canada (Alberta) | 100% |
| Crown KS Gaming LLC | United States (Delaware) | 100% |
| Crown LA Gaming LLC | United States (Delaware) | 100% |
| Crown MD Gaming LLC | United States (Delaware) | 100% |
| Crown ME Gaming LLC | United States (Delaware) | 100% |
| Crown OK Gaming LLC | United States (Delaware) | 100% |
| Crown AL Gaming LLC | United States (Delaware) | 100% |
| Crown PR Gaming LLC | United States (Delaware) | 100% |
| DK II Security Corporation | United States (Massachusetts) | 100% |

A546

| | | |
|---|---|---|
| Crown FL Gaming LLC | United States (Delaware) | 100% |
| Crown SD Gaming LLC | United States (Delaware) | 100% |
| Blue Ribbon Software Ltd. | Israel | 100% |
| Blue Ribbon Holding Limited | Malta | 100% |
| Blue Ribbon Software Malta Limited | Malta | 100% |
| Northside Crown Gaming LLC | United States (Delaware) | 99% |
| LHGN Holdco, LLC | United States (Delaware) | 100% |
| Golden Nugget Online Gaming, Inc. | United States (Delaware) | 100% |
| Golden Nugget Online Gaming, LLC | United States (Delaware) | 100% |
| Crown OH Gaming LLC | United States (Delaware) | 100% |
| Crown CA Gaming LLC | United States (Delaware) | 100% |
| Crown WI Gaming LLC | United States (Delaware) | 100% |
| GNOG CAN Ltd. | Canada (Alberta) | 100% |
| Crown MD Online Gaming LLC | United States (Delaware) | 95% |
| DK Dash LLC | United States (Delaware) | 100% |
| DK Crown Media LLC | United States (Delaware) | 100% |
| DK Horse LLC | United States (Delaware) | 100% |
| GNOG WA LLC | United States (Delaware) | 100% |
| Crown MN Gaming LLC | United States (Delaware) | 100% |
| Crown NE Gaming LLC | United States (Delaware) | 100% |
| Crown KY Gaming LLC | United States (Delaware) | 100% |
| DK MKT LLC | United States (Delaware) | 100% |
| DK Draw LLC | United States (Delaware) | 100% |
| Black Throne Studios LLC | United States (Delaware) | 100% |
| Crown NC Gaming LLC | United States (Delaware) | 100% |
| Crown VT Gaming LLC | United States (Delaware) | 100% |
| Fortune Merger Sub Inc. | United States (Delaware) | 100% |
| Fortune Merger Sub LLC | United States (Delaware) | 100% |

A547

A548

A549

**Exhibit 23.1**

Consent of Independent Registered Public Accounting Firm

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (No. 333-237693-01 and No. 333-238051) and Form S-8 (No. 333-264716) of DraftKings Inc. of our reports dated February 16, 2024, relating to the consolidated financial statements and the effectiveness of DraftKings Inc.'s internal control over financial reporting, which appear in this Annual Report on Form 10-K.

/s/ BDO USA, P.C.
Boston, Massachusetts

February 16, 2024

**Exhibit 31.1**

**Certification of Principal Executive Officer Pursuant to Exchange Act Rule 13a-14(a)/15d-14(a) as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Jason D. Robins, certify that:

1. I have reviewed this Annual Report on Form 10-K of DraftKings Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 16, 2024

A550

/s/ Jason D. Robins
Jason D. Robins
Chief Executive Officer and Chairman of the Board
(Principal Executive Officer)

A551

**Exhibit 31.2**

**Certification of Principal Financial Officer Pursuant to Exchange Act Rule 13a-14(a)/15d-14(a) as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Jason K. Park, certify that:

1. I have reviewed this Annual Report on Form 10-K of DraftKings Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 16, 2024

A552

A553

/s/ Jason K. Park
Jason K. Park
Chief Financial Officer
(Principal Financial Officer)

A554

**Exhibit 32.1**

**Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, I, Jason D. Robins, Chief Executive Officer and Chairman of the Board of DraftKings Inc. (the "Company"), hereby certify, that, to my knowledge:

1. The Annual Report on Form 10-K for the period ended December 31, 2023 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 16, 2024

/s/ Jason D. Robins
Jason D. Robins
Chief Executive Officer and Chairman of the Board
(Principal Executive Officer)

A554

**Exhibit 32.2**

**Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, I, Jason K. Park, Chief Financial Officer of DraftKings Inc. (the "Company"), hereby certify, that, to my knowledge:

1. The Annual Report on Form 10-K for the period ended December 31, 2023 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 16, 2024

/s/ Jason K. Park
Jason K. Park
Chief Financial Officer
(Principal Financial Officer)

A555



**EXECUTIVE COMPENSATION
CLAWBACK POLICY**

-1-

Approved and Effective as of December 1, 2023
©2023 DraftKings Inc.

A556



## I.  BACKGROUND

DraftKings Inc. (the "Company") has adopted this Executive Compensation Clawback Policy (this "Policy") to provide for the recovery or "clawback" of certain incentive compensation in the event of a Restatement (as defined below).  This Policy is intended to comply with, and will be interpreted to be consistent with, the requirements of the Nasdaq Stock Market ("Nasdaq") Listing Rule 5608 (the "Listing Standard").  Certain capitalized terms used herein are defined in Section VIII of this Policy.

## II.  STATEMENT OF POLICY

Except to the extent provided under Section V, the Company shall recover reasonably promptly the amount of erroneously awarded Incentive-Based Compensation in the event that the Company is required to prepare an accounting restatement due to the material noncompliance of the Company with any financial reporting requirement under the securities laws, including any required accounting restatement to correct an error in previously issued financial statements that is material to the previously issued financial statements, or that would result in a material misstatement if the error were corrected in the current period or left uncorrected in the current period (each, a "Restatement").

## III.  SCOPE OF POLICY

**A.  *Covered Persons and Recovery Period.*** This Policy applies to Incentive-Based Compensation received by a person:

- after beginning service as an Executive Officer,

- who served as an Executive Officer at any time during the performance period for that Incentive-Based Compensation,

- while the Company has a class of securities listed on a national securities exchange or a national securities association, and

- during the three completed fiscal years immediately preceding the date that the Company is required to prepare a Restatement (the "Recovery Period").

Notwithstanding the foregoing, the Company is only required to apply, and shall only apply, this Policy to Incentive-Based Compensation received by Executive Officers on or after October 2, 2023.

For purposes of this Policy, Incentive-Based Compensation shall be deemed "received" in the Company's fiscal period during which the Financial Reporting Measure specified in the Incentive-Based Compensation award is attained, even if the payment or grant of the Incentive-Based Compensation occurs after the end of that period.

**B.  *Transition Period.*** In addition to the Recovery Period, this Policy applies to any transition period (that results from a change in the Company's fiscal year) within or immediately following the Recovery Period (a "Transition Period"); provided that a Transition Period between the last day of the Company's previous fiscal year end and the first day of the Company's new fiscal year that comprises a period of nine to 12 months will be deemed a completed fiscal year.

**C.  *Determining Recovery Period.*** For purposes of determining the relevant Recovery Period, the date that the Company is required to prepare the Restatement shall be the earlier to occur of:

-2-

©2023 DraftKings Inc.

A557



- the date the board of directors of the Company (the "Board"), a committee of the Board, or the officer or officers of the Company authorized to take such action if Board action is not required, concludes, or reasonably should have concluded, that the Company is required to prepare a Restatement, and

- the date a court, regulator, or other legally authorized body directs the Company to prepare a Restatement; provided that the determination and application of this Policy shall occur after such order is final and non-appealable.

For clarity, the Company's obligation to recover erroneously awarded Incentive-Based Compensation under this Policy is not dependent on if or when a Restatement is filed.

**D.  *Method of Recovery.***  Without limiting this Section III, the Compensation Committee of the Board (the "Compensation Committee") will have discretion in determining the means to effectuate the recovery of erroneously awarded Incentive-Based Compensation under this Policy, recognizing that different means of recovery may be appropriate in different circumstances.

## IV.  AMOUNT SUBJECT TO RECOVERY

**A.  *Recoverable Amount.***  The amount of Incentive-Based Compensation subject to recovery under this Policy is the amount of Incentive-Based Compensation received by any individual covered by this Policy pursuant to Section III that exceeds the amount of Incentive-Based Compensation that otherwise would have been received by such individual had it been determined based on the amounts after giving effect to the applicable Restatement, computed without regard to any taxes paid on such Incentive-Based Compensation.

**B.  *Covered Compensation Based on Stock Price or TSR.***  For Incentive-Based Compensation based on stock price or total shareholder return ("TSR"), where the amount of erroneously awarded Incentive-Based Compensation is not subject to mathematical recalculation directly from the information in the applicable Restatement, (i) the recoverable amount shall be determined by the Compensation Committee based on a reasonable estimate of the effect of the Restatement on the stock price or TSR upon which the Incentive-Based Compensation was received and (ii) the Company shall maintain documentation of the determination of that reasonable estimate and provide such documentation to Nasdaq (or the Company's then-applicable national securities exchange or national securities association).

## V.  EXCEPTIONS

The Company shall recover erroneously awarded Incentive-Based Compensation in compliance with this Policy, except to the extent that (i) either of the conditions set out below in this Section V are met and (ii) the Compensation Committee or, in the absence of a Compensation Committee comprised solely of independent directors, a majority of the independent directors serving on the Board, has made a determination that recovery would be impracticable:

**A.  *Direct Expense Exceeds Recoverable Amount.***  The direct expense paid to a third party to assist in enforcing this Policy would exceed the amount to be recovered; provided, however, that before concluding it would be impracticable to recover any amount of erroneously awarded Incentive-Based Compensation based on expense of enforcement, the Company shall make a reasonable attempt to recover such erroneously awarded Incentive-Based Compensation, document such reasonable attempt(s) to recover, and provide that documentation to Nasdaq (or the Company's then-applicable national securities exchange or national securities association); or

©2023 DraftKings Inc.

A558



**B.** *Recovery from Certain Tax-Qualified Retirement Plans*.  Recovery would likely cause an otherwise tax-qualified retirement plan, under which benefits are broadly available to employees of the Company, to fail to meet the requirements of 26 U.S.C. 401(a)(13) or 26 U.S.C. 411(a) and regulations thereunder.

## VI.  PROHIBITION AGAINST INDEMNIFICATION

Notwithstanding the terms of any indemnification arrangement or insurance policy with any individual covered by this Policy pursuant to Section III, the Company shall not indemnify any Executive Officer or former Executive Officer against the loss of erroneously awarded Incentive-Based Compensation, including any payment or reimbursement for the cost of insurance obtained by any such covered individual to fund amounts recoverable under this Policy.

## VII. DISCLOSURE

The Company shall file all required disclosures with respect to this Policy and recoveries under this Policy in accordance with the requirements of the U.S. Federal securities laws, including the disclosure required by the applicable Securities and Exchange Commission ("SEC") filings.

## VIII. DEFINITIONS

Unless the context otherwise requires, the following definitions apply for purposes of this Policy:

"Executive Officer" means the Company's president, principal financial officer, principal accounting officer (or if there is no such accounting officer, the controller), any vice-president of the Company in charge of a principal business unit, division, or function (such as sales, administration, or finance), any other officer who performs a policy-making function, or any other person who performs similar policymaking functions for the Company.  Executive officers of the Company's subsidiaries are deemed Executive Officers of the Company if they perform such policymaking functions for the Company.  The term "policy-making function" is not intended to include policy-making functions that are not significant.  Identification of an Executive Officer for purposes of this Policy will include, at a minimum, the executive officers identified pursuant to 17 CFR 229.401(b).

"Financial Reporting Measures" means any of the following: (i) measures that are determined and presented in accordance with the accounting principles used in preparing the Company's financial statements, and any measures that are derived wholly or in part from such measures, (ii) stock price and (iii) TSR.  A Financial Reporting Measure need not be presented within the Company's financial statements or included in a filing with the SEC.

"Incentive-Based Compensation" means any compensation that is granted, earned, or vested based wholly or in part upon the attainment of a Financial Reporting Measure.

## IX.  ADMINISTRATION; AMENDMENT; TERMINATION

Unless expressly provided otherwise, all determinations under this Policy will be made by the Compensation Committee, including determinations regarding the means by which any recovery under this Policy shall be effectuated.  Any determinations of the Compensation Committee will be final, binding and conclusive and need not be uniform with respect to each individual covered by this Policy.

The Compensation Committee may amend this Policy from time to time and may terminate this Policy at any time, in each case in its sole discretion, subject to applicable law, including but not limited to, the Listing Standard (or the listing standards of the Company's then-applicable national securities exchange or national

-4-

©2023 DraftKings Inc.

A559



securities association).

**X.   EFFECTIVENESS; OTHER RECOUPMENT RIGHTS**

This Policy shall be effective as of December 1, 2023. Notwithstanding the foregoing, the Company is only required to apply this Policy to Incentive-Based Compensation received on or after October 2, 2023. Any right of recoupment under this Policy is in addition to, and not in lieu of, any other remedies or rights of recoupment that may be available to the Company and its subsidiaries and affiliates under applicable law or pursuant to the terms of any similar policy or similar provision in any employment agreement, equity award agreement or similar agreement.

**XI.   EXCEPTIONS TO THIS POLICY; QUESTIONS**

To the extent permitted by applicable law, exceptions to this Policy may be granted by the Compensation Committee or, in the absence of a Compensation Committee comprised solely of independent directors, a majority of the independent directors serving on the Board.

If you have any questions about this Policy or its application, please contact the Legal Department.

-5-

©2023 DraftKings Inc.

A560

A561

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DRAFTKINGS, INC.,

        *Plaintiff,*

    v.

MICHAEL Z. HERMALYN,

        *Defendants.*

Civil Action No. 1:24-cv-10299

---

**DECLARATION OF DEFENDANT MICHAEL Z. HERMALYN
IN SUPPORT OF HIS OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

A562

## DECLARATION OF MICHAEL Z. HERMALYN

I, Michael Z. Hermalyn, hereby declare, under penalty of perjury, the following:

1.      I am over the age of 18 and have personal knowledge of the facts set forth in this Declaration.  If called upon to do so, I could and would testify competently thereto.

2.      I submit this declaration to address a limited number of allegations raised in DraftKings' motion for preliminary injunction that were not raised during my deposition or that warrant reiteration.

3.      DraftKings claims that I improperly solicited two of its employees, Andrew Larracey and Hayden Metz.  That accusation is false.  On February 1, 2024, Mr. Larracey and Mr. Metz reached out to me on their own volition.  They first contacted me from a DraftKings conference room, and then later that evening, they called me from Mr. Larracey's wife's cellphone. I did not direct Mr. Larracey to call me from his wife's phone, or from any other phone—that was Mr. Larracey's choice.  To my knowledge, Fanatics has not hired any DraftKings employees since I joined and certainly none to work in Fanatics' VIP business.

4.      DraftKings also contends that I have solicited its customers.  That, too, is false.  As for DraftKings' vague accusation that I "met with" unnamed "DK partners," I have no idea who they are referring to, but I do know that I had no such business meetings.  To my knowledge, DraftKings has not lost a single customer as a result of my departure, and it does not claim otherwise.

5.      DraftKings authorized me to use my personal phone for work and I did so. DraftKings now accuses me of retaining certain personal devices that may contain DraftKings' confidential information.  As I have previously testified in both my declaration and in my deposition, this allegation is false.  DraftKings' new allegation that I retained "two iPhones" is

1

A563

also incorrect. Like most iPhone users, I periodically upgrade my iPhone to a new model. The "two iPhones" that DraftKings refers to in its briefing are *prior* phones that I used for work that I no longer possess because they were traded in for new phones when I upgraded to a new model. In addition, to the best of my knowledge, I have only ever owned one iPhone 14.

6. In my prior declaration, I addressed DraftKings' allegation that, on January 30, 2024, I downloaded the "(Master) SB 2024" spreadsheet. As I testified, I did not download this document, but I did access it for purposes of my work for DraftKings, and in particular, to address inquiries I received from my former colleague, Brittney Goodman.

7. In her affidavit, Ms. Goodman disputes my version of events primarily on the basis that the "(Master) SB 2024" spreadsheet relates to business partners as opposed to VIP customers. Ms. Goodman is correct that the spreadsheet and her email to me on this issue relate to partners, not customers (both of which I generally refer to as "VIPs"; the references to customers in that paragraph of my prior declaration should, however, be to "partners"). With that correction, my prior declaration is accurate, and the point remains the same: Ms. Goodman asked me for information about VIP invitations, and I looked at the document to provide that information to her.

8. To provide more context about this exchange, on January 24, 2024, Ms. Goodman contacted me by sending an email to my personal Gmail account about Super Bowl invitations for several individuals and other VIP invitees. Believing that Ms. Goodman had emailed my Gmail account by mistake, I replied the next day and added my DraftKings email address and stated, in effect, that I would work on her request. Ms. Goodman's email was focused on last-minute updates to the status of various DraftKings Super Bowl party guests (*i.e.*, whether they would be attending) and whether invitations needed to be sent out to others. Her email also specifically referenced tabs in the "(Master) SB 2024" spreadsheet. I therefore accessed the "(Master) SB 2024" spreadsheet

2

A564

to review the list and direct Ms. Goodman and other DraftKings employees on who needed invitations and how to go about contacting them.

9.      As I have repeatedly testified, I did not "steal" or "disclose" any of DraftKings' confidential information, whether before or after my departure from the company.  To be clear and unequivocal: I did not take any of DraftKings' confidential information in anticipation of leaving; I did not use or disclose any DraftKings confidential information other than for DraftKings business; and I do not have or have access to any of DraftKings' confidential information.

10.      During the last six months of my DraftKings employment, the vast majority of my time was spent on DraftKings' gaming business—specifically, the sports betting and casino lines. My work did not cover every aspect of gaming, as for example, it did not include lottery, pari-mutuel betting, bingo, dog racing, or simulated racing.  To a much lesser extent, I worked in the fantasy sports community, or "FSC," line of business during this same period.  I had limited involvement with DraftKings' "Marketplace" and "Ecommerce" businesses, and no involvement with the "Media" business during my last six months with the company.  Nevertheless, I understand that DraftKings is seeking to broadly prohibit me from working in every line of business at Fanatics that overlaps with any of DraftKings' lines of business, regardless of whether the area was a focus of my work at DraftKings.

11.      I fear that if I am prohibited from working for Fanatics for a year, Fanatics will need to hire someone else to fulfill my role as head of its Los Angeles office and member of the executive team, and I will not have this once in a lifetime, career advancing opportunity.

3

A565

A566

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 21, 2024.

By: _____
        Michael Z. Hermalyn

4

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on Plaintiff's counsel on the date below via email and will be filed through the ECF System and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: March 21, 2024

/s/   *Russell Beck*
Russell Beck

A567

**UNITED STATES DISTRICT**
**DISTRICT OF MASSACHUSETTS**


**DRAFTKINGS, INC.,**              )
      **Plaintiff,**              )
      **vs**              )   **No. 1:24-CV-10299-JEK**
**MICHAEL HERMALYN,**              )
      **Defendant.**              )
                    )


BEFORE THE HONORABLE JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE
EVIDENTIARY HEARING




John Joseph Moakley United States Courthouse
Courtroom No. 3
One Courthouse Way
Boston, Massachusetts  02210

TUESDAY, APRIL 16, 2024
9:00 A.M.




Catherine L. Zelinski, RPR, CRC
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 7205
Boston, Massachusetts  02210
Email: CAL.Zelinski.Steno@gmail.com



Mechanical Steno - Computer-Aided Transcript

A568

2

**APPEARANCES:**

Orin Snyder
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
212-351-4000
Email: Osnyder@gibsondunn.com
for Plaintiff.

Harris Mufson
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
212-351-4000
Fax: 212-351-4035
Email: Hmufson@gibsondunn.com
for Plaintiff.

Justine Goeke
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
212-351-5372
Email: Jgoeke@gibsondunn.com
for Plaintiff.

Christine Demana
Gibson Dunn & Crutcher LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 76201
214-698-3100
Email: Cdemana@gibsondunn.com
for Plaintiff.

Jacob T. Spencer
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. NW
Washington
Washington, DC 20036
617-921-2105
Email: Jspencer@gibsondunn.com
for Plaintiff.


(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)

A569

**APPEARANCES:**

Russell Beck
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Boston, MA 02110
617-500-8670
Fax: 617-500-8665
Email: Rbeck@beckreed.com
for Defendant.

Stephen D. Riden
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Boston, MA 02110
617-500-8672
Email: Sriden@beckreed.com
for Defendant.

Aliki Sofis
Quinn Emanuel Trial Lawyers
111 Huntington Avenue, Suite 520
Boston, MA 02199
617-951-7000
Email: Alikisofis@quinnemanuel.com
for Defendant.

Alexander S. Del Nido
Quinn Emanuel Urquhart & Sullivan LLP
111 Huntington Ave
Suite 520
Boston, MA 02118
617-712-7100
Email: Alexdelnido@quinnemanuel.com
for Defendant.

A570

4

**P R O C E E D I N G S**

THE CLERK:  All rise.

(The Honorable Court Entered.)

THE CLERK:  Thank you very much.  You can be seated. This is Civil Matter 24-1029, DraftKings Inc. Versus Hermalyn.

And will counsel starting with the plaintiff please state your name for the record?

MR. SNYDER:  Yes, good morning, your Honor.  It's Orin Snyder for the plaintiff accompanied by Madelyn La France, Justine Goeke, Harris Mufson, Jacob Spencer, Danielle Hesse, and our most important person in the court is Andrew White who is going to be our hot seat technology guru.

THE COURT:  Okay, good morning.

MS. GOEKE:  Good morning.

MR. SNYDER:  Second most important person in the courtroom.

MR. BECK:  Good morning, your Honor.  Russell Beck from Beck, Reid, Riden, and I will allow each of my co-counsel to identify themselves.

MS. SOFIS:  Good morning, your Honor.  Aliki Sofis from Quinn, Emmanuel on behalf of Mr. Hermalyn.

MR. DEL NIDO:  Good morning, your Honor.  Alex Del Nido also from Quinn, Emmanuel.

MR. RIDEN:  And good morning, your Honor.  Stephen Riden from Beck, Reid, Riden on behalf of the defendant.

A571

5

THE COURT:  Okay.  Good morning, everyone.

So we are here on a hearing that's a continuation of the hearing on the motion for a preliminary injunction that we had held on April 2nd.  And as I said at the hearing on April 2nd, the focus of this hearing is to hear testimony from witnesses where there was conflicting evidence in the submissions that the parties made in support of and in opposition to the preliminary injunction motion.  As I said at that hearing, the only claims where I saw conflicting evidence were the misappropriation claims and the claim alleging that Mr. Hermalyn breached his non-solicitation clause as to DraftKings' employees.  And also as I said, on April 2nd, because we're here just to focus on conflicting evidence, the universe of witnesses that might testify today include Mr. Hermalyn, Mr. Metz, Mr. Larracey, Ms. Goodman, Mr. Harris, and Ms. Green.  I did not require that the parties call all of those witnesses, but I said the parties could call those witnesses at their option.

Now, yesterday Mr. Hermalyn filed two motions:  One was a motion to compel the testimony of a different witness, Mr. Hernandez, at this hearing, or in the alternative, to strike his declaration that was submitted in support of DraftKings' preliminary injunction motion.

The second motion was a motion to seal certain portions of the motion to compel, and I conditionally granted

A572

the motion to seal pending the redacted portions. I have now reviewed those portions, and I will grant the motion to seal. And I am satisfied that the redacted portions include confidential medical information.

The motion to compel or strike is denied for several reasons.

So, first, as I said, the purpose of this hearing is to assess the credibility of witnesses where the parties' evidentiary submissions conflicted. And I don't see any conflict between the substance of Mr. Hernandez's declaration and any of the evidentiary submissions that were made by Mr. Hermalyn in opposition to the motion for a preliminary injunction. Mr. Hernandez's declaration addresses a meeting that he had with Mr. Hermalyn on or before December 22, 2023, and it also addresses certain Slack messages sent by Mr. Hermalyn on the night of January 16, 2024, and explains why Mr. Hernandez didn't receive those Slack messages until the following morning.

Mr. Hermalyn has not submitted any evidence that contradicts that testimony. Indeed, I noted in his deposition that he said the Slack messages on the night of January 16th refreshed his memory. His motion also does not identify any conflicting evidence that he submitted in opposition to the motion for a preliminary injunction, so there's no basis to compel Mr. Hernandez to testify today.

A573

Second, Mr. Hermalyn acknowledges that hearsay evidence is admissible in preliminary injunction proceedings when it's appropriate given the character and the objective of the proceedings.  That's a correct statement of the law under the First Circuit's decision in *Asseo A-S-S-E-O versus Pan American Grain Company*.  But Mr. Hermalyn argues that where the averments and Affidavits are conflicts, they should be resolved through oral testimony.  And as I just explained, there is no testimony between the averments and Mr. Hernandez's Affidavit and the evidence submitted by Mr. Hermalyn.  That's why I make clear on April 2nd, the universe of witnesses that might testify today, and Mr. Hernandez was not on that list.  Like DraftKings, Mr. Hermalyn has submitted declarations from witnesses who will not testify today, and I will certainly consider those declarations.

Third, I want to note that this motion was filed at 6:30 p.m. on April 15th, the night before a nine a.m. evidentiary hearing on April 16th.  I had ordered this evidentiary hearing on April 2nd, so Mr. Hermalyn had two weeks to put together this motion, and I don't see any basis for him to have waited until the night before the hearing.

Having said all of that, this ruling does not affect what happens in discovery later in this case.  These are preliminary proceedings.  I've emphasized that before.  The purpose of this hearing is to determine whether DraftKings has

A574

8

met its burden to show that it's entitled to a preliminary injunction under the four-part test that governs preliminary injunction motions.

I want to turn to the proceeding today.  I understand that both parties intend to call Mr. Hermalyn as a witness.

Is that right, Mr. Snyder?

MR. SNYDER:  Yes, he's our first witness.

THE COURT:  And Mr. Beck?

MR. BECK:  Yes, it is your Honor.

THE COURT:  It strikes me as somewhat inefficient to have you both call him and then go through cross and redirect and recross twice.  And if that's the way you want to do it, that's fine with me.  But what I thought might be more efficient, and I'll propose this to the parties, is that Mr. Hermalyn's counsel calls him, does the direct.  DraftKings can cross him, but the cross would not be limited to the scope of the direct, and then redirect and recross.

So, Mr. Snyder, I'll put that to you and see what you think.

MR. SNYDER:  Respectfully, your Honor, we would like to begin with the cross-examination.  If Mr. Beck then wants to direct him beyond, obviously beyond the cross, we have no objection to that.

THE COURT:  Well, it would be a direct.  But, you know, you'd have some latitude to ask leading questions.

A575

MR. SNYDER:  In other words, I would call him first as my first witness?

THE COURT:  Yes.

MR. SNYDER:  And then I intend to cross him and then Mr. Beck would call him on his direct case and ask whatever questions you want, and then I would have a chance, I guess, to recross him on anything that went beyond the scope of my initial cross.

THE COURT:  Okay.

Mr. Beck, what do you think?

MR. BECK:  Your Honor, we're content with putting him on once and having, having the series of directs and crosses and redirects, recrosses happen.  I understand that Plaintiff's counsel will call him as a hostile witness.

THE COURT:  Yes.

MR. BECK:  And we would cross-examine him.

THE COURT:  Yes.

MR. BECK:  While I prefer that we put him on first, I have no objection to allowing them to do their direct and then we will go ahead, and not limited by the scope of their direct, we'll ask him more questions as though he were on direct.

THE COURT:  Okay, all right.

MR. BECK:  Right after.

THE COURT:  Okay, that's fine with me.  Then we'll do that.

A576

10

MR. BECK:  Thank you, your Honor.

THE COURT:  I just wanted to in the interest of time that we move this along as efficiently as possible.

So the parties can assume my familiarity with the evidentiary submissions.  You don't need to separately move to introduce evidence that's been submitted.  You can refer to it as, for example, Exhibit A to Mr. Harris's declaration or you can refer to it by ECF number, that's fine with me.  I previewed this on April 2nd, but we will go until 11:00 this morning, we'll take a 15-minute break.  We'll go until 1:00, take a one our break for lunch.  We'll start again at 2:00 to the extent that it's necessary, and go until 4:00.  You don't have to use all of that time but you, you have it if you need it.  Given that this will be about six hours, give or take, and then when we account for breaks, that would mean each side has two hours and 45 minutes of questioning time.  Ms. Currie is very helpfully going to keep time.  If you are finished with a witness and want to know how much time you've used or how much you have left, feel free to ask.

And I also want to note for the record that the parties have submitted a stipulation on the potential bond and I thank you for your cooperation on that.

With that, Mr. Beck?

MR. BECK:  Yes, your Honor.  I just have one administrative matter.

A577

THE COURT:  Yes.

MR. BECK:  We would ask of exclusion of all witnesses who have not testified, and that they not be told about the testimony that preceded them.  Obviously, this is about credibility, and I think it's critical that they not be in the courtroom to hear what the other witnesses say.

THE COURT:  Okay.  Well, so Mr. Hermalyn is a party.  He's certainly entitled to stay.

DraftKings, I don't know if you've identified a corporate representative.

MR. SNYDER:  We have a corporate representative who is not -- we have our chief legal officer and other attorneys, but no witnesses in the --

THE COURT:  There are no witnesses here?

MR. SNYDER:  No, your Honor.

MR. BECK:  And, your Honor, if I may, if I may ask on that, that part of that directive is that the witnesses, whether they're here or not, not be told about the testimony until after they have testified.

THE COURT:  Yes, that's fine.  I'll order that.  And I would just ask if anyone notices a witness coming in, that you ask the witness to leave until the witness is called.

MR. BECK:  Thank you, your Honor.

MR. SNYDER:  Yes, your Honor.  Thank you.

THE COURT:  Okay.

A578

12

Mr. Snyder, you have the burden.  Go ahead, call your first witness.

MR. SNYDER:  DraftKings calls Mr. Hermalyn.

THE COURT:  Good morning, Mr. Hermalyn.  Please stand and you'll be sworn and then take a seat.

**MICHAEL HERMALYN, Sworn.**

THE CLERK:  Thank you very much.  You may sit down.

THE WITNESS:  Could I have a pitcher of water?  Could I grab one of those?  Stay hydrated.  Thank you.  Okay.  Too close?  Okay.

THE COURT:  Go ahead.

MR. SNYDER:  Has the witness been sworn?

THE COURT:  Yes.

MR. SNYDER:  Thank you.

THE WITNESS:  Oh, my God.  Sorry.  I need a napkin. First time.

**CROSS-EXAMINATION BY MR. SNYDER:**

Q.   Good morning, Mr. Hermalyn.

A.   Hello, Mr. Snyder.

Q.   Am I correct you resigned from your position as DraftKings' Vice President of VIP Management to lead VIP business at Fanatics on February 1, 2024?

A.   It wasn't my exact title, but yes, that's when I resigned.

Q.   And am I correct it's your sworn testimony here today that since you resigned on February 1st, you have not solicited any

A579

13

DraftKings' employees at Fanatics?

A.   Yes, it is.

Q.   And that same day, February 1st, in the afternoon, you had a phone conversation with Mr. Larracey and Mr. Metz, correct?

A.   Yes, I did.

Q.   They called you from a DraftKings' conference room in Boston, correct?

A.   Yes, correct.

Q.   And then you called them back, correct?

A.   Yes.

Q.   At the time you were in the home of CEO of Fanatics, Michael Rubin, his home in Los Angeles when you spoke with him in the afternoon, correct?

A.   I don't know exactly where I was at that moment, but I was in Los Angeles, yes.

MR. SNYDER:  Mr. White can, you play from Defendant's deposition transcript page 45 lines 18 to 25.

(Playing Video.)

Q.   Did you give that answer --

MR. BECK:  Objection, your Honor.

Q.   -- to that question?

MR. BECK:  Objection, your Honor.

THE COURT:  Basis?

MR. BECK:  These -- he hasn't established a foundation.  These are the same calls.  You would recall that

A580

14

there were calls earlier and later.

THE COURT:  All right.

Mr. Snyder, why don't you ask a few more questions to lay the foundation.

MR. SNYDER:  I'll move on.

Q.  Do you remember, sir, where you were on February 1st in the afternoon when you spoke to Mr. Larracey or Mr. Metz?  That is, do you have a present recollection here of where you exactly were?

A.  I have a vivid memory of the -- of the one at -- in the evening.  But during the day I was either in Mr. Rubin's house or in a car going to get coffee or to this cafe around the corner.

Q.  Can you please answer my question, sir?

A.  I think I did.

Q.  Do you have a present recollection sitting here today, yes or no, of where you were in the afternoon when you spoke to Mr. Larracey and Mr. Metz?  Yes or no.

A.  I was in Mr. Rubin's house for most of the day on the 1st.

Q.  Can you answer my question, sir?  Do you have a present recollection in this courtroom at this moment of where you physically were present during that call in the afternoon on the 1st?  Yes or no.

A.  For that specific call?

Q.  Yes.

A581

15

A.   Or after seeing that, that was closer to the time, it was a crazy day.  I must have been in Mr. Rubin's house.

Q.   Can you answer my question, sir?

Do you have a present recollection sitting here today, yes or no, of where you were?

A.   Right now, no.  I know I was in L.A.  I was either in a car going to get a coffee or in Mr. Rubin's house.

Q.   So the answer is no, you have no present recollection of where you were, is that your testimony, as to those two places?

A.   Well, based on what I just saw, I would assume I was in Mr. Rubin's house.

Q.   Okay.

Sir, I'd like to direct your attention to your response to Interrogatory No. 4.

A.   Sure.

Q.   Do you recall -- are they sworn answers to Interrogatories before today?

A.   Of course, yes.

MR. SNYDER:  Mr. White, just put it up.

Q.   Do you remember being asked to describe all communications you had with any current or former employees of DraftKings, sir?

A.   Yes, I do.

Q.   And your response goes on for several pages, but I'm going to direct your attention to No. 17.

A582

16

A.   Real quick question, is this supposed to be on with that, or no?

Q.   I don't know, sir.

A.   Okay.  It's okay if it's not.

THE COURT:  Can we turn it on?

THE WITNESS:  No, it's not.  It's okay.  I just didn't -- I don't mind.

THE COURT:  You should be able to see the exhibit so we'll turn that on.

MR. SNYDER:  Agreed.

A.   Well, I can see it there.

Q.   Let's try to get it to work for you there.

Do you see it now, sir?

A.   No, but I do see it here, so it's okay.

THE COURT:  Mr. Hermalyn, if you need us to adjust the monitor, we can do that.

THE WITNESS:  I don't mind.  Can I see it.

THE COURT:  Okay, all right.

Q.   Are you comfortable with reading it there, sir?

A.   Yeah, after my spill and everything, I feel good now.

Q.   Thank you, sir.

I'm going to read you one sentence for our response:

"At no point during either conversation did Mr. Hermalyn hint or encourage Mr. Larracey or Mr. Metz to leave DraftKings for Fanatics."

A583

Sitting here today, sir, do you swear to the truth that you did not hint or encourage Mr. Larracey or Mr. Metz to leave DraftKings for Fanatics?

A.   I don't know how to answer this more, like, clearer than absolutely not, I did not do that.

Q.   You did not hint?

A.   Either.

Q.   Okay.

And when you used the word "hint," what did you mean by that word, sir?

A.   That was trying to be as clear as I am trying to be right now.

Q.   Okay.

A.   But there's -- I did not do any such thing.

Q.   Okay.

And did you mean something different with encourage than hint or did you mean to convey the same thing?

A.   I'm not following.

Q.   Okay, I'll move on.

A.   Okay.

Q.   Now, during the course of your professional relationship with Mr. Metz and Mr. Larracey, you worked closely together, correct?

A.   Very close, yes.

Q.   You held both in high regard?

A584

18

A.    Absolutely.  Still do.

Q.    And did you ask Mr. Larracey or Mr. Metz during the afternoon call on the 1st to call back on FaceTime and scan the conference room over the video to confirm that no other persons were physically present other than the two of them in the conference room?

A.    I don't -- I remember the FaceTime, but scanning the conference room, I don't recall that.  It's not something -- no, it's not something I would do.

Q.    So you're saying you did not do that?

A.    I'm saying I don't think I -- no, I'm saying I don't think I did.  Don't recall.  But think I would do it, don't remember doing that.

Q.    Okay, those are three different things:

            One is I didn't do it.

            One is I don't remember if I did or did not.

            Which are you telling the Court?

A.    This was a crazy day in terms of vivid memory.  Do I -- if I -- would I do that or do I think I did?  No, I do not think I did.  So, if I had to answer yes or no, it would be no.  I don't remember specifically, but that is not something I would do.  There would be no reason for me to do that, so that's all.  That's my answer.

Q.    Do you have a present recollection of doing that?

A.    No.

A585

19

Q.   Is it possible you did it and you just don't remember?

A.   I think it's extremely unlikely so I would still say no.

Q.   Okay.

Let me play you your deposition testimony from 29 line 12.

A.   I don't remember what I said there.

Q.   I'm going to play it and ask you whether you gave these answers to my questions.

MR. SNYDER:  There's no audio.

A.   I can read it.  I read it.  I said it.  I don't remember.

Q.   Now, did you tell Mr. Larracey or Mr. Metz during the afternoon call that there were two positions on the Fanatics' website to which they should apply?

A.   No.

MR. SNYDER:  Let me mark -- let me ask Mr. White to please put on the screen Exhibit 76-6.

And, your Honor, consistent with the Court's guidance, we're marking exhibits consistent with their placement on the record.

A.   Is it possible to move this, like, right here?  It's okay. I don't know why I'm -- it's completely fine.

THE COURT:  Why don't we take a brief pause and -- do we have someone from IT that might be able to work on this?

THE WITNESS:  It's okay.

THE CLERK:  Is it on now?  Because I just tried to

A586

switch it.

COURT:  No, I want you to see the exhibits, Mr. Hermalyn.

THE WITNESS:  I can see it.  Oh, here we go.  I think I plugged it in.

MR. SNYDER:  We now are triple covered.

THE WITNESS:  I feel good.

MR. SNYDER:  Two streams and a binder.

THE COURT:  Okay, Mr. Hermalyn can see the screen.

Q.   Can you see it, sir?

A.   Yes, I can.

Q.   You've seen these notes before, correct?

A.   I saw it in one of the filings.

Q.   Right.

And you reviewed those -- you've reviewed those notes before today, correct, sir?

A.   Yes, I read them.

Q.   Okay.

And Mr. Larracey's notes state on February 1st, "called Mike with Hayden."  That's true, correct?  We've established that, that Mr. Metz and Mr. Larracey called you on February 1st?

A.   Yes.

Q.   And then the notes go on.  He said he resigned.

That's true, isn't it?  You said you resigned on that

call?

A.   Yeah, the first question was they were, like -- they were surprised.  Yes, I'm sorry.  The reasoning, yes, I did say that.

Q.   Thank you.

And then the notes read, "There were roles for Mr. Hayden and I, posted, just apply."

Yes or no, did you tell them that?

A.   No.

Q.   You didn't take notes to their call with Mr. Metz or Mr. Larracey, did you?

A.   No, it was a call calling two friends excited to --

Q.   So you -- I'm sorry.

So you have no corroboration for your testimony here today that you never told them to apply for roles at Fanatics?

A.   No, I -- I've been very consistent with that.  I did not do that, no.

Q.   After talking to your former colleagues that afternoon, while they were in the DraftKings' conference room, after doing that, you spoke to them again on that evening?

A.   Yes, I did.

Q.   And speaking with them on the evening, yes or no, did you make specific offers of compensation to Mr. Larracey and Mr. Metz to incentivize them to accept roles with Fanatics?

A.   No.

22

Q.   I'm going to show you Mr. Larracey's contemporaneous notes again.  This is 76-6 that we discussed.  If we go to page 3 to 4, can you please read for the Court the dollar amounts beginning at the bottom of the first page displayed here on to the second page?  Just read them into the record, please.

A.   So are you highlighting that?  What -- am I looking at -- my --

Q.   Mr. White is highlighting.

A.   Oh, okay.

So I'm reading the -- you want me to read the numbers?

Q.   Yes, please.

A.   Okay.

Hayden, 500.  And it's cut off.  And then there's 500, 200, 1M, 3.5M, equity.  Me -- okay.  Here we go.

Me, 400, 150, 750, 2.5 at 28B, equity.  Counter, 400, 150, 1.5, 4.  I see it.

Q.   Does this change your testimony, sir, one way or another, yes or no --

A.   No.

Q.   -- whether you made specific offers of compensation to incentivize Mr. Larracey and Mr. Metz?

A.   No, it does not.

Q.   28 billion, you're familiar with that number, sir, as it relates to Fanatics?

A589

23

A.   Yes, I am.

Q.   And what is that number?

A.   It's a valuation of the company.  I don't know if it's current, but it's a round of --

Q.   And that valuation was relevant to you, sir, when you were computing the value of the compensation packet that Mr. Rubin made to you, correct?

A.   Yes.

Q.   You knew, did you not, sir, because you were their boss, how much Mr. Larracey and Mr. Metz made in compensation at DraftKings?  Yes or no.

A.   Yes, they also know what I made.

Q.   And isn't it true, sir, that their salary, their compensation was confidential information belonging to DraftKings?  Yes or no.

A.   I argue any -- the -- I don't know of what's confidential or not.  I just look at anything that was done at DraftKings or that's DraftKings' is confidential.  So anything you're going to ask me, I'm going to say yes.

Q.   So their compensation information was confidential DraftKings' information, correct?

A.   Yes.

Q.   And on the evening of the 1st, while you were on the phone, you talked to both of them, did you not, about Fanatics' public career site?  Yes or no.

A590

A.    Yes, I did.

Q.    And during your evening phone conversation with your former colleagues, you were present in Mr. Rubin's home in Los Angeles for the entirety of those phone calls, correct?

A.    Yes.  I know exactly where I was, yes.

Q.    And isn't it a fact, sir, that you were on the phone with them that evening on your very first day at Fanatics, from 10:45 p.m. Eastern time until 2:18 a.m. Eastern time the next day?

A.    The next day is tough characterization just because I was on the West Coast.  And I did look at it as one call.  Even reviewing the call logs, I still look at it as one big call. But, yes, I'm not denying any of that call.

Q.    So you're not denying that you were on the phone with them that night for 168 minutes total?

A.    No, I don't deny any of those phone calls.

Q.    And isn't it fact, sir, that in making those calls, you used not one, not two, but three different and separate phones?

A.    I saw the numbers and I don't deny those calls at all.

Q.    Can you answer my question, sir?

A.    I think it was two different numbers.

Q.    Do you know, sir, how many phones you used to facilitate those calls?  Yes or no.

A.    How many phones I used?  I think you're mixing up the one call that was February 2nd.  That was another 201 number.

A591

There was two phones on the night of the 1st.

Q.   Sir, how many phones did you use between the night of the 1st and the early morning hours of the 2nd Eastern time for these calls, one, two, or three?

A.   Can -- I used two phones on that one long call and then another phone that morning West Coast time, around six o'clock, that time.

Q.   I'm talking about before the six o'clock a.m. daylight call.  I'm talking about the calls during the nighttime hours.  Early morning of the 2nd did you use a third phone?  Yes or no.

A.   I just want to make sure I'm saying the right thing.  On the 1st it was a -- what I thought was one call.  It was what I saw multiple calls, don't deny any of those calls.  There were two different numbers.  There was -- those two numbers were that.  And then there was another phone number, another 201 number, on the morning -- that Friday morning around six a.m. my time, West Coast time.

Q.   Thank you.

Now, I want to direct your attention to the early daylight hours on February 2nd.

A.   Okay.

Q.   I'm showing you Exhibit 74-6.

Do you recognize this 201 number?

A.   Yes.

Q.   This is your brother's number, correct?

A592

A.    Yes.

Q.    So you used your brother's phone number to call Mr. Larracey on the morning of the 2nd, correct?

A.    Yes.

Q.    And you called Mr. Larracey's wife's phone, correct?

A.    Yes, that was -- yes.

Q.    Okay.

And you could have called Mr. Larracey directly from your personal phone, correct?  Yes or no.  Yes or no.

A.    I think I have that number, so yes.

Q.    So isn't it a fact that you used your brother's phone to call Mr. Larracey's wife's phone on the morning of February 2nd to make doubly sure that there would not be a record of a direct call between you Mr. Hermalyn and Mr. Larracey?  Yes or no.

A.    No.  The first call I made to them was 58 minutes on my personal phone.  Like, I wasn't hiding anything.

Q.    Isn't it a fact, sir, that your brother's phone -- your brother was with you at Mr. Rubin's house at this time?

A.    That call, we were on a flight -- we were going back to New Jersey.

Q.    Okay.

How long, how long was your brother with you in Mr. Rubin's house, the entirety of your stay there?

A.    No, I got in Sunday night.  He came Monday night.  It was

A593

lonely.

Q.   When you called Mr. Larracey in the morning of the 2nd, yes or no, did you tell him that you and Mr. Rubin were excited about him interviewing with Fanatics?

A.   No, I did not do that.

Q.   Okay.

Were you aware, sir, that during the 168-minute span of these calls, Mr. Larracey, after one a.m. in the morning, applied for a job at Fanatics?  Yes or no.

A.   Just so -- ten p.m. where I was?  No, I did not.  I did not know that.

Q.   You came to learn that, though, didn't you?

A.   I did not know that on the call.  It would have been a show stopper for the call.

Q.   You did come to learn that after the 1st, correct?  Yes or no.

A.   In the days following, yes.

Q.   Yes.

And let's go to the next day, the morning of Saturday, February 3rd, did you have another phone conversation with Mr. Larracey?  Yes or no.

A.   Yes, I did.  Yes, I remember.

Q.   And did you call him up and tell him you haven't gotten back to Fanatics about the interview.  You're going to make me look really bad.  It's going to reflect poorly on me if you

A594

28

don't reply?  Yes or no.

A.   Absolutely not, no.

Q.   Let me show you a screenshot of the call history from the phone application on Mr. Larracey's wife's phone from February 3rd.

     MR. SNYDER:  This is 76-9.  Well, I don't need to show this.  Oh, yeah.

Q.   This number.  Whose number is this, sir?

A.   I don't recognize the number, but I definitely don't deny making the call.

Q.   You don't recognize that number?

A.   No.

Q.   Let me show you the next exhibit, then, which is 74-8. It's a text message, sir.

     MR. SNYDER:  Okay, let's put that up, Andrew.  76-9. And then after that we're going to put -- okay.

Q.   So your testimony is that you don't know that number?

A.   I don't recognize the number, no.

Q.   Okay.  Let's look at the next exhibit, 74-8.

     MR. SNYDER:  Sorry, there was a little binder failure here.

Q.   At your deposition you testified that you were unfamiliar with it, correct?

A.   Yes.

Q.   And that was under oath, correct?

A595

A.    Yes.

Q.    Isn't it a fact that you told Mr. Larracey or Mr. Metz on February 1st that this 737 number was the number of a second cellphone of your brother's?  Yes or no.

A.    No, I didn't say that.

Q.    Okay.

Let me show you Exhibit 76-6 again.  This is the screenshot of Mr. Larracey's contemporaneous notes as the notes application on his iPhone.  Do you see the number at the top?

A.    Yes.

Q.    And you'd agree that's the same number you used to call Mr. Larracey on the 3rd, correct?

A.    Yes.

Q.    Okay.

And how do you square this note with your sworn testimony here today, sir, that you don't know anything about that phone number?

MR. BECK:  Objection, your Honor.

THE COURT:  Basis?

MR. BECK:  Calls for speculation.

THE COURT:  Well, he can answer.

Go ahead.

A.    I don't recognize the phone number.  In looking at this, the only thing I can possibly think of, which I know speculating is not a good move, but the only thing I can think

A596

30

of is that I did have a temporary phone that week that I used for my move to California.  It could have been that.

Q.  I just need to clarify your testimony, sir.

A.  Sure.

Q.  Is that your brother's phone number or not?

A.  No, it is not.  Or I don't think it is.  It could -- I didn't say I was using my brother's second phone.  I don't believe my brother has a second phone.  He might.  But --

Q.  You don't believe your brother has a second phone?

A.  You asked me -- the number you showed me, the two -- I don't know if I have to repeat this.  The number that you showed me that's not mine, that you showed me for that morning when I was in the -- on the plane, that is his number.  That's the number that's memorized in my phone as my brother.  You're asking me if my brother has a second phone.  I don't know.  But what I do know is that I did not say anything about calling my brother's second phone.

Q.  Are you telling this Court that you're unaware that your brother has both a personal phone and a work phone?  Is that your sworn testimony, sir?

A.  No -- I don't know how to answer that besides repeating what I just said.

Q.  How about just answer the question.  Yes or no?

A.  Do I know if my brother has more than one phone?  No, I do not.  I don't know.

A597

Q.   So it's your sworn testimony that you're unaware that your brother has, and had during the week he was with you in Mr. Rubin's house, both a personal phone and a business phone?

A.   I don't -- I -- I'm not looking through the question.  I'm just trying to -- you're asking me do I know if my brother has more than one cellphone?  I don't know.  I don't think he does.  But I do know that I definitively did not say anything to Hayden and Andrew about calling me on the other phone that my brother had.

Q.   So my question is this --

A.   Okay.

Q.   -- is it possible you called Mr. Larracey from two separate phones owned by your brother on the early -- in early February, both a work phone and a personal phone?  Is that possible?

A.   No, I don't think it is.

Q.   Now, sir, after you learned that Mr. Larracey applied for a job at Fanatics, you became aware that he was interviewing there, correct?  Yes or no.

A.   Sorry, what was the timeline on that?

Q.   After you learned that Mr. Larracey had applied for a job at Fanatics, you became aware that he was going to interview there?  Yes or no.

A.   He mentioned it on the -- the last and final call I had with him, yes.

A598

Q.   The answer's yes?

A.   Yes.

MR. SNYDER:  Let's go to Exhibit 76-8, an e-mail from Fanatics VP of Human Resources, Niles Brandon to Mr. Larracey.

Q.   You've seen this document before, correct, sir?

A.   Yes, I have.

Q.   And you see that Mr. Brandon referred to interviews with Mr. Larracey with some of the most senior executives at Fanatics for the very next day and a Sunday, correct?

A.   Yes, I see -- I'm reading what you're reading.

Q.   And are you aware, sir, that Mr. Larracey submitted no resume with his application to Fanatics?  Yes or no.

A.   No, I'm not aware of that.

Q.   Are you aware that he submitted no biographical information of any kind, including a LinkedIn page?

A.   No, I'm not -- I'm not aware of anything with regards to his e-mail.  The first time I saw this e-mail is when I read it in one of the filings.

Q.   And you acknowledge that just days after he applied, Mr. Larracey had an interview on a Sunday with some of the most senior executives at Fanatics?  Yes or no.

A.   I acknowledge what I read, and that this happened, yes. But it didn't -- yes, I acknowledge that I read this and this is what happened.

Q.   And in fact one of those interviews was with Mr. Tucker

A599

Kain, the Fanatics' chief strategy and growth officer, correct?

A.   Yes.  That's what it says.

Q.   And you know now, having been at the company for a couple of months, that Mr. Kain is responsible for the strategic roadmap for all new adventures, including gaming and sports betting, correct?

A.   Yes, he runs strategy for the company.

Q.   And before he interviewed with Mr. Larracey, you discussed Mr. Larracey specifically with Mr. Kain, correct?

A.   Absolutely -- I did not do that, no.

Q.   Okay.

You didn't tell Mr. Kain that Larracey would be an important part of your business operation as the head of Fanatics' nascent VIP business?

A.   There's a lot in there, but no, I didn't do any of that.

Q.   Okay.

Are you aware that Mr. Kain told Mr. Larracey during his Sunday morning interview, that Mr. Larracey didn't need to tell Mr. Kain anything about his background and experience, because, "Mike already told me all about you, and his experience working with you over a two-year period is more than I would get out of a 30-minute interview."

Did you learn at any time that Mr. Kain said that to Mr. Larracey during the Sunday morning interview?

MR. BECK:  Objection, your Honor.

A600

THE COURT:  Sustained.

That's a compound question and hearsay.

MR. SNYDER:  Your Honor I'm offering here for the truth.  I'll shorten the question.  I'm offering it to determine whether Mr. -- I'll withdraw the question.

Q.   Were you aware, sir, that Mr. Larracey continued to discuss his job application with Fanatics between February 5th and February 20, 2024?  Yes or no.

A.   No, I did not.

Q.   You are aware that the Court issued a TRO, temporary restraining order, on February 8th, that among other things, prohibited and enjoined you from helping another person or entity hire away a DraftKings' employee, correct?

A.   Well, I know that a non-solicit before that order, yes, I'm very clear with the Court's order.

Q.   Did you at any point after February 8th, tell Fanatics to stop trying to hire Mr. Larracey away from DraftKings?  Yes or no.

A.   No, absolutely not.

Q.   All right.

Let's go on to the next subject, and I have a couple of just targeted yes or no questions.

Did you use AirDrop on January 16, 2024, to transfer confidential DraftKings' business documents from your DraftKings' laptop to any non-DraftKings' device?  Yes or no.

A601

A.    Not confidential DraftKings' information but personal documents to the phone that's currently with counsel.  Not DraftKings' information.  Personal files or photos.

Q.    At approximately 7:40 p.m. on that same date, do you recall making five successful airdrops from your 16-inch laptop which we're going to call Laptop 1 --

A.    Okay.

Q.    -- to an iPhone Max Pro 15 named MZH, your initials, X(3)? Yes or no.

A.    I don't know the name of the phone, but I do remember transferring personal files, as I was migrating laptops, from one computer to the -- to my personal phone.

Q.    Okay.

On January 16th you recall visiting Dropbox.com?  Yes or no.

A.    I don't recall that, but I do -- I did read it.  So I was clearly there.  I was trying to move that big panel.

Q.    I'm sorry, did you -- do you recall -- I'm asking you what you recall today, not what you read.  Do you understand the difference?

A.    Yes, but I'd say in the three months it's kind of blurry. So I would say, did I recall that at that moment?  No.  Did you refresh my memory that I did that?  Do I refute that?  No.

Q.    My question is sitting here today, do you have a present recollection, that is a memory that you can activate, of

A602

actually on the 16th visiting Dropbox.com?  Yes or no.

A.    I don't.

Q.    Thank you.

A.    Okay.

Q.    Do you have anything else to say?

A.    No, but I, I was trying to transfer this big file.  So when I googled that, if I went to Dropbox.com, totally could have happened.  So I don't refute -- I don't know what I'm looking at.  I don't refute anything that was in -- that was written about me visiting Dropbox.

Q.    Directing your attention to the evening of January 16th, you have no memory of slacking 19 documents to yourself, right?

A.    No, I do.  And not the specific count of documents, but yes, I do remember slacking myself documents.

Q.    Okay.

Let me read for you --

MR. SNYDER:  Or have Mr. White play from your deposition, line 22 -- line 25 to line 10, please.

No sound?

A.    The good news I can see it and read.

MR. SNYDER:  Apparently we have no sound.

THE CLERK:  It worked the first time as he played the video.  I don't know.

Do you want to try to disconnect it and reconnect?

MR. WHITE:  Yeah, that's what I'm doing.

A603

Q.   Okay.  Did I ask you this question:

"Question" -- let's put it up so the Court can see the transcript, please.

"Question:  Just -- so just before we break, just to be clear, you have no memory on the 16th, the day that you told your brother you were suffering high stress, you didn't want to get fired.  You have no memory of that day in the evening slacking 19 documents to yourself and then deleting them all from our laptop?

"I have no memory of that.  And those two things are definitely correlated."

Did you give that answer to my question?  Yes or no.

A.   That was before -- that was before I saw what I was actually doing, where counsel showed me the Slack message with Mr. Hernandez, and I know exactly what I was doing exactly that day now.

Q.   So I take it you have no memory that of the 19 documents that you slacked to yourself, 18 of them were unique documents and one was a duplicate?

A.   I don't know -- well, I've read the specific documents, I sent.  But I know, I know for sure that I slacked myself the documents.

Q.   You've read the specific documents that you slacked yourself?

A.   Yeah, in one of the filings.

A604

38

Q.   Okay.

So let's look at Exhibit C to the Affidavit submitted by DraftKings' Chief Information Security Officer Brian Harris, which is Exhibit 90-4.  And this document is described -- and this document is described at paragraph 30 of Mr. Harris' Affidavit.  And he's testified that this is a true and correct copy of the Slack messages collected from your DraftKings' Slack user account.  And if we look at pages 2 and 3, having read some of the Slack messages, as you just testified, you will recognize, will you not, that these are the 19 that you slacked yourself, correct?

A.   Yes, I've seen this.

Q.   Okay.

And looking at the names of these files, you see that many of these documents are confidential DraftKings' documents, correct?

A.   I slacked myself from --

Q.   Sir, correct?

A.   Yes, but the characterization is really tough.  I -- I had one computer, DraftKings' computer, transferring to a new DraftKings' computer.  I took DraftKings' confidential files -- I don't refute anything as confidential.  I think anything is clearly confidential.  I took it from Slack -- or I took that computer, I thought these might be saved locally.  I put it on Slack.  They now are on that next computer.  I don't -- the

A605

39

characterization that I slacked it into the ether, I --
DraftKings' device to DraftKings' device.  DraftKings'
application, DraftKings' application.

Q.   We'll get to that, sir.  I have a very simple question.

You just told this Court a couple of minutes ago,
that everything you slacked to yourself was personal?  Do you
recall that testimony?  Yes or no.

A.   No, I didn't say that --

MR. BECK:  Objection.

THE WITNESS:  I'm sorry.

A.   That's correct.

Q.   You slacked yourself 19 documents on the 16th, and those
included confidential DraftKings' documents?  Yes or no.

A.   Yes, to AirDrop.  AirDrop is personal from computer, to I
think, my phone that you outlined.  Slack was anything that was
DraftKings' files.

Q.   And if you look at -- thank you.

If you look at one of the documents in the third
group of messages on page 1, you'll see that on the 16th one of
the documents you slacked to yourself, a vital comp
adjustments?

A.   Yes.

Q.   Is about as confidential as confidential can get.  You
would agree with that, wouldn't you, sir?

A.   I look at all of these as confidential.  But, yes, that

A606

40

one has comp over certain people, so I understand what you're saying.

Q.   Not just comp over specific people, sir.  You agree that this document contains the confidential compensation information for thousands of DraftKings' employees, correct?  Yes or no.

A.   Yes.

Q.   Including employees that you have actually absolutely no jurisdiction over as the head of VIP, correct?  Yes or no.

A.   The implication there is really tough, but yes, I am not refuting what was in the file.

Q.   Thank you.

Now after slacking yourself these documents, do you agree that you then viewed or downloaded to your iPhone at least seven of those documents that you had previously slacked to yourself?  Yes or no.

A.   I don't refute -- I definitely refute downloading, because I don't think that's how that works on your iPhone.  Do I refute viewing that on my iPhone later?  No, I don't think that's something -- no, I don't refute that.  It's not something -- it's neither here nor there.  I could have totally done that.

Q.   And on January 16th do you recall deleting anything from Laptop 1?  Yes or no.

A.   Yes, a lot of stuff.

A607

41

Q.    And do you recall deleting 18 unique documents on Laptop 1 that you sent to your Slack that day?  Yes or no.  That is, do you have a present recollection of doing that after taking --

A.    Not that --

Q.    -- 18 documents from Laptop 1, sending them to Slack, do you remember wiping those 18 off of Laptop 1?  Yes or no.

A.    I don't remember specific numbers of documents, like I said before.  But, yes, I remember cleaning up that laptop.

Q.    And you don't recall, do you, deleting your web browser history on the 16th?

A.    I don't specifically recall that, but I understand why I would do that.

Q.    Okay.

And you don't recall deleting all of your iMessages and SMS messages from Laptop 1, correct?

A.    Well, I clearly didn't delete all of them, but I tried to.

Q.    Right.

Because one on the 16th was recovered by DraftKings during its forensic investigation, the one where you said you didn't want to get fired, correct?

A.    Yes, the conversation with my brother?

Q.    Yes.

A.    Yes.

Q.    And that's why at your deposition you were so surprised when I showed it to you, correct, sir?

A608

A.   No.  In the deposition if you played the tape, you asked me multiple times, multiple times if I was surprised.  I repeatedly said I was not.  I tried to delete all of my iMessages, not that one specifically, but I wasn't surprised that I didn't -- I didn't do it completely.

Q.   Do you have any factual basis to dispute DraftKings' forensic analysis on January 16th, after texting your brother that you didn't want to get fired, you deleted over 237,000 files from Laptop 1, including dozens of confidential DraftKings' documents?

A.   Two different things.  My brother's text messages have nothing to do with the reason why I was migrating computers, but I was migrating computers.  Do I think that number of the volume -- that that number seems much higher than I would have thought, but I was trying to get -- I treated that computer as a personal computer and I was trying to get everything off of it.

Q.   Now, your testimony before this Court is that all you were doing on the 16th was an innocent, ordinary course migration from Laptop 1 to 2; is that your testimony?  Yes or no.

A.   Yes.

Q.   Okay.

And -- well, remember the 18 documents you slacked to yourself on January 16th that we just talked about?

A.   Yes, I remember when it was.

A609

Q.   Isn't it true that only four of those found its way onto Laptop 2?

A.   No, that's absolutely not true.

Q.   Okay.

And is there another reason, sir, why your migration theory doesn't add up?

A.   I, I have no idea what you're asking.

Q.   Isn't it true that the very next day, on January 17th, you began deleting files from Laptop 2, your 14-inch, the new laptop you say you were transferring files to in an ordinary course migration the day before?  Yes or no.

A.   I regularly would delete files and I would save a lot of stuff to my desktop, and every day, every week, every couple of days I would delete files, but no, I don't -- that doesn't -- that's two very separate things.  At that point I had a new computer set up.

Q.   Do you remember deleting files on the 17th?

A.   No, not specifically.

Q.   Do you remember that when you turned in your Laptop No. 2 at the end of January, everything was deleted except for two documents?  Yes or no.

A.   Yeah, I tried to -- I didn't have another computer.  That was my personal computer.  So I tried to get everything personal off of that.

Q.   Right.

A610

44

A.    So, yes.  That's --

Q.    And you also got DraftKings' confidential documents wiped off of Laptop 2, did you not, sir?

A.    No.

Q.    Before you handed it in?  Yes or no.

A.    From what I read, I left the DraftKings' documents on Laptop No. 2.  So -- but I did delete or tried to delete everything personal that was on there.

Q.    Isn't it a fact that you have no idea sitting here today and cannot testify under your oath whether you did or didn't delete confidential DraftKings' documents from Laptop 2 before you turned it in?

A.    I would have no reason to delete anything DraftKings related because I was handing that computer in to DraftKings.

Q.    Well, let me ask you if you acknowledge at least this, isn't it true that when you turned over Laptop 2 before resigning, it wasn't chockful of documents migrated from Laptop 1?

A.    I -- well, that was two weeks after I started a fresh computer.  So it's kind of a clean slate.  It's kind of like moving into a new house.

Q.    Right.

        It was stripped bare, scrubbed away everything except for two documents, correct?

A.    Scrubbed is not --

A611

MR. BECK:  Objection, your Honor.

THE WITNESS:  Sorry.

THE COURT:  Basis?

MR. BECK:  The characterization of the prior testimony and the characterization of the evidence.

MR. SNYDER:  I'll withdraw the question.

THE COURT:  Okay.

Q.   Let's look at the Slack messages you sent to DraftKings' IT personnel, George Hernandez, on January 16th.  And let's look at the first message you sent to Mr. Hernandez.  "Moved the files off my MAC.  Either slacked myself or transferred the personal docs I had on the drive."

Do you see that?

A.   Yes.

Q.   That was not a truthful statement to Mr. Hernandez, was it?

A.   Uhm --

Q.   That they are personal files?

A.   Either slacked to myself the work DraftKings' files or transferred personal files that I had on the drive via AirDrop.

Q.   Sir, you told Mr. Hernandez either slacked to myself or transferred the personal docs I have on the device.  Did you say that?  Yes or no.

A.   I'm reading what you're reading if that's your question.

Q.   Did you say that, sir?

A612

46

A.   I'm not refuting anything that's on this page, if that's --

Q.   Did you say that, sir?

A.   Sorry, I'm really -- I don't understand what you're saying.  Are you asking me did I write this text -- this slack?

Q.   Yes.

A.   Yes, I obviously did.

Q.   And it wasn't truthful, was it?

A.   That I moved -- yes, all of this is truthful.

Q.   Well, if you go back to Exhibit 90-4, isn't it a fact, sir, that you didn't slack to yourself just the personal documents, but you slacked to yourself some of the most confidential DraftKings' documents that exist?  Isn't that true?  Yes or no.

A.   It's not a yes or no question.  I transferred anything personal via AirDrop from my old computer or Computer 1, to my iPhone.  I slacked myself from one DraftKings' device to another DraftKings' device, and Slack, which is a DraftKings' application, any documents I didn't want to necessarily lose when I handed in the first laptop.  So, yes, these are all DraftKings' documents.  These are not personal documents.  That is what I slacked.

Q.   You did not tell Mr. Hernandez, did you, that you slacked yourself confidential DraftKings' documents, did you?

A.   Well, that's what the first thing says.  It says I slacked

A613

myself documents or transferred to -- or transferred.  That's slacked DraftKings' docs and transfer --

Q.   Where do you say in your Slack to Mr. Hernandez that you did anything other than transfer personal docs?

A.   I'm not looking at the thing.  But it -- this is what this means.  I slacked to myself DraftKings' documents or transferred the personal docs I had in the draft -- transferred is -- I airdropped myself those personal docs.

Q.   Isn't it true that you were lying to Mr. Hernandez to create a cover story because you knew the documents you slacked yourself on the 16th were not personal documents but were confidential DraftKings' documents?

MR. BECK:  Objection, your Honor.

THE COURT:  Sustained.

MR. BECK:  Thank you.

THE COURT:  He's testified to his understanding of this message.

Q.   On January 23rd you met Mr. Rubin in his New York City apartment, correct?

A.   Yes, I did.

Q.   And during this meeting you and Mr. Rubin discussed the fact that you had a non-compete, correct?

A.   He was aware of it, but it wasn't a major discussion point.

Q.   And then over the course of the next week you met with

A614

48

other members of the Fanatics' Senior Executive Team, correct?

A.    Yes, I did.

Q.    And you're aware, are you not, that Mr. Harris has provided forensic evidence that -- of all files downloaded by you from a non-DraftKings' device after January 11, 2024, from the DraftKings' Google Workspace Lab.  You're familiar with that, right?

A.    Non-DraftKings' device being my iPhone that I used for work?  Yes, I am.

Q.    Okay.

And it includes the file names and all the other detail, the IP addresses?  You've seen that chart, correct?

A.    I've seen everything that was submitted.

Q.    Okay.

So let's look at Exhibit 79 just for a moment.  It's Table 2.  And the question is --

MR. SNYDER:  If we can highlight three documents on the 24th.

Q.    -- yes or no, did you download these three highlighted documents on January 24th from DraftKings' Google Workspace using a non-DraftKings' device?

A.    I don't believe I downloaded anything ever on my iPhone. The process would be this document would be somewhere, I click on it and it would open.  And then when I got out of that document, it would then go away.  So download, I don't think I

A615

49

downloaded.  I strongly don't believe I downloaded anything to my iPhone.

Q.  My question is:  Do you have a memory of accessing these three documents on the 24th?  Yes or no.

A.  I don't, I was doing my job.

Q.  Okay.

But you don't have a memory one way or another?

A.  No.

Q.  Okay.

And are you aware, sir, that with respect to customer QBR, the VIP document, only seven other employees in the company had access or permission to access that document?

A.  There --

Q.  Yes or no, sir?

A.  The only seven is a weird characteriz -- respectfully, weird characterization.  There are tons of documents that I had access to that only had a few people.

Q.  Thank you.

And, sir, on January 24th you were just seven days away from starting your new job, correct?

A.  At that point I had no idea that that week was going to turn out that way.

Q.  But that week you had a meeting with the senior executives of Fanatics, correct?

A.  Yes.

A616

50

Q.   And if you had stayed that DraftKings --

MR. SNYDER:  Withdrawn.

Q.   On Saturday, January 27th, you met with Mr. Rubin again in Pennsylvania, correct?

A.   Yes.

Q.   And at that meeting, Mr. Rubin called the chief legal officer from Fanatics, Greg Winiarski, W-I-N-I-A-R-S-K-I, correct?

A.   Yes.

Q.   And during that call with Mr. Rubin and Mr. Winiarski you discussed your non-compete agreement, correct?  Yes or no.

A.   Yes, that came up.

Q.   And you said you wanted to get your own lawyer at that time, correct?

A.   Yes.

Q.   And Mr. Winiarski told you that he, through Fanatics, knew you had a non-compete with DraftKings and that you and Fanatics would take it step-by-step, correct?

A.   I don't know about step-by-step, but, yes, something like that.

Q.   Okay.

And then after that you provided him your non-compete and non-solicit agreement of January 27th, correct?

A.   Yes.

Q.   And your testimony, as I understand it, is that the next

A617

day, Saturday the 28th, you decided to accept the job at Fanatics, correct?

A.   I got home on the 27th, I hugged my girls, spoke to my wife, woke up the next day and said, all right, let's go -- let's see if we can do this.

Q.   Okay.

A.   So, yes.

Q.   That's a yes.

And then you booked a ticket to fly out to Los Angeles on the 28th, correct?  And that's the night you started staying at Mr. Rubin's house in L.A., correct?

A.   Correct.

Q.   Now turn to the Laptop No. 2 issue again.  When you arrived at Mr. Rubin's house in L.A., you knew at that point that you're going to be leaving DraftKings and joining Fanatics, correct?

A.   Yes.

Q.   And let me direct your attention to January 27 and 28, which you can see on the calendar, after your conversation with Mr. Winiarski you did not preserve the files on Laptop 2, did you?

A.   I -- anything DraftKings' related I did or -- yeah, I did. Anything personal I tried to get off that.

Q.   Isn't it a fact, sir, that you continued to delete files off of Laptop 2 during this time period that you were in

A618

52

Q.   Mr. Rubin's home, did you remember that?

A.   Personal files, yes.  DraftKings' files, no.

Q.   Okay.

It's your sworn testimony that you didn't touch a DraftKings' document in terms of deletions that week?

A.   To what I thought I was doing, yes, I did not think I did that.

Q.   Isn't it a fact, sir, again, that by January 28th, your first day at Mr. Rubin's home, you had deleted all but two documents off of that?

A.   Well --

Q.   Yes or no, sir.

A.   First day was the 29th.  But I don't -- I tried to delete everything personal.  I treated that --

Q.   Do you remember after January 28th also going onto Laptop 2 and deleting your web browsing history?  Do you remember that?

A.   That is something I don't -- definitely don't deny. There's a lot of saved passwords in a personal computer.

Q.   But web browsing history, what websites you visited, you deleted off of Laptop 2, correct?

A.   Yes, I read that.

Q.   And the documents you deleted from Laptop 2 were not purely personal documents.  You deleted confidential DraftKings' documents from Laptop 2, correct?

A619

A.    If I did, I was -

MR. BECK:  Asked and answered multiple times at this point.

THE WITNESS:  Oh, sorry about that.

THE COURT:  He can answer.  And then move on, Mr. Snyder.

A.    If I did, it would have been -- I would have been positive they were somewhere saved on the Cloud in DraftKings.

Q.    Let me direct your attention to 99-1 which is Exhibit A to Mr. Harris' Affidavit dated March 21.  You created this document on Sunday, January 28th, didn't you?

A.    I saw this.

Q.    Yes or no.

A.    I don't deny this.  This is like a --

Q.    Did you create this document, sir?

A.    If you found it on my computer, this is something I would write as, like, a list of stuff I needed to do.

Q.    Do you remember writing these words down on a blank e-mail?  Yes or no.

A.    I'm not going to deny that, so, yes.

Q.    Okay.

And then after creating this e-mail isn't it a fact that you triple deleted it?  Yes or no.

A.    Uhm.

Q.    Yes or no, sir.

A620

54

A.   Well, it's not yes or no.  The implication is I went in and specifically deleted this note.  I was trying to get every -- it was the only computer I had at the time.  I treated it as a personal computer.  I wanted to get anything personal off of it.  I didn't cherry pick notes.  I was trying to get rid of all that, any saved passwords, iMessage, et cetera.

Q.   Well, you didn't just delete this message, did you, sir?  You deleted it three times, correct?

A.   Well --

Q.   Do you remember that?

A.   No, but obviously I didn't do a great job at it.

Q.   Well, sir, you deleted the draft from your mailbox, correct?  And then deleted it -- sorry for the compound -- from your deleted files.  And then you went in, for good measure because twice wasn't enough, you deleted it a third time from your recoverable items folder.  Triple delete, correct?

A.   I was trying to get everything possible that was personal off that computer, yes.

Q.   Was there any other document that you triple deleted?  Yes or no.

         MR. BECK:  Objection, your Honor.

         THE COURT:  He can answer that question.  As to the prior question, you didn't object.  But so he can answer this question.

A.   I can't speak to triple deleted anything, so I don't

A621

recall triple deleting anything.

Q.   How did you even know how to do that?  Did you have to go on to the Internet to figure out that it's not just enough to delete summary from your deleted files, you have to go to recoverable items file to make sure that it wasn't recoverable?

MR. BECK:  Objection, your Honor.

THE COURT:  Sustained.

MR. SNYDER:  Withdrawn.

Q.   Do you remember researching how to get rid of an e-mail permanently or anything like that, before you triple deleted that?

A.   No, I don't think you can get rid of an e-mail totally, so, no, I don't.

Q.   During the week of the 29th, given that you expected to join Fanatics VIP as its President, did you not attend scheduled DraftKings' meeting in Boston to avoid hearing information about DraftKings while you had an offer pending from Fanatics?

A.   A couple of things to break down in that.

One, my role is on -- I'm on the Executive Team at Fanatics.  I run the L.A. office.  And, yes, I'm the President of VIP, but it's that -- what you said was not right.

And, two, I -- that week I stare at often.  I was trying to do the bare minimum by not impacting DraftKings, but also not leaving my team out on, out on an island.  So I, I

A622

56

don't deny anything with regards to -- anything, that's kind of broad.  But if I was -- if there was a meeting that was scheduled and I was, I actively thought about it and I said is this something that would -- is this something that's business critical that needs to be answered right now?  If the answer was no, I didn't touch it.  If it was something that I would leave my team hanging for multiple days on an important week, I would answer the e-mail because I thought that was the right thing to do and I still do.

Q.   Let me ask the question again.  Given that you expected to join Fanatics VIP, did you avoid hearing information about DraftKings while you had an offer pending from Fanatics?  Yes or no.

A.   I put up a -- I really put up a wall between both, but yes, I tried to -- if I didn't have to respond to anything or see anything, I tried to avoid it.

Q.   Thank you.

Isn't it true that you finalized the terms of your compensation with Fanatics between January 28 and 31?

A.   It all came together the morning of the 1st.  But, yes, that time was negotiating my contract.

Q.   And to your testimony --

MR. SNYDER:  Withdrawn.

Q.   Now, a forensic review of your DraftKings' e-mail account revealed that of the 365 e-mails you received on your

A623

57

DraftKings' e-mail account between January 28 and 31, you ignored all of six of them or 98.4 percent of them.

Do you have any factual basis to dispute that?

A.   No.  I will say I rarely -- my response rate to e-mail is probably 10 percent in general.  But, no, I don't refute that.

Q.   Okay.

Let me show you -- do you recall telling this Court: I did not visit Fanatics' Los Angeles office or any Fanatics' office prior to accepting VIP's -- Fanatics' VIP's offer of employment.  And that the first day you were in Fanatics' L.A. office was February 6th?

A.   Yes, I was accused of going to the office, and I never did.

Q.   And that wasn't entirely truthful, was it, when you said that to the Court?

A.   It was entirely truthful.

Q.   In fact, you were at Fanatics' Michael Rubin's house connected to a Fanatics' Wi-Fi server on January 29th and 30th while you were still employed by DraftKings, correct?

MR. BECK:  Objection.

THE COURT:  Overruled.

Q.   Sir?

A.   So I answer?  I was staying at Mr. Rubin's house.  Many -- the CEO of DraftKings has stayed at his house.  It was empty.  But -- and to answer your question -- the -- there was no

A624

58

Fanatics' Wi-Fi address.  That's not what the Wi-Fi address was.  So, no, that was not a Fanatics' office.

Q.   It was empty?

A.   There was nobody else there outside of his, like, house staff.

Q.   Mr. Rubin didn't arrive at any time?

A.   He arrived after I resigned on the 1st.

Q.   Okay.

Who else was there other than your brother?

A.   There was, like, cleaning staff.

Q.   Let's walk through quickly the 29th and 30th.

You met with the Munger Tolles law firm on January 28, correct?

A.   Yes.

Q.   And that's the same law firm that filed a lawsuit entitled, "*Hermalyn versus DraftKings* in the California Superior Court three days later on February 1st, asking the Court there to invalidate your non-compete and non-solicitation restrictions, correct?

A.   Yes, that's correct.

Q.   And you continued to work with Munger Tolles throughout that week as they prepared to file your lawsuit, correct?

A.   Yes.

Q.   And you also worked with your counsel, personal counsel, at Winston and Strong, correct?

A625

A.   Yes.

Q.   And then subsequently the Quinn Emmanuel law firm was involved on behalf of Fanatics, correct?

A.   Yes.

Q.   And while preparing to sue DraftKings, working with these law firms, you also knew that if you left DraftKings and went to Fanatics in January of 2024, given your past experience, DraftKings could sue you?  Yes or no.

A.   I can't speak to what I thought was going to happen legally.  I do know when people leave their -- DraftKings historically is not very happy.

Q.   Let me show you your deposition testimony from 151, 20 to 152-3.  Do you recall me asking this question and you giving this answer:

         "Question, I am not --"

         MR. SNYDER:  Can we please put that up, Mr. White.

Q.   "Question:  I'm not asking about conversations with counsel.  I'm asking you, you knew that if you left DraftKings and went to Fanatics, its competitor, in January of 2024, that given your past experience, DraftKings could sue you, correct?

         "I'm not a lawyer, but I thought that could be an outcome, yes."

         Did you give that answer to my question?

A.   Sorry.

         MR. BECK:  Objection, your Honor.

A626

THE COURT:  Hold on, he's objecting.

What's your basis?

MR. BECK:  Under the rule of completeness, the next several lines are critical to him understanding and actually responding to this.

THE COURT:  You can question him on, you know, redirect.

Q.   Did you give that answer, sir?

A.   I did not see what you were just talking about.  So if you could --

Q.   Did you tell the Court -- did you tell us in your sworn deposition testimony in March that you thought that an outcome of you leaving DraftKings for Fanatics could be DraftKings suing you?

A.   I thought that could be an option.  There's no way I thought it was going to go like this, though.

Q.   When you were in Mr. Rubin's house, you viewed documents from DraftKings' applications on your personal iPhone, correct?  Yes or no, sir.

A.   If that -- yes.  If that's what was in the piece.

Q.   Let me show you Exhibit 36, which is your declaration in opposition to our TRO motion at page 14.  And the first sentence, sir, you swore to the Court:  I do not believe that I accessed or downloaded a BD_Gaming101 presentation on January 29 or 30.

A627

61

Do you see that testimony?

A.    Yes, I do.

Q.    Is that your sworn testimony today?  Yes or no.

A.    Yes, I, I didn't think I opened that document.

Q.    Okay.

Do you recall one way or another as you project back in time to January 29th and 30th, do you recall one way or another whether you accessed BD_Gaming101?  Yes or no.

A.    I do not recall opening that document, no.

Q.    Does that mean you don't remember doing it or you don't remember one way or another whether you did it?

A.    No, I don't remember doing it.  There's an external presentation that I don't remember doing that, no.

Q.    Okay.

You don't remember whether you did it?

A.    No, I don't remember opening that -- either of those two days.

Q.    You understand that this document is a 75-page confidential DraftKings' PowerPoint made -- used to make presentations to potential business partners, like sports leagues and sports teams, correct?  Yes or no.

A.    The characterization of that I don't think is right.  It's an external document used to educate people in the industry.  It's shown to hundreds, if not thousands of people externally.  But do I consider it a confidential document?  I consider every

A628

document at DraftKings confidential so --

Q.   And you weren't involved in pitching prospective DraftKings' partners on January 29th or 30th because you were planning to sue DraftKings a couple of days later, correct? Correct?

A.   There's a bunch in there.

MR. SNYDER:  I'll withdraw the question.

Q.   On January 29th and 30th, sir, you were not pitching prospective DraftKings' partners for business, correct?

A.   If I was actually pitching a partner?

Q.   Yes.

A.   No, no, I was not.

Q.   Let me move to another document which is Master SB2024. And am I correct, sir, that, in January -- although you were -- at this point, although you were ignoring all their e-mails, you didn't ignore Ms. Goodman's request for help, correct?

A.   I'm sorry, would you mind repeating that?

Q.   Ms. Goodman reached out for assistance and you provided assistance, correct?

A.   Yes.

Q.   And you didn't ignore it because it gave you an opportunity to access a DraftKings' Super Bowl document chockfull of confidential information just weeks before the Super Bowl, correct?

MR. BECK:  Objection, your Honor.

A629

63

THE COURT:  Sustained.

You can rephrase.

Q.   You could have ignored her e-mail like you ignored almost all the others, correct?  Yes or no.

A.   I wouldn't do that to her.

Q.   Okay.

You could have referred her to another person on your team, correct?

A.   In that case, I put -- I helped put that document together so I was very familiar with it.  She was new, very new.  And it was about invites to different parties we were having.  And she called me, I answered, and I tried to help.

Q.   And this document, you would acknowledge, contained some of DraftKings' most confidential VIP data related to its Super Bowl plans, correct?

A.   I wouldn't clarify -- I wouldn't constitute it like that. It had to do with -- it was essentially a party list.  And it was different people at DraftKings submitting a list of potential invites that we would want to invite to parties.  Is that like -- is that a customer list, like with customers?  No. Was it people or partners or athletes or what we call VIP's generally?  Yes.

Q.   Is that something you would have put on the internet for all of your competitors to see, sir?

A.   I wouldn't put a single DraftKings' document ever on the

A630

64

internet for anybody to see, so no.

Q.   Okay.

Now, I want to make sure I understand your testimony. It's January 30th, right?  We're two of days away from you joining Fanatics and the Super Bowl.  You knew you were not going to participate in DraftKings' Super Bowl events, correct?

A.   Yes, I did, very likely.

Q.   And you were sitting in the home of one of DraftKings' most fierce competitors, correct?

A.   He has multiple homes and I was alone with my brother, but, yes.

Q.   And you knew that you would be working VIP for Fanatics at the Super Bowl, correct, at that time?

A.   I was unclear of what the -- what the next couple of weeks would look like.  I was very much focussed on the next couple of days.

Q.   Okay.

Let's move to the day that you resigned from DraftKings.  Let me ask you this:  Do you remember on the 31st accessing confidential DraftKings' information?  Yes or no.

A.   No.

Q.   On the 1st you were still in Mr. Rubin's home, correct?

A.   Yes.

Q.   You gave notice of your resignation a little before 12:00 Eastern time, correct?

A631

65

A.   Yes.

Q.   And your access to DraftKings' systems was cut off shortly after you tendered your resignation, correct?

A.   That's my understanding.

Q.   Okay.

I want to direct your attention to the hours shortly before you resigned.  Let's look back at Table 2 of Mr. Harris' Affidavit that we looked at before, Exhibit 79.

At 9:17 a.m. Eastern time or 6:17 Eastern time -- Pacific time for you, on February 1st, yes or no, did you use your DraftKings' credentials to access the Google Workspace and download from the platform VIP bimonthly update to a non-DraftKings' device?  Yes or no.

A.   The highlights --

MR. BECK:  Objection.

THE WITNESS:  Sorry about that.

MR. BECK:  That's where I was headed.  The highlighting -- the -- Mr. Snyder was asking about February 1. The highlighted is January 30th, which obviously creates implications.

THE COURT:  Yes, Mr. Hermalyn, you can just ignore the highlighting.  The question was about February 1st.

Q.   Yes or no, did you download this document, VIP bimonthly update?  Simple question.

A.   The answer is no.

A632

66

Q.    Thank you.

A.    And also the answer's I don't even know how this is possible that I could have accessed this --

Q.    Thank you.  The answer is no, correct?

A.    Yes, the answer is --

Q.    And the same question with BD_Gaming101 at 9:32 a.m., Eastern Standard Time?

A.    Both of those documents, I do not know how that is possible that --

Q.    Okay.

      And that's the -- BD_Gaming101 is a document we spoke about earlier, correct?

A.    Yes.

Q.    Let me show you Exhibit 76-1, a screenshot of the call history from a photo application in Mr. Larracey's phone. We're going back now to -- all right, you recognize this 201 number, correct?  7 --

A.    Yes, yes.

Q.    And what's that number?

A.    My number.  My phone number.

Q.    And right.  That's the same phone number you had while at DraftKings in January of '24, correct?

A.    Yes, for quite sometime.

Q.    At one p.m. Eastern time on February 1, you still had access to your old cellphone number, correct?

A633

67

A.   Yes.

Q.   I'd like to direct your attention to their opposition, to DraftKings' motion for preliminary injunction.

MR. SNYDER:  That's Exhibit 101, Mr. White.

Q.   And you tell the Court, sir, in these bullets, you represented to the Court that on January 31, the night before you resigned, you gave your counsel your personal phone and you, "Obtained a new phone with a new number," that you, sir, used going forward.

Do you see that?

MR. BECK:  Objection, your Honor.  This is a citation out of our brief, not Mr. Hermalyn --

THE COURT:  The objection is sustained.

MR. BECK:  Thank you.

THE COURT:  You can just ask him directly.

Q.   Is that a truthful statement, sir, that you obtained a new phone with a new number on the 31st?  Yes or no.

A.   I obtained a new cellphone -- let me say it the right way. I had a -- I knew I was going to give my phone to counsel.  I bought another phone.  I then, on the 31st when I handed my phone -- can we call it Phone 1 and Phone 2?

Phone 1 is what I used for however long an iPhone 15 has been out.  That that number is that phone.  On the 31st I took that phone, I handed it to counsel.  I then set up a new iPhone 15 with the same phone number, but not the same

A634

68

credentials.  Didn't set up iCloud, didn't really know how that was going to work but it does.

Q.   So you still had your old 201 number on the morning of the 31st?

A.   Same number, different phone.

Q.   Okay.

And isn't it a fact that your personal iPhone is not the only device from which you or any DraftKings' employee could access Google Workspace?  You know that, right, sir?

A.   Yeah, I -- you could access Google, you could log into DraftKings on any device.  You just need a Duo authentication to do so.

Q.   You accessed Google Workspace on an iPad not just your iPhone?  Yes or no.

A.   I didn't think I did that until I read that in one of the DraftKings' filings.

Q.   You don't know one way or another, sir, right?

A.   I don't think I did.  But I did hand in my iPad right when --

Q.   You don't think you did, but you can't tell this Court under oath whether you actually did or not, correct?

A.   I worked for DraftKings for three-and-a-half years.  I traveled a lot.  I worked remotely.  I cannot tell you definitively to the Court if I used my iPad in -- sometime in 2023 or 2022, but right when you -- not you, excuse me, but

A635

69

right when I read the filing, I immediately, in abundance of caution, it's how I've been operating my life, I handed it over to counsel.

Q.   Well, I'm not talking about handing over phones.  I'm talking about accessing and getting onto Google Workspace, you know -- once you download the Google Workspace application to any device, you can then access the Google Workspace by opening the application on the device, correct?

A.   For that, i -- for that iPad, if I did have it with me, which I do not believe I did, I could not -- I could not -- to answer your question, I could not not have access DraftKings' anything on that iPad.  I couldn't have done that.  Even if I I've done it in the past, which I don't think I did.  And the reason for that has been quite -- I know I didn't use that iPad in 2024, and it would prompt two-factor authentication in order for me to get into anything.  So definitively if I did, which I don't think I did, there is no way I could access anything DraftKings without typing in my credentials and getting that two-factor authentication.

Q.   Isn't it a fact, sir, you know that's not true.  That you can enter your Google Workspace credentials onto an application -- you can, you can download and install the workspace application on any device, enter your credentials, and then you remain logged on to the Google Workspace without having to re-credentialize?  You know that, sir.  Just like the

A636

Uber app, just like the Instagram app, or any other app that allows you to maintain a continuous session.

MR. BECK:  Objection, your Honor.

THE COURT:  It's sustained.

Break it into multiple questions, Mr. Snyder.

Q.   Well, let me ask you this, when you have the Instagram app on your phone -- you have that, right?

A.   Yes, I do.

Q.   And you don't have to log in every time, correct, because you just hit the app and it opens up?  That's the whole, that's the whole beauty of an app, correct?

A.   This would be the biggest security issue ever if there wasn't want 202-factor authentication.  What you're saying -- I just want to be clear.  I want to make sure I understand the question.  What you're saying is if I logged into DraftKings anything, whenever I did it, on whatever device, somebody could find that device, click it, and have the treasure trove of all DraftKings' information?  That is one, not possible.

Two, it would be a major risk to the business.

And, three, I definitively did not do that on the iPad, and it would be impossible to do that.

Q.   Isn't it true, sir, that there are two ways to log on to Google Workspace?  One, by hitting the app and accessing your continuous ongoing session?  Or, two, going on to something like Chrome off the web, isn't that a separate way to do it?

A637

An application or through Chrome and typing in the web address for Google?

A.   The only way I know how to do it is to log into my credentials and then I get a Duo authentication to get in there.

Q.   But that's not true, sir.  You can hit the app without having to authenticate each time.

A.   If I was using that -- if I was in my DraftKings' device and I was logged in, to your point, on Chrome in Document 1 and then 15 minutes later clicked on Document 2, yes, I wouldn't have to type that in every day.  If it was this, a scenario where it's a lapse of time, I definitively did not use the iPad in, like, I didn't even know if I had it there, let alone use it.  It wouldn't just all of a sudden open it up.

Q.   Well, let me ask you this, you didn't turn in your iPad into counsel until February 4th, correct?

A.   I returned it over immediately when I saw I was going to --

Q.   And your brother who was with you at Mr. Rubin's house, we've already established, had two phones, didn't he?

      MR. BECK:  Objection, your Honor.

      THE COURT:  Sustained.

Q.   You used those phones freely to contact Mr. Larracey, didn't you, sir?

A.   Sorry, I think -- I thought I answered this question.  I

A638

72

don't deny any call I made to Andrew, actually.

Q.   And Mr. Rubin had internet devices at his home?

A.   Internet devices meaning?

MR. SNYDER:  Withdrawn, withdrawn.

Q.   So you would acknowledge, would you not, that --

MR. SNYDER:  Well, withdrawn.  I'll let someone else do it.

Q.   Now, would it surprise you to learn that during the 18 months --

MR. SNYDER:  Wrapping up, Judge.

Q.   -- you signed different agreements with DraftKings containing a one-year non-compete?

A.   Whenever I was -- I can't speak to the number of documents, but whenever you're awarded equity at DraftKings, you sign, you sign you received it and that's a part of that?

Q.   And isn't the reason that you so knowingly violated your non-compete on February 1st because you knew your lawyers were marching to court that same day to ask a California court to validate your non-compete restrictions?

MR. BECK:  Objection, your Honor.

THE COURT:  Sustained.

That's argumentive, Mr. Snyder.

Q.   You would agree, would you not, that you're the first President ever a VIP at Fanatics?

A.   Yes, I don't think that role existed before.  And also the

A639

73

first head of the office.

Q.   And it's your job to build that VIP group as big as you can, correct?

A.   I don't know how to answer that.  I would say as big as it needs to be.

Q.   And you would agree, of course, and my last question, that DraftKings is one of your prime competitors in that space, the VIP space?

A.   We have a lot of competitors, anybody in the game and industry I would say for that specific business unit of Fanatics.

Q.   You would agree that DraftKings is one of the leaders in the industry, that is, the VIP gaming industry?

A.   Absolutely, they have a great business.

MR. SNYDER:  Thank you.  No further questions.

THE COURT:  Okay, Mr. Beck.

MR. BECK:  Your Honor, may I have a few minutes?  Obviously given this -- the scope of the direct at this point and given the way that we're putting the witness on, if I could just have a few minutes to adjust my examination.

THE COURT:  Sure, take two minutes.

MR. BECK:  Thank you.

THE WITNESS:  Can I use the restroom quickly?

THE COURT:  Yes.  We'll take a two-minute recess and, Mr. Hermalyn, you can use the rest room.

A640

THE WITNESS:  Thank you.

THE CLERK:  All rise.

(The Honorable Court Exited.)

(Court Stood in Recess).

THE CLERK:  All rise.

(The Honorable Court Entered.)

THE CLERK:  Thank you very much.  You may be seated.  Court is back in session.

THE COURT:  Okay.

Mr. Hermalyn, you're still under oath.

THE WITNESS:  Is that a question?

THE COURT:  I'm confirming for you.

THE WITNESS:  Sorry, yes.

THE COURT:  And, Mr. Beck, we'll go five minutes past eleven because of the break.

MR. BECK:  Thank you, your Honor.

**DIRECT EXAMINATION BY MR. BECK:**

Q.   Good morning, Mr. Hermalyn.

A.   Hi, Mr. Beck.

Q.   Let me take you back to January 16th, and I just want to ask you about the timing of that -- the migration.  How did it come to be that you were moving and deleting the documents on January 16th off of your prior laptop, prior work laptop?

A.   Sure.  On late 2023 I asked for -- I wanted to get a new computer.  I actually asked for 14-inch Pro because that was

A641

75

lighter -- or Air but got a Pro.  I got the computer, and then at some point in late December, and then again in early January, Mr. Hernandez, who was IT -- he looked over IT in the New York and in the New Jersey office, and then he split time between the two, asked me for an update of where that, the 16-inch was.  Mr. Snyder -- let's call that Laptop 1 and Laptop 2 is the 14-inch -- he asked me for an update for where Laptop 1 was.  I said, well, I didn't take Laptop 2 out of the box yet.  And he said okay, he has to let IT know.  He has to give IT an update because they were asking.  And if I don't hand in my old computer -- so in this case, Laptop 1 in X amount of time, they could shut down my, or shut off my access, my credentials to DraftKings.  So I told them I would carve out some time to make sure I did it.  Yeah, so that's --

Q.   I'm sorry, when was that conversation?

A.   Late December and then, again, I believe I was in the office on the 2nd, 3rd, and 4th, some combo of that, in January.  And I saw him in the office.  And he sat, like, walk in -- he was right there and he looked up and asked for an update.

Q.   Okay, thank you.

And then, so that was January 2, 3 or 4.  Why didn't you do the transfer, the migration at that point?

A.   I wanted to carve out time to actually do it because I had a lot going on on that Laptop 1, and I wanted to make sure I

A642

76

had a clean move to the 14th, set-up time.  I was, you know, in the New York office that first week.  The second week I was travelling.  And then I had set up time to do it on the 16th.

Q.  Okay.

Was there any connection between your changing computers on the 16th and anything else that was happening at the company, your investigation your -- anything?

A.  No.  The investigation was definitely something that I've never been through and look to never go through that again, but it didn't affect at all my work.

Q.  Okay.

And now Mr. Hernandez, Docket No. 82 in paragraph 2 says that he has not spoken with Mr. Hermalyn about transferring files or about the 14-inch MacBook Pro since our discussion on or about before December of 2022.  Is that accurate?

A.  If you -- you're looking into the actual words of that sentence, the 14-inch I, I think the only time I talked to him was I mentioned that it was still in the box.  That was Laptop 2.  But I definitely talked about the 16-inch Laptop 1 and I definitely talked about transferring files since December.

Q.  Okay.

Now, in terms of the actual migration process, can you just explain what you were trying to accomplish?

A.  Sure.  I would imagine most people in this court have gone

A643

from one computer to another.  It's like your -- it's like moving offices.  You set up a couple of boxes of stuff you're going to throw away, one box.  Another box is you're going to keep and bring to the next office, and the other stuff is personal stuff that your wife's not happy you bring home but you bring home.

Q.   Okay.

So let's just talk about the keep box.  Can you explain -- what did you do to -- for the documents you wanted to keep -- the materials that you wanted to keep?

A.   To take a step back.  What I did was I keep a lot of stuff on my desktop.  To the point made earlier about deleting stuff on the 17th, like, deleting stuff off my desktop is something I would do normal.  I looked at the file folder that had, like, this bunch of stuff in it.  Like, a ton of documents. Basically I guess -- this would help.  Normal practice in a given week or two weeks or three weeks, my desktop would be cluttered with a bunch of files.  I then would delete some of them.  And any other ones I thought I wanted to keep or not delete right away, I would throw in a folder.  One folder I called it miscellaneous on my desktop.  That folder was my fake way of organizing, because if you clicked on it, it was a ton of folders -- a ton of files on that folder.  I looked in that folder.  I looked at anything I wanted to go in those different boxes.  I pulled out a couple of personal documents.  Big thing

A644

to mention here is that this was the only computer I had.  So, though I'll never do this again in my career, I didn't have a personal computer.  This was the personal computer.  So it had iMessage.  It had my notes apparently.  It was logged into iCloud.  It had all of my passwords saved, my personal g-mail, et cetera.  So I pulled out personal files that I wanted to keep.  That can be --

Q.   Wait, Mr. Hermalyn, before you get into the personal stuff --

A.   Sorry.

Q.   I'm just talking about the stuff -- the work stuff that you wanted to --

A.   Oh, the work stuff.  So I looked at it and I said -- I was handing in this computer, I would never see it again.  I wanted to do a -- be done with it that day.  So what I did was I looked at any files that I thought might not be saved on the Cloud.

Q.   What do you mean "might not be saved on the Cloud"?

A.   So, one of the documents, Mr. Snyder mentioned it might -- I didn't know for sure if one of those documents was on the Cloud somewhere.  The Cloud meaning Google Workspace.  Like, being able to access it from anywhere you were already logged into DraftKings.  I didn't know if they were somewhere I could find again or local files only on that desktop.  So I pulled out the local files.  I wouldn't have guessed 18.  I probably

A645

would have guessed more, but it was 18.  And I slacked myself those files.

Q.   Okay.

What does it mean to slack yourself?  Can you just explain what you were doing when you slacked yourself those files?  What does that mean?

A.   So Slack is a messaging service.  It's like a, we use it, or DraftKings uses it a lot.  The best way to describe it is that -- another way to describe it is e-mailing yourself. Like, I'm e-mailing myself documents.  If I want to look it up one day, I can search somewhere and find that document.  So I'm -- slacking yourself is essentially -- I use this -- it's a feature where you can slack yourself stuff.  I would do that regularly or I did do that.  Notes or files or reminders or something.  Does that make sense?

Q.   Yes.

A.   Okay.

Q.   So one of the points, you understand one of the points that DraftKings has made, is that when you slacked yourself those 18 documents, you did not actually, they say you didn't migrate them over to your new computer.  Is that true?

A.   No.

Q.   What is the truth?

A.   They're already on that computer.  So when you slack yourself -- I was going from one DraftKings' computer to

A646

another DraftKings' computer.  If you slack yourself anything from one computer to another, it's already on there.  Like, just like the hundreds of other files that I would access in a given month.  They live somewhere on the Cloud.  What I wanted to do was avoid them living on that first computer and never seeing them again.  So they're definitively on that computer, on Slack.

Q.   Okay.

So they're available?  They're not gone?

A.   Yes.

Q.   And if you still have that -- if you still had your 14-inch computer, you can access all of those documents through Slack?

A.   Yes.

Q.   Now, I want to ask you now about the, the four unique documents that DraftKings has said that you either downloaded -- that you downloaded during that period between January 27, when you had received a verbal offer, and between February 1 when you had finalized the deals -- you accepted the offer and you had resigned.  Okay?

A.   Yes.

Q.   And so I'm asking about that period.

And during that time, specifically the last three business days is when I want to focus on right now.

A.   Okay.

A647

Q.    The 29th, the 30th, and the 31st.

A.    Yes, that's helpful.

Q.    You were asked about the master SB2024 spreadsheet.  Can you just -- I know you've already said it, just very high level, what was that document?

A.    DraftKings had several parties or functions going on at Super Bowl.  They were hosting a lot of people, hundreds of people.  And it basically was a waterfall document of invites.  So if the five of you were on the very special list of let's ask you first, we would e-mail you or text you or figure out how to get to you.  We would give you the range of all the different parties to go to.  You would then pick them.  If you picked something that was on the one party with 50 invites, we would check the box.  If you didn't, we would go down the list and go to the next person.  So it was time sensitive in the fact that there was a lot of invites that you're juggling.  And Brittney, who is brand new to the role, was leading that charge and that week was a big week for that.

Q.    Okay.

So just to -- very quickly with regard to why you were looking at that document, what happened that caused you to look at that document?

A.    Brittney called me -- or Mrs. Goodman called me on the 30th.

Q.    Okay.

A648

82

And what did she say to you on the 30th?

A.   The first part of the conversation was actually about my friend that passed away, despite allegations that I faked a friend's death.  The reason why she was an employee of DraftKings is because of that friend that passed away.  He recommended her.  So he was close -- we were connected on that point.  She was saying -- we talked a lot about that and how crazy it was that he passed away.  And in the end it was just, like, hey, I know you're dealing with this, but what are we doing with this stuff?  I'm getting pressure from a lot of people on, like, figuring out if X, Y, and Z athlete, celebrity partner was invited.  Where does that stand?

Q.   Okay.

Let me now turn you to after you left, and you've already addressed the document piece.  So I'm going to ask you about the phone calls with Mr. Larracey and Mr. Metz just very briefly.  We've been through them so we don't need to spend a lot of time on them.

A.   Sure.

Q.   Can you just describe what was your relationship like with Mr. Metz and Mr. Larracey?

A.   Very close.  Like, I walked outside for two minutes, I wanted to hug them badly.  Friends, but you know, rooted in work, but friends.

Q.   Prior to February 1 when they called you, had you told

A649

them that you were considering leaving for Fanatics or that you had accepted a job from Fanatics?

A.   No.  In that two-week period that was probably singularly one of the hardest things I did.

Q.   And why didn't you tell them?

A.   Inappropriate.  Puts them in a -- why didn't I tell them you said?

Q.   Yeah.

A.   Just not something you would tell somebody that works on your team, let alone anybody.

Q.   Okay.

So then during -- now the series of calls that you had, the morning call and then those evening calls during either the morning conversation or the evening conversation, did you suggest to either or both of them that they should apply for a job at Fanatics whether on the website or otherwise?

A.   Absolutely not.

Q.   Okay.

And when you were on the call with them later that day, now in the evening, because I know we just talked about both, but I want to focus in on the later call, at any point during that call, did you talk to them about what it would look like -- did you ever suggest to them what it would look like to come over to Fanatics for them?

A650

84

A.    No.

Q.    Okay.

So you saw Mr. Larracey and Mr. Metz identified some numbers, Mr. Snyder walked you through those.  Did you provide all of those numbers?

A.    No.

Q.    Did those numbers even come up?

A.    I don't know the specific numbers, but numbers did come up.

Q.    How did they come up?

A.    The -- should I -- well, I'll tell you about the call?

Q.    Yeah, please.

A.    The -- I remember exactly where I was.  I was excited to speak to him.  It was a crazy day for me and continues to be. I received a call, I went downstairs, I went to the media room. I was in a very comfortable couch, and for one second of that entire week I took a deep breath and I was excited to talk to two people, that yes, were DraftKings but are friends.  So I'm a single person at DraftKings that would see us work together and mitigate that.  And at that point they didn't know anything about the last week and a half.  It was, it was a session of just, like, talking.  You tell A or what's Mr. Rubin like? Like, tell me about the role.  I can't, like -- what does my wife Tiffany think?  What are the girls saying?  The two young girls, they have no idea.  We talked about, like, everything

A651

85

that went down.  I would say that went down the last week and a half.  It's obviously nothing confidential.  It's just people talking.  And it felt really good to tell them, because it's one thing to tell your family or friends what's happening, it's another thing to actually connect it to business.  And these two knew everything about me from a business perspective.

Q.   Okay.

And how much of the conversation was that type of discussion?

A.   Most of it.

Q.   Okay.

And then what happened, what happened after you finished all the -- we'll call them therapy discussions --

A.   Yeah.

Q.   -- what did you talk about?

A.   These are numbers guys.  I'm a little more art.  They're a little more math.  And they were wracking their heads with, like, how -- and when I say "they," it was mostly Hayden.  Andrew was more of a silent participant on the phone, which is not atypical.  And then they were just, like, how -- but I don't understand.  Like, how does this make sense?  Not quite, like --

Q.   How does what make sense?

A.   Me going to Fanatics.  I had a great job at DraftKings.  I loved my job at DraftKings.  I've been consistent with that.  A

lot of good friends there.  Well, still.  And it was shocking.  They were shocked.  The piece they couldn't get -- and it was friendly banter, but it was them saying, like, why did you do this?  Like, what -- like, man, this is a big risk.  And the big thing we talked about was equity.  And the thing they -- and when I say "we," they're, like, how do you look at that?  And the context there was, they knew everything about how Fanatics operated because they were very involved in Rob Ferrara leaving in July.  So they understand, like, what that looked like.  And it's something we even spoke about back, like, it was brought up in July of that.  So equity was a part of this conversation.  The conversation was just, like, how do you value that?  Which is a -- I think a pretty standard question from these two.  And the -- how you valuate what was rooted in public versus private?

         Well, at that point -- well, at that point DraftKings' stock was somewhere in the thirties.  It was, like, a healthy business.  So, like, I left it at the -- at a great moment in time at DraftKings and continues to rise.  And they knew that.  And they just didn't understand -- they, Hayden didn't understand the private equity piece.

Q.   Meaning why you would leave, give up public equity for private?

A.   Yeah, he just didn't understand it.  He related it back to Uber.  He was at Uber for a period time and I guess promised a

lot, and it turned out into not that.  So, that was, that was that.

Q.   Okay.

And then did you ask them at any point that day to come over to Fanatics?

A.   No.  That would be the last thing -- no, no.

Q.   And have you at any point that day or at any point after asked them to come over to Fanatics or suggest that they come over to Fanatics in any way?

A.   No.  The -- what I'm pausing now, this doesn't, it doesn't make sense why I would do that.

Q.   Why is that?

A.   Well, a couple of things.  One, that from the 22nd, but specifically on the 28th, I operated in extreme caution.  I still do after the TRO hearing.  I don't even know -- I handed over my phone with contact information.  I can't even call my electrician.  I have operated in extreme caution.  These two, if you were looking at -- if somebody was looking at, like, who would this guy target to call?  These two would be on the top of the list.  Why would I do that on the first day of me being employed and run and try to hire these people?  It doesn't make any sense.  Also, part of the conversation was Hayden got promoted.  That was -- I was -- that was a major thing for me. I was a champion of Hayden, continued to be the whole time there.  I was so excited about that.  He wasn't going to get

A654

that -- he wasn't going to get promoted.  That was a -- Andrew knew in more detail of that, but that really bothered me.  He was, like, ready and should be promoted.  He earned it.  But DraftKings can get kind of corporate at times and didn't do that -- or said no.  And he got the role.  Like, he took my role.  Like, it's the best possible thing for him.  I'm in a job for four hours, I have no idea what tomorrow looks like, it just doesn't make any sense.

Q.   All right.

Have you -- I know we've talked about these initial phone calls on that day of the 1st, and then I know there were follow-ups that Mr. Snyder had asked you about.  And just to be clear, during any of those phone calls that Mr. Snyder asked you about, any of them, did you at any point suggest that they follow you to Fanatics, either one of them?

A.   No, absolutely not.

Q.   Okay.

Did you encourage them to apply for a job at Fanatics?

A.   No.

Q.   Now, those are those conversations.  Let's move forward.

Have you had additional conversations with either of them about trying to come over to Fanatics?

A.   No.

Q.   At any point?

A655

A.    No.

Q.    Okay.

So let me, let me just ask about information initially.  Since you resigned DraftKings and begun to work at Fanatics, have you accessed any of DraftKings' confidential information or documents?

A.    No, absolutely not.

Q.    Would that include on the 1st?

A.    Yeah, that definitively, no.

Q.    And when you say "definitively," why is that?

A.    I've been, I'm obviously being very deliberate the words I use in this courtroom, your Honor, I don't know how to express this.  I don't think it is possible that I -- that I could have done that, even if I wanted to.  I truly don't believe that it is possible.

Q.    Okay.  But -- and so whether possible or not, did you?

A.    Absolutely not, no.

Q.    Okay.

Do you have any of DraftKings' confidential information or documents in your possession?

A.    No.

Q.    At any time have you disclosed any DraftKings' confidential information to Fanatics?

A.    Or anybody else, no.

Q.    Or anybody else, yeah.

A656

90

A.   No.

Q.   Okay.

     Would you?

A.   No.

Q.   Why not?

A.   One, just as a human, that's not the right thing to do. But, two, I have a lot of respect for where I worked and who is still there.  Like, I would never do that in general, but I also wouldn't -- the answer is hard no, zero shot.  And I get answered -- I get asked that a lot.  I don't know what adverb to put in there.  It's not something that I would ever do, and I definitively did not do that.

Q.   All right.

     Do you need any of that information in order to do your job for DraftKings?

A.   No.

Q.   For Fanatics?

A.   No.

Q.   Have you tried to solicit any -- I know we've talked about Mr. Larracey and Mr. Metz, and so, you've already addressed them.  Are there any other employees that you've had any conversations with in order to come over to Fanatics?

A.   No.

Q.   So, starting from February 3rd, moving forward all the way to the date of the TRO order, did you have any communications

A657

with any employees to come over to Fanatics?

A.   No.

Q.   After the date of the TRO order, which was February -- I'm sorry, yeah, February 8th, have you had any conversations with any employees in any way in connection with them moving over to Fanatics?

A.    Not only have I not done that, I don't even know how to communicate to former DraftKings' people.  I would love to.  I'd like to say hi to most of the people that are sitting in the courtroom.  I don't know how to talk to people anymore from DraftKings.

Q.   And just very quickly, have you solicited any DraftKings' customers?

A.   No.

Q.   Any partners?

A.   No.

Q.   All right.

          Thank you, Mr. Hermalyn.

          THE COURT:  Mr. Snyder, recross?

          MR. SNYDER:  Yes, a couple of questions.

**RECROSS EXAMINATION BY MR. SNYDER:**

Q.   Sir, you testified at the outset of counsel's examination that you wanted to make a clean move quote/unquote from Laptop 1 to Laptop 2.  Do you recall that testimony?

A.    Yes.

A658

Q.   Okay.

And you say, then, instead of migrating all of your files from Laptop 1 to Laptop 2, you sent 18 DraftKings' documents from Laptop 1 to your Slack because those were the ones you thought might not be on Google Workspace.  Is that your testimony?

A.   I didn't know if they were saved on the Cloud.  I thought they might be just local on the Laptop 1, yes.

Q.   And you know, you knew that there was a protocol that IT gave you for migration from one device to another, correct?

A.   I'm -- I know it wasn't brought up yet, no.  The first time I read that -- or the first time I heard of that was in the declaration or one of the submissions by Mr. Hernandez.  I was not only never told that or don't recall that, I've never used that.  And I have transferred files via Slack before.

Q.   You'd acknowledge that you do not have any evidence that you actually migrated everything from Laptop 1 to Laptop 2, correct?

         MR. BECK:  Objection, your Honor.

         THE COURT:  Basis?

         MR. BECK:  Argumentive and foundation.

         THE COURT:  I'll allow it.  That's fine.

         You can answer it.

         Overruled.

A.   Do you mind asking that again?

A659

Q.   Sir, you have no evidence that what you actually did on the 16th was move everything from one laptop to the other in the way, for example, I had a new iPhone this week and they took both my phones and then came back, one didn't work and one had everything in it.  That's the way it's usually done, right?

MR. BECK:  Objection, your Honor.

MR. SNYDER:  Withdrawn.

Q.   Sir, did you not transfer everything from Laptop 1 to Laptop 2, correct?

A.   I transferred any personal files that I wanted to myself, and I transferred anything that I didn't want to lose on that laptop when I turned it over.

Q.   Thank you.

Now, you testified a moment ago that you operated in extreme caution, right?

A.   I tried.

Q.   Right.

And that's why you told the Court you never, ever would have solicited Mr. Larracey and Mr. Metz, correct?

A.   Yes.  That's one of the reasons, yes.

Q.   Because you had a non-solicit agreement, correct?

A.   Yes, I understand.

Q.   But you also had a non-compete agreement, didn't you?  Yes or no, sir.

A.   Are you asking if it's okay that I took another job?

A660

94

Q.   Sir, you also had a non-compete agreement, correct?

        MR. BECK:  Objection, your Honor.

A.   Yes, I --

        THE COURT:  Over --

        THE WITNESS:  I'm sorry.

        THE COURT:  Just a minute, Mr. Hermalyn.

        Overruled.  You may answer, Mr. Hermalyn.

A.   Did I have a non-compete agreement?  Yes.

Q.   But you didn't act with extreme caution because you resigned and went to work at Fanatics on February 1st knowing that you had a non-compete, correct?

        MR. BECK:  Objection, your Honor.  Argumentive, outside the scope.

        THE COURT:  That's sustained.

Q.   Do you recall telling Mr. Larracey and Mr. Metz that if the lawyers asked them about your conversations with them, that they should lie?  Do you remember saying that to them?  Yes or no.

A.   No.  Not only do I not remember saying that, but that's something I would never do.

Q.   You would never tell them to lie, correct?

A.   I would never tell them to lie.  I would never tell them anything about lying to lawyers.  I would never say that.

Q.   Do you remember -- you used the phrase nuclear option in your normal vernacular, don't you?

A661

A.    Never.

Q.    You didn't tell them that if this all came out, this meaning the phone calls, that would be the nuclear option?

A.    No, that's not something that would come up.  Also I called on my personal phone.  I -- I did -- there was nothing to hide.

Q.    Okay.

That's my final question.  Can you tell the Court, please, if you were not doing anything wrong, why on February 1st and 2nd you used your personal phone and then your brother's phone, personal phone, and then why in the third, you used your brother's work phone?

MR. BECK:  Objection, your Honor.

THE COURT:  Overruled.

You can you answer.

A.    I think the key to that question is that I used my personal phone as almost an hour of that call.  There was nothing to hide.  I -- to asking why I use other phones?

Q.    Yes.

A.    The battery might have been dead?  There is no other reason other than, there is nothing to hide.

Q.    Do you remember using your brother's work and then personal phone?  Actually personal and then work phone.

MR. BECK:  Objection, your Honor.

THE COURT:  Objection.  Mr. Snyder, I believe

A662

96

Mr. Hermalyn testified that he's not aware that his brother had a work phone.

MR. SNYDER:  Okay.

Q.   So you have no memory of why you switched from your personal phone to your brother's phone?

MR. BECK:  Objection, your Honor.

THE COURT:  Can you rephrase the question?  Are you talking about the brother's personal phone or the brother's work phone?

Q.   Let me --

MR. SNYDER:  It's a good objection.

Q.   Let me ask you this:

Do you have any memory of switching from your personal phone to any phone owned by your brother for the subsequent calls?  Yes or no.

A.   My memory of that conversation, it was one call.  I thought it was under an hour.  I don't deny any of the calls in that log.  I'm surprised to see that it was an hour and 68 minutes.  But I don't deny any of that, I still look at it as one call.

Q.   Can you answer my question, sir?

A.   Do I have any reason to believe why I switched phones?

Q.   Do you have any memory of switching phones?

A.   No.

Q.   Do you have an explanation for why you did so?

A663

A.   I'm not supposed to speculate here, but I would imagine battery.  I mean, the first hour I was on my phone, my actual phone.  I had nothing to hide.

Q.   You said, you don't need DraftKings' confidential information to do your job at Fanatics.  Do you recall that?

A.   Yes.

        MR. SNYDER:  Can you please, Mr. White, for my last question, put on the screen Exhibit 74-1 which is the --

Q.   Your sworn declaration, sir, in the California case.  Do you recall submitting sworn statements to the California court?

A.   Yes, I do.

Q.   Okay.

        MR. SNYDER:  Apologies, Judge.

        THE COURT:  Okay.

        MR. SNYDER:  I don't have the document.

Q.   Let me ask you this:

        You read all the briefs that you submitted in California and the declarations?

A.   Yes.

Q.   Okay.

        Do you recall telling the California court that you wanted to be able to use confidential information?

        MR. BECK:  Objection.

Q.   And confidential DraftKings' information in your Fanatics, role.  Do you recall that?

THE COURT:  Sustained.

Mr. Snyder, lay more of a foundation here.

MR. SNYDER:  Yeah, I'm trying to.

Your Honor, in the interest of time it's in the record and I can point it out to your Honor, not through cross-examination.

No further questions at this time.

THE COURT:  Thank you.

Mr. Beck, do you have a brief redirect?

MR. BECK:  I have one question.

THE COURT:  Okay, go ahead.

**REDIRECT EXAMINATION BY MR. BECK:**

Q.   All right.

Mr. Hermalyn, have you at any point in your work for Fanatics, used or disclosed any of DraftKings' confidential information or trade secrets?

A.   Never.

MR. BECK:  Thank you.

THE COURT:  Okay, thank you.

Mr. Hermalyn, you may step down.

THE WITNESS:  Thank you.

THE COURT:  We will take a 15-minute recess at this point and then I'll ask DraftKings to call their next witness.

So we will reconvene at 11:20.  Mr. Snyder, something you wanted to raise?

A665

MR. SNYDER:  Yeah, I just wanted to let the parties and the Court know that our next witness is Andrew Larracey. And then we're going to call Mr. Metz and then we're going to call Mr. Harris, Ms. Goodman, and Mr. Green.  And this is going to be like speed testimony.

THE COURT:  Okay.

Let me give you all a brief update on how much time we've used.

THE CLERK:  Plaintiff has used an hour and 21 minutes. Defendant has used 22 minutes.  Plaintiff has an hour and 24 minutes left.  Defendant has two hours and 23 minutes left.

MR. SNYDER:  And since we have the burden, maybe my learned brethren will agree that if we have a little time, because we may not even get to speak with the witnesses.  So we should talk about --

THE COURT:  Yes, Mr. Snyder, you all can talk while on a break.  So we'll take a brief recess and return at 11:20.

THE CLERK:  All rise.

(The Honorable Court Exited.)

(Court Stood in Recess.)

THE CLERK:  All rise.

(The Honorable Court Entered.)

THE CLERK:  You may be seated.  Court is back in session.

THE COURT:  All right, remind me your name.

A666

MR. MUFSON:  Harris Mufson from DraftKings.

THE COURT:  Are you ready to call your next witness?

MR. MUFSON:  Yes.  DraftKings calls Mr. Larracey.

THE COURT:  Mr. Larracey, please stand while the Clerk administers the oath.

**ANDREW LARRACEY**, Sworn.

MR. MUFSON:  May I inquire, your Honor?

THE COURT:  Yes.

**DIRECT EXAMINATION BY MR. MUFSON:**

Q.   Mr. Larracey, are you the current director of VIP operations at DraftKings?

A.   Yes.

Q.   And how old are you?

A.   I'm 30.

Q.   Just speak a little bit into the microphone.

A.   Sorry.

Q.   Maybe pull it closer to you.

Where did you go to college?

A.   Harvard College.

Q.   You submitted a sworn Affidavit in support of DraftKings' motion for preliminary injunction that was filed on March 14, 2024; is that right?

A.   Yes.

MR. MUFSON:  And for your Honor, that is ECF No. 76.

Q.   Did you review your Affidavit in advance of today's

A667

hearing?

A.   Yes, I did.

Q.   And is everything in your Affidavit still true and correct today?

A.   Yes, it is.

Q.   Mr. Larracey, in your Affidavit you reference a series of discussions with the defendant Michael Hermalyn between February 1st and February 3rd.  I'd like to show you a demonstrative that we premarked Exhibit 1001.

     MR. MUFSON:  Mr. White, if we could call that up.

Q.   Mr. Larracey, have you viewed this demonstrative before?

A.   Yes, I have.

Q.   And is this a fair and accurate summary of the calls between you and Mr. Hermalyn between February 1st and February 3rd of your Affidavit?

A.   Yes.

Q.   Mr. Larracey, Exhibit 1001 shows that you spoke with Mr. Hermalyn on three different phone numbers between those dates.  So I'd like to ask you about those phone numbers.

     The first, for example, in line 1, is 201-723-6188.  Do you recognize that phone number?

A.   Yes, I do.  That's Mr. Hermalyn's personal cellphone.

Q.   And was that Mr. Hermalyn's personal cellphone that you used to communicate with him?

A.   Yes.

A668

Q.   And now the second number, say on line 6 is 737-497-6660. Do you recognize that number?

A.   I recognize it as the number that Mr. Hermalyn told me to call him on on the night of February 1st.

Q.   And did Mr. Hermalyn tell you whose number that belonged to?

A.   He told me it was his brother's work phone.

Q.   Now, I'd like to you ask about a third number in line 11, which is 201-220-7615.  Do you see that number?

A.   Yes.

Q.   And do you recognize that number?

A.   Just as the phone number that he called me on that morning.

Q.   So I'd like to show you Exhibit 74-8.  74-8.  And I'll represent to you that Exhibit 74-8 is a text message exchange between Mr. Hermalyn and his brother Andrew Hermalyn.  And my question is a simple one.  I'd like to you compare the number used by Andrew Hermalyn in this text message and compare it to the number that Mr. Hermalyn used to call you at 9:43 a.m. on February 2nd.

A.   It's the same number.

Q.   Thank you.

        Now, Mr. Larracey, I'd like to show you Exhibit 76-6 at pages 2 and 3.  And these are -- this is a document that was attached to your Affidavit.  Do you recognize 76-6?

A669

A.   Yes, these are notes from my cellphone, screenshots of notes.

Q.   And what do these notes show?

A.   These are my notes of the conversations that I had with Mr. Metz and Mr. Hermalyn on February 1st and 2nd.

Q.   And the top of your notes it says created February 1, 2024, at 3:01 p.m.

Do you see that?

A.   Yes.

Q.   And what does that mean?

A.   That's, that's when I started the set of notes.  It was after an initial phone call and lunch with Mr. Metz, and Mr. Hermalyn was on the phone.

Q.   And how did you take these notes?

A.   I took it on the phone Notes app.  The iPhone Notes.

Q.   On your personal iPhone?

A.   Yes.

Q.   And did you change or modify anything in your notes after you took them during your discussions with Mr. Hermalyn and Mr. Metz over the course of February 1st and the early evening hours, early morning hours, excuse me, of February 2nd?

A.   Sorry, can you ask that again?

Q.   Sure.

Did you change or modify your notes after you took them during your discussions with Mr. Hermalyn and Mr. Metz?

A670

104

A.   Yes, I --

MS. SOFIS:  Objection, your Honor.

THE COURT:  Just wait for me to rule on the objection before you answer.

MS. SOFIS:  Compound and leading.

THE COURT:  I'll allow it.  Overruled.

A.   I made some minor changes to things like headings.  I think I changed the title, but nothing to the major, like, body and substance.  Like, these are accurate to what I wrote on February 1st and 2nd.

Q.   Okay.

And when did you make those modifications to the headings to some of your notes?

A.   It wouldn't have been too long after, within a few weeks.

Q.   Okay.

Did you take your notes during your discussions with Mr. Hermalyn and Mr. Metz?

A.   Yes, I did.

Q.   And did you create the notes when your conversation with Mr. Hermalyn and Mr. Metz was fresh in your memory?

A.   Yes, I did.

Q.   Would consulting your notes assist you to testify fully and accurately today?

A.   Yes.

Q.   Do your notes fairly and accurately reflect portions of

A671

your discussions with Mr. Metz and Mr. Hermalyn?

A.    Yes, they do.

Q.    Now, directing your attention to page 3 of your notes, based on your recollection and your contemporaneous notes, can you please describe for Judge Kobick your conversation that you had with Mr. Hermalyn and Mr. Metz on the afternoon of February 1st?

A.    Yeah, so initially the IT department at DraftKings notified me that they -- they asked if we can verify a sales force account was shut off for an employee.  I said we could.  And I asked the name, the name of the employee, and they said M. Hermalyn.  And at that point I walked into the nearby conference room where Mr. Metz was working and I showed him the slack exchange and said that we should call Mr. Hermalyn and see what's going on.  And so I did.  I called Mr. Hermalyn.  First he didn't pick up, and then he called us back.  He, he told us that he had left DraftKings and had started working at Fanatics.  He then asked if we were alone in the conference room?  We told him that we were.  But he then transitioned the call to a FaceTime video call and he asked us to sweep the room using the phone's camera to just verify that it was only us in the room.  After that point he told us going forward that we could only call him and he could no longer call us.  And he said that he had moved to Los Angeles in order to take this role and that there were two roles on Fanatics' career website

A672

for Mr. Metz and I, a senior director position for myself and a VP position for Mr. Metz. And he told us to just apply, and then we got off the phone.

Q. Now, after the -- that discussion on the afternoon of February 1st, did you speak with Mr. Hermalyn and Mr. Metz again on the evening of February 1st?

A. Yes, I did.

Q. And did you facilitate that call, that discussion amongst you, Mr. Hermalyn, and Mr. Metz?

A. Yes, I did.

Q. And can you please describe for the Court how you facilitated that call?

A. Oh, yeah. So after Mr. Metz finished hosting a few customers at a Celtics game and dinner, I called him from my cellphone and we discussed Mr. Hermalyn's departure. And we were discussing, you know, what we knew about the roles that he had, had offered us. And we decided we wanted to know more about the context of his own departure. Like, why did he leave DraftKings?

We knew a little bit about an internal investigation that was ongoing, but really we just didn't feel like we had enough context to just apply to the roles. And so, we decided to call Mr. Hermalyn. I used my wife's phone to make the call, given Mr. Hermalyn's, like, sensitivity on communication earlier. I think I just felt he would feel more comfortable

A673

that way.  So I called him on my wife's phone and I just had the two phones on speaker.

Q.    Now, directing your attention to pages 4 and 5 of your contemporaneous notes, based on your recollection in your notes, can you please describe your calls, describe for the Court your calls with Mr. Hermalyn and Mr. Metz starting on the evening of February 1st and into the early morning hours of February 2nd.

A.    Yeah, so the phone calls started off with us discussing the conditions around Mr. Hermalyn's resignation from DraftKings.  He told us there were three main things that drove his decision:  The first was he said he was really frustrated with his inability to get Mr. Metz's promotion through.  He wanted to put Mr. Metz up for a promotion to VP.  He told us the company had blocked it and so he was frustrated with that.

The second element listed here is Lemack thing. There was an employee on my team who was being offered a separation package from DraftKings that I had been lobbying for it to be more generous, and we weren't able to get the terms to be more generous for that employee.  And as he said, that was something that frustrated him.

And then the third element refers to his internal investigation, which was surrounding his use of company funds and his expense reports and his relationship with his executive assistant.

A674

The second part of the call then transitioned to him talking more about what his role at Fanatics is. So Mr. Metz and I were asking him questions about, you know, what the reporting structure is like, what his roles and responsibilities will be, how the two roles that he offered us, like, fit into the overall picture. Like, how many other reports did he have? What do they do? Like, what exactly are the jobs that he's offering us? And so we talked about that in length.

He said he was reporting to Michael Rubin directly. He said that he had some former heads of VIP departments working on his team. And he said that, you know, the roles could be very, like, flexible into whatever Mr. Metz and I kind of wanted them to be in the VIP department.

He then transitioned to asking Mr. Metz and I, like, what compensation would make this a no-brainer for us to leave DraftKings and work with him at Fanatics. From there, he gave us two initial offers for compensation, because we didn't give him a number. I answered that it would have to be logged. It would have to be, I think I said multiples of what I make today given that it would require me relocating my family from Boston to L.A. With my wife being nine months pregnant at the time, it was just a big ask. And then on top of that, the legal risk knowing that I have a non-competition clause in my contract.

So then Mr. Hermalyn gave us two initial offers. He

A675

offered me $400,000 base salary, 150,000 in bonus, bonus cash, a $750,000 sign-on bonus, and then 2.5 million in Fanatics' equity underwritten at 28 billion.  And he also gave Mr. Metz an offer which is above in the notes.  The 500, 250, 1 million, 3.5, each corresponding to those same compensation elements.

From there Mr. Metz and I both told Mr. Hermalyn that it wasn't enough for us to leave DraftKings.  I think I understood at that point I was in a negotiation, so I wouldn't take the first offer.  And at that point he -- he said that he was going to speak with somebody at Fanatics and would get us counteroffers and that we should call him back in ten minutes, and he gave us a phone number to call him back on.  And that was at 6660 number from earlier.

Q.   And does that number appear in your notes?

A.   It does.  It's under the four million there.  It's 737-497-6660.

Q.   Now, what was your understanding about whether Mr. Hermalyn had authority to make these compensation offers to you?

A.   I understood that he had the authority to make the offers. He told us he was the president of VIP at Fanatics.  He was reporting directly to the CEO.  I had no reason to doubt that these were valid offers.

Q.   And what, if anything, did Mr. Hermalyn discuss about his DraftKings' non-compete?

A676

110

A.    He told us that his move to L.A. was part of him trying to fight his non-compete and that's why we would have to move to L.A. to take these positions.  He also told us that Fanatics would cover any legal expenses relating to the contract breach and that, and that they would indemnify us if we took the jobs.

Q.    Now, you testified that Mr. Hermalyn ended the call and said he needed to speak to someone at Fanatics.  Did the call resume a short time thereafter?

A.    Yeah, a little after ten minutes we called Mr. Hermalyn on that number.  He told us that he had revised offers for Mr. Metz and I.  The revised offer is listed here at counter. So it was the same base salary, same bonus, but the sign-on bonus doubled to 1.5 million and the equity element was raised to four million.  I had told Mr. Hermalyn on the prior call that those were the two most important elements to me.

Q.    Were Mr. Hermalyn's compensation offers to join Fanatics' VIP department more than you were being compensated at DraftKings?

A.    Yes, significantly more.

Q.    And was Mr. Hermalyn aware of your compensation at DraftKings?

A.    Yes, he was.

Q.    Now, I'd like to show you Exhibit 76-7 and ask you to identify that exhibit, please?

A.    This is a receipt for my application to Fanatics on

A677

February 2nd.

Q.   And what is the date and time of this e-mail receipt?

A.   February 2, 1:16 a.m.

Q.   And was the director VIP customer development role that you applied for at Fanatics, in the early morning hours of February 2nd on the East Coast, the same role that Mr. Hermalyn had referenced and directed you to earlier that day?

A.   Yes, it is.  He had referenced it on the phone as a senior director position during our phone calls that evening.  I clarified with him that the role listed was a director position.  He told me that was the one I should apply to, that it's actually senior director.

Q.   Would you have applied for this role at Fanatics if Mr. Hermalyn had not made the financial offers to you that you just testified about?

A.   No.

Q.   How did you apply for this role at Fanatics?

A.   I applied on the career website at Fanatics.  It asked for my name, e-mail address, phone number.

Q.   And so what information did you provide to Fanatics on the career website to submit your application?

A.   Just my name, e-mail, and phone number.

Q.   What e-mail did you use?

A.   I used the AndrewLarracey@gmail.com.

Q.   Did you submit your resume?

A678

A.   No, I did not.

Q.   Did you indicate in your application that you were employed by DraftKings?

A.   No.

Q.   Did you say anything in your application about your roles and responsibilities at DraftKings?

A.   No.

Q.   Did you include anything in your application about your background or your experience?

A.   I did not.

Q.   Did you at least tell them you went to Harvard?

A.   I didn't.

Q.   And in February of 2024, do you have a public LinkedIn profile?

A.   No, I do not.

Q.   Now, did you apply for a position at Fanatics before 2024?

A.   Yeah, in 2022.

Q.   And what role did you apply for in 2022?

A.   It was business manager and strategy and business operations.

Q.   Was that role part of the Fanatics' VIP department?

A.   It was not.

Q.   And at the time you applied for the strategy and business operations role at Fanatics in 2022, were you a member of the VIP department at DraftKings?

A679

A.    No, I was not.

Q.    Did you receive any response from Fanatics in 2022 or any time thereafter in response to that application?

A.    Yeah, only application receipt similar to this one on screen.

Q.    Did you ever interview with Fanatics for that role?

A.    I did not.

Q.    Okay.

Now, I'd like to draw your attention back to Exhibit 1001 which is the chart.  And that chart shows at line 7 and 8 that you had two missed calls from Mr. Hermalyn at 12:53 a.m. and 1:20 a.m. Eastern time, and that you called Mr. Hermalyn at 1:22 a.m. Eastern time.  Did Mr. Metz join that call again?

A.    Yes, he did.

Q.    And can you tell the judge what you recall about that conversation that started at 1:22 a.m.?

A.    So the call started off, I had informed Mr. Hermalyn that I had done the application for the Fanatics' position.  And then he and Mr. Metz resumed, you know, their negotiations on the position for Mr. Metz.  They had yet come to a number they agreed on.

Q.    And this 1:22 a.m. call, that was about six minutes after you had applied; is that right --

A.    Yes.

Q.    -- for the Fanatics' position?

A680

114

And how did that call end?

A.   That call ended similar to how it started, Mr. Metz and Mr. Hermalyn still had not come to an agreement on terms, and so Mr. Metz told Mr. Hermalyn he wouldn't be applying.

Q.   Okay.

Now, the call log at line 10, excuse me, shows another call with Mr. Hermalyn at 1:59 a.m. when you and Mr. Hermalyn spoke for 19 minutes after he called you.  Did Mr. Metz or anyone else participate in that conversation?

A.   No, that was just myself and Mr. Hermalyn.

Q.   Can you please tell Judge Kobick what you recall about that conversation that began at 1:59 a.m.?

A.   Yes.  So, Mr. Hermalyn expressed that he was excited that I had filled out the application and was moving forward with the process.  He thought it was the right -- or he told me it was the right decision for me and that it was, you know, a great deal that I had negotiated.  He then reassured me that he thought that Mr. Metz would still end up working at Fanatics even if it wasn't now, it would be, you know, three months down the line.

Q.   And I want to ask you about the next call on line 11.  At line 11, that lists another call with Mr. Hermalyn about seven-and-a-half hours at 9:43 a.m. on February 2nd.  Did Mr. Metz or anyone else participate in that call?

A.   Only my wife who answered the phone and then brought it to

A681

me.

Q.   Okay.

Can you please tell Judge Kobick about what you recall about that call that began on 9:43 a.m. on February 2nd?

A.   On that call Mr. Hermalyn continued to express his excitement of me moving forward with the process.  Again, he said the same on reassuring me that Mr. Metz would probably be behind me in some -- at some point.  And then he told me that Fanatics' HR would be reaching out and setting up interviews for me.

Q.   Did Mr. Hermalyn reference Michael Rubin at all in that discussion?

A.   Yes, he did.

So, he had mentioned Michael Rubin earlier that evening.  And he had said that he was in Michael Rubin's house during the time of those phone calls that night, and he had offered to put Mr. Rubin on the phone with Mr. Metz and I.  We had -- we declined.  And then the following morning, that 9:43 call, he told me that Mr. Rubin was -- he had -- he told me that he had told Mr. Rubin about me and that Mr. Rubin was also excited with me joining Fanatics or the potential for me to join Fanatics.

Q.   Now, when Mr. Hermalyn called you at 9:43 at February 2nd, had you heard back from Fanatics about scheduling an interview with them?

A682

116

A.   I had not, no.

Q.   Now, I'd like to show you Exhibit 76-8.  It's in the record.  It's an e-mail exchange between you and employees at Fanatics and their HR Department.  I'd like to direct your attention to the February 2, 2024, e-mail from Deidre Parlon at Fanatics.  Do you see that e-mail?

A.   Yes.

Q.   And how soon after you ended your 9:43 a.m. call with Mr. Hermalyn, that you just testified about, did you receive this e-mail from Fanatics?

A.   It was about an hour.

Q.   And in Ms. Parlon's e-mail she asked if you were free that day for a brief interview, and you responded that you could not speak with her at one p.m. and that you would come back to her with a time?

Did you in fact interview with Ms. Parlon that day?

A.   I did not.

Q.   And I want to direct your attention to another e-mail in this exchange at 7:01 p.m. on the same day, February 2nd.  Mr. Brandon, who identified himself as the Vice President of Human Resources at Fanatics, asked for your availability to interview with himself, Fanatics' chief strategy and growth officer, chief people officer, and SVP, again, manager of Fanatics' Loyalty Programs.  Do you see that?

A.   Yes.

A683

Q.   Now the e-mail chain does not show any response to you, to Mr. Brandon on that day, February 2nd; is that correct, that you did not respond to him that day?

A.   That's correct.

Q.   Why didn't you respond to Mr. Brandon's request to schedule interviews that day?

A.   I was trying to slow down the process a bit.  I, I didn't really -- hadn't really fully come to grips about how I felt about it and it was moving very quickly and so I was just trying to put the brakes on it.

Q.   Okay.

So that's February 2nd.  I'll come back to the interviews in a minute.  Now, I want to direct your attention back to Exhibit 1001.  That shows a call with you the next day, Saturday, February 3rd, at 7:55 a.m. with Mr. Hermalyn.  Can you please tell Judge Kobick what you recall about this Saturday morning conversation with Mr. Hermalyn?

A.   Yeah.

So Mr. Hermalyn called to check in with me and get a pulse on how I was feeling about the process.  I told him that I was trying to slow things down.  I hadn't responded to HR.  I said that it was a really big decision for me given everything that was going on in my life, and I'm not the only stakeholder in this decision.  I have to take my family into account.  I told him I was -- I was worried about the legal risks, and I

was worried that there was a situation here where I could end up with no job and I -- I didn't feel very comfortable. And Mr. Hermalyn told me that, you know, the deal that we had negotiated was extremely strong and that, you know, I -- he said I owed it to myself to, to take the meetings and to go through the process at least and, you know, pursue this. He had told me that, that if I didn't take the meeting, because I asked him, like, what if I just don't take the meeting this weekend and I just slowed down a little bit? Like, does this go away? He told me if I didn't take the meetings over the weekend, that it would be a bad look for him. And that, like, he was part of setting it up, or used some relationship capital to set them up, and it would reflect poorly on him if I didn't take them. He told me that he, he had already, you know, warmed up some of them to me. That he specifically had already talked to Mr. Kain about me and had referenced that, you know, in future whiteboard sessions -- Mike used to, like, do these whiteboard sessions, strategy sessions, that, you know, I would be one of the people in the room for those with him and Mr. Kain.

Q.   Now, after your call with Mr. Hermalyn did you respond to Mr. Brandon's request to schedule interviews with Fanatics' executives?

A.   Yes, I did later that day.

Q.   And now moving back to Exhibit 76-8, on February 3rd,

again, Saturday at 5:59 p.m., Mr. Brandon provided you with a schedule of interviews for Sunday, February 4th.  Do you see that?

MR. MUFSON:  If we can call up Exhibit 76-8.

A.   Yes.

Q.   And did you in fact interview with each of those individuals on February 4th?

A.   Yes, I did.

Q.   Now, during your interviews with these Fanatics' employees, did anyone from Fanatics mention Mr. Hermalyn to you?

A.   Yes.  Mr. Kain mentioned Mr. Hermalyn.  At the start of our interview, he said that he wasn't worried about interviewing me on my background or experience.  That, you know, Mike had already told him all about me and that Mike's experience working with me over the past two years is more than he would learn in a 30-minute interview.  So instead he wanted to focus on, you know, how he viewed Fanatics' overall strategy, their future plans, and how VIP fits into that.

Q.   And, Mr. Larracey, when was the last time you communicated with anyone at Fanatics about the role that you applied to in their VIP department?

A.   I believe it was February 20th with a phone call with Mr. Kain.

Q.   Now, Mr. Larracey, I'd like to show you Exhibit 74-3 which

A686

is Mr. Hermalyn's sworn Interrogatory response detailing your discussions on the evening of February 1st and the early morning of February 2nd.  And Mr. Hermalyn states in that sworn response that, "At no point during either conversation did Mr. Hermalyn hint or encourage Mr. Larracey or Mr. Metz to leave DraftKings for Fanatics."

Is that a true statement?

A.   No, it is not.

Q.   Did Mr. Hermalyn solicit you to leave DraftKings and work with him at Fanatics?

A.   Yes.

Q.   Mr. Larracey, how clearly do you recall the discussions with Mr. Hermalyn in February 2024?

A.   Very clearly.

Q.   During these discussions did Mr. Hermalyn say anything to you about telling others about your conversations with him?

A.   Yes.  He told me at some point it was likely that lawyers from DraftKings would ask me about our conversations and that I should lie and say they never happened.

Q.   And when did you come forward and disclose to DraftKings your communications with Mr. Hermalyn between February 3rd and -- February 1st and February 3rd?

A.   At the end of February.

Q.   And why did you come forward and disclose those communications to DraftKings?

A.   DraftKings' legal team was asking me about the two calls that Mr. Hermalyn had stated that he had with me on February 1st, and they asked me if Mr. Hermalyn tried to solicit or offer me a position at DraftKings and then I responded truthfully.

MR. MUFSON:  I have nothing further, your Honor.

THE COURT:  Okay.

Cross?

MS. SOFIS:  If you could give me one moment to set up.

THE COURT:  Sure.

**CROSS-EXAMINATION BY MS. SOFIS**:

Q.   Good morning, Mr. Larracey.

A.   Good morning.

Q.   On the afternoon of February 1, 2024, you learned that Mr. Hermalyn's sales force account at DraftKings had been shut off?

A.   Correct, that's correct.

Q.   You learned that from DraftKings' IT department, correct?

A.   Correct.

Q.   You worked very closely with Mr. Hermalyn at DraftKings; is that right, sir?

A.   I did, yes.

Q.   You interacted with him multiple times a day, right?

A.   Not every day, but some days, yes.

Q.   You interacted with him a lot, right?

A688

122

A.   Yes.

Q.   You shared with Mr. Hermalyn some of the most personal things that you had going on in your life at the time, right?

A.   That's correct.

Q.   But Mr. Hermalyn, he didn't tell you that he was leaving DraftKings before he did, right?

A.   Correct.

Q.   You found out from DraftKings' IT department that a sales force account had been shut off, right?

A.   Yes.

Q.   He didn't tell you that he was planning to resign and to go to Fanatics, correct?

A.   Correct.

Q.   And so, leading up to his resignation from DraftKings, Mr. Hermalyn never asked to you join him at Fanatics, correct?

A.   Correct.

Q.   And leading up to his resignation from DraftKings, he never offered to put you in touch with anybody at Fanatics, correct?

A.   Correct.

Q.   After you found out that Mr. Hermalyn's account at DraftKings had been shut off, you reached out to him, correct? Mr. Hermalyn didn't reach out to you on that day, correct?

A.   Yes, that's correct.

Q.   You and your colleague, Hayden Metz called Mr. Hermalyn to

A689

123

find out what was going on, right?

A.   Yes.

Q.   On February 2nd you submitted an application for employment on Fanatics' public career website, correct?

A.   Yes, I did.

Q.   And a couple of days later as you testified on February 4th, there was an interview panel set up and you had four meetings over Zoom with folks at Fanatics, correct?

A.   Yes.

Q.   Mr. Hermalyn didn't join any of those meetings, correct?

A.   Correct.

Q.   Mr. Hermalyn didn't participate at all, right?

A.   Not directly in the meetings, but --

Q.   Mr. Hermalyn didn't participate in the meetings, correct, sir?

A.   Correct, not directly.

Q.   You testified on direct, it caught my ear, you said something about Mr. Kain telling you that Mr. Hermalyn had already told him all about you, right?

A.   Yes.

Q.   You didn't put that in your declaration did you, sir?

A.   I did not.

Q.   The next day after your interviews, you reached out to Mr. Hermalyn by text.  Do you recall that?

A.   I do.

A690

MS. SOFIS:  Can we put up the text messages.

Q.   Do you recognize this as a text exchange between you and Mr. Hermalyn from February 5, 2024, and February 10th, 2024, sir?

A.   Yes.

MS. SOFIS:  Your Honor, I'd like to offer this as Defendant Exhibit 1.

THE COURT:  Any objection?

MR. MUFSON:  I'm asking is this in the record?

MS. SOFIS:  It's not, but Mr. Snyder opened the door when he asked Mr. Hermalyn about his communications with Mr. Larracey after February 3, 2024.

MR. MUFSON:  Your Honor, we object.  This is not a document that's in the record.  Your Honor was very clear that there was no new evidence and no new documents that are admissible at this hearing.

THE COURT:  I'm going to sustain that.  I did say no new exhibits here.  You can ask about the text exchange.

MS. SOFIS:  Your Honor, may I be heard?

THE COURT:  Sure.

MS. SOFIS:  Plaintiff's counsel opened the door to these text messages coming in on the grounds of whether or not Mr. Hermalyn asked Mr. Larracey any questions about his Fanatics' application process or the interview process after February 3, 2024.  That was his question and I should be

125

allowed to explore that.  Additionally, your Honor, DraftKings put in a number of exhibits using Mr. Larracey's phone.  They have access to these documents.  They have access to these exact text messages, and they decided to omit them from the declaration they submitted in connection with the motion.  We should be allowed to explore that, your Honor.

THE COURT:  Mr. Mufson?

MR. MUFSON:  Your Honor has ruled on this issue, No. 1.

No. 2, these are text message exchanges with pictures of Mr. Larracey's child.

MS. SOFIS:  We've redacted those, your Honor.

THE COURT:  Yeah, so I am not going to allow you to introduce this into evidence.  You can explore the text message exchange, but the motion is denied.

MS. SOFIS:  Thank you, your Honor.

Q.   (By Ms. Sofis)  You sent Mr. Hermalyn a picture of you and your newborn baby, February 5th at 7:45 p.m.

Do you recall that, sir?

A.   Yes.

MR. MUFSON:  Can we put -- I apologize.  Could we please have that one removed?

MS. SOFIS:  Oh, I'm sorry about that.

MR. MUFSON:  A picture of his child.

MS. SOFIS:  We can take it down.

A692

126

MR. MUFSON:  Thank you.

Q.   Do you recall that, sir?

A.   Yes, I do.

Q.   Do you recall that in that text message exchange, Mr. Hermalyn responded with a bunch of exclamation points and asked you how your family was doing?

A.   Yes.

Q.   And you gave him an update about your family.  Do you recall that?

A.   Yes.

Q.   Mr. Hermalyn didn't ask you about your meetings with Fanatics that were just the day before, correct?

A.   Correct.

Q.   He didn't mention Fanatics at all, right?

A.   Correct.

Q.   You reached out to Mr. Hermalyn again by text on February 10th.  Do you recall that?

A.   Yes.

Q.   You sent Mr. Hermalyn another family photo on February 10th in the late afternoon, correct?

A.   Yes.

Q.   You responded to Mr. Hermalyn something to the effect of "I got him out in the stroller today, smoothest ride in town, thank you."  Do you recall that?

A.   Yes.

A693

Q.   And you responded thank you, to Mr. Hermalyn, because he had given you that stroller back in the fall of 2023?

MR. MUFSON:  Objection, your Honor.

THE COURT:  What's the relevance?

MS. SOFIS:  The relevance is whether or not Mr. Hermalyn asked about Fanatics.

THE COURT:  Ask that question.  We don't need to go into the text about children.

MS. SOFIS:  Okay.

Q.   That was the last communication you had with Mr. Hermalyn, correct?

A.   Correct.

Q.   And he never mentioned anything about Fanatics, correct?

A.   Not in those texts, no.

Q.   By the way, you use a personal iPhone in connection with your work at DraftKings, correct?

A.   I do, yes.

Q.   You don't have a company-issued cellphone, right?

A.   I do not.

Q.   I want to focus your attention on the calls that you testified about.  As you testified earlier, you and Mr. Metz together reached out to Mr. Hermalyn on the afternoon of February 1st, correct?

A.   Correct.

Q.   You've then decided to initiate another call with

A694

128

Mr. Hermalyn on the evening of February 1st, right?

A.   Yes.

Q.   For that second call, you initiated with Mr. Hermalyn on February 1st, you did that using your wife's cellphone, right?

A.   I did, yes.

Q.   You used your cellphone to call Mr. Metz and had him on speaker with you and Mr. Hermalyn, right?

A.   Yes.

Q.   You signed an Affidavit in this action, correct, sir?

A.   Correct.

        MS. SOFIS:  And I'd ask that we put that up.

        And for your Honor's reference, the public version is ECF No. 88.

Q.   This is the Affidavit that you signed and DraftKings submitted in connection with the motion for preliminary injunction against Mr. Hermalyn.  Do you see that?

A.   Yes.

Q.   I'm going to direct your attention to paragraph 6 of your declaration.  The fourth sentence you wrote, "I used my wife's cellphone to place the call because Mr. Metz and I were under the impression that Mr. Hermalyn did not want us to call him from our own cellphones."

        Do you see that?

A.   Yes.

Q.   And Mr. Metz also put in an Affidavit in this action --

A695

129

MS. SOFIS:  I'd like to bring that up.

And that is ECF No. 77, your Honor.

Q.   Do you see that on the screen?  Do you see that, sir?

A.   Yes.

Q.   I'm going to direct your attention to the third sentence of paragraph 6.  He also stated, "Mr. Larracey used his wife's cellphone to place the call because Mr. Larracey and I were under the impression that Mr. Hermalyn did not want us to call him from our cellphones."

Do you see that?

A.   Yes.

MS. SOFIS:  And if we could just pop those up side by side, Kelsey?

Q.   Outside of the name substitutions, that's the identical language, word-for-word, that I just read from your declaration, right, sir?  Word-for-word?

A.   Yes, they're very close.

Q.   Identical, right?  Outside of the name substitutions?

A.   Yes.

Q.   You didn't state in your declaration that Mr. Hermalyn ever directed you or told you or asked you not to use your own cellphones.  That's not what's written there, right?

A.   Correct, only the impression.

Q.   During those calls, you recall that Mr. Hermalyn asked you how you were doing?

A696

130

A.    Asked me how -- during the first call?

Q.    During the evening calls of February 1st.

A.    Asked us how we were doing?  He may have.

Q.    Do you recall that Mr. Hermalyn assured you everything was going to be okay at DraftKings?

A.    No.

Q.    You don't recall that, sir?

A.    I don't.

Q.    Okay.

       Didn't Mr. Hermalyn tell you that his departure from DraftKings is actually a good thing for you because it created room for you and Mr. Metz to get promoted at DraftKings?

A.    He did not.

Q.    He didn't say that to you, sir?

A.    No.

Q.    Didn't Mr. Hermalyn congratulate Mr. Metz on getting promoted that day --

A.    He did not.

Q.    -- February 1st, to the position that he previously held at DraftKings?

A.    He did not.

Q.    He didn't, he didn't congratulate him?

A.    No.

Q.    Don't you recall that when Mr. Hermalyn congratulated Mr. Metz, his response was "How'd you find out?"

A697

A.   He did not congratulate him.

Q.   Do you recall that Mr. Metz responded to Mr. Hermalyn by saying "How'd you find out?"

A.   I do not.

Q.   The fact that Hayden Metz hadn't been promoted was actually one of the reasons Mr. Hermalyn told you he decided to leave DraftKings, correct?  You just testified to that?

A.   Correct.

Q.   And that was a topic of conversation that night, right?

A.   Yes.

Q.   You're aware that Mr. Hermalyn had tried to get Mr. Metz promoted to a Vice President position in January of 2024, but DraftKings wouldn't promote him, right?

A.   I'm not aware of the second part, but I'm aware that he wanted to put him up for promotion.

Q.   Is it your testimony under oath that Mr. Hermalyn didn't tell you that Mr. Metz was not going to be promoted that cycle and to check in with him to make sure he was doing okay?

A.   That's what Mr. Hermalyn told me, yes.

Q.   So you were aware that Mr. Metz wasn't being promoted on cycle at DraftKings in January of 2024, correct?

A.   Assuming that what Mr. Hermalyn told me was correct, yes.

Q.   Okay.

       In fact, you worked with Mr. Hermalyn on Mr. Metz's promotion packet, correct, sir?

A698

132

A.    I did.

Q.    And that was during the period of November 2023 through January of 2024, right?

A.    Correct.

Q.    And you knew that Mr. Hermalyn spoke with DraftKings' leadership and they told him that Mr. Metz wasn't going to be promoted against Mr. Hermalyn's strong recommendation, right?

A.    That is what Mr. Hermalyn told me.

Q.    And you're aware that Mr. Henley communicated to Mr. Hermalyn that Mr. Metz wasn't going to be promoted at that time and likely not at midyear either, correct?

A.    I don't know anything about Mr. --

Q.    Did Mr. Hermalyn tell you that, sir?

A.    Not that Mr. Henley communicated that, no.

Q.    Did anybody communicate about that to you?  Didn't Mr. Hermalyn tell you that Mr. Metz wasn't going to be promoted on cycle and likely wouldn't be promoted at the midyear point either at DraftKings?

A.    Yes, Mr. Hermalyn told me that.

Q.    He reported that to you, right?

A.    Yes.

Q.    So you were aware of it?

A.    Yes.

Q.    You are also aware that Fanatics is a private company, correct?

A699

A.   Yes, I am.

Q.   And DraftKings is a public company, right?

A.   Yes.

Q.   During your conversations with Mr. Hermalyn and Mr. Metz, do you recall that Mr. Metz described his own experience with private company equity from the time that he was at Uber?

A.   I do, yes.

Q.   And one of the things Mr. Metz asked Mr. Hermalyn was how he could give up public company equity for private company equity, correct?

A.   Yes.

Q.   And he was asking that because he was trying to figure out how Mr. Hermalyn could have made the decision to go from DraftKings, a public company, to Fanatics, a private company, correct?

A.   No, I don't think so.

Q.   You don't think so?  He did bring up the private versus public company equity, correct?

A.   Yeah, he brought that up, I just didn't think that was the context.

Q.   Oh, okay.

       As you testified, you decided to apply for a position at Fanatics, right?

A.   I did, yes.

Q.   And that wasn't the first time that you'd applied for a

A700

134

position at Fanatics, correct?  You had done so previously in August of 2022?

A.   That's correct.

Q.   So you were familiar with Fanatics' application process when you applied again in February of 2024, right?

A.   Yes.

Q.   Now, you testified during direct examination that you took the notes, or at least some of them, during your conversations with Mr. Hermalyn, correct?

A.   That's correct.

Q.   I'd like to bring up your declaration, paragraph 8.

I'll guide you in just one moment.

MS. SOFIS:  Kelsey.  It's on page 3.

Q.   The last couple of sentences above paragraph 9, sir, do you see in your declaration, you wrote, "Following our conversations, I wrote down the terms of the -- the terms of offers communicated by Mr. Hermalyn in my Notes application on my phone.  A true and correct screenshot, my notes from this call, with Mr. Hermalyn on February 1, 2024, and February 2, 2024, is attached thereto as Exhibit F."

Do you see that?

A.   Yes.

Q.   Did I read it correctly?

A.   You did.

Q.   Was it an accurate statement when you signed this

A701

135

declaration?

A.   Yes.

Q.   So then you didn't write down these notes during the conversations, you wrote them down following the conversations as you declared here under oath, correct?

A.   I'm not following all of the conversations, like, I think the numbers piece of those notes was written after that first call with him that evening.  Like, there was that gap of time between where we called him back on the other phone number, and then the initial part of the notes, the top part of the notes, was written after the first phone call with him.  And then the last part of the notes that has the summary was, like, after all the calls of that evening.

Q.   And you did testify that you made some edits to those notes, following the conversations with Mr. Hermalyn, correct?

A.   Yes.

Q.   I thought I heard you say it was a few weeks after that you made some changes to those notes, correct?

A.   Yes.

Q.   Is that the same time you were meeting with DraftKings' legal counsel in connection with your declaration that you submitted in this action?

A.   No, not the same time.

Q.   Who directed you to make edits to those notes?

A.   Nobody.

A702

136

Q.    Did anybody?

A.    No.

Q.    When did you make the edits to the notes, sir?

A.    I don't know exactly when.

Q.    Do you recall which edits you made, you mentioned the headings?

A.    Yeah, I think I added some labels in, like, like, the above, some of the numbers.  Like, I think I wrote Me above a line to clarify that it was me versus Mr. Hayden's offer.  I think I changed the title.  That's all I remember.

Q.    Anything else?

A.    Not that I remember.

Q.    Anything else, sir?

A.    Not to my recollection.

Q.    I'd like to bring up those notes, Exhibit F to the declaration.

        MS. SOFIS:  It's ECF No. 88 for your Honor.

Q.    Now Exhibit F contains all of the notes that you wrote after your conversations with Mr. Hermalyn, correct?

A.    Correct, yes.

Q.    And what we have here are screenshots from your notes application on your iPhone, right?

A.    That's correct.

Q.    And you're generally familiar with the notes application on your iPhone.  You've used it in the past and in connection

A703

with these notes, right?

A.   Yes.

Q.   These screenshots were taken on specified dates.  You can't tell from the face of the screenshots when the screenshots were taken, correct?

A.   That's correct.

Q.   And the screenshots, they show different time stamps. They're -- directing your attention to page 1 at the top, that's 7:39 p.m., correct?

A.   Yes.

Q.   And directing your attention to page 2, that's 8:41 p.m., right?

A.   Yeah.

Q.   And I'd like to direct your attention back to page 1.  You see there's, there's a yellow cursor there.  Do you see that?

A.   Yeah.

Q.   And that shows it's still in edit mode, right?

A.   Yeah, I don't know if you can take notes off of edit mode.

Q.   Do you recall that you can take notes off of edit mode in order to take a screenshot, sir?

A.   No, I don't know if you can.

Q.   The keyboard is up on page 1 as well indicating that the notes were still in edit mode, right?

A.   Yes.

Q.   And directing your attention to page 2, you see that

A704

138

little back arrow in the middle, that's the undo, button, right?

A.   Yes.

Q.   And that also indicates that the notes were in edit mode, right?

A.   Yes.

Q.   And a few weeks after February 1st and February 2nd would land right at about February 27th or 28th, correct?

A.   It could.

Q.   Directing your attention to page 1.  Your counsel showed you the create date there.  Do you see that?

A.   Yes, I do.

Q.   And you're aware that the create date is visible there, but the last edited date is not, correct, sir?

A.   That's correct.

Q.   And in order to get the create date line and the iPhone -- by the way, did you take these screenshots?

A.   I did, yes.

Q.   Okay.

So in order to get the create date line in the iPhone Notes app, you're aware that it takes a few steps.  First you have to swipe the note down, right?

A.   Yeah, I think you -- I just have to go to the top and press.

Q.   And you swipe it down and you get the create date?

A705

A.   I don't remember having to swipe it down.  I think I just had to press it.

Q.   And you -- once you get the create date, you're aware that if you tap the create date, the last edit date shows up, right?

A.   Yes.

Q.   And you didn't provide that in connection with your declaration, did you, sir?

A.   I did not.

Q.   Do you know what the last edited date was?

A.   I do not.

Q.   It was at least a few weeks after February 2nd, right?

A.   Yes.

         MS. SOFIS:  Put up Mr. Larracey's declaration, please.  And let's go to the last page.

Q.   On what date did you sign your declaration, sir?  Can you read that to the Court?

A.   The 28th of February.

Q.   February 28th, a few weeks after February 2nd, right?

A.   Yes.

Q.   I'm sorry?

A.   Yes.

Q.   You used a new word here today in your testimony with respect to your conversations with Mr. Hermalyn on February 1st and 2nd.  Negotiation.  Is that your word, sir?

A.   Yes.

A706

Q.   It didn't appear anywhere in your declaration, though, correct?

A.   I don't know.

Q.   I'll represent to you that it didn't.

A.   Okay.

Q.   You had a call with Mr. Hermalyn on the morning of February 3rd, right?

A.   Yes, I did.

Q.   You're aware that the reason Mr. Hermalyn called you that day, it had nothing to do with Fanatics or work, he was calling to check in with you regarding a personal matter, right?

A.   No.

Q.   Is it your testimony under oath that Mr. Hermalyn wasn't calling you to check in with you about a personal family matter, sir, on February 3rd?

A.   Yes.

Q.   Okay.

        Didn't Mr. Hermalyn check in with you quite often, several times a week, about a family issue that you had going on at the time?

A.   No, not several times a week, no.

Q.   He didn't check in with you regularly about that?

A.   Yeah, but maybe monthly, not several times a week, absolutely not.

Q.   You don't have any notes from your conversation with

A707

Q.   Mr. Hermalyn on February 3rd, right?

A.   I do not.

Q.   Now, after the interviews that you had with Fanatics on February 4th, you never received an offer of employment from Fanatics, correct?

A.   Well, I received the offer from Mr. Hermalyn.

Q.   Sir, listen to my question.  After the interviews --

A.   After the interviews, no.

Q.   -- with Fanatics, you never received an offer from Fanatics, correct?

A.   After the interviews, no.

Q.   You understand that Mr. Hermalyn disputes your account of those calls and that he didn't make an offer to you, you understand that, right?

A.   He did make an offer to me.

Q.   But you understand that that's your version of events.  He disputes that version.  Do you understand that, sir?

A.   Yes.

Q.   And you never received an offer of employment from Fanatics back in 2022 when you applied either, correct?

A.   Correct.

Q.   After the morning of February 1, you weren't expecting a promotion at DraftKings, right?

A.   No.

Q.   You weren't up for a promotion at DraftKings during the

A708

Q. most recent promotion cycle, correct?

A. Not to my knowledge.

Q. And as we just saw, you signed your declaration on February 28, 2024, correct?

A. Yes, I did.

Q. And then two days later on March 1, DraftKings gave you a promotion to director of VIP operations, correct?

A. They gave me the promotion earlier. The promotion was effective March 1st, but they had communicated it earlier.

Q. So the promotion became effective on March 1, two days after you signed your declaration, correct?

A. That's correct.

Q. And you received an increase in your compensation and your bonus and your stock options with that promotion, right, sir?

A. I did, which was also communicated to me prior to the 28th.

Q. While you've been outside the courtroom, have you communicated with anyone about the testimony that's taken place here today, sir?

A. Maybe my wife, my family.

Q. Anybody else?

A. No.

MS. SOFIS: Nothing further, your Honor.

THE COURT: Thank you, Ms. Sofis.

Redirect?

A709

143

MR. MUFSON:  Just a few questions, your Honor.

THE COURT:  Sure.

**REDIRECT EXAMINATION BY MR. MUFSON:**

Q.   Mr. Larracey, counsel asked you a question about Mr. Metz making certain statements during your discussions with Mr. Metz and Mr. Hermalyn on the evening of February 1st into the early morning hours of February 2nd concerning the different, difference between private versus public companies.  Do you recall that?

A.   Yes, I do.

Q.   And you were asked a question about what context Mr. Hermalyn -- excuse me, Mr. Metz made those statements, the difference between a private and public company.  And you testified something to the effect that it was a different context.  I want to give you an opportunity what context you recall that discussion coming up in?

A.   It was in the context of the negotiations on our comp packages.  Mr. Metz was saying that the equity numbers that Mr. Hermalyn was putting forward weren't worth much to him because he had the bad experiences with private equity in the past.

Q.   And you were just asked a few questions about your promotion to a new position at DraftKings.  When was it communicated to you at DraftKings that you were going to receive the promotion effective March 1st?

A710

A.   I don't remember the exact date, but it was several days before the 28th.

Q.   And was there any relation between your promotion and the testimony that you've given in your Affidavit under oath today?

A.   No.

MR. MUFSON:  Nothing further, your Honor.

THE COURT:  Okay.  Thank you, Mr. Mufson.

Any recross?

MS. SOFIS:  No, your Honor.

THE COURT:  Thank you, Mr. Larracey, you may step down.

THE WITNESS:  Thank you.

THE COURT:  Next witness.

MR. MUFSON:  Your Honor, our next witness is Hayden Metz.  Just be a moment, your Honor.

THE COURT:  Sure.

Good morning, Mr. Metz.  Remain standing in the witness box.  The Clerk will swear you in and then you can have a seat.

**HAYDEN METZ**, Sworn.

THE CLERK:  Thank you.  You may be seated.

THE COURT:  Go ahead, Mr. Mufson.

MR. MUFSON:  Thank you, your Honor.

**DIRECT EXAMINATION BY MR. MUFSON**:

Q.   Mr. Metz, what is your current position at DraftKings?

A711

A.    I am the Vice President of VIP growth and development.

Q.    Are you the, essentially the head of VIP department at DraftKings?

A.    Yes.

Q.    And is that essentially the same role that Mr. Hermalyn previously held at DraftKings during his employment?

A.    Very similar responsibilities, yes.

Q.    And Mr. Metz, did you go to college?

A.    I did.

Q.    Where did you go to college?

A.    Amherst College.

Q.    Mr. Metz, you submitted an Affidavit in support of DraftKings' motion for preliminary injunction in this case --

MR. MUFSON:  -- which is for your Honor, ECF No. 77.

Q.    Did you review that Affidavit in advance of today's hearing?

A.    I did.

Q.    And is everything in your Affidavit still true and correct today?

A.    It is.

Q.    Now, Mr. Metz, could you briefly describe for Judge Kobick your working relationship with Michael Hermalyn during his employment with DraftKings?

A.    Yes.  Starting in May, almost two years ago now, we began working closely together, and later that summer around August

A712

or September, he became my direct manager.  So for about a year and a half he was my direct manager and I managed some of the teams that he was responsible for.

Q.   Is it fair to say that you were Mr. Hermalyn's number two in the VIP group at DraftKings?

A.   Yes, I was one of the small group that reported to him and viewed myself in some ways as his right-hand man.  Andrew Larracey also had some chief of staff responsibilities.  So could have also been considered a number two in some aspects but, yes.

Q.   Was Mr. Hermalyn involved in your compensation at DraftKings?

A.   He was.  He was the one who would make recommendations for my compensation when I took the role on his team, and annually.  Or with any role change, ultimately he wasn't the final decision maker on my compensation, but he was aware and would make recommendations for my compensation.

Q.   Now, in your sworn Affidavit you describe a series of conversations with Mr. Hermalyn and Mr. Larracey on February 1st and 2nd of this year.  I'd like to start by asking about the conversation on the afternoon of February 1st.  Can you please describe for Judge Kobick what prompted that conversation on the afternoon of February 1st?

A.   Yes.  I was in our Boston office and received a slack message asking to confirm that a sales force account had been

A713

147

deactivated.  And was told the account was M. Hermalyn.  So Michael's account on sales force.  Knowing that what that means is he was no longer with DraftKings, I reached out to Mike.  Andrew and I were together at the time.  We reached out to Mike to try to figure out what was going on and why his account was being deactivated knowing that that likely meant he was leaving for some reason or another.

Q.   And where were you and Mr. Larracey when you reached out to Mr. Hermalyn?

A.   We were in the conference room on the fourth floor of our Boston office on Boylston Street.

Q.   And was anyone else present with you in the conference room?

A.   Just Andrew and I.

Q.   Was the discussion with Mr. Hermalyn by phone, video, or something else?

A.   We started the conversation on the phone, and then Mike asked to FaceTime or FaceTimed, and we discussed -- the majority of the call was on FaceTime.

Q.   And what do you recall that Mr. Hermalyn saying about transitioning the call to a FaceTime call?

A.   He had asked us if there was anybody else in the room, and then had asked Andrew, who was holding the phone, to show that the room was empty.  It was a relatively small room and so Andrew showed that we were the only two in the room on

A714

FaceTime.

Q.   And after Mr. Larracey showed Mr. Hermalyn that you and he were alone in that conference room, did a conversation continue through the FaceTime app?

A.   Yes, we had a somewhat brief conversation then.

Q.   And can you tell Judge Kobick about that conversation that you can recall?

A.   Yes.  We asked Mike about why his account had been deactivated.  And he told us that he had resigned from DraftKings and that he had accepted a role at Fanatics.  He mentioned that he had moved to California.  And he told both Andrew and I that there were two roles posted on the Fanatics' career page for us that we should apply to.  He told us one role was a Vice President role for me, and that one role was a senior director role for Andrew.

Q.   And were those roles that Mr. Hermalyn mentioned within the Fanatics' VIP Department?

A.   Yes.

Q.   Did Mr. Hermalyn say where those Fanatics' VIP roles were posted and where you should apply for them?

A.   I don't remember if he said directly website.  I don't think he would have.  I think he just said the website's on the Fanatics' -- sorry, posted on the Fanatics' career page.

Q.   And during this discussion, did Mr. Hermalyn say anything about how to contact him in the future?

A715

A.   He mentioned that he could not call us, but told us that if we were to call him, that he could answer the call.

Q.   Now, after the discussion with Mr. Hermalyn on the afternoon of the 1st, did you speak to Mr. Hermalyn and Mr. Larracey again on the evening of the 1st?

A.   Yes.  Yes, there was a break where we had spoke to Mike. Andrew and I went to lunch that afternoon, and then went back to the office and worked that afternoon.  I was actually informed during that afternoon that I would be promoted to effectively what Mike's position had been, and then I had some responsibilities that evening.  I took some customers to a dinner and then the Celtics game.  And then Andrew and I spoke again later that night and also spoke with Mike again later that night.

Q.   And so can you please explain to Judge Kobick what you and Mr. Larracey discussed with Mr. Hermalyn during discussion on the evening of February 1st?

A.   Yes, there were a few topics discussed.  At first I spoke with just Andrew after -- while I was on my way back from the Celtics game, and we decided that if we were going to consider the Fanatics' roles, that we would want to talk to Mike again. We knew that he wouldn't be reaching out to us, because he told us that he couldn't call.

So, we decided together that we would call him.  So Andrew called him and we had a conversation where there were a

few main topics.  One bucket of conversation, and one that we spent sometime on, was sort of just understanding the motivations for why Mike had left.  We asked some questions that it felt like a surprise to me and to Andrew.  Generally we thought that Mike was pretty happy at DraftKings despite maybe some frustrations over a somewhat recent period of time.  So we wanted to learn more about that.  And he explained some of his motivations there.

He did mention that he had been under some investigation by DraftKings, but had said that he had been cleared of all wrongdoing during that investigation so that that had not played any role in his departure, but maybe some role in his frustration.  We asked him questions about, you know, even if you were frustrated in leaving, why to a competitor and why to Fanatics?  It seemed like that was going to create a bit of a stir and potential legal issues, you know, non-complete stuff that -- I had a non-compete and I knew that Mike did as well.  So I was curious, you know, of all the options and other places that he could have gone, why did he choose to go to one that would potentially create situations?  So that was a one bucket of conversation and sort of motivation and the why behind him leaving.

Another bucket of conversation -- those questions were probably most driven by me.  The next was discussing a little bit more of the roles that he had mentioned.  So he

A717

explained a little bit more about what they would be doing and a little bit more about the team structure, a little bit more about Fanatics in general, and the Fanatics VIP program and the people on the team and what their goals were trying to learn more about these roles if we were going to consider applying to them.  Both Andrew and I were curious about what they would be and what the day-to-day would be like.  And then the other chunk of our conversation was about compensation and if we were to apply, what the offers would look like and what the dollars associated with it would be.

Q.   And during that discussion about compensation, what did Mr. Hermalyn say in terms of specifics regarding compensation?

A.   Yes, he mentioned initially what the numbers would be.  He said that for the role that -- he had mentioned for me, the VP role, that there was a base salary, an annual bonus target, a signing bonus, and then an equity package.  And so he had given me offers for each of those buckets.

Q.   And did Mr. Hermalyn make more than one offer?

A.   There was an initial offer with numbers for each of those. And then I had shared that those numbers would not make me consider applying.  I had said I had concerns about applying in the first place, but that, you know, I would need numbers that were even higher than what he had initially said before I would consider putting in an application.  There was a lot of other factors to consider outside of the money, but one of the things

A718

152

would be the money would need to be higher if I was going to apply.

Q.   And what were the concerns that you expressed to Mr. Hermalyn?

A.   Well, one of them was moving to Los Angeles.  I have a family here.  And I knew that even before applying I would have to speak with my wife and tell her what the situation was and see how comfortable she was with it.  I had some concerns about what the role would actually be.  I had some concerns about leaving DraftKings in general where I knew I was valued and also, you know, believed to be the leader in the space that we're in and the place that I want to be long term.  So there was a lot of openness and question marks.  And I kind of told Mike that to sort of be okay with a lot of that, the change and openness and question marks, I would need a pretty serious increase in compensation to consider.

Q.   And do you know where Mr. Hermalyn was during these conversations?

A.   I don't for sure.  He told us that he was in California specifically.  So I know he was in California and in the Los Angeles area.  He had mentioned that he had been with Mr. Rubin, Michael Rubin, and he also offered to put Michael Rubin on the phone at some point.  So I had assumed that based on a few things that he said during the conversation that he was in Michael Rubin's house or with Michael Rubin, but he

A719

153

didn't specifically -- I don't recall him specifically saying that he was in his house.

Q.   Okay.

I'd like to show you what's been marked as Exhibit 77-3, which is a screenshot from your Affidavit that you submitted in this case.  Can you please identify for Judge Kobick what this is and explain it, please?

A.   Yeah.  These are notes that I took during the phone conversation.  The top row is the -- are the numbers from the initial offer that Mike had said would come from applying -- the offer that would come if I applied for the VP role.  So the 500 is a $500,000 base salary.  250 is a $250,000 annual bonus target.  The one million is a million dollar signing bonus, and the 3.5 is a $3.5 million equity package.

The bottom line is the number I told Mike it would have to be -- the offer would have to be for me to even consider applying -- again, I mentioned that I would still need to speak with my wife, and by no means did it mean that I would definitely go work for Fanatics if he were able to offer this number.  But that my, my number that I would consider applying for was these.  And it's he the same four sets of numbers, but the 500 and 250 are the same.  I said I would need the signing bonus to be three million, and I would need the equity package to be 6.3 million.

Q.   And so understanding your testimony is the first line in

A720

154

this exhibit was the initial offer that Mr. Hermalyn conveyed, was there another offer that Mr. Hermalyn conveyed during these discussions to you?

A.    Yes.  Mike told me that the number that I was asking for was -- he was not going to be able to get the compensation package to be that high.  He eventually did give a number higher than what he had said, but lower than what I had said I would need.  I did not write that number down in my notes.  I do know what it was.  It was 500, 250, $3 million signing bonus, and then a $4 million equity package.

I remember that piece because Mike referred to the number that I was asking for as a $10 million package.  He referred to the other one as an $8 million package.  If you summed up all four numbers, came below just eight.  Whereas the one that I had said was about 10.  And we had some back and forth about it.  Mike had told me what his package was going to be with Fanatics, and I felt that my ask was fair based on how it compared to his package.  And he said that it was unfair to compare the two offers.  His was an exact offer, mine was for a VP position, and it shouldn't be compared.  He did ultimately, like I said, come back with an offer that was between these two.

Q.    Mr. Metz, is there any doubt in your mind sitting in this courtroom today that Mr. Hermalyn offered you two compensation packages as an inducement to join him at Fanatics?

A721

155

A.    No.

Q.    After this call ended, this series of calls ended, did you speak to Mr. Hermalyn again?

A.    I didn't, no.

Q.    In his sworn Interrogatory responses Mr. Hermalyn states under oath that at no point during either conversation -- let me just reference that he did -- did he hint or encourage you to leave DraftKings for Fanatics.  Is that a true statement?

A.    No.

Q.    In your declaration you reference a comment that Mr. Hermalyn made during these calls on February 1st and February 2nd about a nuclear option.  Could you please explain that to Judge Kobick, please?

A.    Yeah.  I, I learned a lot about negotiating from Mike.  It was a skill that he was very, very good at and he taught me a lot of things about how to negotiate.  And so during the course of conversation, you know, he knew that both Andrew and I had become both better at negotiating after having worked with him.  And he mentioned that a nuclear option would be to use Mike's offer to go work at Fanatics and take that and bring it to DraftKings and tell them that we had had an offer of employment elsewhere for our own personal gain, and basically say hey, this is what Fanatics is willing to pay me, would you be willing to match or do something close to matching?  Mike referred to that as a nuclear option, and basically his way of

A722

asking us, or I interpreted it as, his way of asking us not to tell anybody -- not to tell DraftKings about this offer, because it would be suggesting that he had solicited us in trying to get us to go work with him.  So the nuclear option would be using his offer for mine and Andrew's personal gain.

Q.   Did you use Mr. Hermalyn's offers to join Fanatics to increase your compensation at DraftKings?

A.   No, I -- we did not use the nuclear option.  Like I said, I had already been promoted earlier that day before this series of conversations and before the nuclear option had been mentioned.  I did not tell DraftKings about this offer until after my financial situation with my promotion had already been communicated to me and it hasn't changed since I communicated this to DraftKings.

MR. MUFSON:  Nothing further, your Honor.

THE COURT:  Okay, thank you.

Cross?

MS. SOFIS:  Yes, your Honor.

**CROSS-EXAMINATION BY MS. SOFIS**:

Q.   Good afternoon, Mr. Metz.  You testified on direct that Mr. Hermalyn didn't tell you where he was when he took the call on the evening of February 1st, correct?

A.   He told us what state he was in and that he was in Los Angeles.  But other than that, that's all I knew.

Q.   You signed an Affidavit in this matter, correct?

A723

157

A.   Similar.  He suggested I --

Q.   I'm sorry, you signed an Affidavit in this matter, correct?

A.   I'm just deciding if it matched on what you're saying versus what I said.  I don't know exactly what my Affidavit says word-for-word.

Q.   Okay.  We're going to show it to you.

        MS. SOFIS:  Kelsey, can you pull up the Affidavit, please.

Q.   You recognize this as the Affidavit that you submitted in this case under oath?

A.   This page looks to be, yes.

Q.   And I'm going to direct you to paragraph 8 of your Affidavit.

A.   Okay.

Q.   And in paragraph 8 you wrote, "Mr. Hermalyn represented that he had authority from Fanatics to make these offers.  In fact, Mr. Hermalyn represented to us that he was taking the phone call from inside the home of Michael Rubin."

A.   Right.

Q.   Did I read that correctly?

A.   Right.

Q.   I'd also like to direct your attention to paragraph 9 of the declaration.

        You just testified to what nuclear option

A724

158

Mr. Hermalyn referenced during your phone calls, correct?

A.   Yes.

Q.   In paragraph 9 of your Affidavit, you framed it a little bit differently.  You wrote, "During our conversations, Mr. Hermalyn reiterated that despite his assurances regarding these rules with Fanatics, Mr. Larracey and I would need to formally apply for the positions in order to receive written offers.  Mr. Hermalyn told Mr. Larracey and me that it would be, quote, 'a nuclear option' for either of us to report the information from our phone conversations to DraftKings or use his offer to negotiate higher compensation with DraftKings."

          Did I read that correctly?

A.   Yes, I believe that's what I just explained.

Q.   You reported directly to Mr. Hermalyn at DraftKings until February 1, 2024, correct?

A.   Correct.

Q.   And Mr. Hermalyn, he was your boss at DraftKings, right?

A.   Yes.

Q.   His title was the Vice President of growth and development of DraftKings, correct?

A.   He was Senior Vice President.

Q.   His internal title was Vice President of growth and development, right, sir?

A.   Everybody referred to him as Senior Vice President.  I don't know anything different.

A725

Q.   That's your title now, correct?

A.   Vice President.

Q.   Vice President of growth and development, right, sir?

A.   Yes.

Q.   And on the same day that Mr. Hermalyn resigned from DraftKings, February 1, you were promoted to that position; is that correct?

A.   That's correct.

Q.   And in connection with your promotion, you testified that you received an increase in your compensation, right?

A.   That's correct.

Q.   And the actual dollar figures and equity that you received -- when was that finalized?

A.   I know that it was finalized prior to February 25th.  I don't remember the exact date.

Q.   It was finalized after February 1, correct?

A.   After I was promoted?

Q.   Yes.

A.   Yes.

Q.   And when you and Mr. Larracey called Mr. Hermalyn for the second time on February 1, do you recall that Mr. Hermalyn congratulated you on your promotion at DraftKings, sir?

A.   I don't remember that, no.

Q.   You don't remember him congratulating you?

A.   No.

A726

Q.   You don't remember it one way or the other?

A.   I don't remember whether he did or didn't congratulate me, no.

Q.   Did Mr. Hermalyn tell you during those conversations that his departure from DraftKings was actually a good thing for you, because it made room for you and Mr. Larracey to get promoted at DraftKings?

A.   I don't remember him saying that, no.

Q.   Do you remember Mr. Hermalyn telling you that he was happy for you for your promotion?

A.   No, I don't remember him saying that, no.

Q.   All right, let's take a step back.

On the afternoon of February 1, you testified that you and Mr. Larracey reached out to Mr. Hermalyn, correct?

A.   Yes.

Q.   You had learned from DraftKings IT that his sales force had been shut down and you wanted to figure out what happened, correct?

A.   Yes.

Q.   You didn't know on February 1 that Mr. Hermalyn was leaving DraftKings to join Fanatics, correct?

A.   Sorry, could you restate that?

Q.   Prior to your phone conversation --

A.   Oh, prior?  Correct.

Q.   -- with Mr. Hermalyn, you didn't know that, right?

A727

A.    Right.

Q.    And that's because Mr. Hermalyn didn't tell you, right?

A.    That's correct.

Q.    So leading up to his resignation from DraftKings, he never asked you to join him at Fanatics, correct?

A.    Leading up to, so prior to that phone call, no mention of -- or no suggestion of me going there, no.

Q.    He never gave you a heads up that he was leaving DraftKings to join Fanatics at all, right?

A.    No.

Q.    You were surprised when you found out that Mr. Hermalyn had joined Fanatics, right?

A.    Yes.

Q.    You were actually pretty angry about the fact that he didn't give you a heads up, right, sir?

A.    Not necessarily, I'm not sure that's fair to say.

Q.    You were upset.  He didn't tell you that he was leaving DraftKings to join Fanatics, right?

A.    There had been points previously where Mike had said that he wouldn't always be able to tell me everything, and part of that would be to protect me so that I wouldn't have to lie about a situation.  So, my level of upset was not -- I wouldn't have called it anger.  I understood that he was not -- he hadn't said anything because he was trying to protect me from not having to say a lie about knowing that he was leaving or

A728

not tell somebody.

Q.    Okay.

Mr. Hermalyn doesn't want to put you in a position to lie, right?

A.    I thought that.

Q.    You and your colleague Mr. Larracey called Mr. Hermalyn that afternoon on February 1, right?

A.    Yes.

Q.    You don't have any notes from that conversation, right, sir?

A.    From the first phone call?  No.

Q.    Shawn Henley, he's DraftKings chief customer officer, correct?

A.    Yes, yes.

Q.    You testified on direct that Mr. Hermalyn told you during the conversation you had with him on February 1 in the afternoon that you can reach out to him but he can't reach out to you, right?

A.    I did.

Q.    That's nowhere in your Affidavit that you submitted in connection with DraftKings' preliminary injunction motion, correct?

A.    I don't remember it being there, no.

Q.    It's not in your Affidavit, right, sir?

A.    I don't remember it being in there.

A729

163

Q.    That same afternoon on February 1, Mr. Henley informed you that you were getting promoted to Mr. Hermalyn's position at DraftKings, correct?

A.    Yes.  He told me that I was getting promoted.  It's not exactly the same position, but it's very similar responsibilities.

Q.    Okay.
       You learned that you were getting promoted that afternoon?

A.    Yes.

Q.    From Mr. Henley, right?

A.    Yes.

Q.    And you testified that evening, now that you are a VP, you attended a DraftKings' dinner event, correct?

A.    I was going to be attending whether I had been promoted or not, yes.

Q.    And that dinner event took place at Contessa on the evening of February 1, right?

A.    It did, yes.

Q.    And what time did that dinner start, sir, approximately?

A.    It was either 5:00 or 5:30.  It was on the earlier side before a Celtics game.

Q.    And Mr. Henley attended that dinner as well, right?

A.    He did not, no.

Q.    Did Matt Kalish, DraftKings' president and cofounder,

attend that dinner?

A.   He did.

Q.   Who else attended that dinner from DraftKings?

A.   Taylor Carlton was there, Greg Stoll was there.  There were some DraftKings' partners and customers there as well.

Q.   Anybody else from DraftKings?

A.   I believe I've said the names -- you said Matt, and I believe Taylor and Greg were the only DraftKings' folks.

Q.   Did you have some alcoholic beverages at that dinner, sir?

A.   I did not.

Q.   You didn't have any?

A.   No.

Q.   You're aware that after the dinner at Contessa you attended the Celtics game, right?

A.   Yes.

Q.   You put that in the declaration?

A.   Yes.

Q.   And the Celtics game that night was actually against the Lakers.  It was a big game.  7:30 p.m. tip off time, right?

A.   Yes.

Q.   Did you have any alcoholic beverages at the Celtics game?

A.   I believe we ordered a drink when we first got there, and it came to the area where we were after I had left.  And I don't believe I had any of that drink.  They had -- when we went to the -- there's a club area that we had access to, and

165

we went there at halftime.  They had put those drinks that we had ordered down there.  So I had a couple of sips when we were at halftime, but I wouldn't have even had a full drink.

Q.   During the Celtics game you got a text message from Mr. Larracey asking if you wanted to talk after the game, right?

A.   Yes.

Q.   And I'm going to direct your attention to Exhibit A of your declaration.

MS. SOFIS:  That's ECF 77-1, your Honor.

Q.   This shows a few text messages between you and Mr. Larracey dated February 1 at 9:16 p.m., correct, sir?

A.   Yes.

Q.   And this is a screenshot from your phone, right?

A.   Yes.

Q.   And you can tell that it's a screenshot because it's got things like your phone battery image and the reception bars and the sound setting image at the top, right?

A.   Yeah.

Q.   You responded to Mr. Larracey that you did not want to talk as long as he wasn't asleep, right?

A.   Yes.

Q.   And Mr. Larracey called you on your cellphone at 10:16 p.m. that night, right?

A.   I don't know the time, but yeah, yes.

A732

Q.   It's in your Affidavit, sir.

A.   Yeah.

Q.   10:16 p.m., correct?

A.   Yes.

Q.   Where were you when Mr. Larracey called you?

A.   I was in Boston Common.  I was walking to a hotel from the Celtics game.

Q.   And you were staying at a hotel that night?

A.   I was.

Q.   And by the way, you use a personal iPhone in connection with your work at DraftKings, correct?

A.   I do.

Q.   You don't have a company-issued cellphone; is that right?

A.   I do not.

Q.   For the second call that you and Mr. Larracey initiated with Mr. Hermalyn on February 1, Mr. Larracey used his wife's phone to call Mr. Hermalyn and his own phone to call you.  You were aware of that at that time, right?

A.   Yes.

Q.   And I'm going to direct you to paragraph 6 of your Affidavit.  You stated in the fourth sentence I believe, "Mr. Larracey used his wife's cellphone to place the call because Mr. Larracey and I were under the impression that Mr. Hermalyn did not want to us call him from his own cellphone."

A733

Do you see that?

A.   Yes.

Q.   And you didn't say there -- well, it's not written there, that you -- that Mr. Hermalyn ever directed you or asked you or told you not to use your own cellphones, correct?  That's not what's written there?

A.   Yes.

Q.   Now, when Mr. Hermalyn congratulated you on your promotion at DraftKings, do you recall that your response was "How'd you find out?"

A.   I don't --

        MR. MUFSON:  Objection.

        THE COURT:  Just a minute.

        Sustained.  That wasn't the testimony.

Q.   Do you recall, sir, that you had been passed up for a promotion at DraftKings during that same cycle January of 2024?

A.   Promotions hadn't been communicated yet.  I knew that I had been discussed for one, so....

Q.   Didn't you find out in January of 2024 that you weren't going to be promoted to a VP position during that cycle?

A.   I hadn't officially been told, no.  I had my suspicions based on some information that I had seen around other promotions that I assumed I would have seen my name in if I had been promoted, but I had not been officially told whether or not --

A734

168

Q.   Wasn't the fact that you hadn't been promoted one of the reasons Mr. Hermalyn told you he decided to leave DraftKings? Didn't he say that to you during the phone calls that evening?

A.   I don't remember that, no.

Q.   You don't remember that coming up at all?

A.   No.

Q.   You're aware that Mr. Hermalyn had advocated for you to get a promotion, correct?

A.   He had told me that he had, yes.

Q.   And it's your testimony, under oath, that that wasn't something that was discussed during those calls that evening on February 1?

A.   Which part?

Q.   The fact that Mr. Hermalyn was upset that you hadn't gotten a promotion and it was one of the reasons --

A.   I don't recall that.

Q.   -- why he left DraftKings?

A.   I don't recall that.

Q.   Did Mr. Hermalyn tell you that he was happy for you?

A.   I don't recall that.

Q.   You told Mr. Hermalyn that you were shocked that he didn't tell you he was leaving and going to Fanatics, correct?

A.   I don't recall the exact words, no.

Q.   You don't recall telling him you were shocked?

A.   No.

A735

Q.   You told Mr. Hermalyn that you were upset that he didn't give you a heads up, right?

A.   I don't recall that, no.

Q.   Mr. Hermalyn expressed that he was sorry that he had to leave without telling you.  Do you recall that?

A.   Yes.

Q.   You asked Mr. Hermalyn a series of questions about why he left DraftKings and went to Fanatics, correct?

A.   Yes.

Q.   And you told Mr. Hermalyn you couldn't understand why he left DraftKings given his compensation structure there versus the compensation structure at Fanatics, correct?

A.   I'm not sure I would word it exactly that way.  I definitely mentioned something about equity at Fanatics, not having similar value equity at DraftKings.

Q.   You're aware --

A.   Up until that call I didn't know -- I didn't know exactly what his compensation at DraftKings was either.

Q.   You're aware that Fanatics is a private company, correct?

A.   Yes.

Q.   And DraftKings is a public company?

A.   I am.

Q.   And before DraftKings you worked at Uber for almost four years, right?

A.   That's correct.

A736

Q.   You worked at Uber from April of 2015 through February of 2019 before it went public, right?

A.   That's correct.

Q.   And so during your conversations with Mr. Hermalyn and Mr. Larracey, you described your experience with private company equity, correct?

A.   Yes.

Q.   And one of the things you asked Mr. Hermalyn was how he could give up public company equity at DraftKings for private company equity at Fanatics, correct?

A.   Something like that, yes.

Q.   You told him that just didn't make sense to you, right?

A.   I think in some ways I said it's hard to value private company equity, yeah.

Q.   And you were familiar with Fanatics' compensation structure from when Rob Ferrera left DraftKings and joined Fanatics, correct?

A.   I knew that his offer had had the four components that I mentioned, yes.

Q.   You were one of the people who was involved in trying to get Mr. Ferrara to stay at DraftKings in July of 2023?

A.   I was.

Q.   Right?

A.   I was.

Q.   And you're aware that Mr. Hermalyn was too, correct?

A737

A.   Yes.

Q.   And as you just testified, you knew that Fanatics' compensation structure, it was broken down into four components:  A base salary, an annual bonus, a signing bonus, and an initial equity allocation, correct?

A.   Yes.

Q.   You also knew Mr. Ferrara made more money at Fanatics than he did at DraftKings, correct?

A.   I had heard that.  I didn't know that for a fact, but I heard that.

Q.   And in connection with Mr. Ferrara's departure from DraftKings, DraftKings made certain payments to get people to stay, right?

A.   Yes.

Q.   You were one of the beneficiaries of those payments.  You got a retention payment in July of 2023, correct?

A.   It was an equity grant that invests over time, but yes.

Q.   And you were upset with that equity grant, you thought it should have been higher, right?

A.   Yes.

Q.   You complained about that at the time, you didn't think you got enough, right?

A.   I had mentioned that there were points where the number that was mentioned was higher, and I was a little disappointed that I did not get the number that had initially been

A738

mentioned, sure.

Q.   And you complained about it, right?

A.   Well, I spoke to Mike about it.

Q.   You wanted it to be higher, right?

A.   I wanted it to be the initial number that had been mentioned, yeah.

Q.   Now, I want to direct your attention to your Affidavit in this matter?

MS. SOFIS:   Again, page 3, please, Kelsey.

Q.   And I'm going to direct you to paragraph 8, the second to last -- excuse me.

MS. SOFIS:   Strike that.

Q.   It's in the second to last sentence above paragraph 8. You see where you wrote, "A true and correct screenshot of my notes from my conversations with Mr. Hermalyn that began on February 1, 2024, and concluded in the early morning hours of February 2, 2024, attached hereto as Exhibit C."

Do you see that?

A.   Yes.

Q.   And just before that you represented that you took these notes in the Notes application on your phone, right?

A.   Yes.

Q.   I'm going to direct your attention to Exhibit C, the notes.

MS. SOFIS:   And that's ECF No. 77-3 for the Court's

173

reference.

Q. Do you recognize this as Exhibit C? You were shown on direct, right, sir?

A. Yes.

Q. And these are the only notes that you attached to your declaration from your conversations with Mr. Hermalyn, correct?

A. Yes.

Q. This isn't a true and correct screenshot? I mean, it's not a screenshot at all. There was no phone battery image. There's no reception bars? There's no time. There's no sound setting image. Correct, sir?

MR. MUFSON: Objection. Argumentive.

THE COURT: Break it into separate questions.

Q. Sir, there's no phone image, reception bars, there's no time or sound setting image shown at the top here, correct?

A. No.

Q. And this document, it's been cropped, right?

A. Screenshots are often cropped. The other one was as well.

Q. Which other one?

A. The other one that we talked about. My screenshot with Andrew was a cropped image. That wasn't a full screenshot screenshot, but it's still a screenshot.

Q. And you cropped all the other stuff that was around it on your Notes application, right?

A. Yes.

A740

174

Q.   You cropped that out?

A.   It's a cropped screenshot, correct.

Q.   And so all we have is this little rectangle, right?

A.   That is what you have on that screenshot.  That is a true and correct screenshot, yes.

Q.   Did you crop it or did somebody else?

A.   I cropped it.

Q.   And how did you do that?

A.   I took a screenshot and you can crop a screenshot, the same way I did the other one.

Q.   And I want you to tell me how did you it.

A.   Do you want me to -- I don't have my phone.  You take a screenshot with the two buttons that take a screenshot and then it pops up and you can swipe to remove other parts of the image that are irrelevant.

Q.   And the other parts of the image you can't see in here because you've cropped it, right?

A.   Yes.

Q.   And there's no date or time at all in the face of this document, right?

A.   No.

Q.   There is no create date, correct?

A.   In the image?

Q.   Right.

A.   No.

A741

Q.   There's no edit date, right?

A.   No.

Q.   No date at all, right?

A.   No.

Q.   Your compensation in connection with your promotion to VP of growth and development was finalized after February 1, as you testified earlier, correct?

A.   That's correct.

Q.   And so this time around you were seeking to leverage Mr. Hermalyn's departure to get as much money as possible out of DraftKings, correct?

A.   No.

Q.   When you were peppering with -- when you were peppering Mr. Hermalyn with questions about compensation, you wanted to use that as an effort to get more money out of DraftKings, claim that you had an offer from Fanatics, to squeeze as much as you could out of DraftKings, correct?

A.   No.

Q.   You didn't do that, sir?

A.   I did not.  There is proof of when I received that and when I first communicated my conversation to DraftKings, and the timing of when I got my compensation was prior to communicating this conversation to DraftKings.  So I can prove that that's true.

Q.   You can prove that that's true.  Did you attach any of

A742

that to your declaration, sir?

A.   Timing, no.  Of when I received my offer is not in there.

Q.   It's not in your declaration, right?

A.   No.

Q.   Correct?

A.   Correct.

Q.   You've never applied for a job at Fanatics, correct?

A.   I have not.

Q.   And Mr. Hermalyn never introduced you or connected with anyone at Fanatics about a job, right?

A.   No.

Q.   And the last time you communicated with Mr. Hermalyn in any way was on the early morning of February 2, your time, Eastern time, correct?

A.   Yes.

MS. SOFIS:  Nothing further, your Honor.

THE COURT:  Okay, thank you, Ms. Sofis.

Do you have a redirect, Mr. Mufson?

MR. MUFSON:  Maybe a minute.  I don't want to overpromise and under deliver.

THE COURT:  Sure, we'll do it.

**REDIRECT EXAMINATION BY MR. MUFSON:**

Q.   Mr. Metz, just a few questions.

You were asked by Mr. Hermalyn's counsel about a discussion during the conversations on the evening of the 1st

**A743**

and into the early morning hours of the 2nd on the East Coast about the difference between public and private equity.  Did you discuss that topic in connection with your, the compensation offer that was made to you by Mr. Hermalyn?

MS. SOFIS:  Objection, leading.

A.    Yes.

THE COURT:  Overruled.

Q.    Can you describe the context on which that arose?

A.    Yes.  Part of why I was telling Mike that I would want to see a larger number in equity than he had initially suggested was my concern that there's no real way to value the private company equity.  So the numbers that he was telling me, I needed to start at a higher place because I was unsure of the value of what it meant.  I was asked about my time at Uber.  I had seen private company equity not end up being worth what I had been told it was worth, and so I had some concerns if I were to consider going to another private company and had promises of equity, that I might see a similar situation happen.  So it was part of the context for why I told Mike I was asking for a much larger equity number that he had initially mentioned.

Q.    Mr. Metz, during the conversations that you described and testified about where Mr. Hermalyn made multiple compensation offers to you to join Fanatics, was he soliciting you to join Fanatics in their VIP department?

178

A.    I believe so.

MR. MUFSON:  Nothing further, your Honor.

THE COURT:  Recross?

MS. SOFIS:  One question, your Honor.

THE COURT:  Go ahead.

**RECROSS EXAMINATION BY MS. SOFIS**:

Q.    What you just testified to about your conversations relating to private and public equity, that wasn't in your Affidavit, correct, sir?

A.    I don't believe so.  I don't remember.

MS. SOFIS:  Thank you.

THE COURT:  Thank you, Mr. Metz, you may step down.

We will head into a lunch break.  I'll ask everyone to come back at 2:10 rather than 2:00.  And I just remind counsel that the witnesses are not to discuss any of the testimony that's come in so far.

Anything further before we break?

MR. SNYDER:  No, your Honor.  Thank you.

THE COURT:  Mr. Beck?

BECK:  No, your Honor.

THE CLERK:  All rise.

(The Honorable Court Exited.)

(Court Stood in Recess for Lunch.)

A745

**A F T E R N O O N   S E S S I O N**

THE CLERK:  All rise.

(The Honorable Court Entered.)

THE CLERK:  Thank you very much, you may be seated. Court's back in session.

THE COURT:  Okay, we will resume with the hearing. Mr. Snyder, please call your next witness.

MR. SNYDER:  Thank you, your Honor.  DraftKings calls Brian Harris.

THE COURT:  Mr. Harris, if you would stand while the Court gives you your oath.

**BRIAN HARRIS**, Sworn.

**DIRECT EXAMINATION BY MR. SNYDER:**

Q.   Good afternoon.

A.   Good afternoon, sir.

Q.   Mr. Harris, Defendant testified this morning that his activity on January 16, 2024, was an ordinary course migration of data from what we call Laptop 1 to Laptop 2.  Are you aware of that position?  Are you aware that the defendant has taken the position --

A.   I'm aware he's taken the position in the past, I wasn't aware he testified to it.

Q.   Okay, that's fair.

And did you investigate this claim in connection with the forensic analysis that you yourself conducted as the CSO of

A746

DraftKings?

A.   I did.

Q.   And what did you do to test that claim?

A.   We went back and looked at the files that were moved, first of all, and the number of files and where they went.  And then it was also discovered that he did it via Slack and not by the normal means that we would approve.  The files that were moved over via Slack, very, very few made it to the new computer, based on what we can see.  So it doesn't seem like it was an ordinary type of migration.

THE COURT:  Mr. Harris, can I ask you to just pull that microphone closer to you?

THE WITNESS:  Certainly.

THE COURT:  Thank you.

Q.   Approximately how many employees' systems do you oversee as the chief information security officer of the company?

A.   We have 5,000-ish employees, another 1,000 contractors, and 10,000 plus systems.

Q.   During the course of your almost decade at the company, sir, have you ever heard of any DraftKings' employee ever migrating data from an old laptop to a new laptop via Slack?

A.   I have not.

Q.   Now, did your investigation determine whether in fact there was a migration of data from Laptop 1 to Laptop 2 on the 16th?

A747

181

A.   Again, I don't know I would call it a migration because it was 18 files uploaded, only a few were downloaded to a new computer.

Q.   Thank you.

A.   So I wouldn't call it a migration.

Q.   Now, the defendant testified this morning that it would have been impossible, that was his word, for him to access Google Workspace on February 1, 2024, because he claims he didn't have the iPhone he used for DraftKings' work on that date.  Based on your experience as a chief information security officer, do you agree that the only way Mr. Hermalyn could have accessed Google Workspace on February 1st was through his iPhone that he used at DraftKings?

A.   I do not.

Q.   Okay.

     Can you explain to the Court?

A.   So Google Workspace is available from any system in the world in theory.  So browser, app, whatever.  As long as it has the authenticated session token to log in, meaning they logged in at one point, used their MFA, boom, they're in, via the drive app which is a Google-issued application.  It can be running on any system, anywhere.

Q.   How does that compare to, say, Uber or Door Dash on your phone?

A.   Yeah, it's the same type of app or Facebook or anything

A748

else you'd have on your phone.  Once you log in, you pretty much stay logged in, until there's some kind of event that disconnected that for a long period of time.

Q.   And can a DraftKing employee install an app on more than one device?

A.   Absolutely.

Q.   And when you talked about a session token, just explain to the Court, please, what a session token is for the record?

A.   So once you log in and you use your user name and password from, what we had given you and then you also multifactor authenticate to your phone, it creates what we call a session token in the Internet world.  So it keeps your authentication between the application and the destination where you're trying to reach constant and always connected and always authenticated.

Q.   Did your investigation, sir, consider whether on February 1, 2024, in the morning hours, Mr. Hermalyn downloaded confidential DraftKings' documents?

A.   His account did download confidential information from our Google Workspace site.

Q.   And did you describe that in detail to your sworn statements to the Court?

A.   I did.

Q.   Okay.

        And just to be clear, that was, those downloads were

A749

183

downloads not views?

A.   They were.

Q.   Okay.

Now the defendant testified this morning that any time your analysis says that he downloaded something, that it's impossible to discern whether that means download or views.  Is that true?

A.   It is not.

Q.   Can you explain to the Court why that's so?

A.   Yeah.  When the investigation started with this case, we initiated our own testing, because we wanted to make sure that the logs were 100 percent correct.  And we ran several different scenarios with several different file types, and we were never able to get a view to show in the log as a download no matter what we tried with all the different file types we tried it with.

Q.   And with what degree of certainty do you apply that to your testimony here today?

A.   Very high degree of certainty.

Q.   Okay.

And you referred to the logs.  I think I know what you're talking about.  Can you please just verify?

A.   Sorry.  The Google Workspace work logs maintained by Google for activity with the files that we store there.

Q.   And just for summary, I know it's in your Affidavit, what

A750

data or fingerprint does that log provide?

A.   The Google Workspace log tells us time and date in Eastern time.  It tells us the IP address from which you connected to the system, what file you were working with, and what action you took against that file, whether it was view, download, print.

Q.   Based on that analysis, did you determine whether Mr. Hermalyn accessed, downloaded two documents on February 1st in the morning?

A.   His account did download two documents that morning of the 1st.

Q.   And from a non-DraftKings' device?

A.   Correct, it was a non-DraftKings' endpoint.

MR. SNYDER:  Okay.  No further questions.

THE COURT:  Cross?

**CROSS-EXAMINATION BY MR. RIDEN:**

Q.   Good afternoon, Mr. Harris, nice to see you again.

A.   Good afternoon.

Q.   You have three certifications in information security; is that right?

A.   Correct.

Q.   Certified Cloud security professional, certified information security manager, and certified information system security professional; is that right?

A.   Correct.

A751

185

Q.   And none of these qualifies you as an expert in computer forensics, correct?

A.   I have 25 years' working in IT.  I have taught TCPIP and computer networking at the collegiate level.  I have had certifications at the highest levels of Microsoft and Cisco, obviously since has expired.  I believe my breadth of experience gave me the necessary knowledge to review the data that we were seeing in the logs and do the forensic investigation from our perspective.

Q.   Now, when I asked you at your deposition whether any of these certifications qualify you as an expert in computer forensics, you said no.  Do you remember that?

A.   I do.

Q.   Now, you have zero formal training in forensic computing; is that right?

A.   I would say that's not accurate.

Q.   Well, when I asked you at your deposition "Have you taken any formal training in forensic computing?"  You testified, "I have not."  Is that right?

A.   I have not taken any specific classes on computer forensics.

Q.   Now, when DraftKings has an issue that requires forensic knowledge, it traditionally hires a third party to perform forensics, correct?

A.   We do.

A752

186

Q.   Now, that's because neither you or your team are qualified in the way we just talked about in forensics, right?

A.   That's not correct.  We wanted an independent expert.  So they were evaluating the data independently of ourselves.

Q.   And so in this case, though, DraftKings hired Stroz as it's third-party forensics expert, correct?

A.   Correct.

Q.   And in particular DraftKings retained Mr. Green from Stroz to perform forensic analysis of the devices that Mr. Hermalyn returned?

A.   Mr. Green did do the analysis, yes.

Q.   Now, you submitted several Affidavits in this case.  Do you recall that?

A.   Yes.

Q.   And you're familiar with what you included in those Affidavits?

A.   Yes.

Q.   And you relied on Mr. Green's analysis in making sworn assertions in several of their Affidavits, didn't you?

A.   Some of the data did come from the Stroz forensic reporting, yes.

Q.   Now, you don't have any personal knowledge of what was on Mr. Hermalyn's laptops, do you?

A.   I only have the knowledge from which we received from the Stroz reports.

A753

187

Q.   You didn't review Mr. Hermalyn's actual web browsing history on any of the devices for the Affidavits?

A.   Again, no, we only reviewed the Stroz reports when it came to the specific laptops.

Q.   And you didn't review Mr. Hermalyn's actual file system event history from the actual devices?

A.   Again, no, it came from the Stroz report.

Q.   You just reviewed the logs that Stroz provided to you, right?

A.   We reviewed the reporting on the forensic investigation that Stroz gave us.

Q.   You did a lot of that just over Zoom with them reading you from the reports?

A.   There were several meetings, yes.

Q.   And then you made assertions in your sworn Affidavit regarding Mr. Hermalyn's computer activity, didn't you?

A.   Based on the Stroz report I did.

Q.   Yeah.  You didn't oversee the Stroz's analysis when they prepared those reports, did you?

A.   I did not.

Q.   And you don't know if there are any errors in those reports, did you?

A.   I did not.

Q.   Have you ever conducted an investigation or survey across the thousands of employees at DraftKings to determine whether

A754

188

any of them have used Slack to migrate files from one laptop to another?

A.   I have not conducted a survey.

Q.   So you've never looked at this issue across the board, have you?

A.   I haven't had a need because it's against protocol and against policy, specifically, and it's communicated and trained into our employees not to use Slack to move confidential information.

Q.   But you haven't looked, you don't know if it's happening one way or another, do you?

A.   I have not.

Q.   Okay.

You testified a moment ago about Mr. Hermalyn's use of multifactor authentication on his phone?

A.   Multifactor is usually applied to the phone, yes.

Q.   And you have no personal knowledge of whether Mr. Hermalyn was actually using multifactor -- or how frequently he was using multifactor authentication on his phone to get access to the Google Workspace area in DraftKings, were you?

A.   I do.

THE COURT:  Could you repeat that answer?

THE WITNESS:  I'm sorry.  Yes, I do.

Q.   You have personal knowledge of Mr. Hermalyn's use of the multifactor authentication tool on his cellphone?

A755

A.   Yes.

Q.   What's the basis of that?

A.   We log all multifactor authentication access in our duo system, which also tells us the device, IP address it came from, and where they were.

Q.   Have you attested that information in your Affidavits?

A.   I don't believe it's in my Affidavits.

Q.   Now, you -- in your Affidavits you provide excerpts and summaries of various Google Workspace reports for Mr. Hermalyn's activities that include download events; is that correct?

A.   Yes.

        MR. RIDEN:  If we could put up, Kelsey, Attachment A, please.  That's for Tab 4.

Q.   I'm going to show you in just a moment Appendix A to your March 14th Affidavit.

        MR. RIDEN:  If we can scroll down, please.

Q.   Okay.

        So this -- do you recognize this document, sir?

A.   I do.

Q.   Now, this appendix, I'll represent, if counted, includes 29 events described as downloads.  Now, the dates of those downloaded events range from January 4, 2024, to February 1st of 2024, correct?

A.   Correct.

A756

190

Q.   And each of these download entries lists the access device as a non-DraftKings device, right?

A.   That is what's in the log, correct.

Q.   Now, I'll represent that Mr. Hermalyn first talked to Fanatics' CEO Michael Rubin on January 11th about a job at Fanatics.  Now, this chart shows that Mr. Hermalyn was regularly downloading documents on his phone before that date, right?

MR. RIDEN:  And we can scroll down to a date before January 11th.

A.   So, yes, it does.

Q.   Okay.

And you were asked to determine whether the Google Workspace reports record more frequent download events on Mr. Hermalyn's cellphone in January 2024 then, say, September 2023, right?

A.   We pulled the logs from August on.  I guess if that's what you're asking.

Q.   Sure.

Did you conduct a trend analysis to determine whether or not he was accessing -- accessing Google Workspace more or less often over a period of time?

A.   I did not, no.

Q.   So you don't know if the frequency of his access to Google Workspace on this non-DraftKings' device in January of 2024 was

A757

191

any more frequent than it was in, say, January of 2023, do you?

A.   No.  Frequency wasn't my concern.  It was more once we discovered it, it was the type of data to which he was moving and where he was downloading it to.

Q.   Did he access any data on Google Workspace that he didn't have authority to access?

A.   Yeah, there were a couple of documents that he was accessing, I think more specifically in Slack, that weren't material to his role.  Things that have, like, compensation for the entire company, et cetera.  He should not have been accessing those.

Q.   Well, I asked you on Google Workspace.  Was he accessing areas in Google Workspace that he should not have had access to?

A.   Again, I would -- again, I would have to review the log, the whole thing in front of me.  I don't remember every file name that he looked at.

Q.   Do you have any recollection of learning that Mr. Hermalyn was gaining unauthorized access to different areas of Google Workspace during his time working for DraftKings?

A.   Unauthorized areas?  No, I'm not aware of having access to unauthorized areas.

Q.   Now, the rest of the entries, we talked about the entries of download, the rest of the entries are logged as view events rather than download events.  Do you see that?

A758

192

A.    I do.

Q.    Now, the type of event, whether it's a view or a download, that's information that Google provides, right?  It's not a description that you or your team came up with?

A.    Correct, that's what they put that in their own logs.

Q.    And so Google reports distinguish between a view and a download?

A.    It does.

Q.    Okay.

And Google's own published guidance on drive log events in its workspace, notes that despite the distinction between view and download, some view actions are logged as downloads; is that right?

A.    When we saw that, I wanted to make sure we're giving the benefit of the doubt to anyone.  So we ran through the tests which I talked about a minute ago --

Q.    We'll get to the testing.  But I'm just asking what Google says about its own system.

So you recall testifying and seeing the document.  We can put it up if you need to.  That, Google Workspace notes that there's a distinction between a view and a download, but some view actions are logged as downloads, right?

A.    That is in the documentation.

Q.    And Google published its guidance in stating that previewing a file in the drive app on a mobile device is logged

A759

as a download event, right?

A.   The -- I believe the documentation says it can be under certain circumstances.

Q.   And it specifically says previewing a file in the drive app on a mobile device is logged as a download event?

A.   I don't have it in front of me to honestly answer that, so....

Q.   We can put it in front of you.

And right there where it says "download," do you see that?  And where it says "previewing a file"?

A.   I do see where it says that, yes.

Q.   Did I read that correctly?  "Previewing a file in a drive app on a mobile device is logged as a download event?"

A.   That's exactly what the documentation says.

Q.   And you were in fact aware of this explanation in Google's own policy before you submitted your first Affidavit in this case?

A.   I was?

Q.   Now, DraftKings' Google Workspace can be accessed through the Google app, right?

A.   Can be, yes.

Q.   And there's no technical barrier preventing a DraftKings' employee from installing the Google app on personal devices and using it to access DraftKings' Google Workspace on that personal device, right?

A760

A.    Correct.

Q.    And importantly, DraftKings' employees are allowed to use their personal devices to access their DraftKings' Google Workspace accounts, including for the drive app, correct?

A.    They're permitted to access as long as they're adhering to the information security policies.

Q.    So each of the downloads on that report we were looking at to a non-DraftKings' device in the Google Workspace reports, could have just been Mr. Hermalyn previewing the files on his phone as permitted by DraftKings, right?

A.    So, again, our extensive testing, we could never get a preview or a view to show as a download in any of our testing.

Q.    We'll get to your testing.

But you have no personal knowledge disputing that Mr. Hermalyn was viewing a document in the Google Drive app on his phone for each of the download events?

A.    Again, I can't speak to that, because we could not get a view event to show it as a download in the testing.

Q.    But you don't have any personal knowledge, right?  You weren't with him when he was --

A.    I was not with Mr. Hermalyn.

Q.    And to your testing, now you've repeatedly referenced this testing.  And you specifically tested whether events are logged as views or downloads, right?

A.    Correct.

A761

195

Q.   In your personal opinion, is that based on your testing that Google is wrong when it says that Google can log a view on a mobile device as a download, correct?

A.   I haven't spoken directly to Google about that, so I can't say they're wrong.  All I can tell you our testing didn't show that whatsoever.

Q.   Now nowhere in your Affidavits do you detail the process this for testing, do you?

A.   I don't believe we do, no.

Q.   And you never performed this testing on Mr. Hermalyn's actual device?

A.   Correct.  I never had access to his actual devices.

Q.   So you know that based on DraftKings' own testing, there could be circumstances where a document downloads in the background.  For example, when previewing a file that cannot be opened in Google Docs, right?

A.   Correct.  A PDF would only be an example of that.

Q.   And that aligns with Google's published guidance that a drive log event, which states that previewing a file, such as a PDF, that can't be directly open in Google Docs or other Google app, is logged as a download event, right?

A.   So when our testing with PDFs, and we specifically looked at this, we could not duplicate what was in the Google documentation.  It never showed as a download for us whether we viewed it or previewed it.

A762

196

Q.    But you understand what Google says about its own --

A.    I understand what the documentation says, yes.

Q.    In the Appendix A that I just showed you a moment ago, you don't specify what type of file any of the documents are, for example, whether any of them are PDF files, do you?

A.    They're not specified on here, no.

Q.    Now, you also noted that if an employee wanted to access a Google Drive file through another app like Google Presentation, through the Microsoft PowerPoint app, this would also be logged as a download?

A.    It would.

Q.    And there are no technological barriers, are there, to DraftKings' employees doing this?

A.    Correct, there no technical barriers.

Q.    The BD_Gaming101 file that the Google Workspace reported logged as a download event on January 29th, January 30th, and February 1st, is a Google presentation, right?

A.    I believe it is, yes.

Q.    And if an employee accesses a Google Workspace file through a separate Google app like Google Slides to review a Google presentation, that would be logged as a download?

A.    I'm sorry, can you repeat that question?

Q.    Sure.

      If an employee, consistent with what we've just been talking about -- if an employee --

A763

THE COURT:  Mr. Riden, I just ask you to slow down for the record.  Thank you.

MR. RIDEN:  I'm so sorry.

Q.   If an employee accesses a Google Workspace file through a separate Google app, like Google Slides, to review a Google presentation, that would be logged as a download?

A.   Not in our testing.

Q.   But according to Google's own documentation, it could be; is that right?

A.   The documentation says that, yes.

Q.   Now, it is possible, then, that Mr. Hermalyn was simply reviewing these documents in other apps on his phone?

A.   I can't speak to what Mr. Hermalyn was doing or viewing, I don't know.

Q.   When you say a document downloads in the background, you don't know whether it's retained on the iPhone itself, do you?

A.   It certainly can be.  I don't -- I guess I don't understand the question.

Q.   Did you test for that whether or not a document can be downloaded in a background where it's retained?

A.   We did.  We know where the file goes on iPhone iOS.  We don't know specifically -- that could be changed by user preference.

Q.   Did you test for that when you did your testing?

A.   We can't test for user preference.

A764

198

Q.   Because you had no access to Mr. Hermalyn's phone, right?

A.   Correct.

Q.   Now, if any downloads in the background took place on Mr. Hermalyn's phone, you don't know whether or not he would be personally aware of them, do you?

A.   He would have to be accessing the file and accessing the data with his user account, so I imagine he'd be aware of it.

Q.   So if something downloads in the background on Mr. Hermalyn's phone, you would assume that he simply just knows it's on his phone at that point?

A.   If he's downloading a file, I would assume he knows he's downloading a file, yes.

Q.   Even if it's downloaded in the background?

A.   If it's downloaded in the background, it still requires human input to start that download in the background.

Q.   Well, then, based on the Google Workspace report, you can only say that a downloaded document could be potentially exfiltrated or potentially misappropriated, right?

A.   Correct.

Q.   But if any of the files were downloaded in the background because Mr. Hermalyn was simply looking at them in other apps, you're not even sure where they're saved on his phone after the review, are you?

A.   I can't speak to where they're saved on his phone.

Q.   Now, you testified at your deposition that you're aware of

A765

nothing that contradicts Mr. Hermalyn's representation that he has not ever provided DraftKings' non-public information to Fanatics, right?

A.   I don't know what he's provided directly to Fanatics.

Q.   Now, you testified that you reviewed logs of Mr. Hermalyn's workspace activity.  And the date range was approximately a six-month period ending February 1, 2024.

A.   At this point it's almost nine months, I believe, but it started in August.

Q.   Now, it's not -- we only see, we only see a fraction of that in the attachment to your Affidavit, don't we?

A.   Yes.  This is a limited -- this is a D-duplicated set of the files he downloaded in the month of January.

Q.   Now those excerpts in your Affidavit do not cover dates outside of January 24th to February 1st, do they, for documents that are downloaded?

A.   I believe they go back further on this.  I think it goes down to January.  January 2nd, in this case, through February 1st.

Q.   I stand corrected.

So they were representing activity that started in January up through February; is that right?

A.   Correct.

Q.   Even though you had pulled more than six months of data it sounds like?

A766

200

A.    Correct.

Q.    Now, you submitted an Affidavit on March 14th, right?

A.    Oh, yes, sorry.

Q.    Right?

And you didn't attach summaries of any google activity prior to January 2, 2024?

A.    That's correct.

Q.    So you've not attached any of the -- to any of your Affidavits, copies of the complete activity logs for the six- or seven-month period that your team pulled, did you?

A.    We attached only the month of January to this deposition.

Q.    All this fast talking is making me a little hoarse, I apologize.

So, DraftKings' employees are allowed to use their personal devices to access the Google Workspace including through Drive app, right?

A.    Correct.  Again, as long as they're adhering to our information securities policies.

Q.    Now, DraftKings could have prevented syncing between the Google Drive and Mr. Hermalyn's devices when he worked at DraftKings, right?

A.    Technically we could have.

Q.    But you didn't?

A.    We did not.

Q.    Now, downloading a document from the Google Cloud, a

A767

201

download event, and a device syncing with the Google Cloud, a device sync event, are two distinct things, right?

A.   They are.

Q.   Google activity logs for Mr. Hermalyn show that an iPad was last synced with a Google drive on January 7, 2024; is that right?

A.   I'd have to have in front of me.  I don't have it to look at, sorry.

Q.   I represent that was contained in Mr. Green's Affidavit.

Now, Google Workspace is a secure document repository; isn't it?

A.   It is.

Q.   And you guys, we've talked about the only way users are able to access it is by using multifactor authentication?

A.   That's user name and password and multi-authentication, that's correct.

Q.   So credentials and authentication?

A.   Yes.

Q.   But you decommissioned Mr. Hermalyn's Google Workspace account February 1, 2024, at 12:53 p.m. Eastern; isn't that right?

A.   That -- yeah, that sounds correct.

Q.   And he couldn't access it after that?

A.   After February 1st at 12 -- yeah, 12:45, 1:00, whatever it was, yeah.

A768

202

Q.   You have no evidence that he's tried to access it since then, have you?

A.   No, we have not seen any activity since then.

Q.   You submitted an Affidavit saying that on January 16th, Mr. Hermalyn visited the website Dropbox.com and various sub pages of the Dropbox website on January 16th at around 4:20, right?

A.   Yes.

Q.   You don't know why he visited Dropbox.com, do you?

A.   I don't know why he visited the website, no.

Q.   You don't know what he was doing during the period of time that his computer showed a connection to the Dropbox account?

A.   I don't.

Q.   I'm sorry, Dropbox.com.

A.   I don't.

Q.   And you don't know if Mr. Hermalyn actually logged into a Dropbox account when he visited the website Dropbox.com?

A.   The browser, I'm not.  I don't know if he logged in or not.

Q.   So you don't know if he uploaded any information to or downloaded any information from Dropbox.com on January 16, 2024?

A.   I don't know specifically other than what I've seen in the Stroz report.

Q.   And none of the Stroz reports shows that he downloaded

A769

203

information to or in from Dropbox.com on January 16th; do they?

A.    It's my understanding that there was data in the Dropbox app that he had installed on his laptop.  DraftKings' data, that was in the app, which I would infer, was moved up to Dropbox.com via that app in a sync process.

Q.    It's all your inference.  You haven't seen any evidence of that, have you?

A.    I have not.  I have not seen his laptop.

Q.    Now, in your February 24, 2024, Affidavit you also said that operating system logs of file activity indicate that a number of DraftKings' documents were stored locally, to your point, on Mr. Hermalyn's 16-inch DraftKings' laptop and synced with his personal Dropbox account.  Now, this is different from visiting Dropbox.com, right?

A.    That's correct.

Q.    Now, this means that Dropbox was installed locally on the 16-inch laptop?

A.    It apparently was, yes.

Q.    And now, understand that you've submitted an Affidavit that says based on DraftKings' preliminary investigation, DraftKings contends that Mr. Hermalyn misappropriated DraftKings' documents by the use of his Dropbox account?

A.    Correct.

Q.    And you further state that -- or the Interrogatory answer further states that DraftKings does not current contend that

A770

204

all of the files that may have been historically synced with the Dropbox account contain DraftKings' confidential information?

A.   There should be no DraftKings' information going to Dropbox from Mr. Hermalyn.

Q.   But you understand that DraftKings doesn't currently contend that all of the files that were ever synced to his Dropbox account through that app contain DraftKings' confidential information?

A.   I didn't look inside of every file so I can't honestly answer that.

Q.   You just looked at file names?

A.   Yep.  We looked at some of the files and we looked at file names, yes.

Q.   But you don't know when those documents were synced with the Dropbox account, do you?

A.   I don't.

Q.   You don't know when that Dropbox account was installed on the 16-inch laptop?

A.   I do not.  But, again, a personal Dropbox account should not be used for DraftKings' data at all.  And that is explicitly called out on our policies.

Q.   Have you conducted an investigation or survey across the board at DraftKings to determine if anybody else has ever installed Dropbox on their laptops?

A771

A.    Actually we have.  And we have an application that is monitoring for that every day.

Q.    When did you start monitoring for that?

A.    I would say probably as a result of the investigation for this case.  I don't have an exact date.

Q.    So after Mr. Hermalyn left?

A.    Yes.

Q.    Okay.

In your March 14, 2024, Affidavit you said, that based on your review of data from DraftKings' forensics expert, that the Dropbox account was installed at some point prior to January 16, 2024?

A.    Based on the Stroz report, correct.

Q.    You don't know if that Dropbox account was synced to any other devices?

A.    I do not.

Q.    You don't know if it was accessed on other devices?

A.    Again, I do not.

Q.    And you don't know why it was installed on the 16-inch laptop, what we call Laptop No. 1, do you?

A.    Again, I don't know why he installed it.

Q.    And you can't contest that the Dropbox account was an account that Mr. Hermalyn used in his prior role over a year and a half ago at DraftKings, can you?

A.    I'm sorry, repeat the question.

A772

Q.   Sure.

You can't argue with the fact that Mr. Hermalyn used the Dropbox account over a year and a half ago in connection with his prior role at DraftKings?

A.   I can't speak to what he did a year and a half ago with Dropbox, no.

Q.   And you don't know the last time that he accessed his Dropbox account, do you?

A.   I do not, no.

Q.   You don't know if he showed an account of those documents to anybody?

A.   I don't.  But I do know there were DraftKings' documents in his Dropbox application that should not have been being shared outside of our systems.

Q.   But you don't know -- you have no evidence showing that they were shared with anybody else?

A.   No, I don't know who may have received them.

Q.   Now, you have claimed that Mr. Hermalyn was not authorized to install Dropbox on any of his DraftKing devices, right?

A.   Correct.

Q.   At least during the period of time when Mr. Hermalyn's working for DraftKings, DraftKings took no effort to block access to Dropbox.com, did they?

A.   We sent out a few different notifications to all employees that Dropbox was not to be used except by a subset of approved

A773

employees, and they would use our Enterprise Dropbox account to which IT would grant and remove access as needed.

Q.   You never blocked access?

A.   There was no technical barrier, no.

Q.   Now, you said that -- we're going to focus on the Slack messages.  You said on January 16th, Mr. Hermalyn sent a series of Slack messages to his own Slack user account attaching nearly a dozen confidential DraftKings' documents, right?

A.   Correct.

Q.   Now, this was his DraftKings' Slack account?

A.   It was?

Q.   DraftKings' employees are allowed to use their personal devices to access the DraftKings' Slack accounts?

A.   As long as they're doing it in accordance with the information securities policies, yes.

Q.   Now, you submitted another Affidavit saying that seven of the documents that Mr. Hermalyn slacked to himself on January 16th were subsequently downloaded from Slack to a non-DraftKings' iPhone?

A.   Yes, the investigations actually subsequently showed there was actually ten files he downloaded to his iPhone.

Q.   The term downloaded from a Slack log that you reviewed?

A.   I'm sorry, what?

Q.   You're using the term downloaded based on a Slack log that you reviewed?

A774

A. Correct.

Q. Now, in its Interrogatory response that you verified, DraftKings wrote, According to Slack, a document is considered downloaded if it is downloaded in the traditional sense, but can also mean that the document was accessed in Slack itself.

A. Correct.

Q. And because DraftKings does not have access to Mr. Hermalyn's personal devices, it's impossible for DraftKings to currently determine what precisely happened to those documents?

A. The data that was transferred in those 18 files, in some of those 18 files, contained, one, information Mr. Hermalyn should never have had access to. But whether they were downloaded or viewed, he still could have cut and paste. He could have screenshot them. He was a prolific screenshotter, so who knows where that went. There's many ways to exfiltrate the data besides just download.

Q. But that's all your speculation, isn't it?

A. It's not my speculation that he should not have even accessed the files.

Q. You just speculated he could have done a number of things with those files. That is pure speculation, isn't it?

A. It's not speculation that those are effective modes of exfiltration.

Q. You don't know that he did any of those, do you?

A775

209

A.   I don't have information as to what he physically did, no.

Q.   So you don't know if he actually downloaded any of them on his phone, do you?

A.   I don't.  But I would question why he would even need to view comp of 6,000 employees.  That was one of the files that was uploaded.

Q.   You have no -- you have no insight into his intention, do you?

A.   I do not.

Q.   You don't know why he sent them to himself on the Slack account in the first place, do you?

A.   I can't speak to as to why, no.

Q.   And you also look for any trends in the Slack data log to show how often he sent himself information via Slack, for example, in 2023?

A.   We did, going back to August actually.

Q.   Well -- okay.

Well, in your deposition you indicated to me that you had not done any data trending with respect to Slack?

A.   Yeah, the investigation continued following that, obviously.  We have gone back and taken a look at a lot more of the data since then.

Q.   Now, none of this is in your March 14th declaration, is it?

A.   No, it's not.

A776

210

Q.   Okay.

And you cannot dispute Mr. Hermalyn's explanation that he slacked himself those documents in connection with the transition from one laptop to a new one?

A.   I find that position to be a bit ridiculous.  That's like having a large pile of gravel to move and you're moving it one stone at a time by hand.  He'd probably still be there if he was doing a true migration with his laptop from one place to another.  And secondly, why would he need to view them on the phone after he uploaded them if it was a laptop to a laptop?

Q.   You're raising lots of good arguments, Mr. Harris, but you actually have no insight what he was thinking when he moved them from -- when he slacked himself the documents, do you?

A.   I can truly not tell you what's inside Mike Hermalyn's head.

Q.   Now, the compensation document that you reference was a document that he had on his computer before January 16th, right?

A.   I honestly don't remember the exact date he had it on his computer.

Q.   Well, he had it on his computer in order to slack it to himself, right?

A.   Correct.  He would have to have been on the computer in order upload it into Slack.

THE COURT:  Mr. Harris, if I can interrupt, I just ask

A777

211

you to speak a little slower for the record.

THE WITNESS:  Oh, sorry.

THE COURT:  Thank you.

Q.   We'll touch briefly on allegations about Mr. Hermalyn's plan to move large files.  You said that on January 16th, he searched the phrase "move big files" on Google that day.

Do you remember that?

A.   I do.

Q.   You don't know why he searched that phrase?

A.   I do not.

Q.   And you would be speculating if you said he searched this phrase in order to misappropriate DraftKings' data, right?

A.   Again, I don't know why he searched that phrase.

Q.   You also said that he accessed a website on the same day called transfernow.net.  Now, you don't know why he visited this website, do you?

A.   I do not.

Q.   And you can't dispute Mr. Hermalyn's explanation that he visited this website in connection to move a large video file of a presentation that he gave?

A.   I can't speak to as to why he visited those websites.

Q.   You don't know if you downloaded anything from or uploaded anything to transfernow.com, do you?

A.   I do not.

Q.   At least during the period of time when Mr. Hermalyn was

A778

212

working for DraftKings, DraftKings did not block access to transfernow.net, did it?

A.   It did not.

Q.   Now, as we've discussed, DraftKings' employees are permitted to access their Google Workspace area, Slack, and e-mail from their personal phones, right?

A.   Correct.

Q.   And you've talked frequently about the DraftKings' policy that prohibits employees from downloading DraftKings' confidential information to unapproved or non-DraftKings' devices or endpoints?

A.   Correct.

Q.   Now, you chose not to provide or even quote the specific policy in your Affidavit, right?

A.   The acceptable use policy clearly states you cannot move confidential information via e-mail or Slack, and every employee is trained on that.

Q.   You didn't attach this in any of your Affidavits, did you?

A.   I don't believe we did, no.

Q.   You have a non-DraftKings' phone, right?

A.   I do.

Q.   And can you say under oath that you've never opened a PDF on Google Drive on your phone that contained confidential data?

A.   I can.

Q.   You've never opened a PDF from Google Workspace on your

A779

213

phone that contains DraftKings' confidential information?

A.    I have not.

Q.    And have you done a survey to determine whether that has been done by any of the other thousands of DraftKings' employees who are allowed to access it on their iPhones?

A.    I have not done a survey.

Q.    Now, and you're also not familiar with the criteria for determining what constitutes DraftKing's confidential information?

A.    I'm sorry, can you slow down?  You're talking really fast.

Q.    Sure.

You're not familiar with the criteria for determining what constitutes DraftKings' confidential information, are you?

A.    I am.

Q.    At your deposition you said that you, you weren't.

A.    I don't recall that.

Q.    Okay.

So DraftKings did not provide Mr. Hermalyn with a cellphone, did it?

A.    We did not.

Q.    If fact, DraftKings does not provide most of its employees with cellphones, do they?

A.    I don't have a measurement of the number of employees. There are a group that do and there is a group that doesn't.  I don't know the exact numbers.

A780

214

Q.   Is the group that does get company devices, is that more than a thousand employees?

A.   I would say probably not.

Q.   Okay.

So, let's see.  And you have no evidence -- this is it, you have no evidence that Mr. Hermalyn has used or disclosed any DraftKings' information following his departure from DraftKings, do you?

A.   The downloads that occurred from the Fanatics' network would lead me to believe that he was inappropriately downloading or viewing DraftKings' confidential information on a competitor's network.  So I would argue the competitor, even through their own electronic systems, may automatically have access to those files.  I don't know.

Q.   Total speculation on your part, though, right?

A.   Not that he downloaded it from Fanatics' networks, no.

Q.   But total speculation as to your conclusion, right?

A.   Correct.

Q.   Okay.  Thank you.

THE COURT:  Redirect?

MR. SNYDER:  One question.

**REDIRECT EXAMINATION BY MR. SNYDER:**

Q.   Following up on the notion that Mr. Hermalyn was migrating from Laptop 1 to 2 via Slack, I want to show you paragraph -- Exhibit 79 which is your Affidavit.  And you state at the end

A781

215

of paragraph 30 on page 9 --

MR. SNYDER:  Last sentence, Andy.

Q.   You state:  "None of the previous Slack messages sent to his own Slack account contained highly confidential DraftKings' documents."

A.   That's correct.

Q.   What did you mean by that?

A.   So in those previous Slack messages prior to January 16th, there were various notes to himself, airline credits.  It was nothing containing DraftKings' confidential information.

Q.   And on the evening of the 16th of January, was that the first time you had seen a single, much less 18 documents -- DraftKings' documents slacked to himself?

A.   Yes.

MR. SNYDER:  No further questions.

THE COURT:  Any recross?

MR. RIDEN:  No, I'm all set.

THE COURT:  Okay, thank you.

Mr. Harris, you may step down.

MS. DEMANA:  Good afternoon, your Honor.  Christina Demana for the plaintiff.

THE COURT:  Good afternoon, Ms. Demana.

MS. DEMANA:  We call Brittney Goodman.

THE COURT:  Ms. Goodman, you can come right up here to the witness box and remain standing and the Clerk will swear

A782

216

you in.

**BRITTNEY GOODMAN**, Sworn

**DIRECT EXAMINATION BY MS. DEMANA:**

Q.   Good afternoon, Ms. Goodman.

A.   Hello.

Q.   Mr. Hermalyn has testified that you contacted him about VIP customer invites to the Super Bowl at the end of January 2024; is that accurate?

A.   That is not accurate.

Q.   Did you communicate with Mr. Hermalyn at the end of January about Super Bowl invites for DraftKings' business partners?

A.   Yes.

Q.   Are you familiar with a document called the Master SB2024 spreadsheet?

A.   Yes.

Q.   If you had known Mr. Hermalyn was in L.A. and planned to start working for DraftKings at the end of January -- or sorry, started to work for Fanatics, excuse me, at the end of January, would you have communicated with him about that document?

        MS. SOFIS:  Objection, your Honor.

        THE COURT:  Sustained, that's speculative.

Q.   Did you know where Mr. Hermalyn was physically located at the end of January 2024?

A.   At the time I spoke with him on the phone and he told me

A783

that he was at home mourning the loss of our personal friend that we shared.  And that he was spending time with his family grieving that loss in New Jersey.  But come to find out after the fact, he was actually in Los Angeles at Michael Rubin's house.

THE COURT:  Can I ask you to pull the microphone closer to you?

THE WITNESS:  Sorry.

THE COURT:  That's okay.  Thank you.

Q.   And if you had known and you now understand that Mr. Hermalyn was at Michael Rubin's house, would you have communicated with him about the Master SB2024 spreadsheet?

MS. SOFIS:  Objection.

THE COURT:  Sustained.

Q.   The Master SB2024 spreadsheet, is that a confidential DraftKings' document?

A.   Yes, very confidential.

Q.   Why do you say that?

A.   It's a compilation of all the names of our top business partners.  Friends of DraftKings, influencers, celebrities, all of our business partners, lead partners, a very confidential document that contains a lot of names of people over the years that DraftKings has used for its overall strategic business platforms.  And basically that list is, you know, drives the whole retention of our -- of our business.

A784

218

Q.   Is that document a party list?

A.   I'm sorry, what is that?

Q.   Would you classify that document as a party list?

A.   It was used for -- as a list for invitees for a party, but overall it was collaboration of all the different verticals putting in all of our top business partners.

Q.   Does that document remain confidential today after the Super Bowl?

A.   Yes, absolutely.  I mean those names were there for invitees, but that is, those are strategic drivers for our business, throughout the year whether it was for Super Bowl or not.  Those are, that's the list of all of our partners.

Q.   Would you want Fanatics to have that information in that document?

A.   Absolutely not.  That would give them full insight into our overall strategy across, specifically, events but also business development as well.

Q.   And if you had known that Mr. Hermalyn was about to start a job for Fanatics at the end of January 2024, would you have asked him about that document?

        MS. SOFIS:  Objection.

        THE COURT:  Sustained.

        You can rephrase, Ms. Demana, but without speculation.

        MS. DEMANA:  I have no further questions.

        THE COURT:  Okay.

A785

219

Cross?

MS. SOFIS:  Yes, your Honor.

**CROSS-EXAMINATION BY MS. SOFIS**:

Q.   Good afternoon, Ms. Goodman.

A.   Hi, how are you?

Q.   You joined Fanatics in November of 2023?

A.   I joined DraftKings in November.

Q.   I'm sorry.  You joined DraftKings in November of 2023, correct?

A.   Yes.

Q.   And so you had only been with DraftKings for a couple of months as of January of 2024, right?

A.   Correct.

Q.   You're the senior director of events at DraftKings, right?

A.   Yes.

Q.   You reported directly to Mr. Hermalyn until he resigned on February 1st, correct?

A.   Yes.

Q.   You worked on the DraftKings' team that was planning the VIP customer and partner events and parties at the Super Bowl, right?

A.   Yes.

Q.   The Super Bowl this year was on Sunday, February 11th, correct?

A.   Yes, it was.

A786

220

Q.   And there were DraftKings' VIP events leading up to the Super Bowl, right?

A.   There were a variety of DraftKings events throughout the week, yes.

Q.   And you're aware that the Super Bowl is an important annual event for DraftKings, right?

A.   Yes, it is.

Q.   And you were new to the team.  You just started in November so this was your first Super Bowl event with DraftKings, correct?

A.   Correct.  It was my first one with DraftKings, but I've been in the sports industry for many years so....

Q.   Yes, but with DraftKings it was your first one, right?

A.   Yes.

Q.   And by the way, you use your personal phone in connection with your work at DraftKings, correct?

A.   Technically -- well, it used to be a former work number. I have a separate work phone, but I have a device.

Q.   You don't have a company-issued cellphone?

A.   Correct.

Q.   It's your own cellphone?

A.   Correct, I have a separate personal phone.

Q.   Now I want to direct your attention to the Affidavit that you signed in this case.

        MS. SOFIS:  If we could put that up, Kelsey.  And this

A787

221

was approved with respect to redaction.  If we go to the last page.

Q.   That's your signature, right?

A.   Yep.

Q.   And before you signed your Affidavit, did you review it to make sure it included all relevant information about your communications with Mr. Hermalyn from January 24, 2024, forward?

A.   Yes.

Q.   In your Affidavit you dispute Mr. Hermalyn's account of your communications with him leading up to the Super Bowl, right?

A.   Yes, I disputed that we were in discussion about VIP customers.

Q.   Right.  The only issue you actually take with Mr. Hermalyn's account of what happened is that he referred to VIP customers as opposed to business partners in one of his declarations, correct?

A.   No, there is one more piece that I disagreed with.

Q.   And we'll get to that.  One of them is the fact that he used the term VIP customers instead of business partners, right?

A.   Correct.

Q.   I'm going to direct your attention to the top of page 2. This is a continuation of paragraph 5.  You admit that you

A788

222

e-mailed Mr. Hermalyn on January 24th to follow up on ten DraftKings' business partners who were supposed to be invited to DraftKings' events by Mr. Hermalyn, but to your knowledge had not been, correct?

A.    Correct.  I needed him to confirm if they had been or not, because the process that was not followed, so I didn't have the insights into who RSVP'd or not.

Q.    And you were asking Mr. Hermalyn for that information, right?

A.    Correct, because he was supposed to be the one to send those out.

Q.    And you italicized the words "business partners" to distinguish them from VIP customers?

A.    It's italicized.

Q.    And the reason you italicized those words was to distinguish them from VIP customers?

A.    Correct.

Q.    That's the distinction you were trying to draw?

A.    Yes.

Q.    Directing your attention to paragraph 3 of your declaration, you included a paragraph from one of Mr. Hermalyn's declarations, correct?

A.    I'm just reading it to see.

Q.    Yes?

A.    Yes.

A789

Q.   And that's the paragraph you were responding to in your declaration, correct?

A.   Yes.

Q.   If the words "business partners" appear in Mr. Hermalyn's declaration rather than "VIP customers," customers and VIP's just right above that, you'd agree with his statements here, correct?

A.   I would agree with that portion of his statement.

Q.   Are you aware that Mr. Hermalyn made that correction, substituted those words in a subsequent Affidavit?

A.   Yes.

Q.   In terms of the January 24th e-mail that you sent to Mr. Hermalyn, that was with respect to those ten DraftKings' business partners, correct?

A.   Yes.

Q.   Do you recall that the subject line of your e-mail was "SB invites"?

A.   I don't recall, but it could very well be.

Q.   And you included the names of those ten DraftKings' business partners in your January 24th e-mail to Mr. Hermalyn. Do you recall that?

A.   I recall adding names because there was a discrepancy in the document compared to -- there was a discrepancy I was trying to clarify with him in the document.

Q.   And the document you're referring to is the Master SB2024

A790

224

spreadsheet, correct?

A.    Correct.  That was the document I was responsible for updating, but because the process wasn't followed, I needed to get more detailed information as to if they were sent out or not.

Q.    And in your January 24th e-mail, you referred to that Master SB2024 spreadsheet, correct?

A.    I believe so.

Q.    You asked Mr. Hermalyn for the status of the invitations so you could update that spreadsheet, right?

A.    Yes.

Q.    And you're aware that the Master SB2024 spreadsheet is a Google spreadsheet, correct?

A.    Yes.

Q.    And your e-mail also referenced the titles of certain tabs, the sheets on that spreadsheet.  Do you recall that?

A.    Yes.

Q.    And those sheets included invite lists.  It was like a waterfall, correct?

A.    Do you have a copy of the --

Q.    I do not actually.

A.    Okay.  I don't want to be answering without just confirming because it was a while.

Q.    I'm asking for your recollection.

A.    Okay.

A791

225

Q.    So the e-mail reference, the titles of certain halves, the sheets, correct?

A.    Yes, I believe so.

Q.    And those sheets included invite lists to the Super Bowl parties that were coming up for the DraftKings' events, correct?

A.    Correct.  They included names of our business partners, and each group had a different tab they were updating.

Q.    And it was set up as a waterfall, correct?  Meaning there were priority invites that were at the top of the list, and if somebody couldn't come, then you would go to the next set of individuals on that list, correct?

A.    No.

Q.    It wasn't set up that way?

A.    No.

Q.    You have highlighting, though, to determine who you should invite and who had not been invited yet, correct?

A.    The highlighting was to distinguish if an e-mail had gone out, not whether or not they should be invited or not.

Q.    And the events had, certain of the events had a limit in terms of how many people could arrive, could go to the event, correct?

A.    We did have an event capacity.

Q.    And if, and you tried to fill that capacity in full, correct?

A792

226

A.   Yes.

Q.   And you used that master SB2024 spreadsheet in order to do that, right?

A.   Yes.

Q.   Directing your attention back to your declaration at the top of page 2, please.  You refer to the January 24th e-mail that you sent to Mr. Hermalyn in your Affidavit, right?

A.   Yes.

Q.   Did you review it in connection with preparing your Affidavit?

A.   I reviewed it prior, yes.

Q.   But you didn't attach the e-mail you sent to Mr. Hermalyn on January 24th to your Affidavit so that the Court could review it, correct?

A.   I don't know.

Q.   It's not attached, is it?

A.   I don't know.

Q.   Well, let's take a look.

        MS. SOFIS:  If you could scroll down.

Q.   Are there any exhibits attached or referenced in your Affidavit?

A.   Nope.

Q.   You testified that you had a conversation with Mr. Hermalyn in January, right?

A.   Yes.

A793

227

Q.   And that conversation was after your January 24th e-mail. It was, actually, you had two conversations, on January 30th and 31st, correct?

A.   I spoke with Mr. Hermalyn on Wednesday -- Tuesday and Wednesday.

Q.   And Tuesday and Wednesday are January 30th and 31st, correct?

A.   I believe so, yes.

Q.   You called Mr. Hermalyn on the morning of January 30th and you first asked Mr. Hermalyn how he was doing after your mutual friend passed away, correct?

A.   I'm trying to remember the date, but I believe Tuesday was the day he called me and then I called him on Wednesday the 31st.

Q.   Leaving that aside, I can represent to you that you did call him on January 30th, but if you don't recall it, that's fine.

During the January 30th conversation, the two of you discussed the passing of your mutual friend, correct?

A.   Correct.

Q.   And Mr. -- your friend, I don't want to say his name, your friend passed away on January 27th, correct?

A.   Yes, I believe so.  It's a Saturday.

Q.   And you and Mr. Hermalyn talked about the memorial service that was going to be held on his behalf.

A794

228

Do you recall that?

A.   I recall on Tuesday, specifically, our conversation was in regards to him not coming to Boston for the day.  Him being in mourning and wanting to spend time with his family in New Jersey.  And what time he said, he'd then be in on Wednesday.  And Wednesday morning is when I called him to speak with him, and that's when we talked about the memorial service.

Q.   On your January 30th call, you followed up with Mr. Hermalyn about your January 24th e-mail relating to the invite list, correct?

A.   I asked him about the invite list, and at that point he hurried off the phone so we were not able to discuss.

Q.   You didn't mention your January 30th call with Mr. Hermalyn in your declaration, correct?

A.   I didn't see it, no.

Q.   That information isn't in there at all, right?

A.   Nope.

Q.   And I'd like to direct you back to paragraph 3 of that declaration.  And this is the portion of Mr. Hermalyn's declaration that you quoted and in your Affidavit.  Do you see that?

A.   Yes.

Q.   January 30th, that's the day that Mr. Hermalyn represented, "I accessed the Master SB2024 spreadsheet on January 30, 2024.  I did so because a DraftKings' employee

A795

229

Brittney Goodman contacted me."

Did I read that correctly?

A.   Yes.  But I did not reach out to him on that date.  He contacted me regarding invites on that day.

Q.   January 30, 2024, correct?

A.   Correct.

MS. SOFIS:  Nothing further.

THE COURT:  Okay.

Redirect?

MS. DEMANA:  No, your Honor.

THE COURT:  Thank you, Ms. Goodman, you can step down.

THE WITNESS:  Thank you.

MS. GOEKE:  Your Honor, DraftKings calls Mitchell Green to the stand.

THE COURT:  Good afternoon, Mr. Green.  You can come over here and remain standing while the Clerk administers the oath.

**MITCHELL GREEN**, Sworn.

THE CLERK:  Thank you, you may be seated.

THE COURT:  Go ahead.

MS. GOEKE:  Yes, your Honor.

**DIRECT EXAMINATION BY MS. GOEKE:**

Q.   Mr. Green, Defendant testified this morning that on January 16th his activity was, "An ordinary course migration from what we've been referring to as Laptop 1 or the 16-inch

A796

230

laptop, to what we've been calling Laptop 2, his 14-inch DraftKings' laptop.

Did you investigate this claim?

A.   Yes, we did.

Q.   Did you reach any conclusions related to this claim?

A.   Yes, I did.

Q.   And what were the conclusions based on your forensic investigation of DraftKings' Laptops 1 and 2?

A.   Based on my investigation of these two laptops, I concluded that it was unlikely that this activity was consistent with the transfer of materials from Laptops 1 to Laptop 2.

Q.   And why is that?

A.   Because during my analysis of these laptops, as well as the associated logs that we reviewed from various sources, I identified evidence of the transfer of data to sources that were other -- excuse me, not DraftKings' devices, including a personal iPhone.

Q.   And focusing your attention specifically on the Slack logs, Defendant testified this morning that in attaching 18 unique documents to a series of Slack messages that he sent to his own Slack account, that this was part of an ordinary course migration to a second laptop.  Did you look at this question specifically as it relates to the Slack logs?

A.   Yes, I did.

A797

231

Q.    And what did you conclude?

A.    Based on my review of the Slack logs, I identified that it was not consistent with transferred materials and that there was the excess viewer download of ten of those documents on a personal iPhone.

Q.    And how many of the documents were viewed or downloaded of the 18 on to Laptop 2?

A.    Four.

Q.    Were you able to reach any conclusions about whether those four documents that were viewed or downloaded on Laptop 2 were actually retained on Laptop 2?

A.    Yes.

Q.    Could you describe your conclusions to the Court on that subject?

A.    Yes.  At the time of my review of Laptop 2, none of those four documents remained on that laptop.  And based on my review of the file system event logs that detail files among other things, created, modified, and deleted, none of those four files had been created, modified or deleted within the available logs of file system events dating back to January 17th.

Q.    And based on your forensic investigation, what can you tell the Court about the circumstances under which you would not see either creation or deletion of those four documents sent via Slack on Laptop 2?

A798

A.    Given the circumstances that I just described, there are two possibilities:

One, being that these documents were downloaded from a Slack application and deleted before the earliest bounds of these file system event logs on the 17th.  The alternative possibility here is that these documents, these four documents, were not downloaded to the second laptop.

Q.    And how does that evidence that you saw in connection with your forensic investigation inform your conclusion that the activity on January 16th was unlikely to be an ordinary course migration?

A.    Based on the activity that I just described, if this was part of an ordinary course migration, I would have expected to have seen at least those four documents being downloaded and saved to the second laptop, and potentially more of those 18 documents as well.

Q.    Mr. Green, in connection with your investigation, were you able to identify a single document on Laptop 2, that based on your investigation, originated on or was transferred from Laptop 1?

A.    No, I was not.

Q.    Mr. Green, there was testimony about Defendant's deletion of iMessages this morning.  Could you please describe to the Court the circumstances of that deletion activity based on your investigation?

A799

233

A.    Based on my investigation, I identified that the iMessages were deleted from both Laptops 1 and Laptops 2 by Mr. Hermalyn.

Q.    Were you able to determine approximately on what date the iMessages were deleted?

A.    On Laptop 1 that occurred on approximately January 16th, and on Laptop 2 on January 17th.

Q.    And did you see any evidence in connection with your investigation of intentional efforts by the user to install iMessage on either device?

A.    Yes.

MR. RIDEN:  Objection.

THE COURT:  Basis?

MR. RIDEN:  To the extent that it's calling for a speculation about Mr. Hermalyn's intentions.

THE COURT:  It's calling for what did he see in his investigation so I'll allow it.  Overruled.

A.    On December 18th of 2023, I observed a google search for how to set up iMessage on Laptop 2.

Q.    On December 18th, just to clarify your testimony, on December 18th you saw a google search for how to set up iMessage.  And then on January 17th you saw deletion on Laptop 2 of iMessage related data; is that right?

A.    Yes, that is correct.

Q.    Now, did you just see deletion of the iMessages on both Laptop 1 on January 16th and on Laptop 2 on January 17th?

A800

A.    I did see deletion.  However, it was notable that that deletion was sophisticated in nature in that it was not simply just the unlinking and deletion through the application, but rather Mr. Hermalyn had navigated to these application folders associated with the iMessage application and deleted the underlying database and attachment files that were stored.

Q.    And you said that was notable.  Why was that notable?

A.    I consider that notable because it signified a level of intent beyond what we typically see a normal user performing who delete an iMessage.

Q.    And what, if anything, or how, if at all, did that inform the conclusions that you drew in this case about the nature of the deletion that Defendant engaged in on Laptop 1 and Laptop 2?

A.    This combined with my observations of the other means of deletion led me to believe that this amounted to a more -- excuse me, intentional and significant amount of deletion overall.

Q.    Defendant testified this morning that the only deletion activity on Laptop 2 was deletion of personal documents.  Put another way, that he was attempting to preserve DraftKings' documents on Laptop 2.  Did you investigate this claim?

A.    Yes, I did.

Q.    What did your investigation reveal?

A.    I identified that several files were deleted from Laptop

A801

235

2.  That based on the file names, appeared to be DraftKings' data.

MS. GOEKE:  No further questions at this time.

THE COURT:  Okay.  Thank you, Ms. Goeke.

Cross.

**CROSS-EXAMINATION BY MR. RIDEN:**

Q.   Mr. Green, everything you've just testified about occurred in January of 2024 or before; is that right?

A.   That's correct.

Q.   Are you aware that Mr. Hermalyn spoke to Mr. Hernandez at DraftKings about transferring files in December of 2023?

A.   I'm generally not aware of details of that.

Q.   Now, your Affidavit states that at least four different Apple devices were connected with Mr. Hermalyn's DraftKings' issued laptops via a USB; is that right?

A.   That's right.

Q.   Now, one way to charge a mobile device is to plug it into a computer with a USB?

A.   That's correct.

Q.   And one of the devices connected to Mr. Hermalyn's DraftKings' issued laptops with USB was a 10.5 inch iPad Pro, right?

A.   I believe so.

Q.   And these connections occurred in December of 2023?

A.   If it's in my Affidavit, then, yes.

A802

236

Q.   And you don't know who owns that iPad, do you?

A.   I do not.

Q.   And you don't know who plugged it into the laptop?

A.   I do not.

Q.   And you don't know if any DraftKings' information was transferred to the iPad, do you?

A.   I can't say based on the data available to me right now.

Q.   Now, your Affidavit discusses a second 11-inch iPad that was connected to one of his DraftKings' laptops in December 9th of 2023.  Again, the connections for this 11-inch iPad took place before December -- before January of 2024, right?

A.   That's correct.

Q.   You also say that this 11-inch iPad last synced with his DraftKings' Google Workspace on January 7, 2024?

A.   That's correct.

Q.   Now, you don't say the iPad viewed or downloaded documents from DraftKings' Google Workspace, do you?

A.   Based on the logs that I reviewed, I didn't observe that.

Q.   And you don't define what it means for a device to sync with a Google Workspace account in your Affidavit?

A.   I do not.

Q.   Do you know that DraftKings decommissioned Mr. Hermalyn 's Google Workspace access on February 1, 2024?

A.   That specific piece of information was not made available to me.

A803

Q.   You performed forensic examination of three computers, right?

A.   Yes.

Q.   One was a 16-inch computer where you report deletion between January 16 and 17, 2024?

A.   Yes.

Q.   One was a 14-inch computer where you report deletion between 17th and 18th of January 2024?

A.   Yes.

Q.   And the third was a 16-inch laptop which you report was wiped or otherwise reset on or about March 27, 2023?

A.   Yes.

Q.   Now you don't know why Mr. Hermalyn deleted anything from his computers in 2023 and 2024, do you?

A.   I can't speak to his specific intention there, no.

Q.   And you can only speculate that deletions in 2024 were somewhat related to deletions in this case?

A.   Yes.

Q.   Now, in your report you specify there were at least 237,000 files deleted from Laptop 1 between January 16th and January 17th of 2024, right?

A.   That's correct.

Q.   Yeah.

     You only characterize 347 of those as user created files?

A804

A.   That's correct.

Q.   But you don't provide the file names in your report, do you?

A.   I do not.

Q.   And you don't dispute that at least some of the deleted files were personal files?

A.   I do not.

Q.   And there's no attempt to characterize the other 237,000 or so other files, is there?

A.   There is not.

Q.   Many of them were more likely system files?

A.   They could have been.

Q.   System files related to the operation of the computer and they include things like font folders, right?

A.   They could have, yes.

Q.   Now, the FS event logs you talked about, those include the list of file names, right?

A.   They do.

Q.   And you did not include that list as an exhibit to your Affidavit?

A.   I did not.

Q.   And you can't say anything about whether or not this was similar to prior deletions by Mr. Hermalyn on this computer because your FS event logs only go back to January 16th, right?

A.   That is correct.

A805

239

Q.    Now, you testified you're aware that Mr. Hermalyn has said that he was migrating from one laptop to another on January 16th, right?

A.    Yes.

Q.    And you can't say for certain whether this deletion activity was unrelated to that migration, correct?

A.    On Laptop 1, no.

Q.    And you note that the iMessages were deleted from Laptops 1 and 2?

A.    I do.

Q.    So removing iMessage from a laptop and deleting the database wouldn't affect iMessages in the Cloud, would it?

A.    It would not.

Q.    And are you aware that Mr. Hermalyn ceded his Cloud account to his -- his iCloud account to his counsel on January 21, 2024?

A.    I was not previously aware of that.

Q.    You included in your report that the local Dropbox folder on Laptop 1 was likely deleted?

A.    Yes.

Q.    Again, this wouldn't affect the files on the Dropbox Cloud, would it?

A.    It would not.

Q.    And you're aware that Mr. Hermalyn ceded his Dropbox account to counsel?

A806

240

A. I understand that now.

Q. And on the deletion in general you're aware that DraftKings alleges that Mr. Hermalyn exfiltrated various files, correct?

A. Yes.

Q. Now, deleting a file doesn't exfiltrate it, does it?

A. No.

Q. In your Affidavit you said that you reviewed a log export collected by DraftKings' IT from the messaging platform Slack detailing Mr. Hermalyn's file related activity occurring between August 7, 2023, and February 1, 2024, right?

A. Yes.

Q. Okay.

You state that based on a review of the Slack logs on January 16th, he sent 18 unique documents to his own DraftKings' Slack account on his 16-inch laptop, right?

A. Yes, that's correct.

Q. Shortly before Mr. Hermalyn transferred those documents via Slack, there are indications that Airdrop was used to attempt to transfer files from Laptop 1 to an iPhone?

A. Yes.

Q. You don't know what files were airdropped, do you?

A. No.

Q. It's possible that the AirDrop files were personal files?

A. Yes.

A807

241

Q.   And two of those airdrop attempts -- two of those airdrop attempts failed because the receiving phone didn't even have enough space to receive files; is that right?

A.   Yes.

Q.   Now, turning back to Slack, you don't know why he sent those documents to himself via Slack, do you?

A.   I do not.

Q.   Now, in your report you indicate that the activity appears consistent with user efforts to transfer or attempt to transfer files from Laptop 1 to other devices?

A.   Yes.

Q.   And now, this activity, the AirDrop activity and on the phone -- on the phone, it's consistent with someone who is moving files from an old laptop to a new laptop through Slack or their phone, right?

A.   I would not characterize transferring data to the phone as being consistent with transferring data to the new laptop, no.

Q.   Transferring personal files away from one laptop that you're giving back, to an iPhone is consistent with transferring from that laptop to move to a new laptop, though, correct?

A.   Based on the evidence available, I can't speak to whether those were personal files or not.

Q.   Your report doesn't -- you can't discern that one way or another?

A808

242

A. That's correct.

Q. In your Affidavit you give three separate reasons why you contend this information wasn't being transferred from Laptop 1 to Laptop 2. The first was that the transfer happened on January 16th, where Mr. Hermalyn had been using Laptop 2 since at least December 18th of 2023?

A. That's correct.

Q. Now, he could have started using Laptop 2 before moving files, correct?

A. That's correct.

Q. And Laptop 2 had been set up with DraftKings' Google Workspace since December, right?

A. That's my understanding.

Q. So if he had access to his work -- his Google Workspace files, already, correct?

A. Presumably, yes.

Q. And the next inconsistency you raise is that the majority of the files that Hermalyn transferred from laptop -- from laptop were never downloaded to Laptop 2. Now, first you note that of the 18 documents sent over Slack, 14 were never downloaded, two are viewed from Slack on Laptop 2?

A. That's correct.

Q. Now, Mr. Hermalyn could access DraftKings' Slack on Laptop 2, right?

A. Yes.

A809

243

Q.   So the documents he sent via Slack would have been available to him through Slack on the 14-inch computer, correct?

A.   Yes.

Q.   They weren't going to disappear?

A.   I can't speak to the specific setting of DraftKings' Slack.

Q.   But by sending them by Slack, they would have been available to him on his 14-inch laptop when or if he needed them simply by looking at the messages that he sent himself, correct?

A.   Yes.

Q.   So it's entirely possible he didn't view or download these files from his new device because they were readily available on Laptop 2 through Slack?

A.   Yes.

Q.   Now, view and download in Slack are two different things, right?

A.   I don't recall specifically, but my understanding generally is, yes.

Q.   But with respect to the documents in Slack, you don't know whether the documents were viewed or downloaded and that's why you used the word "or," correct?

A.   Correct.  It could have been a viewed event or a download event.  They are logged the same in that evidence source.

A810

244

Q.   Right.

He simply -- he could have simply just taken a quick glance of the documents within Slack on his phone, correct?

A.   Yes.

Q.   And that would have been logged as a view or download?

A.   That's correct.

Q.   Now, for the documents you noted as viewed or downloaded on iPhone you can't say what happened to them after they were viewed or downloaded, correct?

A.   Correct.

Q.   You can't say that he shared them with anybody else or shared them outside of DraftKings?

A.   He could have further disseminated them, but I can't make a statement on that without seeing that iPhone.

Q.   It would be speculation, right?

A.   Yes.

Q.   Turning back to your reported inconsistencies, you note that the 130 documents saved in the MISCDK Dropbox folder on Laptop 1 are not on Laptop 2 or referenced in the FS events log for the device, right?

A.   That's correct.

Q.   Now, Dropbox had been installed since at least June 29, 2022, correct?

A.   Correct.

Q.   Your Affidavit does not indicate when files were added to

A811

245

the Dropbox MISCDK folder, correct?

A.   That's correct.

Q.   And it's possible that the files in the Dropbox account were from Mr. Hermalyn's prior role at DraftKings over a year and a half ago, correct?

A.   That is correct.

Q.   Finally, you note that the FS event log for Laptop 2 indicates that only 60 user created files from any source were added to Laptop 2 after January 17th?

A.   Correct.

Q.   You used user created to mean documents like Excel spreadsheets, PowerPoints, PDFs, pictures, and zip files, right?

A.   Yes.

Q.   And January 17th is a date after that transfer?

A.   Yes.

Q.   And from January 17th on, it's possible he only needed 60 user created files to work off of Laptop 2, correct?

A.   I'm not sure I can speak to that.

Q.   The last argument you make regarding the inconsistencies is that the FS events log indicates that he began deleting files from Laptop 2 on January 17th.  And you note that all user created files on Laptop 2, with the exception of two PDFs, were deleted on January 28, 2024?

A.   By January 28th.

A812

246

Q.   And he could still access those files on Slack and Google Workspace, though, right?

A.   Only to the extent that they came from those sources.

Q.   But he didn't cut off his own access to DraftKings' Slack or DraftKings' Google Workspace on that date, did he?

A.   No.

Q.   And he didn't need user files like the Excel and the PDF in order to edit google files and Google Workspace, did he?

A.   No.

Q.   So it's possible he was using a new device for work still?

A.   Yes, it is.

Q.   Okay.

The last topic here just focuses on his access to Dropbox.  You state that his web browsing history indicates he visited Dropbox.com, right?

A.   Yes.

Q.   And you also further state that Dropbox was installed on his 16-inch laptop?

A.   Yes.

Q.   Now, visiting Dropbox.com and Dropbox being installed on a computer are two different things, right?

A.   Yes.

Q.   Now, in your Affidavit you state it's unclear why Mr. Hermalyn visited the Dropbox website rather than accessing Dropbox through the application?

A813

A.   That's correct.

Q.   Your Affidavit states that Dropbox was installed locally on his laptop since at least June of 2022?

A.   Yes.

Q.   And that's about a year and a half before January of 2024?

A.   That's correct.

Q.   You don't know why it was installed?

A.   I do not.

Q.   You don't know when Mr. Hermalyn last intentionally uploaded anything to Dropbox?

A.   I do not.

Q.   And you attached to your Affidavit an appendix that listed 130 files in that particular Dropbox account, right?

A.   In -- specifically, in the MISCDK folder, yes.

Q.   And your Affidavit states that these files were historically saved to a folder in the 16-inch laptop entitled, "MISCDK"?

A.   Yes.

Q.   Now, if you look -- and you looked at the file names on that list?

A.   I have, yes.

Q.   And you notice that many of the file names appear to contain dates like November 25, 2021?

A.   I do recall that.

Q.   And that would indicate the files were in fact from 2021?

A814

A.   It could, yes.

Q.   Okay.

MR. RIDEN:  I have no further questions.

THE COURT:  Okay.

Redirect?

MR. SNYDER:  No redirect, your Honor.

THE COURT:  Okay.  Thank you, Mr. Green, you can step down.

THE WITNESS:  Thank you.

THE COURT:  No further witnesses for DraftKings?

MR. SNYDER:  We have no further witnesses.  I do have, it looks like we have 16 minutes left and I think I have, meaning Plaintiffs have, and I think I have a closing of about 10 to 12 minutes.

THE COURT:  I want to confirm with Mr. Beck or any of the other counsel for Mr. Hermalyn, do you intend to call any witnesses?

MR. BECK:  No, your Honor.

THE COURT:  Okay.

So here's what I'd like to do.  I'd like to take a brief ten-minute recess and then I will hear argument from both sides.  Ten minutes sounds good to me, Mr. Snyder.

MR. SNYDER:  I think I said 10 to 12.

THE COURT:  Twelve is okay.  Just on the testimony that we've heard today.  And we don't need to repeat the

A815

argument that you all made on April 2nd.  So we'll take a brief recess.

MR. SNYDER:  No procedural background of the *Aspect* case, Judge.

THE COURT:  Sounds good to me.

THE CLERK:  All rise.

(The Honorable Court Exited.)

(Court Stood in Recess).

THE CLERK:  All rise.

(The Honorable Court Entered.)

THE CLERK:  Thank you very much.  Court is back in session.  You may be seated.

THE COURT:  Okay, I will hear from both sides briefly, argument, post-testimony argument.

Go ahead, Mr. Snyder.

MR. SNYDER:  Thank you, your Honor.

Your Honor, fact issues that turn on whether Mr. Hermalyn was telling the truth about solicitation and misappropriation of DraftKings' trade secrets and confidential information, and today's hearing answered that question clearly and resoundingly and before lunch.  And I could state is simply, Mr. Larracey and Mr. Metz took the stand.  We all watched them testify.  They told the truth and Mr. Hermalyn did not.  We saw Mr. Larracey and Mr. Metz were detailed.  They were authentic.  They were unrehearsed.  Mr. Hermalyn offered

A816

250

categorical denials, no details, and gave us a 60-second synopsis of the 168-minute conversation with a categorical denial about his conversations.  And what was telling is in that 60 or 45-second summary, and striking, he said, we talked about numbers.  They asked me questions.  And that was it. What questions did they ask you?  What answers did you give? Nothing.  Just, I never would have done that and I didn't do that.

This case has directly conflicting testimony about a material and discrete issue, did Mr. Hermalyn solicit Mr. Larracey and Mr. Metz on February 1, in the afternoon and in the evening hours?  There's no getting around it, your Honor.  Someone took the stand this morning and lied, and it wasn't Mr. Metz and it wasn't Mr. Larracey.  And the whole courtroom watched the testimony, and your Honor of course will form her own judgments about that.

We also, of course, have powerful corroborating evidence of the testimony of these two young men.  The notes tell the truth.  The compensation numbers are right there in plain sight, and Mr. Hermalyn had to acknowledge that, yes, that 28 billion was the value of Fanatics.  Of course that came from him.  And we know that the defendant used confidential trade secret and other information to form those compensation offers because he offered them higher compensation with DraftKings -- with Fanatics, than he knew they were making at

A817

251

DraftKings. And we saw the negotiation in realtime on those notes. And I commend Mr. Larracey for having the presence of mind to understand that this was an important conversation and memorialize it.

And then we have the job application in realtime unfolding as if we could see the image on a screen. He applies for the position at 1:16 a.m. He entered his name and his cellphone. His personal e-mail address, not even Harvard, and what do you know, he's expedited on the fast track for Sunday morning interviews with the senior executives of a $28 billion company. Who applies for an executive job at one in the morning at a multibillion dollar company without even submitting a resume? Somebody who knows that he has the job in the bag because his former boss said so and set it up.

So what happens next? He gets fast tracked for an interview. And how does that happen, without a resume, on a Sunday morning? We know Defendant set it all up in motion that he solicited and facilitated not indirectly, directly, the solicitation of these two employees, because Fanatics executive told Mr. Larracey, Hermalyn told me all about you. I can get -- I don't really need to interview you. I know all that I need to know from him, much more than I can get from a 30-minute interview. We saw the testimony, the truthful testimony of the witness. And then we had the defendant's evasion and cover-up. His phone, his brother's phone, his

A818

brother's work phone.  Mr. Larracey's wife's phone.  Scanning the room with FaceTime.  If you're approached by lawyers, lie.  The nuclear option.  And we saw in the morning this witness, we saw this witness evading, not being truthful, saying one thing and then saying another.  And then he doubled down as I said today, your Honor, he took the witness stand and told this court under oath that he did not hint or suggest that Mr. Larracey or Metz should join him at Fanatics.

There is no way to square that testimony with the testimony of Mr. Larracey and Mr. Metz.  He has zero corroboration for his story, and he didn't even attempt to back it up with his own self-serving testimony.  They asked questions.  Of course we talked about compensation.  I told them about the career site.  Yes, I did.  I knew he was going to interview.  He didn't fill in any of the blanks.  None of them.  He didn't even attempt to explain to, your Honor what he said in response to the purported questions.  It's not credible, it's not believable, and it is dispositive of this motion.  Because when you have a defendant come into court lying under oath on the material -- one of the material issues in the case, that answers the question this hearing was designed to answer, he has no credibility, and that only continued this afternoon when we heard testimony about the forensics, because that testimony, as brief as it was, and I know your Honor has the written testimony firmly in mind,

A819

confirms that defendant accessed DraftKings' confidential information and trade secrets through improper means from January 16 through and including to the morning of February 1. These stories, these stories are half-baked, absurd, and some of them outright lies.

It's only personal files. Not true. Another lie.

Ordinary course migration. Not true. Another lie.

Mr. Hernandez on moving personal files, a cover story. He never responds. Not true. Another lie.

And then I says but I was staying out of harm's way that week. I didn't want to look at any of these documents. And time and again he's accessing the crown jewel of confidential documents. And as to three of them, he doesn't even attempt to explain what he was doing or why from the CEO's home as he's planning to sue my client to get out of his contractual obligations, on the 29th and the 30th and the 1st, he's downloading it. Downloading BD_Gaming101. On the 2nd, VIP bimonthly update. On the 24th, a whole slew of documents, including BD weekly, team tracker. You can search his Affidavit high and low, he has no explanation for what he was doing with these documents, because by that time he wasn't working for us, he was working for the competitor.

Now, what makes this case an outlier, if that's not enough, false testimony under oath in the preliminary injunction hearing itself accessing documents on the way out

A820

254

the door that he had no business to access, much less on the 16th looking at the compensation of every employee in the company, and then lying to this Court about what he was doing. Is he knowingly and intentionally deleted evidence on the way out the door.

Now, if this case goes to trial, we will likely be asking for an adverse inference there. When he was on his deletion spree, he knew by his own admissions, that he was going to be sued, and he knew he was going to sue. He had three law firms working for him. And spoliation is what thieves do to cover up misconduct, period, full stop.

One example, January 28th, three days away from suing us in California, the same day he decides to accept the offer and flies to California, he deleted hundreds of documents in unknown number of iMessages and his web browsing history, web browsing history from his 14-inch DraftKings' issued laptop. If he was innocent and trying to stay out of harm's way, as he falsely testified this morning, he would have wrapped that up in a, in bubble wrap. He would have put it somewhere safe, and he would have made sure that DraftKings got it intact. He didn't. He did what people do to cover their tracks. And then in the end, the lasting memory from this hearing, for everyone who was here, was watching Mr. Hermalyn on the stand. His disassembling, his evasion, and his lies documented by the corroborating evidence, is just categorical denials was only

A821

255

personal, not true.  He couldn't even get his testimony straight.  He did slack himself personal documents.  He didn't.  We know he did.  And then only 18 and that's a migration?  When I migrated to my iPhone today, there were thousands and thousands -- this week, thousands and thousands of files.  It's not the way you migrate files.  He knows it.  The evidence is clear.  And the only -- and if you read his deposition, which I took, that wasn't his first story.  It was only when I showed him the Hernandez Slack that he said, oh, I think I know what I as doing here.  I must have been, dot, dot, dot.  You saw the lie in his deposition at its very inception in that deposition testimony which we cited.  Because at first he says, I don't really know, I don't remember.  I showed him that.  Oh, yeah, I must have been transferring from one to two.  To be clear, there is no record evidence of a migration from Laptop 1 to Laptop 2.  What we have evidence of, the day that he thinks that he's going to possibly get fired and the walls are closing in on him, he spends four hours that night with all of this activity, including doing something he had never done before, taking 18 of our crown jewel documents off his laptop 1, sending them to himself on Slack, and then downloading a number of them on to his personal iPhone.  That was an aberration.  That was not a coincidence.  That was not ordinary course anything.

Now, you know our position in this case, Judge.  That

A822

256

based on Defendant's violation of his non-compete, which is not controverted.  The non-compete is binding and enforceable.  He has breached it.  And based on the violation of his non-solicit, which we have met our burden on this motion, I believe.  We have -- if we had a preponderance burden, which we don't, we would have met it.  I believe if I had a proof beyond a reasonable doubt burden with an empaneled jury, we made it on this record today as to solicitation.  But this is a paradigm case under Massachusetts law for enforcement of the benefit of the bargain.  And a preliminary junction prohibiting Mr. Hermalyn from working for Fanatics for a period of one year is the only remedy, the only remedy, that will protect my client against irreparable harm resulting from him competing unfairly because he has already competed unfairly.  His first day on the job, his first job was to breach his agreement and try to hire away two of the lynchpins of the department that just a day before he had a fiduciary duty to protect.  So where does that leave us in closing?  Your Honor should convert the TRO into a preliminary injunction, and enjoin Mr. Hermalyn from working at Fanatics.

And the why of it is, you saw today, this is not a man who will honor his obligations.  That is clear.  He will not tell the truth even under oath.  I did not solicit.  That was false testimony under oath.  Categorical denial with no support, and only smoke around the edges of the testimony he

A823

did give.  We talked about numbers.  They asked me questions, et cetera, et cetera.  So he'll continue to compete unfairly because he has competed unfairly.  And if he had come to court and admitted it, fallen on the sword, bar me from no more solicitation, it would have been the same result we think.  But when a Defendant comes to this Court, takes an oath and lies, that Defendant is not entitled to any deviation from the benefit of the bargain, and nothing less than our post-preliminary injunction will protect DraftKings from irreparable harm.

So, your Honor, respectfully, you said on the TRO, I need to see some evidence before I decide what to do with a non-compete.  The evidence has now come in.  It's overwhelming and it really, under the *Aspect* case under other cases that we've cited, it is a paradigm case for the enforcement of the full suite of restrictions that this Defendant agreed to 13 different times.

Thank you, your Honor.

THE COURT:  Thank you, Mr. Snyder.

Mr. Beck.

MR. BECK:  Good afternoon, your Honor.

So, Plaintiffs are obviously seeking extreme relief in this case.  They're seeking an extraordinary remedy.  They've got the burden, they acknowledged that.  And we agree that this hearing has resolved factual issues.  Let me start first with

A824

258

the migration.

Despite some of the comments that we've just heard, there is no dispute that Mr. Hermalyn migrated his computer on January 16. No dispute about that. In fact, the only evidence about the -- the only evidence about what happened was he migrated his computer. Now, I understand that the first accusation was that well, he did it that day for nefarious reasons. As Mr. Hermalyn explained, the witness that -- the only witness who wasn't here to address this, to confirm what he said was that he spoke with Mr. Hernandez about moving the files over. And that's consistent with what he put in his Slack messages. The Slack messages says, I migrated my computer, I moved the files in my computer. I slacked to myself and I transferred my personal files to myself. And you heard Mr. Hermalyn explain that. The Slack, all the information, and I'll explain where that went, was for business, AirDrop was for personal. And now the Slack. So, the 18 documents that we've been talking about here on Slack, the whole story those documents never made it on the new computer and then they were deleted from the new computer. But Mr. Green admitted that those documents still live in Slack and were available afterward. So the fact that Mr. Hermalyn -- it fits with what Mr. Hermalyn was saying. I had some documents on my desktop. I put a lot of things on my desktop. I started moving things around. I would delete things. I would add

A825

259

things.  And when I was transferring them, there were a handful of documents that he wanted to make sure that would get moved over, that he still would have access to afterward.  All the other stuff is migrated through Google Drive, Google Workspace.  That's why is was not the kind of process that would require anything other than he's got his new computer, he takes his old stuff off, he grabs the few files that he still wants, makes sure that they're available, work and personal, and then he picks up and moves forward.  And that is exactly what happened.

THE COURT:  So can I clarify?  Your position is all of the DraftKings' files were migrated through Google Workspace except for the 18?  And then understanding that your position is that the personal files kind of fall into a separate bucket.

MR. BECK:  Yes.

THE COURT:  But the majority or many DraftKings' files just migrated the normal course through Google Workspace but there were 18 that went through Slack; is that right?

MR. BECK:  So, yes and no.  Mostly, yes.

So all the documents for DraftKings live in Google Workspace, so yes, all migrate over.  All you have to do -- you heard Mr. Harris, all you have to do is log in with your computer.  We need Duo authentication.  We heard all about that.  But, yes, those were accessible all through Google Workspace on the new computer as soon as he had that set up.  That's those files.

A826

260

The other files, the 18 Slack files, those were from the files that were on his desktop that he said he was not certain whether those were in Google Workspace or not. He wanted to make sure that he had them. They were documents that obviously he had for a reason on his laptop to begin with, and then he moved those documents over by Slack. They were accessible to him at any point. The fact that he looked at them or didn't look at them is irrelevant. They were there. It's just like, your Honor, if you e-mail yourself documents, you don't have to download them from your e-mail, you can get them at any point. And that's what he said.

THE COURT: Just to be clear, I didn't hear evidence that those 18 got uploaded to Google Workspace. I know there is evidence about they were available on Slack.

MR. BECK: Yes.

THE COURT: And that some of them got put on the computer itself. But I didn't hear evidence about those 18, if they were, then transferred to Google Workspace, correct?

MR. BECK: That's correct, your Honor. And I don't know that that ultimately matters anyway, because they've started out as documents that he wasn't sure if they were in Google Workspace or not. They were on his laptop, and then he slacked them to himself so he would have them again. And Mr. Green acknowledged that. That that was, that that is how it's done.

A827

So, all of the -- all of the DraftKings' documents that he would have needed that were in Google Workspace were there.  These documents may have been in Google Workspace.  He wasn't sure.  He moved them over.  But he had them downloaded already on his laptop initially because for whatever reason he had put them on his laptop for work purposes.  And then he slacked them to his -- from his DraftKings' account to his DraftKings' account.  Those are all available still to DraftKings through Slack.  They haven't disappeared.  And I think that's critically important, because the implication is that he deleted them from his computer.  He, he they're available.  They're all there.

When he was cleaning off his computer on the 18th, no dispute about this, he got rid of all of his personal stuff.  Mr. Hernandez had told him, if you don't transition your computer, you're going to get shut out.  You need to transition your computer.  So that's what he did.  That was the reason for the timing.

THE COURT:  And am I correct there's no dispute that he also got rid of all of his DraftKings' documents except for two?

MR. BECK:  Yeah, so -- and on that, your Honor, I think the way that process worked for him was he was putting all of these things into his file, as I think you heard him say, that he moved stuff into a folder called miscellaneous

A828

that he wanted to keep -- you know, that he felt more organized if he took stuff that was on his desktop and he moved them to miscellaneous.  So he goes ahead and deletes all that stuff.  He's giving them back a computer.  Who knows who's going to get it.  Who know who's going to review it.  That was all stuff that was on his computer, both personal and work stuff, that nobody needed.  Everything that they would have needed would have been in Google Workspace.  Period.

So -- and there's no reason to believe that there was any nefarious purpose for that.  When he did his migration, he put iMessage back on -- on to his new computer.  And that is undisputed.  Why would he put iMessage on his computer if he's planning to leave?  Why would he put his personal g-mail account on to his computer if he's planning to leave?  He just finished cleaning off that computer, getting all of his personal stuff off.  Why would he do that?  Because he wasn't -- this was not -- he was not at the point where he was planning to leave.  This was his usual for Mr. Hermalyn at that time.

Neither of the tech people have disputed that Mr. Hermalyn -- that these steps did exactly what Mr. Hermalyn said.  Mr. Harris says, oh, well, he shouldn't have used Slack.  And Mr. Hermalyn says, I only used it for a handful of documents.  Everything else was taken care of through Google Workspace.  Nobody says that he didn't do exactly what he said.

A829

263

They just take issue with the way he did it. Nobody says that he didn't. He migrated and then had he his new computer. And everything confirms that. Even the logs that show the IP address, show that he was using that new computer from January 17 forward. And consistent with his testimony, some things were deleted and some things weren't in the ordinary course as he moved forward.

I want to turn to the documents, because there are, there are four documents that they've identified during that last week after he received an offer while he was still negotiating, and before he received his final offer and then accepted it. So during those -- it's three business days. He was on a flight on the 28th. No documents that day. The 29th and the 30th were the only two days that he said -- they say he looked at anything. And the 31st he didn't look at anything. The documents that the -- the one document that they say was not looked at later on February 1, was the master spreadsheet. And you heard Mr. Hermalyn from the very first time that he submitted an Affidavit, when this issue came up until today, say that he, he looked at that document because Ms. Goodman had reached out to him to ask him questions and he was using that document to answer her questions. Ms. Goodman now concedes the call, concedes the timing, concedes the substance. And that wasn't in her Affidavit. She denied that in her Affidavit. Because he said customers which she later corrected. If he had

A830

264

said partners, then it's consistent, and that's what ultimately Ms. Goodman conceded on the stand.

I want to turn to -- oh, then the other, the other time frames, right? So you have the -- BD_Gaming101. Counsel says that Mr. Hermalyn did not explain that. What Mr. Hermalyn said was I don't recall looking at that. That's perfectly legitimate. I don't recall looking at it, but I don't have it, I didn't use it, didn't disclose it, and don't have possession of it. These are four documents, that's it. In these kinds of cases that's not what you see. What you see is somebody who is trying to avoid looking at documents. So that's two. And then the other two documents they say were downloaded on February 1. So Mr. Hermalyn testified there was no way for him to download it. He had already turned in his iPhone. He had already turned in his computer. He needs Duo authentication to authenticate any documents. And Mr. Harris says he could have gone on with anything. But you need to authenticate it with Duo. Duo was on the cellphone that he had already turned in on January 31st to his counsel. He could not access that. In fact, if he could -- well, he couldn't. And so nobody's contradicted that. Mr. Harris says that, you know, once, once, once you've been authenticated, at some point you're going to need to authenticate yourself. So there has to be a passage of time. There is nothing that they have alleged, that they have put any evidence in front of you, that there was any device

A831

265

that he could have on February 1, without authentication, have accessed those documents.

THE COURT:  So let me ask about that, because I think this is important.

He testified he got a new phone.

MR. BECK:  Yes.

THE COURT:  On the 1st.

MR. BECK:  Yes.

THE COURT:  There was testimony today that you could access DraftKings' Google Workspace through any device, if you had the credentials and the Duo factor authentication.

MR. BECK:  Yes.

THE COURT:  I didn't hear testimony saying that Duo wasn't on the new phone.  So at least under the existing testimony, it's conceivable.  I didn't hear evidence -- I mean, you asked Mr. Hermalyn about it, but I didn't hear evidence about an inability to access those two documents on the new cellphone.

MR. BECK:  I think Mr. Hermalyn said that he would have needed Duo, and Duo was on his cellphone that he had turned in.

THE COURT:  Right, but there wasn't evidence about whether Duo was on his new phone.  Duo is just an app, right?

MR. BECK:  There's no evidence that Duo was on his new phone at all.  And the answer is because he didn't have Duo on

A832

266

his new phone.  You need to get Duo authentication, and it's got to be approved by whoever is, you know, who is requiring the authentication.  So that's going to be DraftKings, right?  In order to authenticate a device and to be able to use Duo to authenticate that device, Duo needs to be authenticated on your device in the first place.  So he couldn't have gotten into it on his computer.  Right.  So he would have needed Duo to install anything onto his new phone, and he didn't have Duo.  And that testimony I think is out there.  I think he's already said that he didn't have Duo.  That was on his cellphone that was turned into counsel.

So absent -- there is zero evidence that there was any way for him to actually access those documents on February 1 without Duo.  And you need DraftKings to approve the installation of Duo on a new device.  So, you know, there are multiple levels where he could not have done it given that he did not have that cellphone or another device with Duo on it, to allow that authentication.  It has to be your phone.  And the only -- he had that new phone, and that new phone didn't have Duo on it.  And there's no evidence that it did.  And he said no, it didn't.  He didn't have access.

So I think that's important, right?  So we don't know why their logs are showing that there were two documents that they say downloaded contrary to what Google and, you know, Google's instructions say.  Mr. Green acknowledged that they

A833

267

may not have been downloaded on that day.  But, you know, we don't know what the problems are with the, the work that they've done to try to find these, but we do know that it would have been impossible for him to access them.  We also know he didn't.  I mean, he testified I did not.  So this is only a question of could he.  And he couldn't.  He didn't and he couldn't.

I think it's important that there is zero evidence whatsoever that he has their information or had their information at any point after January 31.  I get that they claim that he looked at something and we've disputed that, and we've explained why.  Even after that date, there is zero, there is zero evidence that he has it.  There is zero evidence that he used it.  There is zero evidence that he disclosed it.  There is nothing after that day, and that day is disputed, and everything else we acknowledge.  Yes, he had access to it, of course he did.

So in order to find that he misappropriated information and that they would be entitled to an injunction based on that, they have to prove that he intended to take this information on the 16th, which we know was not the case, on the 16th for some ulterior purpose, and that he also intended to walk out the door with it, but he didn't.  Because no matter what happened up until that point, he turned everything over to his counsel on the 31st.  And he doesn't have it and he's

A834

268

testified that he doesn't have anything and there's zero evidence that he does.

I want to turn to the solicitation, because I think that's also an important piece. And I get that there is conflicting -- here there is conflicting evidence. Right? You have Mr. Larracey and Mr. Metz saying one thing and Mr. Harris saying another. I get that. That's conflicting evidence in contrast to information.

THE COURT: Mr. Hermalyn.

MR. BECK: Here's what's not disputed.

Mr. Hermalyn gave them zero indication that he was accepting a job much less that he was even interviewing for a job. They did not know all the way through this interview process, from the date of -- even from the date that he received an offer to the date that he went to California, to the date that he resigned. They had no idea that he was interviewing or had accepted a job or that he'd left. They only found out that he left because they were -- they got a contact about sales force. So Mr. Hermalyn is being so incredibly careful to avoid doing anything to solicit. It's uncontradicted that he did not reach out to them, that they reached out to him, and that -- and that after the disputed conversations, Mr. Hermalyn -- so you've got the disputed conversations that happened the night of the 1st, you have the one on the morning of the 2nd, and you've got the one on the

A835

269

morning -- on the 3rd disputed about what happens.  You know what, it's not undisputed, however, that there was not a single conversation with either of them afterward about any sort of solicitation or about any sort of job.  In fact, the only evidence is exactly to the contrary.  You saw the discussion about the text.  Those were about personal matters having nothing to do with business.  So by that point, no matter what may or may not have happened, we dispute it and they've got the burden.  And no matter what may or may not have happened, it is undisputed that he did not engage in any further conversations with them in any way about work that DraftKings did -- that Fanatics did not hire them.  And that he never solicited -- he had no communications with anybody else, disputed or undisputed, about any sort of solicitation, any sort of movement of any employees.  So there's no evidence of anything with any other employees.  There is no evidence of anything with customers.  There is no evidence of anything with partners.  I think it's also important to remember that the evidence now that Mr. Larracey and Mr. Metz submitted, the -- we keep hearing the contemporaneous notes.  Contemporaneous notes.  Contemporaneous notes.  And what Mr. Larracey said is well, they weren't quite contemporaneous notes.  He put them together after.  At some point after -- we only know the creation date for part of it.  We don't know the edit date.  We don't know what edits he made afterward, but we do know that

A836

weeks after he was still editing it right around the time he was preparing his Affidavit. So they didn't tell us -- they called them contemporaneous notes. These notes are not contemporaneous. Maybe some of them are, but not all of them. And we don't know what was changed. We don't know what was added. We do know that all they had to do when they did the screenshot was to indicate the edit date, but they didn't do that.

THE COURT: Okay. Two more minutes, Mr. Beck.

MR. BECK: Yes, your Honor.

Mr. Metz actually concedes that the screenshot, that so-called screenshot attached to his omits everything else other than one little block there. So we have no idea what exactly came before that, what came after that. We have no idea what date that was. It is uncontradicted that the two of them, Mr. Metz and Mr. Larracey, received promotions that day. They were told they were getting these promotions, and that they got stay bonuses as well.

Mr. Larracey -- I think both of them, Mr. Larracey and Mr. Metz, but certainly one of them --

THE COURT: I think Mr. Metz testified to receiving a promotion that day, but not Mr. Larracey.

MR. BECK: I think he got his a little bit later.

And Mr. Larracey and/or Mr. Metz and Ms. Goodman all confirmed precisely what Mr. Hermalyn has been saying all along

A837

271

just on the cellphone piece. Because I think that's another one that's -- you know, there's so much discussion about the non-DK device. They both, two or three of them confirmed exactly what Mr. Hermalyn's been saying all along, this was an authorized device. It is uncontested that -- just to kind of round out the piece on the solicitation. It is uncontested that for the period before he left, he had no conversations with Mr. Larracey or Metz and they called him. Why? As Mr. Hermalyn said, why would he have been to careful up to that point to only then immediately turn around and do exactly what he's been trying to avoid that whole time? It just doesn't make sense. Because it didn't happen.

And so their view of the evidence requires that you -- that you conclude that Mr. Hermalyn intended to take information, to use information, to disclose information, that he has in some way use or disclose it as an imminent threat. There is zero evidence of any of that. There really isn't. It's been eleven weeks since he went over there. Not a single fact has surfaced since February 3. That's the last communication with Mr. Larracey. Not a single fact about any misconduct at any point from February 4 through the date of your order, your TRO order. From your TRO order all the way today, no use of information, no possession of information, no disclosure of information, no solicitation of anybody at any point after the disputed conversation.

A838

It's their burden.  They're asking for extraordinarily relief.  They're asking you to order Mr. Hermalyn to not work, to not communicate with customers who are joint customers of both parties.  To not communicate -- to not solicit employees, which he's not doing.  And they just haven't met their burden.  This is about irreparable harm.  They have not shown irreparable harm, your Honor.

THE COURT:  Okay, thank you, Mr. Beck.

MR. SNYDER:  Could I have a 60-second rebuttal?

THE COURT:  Yeah, brief rebuttal.

MR. SNYDER:  Thank you.

We have only half the forensics.  Of course, we can't see or hear what Fanatics did with the documents that he viewed, downloaded, screenshot, or however else he secreted them because we haven't done a forensics exam of his personal devices.  So the defense comes down to believe counsel, believe Mr. Hermalyn.  I didn't do or not do anything wrong.  But he's disqualified from being credited.  He can't be believed.  He lied to your Honor under oath.  He is not believable.  So when counsel comes before this Court and says trust me, he has forfeited his right to be trusted.  Everything we know and contest that is material in this case, he has lied about.  And so there's no reason to believe him about what he has done or will do, and that's the benefit of our bargain.  That's why we have a one-year non-compete, because this is a man who ran our

A839

273

biggest business and we can't trust that he is not inevitably going to disclose that. And that comes before he's destroyed documents, exfiltrated documents, downloaded documents. And we need a preliminary injunction to prevent clear irreparable harm and until we uncover the full truth which will ensue when we go to plenary discovery and look at the other side of the house.

Thank you, your Honor.

THE COURT: Okay. Thank you, counsel. I'm going to take the motion under advisement. I've already taken the motion to dismiss under advisement.

The TRO is in place pending a ruling on the motion for a preliminary injunction. And I thank counsel for all of your time today.

MR. SNYDER: Thank you, your Honor, so much.

MR. BECK: Thank you.

THE CLERK: All rise.

(The Honorable Court Exited.)

(Whereupon, at 4:25 the Court Stood in Recess.)

A840

274

**I N D E X**

| **WITNESS** | **Page** |
|---|---|
| **MICHAEL HERMALYN** | |
| Cross-Examination by Mr. Snyder | 12 |
| Direct Examination by Mr. Beck | 74 |
| Recross Examination by Mr. Snyder | 91 |
| Redirect Examination by Mr. Beck | 98 |
| | |
| **ANDREW LARRACEY** | |
| Direct Examination by Mr. Mufson | 100 |
| Cross-Examination by Ms. Sofis | 121 |
| Redirect Examination by Mr. Mufson | 143 |
| | |
| **HAYDEN METZ** | |
| Direct Examination Mr. Mufson | 144 |
| Cross-Examination by Ms. Sofis | 156 |
| Redirect Examination by Mr. Mufson | 176 |
| Recross Examination by Ms. Sofis | 178 |
| | |
| **BRIAN HARRIS** | |
| Direct Examination by Mr. Snyder | 179 |
| Cross-Examination by Mr. Riden | 184 |
| Redirect Examination by Mr. Snyder | 214 |

**(Index Continued on the Following Page)**

A841

275

**I N D E X**

| WITNESS | Page |
|---|---|

**BRITTNEY GOODMAN**

Direct Examination by Ms. Demana          216

Cross-Examination by Ms. Sofis          219


**MITCHELL GREEN**

Direct Examination by Ms. Goeke          229

Cross-Examination by Mr. Riden          235

A842

276

**E X H I B I T S**

**NO.**                                    **ADMIT**

**No Exhibits Admitted**

.........................

.........................

.........................

.........................

.........................

.........................

.........................

.........................

.........................

.........................

.........................

.........................

.........................

.........................

A843

**C E R T I F I C A T E**

**UNITED STATES DISTRICT COURT )**

**DISTRICT OF MASSACHUSETTS      )**

I, Catherine L. Zelinski, certify that the foregoing is a correct transcript from the record of proceedings taken Tuesday, April 16, 2024, in the above-entitled matter to the best of, my skill and ability.

_/s/ Catherine L. Zelinski_            _4/25/2024_

Catherine L. Zelinski, RPR, CRC          Date
Official Court Reporter

A844

A845

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DRAFTKINGS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-10299-JEK |
| | ) | |
| MICHAEL HERMALYN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND DEFENDANT'S MOTION TO DISMISS OR ALTERNATIVELY TO STAY THIS ACTION

**KOBICK, J.**

On February 1, 2024, defendant Michael Hermalyn left his job as a Senior Vice President at plaintiff DraftKings, Inc. to join its digital sports entertainment and gaming competitor, Fanatics, Inc., in a nearly identical role. This lawsuit followed four days later. DraftKings claims that, in connection with his departure, Hermalyn misappropriated its trade secrets and confidential business information in violation of state and federal law, and breached his contractual confidentiality, non-solicitation, and noncompete obligations. After a hearing, the Court granted in part and denied in part DraftKings's motion for a temporary restraining order.

Following a period of limited discovery, DraftKings has moved for a preliminary injunction against Hermalyn. Hermalyn opposes that motion and has moved to dismiss this action on *forum non conveniens* grounds or alternatively to stay this case pursuant to *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), in favor of the first-filed California state court action, which he initiated against DraftKings to, among other things, invalidate his restrictive covenants. For the reasons to be explained, the Court will grant

A845

DraftKings's motion for a preliminary injunction. DraftKings has established a substantial likelihood of success on its claims that Hermalyn breached his contractual commitments and misappropriated its trade secrets, and that the remaining equitable considerations favor injunctive relief. The Court will also deny Hermalyn's motion to dismiss or alternatively to stay this case. This Court is the appropriate forum for the litigation, and the *Colorado River* abstention doctrine does not warrant a stay.

## FACTUAL BACKGROUND

The following facts are drawn from the parties' evidentiary submissions, including their supporting affidavits and exhibits, the witnesses' testimony at the April 16, 2024 evidentiary hearing, and, in a few instances, the verified complaint. Except where otherwise noted, the facts are undisputed.

### I.   Hermalyn's Employment at DraftKings.

#### A.   Hermalyn's Job Responsibilities.

DraftKings is in the competitive digital sports entertainment and gaming industry. ECF 5, ¶ 3. It competes with other online sports platforms, including Fanatics, for valuable individual customers and key partners, such as celebrities and athletes. *Id.* ¶¶ 9, 19, 22; ECF 36, ¶ 19. DraftKings is incorporated in Nevada and has a principal place of business in Boston, Massachusetts. ECF 1, ¶ 12. Its fantasy sports products are available to customers in over 40 states, and its sports betting is offered in 24 states. ECF 5, ¶ 3. DraftKings also has offices and operates in Canada, Israel, and parts of Europe. *Id.*

DraftKings employed Hermalyn from September 14, 2020 until he resigned on February 1, 2024. *Id.* ¶¶ 6-7; ECF 89, ¶ 3. Hermalyn started as DraftKings's Senior Vice President of Business Development before becoming, in May 2022, the "Senior Vice President of Growth,

A846

Customer," primarily responsible for developing and maintaining relationships with high-value individuals or so-called "VIP" customers. ECF 89, ¶¶ 3-5. He was well compensated as a senior executive at DraftKings. ECF 1, ¶¶ 1, 4-5, 51, 97. As part of his duties, Hermalyn oversaw DraftKings's VIP acquisition team, managed the VIP Hosts program, and was responsible for DraftKings's events, as well as its strategy and enablement team. ECF 89, ¶¶ 6-10. Hermalyn was also involved in DraftKings's customer loyalty team. *Id.* ¶ 11.

In those roles, Hermalyn had access to proprietary, confidential, and sensitive business information concerning DraftKings's VIP customers; its strategies for cultivating loyal customers; its plans to develop celebrities and influencers; and its ecommerce, collectibles, and apparel teams. *Id.* ¶¶ 7, 11, 13. According to DraftKings's Chief Customer Officer, Shawn Henley, that information could give DraftKings's competitors an unfair advantage by enabling them to capitalize on its business strategies and developments and, in turn, "to jump in the market at the highest levels" based on DraftKings's work. *Id.* ¶¶ 2, 14. Hermalyn also had access to compensation information regarding employees in the VIP department, which could be used by competitors to solicit those employees. *Id.* ¶ 17.

Hermalyn primarily worked for DraftKings from his house in New Jersey or at its office in New York City. ECF 28, ¶ 9; ECF 74-1, ¶¶ 2, 9. He also traveled to Boston for DraftKings business 25 times between May 2021 and November 2023. ECF 98-1, at 7-9. That amounts to visiting Massachusetts, on average, approximately once every six weeks. ECF 97, at 4.

**B.    Hermalyn's Employment Contracts.**

When Hermalyn joined DraftKings, he signed several employment contracts central to this case. On August 31, 2020, he signed a "Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement." ECF 1-1; ECF 74-1, ¶ 14 & Ex. A. As part of that agreement, Hermalyn

3

A847

agreed, for a period of twelve months after the end of his relationship with DraftKings, not to solicit DraftKings's customers, clients, vendors, employees, or contractors. ECF 1-1, §§ 2-3. Specifically, for that twelve-month period, he agreed that he would not:

> directly or indirectly either for [himself] or for any other person, partnership, legal entity, or enterprise, solicit or transact business, or attempt to solicit or transact business with, any of the Company's customers, clients, vendors or partners, or with any of the Company's prospective customers, clients, vendors or partners about which [Hermalyn] learned Confidential Information . . . . or which [Hermalyn] had some involvement or knowledge related to the Business of the Company.

*Id.* § 2. Likewise, for that twelve-month period, he agreed that he would not:

> directly or indirectly either for [himself] or for any other person, partnership, legal entity, or enterprise: (i) solicit, in person or through supervision or control of others, an employee, advisor, consultant or contractor of the Company for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with the Company or to change an existing business relationship to the detriment of the Company, (ii) hire away an employee, advisor, consultant or contractor of the Company; or (iii) help another person or entity hire away a Company employee, advisor, consultant or contractor.

*Id.* § 3.

In the same contract, Hermalyn agreed that he would "not directly or indirectly either for [himself] or for any other person, partnership, legal entity, or enterprise use or disclose any such customer, partner, or vendor information except as may be necessary in the normal conduct of the Company's business for the specific customer, partner, or vendor," and "that at the end of [his] relationship with the Company, or upon request by the Company, [he would] return to the Company any materials containing such information." *Id.* § 4. Hermalyn further agreed that he would not:

> during or after [his] employment: (i) use any Confidential Information for any purpose that is not authorized by the Company; (ii) disclose any Confidential Information to any person or entity, except as authorized by the Company in connection with [his] job duties; or (iii) remove or transfer Confidential Information from the Company's premises or systems except as authorized by the Company.

A848

*Id.* § 5. The agreement added that upon his termination, Hermalyn would "immediately surrender to the Company all Company property in [his] possession, custody, or control, including any and all documents, electronic information, and materials of any nature containing any Confidential Information, without retaining any copies." *Id.*

That same day, Hermalyn also signed a noncompetition covenant with DraftKings. *Id.* at 10-14. Later, on August 16, 2023, in exchange for a multimillion-dollar equity grant, Hermalyn executed another "Noncompetition Covenant" that prohibited him from competing with DraftKings for twelve months after his employment ended. ECF 1-2, at 1, 11-17; ECF 74-1, ¶ 15 & Ex. B; *see* ECF 1, ¶ 97; ECF 89, ¶ 15. More specifically, Hermalyn:

> agree[d] to not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company): (1) provide services to a Competing Business that relate to any aspect of the Business of the Company . . . for which [he] performed services or received Confidential Information . . . at any time during the six (6) month period prior to such termination; or (2) commit a Threatened Breach of the obligation set forth in the immediately preceding clause.

ECF 1-2, at 11, § (a). Each of those capitalized terms was defined in the agreement. *See id.* at 11-14, § (a). "Restricted Area," for example, meant "any place within the United States or anywhere else in the world." *Id.* at 13, § (a)(vii).

Hermalyn also "agree[d] that the enforcement of this Noncompetition Covenant is necessary, among other things, to ensure the preservation, protection and continuity of the Company's Confidential Information, trade secrets and goodwill," and "that, due to the proprietary nature of the Business of the Company and relationships with others, the restrictions during [his] Relationship with the Company and post-Relationship restrictions set forth herein are reasonable as to duration and scope." *Id.* at 14-15, § (d). He further "acknowledge[d] that this Noncompetition Covenant is necessary because, among other things, the Company's interests

5

A849

A850

cannot be adequately protected through an alternative restrictive covenant." *Id.* at 15, § (d). In addition, Hermalyn "agree[d] that any breach, Threatened Breach or challenge to the enforceability of this Noncompetition Covenant would cause the Company to suffer immediate and irreparable harm for which monetary damages are inadequate." *Id.* at 15, § (e).

## II.    Hermalyn's Departure from DraftKings and Move to Fanatics.

On January 3, 2024, Hermalyn learned that he was under investigation by DraftKings for workplace misconduct. ECF 89, ¶ 20. On January 11, he met with Shawn Henley, his direct supervisor, concerning the investigation. *Id.* ¶¶ 3, 23. That same day, Hermalyn contacted the CEO of Fanatics, Michael Rubin, to ask about applying for a head of VIP position at Fanatics. ECF 36, ¶ 13. Rubin and Hermalyn spoke that night and met in Rubin's New York City apartment on January 23. *Id.*; ECF 130, at 47:18-20. Hermalyn also met with other members of the Fanatics executive team during the week of January 23. ECF 36, ¶ 13; ECF 130, at 47:25-48:2.

Hermalyn learned the results of DraftKings's investigation of his potential workplace misconduct on January 26. ECF 89, ¶ 27. Henley told Hermalyn that he would be put on a performance improvement plan, lose his Senior Vice President title, receive reduced incentive compensation and responsibilities, and no longer have access to his hospitality cards or an executive assistant. *Id.*

On January 27, Hermalyn met Rubin in person in Pennsylvania, and Rubin offered Hermalyn a job at Fanatics. ECF 36, ¶ 14. That same day, Hermalyn's close friend passed away. *Id.* ¶ 30. On January 28, Hermalyn decided that he would accept the position at Fanatics, subject to an agreement on the key terms, and he traveled to Los Angeles that night. *Id.* ¶ 7; ECF 71, ¶ 2.

While he was in Los Angeles, from January 28 to February 1, 2024, Hermalyn stayed in the house of the Fanatics CEO, Michael Rubin. ECF 86-1, at 55:11-14. In his February 7 declaration in opposition to the temporary restraining order ("TRO") motion, Hermalyn represented that he "did not visit Fanatics' Los Angeles office—or any Fanatics office—prior to accepting Fanatics VIP's offer of employment" on February 1. ECF 36, ¶ 17. He failed to disclose, however, that he was staying in Rubin's house while he was in Los Angeles. ECF 130, at 57:7-58:7. Hermalyn also misrepresented his location to DraftKings colleagues in the final days of January. On a January 30 phone call with DraftKings's Senior Director for Events, Brittney Goodman, Hermalyn said that he was with his family in New Jersey grieving the passing of their mutual friend. *Id.* at 216:23-217:5.

Hermalyn made arrangements for his move to California on January 29, including leasing an apartment there, obtaining a California driver's license, purchasing a car, registering to vote in the State, and scheduling appointments with a doctor and a dentist in the area. ECF 36, ¶¶ 9-10. Between January 29 and January 31, 2024, Hermalyn avoided attending DraftKings's meetings and responding to work emails because, in his telling, he did not want to "hea[r] information about DraftKings while [he] had an offer pending from Fanatics." ECF 36, ¶ 34. During that time, he received roughly 365 work emails but only replied to six of them. ECF 90, ¶ 20.

On February 1, 2024, Hermalyn formally accepted the job as President of Fanatics VIP and the Head of Fanatics's Los Angeles office. ECF 74-1, ¶ 3. In his new role, he plans "to further build out [his] Fanatics VIP team" because it "is in a nascent stage." *Id.* ¶¶ 5, 19. This includes developing all three of Fanatics's business verticals: "e-commerce, collectibles, and gaming." ECF 86-1, at 196:9-14. He also "oversee[s] the planned consolidation of the greater

7

A851

Los Angeles-area offices (including Fanatics' Irvine location) into a single location in Los Angeles." ECF 74-1, ¶ 7.

**III.    Hermalyn's Interactions with Confidential DraftKings Documents.**

DraftKings alleges that, between January 12, 2024 and February 1, 2024, in anticipation of joining Fanatics, Hermalyn improperly accessed or downloaded a number of its highly confidential documents. Hermalyn denies any impropriety in his interactions with the documents and contends that he was authorized to access each one of them.

The following facts regarding Hermalyn's interactions with DraftKings's confidential documents are undisputed. As an employee of DraftKings, Hermalyn had access to DraftKings's Google Workspace and, through its document repository, had access to many confidential documents that had been affirmatively shared with him. ECF 90, ¶¶ 15, 17. He did not have a DraftKings-issued cell phone, but he was authorized to use his personal cell phone and Slack, a messaging platform that enables users to share messages, data, and documents, for work, so long as he adhered to DraftKings's information security policies. ECF 90, ¶¶ 29, 42; ECF 130, at 200:14-18, 207:12-15. Hermalyn was not authorized to use Airdrop, a file transfer service for Apple devices, or Dropbox, a cloud-based file storage service, for work. ECF 90, ¶¶ 34-37.

The parties agree that, in mid-December 2023, Hermalyn requested a new work laptop because he wanted something lighter and newer than his 16-inch 2021 MacBook Pro. ECF 90, ¶¶ 25-26. DraftKings gave him a replacement 14-inch 2023 MacBook Pro. *Id.* On December 22, 2023, Hermalyn spoke with George Hernandez, a senior desktop support specialist, about how to transfer files from one work laptop to another. *Id.* ¶ 26; ECF 93, ¶¶ 1-2. Hernandez instructed Hermalyn to use Microsoft OneDrive to transfer files. ECF 93, ¶ 2. It is undisputed that

A852

Hermalyn was not authorized to use AirDrop, Dropbox, Transfernow.net, or Slack to transfer files from his old 16-inch laptop to his new 14-inch laptop. ECF 90, ¶¶ 27, 37.

Aside from these undisputed facts, the parties' factual narratives, and the inferences drawn therefrom, differ in significant respects. The Court thus sets forth each party's view of the relevant facts.

### A.    DraftKings's Account.

DraftKings's allegations concerning Hermalyn's interactions with its confidential documents center on three time periods: (1) January 12, the day after Hermalyn first contacted Rubin; (2) January 16 to 17, when Hermalyn undertook significant file transfers and deletions; and (3) January 23 to February 1, when Hermalyn was meeting with Rubin and staying in his house.

**January 12, 2024:** DraftKings contends that Hermalyn began misappropriating its confidential documents on January 12, one day after he contacted Rubin, the CEO of Fanatics, about applying for a Head of VIP job at Fanatics. That day, Hermalyn accessed two documents from DraftKings's Google Workspace. ECF 89, ¶ 34. The first document, entitled "2024-VIP," is a slide deck that is, according to Henley, "essentially a playbook for DraftKings's VIP business operation and divulges VIP goals and organizational structure," to which only six other individuals had access. *Id.* The second document, named "VIP Org Charts," is another slide deck containing non-public information that, in Henley's view, "a competitor could misappropriate to replicate DraftKings' customer-facing workstreams" and "would be invaluable to a competitor for recruiting purposes." *Id.*

**January 16 and 17, 2024:** On January 16, Hermalyn transferred and deleted a large number of personal documents and DraftKings documents using different devices and programs.

A853

First, on his 16-inch laptop, he visited Dropbox.com, which is not an approved website, for three hours. ECF 90, ¶¶ 34-36; ECF 87, ¶ 14. Without access to Hermalyn's Dropbox account, DraftKings cannot know whether he transferred any files to that account. ECF 87, ¶ 14. Next, Hermalyn attempted to transfer seven files—five successfully—from his 16-inch laptop to an iPhone via Airdrop, which is again not authorized by DraftKings. ECF 90, ¶ 37; ECF 87, ¶ 15.[1] Hermalyn then sent himself eighteen confidential DraftKings files over Slack and accessed seven of those documents on a personal phone. ECF 90, ¶¶ 30-31; ECF 89, ¶ 35. The files included a July 2023 spreadsheet, "(July2023)VitalTalent_CompAdjustments.xlsx," that detailed compensation for thousands of DraftKings employees, and another spreadsheet, "MZH_ExecView.xlsx," that described DraftKings's contracts and identified hundreds of its current and former business partners. ECF 89, ¶ 35; ECF 90, ¶ 31; ECF 114, at 5. At the hearing, DraftKings's Chief Information Security Officer, Brian Harris, testified that Hermalyn could have exfiltrated the data in these files by taking a screenshot or cutting and pasting the material into another document. ECF 130, at 208:11-17.[2]

Later that evening, Hermalyn searched "move big files" on Google and accessed Transfernow.net, which is not a DraftKings-authorized website. ECF 90, ¶ 33; ECF 87, ¶ 18. DraftKings's Information Sensitivity Policy specifically states that its "Confidential Information and Internal Use Information must not be disclosed by any means to non-approved third parties" without Harris's express permission. ECF 90, ¶ 33.

---

[1] DraftKings cannot, at this time, identify what specific files Hermalyn transferred or to which device those files were transferred via AirDrop. ECF 87, ¶ 15.

[2] The declaration of Mitchell Green, Stroz Friedberg's Manager in the Digital Forensics and Incident Response Group, includes, for example, an appendix listing 61 screenshots that he was able to recover from Hermalyn's laptops. *See* ECF 87, ¶¶ 2, 42 n.15; ECF 87-3.

10

A854

DraftKings alleges that over the next two weeks, Hermalyn engaged in a cover-up by deleting hundreds of files from his laptops. For instance, on January 17, Hermalyn removed the Dropbox application from his DraftKings laptop and thereby deleted, based on the file names, numerous sensitive business development and personnel documents. ECF 90, ¶¶ 34 n.3, 36. The presence of that application on his laptop violates DraftKings's Workstation & Mobile Device Policy, which provides that "[o]nly DraftKings approved software may be installed on Workstations and Mobile Devices owned or leased by DraftKings." *Id.* ¶ 35. Around that same time, Hermalyn also deleted or attempted to delete numerous files and data from both his 16-inch and 14-inch laptops. ECF 87, ¶¶ 20, 24. In particular, 237,351 files were permanently deleted from his 16-inch laptop between January 16 and 17, 2024. *Id.* ¶ 25. He also cleared his web browsing history. *Id.* ¶¶ 30-31. Likewise, between January 17 and January 28, 2024, 120 files and at least 115 user-created files were permanently deleted from his 14-inch laptop. *Id.* ¶¶ 35, 37. According to Green's forensic analysis, this "deletion activity . . . is consistent with an intentional effort to manually delete substantially all user-created files from the laptops," rather than a factory reset wipe. *Id.* ¶ 23; *see id.* ¶¶ 24, 38. Green also points out that, according to the user activity report, Hermalyn began using that 14-inch laptop nearly one month earlier, on December 18, by syncing with Google Workspace and using Google Chrome, and that 14 of 18 the files that he allegedly transferred via Slack from his old laptop were never downloaded to his new laptop. *Id.* ¶¶ 52-53.

**January 23 to February 1, 2024:** On January 24, one day after meeting with Rubin at Rubin's New York City apartment, Hermalyn accessed a document entitled "BD Team Tracker – Weekly Report," which was dated November 27, 2023. ECF 90, ¶ 43; ECF 91, ¶ 6. DraftKings's Senior Manager in Business Initiatives, Samuel Russell, who is responsible for managing those

weekly reports, stated in an affidavit that, after November 2023, "[n]o one at DraftKings would have had a legitimate business need to access" that report. ECF 91, ¶¶ 2, 4-7. Accessible to fewer than thirty employees, the report contained "a highly sensitive" 181-page chart detailing DraftKings' "short-term and long-term priority deals and projects," "then-ongoing contracts and their current status," "target markets, media, and platforms," and "internal questions and comments . . . reflecting DraftKings' confidential business strategies." *Id.* ¶¶ 6, 11. According to Russell, Hermalyn did not need to review the report for his weekly team calls after he transitioned from business development to VIP in May 2022. *Id.* ¶¶ 7-8.

Between January 29 and February 1, 2024, after deciding to accept a job with Fanatics and while staying at Rubin's house, Hermalyn downloaded, among other files, three documents from DraftKings's Google Workspace that contained confidential business information. ECF 89, ¶ 38. He did so while connected to a network called "fanatics.ear2.losangeles1.level3.net." ECF 90, ¶ 44. It is possible, according to Harris, that Fanatics "may automatically have access to those files" because the downloads occurred on Rubin's network. ECF 130, at 214:9-14.

The first document, a presentation called "BD_Gaming101," was downloaded by Hermalyn on January 29, January 30, and February 1, the same day that he resigned from DraftKings. ECF 6, ¶ 17; ECF 90, ¶ 43. It "is a pitch deck used to demonstrate DraftKings's value proposition to its prospective business partners" and "contains DraftKings' confidential strategies for building partnerships with potential business partners." ECF 5, ¶ 28. According to Henley, Hermalyn had no "legitimate business reason to access" the document. ECF 89, ¶ 38.

The second document is a PowerPoint presentation entitled "VIP BI-MONTHLY UPDATE." ECF 89, ¶ 38; ECF 90, ¶ 43. Hermalyn downloaded it on February 1. ECF 90, ¶ 43.

12

A856

This document could "allow a competitor to see what's working for DraftKings and what's not" and "assist a competitor in recruiting high-performing talent." ECF 89, ¶ 38.

The third document, which Hermalyn accessed on January 30, is an Excel spreadsheet entitled "(Master) SB 2024" containing DraftKings's plans for entertaining some of its business partners at the 2024 Super Bowl and listing those partners. ECF 89, ¶ 38; ECF 90, ¶ 43; ECF 92, ¶¶ 5-6. The document remains confidential today because those enclosed invitees "are strategic drivers for [DraftKings's] business, throughout the year." ECF 130, at 218:7-12.

According to DraftKings, Hermalyn could have downloaded "BD_Gaming101" and "VIP BI-MONTHLY UPDATE" on February 1 despite having purportedly turned over his phone and two DraftKings laptops to counsel the night before. ECF 130, at 181:6-14. Harris testified that Hermalyn could have accessed those two documents on any device with the Google Workspace application that had previously been authenticated. *Id.* at 181:17-182:15.

**B.   Hermalyn's Account.**

Hermalyn maintains that he did not improperly access any DraftKings document or share any confidential information or trade secrets with Fanatics. In his February 7 declaration, Hermalyn averred that he "did not . . . provide DraftKings' confidential information or any DraftKings documents to Fanatics or any of its affiliates, including Fanatics VIP." ECF 36, ¶ 52. At his March 6 deposition, he similarly testified that he "handed over" "[a]nything that was in [his] possession when [he] worked at DraftKings." ECF 86-1, at 133:23-25. He reiterated in his more recent March 21 declaration that he "did not take any of DraftKings' confidential information in anticipation of leaving; [he] did not use or disclose any DraftKings confidential information other than for DraftKings business; and [he] do[es] not have or have access to any of DraftKings' confidential information." ECF 104, ¶ 9. Hermalyn likewise testified at the hearing

13

A857

that he did not "disclos[e] any DraftKings' confidential information to Fanatics" or "anybody else," and that he does not possess any such information. ECF 130, at 89:3-90:1.

With respect to the January 16 file transfers, Hermalyn testified at his deposition that he did not recall using Dropbox or AirDrop that day. ECF 86-1, at 125:5-11, 127:4-9. He also testified that, at first, he did not recall Slacking himself eighteen confidential DraftKings documents. ECF 130, at 37:1-15; ECF 86-1, at 119:19-121:25. After being shown Slack messages he sent to Hernandez that night, however, Hermalyn stated that he knew "exactly" what he was doing at the time: conducting an "ordinary course migration" in switching from his old 16-inch laptop to his new 14-inch one. ECF 130, at 37:15-25, 36:19-25, 42:18-21; *see* ECF 86-1, at 134:16-135:21, 141:19-142:5, 156:9-20. In those messages, Hermalyn stated that he "either slacked to [himself] or transferred the personal docs [he] had on the drive." ECF 93, ¶ 3. He testified at the hearing that he Slacked himself DraftKings business documents and AirDropped his personal files from the laptop to his iPhone. ECF 130, at 36:11-14, 38:19-25, 39:12-16, 46:15-22. The Slacked business documents could then be available on his new laptop whenever he opened Slack. ECF 130, at 79:7-15. Hermalyn does not refute that he accessed the "(July2023)VitalTalent_CompAdjustments" spreadsheet or that he viewed it on his phone. *Id.* at 39:18-40:22; *see* ECF 90, ¶¶ 31-32. He also does not refute that he deleted files from his old laptop and cleared his browser history. ECF 130, at 41:1-12, 42:11-17, 51:24-52:2.

As to the period after he met with Rubin on January 23, Hermalyn testified that he "operated in extreme caution," and did so "specifically on the 28th." *Id.* at 87:13-14. Accordingly, at the end of January, he deleted only personal files from his laptop, not DraftKings material, because he did not have a separate personal computer. *Id.* at 54:1-18, 77:11-78:7. He added that, in the event that he did delete DraftKings documents, he "would have been positive

14

A858

[they] were somewhere saved on the Cloud" or, in other words, DraftKings's Google Workspace. *Id.* at 52:23-53:8, 78:13-25.

Hermalyn does "not believe" that he accessed or downloaded the "BD Team Tracker – Weekly Report" on January 24, but stated in an affidavit that if he did access or download that document, he did not do so to share its contents with anyone at Fanatics. ECF 36, ¶¶ 58-59. He denies accessing any DraftKings documents from Los Angeles on February 1 because he turned his phone and laptops over to counsel the night before so, in his view, it would have been impossible to do so. ECF 130, at 65:6-66:5, 89:3-17. He thus denies accessing or downloading the confidential "VIP BI-MONTHLY UPDATE" on February 1. With respect to the "BD_Gaming 101" presentation, Hermalyn stated that he did "not believe" that he accessed or downloaded it on January 29 or January 30, and he denied accessing it on February 1. ECF 36, ¶ 61. He also swore that he did not "give it, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else." *Id.* At the hearing, he similarly testified that he "didn't think [he] opened that document." ECF 130, at 60:21-61:23.

Hermalyn admitted to accessing the "(Master) SB 2024" spreadsheet. ECF 36, ¶ 60; ECF 104, ¶ 6. In his February 7 declaration, he stated that he accessed the spreadsheet on January 30 to address Goodman's inquiry about VIP customers who still needed invitations to DraftKings's then-upcoming Super Bowl events. ECF 36, ¶ 60. In his March 21 declaration, Hermalyn corrected his prior declaration, swearing—consistent with Goodman's declaration—that she reached out about DraftKings's business partners, not VIP customers. ECF 104, ¶ 7. He also previously stated that he "did not give the '(Master) SB 2024' spreadsheet, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP," and that he does "not have access to, or any copies of," it. ECF 36, ¶ 60.

15

A859

Hermalyn represented that, on January 31, before resigning from DraftKings on February 1, he turned over his personal phone and his two DraftKings laptops to his counsel. ECF 36, ¶ 45; ECF 86-1, at 189:21-190:7, 191:3-17. He also represented that he later provided his counsel with an older laptop, which he had not used for several months and did not know if it belonged to DraftKings. ECF 36, ¶ 47. Hermalyn further testified to turning his iPad over to counsel roughly one month after February 1, which he similarly did not recall using for DraftKings work. ECF 86-1, at 138:12-20, 191:18-194:6; ECF 114, at 7. He represented that he turned over his Dropbox account to counsel at the same time. ECF 114, at 7.

## IV.   **Hermalyn's Phone Calls with DraftKings Employees.**

DraftKings also alleges that Hermalyn solicited two of its employees—Hayden Metz and Andrew Larracey—after he left DraftKings and began work at Fanatics on February 1. At DraftKings, Metz and Larracey reported to Hermalyn as part of the VIP team and he worked "very close[ly]" with them. ECF 130, at 16:1-3; ECF 89, ¶ 40. The parties present the following contradictory accounts of the interactions among Hermalyn, Metz, and Larracey during a series of phone calls from February 1 through February 3, 2024.

### A.   **DraftKings's Account.**

Larracey and Metz submitted affidavits in support of DraftKings's preliminary injunction motion and testified at the evidentiary hearing. *See* ECF 77; ECF 88; ECF 127. Metz, currently DraftKings's Vice President of VIP Management, and Larracey, currently DraftKings's Director of VIP Operations, worked under Hermalyn at DraftKings. ECF 89, ¶¶ 40-41. Larracey and Metz live and work in Massachusetts. ECF 130, at 108:21-22, 152:5-6.

On the afternoon of February 1, 2024, Metz and Larracey called Hermalyn from a conference room in DraftKings's Boston office after discovering that his Salesforce account had

A860

been shut off. ECF 77, ¶¶ 3-4; ECF 88, ¶¶ 3-4. While Hermalyn did not initially answer, he immediately called them back and asked them to verify that no one else was in the room. ECF 77, ¶ 4; ECF 88, ¶ 4. He then transitioned the call to FaceTime and asked Metz and Larracey to use the phone's video camera to scan the room and confirm that they were indeed alone. ECF 77, ¶ 4; ECF 88, ¶ 4; ECF 130, at 105:15-23, 147:15-148:5. Over a call lasting less than five minutes, Hermalyn said that he had resigned from DraftKings to work for Fanatics, and that Fanatics had two open positions for them in its VIP department: a Vice President role for Metz and a Senior Director role for Larracey. ECF 77, ¶ 4; ECF 88, ¶ 4.

That night, starting at 10:16 p.m. EST, Hermalyn, Metz, and Larracey spoke again for over two hours. ECF 77, ¶ 6; ECF 77-2, at 2; ECF 88, ¶ 6. During that call, Hermalyn described the two available positions at Fanatics and offered both Metz and Larracey specific base salaries, annual and signing bonuses, and initial equity allocations. ECF 77, ¶ 7; ECF 88, ¶ 8. Larracey and Metz both wrote down the numbers contained in Hermalyn's offers,[3] and Larracey took additional notes on the contents of those calls.[4] *See* ECF 77-3; ECF 88-3. One of the numbers Larracey wrote down—"$2.5 @ $28B," ECF 88-3, at 4—referred to the fact that Fanatics was valued at 28 billion dollars at that time. ECF 130, at 109:2-3. Hermalyn stated that he had authority from Fanatics to make those offers and suggested that the CEO of Fanatics, Rubin, could join the call, given that Hermalyn was calling from inside Rubin's house. ECF 77, ¶ 8; ECF 88, ¶ 9.[5] After Metz and Larracey responded that they would not accept those initial offers,

---

[3] It is undisputed that Hermalyn was aware of Metz and Larracey's compensation at DraftKings. ECF 130, at 23:9-22, 110:16-22.

[4] At the hearing, Larracey testified that he started the notes on February 1 and made edits to some of the headings and the title "within a few weeks" of the two calls but before speaking with DraftKings's legal counsel. ECF 130, at 103:4-104:21.

[5] At his deposition, Hermalyn testified that Rubin returned to staying at his house on February 1, 2024. ECF 86-1, at 55:17-18.

17

A861

Hermalyn briefly left the call to speak to someone at Fanatics. ECF 77, ¶ 7; ECF 88, ¶ 8. Ten minutes later, he rejoined and offered to increase the signing bonus and equity allocation for both Metz and Larracey. ECF 130, at 12:9-14; ECF 77, ¶ 7; ECF 88, ¶ 8; *see* ECF 88-3, at 4. Hermalyn told Metz and Larracey that reporting this conversation to DraftKings would be the "nuclear option," which Metz and Larracey understood to mean that the discussion should remain secret. ECF 77, ¶ 9.

Following that call, at 1:16 a.m. EST on February 2, 2024, Larracey applied for the position at Fanatics that Hermalyn had suggested. ECF 88-4; ECF 88, ¶ 14. Larracey did not submit anything substantive with his application, such as a resume or information about his current employer or job title. ECF 130, at 111:25-112:12. Instead, he merely provided Fanatics with his name, email address, and phone number. *Id.* at 111:17-24. Six minutes later, at 1:22 a.m. EST, Larracey, Metz, and Hermalyn talked again. *Id.* at 113:13-24. Larracey told Hermalyn that he had applied for the Fanatics job, and Metz and Hermalyn continued to negotiate Metz's offer at Fanatics. *Id.* at 113:15-114:4. At 1:59 a.m. EST, Larracey and Hermalyn spoke for another nineteen minutes. *Id.* at 114:6-10. During that call, Hermalyn said that he was excited about Larracey's application and indicated that it was the right move. *Id.* at 114:11-20. Hermalyn expressed similar sentiments during a call that began on 9:43 a.m. EST on February 2, 2024. *Id.* at 115:3-6. He also mentioned during that follow-up call that someone from Fanatics's Human Resources team would be reaching out to Larracey about interviews, and that Rubin was excited for Larracey to join Fanatics. *Id.* at 115:8-22.

About an hour later, at 11:04 a.m. EST, Larracey received an email from the Recruiting Manager for the Fanatics's Holding Company about scheduling an interview that day. ECF 88-5, at 7. In contrast, when Larracey applied for a different position at Fanatics in 2022, he did not

A862

receive a response or an interview. ECF 130, at 112:16-113:7. The Recruiting Manager followed up that evening about scheduling interviews with the Vice President of Human Resources and three other Fanatics employees, including Tucker Kain, Fanatics's Chief Strategy & Growth Officer, over the next two days, a Saturday and Sunday. ECF 88-5, at 4-6. Larracey did not respond that day. *Id.* at 4.

The next morning, on Saturday, February 3, 2024, Hermalyn called Larracey to encourage him to meet with those Fanatics employees and to say that "it would reflect poorly on [Hermalyn] if [Larracey] did not." ECF 88, ¶ 16. Hermalyn also mentioned that he had spoken to Kain about Larracey. ECF 130, at 118:15-20. This call between Larracey and Hermalyn lasted thirty minutes. ECF 88, ¶ 16; ECF 88-6. Larracey ultimately had Zoom interviews with four Fanatics employees on the afternoon of Sunday, February 4. ECF 88, ¶ 18; ECF 88-5, at 2-3. During Kain's interview of Larracey, Kain mentioned that he was not worried about Larracey's background or experience because he had already spoken with Hermalyn about Larracey. ECF 130, at 119:12-19.

During one of the calls between February 1 and February 3, 2024, Hermalyn told Larracey that, if approached by DraftKings's lawyers, Larracey should inform them that he did not have any conversations with Hermalyn about any employment offers at Fanatics. ECF 88, ¶ 17. Larracey ultimately told DraftKings about his communications with Hermalyn at the end of February. ECF 130, at 120:12-121:5.

**B.      Hermalyn's Account.**

In his February 7 declaration, Hermalyn averred that he never "encouraged any of [his] DraftKings colleagues" to join Fanatics "or put any of [his] colleagues in touch with Fanatics' CEO or any other Fanatics executives." ECF 36, ¶ 39. He also swore that, "[s]ince [his]

19

A863

resignation from DraftKings, . . . [he has] not solicited any DraftKings employees." *Id.* ¶ 40. Hermalyn similarly averred in a subsequent declaration that he did not "improperly solici[t]" Larracey or Metz. ECF 104, ¶ 3. Likewise, his interrogatory response stated: "At no point during either conversation did Mr. Hermalyn hint or encourage Mr. Larracey or Mr. Metz to leave DraftKings for Fanatics." ECF 86-2, at 16. He testified similarly at the hearing. *See* ECF 130, at 12:24-13:2, 17:1-14.

Hermalyn agreed with Metz and Larracey that they initially called him "on their own volition." ECF 104, ¶ 3. During the call on the afternoon of February 1, Hermalyn was likely in Rubin's house. ECF 130, at 14:16-15:11. He could not recall asking Larracey or Metz to scan the room on FaceTime to confirm that no one else was present. *Id.* at 18:2-25. He testified that he did not tell either of them that there were positions at Fanatics for which they could apply. *Id.* at 19:11-14.

During the series of calls on the evening of February 1, Hermalyn was in Rubin's house. *Id.* at 15:10-11, 24:2-5. Hermalyn testified that his memory was that he had "one call" that evening with Metz and Larracey and that he "thought it was under an hour." *Id.* at 96:16-20. He nevertheless said that he does not deny talking with Larracey and Metz for 168 minutes over the course of multiple phone calls, including about Fanatics's public career site. *Id.* at 23:23-24:1, 24:14-16. Hermalyn testified that he did not make specific compensation offers to them on the phone calls but that "numbers did come up." *Id.* at 21:22-25, 84:3-9. He acknowledged that the "$28B" in Larracey's contemporaneous notes represented the valuation of Fanatics at the time and was relevant to Hermalyn's evaluation of his own compensation offer from Fanatics. *Id.* at 22:24-23:8. Hermalyn testified that he did not suggest that Metz or Larracey should come to Fanatics and did not learn that Larracey had applied to Fanatics until the morning of February 3.

A864

*Id.* at 21:6-9, 31:17-25. Hermalyn also said that he did not encourage Larracey to interview with Fanatics on February 2 or February 3. *Id.* at 27:2-28:2. In addition, he denied discussing Larracey with Kain and using the term "nuclear option." *Id.* at 94:24-95:4.

### V.      Hermalyn's Communications with DraftKings's Customers.

Hermalyn stated in his declaration that he neither solicited DraftKings's customers nor met with any of its partners. ECF 104, ¶ 4. DraftKings nonetheless asserts that, on January 27, 2024, Hermalyn told one of its customers, "I want to take you somewhere." ECF 86-10, at 35. DraftKings's Senior Manager of VIP, Jordan Whall, also averred that Hermalyn approached a DraftKings customer at Fanatics's Super Bowl event and introduced him to a Fanatics employee. ECF 94, ¶¶ 1, 4. This customer has since contacted that employee about partnering with Fanatics. *Id.* ¶ 5. Hermalyn responds that the customer "was well known to the Fanatics VIP team already as he had been a years' long Fanatics customer since 2018." ECF 101, at 22.

### PROCEDURAL BACKGROUND

DraftKings filed its verified complaint and motion for a TRO on February 5, 2024. ECF 1, 3. The complaint asserts eight claims: breach of the non-disclosure agreement (Count 1); breach of the agreement not to solicit DraftKings employees (Count 2); breach of the noncompetition agreement (Count 3); misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 (Count 4); misappropriation of trade secrets in violation of the Massachusetts Uniform Trade Secrets Act, M.G.L. c. 93, §§ 42 to 42G (Count 5); misappropriation of confidential business information (Count 6); breach of the duty of loyalty (Count 7); and conversion (Count 8). ECF 1, ¶¶ 105-173. On February 6, DraftKings moved for expedited discovery and, in light of the February 11 Superbowl, sought a hearing that same day. ECF 7, 9. The Court denied DraftKings's request for a February 6 hearing, ordered Hermalyn to

A865

respond to the TRO motion and the motion for expedited discovery by February 7, and set a hearing on the motions for February 8. ECF 22-24.

In an oral ruling made at the conclusion of the hearing, the Court granted in part and denied in part DraftKings's motion for a TRO. ECF 46. The main purpose of the order was to preserve the status quo pending DraftKings's forthcoming preliminary injunction motion. *Id.* at 51:8-12. The Court determined, at that early stage, that DraftKings had demonstrated a likelihood of success on the merits of its federal and state law claims for misappropriation as well as its claim alleging breach of the non-disclosure agreement. *Id.* at 51-55. The Court also found that DraftKings would suffer irreparable harm if the TRO were not granted because the preliminary evidence revealed that Hermalyn downloaded its confidential documents containing DraftKings's business partner lists, VIP lists, and business plans while in California and after receiving a job offer from Fanatics. *Id.* at 55-56. The Court, in turn, restrained Hermalyn from using DraftKings's confidential information and trade secrets, as well as soliciting its clients and employees, but did not restrain him from working for Fanatics. *Id.* at 56-57.

Also on February 8, the Court granted in and denied in part DraftKings's motion for expedited discovery. ECF 42. The Court permitted both parties to propound up to ten interrogatories, subject to the Court's review, *id.*,[6] and allowed DraftKings to depose Hermalyn and allowed Hermalyn to depose Harris, each for up to four hours. *Id.* In addition, the Court set a briefing schedule for DraftKings's motion for a preliminary injunction and Hermalyn's motion to dismiss, and set a hearing on both motions for April 2, 2024. ECF 41.

After hearing argument on April 2, the Court concluded that it could not make credibility determinations regarding the contradictory facts contained in the parties' evidentiary submissions

---

[6] On February 16, the Court struck one of Hermalyn's proposed interrogatories. ECF 53.

A866

supporting and opposing the preliminary injunction motion without an evidentiary hearing. *See* ECF 115; *Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995) ("[W]hen the parties' competing versions of the pertinent factual events are in sharp dispute, such that the propriety of injunctive relief hinges on determinations of credibility, 'the inappropriateness of proceeding on affidavits [alone] attains its maximum.'" (quoting *SEC v. Frank*, 388 F.2d 486, 491 (2d Cir. 1968))). An evidentiary hearing was held on April 16 to address the disputed material facts. ECF 115-16, 127. Six witnesses testified at the hearing: Michael Hermalyn, Andrew Larracey, Hayden Metz, Brian Harris, Brittney Goodman, and Mitchell Green. ECF 127.

**MOTION FOR A PRELIMINARY INJUNCTION**

## I.      Standard of Review.

"'A preliminary injunction is 'an extraordinary and drastic remedy' . . . [that] is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations omitted). To secure a preliminary injunction, the plaintiff bears the burden to demonstrate: "'(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). The first "factor weighs most heavily in the preliminary injunction analysis," *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020), and is considered "'the main bearing wall of the four-factor framework,'" *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)).

23

A867

II.    **Likelihood of Success on the Merits.**

A.    **Breach of Contract Claims.**

DraftKings contends that Hermalyn breached three contracts signed in the course of his employment with DraftKings: a noncompetition agreement, an agreement not to solicit DraftKings's employees and customers, and a non-disclosure agreement. The contracts contain a Massachusetts choice of law provision and forum selection clause. Applying the Commonwealth's choice of law principles, the Court concludes that DraftKings's breach of contract claims must be analyzed under Massachusetts law, and that DraftKings has established a likelihood of success on the merits on its claims that Hermalyn breached his noncompetition agreement, his agreement not to solicit DraftKings employees, and his non-disclosure agreement.

1.    Choice of Law.

The Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement and the Noncompetition Covenant between Hermalyn and DraftKings specify that the agreements "shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law." ECF 1-1, § 9; ECF 1-2, at 15, § (f). Hermalyn nevertheless maintains that the agreements should be analyzed under California law, rather than under Massachusetts law.

To determine which state's substantive law applies to the breach of contract claims, the Court looks to Massachusetts choice of law principles because the Commonwealth is the forum state for this lawsuit. *See NuVasive*, 954 F.3d at 443 (citing *Klaxon Co v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Massachusetts law, courts will enforce a choice of law provision in a contract unless the provision is contrary to public policy. *Oxford Global Resources, LLC v. Hernandez*, 480 Mass. 462, 468 (2018). A choice of law provision may be contrary to public policy if "'(a) the chosen state has no substantial relationship to the parties or

24

A868

the transaction and there is no other reasonable basis for the parties' choice, or (b) [where] application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state [in the determination of the particular issue]' and is the State whose law would apply . . . 'in the absence of an effective choice of law by the parties.'" *Id.* at 469 (quoting *Hodas v. Morin*, 442 Mass. 544, 550 (2004)) (alterations in original).

The first exception to the enforceability of the parties' choice of law provisions does not apply here. Massachusetts has a "substantial relationship to the parties or the transaction" because DraftKings is headquartered in Massachusetts. *See id.* (because the employer was "headquartered here, Massachusetts ha[d] a 'substantial relationship' to the transaction" (citation omitted)); *Taylor v. Eastern Connection Operating, Inc.*, 465 Mass. 191, 197 (2013) (same).

The second exception to the enforceability of the parties' choice of law provisions does not apply, either, because California does not have "a materially greater interest" than Massachusetts in this litigation and California law would not apply in the absence of the choice of law provisions. Massachusetts courts look to the state with "the most significant relationship to the transaction and the parties" to determine the state law that would apply absent a choice of law provision, paying particular attention to "'(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.'" *Oxford Global Resources*, 480 Mass. at 467 (quoting *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 632 (1985), and Restatement (Second) of Conflict of Laws § 188(2) (1971)).

A869

Applying these factors, California law would not govern in the absence of the choice of law provisions, and California's interest in this lawsuit is not materially greater than Massachusetts's interest. When DraftKings and Hermalyn agreed to contracts with Massachusetts choice of law provisions, Hermalyn was a New Jersey resident and DraftKings was headquartered in Massachusetts. Although Hermalyn primarily worked for DraftKings from New Jersey and New York, he traveled to Massachusetts for work at least 25 times between May 2021 and November 2023, or approximately once every six weeks. Hermalyn does not contend, nor is there evidence, that he performed any of his work responsibilities for DraftKings from California. (Nor, for that matter, does Hermalyn contend that New York or New Jersey law should apply to the breach of contract claims.) Further, as explained below, Hermalyn likely solicited two Massachusetts-based DraftKings employees, Metz and Larracey, on his first days of work at Fanatics. Any harms flowing from Hermalyn's likely violation of his noncompetition, non-solicitation, and non-disclosure agreements will be felt by DraftKings in Massachusetts, not California. *See Nuance Communications, Inc. v. Kovalenko*, No. 22-cv-10656-DJC, 2022 WL 2347112, at *5 & n.1 (D. Mass. June 29, 2022); *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 127 (D. Mass. 2011).

California, in contrast, has only a minimal connection to this lawsuit. Hermalyn established residency there a few days before his resignation from DraftKings and a week before this litigation commenced. He intends to move his family to California and has primarily lived there since February to work at Fanatics. The likely breach of his contracts with DraftKings occurred in part in California and in part in Massachusetts. These facts do not give California a materially greater interest in this case than Massachusetts. Nor, contrary to Hermalyn's argument, is California's public policy against the enforceability of noncompetition agreements

A870

superior to Massachusetts's public policy. California unquestionably has a "'settled legislative policy in favor of open competition and employee mobility,'" embodied in Cal. Bus. & Prof. Code §§ 16600, 16600.1, and 16600.5. *Oxford Global Resources*, 480 Mass. at 469 (quoting *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 (2008)). But, through the Massachusetts Noncompetition Agreement Act, M.G.L. c. 149, § 24L, Massachusetts likewise has adopted a considered legislative policy. Under the Massachusetts statute, noncompetition agreements must meet "minimum requirements" to be "valid and enforceable," and are not enforceable as to certain categories of workers, including many types of vulnerable workers. M.G.L. c. 149, § 24L(b)-(c); *see* J. Cohen, K. Breda, & T. Carey, Jr., *Employee Noncompetition Laws and Practices: A Massachusetts Paradigm Shift Goes National*, 103 MASS. L. REV. 31, 39 (2022) ("The Act dramatically reduces the number of Massachusetts employees who can be subjected to enforceable noncompetition agreements[.]"). Where the legislatures of California and Massachusetts have reached different judgments about whether, and under what circumstances, noncompetition agreements may be enforceable, the Court cannot say that either state's legislative policy is more fundamental or compelling.

The facts of this case are not comparable to the facts in *Oxford Global Resources*, in which the Supreme Judicial Court determined that California had a materially greater interest than Massachusetts in the litigation, and that California law would apply absent the parties' choice of law provision. *See* 480 Mass. at 467-72. Hernandez, the employee in *Oxford Global Resources*, had worked in the California office of his prior Massachusetts-based employer, Oxford, and had never "conducted Oxford-related business in Massachusetts." *Id.* at 468. He had "interviewed for his position [with Oxford] in California, signed the agreement in California, trained in California, and performed all of his job duties in California." *Id.* In addition, the

27

A871

"subject matter of the contract—Hernandez's employment with Oxford—was located exclusively in California," and Hernandez had allegedly solicited clients of Oxford's that were located in California. *Id.* None of these facts are present in this case; to the contrary, during his employment at DraftKings, Hermalyn had regular contact with Massachusetts and no connection to California. *See* ECF 98-1, at 7-9; ECF 74-1, ¶ 2.

Thus, under the Commonwealth's choice of law principles, any disputes arising out of Hermalyn's contracts with DraftKings are governed by Massachusetts substantive law.

    2.    <u>Noncompetition Agreement.</u>

Hermalyn contends that, even if Massachusetts law applies, his noncompetition agreement is unenforceable. The Massachusetts Noncompetition Agreement Act, M.G.L. c. 149, § 24L, governs the enforceability of noncompetition agreements, like Hermalyn's, entered into on or after October 1, 2018. *Automile Holdings, LLC v. McGovern*, 483 Mass. 797, 807 n.15 (2020). To be "valid and enforceable," the agreement: (i) must be in writing, be signed by employer and employee, and state that the employee has the right to consult with counsel before signing; (ii) must "be supported by fair and reasonable consideration independent from the continuation of employment" if signed after commencement of employment, and provide the employee with ten business days' notice before becoming effective; (iii) must "be no broader than necessary to protect" the employer's trade secrets, confidential information, or goodwill, each of which constitute "legitimate business interests"; (iv) may not exceed twelve months from the last day of employment, unless the employee has breached a fiduciary duty or unlawfully taken property belonging to the employer, in which case the agreement may not exceed two years from the last day of employment; (v) must "be reasonable in geographic reach in relation to the interests protected"; (vi) must "be reasonable in the scope of proscribed activities in relation

28

A872

to the interests protected"; (vii) must "be supported by a garden leave clause or other mutually-agreed upon consideration between the employer and the employee"; and (viii) must be "consonant with public policy." M.G.L. c. 149, §§ 24L(b)(i)-(viii).

Hermalyn contends that his noncompetition agreement with DraftKings is not supported by any legitimate business interest and is invalid because DraftKings's interests could have been protected by alternative covenants. But in the contract, Hermalyn agreed that the restriction was "necessary . . . to ensure the preservation, protection and continuity of [DraftKings's] Confidential Information, trade secrets and goodwill," and he likewise agreed that DraftKings's "interests cannot be adequately protected through an alternative restrictive covenant." ECF 1-2, at 14-15, § (d). The facts of this case bear out the nexus between the agreement and DraftKings's legitimate interest in preserving its confidential information and trade secrets. As a Senior Vice President, Hermalyn had access to many DraftKings documents that contained confidential information and trade secrets, including business strategy documents; documents with customer, business partner, and VIP lists; documents portraying DraftKings's strategy for maintaining customer loyalty; and documents containing employee salary information. At the hearing, Hermalyn agreed that these documents are confidential. The disclosure of its trade secrets or confidential information to a competitor would put DraftKings at a competitive disadvantage: the information in the documents could, among other things, allow competitors to profit from DraftKings's work in developing information about customers and VIPs or give competitors information that could facilitate successful recruitment of customers or employees. *See Nuance Communications*, 2022 WL 2347112, at *5 (legitimate business interest when employee was exposed to array of confidential documents concerning business strategy, customer programs, client development, and product development); *Cynosure LLC v. Reveal Lasers LLC*, No. 22-cv-

29

A873

11176-PBS, 2022 WL 18033055, at *11 (D. Mass. Nov. 9, 2022) (legitimate business interest in protecting confidential information where company "introduced evidence demonstrating that [the] senior executives ha[d] detailed knowledge [of its] business strategies and logistics").

The conclusion that Hermalyn's noncompetition agreement was likely no broader than necessary to protect DraftKings's legitimate business interest in its trade secrets and confidential information does not, however, mean that *any* DraftKings employee's noncompetition agreement would be adequately justified by that same interest. As a highly compensated senior executive with access to some of the company's most confidential information, Hermalyn was uniquely positioned, and DraftKings's legitimate interests would not have been protected through alternative restrictive covenants. *See* ECF 89, ¶¶ 13, 17; ECF 1, ¶¶ 1, 4-5, 51, 97. But "the reasonableness of covenants restraining competition" must be assessed "'in light of the facts in each case,'" and this case does not, for example, involve a contract of adhesion or contain evidence of inequitable bargaining power between an employer and an employee. *Automile Holdings*, 483 Mass. at 809 (quoting *Boulanger v. Dunkin' Donuts Inc.*, 442 Mass. 635, 639 (2004)). Quite the contrary: Hermalyn received a multimillion-dollar equity grant in exchange for signing the noncompetition agreement. *See* ECF 1, ¶ 97; ECF 74-1, ¶ 15; ECF 89, ¶ 15.

Hermalyn next challenges the reasonableness of the scope of the noncompetition agreement and its worldwide geographic reach. Under the Massachusetts statute, a noncompetition agreement "must be reasonable in the scope of proscribed activities in relation to the interests protected." M.G.L. c. 149, § 24L(b)(vi). In his contract, Hermalyn agreed not to "provide services to a Competing Business that relate to" aspects of DraftKings for which he "performed services or received Confidential Information" during the six-month period before his termination. ECF 1-2, at 11, § (a). This restriction is reasonably tied to DraftKings's interest

30

A874

in protecting its confidential information and trade secrets: it limits Hermalyn's ability to provide a competitor services relating to the work he did for DraftKings or confidential information he received in connection with that work.

Under the Massachusetts statute, a noncompetition agreement must also "be reasonable in geographic reach in relation to the interests protected." M.G.L. c. 149, § 24L(b)(v). While the Legislature specified that a "geographic reach that is limited to only the geographic areas in which the employee, during any time within the last 2 years of employment, provided services or had a material presence or influence is presumptively reasonable," the statute does not require a noncompetition agreement's scope to be limited to the geographic areas in which the employee worked. *Id.* Rather, the focus of the inquiry is on the interests protected by the covenant.

There is scant evidence that DraftKings must restrict Hermalyn anywhere in the world to protect its confidential information and trade secrets. DraftKings's Chief Revenue Officer avers that DraftKings has offices and operates in Canada, Israel, and parts of Europe, but there is no evidence as to the products or services DraftKings offers in these locations. ECF 5, ¶ 3. On the other hand, there is evidence, at this stage in the proceedings, that a nationwide restriction on Hermalyn would be more appropriately tailored to protect DraftKings's confidential information and trade secrets. DraftKings's daily fantasy sports products are available to customers in over 40 states and its retail sports betting is offered in 24 states. *Id.* Hermalyn's extensive access to confidential documents and information concerning DraftKings business partners, VIPs, customers, and employees could, as described, unfairly benefit a company seeking to compete with DraftKings on these products. Because the Massachusetts Noncompetition Agreement Act gives courts discretion to "reform or otherwise revise a noncompetition agreement so as to render it valid and enforceable to the extent necessary to protect the applicable legitimate business

31

A875

interests," M.G.L. c. 149, § 24L(d), the Court determines that Hermalyn's noncompetition agreement is enforceable only to the extent it has a nationwide, rather than worldwide, geographic scope. *See Nuance Communications*, 2022 WL 2347112, at *6 (nationwide enforcement of noncompetition agreement was reasonable when employer "conduct[ed] business on a wide scale"); *Lombard Med. Techs., Inc. v. Johannessen*, 729 F. Supp. 2d 432, 439-40 (D. Mass. 2010) (noncompetition agreement with nationwide scope was reasonable because the employer sought out clinical sites across the country).

Hermalyn does not dispute that, if his noncompetition agreement is enforceable, he breached it by starting work for Fanatics on the same day that he resigned from DraftKings. Fanatics is a direct competitor of DraftKings, and it hired Hermalyn into a virtually identical role to the position he held at DraftKings. *See Aspect Software*, 787 F. Supp. 2d at 129 (likely breach of noncompetition agreement where the old and new employers were "intense competitors" and the employee was hired by the new employer in "precisely the field in which [he] ha[d] encyclopedic knowledge of [the old employer's] trade secrets"). Because, at this stage in the proceedings, DraftKings has established that the noncompetition agreement is enforceable with a narrower geographic scope, DraftKings has shown a likelihood of success on the merits of its claim that Hermalyn breached his noncompetition agreement.

### 3.   Non-Solicitation Agreement.

Hermalyn similarly contends that, even if Massachusetts law applies, his non-solicitation agreement is unenforceable because it is untethered to any legitimate business interest held by DraftKings. Under Massachusetts common law, non-solicitation agreements are reasonable, and therefore enforceable, if they are "(1) necessary to protect a legitimate business interest, (2) reasonably limited in time and space, and (3) consonant with the public interest." *Automile*

A876

*Holdings*, 483 Mass. at 808. And "[i]n the employer-employee context, the legitimate business interests that may be protected consist of trade secrets, confidential information, and good will." *Id.* at 810.

The non-solicitation agreement, like the noncompetition agreement, is enforceable. When he signed the non-solicitation agreement, Hermalyn agreed that the restriction was "necessary . . . to ensure the preservation, protection and continuity of [DraftKings's] Confidential Information, trade secrets and goodwill." ECF 1-1, at 8, § 14. And the evidence demonstrates that the agreement is necessary to protect DraftKings's same legitimate interests in its confidential information and trade secrets. As described, Hermalyn had access to confidential information concerning employee salary, customer loyalty, and the identities and personal preferences of DraftKings's customers, business partners, and VIPs. This information could facilitate a competitor's efforts to hire DraftKings's employees or solicit DraftKings's customers. *Cf. Automile Holdings*, 483 Mass. at 813 (upholding non-solicitation agreement signed by executive who was "well placed to identify key employees integral to the company's success," and "could use his inside knowledge of the company, including its salary structure and internal management dynamics," to solicit employees).

DraftKings contends that Hermalyn breached his agreement not to directly or indirectly solicit DraftKings employees when he encouraged Metz and Larracey to apply for jobs with Fanatics in the series of phone calls on February 1 through 3, 2024. Because the parties' accounts of those phone calls conflicted, the Court held an evidentiary hearing to assess the credibility of Metz, Larracey, and Hermalyn. *See* ECF 115-16, 127; *Campbell Soup*, 47 F.3d at 470.

Having evaluated the evidentiary submissions and viewed the witnesses' testimony, the Court concludes that Larracey and Metz testified credibly and Hermalyn's account of the phone

33

A877

calls is not credible. Larracey and Metz's accounts of the phone calls were consistent with one another.[7] They recalled with specificity the substance of the discussions and the concrete representations and statements made by each of the parties to the calls. Both of their accounts were supported by contemporaneous notes. Metz's notes listed Hermalyn's initial offer and Metz's counteroffer. ECF 77-3; ECF 130, at 153:4-155:1. Larracey's notes, which show that they were created in the iPhone Notes app on February 1, 2024, detailed the substance of the call on the afternoon of February 1; listed the specific compensation numbers offered to him and Metz by Hermalyn, as well as his counteroffer, during the evening calls; listed the titles of the jobs at Fanatics that Hermalyn suggested for him and Metz; and summarized the reasons why Hermalyn said that he left DraftKings. ECF 88-3. Larracey and Metz's notes on the initial compensation figures offered by Hermalyn to Metz match. One of the numbers in Larracey's notes—the "$28B"—referred to Fanatics's valuation at the time and was relevant to the initial equity allocation offered. ECF 88-3, at 4. Hermalyn acknowledged that "$28B" refers to the "valuation of the company," but did not explain how Larracey could have known the valuation of Fanatics other than through the conversation with him. ECF 130, at 22:24-23:8.

The sequence of the events that occurred during the night of February 1 and 2, 2024 bolsters Larracey and Metz's credibility. The documentary record shows that Larracey applied to the "Director, VIP Customer Development" job at Fanatics that Hermalyn pointed out for him at 1:16 a.m. EST on Friday, February 2. ECF 88-4. Larracey credibly testified that when he applied, he did not submit a resume, identify his current employer or job title, or mention anything about his background, experience, or undergraduate education. ECF 130, at 111:25-

---

[7]   The only difference was that Metz, unlike Larracey, did not recall Hermalyn raising the fact that Metz had not been promoted as a reason for Hermalyn's departure from DraftKings. *Compare* ECF 130, at 168:1-18, *with id.* at 107:12-15, *and* ECF 88-3, at 5 ("Hayden promo" was one "thin[g] that upset [Hermalyn]").

112:12. He nevertheless heard from Fanatics that same day, requesting that he interview with four company executives over the weekend, on Sunday, February 4. ECF 88-5. It is difficult to conceive, given the dearth of information submitted by Larracey in his early morning application, how Larracey could have secured weekend interviews with Fanatics executives without Hermalyn's involvement.

Hermalyn's account of the series of phone calls, in contrast, is not credible. He gave evasive answers to certain questions and could not remember whether key aspects of Larracey and Metz's account occurred, even though the calls occurred one month before his deposition and two and a half months before his hearing testimony. He thought, for example, that he had one call with Metz and Larracey that evening, not a series of calls, though he later said he did not deny that a series of calls occurred over 168 minutes. ECF 86-1, at 31:24-32:13; ECF 130, at 24:14-16. He could not remember whether he asked Metz and Larracey to use Facetime to scan the conference room to ensure that no one else was there during the call on the afternoon of February 1. ECF 86-1, at 28:19-29:12; ECF 130, at 18:2-25. And he could not remember whether he spoke with Rubin about his phone calls with Larracey and Metz, even though he was with Rubin in his house. ECF 86-1, at 46:22-47:6. Hermalyn did, however, deny that he hinted or encouraged Larracey and Metz to join Fanatics, ECF 130, at 17:1-7; deny that he told Metz and Larracey that there were two positions at Fanatics for which they should apply, *id.* at 21:6-9; deny that he made Metz and Larracey specific offers of compensation, *id.* at 21:22-25; ECF 86-1, at 38:19-39:6; and deny that he said he had authority to make specific offers of compensation, ECF 86-1, at 40:17-41:4. In light of the credibility of Metz and Larracey's directly contradictory testimony and the documentary record, the Court does not credit Hermalyn's denials.

A879

Hermalyn's lack of credibility is reinforced by other record evidence. Hermalyn told his colleague, Brittney Goodman, that he was home in New Jersey mourning the death of their mutual friend on January 30, 2024, when in fact he was in California at Rubin's house. ECF 130, at 216:23-217:5. And when, during the TRO proceedings, DraftKings submitted evidence that Hermalyn appeared to be in California using a Fanatics wireless network on January 29 and 30, ECF 6, ¶¶ 19-23, Hermalyn responded by insisting in a sworn affidavit that he "did not visit Fanatics' Los Angeles office—or any Fanatics office—prior to accepting Fanatics VIP's offer of employment" on February 1, ECF 36, ¶ 17. At best, his failure to disclose that he was using a Fanatics wireless network because he was staying at the home of the Fanatics CEO was highly misleading. And taken as a whole, the evidence submitted at this stage in the proceedings suggests that Hermalyn has struggled with candor to the Court.

As recounted by Metz and Larracey's credible testimony, Hermalyn offered Metz and Larracey specific base salaries, annual and signing bonuses, and initial equity allocations for two positions at Fanatics on the evening of February 1. ECF 77, ¶ 7; ECF 88, ¶ 8; *see* ECF 77-3; ECF 88-3. Hermalyn stated that he had authority from Fanatics to make those initial offers and the subsequent counteroffers. ECF 77, ¶ 8; ECF 88, ¶ 9. After applying for one of the positions on morning of Friday, February 2, Larracey received an email from Fanatics about scheduling an interview that day, even though he only submitted his name, email address, and phone number— no resume, cover letter, or any details about his experience. ECF 88-4; ECF 88, ¶ 14; ECF 88-5, at 7; ECF 130, at 111:17-112:12. Larracey and Hermalyn spoke again twice that day and again the following day, and during those calls, Hermalyn encouraged Larracey to move forward with the interviews. ECF 130, at 114:6-115:22; ECF 88, ¶ 16. On Saturday, February 3, Hermalyn also mentioned that he had spoken to a Fanatics employee, Kain, about Larracey, which Kain

36

A880

confirmed during the interview on Sunday, February 4. ECF 130, at 118:15-20. Taken together, these facts establish that Hermalyn likely breached his agreement not to directly or indirectly solicit DraftKings's employees for one year after his termination. *See* ECF 1-1, § 3. DraftKings has, therefore, demonstrated a likelihood of success on merits of this claim.

DraftKings has not, on the other hand, established that it is likely to succeed on a claim that Hermalyn breached his agreement not to solicit DraftKings's customers. As an initial matter, although DraftKings presses this claim in its preliminary injunction motion, it did not assert a breach of contract claim based on the customer non-solicitation agreement in its verified complaint, and "a party cannot amend its Complaint by assertions made in briefs." *Calvary Chapel of Bangor v. Mills*, 542 F. Supp. 3d 24, 37 (D. Me. 2021), *aff'd*, 52 F.4th 40 (1st Cir. 2022). But even if the complaint had asserted such a claim, DraftKings has not submitted sufficient evidence to support it. DraftKings asserts that Hermalyn told one of its customers on January 27, 2024—before he resigned—"I want to take you somewhere." ECF 86-10, at 35. Hermalyn also, according to Whall's affidavit, introduced a DraftKings customer to a Fanatics employee at a Fanatics Super Bowl event, and that customer has since asked the employee about partnering with Fanatics. ECF 94, ¶¶ 1, 4-5. These vague allegations are insufficient to establish that Hermalyn likely solicited—"directly or indirectly"—any DraftKings customers. ECF 1-1, § 2; *see NuVasive, Inc. v. Day*, No. 19-cv-10800, 2019 WL 2287709, at *6 n.3 (D. Mass. May 29, 2019), *aff'd*, 954 F.3d 439 (1st Cir. 2020) (denying preliminary injunction as to the alleged breach of defendant's agreement not to solicit plaintiff's employees because of vague and conclusory allegations). Accordingly, DraftKings has not shown a likelihood of success on its brief's claim that Hermalyn breached his agreement not to solicit its customers.

4.      Non-Disclosure Agreement.

DraftKings also contends that Hermalyn violated his non-disclosure agreement. In that agreement, Hermalyn agreed that he would not:

> during or after [his] employment: (i) use any Confidential Information for any purpose that is not authorized by the Company; (ii) disclose any Confidential Information to any person or entity, except as authorized by the Company in connection with [his] job duties; or (iii) remove or transfer Confidential Information from the Company's premises or systems except as authorized by the Company.

ECF 1-1, § 5. He also agreed to "immediately surrender to the Company," upon his termination, "all Company property in [his] possession, custody, or control, including any and all documents, electronic information, and materials of any nature containing any Confidential Information." *Id.*

DraftKings has established that it is likely to succeed on its claim that Hermalyn breached this non-disclosure agreement. The evidence reveals, at a minimum, that Hermalyn "remove[d] or transfer[red] Confidential Information from the Company's . . . systems" without its authorization, and that he did not "immediately" turn over all of his devices and confidential documents to DraftKings when he resigned. *Id.* In particular, Hermalyn stored and deleted DraftKings's files on Dropbox and used AirDrop to transfer documents, even though neither service is authorized by DraftKings. ECF 90, ¶¶ 33, 36-37; ECF 87, ¶¶ 15, 28, 48. Hermalyn also failed to immediately turn over to DraftKings an older laptop, an iPad, and his Dropbox account when he resigned on February 1, 2024. ECF 36, ¶ 47; ECF 86-1, at 138:12-20, 191:18-194:6; ECF 114, at 7. In addition, as explained, Hermalyn likely used DraftKings's confidential compensation information to solicit Metz and Larracey to join Fanatics, a "purpose that is not authorized by" DraftKings, ECF 1-1, § 5. This evidence is sufficient, at this stage, to establish that DraftKings is likely to succeed on its claim alleging breach of the non-disclosure agreement.

38

A882

### B.    Misappropriation Claims.

DraftKings separately claims that Hermalyn misappropriated its trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the Massachusetts Uniform Trade Secrets Act ("MUTSA"), M.G.L. c. 93, §§ 42-42G.[8] The DTSA provides a private right of action to "[a]n owner of a trade secret that is misappropriated." 18 U.S.C. § 1836(b)(1). The MUTSA similarly authorizes injunctive relief when a plaintiff demonstrates "that information qualifying as a trade secret has been or is threatened to be misappropriated." M.G.L. c. 93, § 42A(a).

The parties agree that the elements of a claim under the DTSA and MUTSA are essentially the same. *See* ECF 73, at 18; ECF 101, at 23; *Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 187 (1st Cir. 2023) (assuming that "'[t]he standard for misappropriation under the DTSA is substantially similar to that under Massachusetts law'" (quoting *Viken Detection Corp. v. Videray Techs. Inc.*, 384 F. Supp. 3d 168, 177 (D. Mass. 2019))).[9] To prevail on its DTSA and MUTSA claims, DraftKings "must establish that 1) the information at issue constitutes a trade secret, 2) the plaintiff took reasonable measures to secure the confidentiality of the information and 3) the defendant obtained the trade secret through improper means." *Viken Detection Corp.*,

---

[8] DraftKings's preliminary injunction motion does not meaningfully press its common law claim for misappropriation of confidential business information or its claims for breach of the duty of loyalty and conversion. *See* ECF 1, ¶¶ 156-73; ECF 73, at 25 n.10.

[9] The key statutory definitions are substantially similar. The DTSA defines "misappropriation" as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5). The MUTSA similarly defines "misappropriation" as "an act of acquisition of a trade secret of another by a person who knows or who has reason to know that the trade secret was acquired by improper means" or "an act of disclosure or of use of a trade secret of another without that person's express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." M.G.L. c. 93, § 42(2).

A883

384 F. Supp. 3d at 177; *see Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 165 (1979) ("The essence of an action for the wrongful use of trade secrets is the breach of the duty not to disclose or to use without permission confidential information acquired from another.").[10] DraftKings has demonstrated a likelihood of success on the merits on each element.

> 1.   The Information at Issue Constitutes a Trade Secret.

DraftKings has established, at this preliminary stage, that Hermalyn likely accessed its trade secrets. The DTSA and MUTSA overlap in their definitions of trade secrets. *Compare* 18 U.S.C. § 1839(3), *with* M.G.L. c. 93, § 42(4). In essence, a "trade secret" consists of any confidential information used in a business that provides the owner "'an opportunity to obtain an advantage over competitors who do not know or use it.'" *Burten v. Milton Bradley Co.*, 763 F.2d 461, 463 n.2 (1st Cir. 1985) (quoting *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736 (1970)).

The evidence shows with sufficient specificity that, from mid- to late-January 2024, Hermalyn accessed DraftKings documents that contained trade secrets. On January 16, he transferred 18 confidential DraftKings documents to his Slack account and then accessed or downloaded at least seven of the documents on a personal phone. ECF 90, ¶¶ 30-31; ECF 89, ¶ 35.[11] The files included a spreadsheet that detailed compensation for thousands of DraftKings employees, a slide deck that described VIP financials and strategy, and a spreadsheet that described DraftKings's contracts and identified hundreds of its current and former business partners. ECF 89, ¶ 35; ECF 90, ¶ 31; ECF 114, at 5. On January 24, Hermalyn accessed a 181-

---

[10] To succeed on the DTSA claim, DraftKings must also show that "the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). DraftKings has done so here. *See* ECF 5, ¶ 3; ECF 1, ¶¶ 18-19.

[11] Harris testified at the hearing that subsequent analysis showed that ten of these documents were downloaded to Hermalyn's phone. ECF 130, at 207:16-21.

A884

page chart, entitled "BD Team Tracker – Weekly Report," that detailed DraftKings's current contracts, target markets, and short- and long-term projects. ECF 90, ¶ 43; ECF 91, ¶¶ 6, 11. On January 29 and 30, at a minimum, Hermalyn accessed a pitch deck presentation called "BD_Gaming101" that "contains DraftKings' confidential strategies for building partnerships with potential business partners." ECF 5, ¶ 28. On January 30, he also accessed a spreadsheet entitled "(Master) SB 2024," which contained DraftKings's plans for entertaining some of its partners at the 2024 Super Bowl and listing those partners. ECF 89, ¶ 38; *see* ECF 90, ¶ 43; ECF 104, ¶¶ 6-8.

DraftKings derives economic value from keeping the information in these documents—information about its business strategies and compilations of its business partners and VIP relationships—secret from its competitors. *See Allstate Ins.*, 79 F.4th at 190-91, 198 (describing economic value as "a key factor" in determining whether information constitutes a trade secret and treating customer lists as a trade secret); *Diomed, Inc. v. Vascular Sols., Inc.*, 417 F. Supp. 2d 137, 144-45 (D. Mass. 2006) ("marketing strategy information" constitutes a trade secret (citing *Campbell Soup*, 47 F.3d at 469 n.4)). There is no suggestion that the information contained in the documents was a matter of public knowledge or ascertainable by competitors at the time Hermalyn accessed the documents. *See Allstate Ins.*, 79 F.4th at 189 ("'[M]atters of public knowledge or of general knowledge in an industry cannot be appropriated' by an entity as a trade secret." (quoting *Burten*, 763 F.2d at 463 n.2)). Hermalyn contends that the information in the "(Master) SB 2024" spreadsheet is no longer a trade secret because "the information is now public as the Super Bowl has happened [and] the attendees were at public events." ECF 101, at 26-27 (emphases omitted). But the information about the Super Bowl became public "*after* the alleged misappropriation began," and thus does not lose its protection following the Super Bowl.

A885

*Diomed*, 417 F. Supp. 2d at 144 (emphasis in original). In any event, the spreadsheet's "compilations would not have been known outside of [DraftKings], and, to the extent they were duplicable, could only be recreated at immense difficulty." *Allstate Ins.*, 79 F.4th at 190. DraftKings has therefore shown a likelihood that the files at issue contained trade secrets.

        2.      <u>DraftKings Took Reasonable Steps to Protect Its Trade Secrets.</u>

Hermalyn does not dispute that DraftKings took reasonable steps to preserve the secrecy of those trade secrets. "To determine whether a company took reasonable steps to protect its trade secrets, courts have considered '1) the existence or absence of a [confidentiality agreement], 2) the nature and extent of precautions taken, 3) the circumstances under which the information was disclosed and 4) the degree to which the information has been placed in the public domain or rendered readily ascertainable.'" *Id.* at 192 (quoting *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 29 (D. Mass. 2004)). Weighing these four factors, DraftKings easily satisfies this secrecy element. DraftKings's employees like Hermalyn must, for example, sign confidentiality agreements when they begin their employment and annually acknowledge that they have received the security and data privacy policy trainings. ECF 90, ¶¶ 8, 12. DraftKings also requires employees to use laptops that are encrypted and protected by firewalls, to change their computer passwords every ninety days, and to use multi-factor identification when reviewing files on its secure document managing system, Google Workspace. *Id.* ¶¶ 13-16. Accordingly, at this preliminary stage of the litigation, DraftKings has established that it likely adopted reasonable measures to protect the secrecy of its confidential information. *See, e.g.*, *Builder Servs. Grp., Inc. v. Harkins*, No. 23-cv-11375-DJC, 2023 WL 4685943, at *6 (D. Mass. July 21, 2023); *G&L Plumbing, Inc. v. Kibbe*, No. 23-cv-40056-MRG, 2023 WL 6881597, at *5 (D. Mass. Oct. 18, 2023).

A886

3.      Hermalyn Likely Obtained Trade Secrets Through Improper Means.

DraftKings is likely to demonstrate that Hermalyn employed improper means to obtain and disclose its trade secrets.[12] First, the evidence at this stage of the proceedings shows that, on January 16, 2024, Hermalyn used an unauthorized method—that is, Slack—to transfer to himself documents containing DraftKings's trade secrets. While Hermalyn was generally authorized to use Slack for work purposes, he was not authorized to use Slack to transfer files from one work computer to another. ECF 90, ¶¶ 27, 37. In the nine months before his resignation, Hermalyn had not used Slack to transfer confidential documents, *id.* ¶ 30; ECF 130, at 214:23-215:14, and he had been instructed by an IT specialist in late December 2023 to use Microsoft OneDrive to transfer files from his 16-inch laptop to his new 14-inch laptop, ECF 93, ¶ 2. Although Hermalyn claimed he was merely transferring the files from one laptop to another, 14 of the 18 documents were not downloaded to his new laptop. ECF 130, at 242:17-22; ECF 87, ¶ 53. Further, Hermalyn later viewed or downloaded at least seven of those documents on his personal phone. ECF 87, ¶ 19. Harris testified regarding the ways the trade secrets in those documents could have been exfiltrated from Hermalyn's phone to another device—for example, by screenshotting or copying and pasting. ECF 130, at 208:7-17. Comparable conduct has been deemed sufficient to establish a likelihood of use of improper means under the DTSA or MUTSA. *See, e.g., Bos. Centerless, Inc. v. DeSantis*, No. 1:22-cv-11729-RGS, 2022 WL 16639138, at *1 (D. Mass. Nov. 2, 2022) (finding likely misappropriation where "Defendant, on his last day of employment with

---

[12] The DTSA defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A). The MUTSA similarly defines "improper means" to include "theft, bribery, misrepresentation, unreasonable intrusion into private physical or electronic space, or breach or inducement of a breach of a confidential relationship or other duty to limit acquisition, disclosure or use of information." M.G.L. c. 93, § 42(1); *see G&L Plumbing*, 2023 WL 6881597, at *5 (the MUTSA and DTSA "'contai[n] very similar language'").

A887

the Company and without the Company's permission, emailed to his personal email accounts multiple spreadsheets containing Plaintiff's trade secrets and confidential information, including Plaintiff's proprietary and competitively sensitive customer information"); *FrontRunner HC, Inc. v. Waveland RCM, LLC*, No. 20-cv-10230-DJC, 2020 WL 7321161, at *11 (D. Mass. Dec. 11, 2020) (similar); *Builder Servs.*, 2023 WL 4685943, at *3-4, 6 (similar).

Second, the evidence shows that on January 29 and 30, 2024, Hermalyn downloaded two documents—"BD_Gaming101" and "(Master) SB 2024"—with DraftKings's trade secrets while he was staying in the home of the Fanatics CEO and connected to a network named "fanatics.ear2.losangeles1.level3.net." ECF 90, ¶¶ 43-44; ECF 6, ¶ 17; ECF 130, at 196:15-18.[13] Hermalyn admits accessing the latter document and does not believe he accessed the former, but he does not specifically deny it. ECF 36, ¶¶ 60-61.[14] He downloaded these documents after he had decided to accept the new job at Fanatics and while he was, as he admits, avoiding DraftKings's meetings and disengaging from DraftKings's emails. *Id.* ¶ 34; ECF 90, ¶ 20. Harris testified that because these downloads occurred over a Fanatics network in Rubin's house, Fanatics "may automatically have access to those files" by virtue of "their own electronic systems." ECF 130, at 214:5-14. Together, these episodes amount to a likelihood that Hermalyn misappropriated DraftKings's trade secrets through improper means.

Hermalyn responds, and has repeatedly testified, that he "did not take any of DraftKings' confidential information in anticipation of leaving; [he] did not use or disclose any DraftKings confidential information other than for DraftKings business; and [he] do[es] not have or have

---

[13] Harris credibly testified that he and his team ran multiple tests to determine that these documents were downloaded rather than merely viewed, ECF 130, at 183:3-184:13, 194:7-12, 195:18-25, 196:15-197:7, but the Court's analysis here does not depend on the distinction.

[14] The parties also dispute whether Hermalyn accessed confidential documents on February 1. The Court does not rest its determination that Hermalyn used improper means on those February 1 documents.

A888

access to any of DraftKings' confidential information." ECF 104, ¶ 9; *see also* ECF 36, ¶ 52; ECF 130, at 89:3-90:1. At this stage in the proceedings, the Court does not credit these denials. The Court's view of Hermalyn's credibility here is colored by its determination, discussed previously, that Hermalyn did not credibly testify about whether he solicited Metz and Larracey. And it is further reinforced by the memory lapses, evidentiary gaps, and inconsistencies in Hermalyn's account of his interactions with DraftKings's confidential documents. For example, on January 16 and January 24, Hermalyn accessed two highly confidential DraftKings documents that, according to the evidence, were far afield from his job responsibilities. The spreadsheet entitled "(July2023)VitalTalent_CompAdjustments.xlsx," which Hermalyn Slacked himself on January 16 and then viewed or downloaded on his personal phone, detailed compensation for thousands of DraftKings employees. ECF 89, ¶ 35; ECF 90, ¶ 31; ECF 114, at 5. Harris testified that Hermalyn "should not have been accessing" that spreadsheet because it was not "material to his role." ECF 130, at 191:5-11. Henley similarly stated in his affidavit that "Hermalyn should not have received this document, and he had no legitimate business reason to be looking at it." ECF 89, ¶ 35. On January 24, the day after meeting with Fanatics CEO Rubin in his apartment, Hermalyn accessed the "BD Team Tracker – Weekly Report" document, dated November 27, 2023, that detailed DraftKings's short-term and long-term priority deals and projects over its 181 pages. ECF 90, ¶ 43; ECF 91, ¶¶ 6, 11. According to Russell's affidavit, "[n]o one at DraftKings would have had a legitimate business need to access" that report after November 2023. ECF 91, ¶¶ 5-7. Hermalyn, for his part, has offered no explanation for why he was interacting with these documents at the same time as he was engaging with Rubin about a potential move to Fanatics.

A889

Hermalyn's account of his January 16 file transfers was marked by memory gaps and inconsistencies. Hermalyn does not recall using Dropbox.com that day, despite the forensic evidence that he spent more than three hours on the website. ECF 86-1, at 125:5-11; ECF 87, ¶ 14; ECF 130, at 35:14-23. When initially asked in his deposition about his Slack activity that day, Hermalyn testified that he had no memory of using Slack or later viewing or downloading certain confidential Slacked documents on his phone. ECF 86-1, at 119:7-121:5, 122:25-123:10. He subsequently testified that he remembered using Slack that day to transfer files upon seeing his Slack messages to Hernandez. ECF 86-1, at 145:24-146:11. Hermalyn has not explained why he used Slack rather than Microsoft OneDrive to migrate to a new computer or why he started Slacking himself confidential DraftKings documents in mid-January, despite no track record of similar file transfers. Nor has he explained why he later viewed or downloaded some of the Slacked documents on his phone, if he was, as he asserts, undertaking a computer-to-computer transfer. *See* ECF 130, at 210:2-10. Assessed as a whole, Hermalyn's testimony about his interactions with DraftKings's confidential documents and trade secrets in January 2024 does not bear sufficient hallmarks of credibility to overcome DraftKings's conflicting evidence. *See Advanced Micro Devices, Inc. v. Feldstein*, No. 13-cv-40007-TSH, 2013 WL 10944934, at *9-10 (D. Mass. May 15, 2013) (finding likelihood of success on the merits of misappropriation claim after refusing to credit denials and alternative explanations provided by employees).

Finally, this Court has repeatedly held that a former employee who breaches his contractual obligations to obtain trade secrets has, as a matter of law, used improper means. *See, e.g.*, *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 240 (D. Mass. 2011) (citing *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1165 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010)); *SpeeDee Worldwide,*

46

A890

*LLC v. Toppa*, No. 24-cv-10274, 2024 WL 1558386, at *4 (D. Mass. Apr. 10, 2024); *Builder Servs.*, 2023 WL 4685943, at *6; *FrontRunner HC*, 2020 WL 7321161, at *11. As discussed, Hermalyn's non-disclosure agreement prohibited him from "remov[ing] or transfer[ring] Confidential Information from the Company's . . . systems" without its authorization and required him, upon termination, to "immediately" turn over his devices and confidential documents to DraftKings. ECF 1-1, § 5. His likely breach of that agreement constitutes evidence of improper means as well. *See Bos. Sci. Corp. v. Lee*, No. 13-cv-13156-DJC, 2014 WL 1946687, at *5 (D. Mass. May 14, 2014); *Advanced Micro Devices*, 2013 WL 10944934, at *9.

DraftKings has, accordingly, demonstrated a likelihood that it will prevail on the merits of its misappropriation claims under the DTSA and MUTSA.

## II.  **Irreparable Harm.**

To establish irreparable harm, a plaintiff must demonstrate that "its legal remedies are inadequate," not "that the denial of injunctive relief will be fatal to its business." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996). This Court has routinely held that irreparable harm is presumed at the preliminary injunction stage when the plaintiff shows a likelihood of success on its claims for misappropriation of trade secrets. *See, e.g.*, *SpeeDee Worldwide*, 2024 WL 1558386, at *4; *Builder Servs.*, 2023 WL 4685943, at *6; *G&L Plumbing*, 2023 WL 6881597, at *7; *Bos. Centerless*, 2022 WL 16639138, at *1; *Bos. Sci. Corp.*, 2014 WL 1946687, at *6; *EchoMail, Inc. v. Am. Exp. Co.*, 378 F. Supp. 2d 1, 4 (D. Mass. 2005). The presumption of irreparable harm recognizes that a "trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir. 1984); *see TouchPoint Sols.*, 345 F. Supp. 2d at 32 ("once the trade secret is lost, it is gone forever"). It "is particularly applicable where . . . the trade secrets are misappropriated by a direct competitor."

A891

*Ooyala, Inc. v. Dominguez*, No. 17-cv-10943-GAO, 2018 WL 3360759, at *7 (D. Mass. July 10, 2018).

A finding of irreparable harm is also triggered where the defendant has likely violated his noncompetition agreement. *Aspect Software*, 787 F. Supp. 2d at 130; *see Oxford Glob. Res., Inc. v. Guerriero*, No. 03-cv-12078-DPW, 2003 WL 23112398, at *11 (D. Mass. Dec. 30, 2003) ("[T]he 'task of quantifying the consequences of violating a noncompetition clause is a particularly difficult and elusive one.'" (quoting *Kroeger v. Stop & Shop Companies, Inc.*, 13 Mass. App. Ct. 310, 322 (1982)); *Boulanger v. Dunkin' Donuts Inc.*, 442 Mass. 635, 643 n.12 (2004) ("[W]orking for a competitor of the defendant makes it likely that the information the plaintiff possesses will be used, yet it might be impossible to detect or prove."). And Hermalyn agreed, in his noncompetition agreement, that "any breach, Threatened Breach or challenge to the enforceability of this Noncompetition Covenant would cause [DraftKings] to suffer immediate and irreparable harm for which monetary damages are inadequate." ECF 1-2, at 15, § (e); *cf. Allstate Ins. Co.*, 79 F.4th at 191 (relying on clause in employment agreement stating that "misuse of the company's confidential information would case 'irreparable damage' which, by definition, cannot be adequately compensated or remedied by any monetary award or damages"). The risk of irreparable harm is compounded by Hermalyn's likely solicitation of DraftKings employees.

Since, as explained, Hermalyn likely misappropriated DraftKings's confidential information and breached his noncompetition agreement through his employment at Fanatics, DraftKings has established that it would suffer irreparable harm absent injunctive relief.

A892

### III.    Balance of the Equities and Public Interest.

The balance of equities considers "the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues." *Ross-Simons*, 102 F.3d at 15. Hermalyn claims that he would suffer irreparable harm if enjoined because he would be prohibited from working in his practice area for an entire year. But, as DraftKings points out, he signed a noncompetition agreement in August 2023, "agree[ing] that any breach . . . would cause the Company to suffer immediate and irreparable harm for which monetary damages are inadequate." ECF 1-2, at 15, § (e). Thus, "to the extent that [Hermalyn] suffers from injunctive relief, 'this harm is a predictable consequence' of [his likely] breach." *Nuance Communications*, 2022 WL 2347112, at *10 (quoting *Get In Shape Franchise, Inc. v. TFL Fishers, LLC*, 167 F. Supp. 3d 173, 203 (D. Mass. 2016)). The "harm is . . . the consequence of enforcing any covenant not to compete and that 'fact alone does not make such covenants unenforceable.'" *Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322, 330 (D. Mass. 2008) (quoting *Marine Contractors, Co., Inc. v. Hurley,* 365 Mass. 280, 289 (1974)). Accordingly, any hardship felt by Hermalyn is outweighed by the potential harm—including possible disclosure of its confidential information and trade secrets—that DraftKings would suffer absent a preliminary injunction.

In addition to the balance of equities, the public interest also supports issuing a preliminary injunction. Both the federal government and Massachusetts have a public policy favoring the protection of trade secrets. *See Bos. Centerless*, 2022 WL 16639138, at *2 (citing 18 U.S.C. § 1836 *et seq.*; M.G.L. c. 93, § 42 *et seq.*); *Jet Spray Cooler*, 377 Mass. at 166 n.8. It also "is 'beneficial to the public that contracts for the partial restraint of trade should be upheld to a reasonable extent.'" *Corp. Techs., Inc. v. Harnett*, 943 F. Supp. 2d 233, 245 (D. Mass.), *aff'd*,

49

A893

731 F.3d 6 (1st Cir. 2013) (quoting *New England Tree Expert Co. v. Russell,* 306 Mass. 504, 508-09 (1940)). Given the public interest in enforcing valid contracts and protecting trade secrets, this factor weighs in favor of a preliminary injunction.

## IV.    Scope of Relief.

Hermalyn contends that even if the Court were to grant preliminary injunctive relief, it should narrow DraftKings's proposed order. *See* ECF 72-1. Hermalyn generally argues that he "should only be restricted from competing with [DraftKings] by using or disclosing [its] confidential information." ECF 101, at 30. He also requests specific revisions to the proposed order, including, for example, limiting the aspects of DraftKings's business that are covered by the noncompete, permitting him to respond to unsolicited outreach from DraftKings's employees, and starting the twelve-month clock for the noncompete and non-solicitation provisions on February 1 (when he resigned) rather than the date of this Order. *See* ECF 102.

To the extent DraftKings's proposed preliminary injunction order goes beyond the parties' agreements, it will not be entered. Nor will the Court accept Hermalyn's invitation to revise the parties' agreements. Rather, the scope of the preliminary injunction will reflect the text of the contracts signed by the parties, to the extent DraftKings has established a likelihood of success on the merits of its breach of contract claims. The scope of relief will thus track the language of the non-disclosure agreement, the agreement not to solicit DraftKings's employees, and the noncompetition agreement, save for the narrowing of the geographic scope of the latter agreement. The noncompetition agreement is qualified: it prevents Hermalyn from "provid[ing] services to a Competing Business that relate to any aspect" of DraftKings's business "*for which [he] performed services or received Confidential Information* . . . at any time during the six (6) month period prior to such termination.*" ECF 1-2, at 11, § (a) (emphasis added). Thus, Hermalyn

50

A894

will not be enjoined from working for Fanatics; rather, he will be enjoined from providing services to Fanatics that relate to any aspect of DraftKings's business for which he performed services or received confidential information, as defined in the agreement, during the six months before February 1, 2024.

The Court agrees with Hermalyn, however, that the period of restriction is twelve months from the date of his February 1 resignation from DraftKings, not from the date of this Order. Both Hermalyn's noncompetition and non-solicitation agreements provide "for a [restriction] period of twelve (12) months" after the end of his relationship with DraftKings. ECF 1-1, § 3; ECF 1-2, at 11, § (a). There is no basis for extending the non-solicitation provision to one year from the date of this Order. In support of extending the noncompete, DraftKings cites section (g) of the noncompetition agreement, which states that Hermalyn "agree[d] to an extension of the [12-month] duration . . . for an additional period of time equal to the time that elapses from the commencement of [any] breach, Threatened Breach or challenge to the later of: (i) the termination of such breach, Threatened Breach or challenge; or (ii) the final non-appealable resolution of any litigation or other legal proceeding stemming from such breach, Threatened Breach or challenge." ECF 1-2, at 16, § (g). It is unclear whether this clause is enforceable under Massachusetts Noncompetition Agreement Act, which provides that "[i]n no event may the stated restricted period exceed 12 months from the date of cessation of employment, unless the employee has breached his or her fiduciary duty to the employer or the employee has unlawfully taken, physically or electronically, property belonging to the employer, in which case the duration may not exceed 2 years from the date of cessation of employment." M.G.L. c. 149, § 24L(b)(iv). The Court has not made a final determination on the merits whether DraftKings will prevail on any of its claims; rather, this opinion, rendered at a preliminary stage in the

51

A895

proceedings without a complete record, addresses only whether DraftKings has established a likelihood of success on the merits of its breach of contract and misappropriation claims. Accordingly, the preliminary injunction order will run for twelve months only, starting on February 1, 2024.

**MOTION TO DISMISS OR STAY**

Hermalyn moves to dismiss this action on *forum non conveniens* grounds or, in the alternative, to stay the case pursuant to the *Colorado River* abstention doctrine in favor of the first-filed California action. Hermalyn's motion will be denied because this Court is the proper forum for the litigation and *Colorado River* does not support a stay.[15]

**I.      *Forum Non Conveniens.***

"*Forum non conveniens* gives courts the discretion 'to dismiss a case because the chosen forum (despite the presence of jurisdiction and venue) is so inconvenient that it would be unfair to conduct the litigation in that place.'" *Curtis v. Galakatos*, 19 F.4th 41, 46 (1st Cir. 2021) (quoting *Nandjou v. Marriott Int'l, Inc.*, 985 F.3d 135, 140 (1st Cir. 2021)). "[T]he bar for a district court to dismiss a suit pursuant to the doctrine is a high one." *Nandjou*, 985 F.3d at 141. To prevail on his *forum non conveniens* argument, Hermalyn "'bears the burden of showing both that an adequate alternative forum exists and that considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum.'" *Imamura v. Gen. Elec.*

---

[15] Hermalyn's motion will not, as DraftKings urges, be construed as a motion for reconsideration subject to a heightened standard of review. At the TRO hearing, the Court made clear that its assessments were preliminary and set a briefing schedule for the motion to dismiss. *See* ECF 41; ECF 46, at 57:9-14, 62:4-7. Additionally, Hermalyn did not raise the *Colorado River* doctrine when he previously sought to stay this action. As the Court observed then, Hermalyn made "no argument that any abstention doctrine warrants a stay of this litigation." ECF 29.

52

A896

*Co.*, 957 F.3d 98, 106 (1st Cir. 2020) (quoting *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 12 (1st Cir. 2000)).[16]

"At the first step, an adequate alternative forum exists when '(1) all parties can come within that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly.'" *Id.* (quoting *Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419, 424 (1st Cir. 1991)). The defendant generally satisfies this prong by "establish[ing] 'that the alternative forum addresses the types of claims that the plaintiff has brought and that the defendant is amenable to service of process there.'" *Id.* (quoting *Iragorri*, 203 F.3d at 12). At the second step, courts "perfor[m] a balancing test to determine whether the defendant has demonstrated that 'the compendium of factors relevant to the private and public interests implicated by the case strongly favors dismissal.'" *Id.* at 107 (quoting *Iragorri*, 203 F.3d at 12).

The parties dispute, at the first step, whether the California state court is an adequate alternative forum for deciding the issues contested in this case. This Court need not decide that question, however, because Hermalyn has not carried his burden at the second step to show that the private and public interests at stake here strongly favor dismissal.

Where, as here, the parties have agreed to a forum selection clause, "they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 64 (2013). Courts must, as a result, "deem the private-interest factors to weigh entirely in favor of the preselected forum" and "consider arguments about public-interest factors only." *Id.* Section 9 of Hermalyn's confidentiality agreement and section (f) of

_____

[16] When evaluating motions to dismiss on *forum non conveniens* grounds, courts can consider materials outside of the pleadings, including affidavits. *See Curtis*, 19 F.4th at 51; *Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419, 425 (1st Cir. 1991).

A897

his noncompetition covenant both provide, in pertinent part, that Hermalyn "submit[s] to the personal jurisdiction of" "the United States District Court for the District of Massachusetts for any dispute arising hereunder" and "waive[s] any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process." ECF 1-1, at 6, § 9; ECF 1-2, at 15, § (f). A forum selection clause, like this one, "is 'prima facie valid' and, absent a 'strong showing' by the resisting party that the clause is 'unreasonable under the circumstances,' it should not be set aside." *Claudio-De Leon v. Sistema Universitario Ana G. Mendez*, 775 F.3d 41, 48 (1st Cir. 2014) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)). Hermalyn does not argue that this provision is invalid under Massachusetts law, ECF 118, at 58:7-13, and the Court has already concluded that his contracts are governed by Massachusetts law. Accordingly, the private interest factors "weigh entirely in favor of the preselected forum." *Atl. Marine Const. Co.*, 571 U.S. at 64.

Hermalyn relies instead on the public interest factors to carry the day. The "public interest factors include 'the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.'" *Imamura*, 957 F.3d at 107 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). Those factors "may sometimes provide support for rejecting enforcement of an otherwise valid forum-selection clause, but '. . . will rarely defeat' such a clause." *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 33 (1st Cir. 2022) (quoting *Atl. Marine Const. Co.*, 571 U.S. at 64).

A898

A899

Pointing principally to the second and third factors, Hermalyn contends that DraftKings's breach of contract claims are governed by California law and that California has a stronger interest than Massachusetts in the substance of this litigation. The Court has already explained why the breach of contract claims are governed by Massachusetts law, not California law. Thus, Hermalyn's argument that this case will involve novel questions of California law is misplaced. Hermalyn also contends that "California has a longstanding and fundamental policy interest . . . in ensuring the rights of its residents and companies to compete free of restrictive covenants that impede employee choice and the ability of California employers to access the national talent pool." ECF 113, at 1. True enough. But, as described, California has no greater interest than Massachusetts in enforcing its laws on restrictive covenants. While California law renders noncompetition agreements unenforceable "regardless of where and when the contract was signed," Cal. Bus. & Prof. Code § 16600.5(a), Massachusetts's Noncompetition Agreement Act provides that noncompetition agreements can be "valid and enforceable" under certain circumstances, M.G.L. c. 149, § 24L(b). Where Massachusetts law governs the breach of contract claims at issue in this case, California does not have a local interest in adjudicating this matter that supersedes Massachusetts's local interest.

This is not the exceptional case where the public interest factors warrant disregarding an enforceable Massachusetts forum selection clause on *forum non conveniens* grounds. *See Amyndas Pharms.*, 48 F.4th at 35 (the "public interest factors will rarely tip the balance" because "'forum-selection clauses should control except in unusual cases'" (quoting *Atl. Marine Const. Co.*, 571 U.S. at 64)). Hermalyn's motion to dismiss is, accordingly, denied.

55

A899

## II.   *Colorado River* Abstention.

In the alternative, Hermalyn seeks a stay of this case pending the outcome of the California case pursuant to the *Colorado River* abstention doctrine. This doctrine "allows federal courts in limited instances to stay or dismiss proceedings that overlap with concurrent litigation in state court." *Jimenez v. Rodriguez-Pagan*, 597 F.3d 18, 21 (1st Cir. 2010). But "'[a]bstention from the exercise of federal jurisdiction is the exception, not the rule.'" *Barr v. Galvin*, 626 F.3d 99, 107 (1st Cir. 2010) (quoting *Colorado River*, 424 U.S. at 813).

In assessing whether to apply *Colorado River* abstention, courts consider the following non-exhaustive factors: "'(1) whether either court has assumed jurisdiction over a res; (2) the [geographical] inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction.'" *Jiménez*, 597 F.3d at 27-28 (quoting *Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 71-72 (1st Cir. 2005)). The ultimate decision to stay "a federal action because of parallel state-court litigation . . . [rests] on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983). "The crux of the *Colorado River* doctrine is the presence of 'exceptional' circumstances displaying 'the clearest of justifications' for federal deference to the local forum in the interest of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Nazario-Lugo v. Caribevisión Holdings, Inc.*, 670 F.3d 109, 115 (1st Cir. 2012) (quoting *Colorado River*, 424 U.S. at 817-19).

A900

As a threshold matter, however, "to create the possibility of abstention under *Colorado River*, . . . the state action must resolve all of the claims in the federal case." *Glassie v. Doucette*, 55 F.4th 58, 64 (1st Cir. 2022). This is because "*Colorado River* 'necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case.'" *Id.* (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 28). Accordingly, "'it would be a serious abuse of discretion to grant [a] stay . . . ' '[i]f there is any substantial doubt' 'that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties.'" *Id.* (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 28).

Hermalyn's request for abstention falters at the outset because the California action will not resolve all of the claims at issue here. This action, unlike the California case, involves claims for misappropriation of trade secrets in violation of the DTSA, MUTSA, and common law, as well as common law claims for conversion and breach of the duty of loyalty. ECF 1, ¶¶ 130-73. None of those claims are at issue in the California action, which principally seeks to invalidate Hermalyn's non-solicitation and noncompetition agreements with DraftKings. *See* ECF 27-1, ¶¶ 73-92. The duplicative contract claims are "not enough to justify a stay of this federal action." *Glassie*, 55 F.4th at 64. And Hermalyn's argument that "a ruling in the California Action that the restrictive covenants are unenforceable would moot (or at least dramatically limit) DraftKings' misappropriation claims" fares no better. ECF 113, at 7. The First Circuit rejected a similar argument in *Glassie* that "the state-court actions 'are likely to moot, or at the very least inform, [the plaintiff's] federal claims.'" *Glassie*, 55 F.4th at 64. This Court is similarly not "convince[d] . . . that [it] would have 'nothing further to do' after the state-court actio[n]." *Id.*

While there is consequently "no need to consider the additional factors drawn from *Colorado River* and its progeny," *see id.* at 65 n.4, the Court does so here for the sake of

57

A901

completeness and concludes that Hermalyn has failed to establish extraordinary circumstances that warrant abstention under *Colorado River*. The parties agree that the first factor, the assumption of jurisdiction over *res*, is inapplicable here. The second factor, the inconvenience of the federal forum, weighs against abstention because, as explained, Hermalyn "contracted to litigate in Massachusetts," *Covidien LP v. Esch*, 280 F. Supp. 3d 284, 286 (D. Mass. 2017) (citing *Atl. Marine Const. Co.*, 571 U.S. at 64), and thus "submit[ted] to the personal jurisdiction of" this Court, ECF 1-1, at 6, § 9; ECF 1-2, at 15, § (f).

The third factor, the avoidance of piecemeal ligation, marginally supports a stay. Hermalyn contends that permitting this action and the California case "to proceed creates the substantial risk of conflicting results," given that "both actions are based on identical acts and overlapping legal issues." ECF 69, at 18. But while there is some risk of inconsistent rulings on some of the claims, abstention "'is not warranted simply because related issues otherwise would be decided by different courts, or even because two courts otherwise would be deciding the same issues,'" and is instead reserved for "'exceptional'" cases. *KPS & Assocs., Inc. v. Designs By FMC, Inc.*, 318 F.3d 1, 10 (1st Cir. 2003) (citations omitted).

The fourth factor—concerning the order in which the forums obtained jurisdiction—is not neutral, as Hermalyn contends, but cuts against a stay. ECF 69, at 18. As the Supreme Court has explained, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 21. While the California action was filed first, the state court has not issued injunctive relief, addressed whether DraftKings is subject to personal jurisdiction there, or ordered discovery. *See* ECF 97, at 20; ECF 98-5; *Michael Z. Hermalyn & FVP, LLC v. DraftKings, Inc.*, No. 24STCV02694 (Cal. Super. Ct.). Here, by contrast, the Court has entered a

58

A902

TRO, authorized the parties to conduct limited discovery, conducted an evidentiary hearing, and entered a preliminary injunction. This case is, therefore, more advanced than the California action. *See Villa Marina Yacht Sales, Inc. v. Hatteras Yachts*, 947 F.2d 529, 535 (1st Cir. 1991) ("The preliminary injunction hearing . . . covered the merits of the [disputed] claim, and thus represented significant development of the case.").

Neither the fifth nor sixth factors weigh in favor of a stay because, as stated, Massachusetts law, not California law, is applicable to the state-law claims at issue in this case and federal law controls the DTSA claim. The seventh factor, concerning the vexatious or contrived nature of the federal claim, weighs against a stay. The Court has already found that DraftKings is likely to succeed on the merits of its DTSA claim. Hermalyn insists, however, that "DraftKings filed this action at least in part to avoid a California court applying California's new laws and its longstanding public policy against restrictive covenants." ECF 69, at 20. But this Court has concluded that Massachusetts law controls, and DraftKings did not go "to federal court solely in reaction to its failure in the [state] court," because the California state court has not resolved Hermalyn's claims. *Villa Marina Yacht Sales, Inc. v. Hatteras Yachts*, 915 F.2d 7, 15 (1st Cir. 1990). DraftKings's federal claim is neither vexatious nor contrived.

The eighth and final factor—respect for the principles underlying removal jurisdiction— is inapplicable here. This factor is only "relevant if a plaintiff was attempting to evade the policy in 28 U.S.C. § 1441 that only a defendant be able to remove a lawsuit from state court to federal court." *United States v. Fairway Cap. Corp.*, 483 F.3d 34, 44 (1st Cir. 2007). The fact that DraftKings, as the defendant, twice sought to remove the California state court action to federal court in California is irrelevant to this inquiry. As a plaintiff here, DraftKings did not, for example, "file a lawsuit in state court, dismiss it and then refile the same action in federal court."

A903

*Villa Marina Yacht Sales*, 947 F.2d at 536. DraftKings initiated this action in federal court and, therefore, did not interfere with Hermalyn's ability to remove the case.

Weighing these factors "heavily . . . in favor of the exercise of jurisdiction," *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 16, a stay based on the *Colorado River* abstention doctrine is not warranted and Hermalyn's motion is denied.

## CONCLUSION AND ORDER

For the foregoing reasons, DraftKings's motion for a preliminary injunction, ECF 72, is GRANTED. The Court will issue a separate Order of Preliminary Injunction consistent with this opinion. The temporary restraining order previously entered, ECF 44, is hereby DISSOLVED. Hermalyn's motion to dismiss or alternatively to stay, ECF 68, is DENIED.

SO ORDERED.

/s/ Julia E. Kobick
Julia E. Kobick
Dated: April 30, 2024                              United States District Judge

A904

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DRAFTKINGS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:24-cv-10299-JEK |
| ) | |
| MICHAEL HERMALYN, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**ORDER OF PRELIMINARY INJUNCTION**

**KOBICK, J.**

After considering the motion of plaintiff DraftKings, Inc., ECF 72, the opposition of

defendant Michael Hermalyn, ECF 101, and the reply brief, ECF 114, and after holding hearings

on April 2, 2024 and April 16, 2024, and for the reasons stated today in the Court's Memorandum

and Order granting that motion, the Court now enters this Order, which shall remain in effect until

further Order of this Court.

IT IS HEREBY ORDERED, pursuant to Federal Rule of Civil Procedure 65, that defendant

Michael Hermalyn is enjoined as follows:

1.  Hermalyn is enjoined from: (i) using any Confidential Information (as
    defined in the "Nonsolicitation, Nondisclosure & Assignment of Inventions
    Agreement" dated August 31, 2020, ECF 1-1)) for any purpose that is not
    authorized by the Company (as defined in the Nonsolicitation,
    Nondisclosure & Assignment of Inventions Agreement); (ii) disclosing any
    Confidential Information to any person or entity, except as authorized by
    the Company in connection with Hermalyn's job duties; or (iii) removing
    or transferring Confidential Information from the Company's premises or
    systems except as authorized by the Company;

2.  Hermalyn is also enjoined for a period of twelve months starting on
    February 1, 2024, from directly or indirectly either for himself or for any
    other person, partnership, legal entity, or enterprise: (i) soliciting, in person

A905

or through supervision or control of others, an employee, advisor, consultant or contractor of the Company (as defined in the Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement) for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with the Company or to change an existing business relationship to the detriment of the Company; (ii) hiring away an employee, advisor, consultant or contractor of the Company; or (iii) helping another person or entity hire away a Company employee, advisor, consultant or contractor;

3.   Hermalyn is further enjoined for a period of twelve months starting on February 1, 2024, anywhere within the United States of America, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company (as defined in the "Noncompetition Covenant" dated August 16, 2023, ECF 1-2, at 11-17)) from: (1) providing services to a Competing Business (as defined in the Noncompetition Covenant, and to include Fanatics, Inc. and Fanatics, Inc.'s subsidiaries, affiliates, and joint ventures) that relate to any aspect of the Business of the Company (as defined in the Noncompetition Covenant) for which Hermalyn performed services or received Confidential Information at any time during the six-month period prior to February 1, 2024; or (2) committing a Threatened Breach (as defined in the Noncompetition Covenant) of the obligation set forth in the immediately preceding clause; and

4.   Hermalyn is additionally enjoined from moving, destroying, deleting, altering, or otherwise disposing of any files, documents, and digital media that contain any Confidential Information (as defined in the Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement) and/or that are derived from such information.

Pursuant to Fed. R. Civ. P. 65(c), DraftKings shall post an additional security bond in the amount of $150,000 as soon as reasonably practicable after entry of this Order but in any event no later than close of business on Tuesday, May 7, 2024. *See* ECF 117, at 2.

SO ORDERED.

/s/ Julia E. Kobick
Julia E. Kobick
Dated: April 30, 2024                      United States District Judge

A906

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DRAFTKINGS, INC.,

       *Plaintiff*,

v.

MICHAEL Z. HERMALYN,

       *Defendant.*

Civil Action No. 1:24-cv-10299-JEK

## NOTICE OF APPEAL

Notice is hereby given that, pursuant to 28 U.S.C. § 1292(a)(1), defendant Michael Z. Hermalyn appeals to the United States Court of Appeals for the First Circuit from the Memorandum and Order and Order of Preliminary Injunction, both entered April 30, 2024 (ECF Nos. 132-133), and each and every part thereof.

Dated: May 2, 2024
Respectfully submitted:

/s/ *Russell Beck*
Russell Beck (BBO# 561031)
Stephen D. Riden (BBO# 644451)
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Boston, MA 02110
Tel.: (617) 500-8660
Fax: (617) 500-8665
rbeck@beckreed.com
sriden@beckreed.com

/s/ *Aliki Sofis*
Aliki Sofis (BBO #675777)
Alexander S. del Nido (BBO #711857)
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA  02199-3600
Tel.:   (617) 712-7100
Fax:   (617) 712-7200
alikisofis@quinnemanuel.com
alexdelnido@quinnemanuel.com

A907

Kimberly E. Carson (*pro hac vice*)
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel.: (212) 849-7000
Fax: (212) 849-7100

Christopher G. Michel (*pro hac vice
application forthcoming*)
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel.: (202) 538-8000
Fax: (202) 538-8100

*Attorneys for Defendant Michael Z. Hermalyn*

A908

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document filed today through the Court's CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: May 2, 2024

/s/ *Alexander S. del Nido*
Alexander S. del Nido

A909

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2024, I electronically filed the foregoing

Joint Appendix Volumes 1 and 2 with the United States Court of Appeals for the

First Circuit by using the CM/ECF system, which will send notifications of such

filing to all CM/ECF counsel of record.


<u>/s/ Christopher G. Michel</u>
Christopher G. Michel