No. 24-1443

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

DRAFTKINGS INC.,

*Plaintiff-Appellee*,

*v.*

MICHAEL HERMALYN,

*Defendant-Appellant.*

On Appeal from a Preliminary Injunction of the United States District Court
for the District of Massachusetts in Case No. 1:24-cv-10299, Judge Julia E. Kobick

## BRIEF OF PLAINTIFF-APPELLEE DRAFTKINGS INC.

WILMER CUTLER PICKERING
  HALE AND DORR LLP

MARK C. FLEMING
WILLIAM F. LEE
ANDREW S. DULBERG
60 State Street
Boston, MA  02109
(617) 526-6000
Mark.Fleming@wilmerhale.com

GIBSON, DUNN & CRUTCHER LLP

THOMAS H. DUPREE JR.
JACOB T. SPENCER
1050 Connecticut Avenue, N.W.
Washington, DC  20036
(202) 955-8500
TDupree@gibsondunn.com

ORIN S. SNYDER
HARRIS M. MUFSON
JUSTINE M. GOEKE
200 Park Avenue
New York, NY  10166
(212) 351-4000
OSnyder@gibsondunn.com

*Attorneys for DraftKings Inc.*

## CORPORATE DISCLOSURE STATEMENT

DraftKings Inc. is a publicly traded corporation listed on the Nasdaq exchange.  No corporation owns 10% or more of DraftKings stock.

# TABLE OF CONTENTS

**Page**

REASONS WHY ORAL ARGUMENT NEED NOT BE HEARD ...................... vii

INTRODUCTION ................................................................... 1

JURISDICTIONAL STATEMENT .......................................... 6

STATEMENT OF THE ISSUES........................................... 7

STATEMENT OF THE CASE ................................................ 8

     A.    Hermalyn Agrees Not To Compete With DraftKings Or Solicit DraftKings' Employees ............................................ 8

     B.    Hermalyn Defects From DraftKings To Fanatics And Manufactures Purported California Residency ................... 10

     C.    Hermalyn Breaches His Nonsolicitation And Noncompetition Agreements.............................................. 14

     D.    The District Court Issues A Temporary Restraining Order, Rejecting Hermalyn's Argument That California Law Applies .................................................................. 15

     E.    The District Court Issues A Preliminary Injunction, Again Rejecting Hermalyn's Argument That California Law Applies .................................................................. 17

     F.    Meanwhile, Hermalyn Seeks To Void His Contractual Obligations In California...................................................... 21

SUMMARY OF ARGUMENT .............................................. 22

STANDARD OF REVIEW ................................................... 24

ARGUMENT ...................................................................... 25

I.    MASSACHUSETTS LAW GOVERNS THIS DISPUTE ............. 26

     A.    Massachusetts Law Governs Even In The Absence Of A Choice-Of-Law Clause.......................................... 29

     B.    California Does Not Have A Materially Greater Interest In This Dispute ................................................... 40

II.    CALIFORNIA SHOULD NOT BE CARVED OUT FROM THE PRELIMINARY INJUNCTION.............................................. 49

A.    Hermalyn Forfeited The Argument That California
Should Be Excluded from the Scope of the Preliminary
Injunction ............................................................................... 50

B.    There Is No Basis To Exempt California From The
Preliminary Injunction Order ............................................... 51

CONCLUSION ........................................................................................ 55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Application Group, Inc. v. Hunter Group, Inc.*,
  61 Cal. App. 4th 881, 72 Cal. Rptr. 2d 73 (1998) ..............................................48

*Aspect Software, Inc. v. Barnett*,
  787 F. Supp. 2d 118 (D. Mass. 2011) ..........................................................41, 42

*Barnes Group, Inc. v. C & C Products, Inc.*,
  716 F.2d 1023 (4th Cir. 1983) ......................................................................54

*Boulanger v. Dunkin' Donuts, Inc.*,
  442 Mass. 635, 815 N.E.2d 572 (2004) ........................................................52

*Bushkin Assocs., Inc. v. Raytheon Co.*,
  393 Mass. 622, 473 N.E.2d 662 (1985) ..............................................29, 33, 38

*Cardoni v. Prosperity Bank*,
  805 F.3d 573 (5th Cir. 2015) ..................................................................46, 48

*Ciena Corp. v. Jarrard*,
  203 F.3d 312 (4th Cir. 2000) ......................................................................53

*Cole v. Champion Enters., Inc.*,
  305 F. App'x 122 (4th Cir. 2008) ................................................................53

*Comerica Bank & Tr., N.A. v. Brown & Rosen, LLC*,
  101 Mass. App. Ct. 574, 195 N.E.3d 432 (2022) ..........................................29

*Consol. Mut. Ins. Co. v. Radio Foods Corp.*,
  108 N.H. 494, 240 A.2d 47 (1968) ..............................................................31

*Dahua Tech. USA Inc. v. Feng Zhang*,
  988 F.3d 531 (1st Cir. 2021) ..................................................................28, 29

*DCS Sanitation Mgmt., Inc. v. Castillo*,
  435 F.3d 892 (8th Cir. 2006) ......................................................................47

*Dow v. Casale*,
  83 Mass. App. Ct. 751, 989 N.E.2d 909 (2013) ............................................34

*Down-Lite Int'l, Inc. v. Altbaier*,
  821 F. App'x 553 (6th Cir. 2020) ............................................................44, 45

*EMC Corp. v. Donatelli*,
  25 Mass. L. Rptr. 399, 2009 WL 1663651
  (Mass. Super. Ct. May 5, 2009) ............................................................32, 38

*Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.*,
  968 F.2d 1463 (1st Cir. 1992) ...................................... 4, 5, 23, 29, 30, 31, 33, 38

*Hall v. Curran*,
  599 F.3d 70 (1st Cir. 2010) ........................................................................7

*Hodas v. Morin*,
  442 Mass. 544, 814 N.E.2d 320 (2004) ...................................................27, 28

*Keener v. Convergys Corp.*,
  342 F.3d 1264 (11th Cir. 2003) ..............................................................54

*Liberty Mut. Ins. Co. v. Correia*,
  100 Mass. App. Ct. 629, 182 N.E.3d 962 (2022) ...................................41, 43

*Marek v. Rhode Island*,
  702 F.3d 650 (1st Cir. 2021) ....................................................................51

*McCulloch v. Velez*,
  364 F.3d 1 (2004) ...................................................................................22

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Flanders-Borden*,
  11 F.4th 12 (1st Cir. 2021) .......................................................................27

*Nat'l Foreign Trade Council v. Natsios*,
  181 F.3d 38 (1st Cir. 1999) .......................................................................51

*Noonan v. Winston Co.*,
  135 F.3d 85 (1st Cir. 1998) .......................................................................51

*Nuance Commc'ns Inc. v. Kovalenko*,
  2022 WL 2347112 (D. Mass. June 29, 2022) ...........................................19

*NuVasive, Inc. v. Day*,
  954 F.3d 439 (1st Cir. 2020) ......................................................27, 28, 29, 41

*Optos, Inc. v. Topcon Med. Sys., Inc.*,
  777 F. Supp. 2d 217 (D. Mass. 2011) .......................................................42

*Oxford Glob. Res., Inc. v. Guerriero*,
  2003 WL 23112398 (D. Mass. Dec. 30, 2003) .......................................33, 47

*Oxford Global Resources, LLC v. Hernandez*,
  480 Mass. 462, 106 N.E.3d 556 (2018) ....................... 29, 38, 39, 41, 45, 47

*Pineda v. Skinner Servs., Inc.*,
  22 F.4th 47 (1st Cir. 2021) .....................................................................24, 25

*Realogy Holdings Corp. v. Jongebloed*,
  957 F.3d 523 (5th Cir. 2020) ...................................................................39

*Roll Systems, Inc. v. Shupe*,
  1998 WL 1785455 (D. Mass. Jan. 22, 1998) ............................................38

*Shipley Co. v. Kozlowski*,
  926 F. Supp. 28 (D. Mass. 1996) ........................................................42

*SimpliVity Corp. v. Bondranko*,
  204 F. Supp. 3d 340 (D. Mass. 2016) .................................................52

*Smith v. Prudential Ins. Co. of Am.*,
  88 F.4th 40 (1st Cir. 2023) ................................................................27

*Steranko v. Inforex, Inc.*,
  5 Mass. App. Ct. 253, 362 N.E.2d 222 (1977) ..................................27

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
  587 F.3d 464 (1st Cir. 2009) .........................................................49, 50

*Waithaka v. Amazon.com, Inc.*,
  966 F.3d 10 (1st Cir. 2020) ...............................................................47

## STATUTES

28 U.S.C. § 1331 ......................................................................................7

28 U.S.C. § 1332 ......................................................................................6

28 U.S.C. § 1367 ..........................................................................7, 8, 9, 10

Cal. Bus. & Prof. Code § 16600 ............................................................43

Cal. Bus. & Prof. Code § 16600.1 .........................................................43

Cal. Bus. & Prof. Code § 16600.5 .........................................................43

2018 Mass. Legis. Serv. ch. 228, § 71 ..................................................45

## RULES

Fed. R. App. P. 27 .....................................................................................1

Fed. R. App. P. 32 .....................................................................................1

## REGULATIONS

16 C.F.R. § 910.1 ....................................................................................49

16 C.F.R. § 910.2 ....................................................................................49

16 C.F.R. § 910.3 ....................................................................................49

16 C.F.R. § 910.6 ....................................................................................49

## OTHER

*Employee Noncompetition Laws and Practices: A Massachusetts
  Paradigm Shift Goes National*, 103 Mass. L. Rev. (2022)..................44

## REASONS WHY ORAL ARGUMENT NEED NOT BE HEARD

Oral argument is not necessary. *First*, the district court correctly applied well-settled law in concluding that the noncompetition agreements between Defendant-Appellant Michael Hermalyn and Plaintiff-Appellee DraftKings Inc. should be governed by Massachusetts law pursuant to the choice-of-law provisions in the parties' agreements. This Court's precedent squarely forecloses Hermalyn's attempt to circumvent the Massachusetts choice-of-law provisions and apply California law. *See Ferrofluidics Corp. v. Adv. Vacuum Components, Inc.*, 968 F.2d 1463, 1467–68 (1st Cir. 1992). *Second*, this Court should reject Hermalyn's argument to carve California out of the preliminary injunction based on federalism and comity principles because he failed to raise that argument below and the argument is otherwise meritless.

**INTRODUCTION**

In a comprehensive, 60-page opinion, the district court preliminarily enjoined Hermalyn from unfairly competing against DraftKings by taking an identical job with its competitor, Fanatics; from soliciting DraftKings' employees, advisors, consultants, and contractors; and from using or disclosing DraftKings' confidential information and trade secrets. In doing so, the court held Hermalyn to the contractual promises he made (and broke) and to his agreement that Massachusetts substantive law would govern the *thirteen* noncompetition agreements he signed with DraftKings in exchange for millions of dollars in compensation. That holding—the only aspect of the preliminary injunction Hermalyn challenges on appeal—was compelled by this Court's precedent and should be affirmed.

The district court's conclusions that DraftKings is likely to succeed on the merits of this lawsuit and would suffer irreparable harm absent injunctive relief are supported by overwhelming evidence. DraftKings submitted nine sworn affidavits and hundreds of pages of evidence. The district court heard a full day of live testimony from six witnesses. That evidence and testimony demonstrated that, before his abrupt departure, Hermalyn was the head of DraftKings' industry-leading VIP business. In the weeks, days, and even hours before his departure—while negotiating with Fanatics, including meeting with Fanatics executives in New York and Pennsylvania—Hermalyn downloaded DraftKings' highly confidential

- 1 -

information and trade secrets.  And the day he joined Fanatics, while staying at the Fanatics' CEO's home, he started soliciting his two most important former co-workers at DraftKings to follow him, in violation of his noncompetition agreements, nonsolicitation agreement, and nondisclosure agreement.  Along the way, as forensic evidence revealed, Hermalyn attempted to cover his tracks by erasing the vast majority of documents from his DraftKings-issued laptops, including after he could have reasonably anticipated litigation.

Based on that extensive evidence and live testimony, the district court found Hermalyn's denials that he misappropriated trade secrets and solicited DraftKings' employees "not credible."  ADD34.  "[T]aken as a whole," the court found, "the evidence submitted at this stage in the proceedings suggests that Hermalyn has struggled with candor to the Court."  ADD36.  After declining to credit Hermalyn's denials, the court found Hermalyn, unless enjoined, would have used DraftKings' trade secrets and DraftKings' employees to benefit DraftKings' direct competitor.

On appeal, Hermalyn does not contest the district court's factual findings or credibility determinations.  He does not argue the district court clearly erred in finding Hermalyn likely "employed improper means to obtain and disclose [DraftKings'] trade secrets."  ADD43.  He does not contend the court clearly erred in finding "Hermalyn likely breached his agreement not to directly or indirectly solicit DraftKings' employees."  ADD37.  And he does not assert the district court

clearly erred in finding that since "Hermalyn likely misappropriated DraftKings's confidential information and breached his noncompetition agreement through his employment at Fanatics," DraftKings "would suffer irreparable harm absent injunctive relief." ADD48.

Hermalyn's appeal primarily focuses on a narrow question:  whether the district court erred in respecting his voluntary and freely bargained-for choice to apply Massachusetts law to the noncompetition agreements he repeatedly signed in return for millions of dollars in compensation.  Hermalyn agreed, thirteen times, that those agreements would be governed by the "internal substantive laws of Massachusetts."  *See* A76, A99.  That language clearly and unambiguously selects Massachusetts law, as Hermalyn does not dispute.  And Massachusetts has by far the most significant connections to those agreements and this dispute—a factual finding unchallenged on appeal.  As the district court found, "[w]hen DraftKings and Hermalyn agreed to contracts with Massachusetts choice of law provisions, Hermalyn was a New Jersey resident and DraftKings was headquartered in Massachusetts."  ADD26.  "Hermalyn primarily worked for DraftKings from New Jersey and New York" and "he traveled to Massachusetts for work at least 25 times between May 2021 and November 2023, or approximately once every six weeks." *Id.*  And Hermalyn "likely solicited two Massachusetts-based DraftKings employees . . . on his first days of work at Fanatics."  *Id.*

California, by contrast, "has only a minimal connection to this lawsuit." ADD26. Hermalyn never worked for DraftKings in California. Rather, he purportedly relocated there just three days before departing DraftKings. In those three days, while telling his DraftKings colleagues that he was grieving the death of a friend, Hermalyn traveled to California, leased an apartment (where he never spent even a single night), bought and registered a car, scheduled doctor's appointments, and registered to vote. He then joined a Fanatics subsidiary—a purportedly California-based entity formed the day before he departed DraftKings—all for the sole purpose of trying to concoct California residency in order to attempt to evade his contractual obligations.

Those minimal California connections are a manifestly inadequate basis for setting aside Hermalyn's choice-of-law provisions. And, even if Hermalyn had not repeatedly bargained for Massachusetts choice-of-law provisions, Massachusetts law would *still* govern, as the district court found. As this Court explained in *Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.*, 968 F.2d 1463 (1st Cir. 1992), under the "most significant relationship" test, which Massachusetts employs, the law of the state where the employer is headquartered, where the contract was executed and performed, and where the employee formerly worked applies to disputes related to restrictive covenants between the parties.

- 4 -

That decision forecloses Hermalyn's appeal. At the time the parties entered their noncompetition agreements, they "could have had no reasonably justifiable expectation . . . that their agreement[s] would be governed by California law, as California bore no relationship to the contract[s] at that time, and continued to have none until [Hermalyn] breached the restrictive covenant[s] there." *Ferrofluidics*, 968 F.2d at 1468. That on-point holding resolves this appeal.

Given the significant relationship Massachusetts had with Hermalyn's employment at DraftKings, California law cannot trump and nullify Massachusetts law. Hermalyn urges this Court to recognize and respect California's "fundamental" public policy against noncompetition agreements. But however strong that policy might be, it does not and cannot displace the "considered legislative policy" of Massachusetts in a case where the parties and transaction had absolutely nothing to do with California until Hermalyn strategically fled there to evade his contractual obligations. ADD27.

Ultimately, Hermalyn retreats from his unsupported position that California law should apply in these circumstances and offers what he presents as a more moderate compromise: that California should simply be excised from the injunction. But that is no compromise, as there is no way to maintain the effect of the injunction while carving out California. If Hermalyn is allowed to compete in California, he will necessarily harm DraftKings in the rest of the country as well. As the district

court found, DraftKings operates its business nationwide such that a "nationwide restriction" was required to protect DraftKings against Hermalyn's unfair competition. ADD31. After all, online sports betting is illegal in California, *see* A407–14, so in competing against DraftKings from California, Hermalyn necessarily would leverage the confidential information he misappropriated from DraftKings to engage with customers outside of California, violating the terms of the preliminary injunction and further injuring a Massachusetts-based company. Hermalyn offers no basis to set aside the district court's well-supported conclusion that "a nationwide restriction on Hermalyn" is appropriate. ADD31. In any event, Hermalyn forfeited his argument for a California carveout by failing to adequately raise it before the district court.

The district court's well-reasoned and carefully considered preliminary injunction should be affirmed.

## JURISDICTIONAL STATEMENT

Hermalyn's jurisdictional statement is accurate and complete—with one exception. DraftKings invoked the subject-matter jurisdiction of the district court (among other grounds) under 28 U.S.C. § 1332(a)(2) (diversity jurisdiction) by alleging DraftKings is a citizen of Nevada and Massachusetts and Hermalyn is a citizen of New Jersey. A27 (¶¶ 12, 13). Hermalyn asserts, without citation, that he "is a California resident." Op. Br. 3. But citizenship for personal jurisdiction

purposes is "determined by domicile," not residency.  *Hall v. Curran*, 599 F.3d 70, 72 (1st Cir. 2010).   And the only evidence in the record tending to support Hermalyn's assertion of California residency is his say-so, *see* A126, A267—an insufficient basis for reaching any conclusion, given his demonstrated "lack of credibility," ADD36.  Of course, whether Hermalyn is a citizen of New Jersey or California makes no difference for diversity jurisdiction.  Either way, the parties are completely diverse and the amount in controversy exceeds $75,000.  And the district court also had subject-matter jurisdiction under 28 U.S.C. § 1331 (federal-question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

### STATEMENT OF THE ISSUES

1.     Whether the district court correctly held noncompetition agreements with Massachusetts choice-of-law provisions—between a Massachusetts company and an East-Coast-based employee who frequently traveled to Massachusetts for work—are governed by Massachusetts law.

2.     Whether the district court abused its discretion by declining to carve California out of its injunction based on federalism and comity concerns, when Hermalyn failed to raise that argument in the district court and does not dispute that enforcing the noncompetition agreements nationally is reasonable under Massachusetts law, and when a national scope is necessary to make the injunction effective.

- 7 -

**STATEMENT OF THE CASE**

**A.    Hermalyn Agrees Not To Compete With DraftKings Or Solicit DraftKings' Employees.**

DraftKings operates in the highly "competitive digital sports entertainment and gaming industry." ADD2. DraftKings is headquartered in Boston. *Id.* "Its fantasy sports products are available to customers in over 40 states, and its sports betting is offered in 24 states." *Id.* DraftKings "competes with other online sports platforms, including Fanatics, for valuable individual customers and key partners, such as celebrities and athletes." *Id.*

Hermalyn first joined DraftKings in September 2020. ADD2. By May 2022, he held the role of Senior Vice President of Growth, Customer. ADD2–3. In that role, he was primarily responsible for developing and maintaining relationships with "VIP" customers. ADD3. VIPs are essential to DraftKings' success. They are DraftKings' most loyal customers and responsible for a significant share of revenue. A23 (¶ 3), A384. To foster relationships with these VIPs, DraftKings has expended substantial resources over nearly a decade to build an industry-leading VIP team. A28 (¶ 18), A30 (¶¶ 25, 26).

Because of Hermalyn's senior role at DraftKings and position in an essential aspect of the business, he had access to a wide range of information related to DraftKings' business strategies and development, including compensation information regarding employees in VIP and other departments. ADD3.

- 8 -

Hermalyn, a longtime New Jersey resident, "primarily worked for DraftKings from his house in New Jersey or at [DraftKings'] office in New York." ADD3. He also traveled to Boston for DraftKings work—"25 times between May 2021 and November 2023" or, "on average, approximately once every six weeks." *Id.* By contrast, there is no evidence that Hermalyn "performed any of his work responsibilities for DraftKings from California." ADD26.

When Hermalyn first joined DraftKings, he signed nonsolicitation and nondisclosure agreements. These covenants provided that for a twelve-month period following the end of his employment with DraftKings, he would not solicit DraftKings' employees, advisors, consultants, and contractors. ADD4. The nonsolicitation agreement states, "The parties hereby mutually agree to the exclusive jurisdiction of [Massachusetts courts]" and "[t]his Agreement shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law." A76.

Over the course of his employment with DraftKings, Hermalyn also executed thirteen noncompetition agreements, including his most recent noncompetition agreement, signed on August 16, 2023. A54, ADD5. In that agreement, Hermalyn agreed that "[f]or a period of twelve (12) months following termination of [his] Relationship with [DraftKings]," or in the event of a breach or threatened breach, "for an additional period of time equal to the time that elapses from the

- 9 -

commencement of such breach, Threatened Breach or challenge to the later of: (i) the termination of such breach, Threatened Breach, or challenge; or (ii) the final non-appealable resolution of any litigation or other legal proceeding stemming from such breach, Threatened Breach or challenge," he would not

> acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of [DraftKings]): (1) provide services to a Competing Business that relate to any aspect of the Business of [DraftKings] . . . for which [he] performed services or received Confidential Information . . . at any time during the six (6) month period prior to such termination; or (2) commit a Threatened Breach of the obligation set forth in the immediately preceding clause.

ADD5.  In exchange for signing the agreement, Hermalyn received "a multimillion-dollar equity grant."  *Id.*  And he agreed—all thirteen times—that any disputes related to the noncompetition agreements would be heard in Massachusetts courts and "governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law."  A99.

"When DraftKings and Hermalyn agreed to [those] contracts with Massachusetts choice of law provisions, Hermalyn was a New Jersey resident and DraftKings was headquartered in Massachusetts."  ADD26.

**B.    Hermalyn Defects From DraftKings To Fanatics And Manufactures Purported California Residency.**

Fanatics is a Delaware corporation headquartered in New York.  Dist. Ct. Dkt. 98-2 at 13–14.  Fanatics recently started building "Fanatics VIP," a "nascent" team that, like DraftKings' VIP team, aims to "[b]uild[ ] and maintain[ ] relationships with

customers and partners."  ADD7; Dist. Ct. Dkt. No. 74-1 ¶¶ 3, 19, 23.  On January 11, 2024, eight days after learning he was the subject of an internal workplace misconduct investigation, "Hermalyn contacted the CEO of Fanatics, Michael Rubin, to ask about applying for a head of VIP position at Fanatics."  ADD6.  The very next day, Hermalyn began downloading highly sensitive DraftKings documents onto a non-DraftKings device.  ADD9, ADD43–46; *see also* Dist. Ct. Dkt. No. 89 ¶ 34; Dist. Ct. Dkt. No. 90-1.

On January 16, Hermalyn sent further DraftKings documents to his personal device, including information regarding DraftKings' partners, contracts, personnel information, and compensation for thousands of employees, including employees identified as "Vital Talent" on the VIP team.  ADD10, ADD45; *see also* Dist. Ct. Dkt. No. 86-10 at 11–13; Dist. Ct. Dkt. No. 90 ¶¶ 31–32.  Fifteen minutes later, Hermalyn Googled the phrase "move big files," visited "Transfernow.net" (an online platform for transferring large files), and then repeatedly transferred files from his DraftKings-issued laptop using unauthorized services, such as AirDrop.  ADD10–11; *see also* Dist. Ct. Dkt. No. 87 ¶¶ 15, 18; Dist. Ct. Dkt. No. 90 ¶¶ 15, 18, 33, 35, 37.  After exfiltrating documents, Hermalyn deleted hundreds of documents, his web browsing history, and digital messages from his DraftKings-issued laptop.  ADD11; *see also* Dist. Ct. Dkt. No. 87 ¶¶ 18, 24–25, 27–28, 30–33.

For the next two weeks, Hermalyn alternated between speaking with Fanatics executives, downloading DraftKings' confidential information, and deleting evidence of his wrongdoing. ADD6–7, ADD11–13. While in New York and Pennsylvania, Hermalyn met with Fanatics' CEO Michael Rubin and multiple members of the Fanatics executive team. ADD6–7.

On January 26, Hermalyn was informed that DraftKings was taking immediate disciplinary action toward him, including by reducing his compensation and title, while DraftKings continued to evaluate his conduct. A50 (¶ 102). The next day, he received an offer from Fanatics and discussed the terms of his DraftKings noncompetition agreement with Fanatics CEO Michael Rubin and Fanatics' Chief Legal Officer. ADD7; A617. The day after that, January 28, Hermalyn decided to accept the Fanatics job and traveled to Los Angeles, where Fanatics' CEO lives. ADD7.

Meanwhile, Hermalyn drafted an email to himself, apparently listing out specific tasks he hoped to accomplish to establish sham residency in California. A359 ("Vote Apt Lease Doctor"). These tasks mirror the actions Hermalyn listed in a declaration as supporting his assertion of California residency. A126, A149.[1] He

---

[1] In addition to the district court's finding that Hermalyn is not credible, recent discovery in Hermalyn's California state court lawsuit against DraftKings provides even more reason to doubt the veracity of his declaration on this point. For example, Hermalyn's sworn declaration in this matter states that before February 1, he "leased an apartment in California." A149 (¶ 9). It turns out Hermalyn leased that apartment

also deleted information off a second DraftKings laptop—including that draft email. ADD11; *see also* Dist. Ct. Dkt. No. 87 ¶¶ 37, 39–40.

In Los Angeles, Hermalyn stayed not in the apartment where he purportedly resided but at Fanatics CEO Michael Rubin's house, a fact he omitted from his initial filings, in which he denied visiting a "Fanatics office." ADD7. While there, he downloaded confidential DraftKings documents using a Fanatics IP address. ADD12. Hermalyn asserts he "avoided attending DraftKings's meetings and responding to work emails" between January 29 and January 31. ADD7. "Hermalyn also misrepresented his location to DraftKings colleagues in the final days of January," telling them that "he was with his family in Jersey grieving the passing of [a] friend." ADD7.

On February 1, 2024, while still in California and staying at Rubin's house, "Hermalyn formally accepted his job as President of Fanatics VIP and the Head of Fanatics's Los Angeles office." ADD7. His new role directly competes with his prior role at DraftKings. He began working to "build out" the Fanatics VIP team. *Id.*

---

from a friend, broke his lease a few days later, and never spent even a single night in that unfurnished apartment. Dist. Ct. Dkt. No. 153-4 at 49:18–50:8, 55:10–14. To the contrary, Hermalyn stayed at the house of Fanatics CEO Michael Rubin—a fact the same declaration "fail[ed] to disclose" in what the district court characterized as a "highly misleading" omission. ADD36.

**C.    Hermalyn Breaches His Nonsolicitation And Noncompetition Agreements.**

The same day Hermalyn left DraftKings and joined Fanatics, he began violating his noncompetition and nonsolicitation agreements. His new role as President of Fanatics VIP was exactly the same as his old role as head of DraftKings' VIP operation. *See* ADD32 ("Hermalyn does not dispute that, if his noncompetition agreement is enforceable, he breached it by starting work for Fanatics."). He wasted no time in soliciting his Boston-based top lieutenants at DraftKings—Hayden Metz, DraftKings' current Vice President of Growth and Development, and Andrew Larracey, DraftKings' current Director of VIP Operations, both of whom testified at the hearing on the preliminary injunction—to join him at Fanatics.

On February 1, Metz and Larracey "called Hermalyn from a conference room in DraftKings's Boston office." ADD16. Both Metz and Larracey live and work in Massachusetts. *Id.* Hermalyn asked Metz and Larracey to confirm there was no one else in the room with them and, when they had done so, informed them "Fanatics had two open positions for them in its VIP department." ADD17.

Hermalyn, Metz, and Larracey spoke again later that evening. Over a series of late-night calls lasting nearly three hours—as reflected in Metz's and Larracey's contemporaneous written notes—"Hermalyn described the two available positions at Fanatics and offered both Metz and Larracey specific base salaries, annual and signing bonuses, and initial equity allocations." ADD17. Hermalyn informed Metz

and Larracey that he was making these offers with the imprimatur of Fanatics' CEO. *Id.* At "1:16 a.m. EST," Larracey applied for the position at Fanatics that Hermalyn had identified—without submitting a resume or any information about his education, qualifications, or experience. ADD18. "He nevertheless heard from Fanatics that same day, requesting that he interview with four company executives over the weekend, on Sunday, February 4." ADD35. As the district court noted, "[i]t is difficult to conceive . . . how Larracey could have secured weekend interviews with Fanatics executives without Hermalyn's involvement." *Id.* And Hermalyn spoke with Larracey repeatedly throughout that process. ADD19. Larracey ultimately remained at DraftKings.

### D. The District Court Issues A Temporary Restraining Order, Rejecting Hermalyn's Argument That California Law Applies.

On February 5, DraftKings brought this suit against Hermalyn, asserting breach of contract for violating Hermalyn's noncompetition, nonsolicitation, and nondisclosure agreements and misappropriation of trade secrets under federal and Massachusetts law, among other claims. A22–69. The same day, DraftKings moved for a temporary restraining order to prevent Hermalyn from misappropriating DraftKings' trade secrets, disclosing its confidential information, soliciting its employees and customers, and unfairly competing against it. A103–06.

The next day, on February 6, Hermalyn filed an emergency motion to stay this suit in favor of his own action, filed against DraftKings on February 1 in California

state court.  A121–23.  Within a few hours, the district court denied that motion.

Even assuming the first-filed rule applied, the court reasoned, "it ha[d] a 'virtually

unflagging obligation' to exercise its jurisdiction" in Massachusetts and that doing

so "would 'better serve the interests involved.'"  A129 (quoting *Maldonado-*

*Cabrera v. Anglero-Alfaro*, 26 F.4th 523, 527 (1st Cir. 2022) and *EMC Corp. v.*

*Parallel Iron, LLC*, 914 F. Supp. 2d 125, 127 (D. Mass. 2012)).  After all, Hermalyn

submitted to "personal jurisdiction" in Massachusetts in his "confidentiality

agreement and . . . noncompetition covenant with DraftKings."  *Id.*  And "[t]he

parties also agreed, in those same contractual provisions, that their agreements 'shall

be governed by the internal substantive laws of Massachusetts, without regard to the

doctrine of conflicts of law.'"  *Id.* (citations omitted).

Following a hearing on February 8, the court issued a temporary restraining

order.  A171–73.  As relevant here, the court rejected Hermalyn's argument that

California law should apply to DraftKings' breach of contract claims, concluding

instead "that Massachusetts law applies to this dispute."  A178.  The court again

pointed to the contractual choice of law provisions selecting Massachusetts law,

"without regard to the doctrine of conflicts of law."  *Id.*  Those contracts, the court

explained, "were negotiated between a company with its princip[al] place of

business in Massachusetts and its employee, who visited Massachusetts on occasion

for work, but who worked primarily in New York and lived in New Jersey, not

California, when he negotiated the contract and worked for DraftKings." A179–180. "California has little connection to this case," by contrast, "other than the fact that Mr. Hermalyn moved to California one week ago." A180. Nonetheless, the court declined to prevent Hermalyn from working for Fanatics at that time, pending expedited discovery. A181–82.

### E. The District Court Issues A Preliminary Injunction, Again Rejecting Hermalyn's Argument That California Law Applies.

Over the next few weeks, the parties engaged in expedited discovery, including taking Hermalyn's deposition, exchanging interrogatories, and conducting a forensic examination of Hermalyn's DraftKings-issued laptops. On March 14, DraftKings moved for a preliminary injunction to enforce Hermalyn's noncompetition, nonsolicitation, and nondisclosure agreements and to prevent further misappropriation of its trade secrets. A269–80. In support, it filed nine sworn affidavits, thirty-six exhibits, and four appendices—totaling hundreds of pages of evidence. Dist. Ct. Dkt. Nos. 72–84. That same day, Hermalyn filed a motion to dismiss, or in the alternative to stay, arguing litigation should proceed in California, not Massachusetts. A185–86.

In opposition to DraftKings' preliminary injunction motion, Hermalyn repeated his familiar argument that California law applies to—and invalidates—his noncompetition, nonsolicitation, and nondisclosure agreements. *See* Dkt. 101 at 16–18. He included a sentence asserting the noncompetition agreements are

unreasonable under Massachusetts law because its geographic scope—"globally or even nationwide"—is "not supportable." *Id.* at 20. But his opposition brief never once argued, or even suggested, that California should be carved out of any injunction. *See id.* at 30 ("At most, Hermalyn should only be restricted from competing with [DraftKings] by using or disclosing [DraftKings'] confidential information.").

The only proposal Hermalyn offered to narrow the geographic scope appears on page 4 of Appendix C to Hermalyn's opposition brief. *See* A363. There, Hermalyn did not mention federalism or comity concerns (words that do not appear anywhere in Hermalyn's opposition). Instead, the appendix states the court should limit the injunction to "New York, New Jersey, or Massachusetts"—the geographic regions where (Hermalyn asserted) he worked for DraftKings. *Id.* Then, in a single sentence devoid of analysis or authority, the appendix says: "Given California's laws on noncompetition agreements and Hermalyn's status as a California resident, the Court should clarify that none of the restrictions apply to the extent his activities are conducted in California." *Id.* (citation to opposition brief omitted).

The court held a hearing on April 2 on the parties' motions, followed by an evidentiary hearing to make credibility determinations on April 16. A17, A19. Six witnesses testified at the full-day evidentiary hearing, including Hermalyn, Metz, Larracey, two other DraftKings employees, and a forensic expert. A568–A844.

- 18 -

On April 30, the court granted in large part DraftKings' motion for a preliminary injunction and denied Hermalyn's motion to dismiss. ADD61–62; *see also* ADD60. In granting the preliminary injunction motion, the court reiterated "DraftKings's breach of contract claims must be analyzed under Massachusetts law." ADD34. The court emphasized "Massachusetts has a 'substantial relationship to the parties or the transaction' because DraftKings is headquartered in Massachusetts" and Massachusetts "has adopted a considered legislative policy" on non-competition agreements. ADD25–27. The court also noted the "evidence . . . that a nationwide restriction on Hermalyn would be . . . appropriately tailored to protect DraftKings's confidential information and trade secrets" as "DraftKings's daily fantasy sports products are available to customers in over 40 states and its retail sports betting is offered in 24 states." ADD31.

The court also observed that "Hermalyn does not dispute that . . . he breached [his noncompetition agreement] by starting to work for Fanatics on the same day that he resigned from DraftKings." ADD32. Any harm flowing from that breach "is a predictable consequence" of his own actions. ADD49 (quoting *Nuance Commc'ns Inc. v. Kovalenko*, 2022 WL 2347112, at *10 (D. Mass. June 29, 2022)) (cleaned up). In denying the motion to dismiss, the court held "California has no greater interest than Massachusetts in enforcing its laws on restrictive covenants." ADD55.

The court further explained the evidence suggested "Hermalyn has struggled with candor to the Court" and found his account of key events "not credible." ADD33–36.  On the other hand, DraftKings' witnesses, including Metz and Larracey, were "credible."  ADD36.  Based on these credibility findings, the court concluded that "Hermalyn likely breached his agreement not to . . . solicit DraftKings's employees."  ADD37.  The court also found that Hermalyn likely breached his nondisclosure agreement by accessing and transferring DraftKings' confidential information without authorization and likely misappropriated DraftKings trade secrets.  ADD38–47.

The court's order enjoined Hermalyn "for a period of twelve months starting on February 1, 2024, from directly or indirectly . . . soliciting . . . an employee . . . of [DraftKings] . . . for the purpose of inducing or encouraging the employee . . . to leave his or her relationship with [DraftKings.]"  ADD61–62.  The order also enjoined Hermalyn:

> for a period of twelve months starting on February 1, 2024, anywhere within the United States of America, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of [DraftKings]) . . . from: (1) providing services to a Competing Business (as defined in the Noncompetition Covenant, and to include Fanatics, Inc. and Fanatics, Inc.'s subsidiaries, affiliates, and joint ventures) that relate to any aspect of the Business of [DraftKings] . . . for which Hermalyn performed services or received Confidential Information at any time during the six-month period prior to February 1, 2024; or (2) committing a Threatened Breach.

ADD62.

Although the court granted DraftKings' motion for a preliminary injunction, it narrowed the relief sought, circumscribing the scope of relief to the United States, rather than globally, and starting the twelve-month term of the injunction on February 1, 2024, the day Hermalyn departed DraftKings, rather than the date the order issued.

### F.     Meanwhile, Hermalyn Seeks To Void His Contractual Obligations In California.

In a further attempt to avoid his voluntarily assumed contractual obligations, Hermalyn and his putative employer, FVP, LLC, sued DraftKings on February 1, 2024, in California state court.  Hermalyn's state complaint describes FVP as "California-based."  A192 (¶ 1), A195 (¶ 13).  But FVP exists only on paper:  It was formed *one day* before suing DraftKings, had just one employee (Hermalyn), and although it originally asserted a California principal address, it now has no California offices and is based out of New York.  A195 (¶ 13); Dist. Ct. Dkt. No. 98-2 at 7; Dist. Ct. Dkt. No. 153-10 at 19–22.  DraftKings twice removed that case to federal court—first alleging diversity jurisdiction and then alleging fraudulent joinder and sham plaintiff.  A218–25.  Although the federal court remanded each time, it declined to conclude the removals were objectively unreasonable.  *Id.*

The California courts have repeatedly rejected Hermalyn's efforts to collaterally attack this litigation.  At an *ex parte* hearing on February 22, Hermalyn sought an order enjoining DraftKings from attempting to enforce the restrictive

covenants Hermalyn had signed just a few months earlier. *See* A227–64. But the court recognized Hermalyn was "asking for [the California judge] to advise a federal judge in Massachusetts" and ultimately denied Hermalyn's motion. A235, A261.

After the district court issued its preliminary injunction here, Hermalyn tried yet again to secure an order from a California court enjoining DraftKings from enforcing its valid covenants against him.[2] The California court, however, again rebuffed his efforts. The California court has now put off that decision, so that DraftKings' personal jurisdiction objections can be resolved.

## SUMMARY OF ARGUMENT

The district court correctly concluded that Massachusetts law governs Hermalyn's noncompetition agreements with DraftKings. Hermalyn's noncompetition agreements contain valid and enforceable choice-of-law provisions selecting Massachusetts law. There is no basis to invalidate those provisions.

To the contrary, even in the absence of a contractual choice-of-law clause, Massachusetts law would still apply. In a case that is squarely on point, this Court

---

[2] In discussing the California action, Hermalyn refers to documents submitted to this Court contemporaneously with his brief. *See* Op. Br. 12–13. Those documents are outside the record and should not be considered. *See, e.g.*, *McCulloch v. Velez*, 364 F.3d 1, 6 n.3 (1st Cir. 2004) ("Because the asserted reason rests on matters dehors the record, we do not consider it at this juncture."). DraftKings offers this additional context to rebut some of Hermalyn's mischaracterization of the California proceedings—which, in any event, are entirely irrelevant to the issues presented on this appeal.

held the state with the "most significant relationship" to a noncompetition agreement was the state where the employer was headquartered, where the contract was executed and performed, and where the employee formerly worked. *See Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.*, 968 F.2d 1463 (1st Cir. 1992). The same is true here: DraftKings is based in *Massachusetts*, the noncompetition agreements were partially executed in *Massachusetts* and designed to protect a *Massachusetts* company, Hermalyn regularly traveled to *Massachusetts* for work, and the harm of the breach will be felt in *Massachusetts*.

On the other hand, the only connection California has to this case is Hermalyn's purported move to the state, mere days before this action was filed to work for a sham company that has no employees besides Hermalyn and no longer even has its registered office in California, all for the sole purpose of trying to concoct California residency in order to attempt to evade his contractual obligations. The law of this Circuit is clear: under such circumstances, Massachusetts law prevails.

Even looking beyond this Court's binding precedent, Hermalyn does not cite a single decision from any court supporting his view that the law of a state with so little pre-breach connection to an employment relationship can trump a choice-of-law provision. That absence of authority is for good reason. As this case shows, Hermalyn's unprecedented position would allow for easy evasion of noncompetition

provisions: A new employer could be set up in a state that refuses to enforce such provisions solely to get around the parties' agreement, despite the lack of any reasonable expectation that the nonenforcing state's law would have governed.

Further, because California does not have a materially greater interest in this dispute than Massachusetts, California law cannot displace the parties' binding choice-of-law agreement. Massachusetts has its own statute governing the enforceability of noncompetition agreements, and the issues raised by this lawsuit affect Massachusetts far more than California. California's noncompetition policy does not warrant overriding Massachusetts's own legislatively declared policy.

Hermalyn's back-up argument may be dispensed with even more ease because he forfeited it by failing to adequately raise it below. In any event, on the merits, the district court acted well within its discretion when it included California within the scope of its preliminary injunction.

The district court's preliminary injunction order should be affirmed.

### STANDARD OF REVIEW

This Court's "review of a district court's decision to grant a preliminary injunction is for abuse of discretion." *Pineda v. Skinner Servs., Inc.*, 22 F.4th 47, 52 (1st Cir. 2021). "Within that framework . . . findings of fact are reviewed for clear error and issues of law are reviewed de novo." *Id.*

## ARGUMENT

The district court's preliminary injunction prohibits Hermalyn from competing against DraftKings within the United States for one year; from soliciting DraftKings' employees, advisors, consultants, and contractors for one year; and from using or disclosing DraftKings' confidential information and trade secrets at any time. In entering that order, the court concluded DraftKings was likely to succeed on the merits of its trade secret, noncompetition, nonsolicitation, and nondisclosure claims. It found, absent preliminary injunctive relief, DraftKings would suffer irreparable harm from a former employee who had likely misappropriated DraftKings' trade secrets and confidential information and breached his voluntary agreements not to compete, solicit, or disclose. And, with respect to DraftKings' noncompetition claim, the court found the noncompetition agreements reasonable and enforceable under Massachusetts law, as applied to the United States.

Along the way, the district court resolved fact disputes by hearing live witness testimony and making credibility determinations. Hermalyn is not credible; DraftKings' witnesses are.

Hermalyn's appeal does not touch the vast majority of the district court's order. He does not argue the district court clearly erred in its factual findings or credibility determinations. He does not argue the court erred as a matter of law with

respect to any issue other than choice of law—and then only with respect to the noncompetition agreements. And he does not argue that the district court abused its discretion in granting the preliminary injunction in any way apart from its decision not to carve out California.

Rather, Hermalyn's appeal presents two challenges to the district court's preliminary injunction order enforcing his noncompetition agreements[3]: *First*, whether the district court erred in respecting his voluntary and freely bargained-for choice to apply Massachusetts law to the noncompetition agreements he repeatedly signed in return for millions of dollars in compensation. *Second*, whether the court should have carved California out of the injunction based on federalism and comity concerns.

Both arguments are meritless. Controlling authority from this Court forecloses Hermalyn's argument for California law. And Hermalyn never presented his federalism and comity arguments to the district court. This Court should affirm.

## I.     MASSACHUSETTS LAW GOVERNS THIS DISPUTE.

Hermalyn's argument for applying California law founders on the choice-of-law provisions he signed—as the district court repeatedly held. Hermalyn has not

---

[3] Hermalyn challenges the district court's order with respect to the noncompetition agreements *only*. His choice-of-law, federalism, and comity arguments do not address his nonsolicitation or nondisclosure agreements. *See* Opening Br. 15 n.7, 37 n.12.

come close to carrying his burden to show that those provisions in noncompetition agreements that selected Massachusetts substantive law—made by a Massachusetts company and an employee who regularly travelled to Massachusetts to work—should be set aside.

"[F]ederal courts sitting in diversity apply the substantive law of the forum state, . . . including its conflict of laws rules." *Smith v. Prudential Ins. Co. of Am.*, 88 F.4th 40, 49 (1st Cir. 2023). This Court "appl[ies] Massachusetts choice-of-law rules to determine the applicable law." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Flanders-Borden*, 11 F.4th 12, 20 (1st Cir. 2021).

Massachusetts's "usual choice-of-law rule . . . is that the choice-of-law provision in an employment contract *should be enforced*." *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (emphasis added). "As a rule, 'where the parties have expressed a specific intent as to the governing law, Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public policy." *Hodas v. Morin*, 442 Mass. 544, 549–50, 814 N.E.2d 320, 324–25 (2004) (quoting *Steranko v. Inforex, Inc.*, 5 Mass. App. Ct. 253, 260, 362 N.E.2d 222, 228 (1977)). Following the Restatement (Second) of Conflict of Laws (the "Second Restatement"), Massachusetts courts "presume[ ] that the law the parties have chosen applies." *Hodas*, 442 Mass. at 550, 814 N.E.2d at 325.

Hermalyn agreed that the "internal substantive laws of Massachusetts" govern his noncompetition agreements. *See* A99. He has never argued that these clauses were vague or ambiguous—nor could he because they are undeniably clear. Instead, Hermalyn contends that, despite the presumption that Massachusetts law applies because that is the substantive law chosen by the parties, California law should govern.

This presumption yields only in two narrow circumstances. Hermalyn does not even attempt to invoke the first exception—where a choice-of-law provision "has no substantial relationship to the parties or the transaction and there is no reasonable basis for the parties' choice." *NuVasive*, 954 F.3d at 443; *see* Op. Br. 18 n.9 ("That prong of the doctrine is not at issue in this case"). Nor could he: "[T]his exception plainly does not apply here," where DraftKings has its principal place of business in the state of the chosen law. *NuVasive*, 954 F.3d at 443; *see also* Second Restatement § 187(2) (choice-of-law provision valid where "one of the parties is domiciled or has his principal place of business" in the chosen state).[4]

---

[4] Hermalyn's reliance on *Dahua Tech. USA Inc. v. Feng Zhang*, 988 F.3d 531 (1st Cir. 2021), *see* Op. Br. 19, is thus misplaced. There, the Court declined to enforce a Virgina choice-of-law provision because the record evidence revealed "no substantial relationship to Virginia and no other reasonable basis for the agreement's reference to Virginia law." *Dahua Tech.*, 988 F.3d at 538.

Rather, Hermalyn focuses only on the second exception, which requires him to demonstrate that (a) "application of [Massachusetts law] would be contrary to a fundamental policy of" California, (b) California "has a materially greater interest than [Massachusetts] in the determination of the particular issue," *and* (c) California is the state whose "law would apply in the absence of an effective choice of law by the parties." *NuVasive*, 954 F.3d at 444 (cleaned up) (quoting *Oxford Global Res., LLC v. Hernandez*, 480 Mass. 462, 468, 106 N.E.3d 556, 564 (2018)).

## A. Massachusetts Law Governs Even In The Absence Of A Choice-Of-Law Clause.

Binding First Circuit precedent is fatal to the application of California law under the circumstances presented here. *See Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.*, 968 F.2d 1463 (1st Cir. 1992). Under Massachusetts law, when the parties have *not* agreed to a choice-of-law provision, the law of the state with the "most significant relationship to the transaction and the parties" applies. *Comerica Bank & Tr., N.A. v. Brown & Rosen, LLC*, 101 Mass. App. Ct. 574, 578, 195 N.E.3d 432, 437 (2022). That inquiry is guided by the factors in the Second Restatement. *Id.*; *see also Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 632, 473 N.E.2d 662, 669 (1985).

### a.    Binding First Circuit Precedent Forecloses Hermalyn's Argument.

This Court has already decided how the Second Restatement factors apply in a case indistinguishable from this one—*Ferrofluidics*—which held that California law *does not apply* to a noncompetition agreement.  There, a Massachusetts corporation with its principal place of business in New Hampshire agreed with an employee to nondisclosure and noncompetition agreements containing Massachusetts choice-of-law provisions. *Ferrofluidics*, 968 F.2d at 1465.  There, as here, the employee began meeting with his employer's competitor while still employed with the Massachusetts company.  *Id.*  There, as here, the employee formed a new venture in California shortly before he departed from his Massachusetts employer.  *Id.* at 1466.  He did so there, as here, based on "advice from lawyers" that he would benefit from California law, since California, "in general, does not recognize non-compete agreements."  *Id.* (former employee's "machinations also reflect his awareness of the covenant not to compete and his concern that it might interfere with his ambition").  And he argued there, as here, that the district court should have applied California law because "California courts almost invariably refuse to enforce restrictive covenants." *Id.* at 1468.

This Court rejected his argument.  The Second Restatement's "'most significant relationship' test," the Court explained, "is 'intended to give effect to the intention of the parties and their reasonably justified expectations.'" *Ferrofluidics*,

968 F.2d at 1468 (citing *Consol. Mut. Ins. Co. v. Radio Foods Corp.*, 108 N.H. 494, 496–97, 240 A.2d 47, 49 (1968)).  Thus, a court applying that test "must examine the jurisdiction/contract relationship *at the time the contract was executed*."  *Id.* (emphasis added).  And at the time the parties executed their noncompetition agreement, they "could have had no reasonably justifiable expectation . . . that their agreement would be governed by California law, as California bore no relationship to the contract at that time, and continued to have none until [the employee] breached the restrictive covenant there."  *Id.*  Their only "reasonably justified expectation" when they entered the contract would have been that it would be governed by the law of New Hampshire (where the employer was headquartered) or Massachusetts (which the parties had selected).  That is because the relevant inquiry is *not* which state has the "most significant relationship" *at the time of a breach*, but which state had the most significant relationship when the contract was formed.  *Id.*

"Viewed in the best light," the employer made the *exact same argument* Hermalyn makes here, that since he "*presently* lives and works there, California has an interest in how his rights are interpreted and enforced."  *Id.*  But "such an interest *hardly suggests* that California had a more significant relationship than New Hampshire with an employment contract performed in New Hampshire by a New Hampshire employer and a New Hampshire employee throughout the employment period."  *Id.* (emphasis added).

Hermalyn has no argument that could possibly evade *Ferrofluidics*, a directly on point precedent.  True, that case arose in New Hampshire and thus applied New Hampshire choice-of-law principles.  But both New Hampshire and Massachusetts employ the "most significant relationship" test and look to the Second Restatement for guidance.  Its reasoning applies with full force to Massachusetts law.  *See EMC Corp. v. Donatelli*, 25 Mass. L. Rptr. 399, 2009 WL 1663651, at *5 & n.4 (Mass. Super. Ct. May 5, 2009) ("examin[ing] the reasonable expectations of the parties at the time the noncompetition covenant was executed," citing *Ferrofluidics*, and rejecting the application of California law under Massachusetts choice-of-law-principles).

Examining the relationships of Massachusetts and California to the noncompetition agreements here *as of the time they were executed*—most recently, in August 2023—leads to only one result.  California had nothing to do with the noncompetition agreements at all—neither DraftKings nor Hermalyn could have had any reasonable expectation that California law would apply.  In August 2023, Hermalyn resided in New Jersey and worked in both New York and Massachusetts.  Massachusetts is both DraftKings' headquarters and the state specified in the choice-of-law provision.  Hermalyn's purported decision to move to California a mere three days before breaching his noncompetition agreement—and for the purpose of

- 32 -

attempting to evade his Massachusetts contractual obligations—plays no role in the analysis under *Ferrofluidics*.

Nor should it. The Restatement's approach to choice-of-law provisions seeks "to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract." Second Restatement § 187 cmt. e. "Neither an employer nor an employee examining an employment agreement could justifiably expect it to be governed by the law of a state that has no relation whatsoever other than the employee will someday happen to be in it when he breaches the contract." *Oxford Glob. Res., Inc. v. Guerriero*, 2003 WL 23112398, at *6 (D. Mass. Dec. 30, 2003) (citing *Ferrofluidics*, 968 F.2d at 1467–68). Thus, considering the "most significant relationship" at the time of contract formation, not breach, is the only way to secure "certainty and predictability." Second Restatement § 187 cmt. e; *see also Bushkin*, 393 Mass. at 633 n.6, 473 N.E.2d at 669 n.6 ("Reliance on posttransaction events . . . as an element in a choice-of-law decision injects an ambulatory quality into the issue that discourages certainty.").

"[A]s compared to any other State, Massachusetts has by far the most significant relationship" to the dispute, because DraftKings is "headquartered in Massachusetts, . . . its physical facilities [a]re located in the Commonwealth[,] . . . [Hermalyn] came to Massachusetts on business multiple times each year, often

working from [DraftKings'] office, … [Hermalyn] communicated with [DraftKings' executives] in Massachusetts via e-mail almost daily and spoke with [them] numerous times each week by telephone; and [Hermalyn's] employment agreement provided that it shall be governed by and interpreted under the law of the Commonwealth of Massachusetts." *Dow v. Casale*, 83 Mass. App. Ct. 751, 757–58, 989 N.E.2d 909, 914–15 (2013). Massachusetts undeniably has the most significant relationship to the noncompetition agreements and the parties. That can and should be the end of the inquiry.

### b. The Second Restatement Factors All Point To Massachusetts Law.

Even if this Court performed an independent analysis of the Second Restatement factors without the precedential force of *Ferrofluidics*, the outcome would be the same. In applying the Second Restatement's "most significant relationship test," the "contacts to be taken into account" include "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." Second Restatement § 188(2).

Every one of those factors favors—or would be consistent with—Massachusetts law. More importantly, not a single factor favors California law:

<u>Place of Contracting.</u>  "[T]he place of contracting is the place where occurred the last act necessary . . . to give the contract binding effect."  Second Restatement, § 188 cmt. e.  The noncompetition agreements were signed in Massachusetts and New Jersey, where Hermalyn resided when he joined DraftKings, not California—as Hermalyn does not dispute.  *See* Op. Br. 32.

<u>Place of Negotiation.</u>  Like the place of contracting, the noncompetition agreements were negotiated in Massachusetts and New Jersey, not California—as Hermalyn concedes.  *See* Op. Br. 32.

<u>Place of Performance.</u>  Where "performance by a party is divided more or less equally among two or more states," "the place of performance can bear little weight in the choice of the applicable law."  Second Restatement, § 188 cmt. e.  Hermalyn's noncompetition obligations were not constrained to a single state, so this factor is of minimal significance.  Regardless, he regularly performed his employment obligations in Massachusetts and travelled to Massachusetts for work, and his key subordinates were based in Massachusetts.  *See* ADD26.

<u>Location of the subject matter.</u>  This factor looks to "place of employment" when the contract "affords protection against a localized risk, such as the dishonesty of an employee."  Second Restatement, § 188 cmt. e.  Hermalyn's "place of employment" was Massachusetts, where he traveled regularly, and New York, the office in which he primarily worked, not California.  And his noncompetition

agreements protected against threats to DraftKings' legitimate business interests in Massachusetts.

Domicil, residence, nationality, place of incorporation and place of business of the parties. DraftKings is incorporated in Nevada and has its principal place of business in Massachusetts. When the noncompetition agreements were signed, Hermalyn resided in New Jersey, not California.

In sum, California has *no* contacts that may be "taken into account" when performing the "most significant relationship" analysis. None. All the relevant contacts pertain to Massachusetts, New Jersey, New York, and Nevada. Critically, the nature of these contacts is a question of fact, not law—and the district court resolved that question in favor of Massachusetts law applying. *See* ADD26. Hermalyn cannot—and does not even attempt to—argue that the district court clearly erred in concluding that the locus of contacts was not California.

With these contacts in mind, the general factors set forth in the Second Restatement for guiding all choice-of-law decisions point overwhelmingly and exclusively to Massachusetts. Take the "relevant policies of the forum" and "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue." Second Restatement, § 6(b), (c). For its part, the Massachusetts legislature has adopted a detailed policy governing the enforceability of noncompetition agreements in the Massachusetts Noncompetition

- 36 -

Agreement Act, Mass. Gen. L. ch. 149, § 24L ("MNAA").  That policy strongly favors the enforcement of noncompetition agreements that satisfy its requirements.

On the other hand, the only other "interested states" with actual contacts to the transaction at issue are New York, New Jersey, and Nevada.  Hermalyn has not identified any particular policies of those states that are relevant here, let alone suggested that those states' "relative interests" outweigh the interest of Massachusetts.

Other factors, such as "the protection of justified expectations," "certainty, predictability and uniformity of result," and "ease in the determination and application of the law to be applied" all likewise favor Massachusetts.  Second Restatement § 6(d), (f), (g).  The parties' written agreement provides for the application of Massachusetts law.  Enforcing the agreement as written protects the parties' pre-existing expectations, provides for a certain and predictable result in line with the plain text of the agreement, and is straightforward and easy to determine by reference to a single document.  The Restatement factors unequivocally favor application of Massachusetts law.

### c.     Hermalyn's Counter-Arguments Fail.

Hermalyn ignores binding First Circuit precedent and resists this straightforward application of the Second Restatement factors.  But his entire argument starts from a flawed premise.  He asserts that the "considerations

particularly relevant to this case focus on the asserted breach of the non-compete covenant in California." Op. Br. 30 (cleaned up). Not so. As explained above, the relevant inquiry looks at the time of contracting, not to the time of Hermalyn's breach. *Ferrofluidics*, 968 F.2d at 1468.

The cases on which Hermalyn relies only highlight his error. *Bushkin*, for example, concluded that courts should generally "choos[e] that law which would carry out and validate the transaction in accordance with intention, in preference to a law that would tend to defeat it." 393 Mass. at 636, 473 N.E.2d at 671 (internal quotation marks omitted). *Bushkin* thus looked at the *formation* of a contract (rather than its breach, as Hermalyn does), and favored *enforceability* of contracts (not invalidation, like Hermalyn). And, in the end, *Bushkin* concluded that Massachusetts law governs. *See id.*

Hermalyn also cites *Roll Systems, Inc. v. Shupe*, 1998 WL 1785455 (D. Mass. Jan. 22, 1998). But there, the defendant-employee "lived in California, and performed most of his employment duties there" when he entered into a noncompetition agreement with a Massachusetts choice-of-law provision. *Id.* at *1. Those facts were critical to the choice-of-law analysis in *Roll*. *See id.* at *3. And in *Oxford Global Resources, LLC v. Hernandez*, 480 Mass. 462, 471, 106 N.E.3d 556, 566 (2018), the employee "executed, performed, and allegedly committed a breach of the agreement in California." *Cf. EMC Corp.*, 2009 WL 1663651, at *5 ("A

Massachusetts employer who obtains a non-competition covenant from an employee who at the time lives and works in California is on notice that, should that employee later resign and seek employment with a competitor, the California court will likely strike the covenant.").  Hermalyn, by contrast, lived in New Jersey until he decamped to the Fanatics CEO's Los Angeles mansion for the final few days of his employment with DraftKings—and performed *none* of his work in California.  Hermalyn "avoided attending DraftKings's meetings and responding to work emails" during his brief period of purported residency in California, further underscoring that *Roll* and *Hernandez* simply have no bearing here.  ADD7.

Likewise, in *Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 533–34 (5th Cir. 2020), the Fifth Circuit concluded that Texas law applied because the defendant-employee was hired to work at one of the employer's subsidiaries "that served the Houston area," and the employee was "a Texas resident" who agreed to the noncompetition agreement in Texas.  Texas had a "more significant relationship than Delaware"—the employer's "place of incorporation."  *Id.* at 533.  Apart from Hermalyn's state of residence (New Jersey), those same factors overwhelmingly favor Massachusetts—and certainly elevate Massachusetts over California.  DraftKings is headquartered in Massachusetts, the noncompetition agreements were agreed to partially in Massachusetts, and, at the time the agreement was signed, Hermalyn was regularly traveling to Massachusetts for work.

Hermalyn's flawed analysis of the most significant relationship test flows from his flawed understanding of the relevant transaction that guides the analysis. As *Ferrofluidics*, *Bushkin*, and the Second Restatement all make clear, the key inquiry is which state had the most significant relationship at the time of contracting—the relevant "transaction" is *the contract*, not its breach. Hermalyn ignores *Ferrofluidics* and misconstrues *Bushkin* and the Second Restatement factors to reach his erroneous conclusion that California law applies. His "domicil" and "residence" were not California when he signed his noncompetition agreements; the "place of performance" and "location of the subject matter of the contract" are not California either. *Compare supra* 35–36 *with* Op. Br. 31–32. Rather, as demonstrated above, the locus of all these contacts is Massachusetts. And when Hermalyn breached his noncompetition agreements, that injury was unfairly felt in Massachusetts because he competed against DraftKings and unlawfully solicited DraftKings' employees who were based in Massachusetts.

In short, all the relevant jurisdictions are on the opposite side of the country from Hermalyn's purported California residence. California law would not apply even in the absence of a forum selection clause.

## B. California Does Not Have A Materially Greater Interest In This Dispute.

Because Massachusetts law applies even in the absence of a valid choice-of-law provision, this Court need not consider the other elements of the public policy

- 40 -

exception.  But those elements favor affirmance as well, because enforcing Hermalyn's noncompetition agreements would not violate a fundamental policy of any state with "a materially greater interest" than Massachusetts "in the determination" of that issue.  *NuVasive*, 954 F.3d at 444 (quoting *Hernandez*, 106 N.E.3d at 564).

Courts weighing which state has the materially greater interest are guided by "the issue raised by this lawsuit."  *Liberty Mut. Ins. Co. v. Correia*, 100 Mass. App. Ct. 629, 632, 182 N.E.3d 962, 966 (2022).  In *Liberty Mutual*, the court considered which state had a materially greater interest in a dispute over the scope of an automobile insurance policy.  Even though the accident occurred in Rhode Island and the defendant was a Rhode Island resident, the court concluded that Massachusetts had a "materially greater interest" because the underlying issue in the suit was the construction of an insurance policy issued by a Massachusetts insurance company to a Massachusetts resident for a vehicle "garaged" in Massachusetts.  100 Mass. App. Ct. at 632–33, 182 N.E.3d at 966.

Courts have reached the exact same conclusion in circumstances virtually identical to this case.  For example, in *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 126 (D. Mass. 2011), the court concluded that California's interest in enforcement of a noncompetition agreement was "either weaker than or, at best, equal to Massachusetts' interest" because "[t]he non-compete clause was negotiated

between a company with its principal place of business in Massachusetts and its employee, who worked at least in part in Massachusetts" and "any harm caused by a violation of the non-compete clause will be felt in Massachusetts." Under those circumstances, California's interest in allowing "its residents to seek employment" and "its employers to hire an employee" did "not materially outweigh Massachusetts' interest in ensuring that Massachusetts contracts are enforced." *Id.* at 127.[5]

Those cases apply with full force here. As the district court correctly observed, "[t]he likely breach of his contracts with DraftKings occurred in part in California and in part in Massachusetts"—not solely in California, as Hermalyn asserts. ADD26. Further, the noncompetition agreements were designed to protect DraftKings, a Massachusetts company; they governed Hermalyn's conduct vis-à-vis

---

[5] *See also Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 230 (D. Mass. 2011) (in case addressing nonsolicitation and nondisclosure agreements, "there is no reason to believe that California's interest in the jurisdictional clause would outweigh Massachusetts' significant interest in exercising jurisdiction here where both [parties] have consented to jurisdiction in the Commonwealth and the latter has allegedly breached a contract and violated both statutory and tort law at the expense of a Massachusetts corporation"); *Shipley Co. v. Kozlowski*, 926 F. Supp. 28, 30 (D. Mass. 1996) ("Massachusetts has a materially greater interest in the matter [than California] since the contract was executed in Massachusetts, the defendant worked in Massachusetts for two years and continues to have contact with the state through his employment, the plaintiff's principal place of business is in Marlborough, Massachusetts, one of the plaintiff's three manufacturing facilities is located in Massachusetts, and more than half of the plaintiff's employees work in Massachusetts.").

DraftKings; and, up until just a few days before his departure, Hermalyn regularly traveled to, worked in, and communicated with employees in Massachusetts, including his direct supervisor and primary reports. When Hermalyn breached his agreements, the harm was felt in Massachusetts—he was competing against a Massachusetts company and soliciting Massachusetts-based employees. All these facts—facts that the district court found and that Hermalyn does not challenge on appeal—demonstrate the substantiality of Massachusetts's interest.

Taking a broader view of "the issue raised by this lawsuit" yields the same result. *Liberty Mut.*, 100 Mass. App. Ct. at 632, 182 N.E.3d at 966. If the "issue" is viewed as the enforceability of noncompetition agreements more generally, California's interest is still not "materially greater" than Massachusetts's. As the district court observed, both California and Massachusetts have "considered legislative polic[ies]" on the enforcement of noncompetition agreements. ADD27. Whereas California generally bars enforcement of noncompetition agreements—and has recently adopted statutes purporting to invalidate even agreements signed outside of California, *see* Cal. Bus. & Prof. Code §§ 16600, 16600.1, 16600.5; *see also* Op. Br. 2, 5—Massachusetts has adopted a balanced approach in the MNAA that allows enforcement against salaried workers provided that the agreement adheres to enumerated limits and involves additional consideration for the employee, *see* Mass. Gen. L. ch. 149, § 24L; *see also* ADD27. The MNAA was the product of

years of legislative debate and compromise and is the Massachusetts Legislature's first comprehensive statutory framework regulating a subject previously governed by state common law. *See* Jerry Cohen et al., *Employee Noncompetition Laws and Practices: A Massachusetts Paradigm Shift Goes National*, 103 Mass. L. Rev. 31, 31–33 (2022); *id.* at 52–54 (summarizing legislative debates).

And, just as California's law purports to trump other states' laws, *see* Op. Br. 5–6, Massachusetts has also expressed a legislative preference for applying its own law. Under the MNAA, a choice-of-law provision "that would have the effect of avoiding the requirements of this section" may not be enforced if the employee resided or was employed in Massachusetts for at least 30 days before termination. Mass. Gen. L. ch. 149, § 24L(e).

There is simply no basis to conclude that California's law represents a "materially greater interest" than Massachusetts's in governing noncompetition agreements. Both states have demonstrated a significant interest in regulating the relationship between employers and employees after the employment relationship ends, and both have enacted statutes to embody their respective policies. And the mere fact that California's legislature has taken a categorical approach hardly renders California's interest "materially greater" than Massachusetts's interest. *See Down-Lite Int'l, Inc. v. Altbaier*, 821 F. App'x 553, 556 (6th Cir. 2020) ("California has a meaningful interest in protecting its resident from Down-Lite's desire to

restrict competitive conduct. But that interest is not materially greater than Ohio's interest in protecting one of its closely held businesses operating in the global economy."). This Court should "not allow California's public policy"—however strongly held—"to trump the parties' clear and unambiguous agreement to apply [Massachusetts] law" and the public policy of Massachusetts. *Id.*

Notwithstanding the enactment of the MNAA, Hermalyn asserts that Massachusetts "has no comparable legislative policy" to California's statute. Op. Br. 26; *accord id.* at 35 (same). This assertion relies on outdated (and now inaccurate) case law. Hermalyn cites *Hernandez*, 480 Mass. at 470, 106 N.E.3d at 565, but the Massachusetts Legislature enacted the MNAA weeks before *Hernandez* issued in September 2018, and the law applied only to contracts "entered into on or after October 1, 2018." 2018 Mass. Legis. Serv. ch. 228, § 71. The dispute in *Hernandez* involved a 2013 contract and 2016 voluntary termination of employment. *See* 480 Mass. at 463–65, 106 N.E.3d at 560–62. *Hernandez* was not referring to the state of the law in Massachusetts after the statute went into effect in 2018, and the MNAA was not before the court.

The district court correctly concluded that "Massachusetts likewise has adopted a considered legislative policy" respecting noncompetition agreements and that, under such circumstances, it is not for the court to "say that either state's legislative policy is more fundamental or compelling." ADD27.

The rest of Hermalyn's analysis rests on an equally shaky foundation. He says, "the inquiry into whether a state has 'a materially greater interest' in a dispute than a contractually selected state examines both the depth of the states' respective policy interests and the extent of their geographic connection to the dispute." Op. Br. 25. But he does not cite any authority for that proposition. "[T]he depth of the states' respective policy interests" seemingly just replaces the "materially greater interest" test with a vaguer phrase. And "geographic connection" appears to derive from *Cardoni v. Prosperity Bank*, 805 F.3d 573, 584 (5th Cir. 2015), where the court observed that—under Texas choice-of-law principles—the state where "both the employee and employer" resided had a strong "interest in the issue affecting actors located within its borders." That says nothing about the extent to which geographic connection impacts the analysis under the distinct circumstances presented by this case.

Regardless, as explained above, the facts here amply demonstrate that Massachusetts has the greater geographic connection to this dispute, not California. *See supra* 34–36. The district court determined, as a factual matter, that California "has only a minimal connection to this lawsuit." ADD26. After all, Hermalyn "traveled to Massachusetts for work at least 25 times between May 2021 and November 2023, or approximately once every six weeks." *Id.* Hermalyn "move[d]" to California at most a few days before formally accepting employment at Fanatics.

- 46 -

ADD7.  None of Hermalyn's work for DraftKings occurred in California because Hermalyn "misrepresented his location" to DraftKings from January 28 to February 1 and consciously avoided performing his job duties in anticipation of the breach on February 1.  *Id.*  And the harm of Hermalyn's breach "will be felt by DraftKings in Massachusetts," including because he immediately solicited DraftKings' Massachusetts employees to leave DraftKings for employment at Fanatics.  ADD26.

Against this backdrop, it is Massachusetts that has the greater geographic connection—and materially greater interest in the dispute.  "[C]ourts generally find it unfair to apply the law of the non-enforcing state and thereby allow the employee to escape the obligations of the contract by, in essence, fleeing the jurisdiction." *Guerriero*, 2003 WL 23112398, at *6.

Hermalyn has not identified a single case where a court allowed an employee to get away with this.  To the contrary, California had "a materially greater interest than Massachusetts" in *Hernandez* "*because* Hernandez executed, performed, and allegedly committed a breach of the agreement in California."  480 Mass. at 471, 106 N.E.3d at 566 (emphasis added).  Likewise, in *DCS Sanitation Mgmt., Inc. v. Castillo*, 435 F.3d 892, 894–96 (8th Cir. 2006), the Eighth Circuit concluded Nebraska had a materially greater interest than Ohio because the employees all worked in Nebraska both before and after they violated their noncompetition agreements.  In *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 34 (1st Cir. 2020),

Massachusetts had a materially greater interest than Washington because the worker "indisputably performed all of his work pursuant to the contract" in *Massachusetts*. And in *Cardoni*, Oklahoma had a materially greater interest than Texas in a dispute over the noncompetition agreements of Oklahoma-based employees who had worked for an Oklahoma-based bank. 805 F.3d at 576–78, 584.[6]

The district court's denial of Hermalyn's attempt to invalidate his noncompetition agreements by fleeing to California with DraftKings' trade secrets should be affirmed. Concluding that California has a "materially greater interest" merely because Hermalyn purportedly moved there a few days before DraftKings brought this suit—and for the express purpose of breaching his noncompetition agreement—would create a roadmap for competitors and employees nationwide to evade contractual obligations, making California's law the *de facto* law of the nation. That result would upset expectations regarding the enforceability of employment contracts, undermine the structure of our federalist system by allowing one state to dictate nationwide policy, and unfairly benefit California employers (or, at the very

---

[6] In *Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal. App. 4th 881, 886, 72 Cal. Rptr. 2d 73, 75 (1998), the new employer was an established "California corporation, with its headquarters in San Francisco, California"—not a sham entity formed (like FVP) the day before the employee breached his noncompetition agreement. Moreover, unlike here, there was "no showing that [the employee] was attempting to exploit [the former employer's] trade secrets or other protected information about its customers." *Application Grp.*, 61 Cal. App. 4th at 902, 72 Cal. Rptr. at 86.

least, employers who can afford to relocate their employees to California) over everyone else. This Court should not countenance that result.[7]

## II.     CALIFORNIA SHOULD NOT BE CARVED OUT FROM THE PRELIMINARY INJUNCTION.

As a fallback, Hermalyn says "the district court erred by declining to narrow the geographic scope of the resulting provisions of the preliminary injunction"—that is, enforcement of his noncompetition agreements—"to exclude California." Op. Br. 38. That argument is both forfeited and meritless. "[T]he district court is in the best position to tailor the scope of injunctive relief to . . . its factual findings." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 487 (1st Cir. 2009).

The district court here considered live testimony, made credibility determinations, reviewed hundreds of pages of record evidence, and carefully tailored the scope of the preliminary injunction. Rather than enforcing the noncompetition agreements globally, the court found "that a nationwide restriction

---

[7] Hermalyn asserts in a footnote that enforcement of his noncompetition agreements will be precluded as of the effective date of a recently adopted Federal Trade Commission rule. *See* Op. Br. 16 n.8. That is incorrect. The rule "do[es] not apply where a cause of action related to a non-compete clause accrued prior to the effective date." 16 C.F.R. § 910.3(b). The rule's effective date is set for September 4, 2024, 16 C.F.R. § 910.6, and Hermalyn breached his noncompetition agreements with DraftKings on or before February 1, 2024. Moreover, Hermalyn was a "senior executive" under the rule because of his "policy-making position" and compensation at DraftKings, see *id.* § 910.1, meaning the rule's requirements would apply only to agreements "entered into after the effective date," *id.* § 910.2(a)(2). Accordingly, even if the rule survives pending legal challenges, it would have no bearing on this case.

on Hermalyn would be more appropriately tailored to protect DraftKings's confidential information and trade secrets." ADD31. "Hermalyn's extensive access to confidential documents and information concerning DraftKings business partners, VIPs, customers, and employees could," the court explained, "unfairly benefit a company seeking to compete with DraftKings on these products"—which DraftKings offers nationwide. *Id.* And because "Hermalyn likely misappropriated DraftKings's confidential information and breached his noncompetition agreement through his employment at Fanatics," the court found DraftKings "would suffer irreparable harm absent injunctive relief." ADD48.

Hermalyn has not come close to showing that the district court abused its discretion in declining to carve California out of the injunction's scope.

### A.    Hermalyn Forfeited The Argument That California Should Be Excluded from the Scope of the Preliminary Injunction.

The district court cannot have abused its discretion in declining to exclude California alone from the scope of the injunction, because the court was never even presented with such an argument. Hermalyn's brief opposing DraftKings' preliminary injunction motion said nothing about a California carveout. *See* Dist. Ct. Dkt. No. 101 at 40 ("At most, Hermalyn should only be restricted from competing with [DraftKings] by using or disclosing [DraftKings'] confidential information."). Rather, Hermalyn raised that possibility only in a single sentence on the fourth page of the third exhibit to his opposition to DraftKings' motion for

preliminary injunction.  *See* A363.  And even then, he did not offer any supporting analysis or case law—or even mention the "comity" and "federalism" concerns that he raises now.  *See id.*

That conclusory assertion, buried in an appendix, is manifestly insufficient to preserve the argument for appeal.  It is well-established that arguments raised in footnotes are forfeited.  *See Noonan v. Winston Co.*, 135 F.3d 85, 91 n.5 (1st Cir. 1998) ("Nor is the footnote sufficient to have preserved an argument . . . .").  So are arguments "adverted to in a perfunctory manner, unaccompanied by some efforts at developed argumentation."  *Marek v. Rhode Island*, 702 F.3d 650, 655 (1st Cir. 2012) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)); *see also Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 60 n.17 (1st Cir. 1999) ("We have repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived.").  That result is triply warranted where a party merely makes a statement (not a developed argument), fails to support it with any authority (or even mention the principles he invokes on appeal), and does not include it in a brief at all.

Put plainly, the district court did not fail to address this argument—Hermalyn failed to present it.

## B.  There Is No Basis To Exempt California From The Preliminary Injunction Order.

Even if Hermalyn had not forfeited his argument that California should be carved out from the district court's order, the district court did not abuse its

discretion.   The MNAA empowers courts to use their discretion to define the appropriate geographic reach of a noncompetition agreement "in relation to the interests protected."  *See* Mass. Gen. L. ch. 149, § 24L(b)(v).  It does not, however, specify that courts must consider policies of other states or generalized principles of federalism.

Given the interests at issue here, the district court took a reasonable approach, limiting the scope of the noncompetition agreements to the United States.  In the weeks before he departed DraftKings, Hermalyn exfiltrated a significant amount of highly confidential information, including trade secrets.  If Hermalyn is allowed to work for DraftKings' direct competitor Fanatics, that "makes it likely that the information [Hermalyn] possesses will be used, yet it might be impossible to detect or prove." *Boulanger v. Dunkin' Donuts, Inc.*, 442 Mass. 635, 643 n.12, 815 N.E.2d 572, 579 n.12 (2004).  The nature of the information Hermalyn stole—such as customer lists, business strategies, organizational structure, and employee compensation—is such that geographic limitations would in no way minimize the harm DraftKings will suffer if Hermalyn discloses this information while working for Fanatics.

And even if Hermalyn will still be bound by nondisclosure obligations, "a defendant in breach of a non-competition agreement, despite his best intentions, often cannot avoid the inevitable disclosure of confidential information." *SimpliVity*

*Corp. v. Bondranko*, 204 F. Supp. 3d 340, 350 (D. Mass. 2016) (collecting cases). Further, courts have held that interstate competition and a defendant-employee's possession of trade secrets, taken together, favor enforcement of broad geographic terms. *See Ciena Corp. v. Jarrard*, 203 F.3d 312, 324 (4th Cir. 2000) (affirming nationwide injunction). The same is true for executive employees, like Hermalyn, in possession of confidential information related to the employer's business "throughout North America." *Cole v. Champion Enters., Inc.*, 305 F. App'x 122, 130 (4th Cir. 2008).

The very structure of the VIP business and digital sports entertainment and gaming create national harm, even if Hermalyn is purportedly allowed to compete only in California. After all, online sports betting is illegal in California. *See* A407–14. Hermalyn's job, however, is to build and maintain relationships with customers who are actively engaged in digital gaming. Thus, if Hermalyn is allowed to work in a competitive role at Fanatics, he will necessarily interact with clients outside California, and still violate the terms of the nationwide injunction. Any attempt to carve out California will merely give Hermalyn a clear vehicle to circumvent the district court's order, rendering it essentially a nullity, especially in light of the district court's finding "that a nationwide restriction on Hermalyn would be more appropriately tailored to protect DraftKings's confidential information and trade secrets." ADD31.

Hermalyn's sweeping invocation of "comity and federalism" to support his desire to violate his noncompetition agreements in California has no legal basis.  For instance, Hermalyn points to *Barnes Group, Inc. v. C & C Products, Inc.*, 716 F.2d 1023 (4th Cir. 1983) (per curiam).  There, the Fourth Circuit excluded Alabama from the scope of a multi-state injunction.  *Id.* at 1033–35.  But the employees in *Barnes* were differently situated from Hermalyn.  All three were Alabama residents, sold equipment for their employer exclusively in Alabama, and continued working in Alabama for their employer's competitor.  *See id.* at 1026–27.  Under those circumstances, any harm from the competitive conduct would be felt solely within Alabama.[8]  But as explained above, if Hermalyn is allowed to compete in California, the harm will be felt nationwide.  None of the cases Hermalyn cites directly addresses the situation presented here:  a former employee seeking partial relief from

---

[8] Hermalyn cites *Keener v. Convergys Corp.*, 342 F.3d 1264, 1268–69 (11th Cir. 2003), where the Eleventh Circuit affirmed a judgment holding a noncompetition agreement unenforceable in Georgia.  But he fails to mention the Georgia Supreme Court's holding, on a certified question, that Georgia courts will not apply another state's law if doing so would contravene a public policy of Georgia regardless of whether Georgia has a "materially greater interest."  *See id.* at 1266–67.  That is not the law in Massachusetts.  And the Eleventh Circuit's refusal to permit "the public policy interests of Georgia to declare [the agreement] unenforceable nationwide" was not based on federalism and comity concerns, but to protect "parties' ability to contract and their ability to enforce appropriately derived expectations."  *Id.* at 1269–70.

a nationwide injunction that, if granted, would have the practical effect of undermining the injunction entirely.

## CONCLUSION

The district court's preliminary injunction order should be affirmed.

Respectfully submitted,

/s/ *Thomas H. Dupree Jr.*

| | |
|---|---|
| Mark C. Fleming | Thomas H. Dupree Jr. |
| William F. Lee | Jacob T. Spencer |
| Andrew S. Dulberg | GIBSON, DUNN & CRUTCHER LLP |
| WILMER CUTLER PICKERING | 1050 Connecticut Avenue, N.W. |
| HALE AND DORR LLP | Washington, DC  20036 |
| 60 State Street | (202) 955-8500 |
| Boston, MA  02109 | TDupree@gibsondunn.com |
| (617) 526-6000 | |
| Mark.Fleming@wilmerhale.com | Orin S. Snyder |
| | Harris M. Mufson |
| | Justine M. Goeke |
| | Christine Demana |
| | GIBSON, DUNN & CRUTCHER LLP |
| | 200 Park Avenue |
| | New York, NY  10166-0193 |
| | (212) 351-4000 |
| | OSnyder@gibsondunn.com |

*Attorneys for Plaintiff-Appellee DraftKings Inc.*

June 21, 2024

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a).

1.     Exclusive of the exempted portions of the foregoing, as provided in Fed. R. App. P. 32(f), the brief contains 12,412 words.

2.     The foregoing has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ *Thomas H. Dupree Jr.*
Thomas H. Dupree Jr.
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
(202) 955-8500
TDupree@gibsondunn.com

June 21, 2024